1             IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF HAWAII

3
     UNITED STATES OF AMERICA,    )      CRIMINAL NO. 19-00099-DKW
4                                 )
              Plaintiff,          )      Honolulu, Hawaii
5                                 )
           vs.                    )      January 29, 2024
6                                 )
     MICHAEL J. MISKE, JR.,       )
7                                 )
              Defendant.          )
8    _____ )

9
                 TRANSCRIPT OF JURY TRIAL (DAY 13)
10            BEFORE THE HONORABLE DERRICK K. WATSON,
           CHIEF UNITED STATES DISTRICT COURT JUDGE
11

12   APPEARANCES:

13   For the Plaintiff:          MARK INCIONG, ESQ.
                                 MICHAEL DAVID NAMMAR, ESQ
14                               WILLIAM KE AUPUNI AKINA, ESQ.
                                 Office of the United States Attorney
15                               PJKK Federal Building
                                 300 Ala Moana Boulevard, Suite 6100
16                               Honolulu, Hawaii  96850

17   For the Defendant:          LYNN E. PANAGAKOS, ESQ.
                                 841 Bishop St., Ste 2201
18                               Honolulu, HI 96813

19                               MICHAEL JEROME KENNEDY, ESQ.
                                 Law Offices of Michael Jerome
20                               Kennedy, PLLC
                                 333 Flint Street
21                               Reno, NV 89501

22
     Official Court Reporter:    Gloria T. Bediamol, RPR RMR CRR FCRR
23                               United States District Court
                                 300 Ala Moana Boulevard
24                               Honolulu, Hawaii 96850

25   Proceedings recorded by machine shorthand, transcript produced
     with computer-aided transcription (CAT).

1                            I N D E X

2   GOVERNMENT WITNESSES:                                PAGE NO.

3

    PRESTON KIMOTO (CONTINUED EXAMINATION)
4
        RESUMED CROSS-EXAMINATION BY MR. KENNEDY          8
5       REDIRECT EXAMINATION BY MR. AKINA                114

6   WAYNE MILLER

7       DIRECT EXAMINATION BY MR. INCIONG               131

8   EXHIBITS:                                          PAGE NO.

9   Exhibit 5-24 was received in evidence                8
    Exhibit 5-25 was received in evidence                9
10  Exhibit 5-27 was received in evidence               11
    Exhibit 5000-268 was received in evidence           31
11  Exhibit 5000-248 was received in evidence           33
    Exhibit 5000-257 was received in evidence           38
12  Exhibits 5000-128 through 5000-145 were received    42
    in evidence
13  Exhibit 5003-008 was received in evidence           48
    Exhibit 5003-007 was received in evidence           50
14  Exhibit 5003-9 was received in evidence             54
    Exhibit 5003-010 was received in evidence           55
15  Exhibit 5003-011 was received in evidence           56
    Exhibit 5003-012 was received in evidence           56
16  Exhibit 9010-101 was received in evidence           65
    Exhibit 9010-084 was received in evidence           67
17  Exhibit 9010-085 was received in evidence           72
    Exhibit 9010-086 was received in evidence           74
18  Exhibit 9010-087 was received in evidence           76
    Exhibit 9010-088 was received in evidence           78
19  Exhibit 9010-089 was received in evidence           80
    Exhibit 9010-090 was received in evidence           83
20  Exhibit 9010-91 was received in evidence            85
    Exhibit 9010-092 was received in evidence           89
21  Exhibit 9010-95 was received in evidence            96
    Exhibit 9010-96 was received in evidence            97
22  Exhibit 9010-097 was received in evidence           98
    Exhibit 9010-104 was received in evidence          100
23  Exhibit 9010-98 was received in evidence           101
    Exhibit 9010-099 was received in evidence          101
24  Exhibit 9010-100 was received in evidence          102
    Exhibit 1-843-A was received in evidence           126
25

|         |    |                                                                      |
|---------|----|----------------------------------------------------------------------|
|         | 1  | January 29, 2024                                    8:28 a.m.         |
|         | 2  | (Open court out of the presence of the jury.)                        |
| 08:28AM | 3  | THE CLERK:  Criminal Number 19-00099-DKW-KJM, United                  |
| 08:28AM | 4  | States of America versus Michael J. Miske, Jr.                        |
| 08:28AM | 5  | Counsel, please make your appearances for the record.                |
| 08:29AM | 6  | MR. INCIONG:  Good morning, Your Honor.  Mark Inciong,               |
| 08:29AM | 7  | Michael Nammar, KeAupuni Akina for the United States.  Also          |
| 08:29AM | 8  | present is Kari Sherman, and FBI Special Agent Thomas Palmer.        |
| 08:29AM | 9  | THE COURT:  Good morning.                                            |
| 08:29AM | 10 | MR. KENNEDY:  Good morning, Your Honor.                              |
| 08:29AM | 11 | THE COURT:  Good morning.                                            |
| 08:29AM | 12 | MR. KENNEDY:  Michael Kennedy with Lynn Panagakos,                   |
| 08:29AM | 13 | Michael Miske, and we are here with Ms. King.                        |
| 08:29AM | 14 | THE COURT:  All right.  Good morning to all of you as                |
| 08:29AM | 15 | well.  You may be seated.                                            |
| 08:29AM | 16 | Just to speak with you all just very briefly this                    |
| 08:29AM | 17 | morning before we bring the jury in, because there is an update      |
| 08:29AM | 18 | with respect to Juror Number 11, the cause of us going dark on       |
| 08:29AM | 19 | Friday, as you may recall.                                           |
| 08:29AM | 20 | So we did receive an update from both her and her                    |
| 08:29AM | 21 | physician.  As is typical with physician notes, it's not very        |
| 08:29AM | 22 | illuminating.  In fact, I'll just read it to you because it's        |
| 08:29AM | 23 | so short.                                                            |
| 08:29AM | 24 | "This is to certify that Juror Number 11 is under my                 |
| 08:29AM | 25 | professional care, was unable to attend jury duty due to a           |

08:30AM   1   recent motor vehicle accident which occurred on January 26th."

08:30AM   2            Things that we obviously already know, and there are

08:30AM   3   about seven more words, so you can tell how much this letter

08:30AM   4   illuminates our situation.

08:30AM   5            "She may return to jury duty on February 5th."  So

08:30AM   6   that's the entirety of the letter.

08:30AM   7            Ms. Williams did also elaborate in a separate email to

08:30AM   8   the same effect.  She provided additional details.  She was

08:30AM   9   rear-ended on the date in question.  She continues to suffer

08:30AM  10   both back and neck pain as well as headaches.  She is on

08:30AM  11   medication that makes her drowsy, and she is not able to turn

08:30AM  12   her neck or to sit for any extended period of time.  And said

08:30AM  13   she -- in fact, she said that she's been spending the majority

08:30AM  14   of her day in bed.

08:30AM  15            In light of the one-week delay that continuing on the

08:31AM  16   jury would result in -- and at that point I imagine she would

08:31AM  17   need to be reevaluated, not immediately then coming into court,

08:31AM  18   I don't think that's automatic -- my suggestion is that we

08:31AM  19   excuse her.  I don't think we can afford the one-week delay

08:31AM  20   that she is asking for at a minimum.

08:31AM  21            Thoughts?

08:31AM  22            MR. INCIONG:  We agree, Your Honor.  I think that's

08:31AM  23   really the only logical choice at this point.

08:31AM  24            MR. KENNEDY:  Agree, Your Honor.

08:31AM  25            THE COURT:  All right.  Then we'll excuse Ms. Williams

08:31AM    1    from further participation.  All of the alternate jurors will

08:31AM    2    then move up one spot.  Alternate Number 1, Mr. Ott, would then

08:31AM    3    move into a deliberating and voting role, with every other

08:31AM    4    alternate moving up one -- one slot from 2 to 1, 3 to 2,

08:31AM    5    etcetera.

08:31AM    6              Okay.  With that, any other issues?  Otherwise, we'll

08:31AM    7    get the jury in and the witness to retake the stand.

08:32AM    8              MR. INCIONG:  No, Your Honor.

08:32AM    9              MR. KENNEDY:  None, Your Honor.

08:32AM    10             THE COURT:  All right.  I hope everyone was able to

08:32AM    11   take advantage of the extra day that we got.

08:32AM    12             Let's go ahead and bring the jury in.

08:32AM    13             And the witness may retake the stand.

08:34AM    14             (In open court in the presence of the jury:)

08:34AM    15             THE CLERK:  Criminal Number 19-00099-DKW-KJM, United

08:34AM    16   States of America versus Michael J. Miske, Jr.

08:34AM    17             This case has been called for jury trial, Day 13.

08:35AM    18             Counsel, please make your appearances for the record.

08:35AM    19             MR. INCIONG:  Good morning, Your Honor.  Mark Inciong,

08:35AM    20   Michael Nammar and KeAupuni Akina for the United States.  Also

08:35AM    21   present with us again is Special Agent Thomas Palmer and Kari

08:35AM    22   Sherman.

08:35AM    23             THE COURT:  Good morning.

08:35AM    24             MR. KENNEDY:  Good morning, Your Honor.  Michael

08:35AM    25   Kennedy with Lynn Panagakos, Michael Miske, and Ashley King is

| | | |
|---|---|---|
| 08:35AM | 1 | assisting us today. |
| 08:35AM | 2 | THE COURT: All right. Good morning to all of you. |
| 08:35AM | 3 | You may be seated. |
| 08:35AM | 4 | And good morning. I hope you all had a good weekend, |
| 08:35AM | 5 | was able to enjoy the Friday bonus that we got last week. So |
| 08:35AM | 6 | you were able to turn it into a hopefully three-day weekend and |
| 08:35AM | 7 | recharge a little bit. I know last -- last week was likely a |
| 08:35AM | 8 | little bit of a long one. It's our first week of evidence. It |
| 08:35AM | 9 | tends to have that effect on most people. |
| 08:35AM | 10 | So good morning to the 17 of you who have appeared |
| 08:35AM | 11 | this morning. One thing that stands out I imagine in all of |
| 08:35AM | 12 | your minds is the absence of Juror Number 11. I'll say just a |
| 08:36AM | 13 | little bit about that situation without going into too much |
| 08:36AM | 14 | detail. |
| 08:36AM | 15 | She is okay. It's not life-threatening or anything |
| 08:36AM | 16 | along those lines, anything approximating that. Nonetheless, |
| 08:36AM | 17 | she is not able to rejoin this trial. Her departure would have |
| 08:36AM | 18 | been at least a week, if not more, and there was some |
| 08:36AM | 19 | uncertainties surrounding that. |
| 08:36AM | 20 | So the parties at the Court's recommendation have |
| 08:36AM | 21 | agreed to excuse her from further service. What that means, |
| 08:36AM | 22 | this is why we have alternates, and this is in addition to why |
| 08:36AM | 23 | we ask our alternate jurors to pay as close attention to what's |
| 08:36AM | 24 | going on to the evidence, to the witnesses as anyone else on |
| 08:36AM | 25 | the jury, because of moments just like this. |

08:36AM   1          So what we're going to ask -- you can all remain where
08:36AM   2    you are for the time being.
08:36AM   3          But at the next break, Mr. Ott, you are the first
08:36AM   4    alternate.  You will move up -- and rather than have
08:36AM   5    Ms. Yoshiyama move over, what we'll just do is have you sit in
08:37AM   6    Juror Number 11's seat so that there is not a mass shuffling.
08:37AM   7          All of the other alternates will then move up.  Number
08:37AM   8    3 -- Number 2 will become Alternate 1, Number 3 will become
08:37AM   9    Alternate 2, etcetera.  Okay?
08:37AM   10          Hopefully that's not confusing at all.
08:37AM   11          Bottom line, continue to pay as close attention to the
08:37AM   12    proceedings as you all have been up to now, and we'll just be
08:37AM   13    fine.
08:37AM   14          Okay.  And we wish Ms. Williams of course a speedy
08:37AM   15    recovery, and I have no doubt that she will get there.  It just
08:37AM   16    won't jibe with the timetable that we have here for this
08:37AM   17    proceeding.
08:37AM   18          Okay.  So with that, I remind you where we were when
08:37AM   19    we adjourned on Thursday afternoon.  Mr. Kimoto was on the
08:37AM   20    witness stand.  Mr. Kennedy, who is just now standing up and
08:37AM   21    taking the podium, had begun his cross-examination of
08:37AM   22    Mr. Kimoto, and that is where we will resume.
08:37AM   23          Mr. Kennedy, when you're ready.
08:37AM   24          MR. KENNEDY:  Thank you, Your Honor.
08:37AM   25                              PRESTON KIMOTO,

| | | |
|---|---|---|
| 08:38AM | 1 | (Resumed the stand.) |
| 08:38AM | 2 | RESUMED CROSS-EXAMINATION |
| 08:38AM | 3 | BY MR. KENNEDY: |
| 08:38AM | 4 | Q    Sir, I want to pull up what's been marked as Exhibit 5-24 |
| 08:38AM | 5 | for you to take a look at it. |
| 08:38AM | 6 | MR. KENNEDY:  Your Honor, I believe we have a |
| 08:38AM | 7 | stipulation that it's admissible that was filed I believe last |
| 08:38AM | 8 | evening. |
| 08:38AM | 9 | THE COURT:  Yes, 5-24 pursuant to the parties' second |
| 08:38AM | 10 | stipulation filed on January 28th is admitted. |
| 08:38AM | 11 | (Exhibit 5-24 was received in evidence.) |
| 08:38AM | 12 | MR. KENNEDY:  And it's a video clip without audio, and |
| 08:38AM | 13 | if we can move to -- |
| 08:38AM | 14 | THE COURT:  Play it?  Yes, you may. |
| 08:38AM | 15 | (Videotape was played for the jury.) |
| 08:38AM | 16 | BY MR. KENNEDY: |
| 08:38AM | 17 | Q    Sir, do you recognize the truck that the jury can see in |
| 08:38AM | 18 | Exhibit 5-24? |
| 08:38AM | 19 | A    Yes. |
| 08:38AM | 20 | Q    Whose is it? |
| 08:38AM | 21 | A    That is my truck. |
| 08:38AM | 22 | Q    All right.  And we're on October 17, 2017, at 4:03 p.m.? |
| 08:39AM | 23 | A    Yes. |
| 08:39AM | 24 | Q    You've walked into the office? |
| 08:39AM | 25 | A    Yes. |

08:39AM   1   Q    And so I want to compare that now, and let's go to 5-24-A.

08:39AM   2   And this is a still shot of you, it looks at 4:03:35 p.m. on

08:39AM   3   October 17, 2017, correct?

08:39AM   4   A    Yes.

08:39AM   5   Q    Now, I want to compare that now to the timeline on the

08:39AM   6   phone, Mr. Miller and you.

08:39AM   7          MR. KENNEDY:  If we could pull up Exhibit 5-37, which

08:39AM   8   is in evidence, Your Honor, and publish it to the jury.

08:39AM   9          THE COURT:  You may.

08:39AM  10   BY MR. KENNEDY:

08:39AM  11   Q    If we go to the last page, since this is in reverse order,

08:40AM  12   page 6, there are no texts from Mr. Miller to you at this time

08:40AM  13   at 4:02 p.m. to 4:04 p.m., correct?

08:40AM  14   A    Yes.

08:40AM  15   Q    And so the first text from Miller to you is at 5:21:49,

08:40AM  16   correct?

08:40AM  17   A    Correct.

08:40AM  18   Q    All right.

08:40AM  19          MR. KENNEDY:  I want to move to Exhibit 5-25, which is

08:40AM  20   also a video clip that is stipulated, Your Honor.

08:40AM  21          THE COURT:  Yes, it is part of yesterday's

08:40AM  22   stipulation, and so the 5-25 is admitted.  You may publish.

08:40AM  23          (Exhibit 5-25 was received in evidence.)

08:40AM  24   BY MR. KENNEDY:

08:40AM  25   Q    All right.  And so we're at 4:13 p.m.?

| | | | |
|---|---|---|---|
| 08:40AM | 1 | A | Correct. |
| 08:40AM | 2 | Q | So this is roughly ten minutes after you entered the |
| 08:40AM | 3 | | office? |
| 08:40AM | 4 | A | Yes. |
| 08:40AM | 5 | Q | And you're leaving the office in your truck. |
| 08:40AM | 6 | A | Correct. |
| 08:40AM | 7 | Q | And so this is on October 17, 2017? |
| 08:41AM | 8 | A | Yes. |
| 08:41AM | 9 | Q | All right.  And if we go to 5-25-A, and this is a |
| 08:41AM | 10 | | screenshot of you getting into your truck at 4:13? |
| 08:41AM | 11 | A | Correct. |
| 08:41AM | 12 | Q | In the afternoon and leaving the office, right? |
| 08:41AM | 13 | A | Yes. |
| 08:41AM | 14 | Q | All right.  If we move to Exhibit 5-37, that last page. |
| 08:41AM | 15 | | Once again, this is now -- there are no texts from Miller at |
| 08:41AM | 16 | | this point, correct? |
| 08:41AM | 17 | A | Correct. |
| 08:41AM | 18 | Q | The first text appears to be at 5:21:49 on that day, |
| 08:42AM | 19 | | October 17, 2017, correct? |
| 08:42AM | 20 | A | Yes. |
| 08:42AM | 21 | Q | All right. |
| 08:42AM | 22 | | MR. KENNEDY:  Now, I want to move to Exhibit 5-27, |
| 08:42AM | 23 | | which is also a video clip that is stipulated, and I would ask |
| 08:42AM | 24 | | that it be published. |
| 08:42AM | 25 | | THE COURT:  Yes, pursuant to the stipulation, the |

08:42AM   1   referenced Exhibit 5-27 is admitted, and, yes, you may publish.

08:42AM   2               (Exhibit 5-27 was received in evidence.)

08:42AM   3   BY MR. KENNEDY:

08:42AM   4   Q    All right.  At this time you're gone in your truck, right?

08:42AM   5   A    Yes.

08:42AM   6   Q    All right.  Do you see an individual in the white shirt

08:42AM   7   walking away?

08:42AM   8   A    Yes.

08:42AM   9   Q    That's Mr. Miske, correct?

08:42AM   10  A    Correct.

08:42AM   11  Q    He's walking out of the office across the way, correct?

08:43AM   12  A    Yes.

08:43AM   13  Q    This is at 4:30, correct?

08:43AM   14  A    Yes.

08:43AM   15  Q    About 15 minutes after you left in your truck, correct?

08:43AM   16  A    Correct.

08:43AM   17  Q    All right.  And if we move to 5-27-A, this is a screenshot

08:43AM   18  of Mr. Miske walking out of the office across the street,

08:43AM   19  correct?

08:43AM   20  A    Yes.

08:43AM   21  Q    All right.  Once again, if we look at Exhibit 5-37,

08:43AM   22  page 6, this is almost 15 minutes before Mr. Miller sends you

08:43AM   23  his first text, correct?

08:43AM   24  A    Yes.

08:43AM   25  Q    4:30:25, he's walking across the street, and the first

08:43AM   1   text is at 5:21:49, correct?

08:43AM   2   A    Yes.

08:43AM   3   Q    All right.

08:43AM   4         MR. KENNEDY:  Let's move to Exhibit 5-28, which is a

08:43AM   5   video clip also pursuant to the stipulation, Your Honor.

08:43AM   6         THE COURT:  Yes, go ahead.

08:43AM   7   BY MR. KENNEDY:

08:43AM   8   Q    This is at 5:35:45?

08:44AM   9   A    Yes.

08:44AM  10   Q    You see Mr. Miske returning to the office, correct?

08:44AM  11   A    Correct.

08:44AM  12   Q    This is now about an hour after he left, actually an hour

08:44AM  13   and five minutes, 5:35, correct?

08:44AM  14   A    Yes.

08:44AM  15   Q    We saw him walk out at 4:30, correct?

08:44AM  16   A    Correct.

08:44AM  17   Q    So an hour and five minutes later?

08:44AM  18   A    Yes.

08:44AM  19   Q    If we move to 5-28-A, this is a screenshot of him walking

08:44AM  20   right at 5:35:43, correct, on October 17, 2017?

08:44AM  21   A    Yes.

08:44AM  22   Q    All right.  At this point I want to compare it to

08:44AM  23   Exhibit 5-37, page 6.  It's at 5:21:49 when Miller texts you,

08:44AM  24   "Yo," right?

08:44AM  25   A    Yes.

08:45AM   1   Q    At 5:33:41, he texts you, "Call me ASAP," two exclamation

08:45AM   2   points, correct?

08:45AM   3   A    Correct.

08:45AM   4   Q    The first one is 14 minutes before we see Mr. Miske

08:45AM   5   walking back into the office, correct?

08:45AM   6   A    Correct.

08:45AM   7   Q    And the "Call me ASAP," double exclamation point, is two

08:45AM   8   minutes before he walks into the office, correct?

08:45AM   9   A    Correct.

08:45AM  10   Q    Now, the government has never shown you any video showing

08:45AM  11   you arriving back at Kama'aina Termite and Pest Control after

08:45AM  12   you left on -- at 4:13 p.m. that day, correct?

08:45AM  13   A    Correct.

08:45AM  14   Q    And you have never seen any video showing you arriving

08:45AM  15   back at Kama'aina Termite and Pest Control after 4:13 p.m.,

08:45AM  16   correct?

08:45AM  17   A    Correct.

08:45AM  18        MR. KENNEDY:  Now, by stipulation, Your Honor, I would

08:46AM  19   admit Exhibit 9010-082, which is a video which is -- and before

08:46AM  20   we pull it up, it's from 5:35:36 through 5:59:48, which is

08:46AM  21   24 minutes.

08:46AM  22        To assist the jury, we have also marked

08:46AM  23   Exhibit 9010-83 that plays the video at 8-speed so we can get

08:46AM  24   through the 24 minutes in three minutes if the Court will

08:46AM  25   allow.

08:46AM   1          THE COURT:  This is pursuant to the second

08:46AM   2    stipulation?

08:46AM   3          MR. KENNEDY:  Yes, Your Honor.

08:46AM   4          THE COURT:  Yes, then go ahead.

08:46AM   5          MR. KENNEDY:  All right.  If we could pull up 9010-83.

08:46AM   6    And this will be at a quicker speed so we can get through.

08:46AM   7    BY MR. KENNEDY:

08:46AM   8    Q    Now, did you see Mr. Miske walk in?

08:46AM   9    A    Yes.

08:46AM  10    Q    All right.  Do you see Mr. Miske get out and deal with

08:47AM  11    that truck that just came in?

08:47AM  12    A    Yes.

08:47AM  13    Q    So you went back into the office with the individual that

08:47AM  14    came with the truck that parked right by the bay, correct?

08:47AM  15    A    Right in front of the shop, yes.

08:47AM  16    Q    Right in front of the shop, yes.

08:49AM  17          All right.  We're now at five -- back to the start, we

08:49AM  18    went all the way up to 5:59:48, correct?

08:50AM  19    A    Yes.

08:50AM  20    Q    Twenty-four minutes, Mr. Miske is still inside the shop.

08:50AM  21    The individual that he met is still inside the shop.  Correct?

08:50AM  22    A    Correct.

08:50AM  23    Q    The video shows that you have not returned, correct?

08:50AM  24    A    Correct.

08:50AM  25    Q    Now, if we go to Exhibit 9010-085, which is also the one I

08:50AM    1    just played that first part, since that was moving at 8-speed,

08:50AM    2    I just want to play the first part of that.

08:50AM    3         We see Mr. Miske walking into the shop, correct?

08:50AM    4    A    Correct.

08:50AM    5         MR. AKINA:  Sorry, just to be clear, this is Exhibit

08:50AM    6    08 --

08:50AM    7         MR. KENNEDY:  082, the ones at regular speed, Counsel.

08:51AM    8    BY MR. KENNEDY:

08:51AM    9    Q    Now, we're at 5:36.  There's not a lot of activity at the

08:51AM    10    shop at this time, correct?

08:51AM    11    A    Correct.

08:51AM    12    Q    In fact, we see no one else in the area working, correct?

08:52AM    13    A    Correct.

08:52AM    14    Q    Now, we see this truck pull up and stop.  A gentlemen gets

08:52AM    15    out of that truck, another gentlemen.  And it's Mr. Miske who

08:53AM    16    comes out to greet them, correct?

08:53AM    17    A    Yes.

08:53AM    18    Q    So we're at 5:37 -- 38 Mr. Miske is dealing with these two

08:53AM    19    individuals and this truck, correct?

08:53AM    20    A    Yes.

08:53AM    21    Q    And they both walk inside.

08:53AM    22    A    Yes.

08:53AM    23         MR. KENNEDY:  All right.  We can take that down since

08:53AM    24    the jury saw the rest of it.  I just wanted to slow it down

08:53AM    25    through that portion.

08:53AM    1    BY MR. KENNEDY:

08:53AM    2    Q    So we're at 5:38:22, Mr. Miske and the gentleman who came

08:53AM    3    in on the flatbed are inside the office, correct?

08:53AM    4    A    Yes.

08:53AM    5    Q    All right.  Now, I want to go back to Exhibit 5-37.  And

08:53AM    6    go to the fifth page.

08:53AM    7         So now we start out, Miller has texted you as we

08:53AM    8    pointed out at 5:21:49, "Yo," and 5:33:41, "Call me ASAP," two

08:54AM    9    exclamation points.

08:54AM   10         Here in 29 and 28 --

08:54AM   11         MR. KENNEDY:  Ms. King, if you can blow that up.

08:54AM   12    Thank you so much.

08:54AM   13    BY MR. KENNEDY:

08:54AM   14    Q    -- Miller is texting you a third time, "WTF, brah?"  WTF

08:54AM   15    being "what the fuck," right?

08:54AM   16    A    Correct.

08:54AM   17    Q    And this is at 5:37:07, correct?

08:54AM   18    A    Correct.

08:54AM   19    Q    So Miller is texting you, "What the fuck, brah?"

08:54AM   20    Mr. Miller is dealing with a guy on a flatbed going into the

08:54AM   21    office, correct?

08:54AM   22         MR. AKINA:  Objection.  That's not what the witness

08:54AM   23    testified to.

08:54AM   24         THE WITNESS:  That wasn't -- that wasn't Miller that

08:54AM   25    Mr. Miske was dealing with.

08:54AM   1   BY MR. KENNEDY:

08:54AM   2   Q    I'm sorry, not Mr. Miller.  He's dealing with someone in

08:54AM   3   the office who came on the flatbed truck.  I just misspoke.

08:54AM   4   Thank you.

08:54AM   5   A    Yes, that's correct.

08:54AM   6   Q    You were getting a text from Mr. Miller, "WTF, brah,"

08:54AM   7   correct?

08:54AM   8   A    Correct.

08:54AM   9   Q    He's texting you, correct?

08:55AM  10   A    Correct.

08:55AM  11   Q    You left in your truck at 4:13, correct?

08:55AM  12   A    Correct.

08:55AM  13   Q    And then at 5:37:36, Miller texts you, "Text me back or

08:55AM  14   something," right?

08:55AM  15   A    Correct.

08:55AM  16   Q    Okay.  Now, about -- we're now -- we see that at 6:08:48

08:55AM  17   is the first time you text him back, correct?

08:55AM  18   A    Correct.

08:55AM  19   Q    It's now about 30 minutes later, right?

08:55AM  20   A    Yes.

08:55AM  21   Q    You text him:  "I was at the house.  Left my phone in the

08:55AM  22   truck.  Hold on.  She just got home."  Correct?

08:55AM  23   A    Correct.

08:55AM  24   Q    Moving to -- up to what is marked as 26, it's another --

08:56AM  25   you text him a second time at 6:42:36, correct?

08:56AM   1   A    Correct.

08:56AM   2   Q    So a little less than a half hour -- a little more than

08:56AM   3   half hour, correct, in between?

08:56AM   4   A    Correct.

08:56AM   5   Q    And what you text is:  "Meet."  Right?

08:56AM   6   A    Yes.

08:56AM   7   Q    "Give me" -- right?

08:56AM   8   A    Yes.

08:56AM   9   Q    -- "15 mins," M-I-N-S.

08:56AM   10  A    Correct.

08:56AM   11  Q    15 minutes, right?

08:56AM   12  A    Yes.

08:56AM   13  Q    Miller texts back at 6:44:54, "K," for okay?

08:56AM   14  A    Yes.

08:56AM   15  Q    You meet him, right?  You just texted him:  "Meet, give me

08:57AM   16  15 mins," correct?

08:57AM   17  A    Correct.

08:57AM   18  Q    You meet him and you talk, right?

08:57AM   19  A    No, I don't remember if we met.

08:57AM   20  Q    You meet him at Sheridan Park, don't you?

08:57AM   21  A    I don't believe so, sir.

08:57AM   22  Q    You're the third voice that Mr. Robert Lee hears near the

08:57AM   23  car, correct?

08:57AM   24  A    No.

08:57AM   25  Q    You just text Miller:  "Meet.  Give me 15 minutes."

| | | |
|---|---|---|
| 08:57AM | 1 | Correct? |
| 08:57AM | 2 | MR. AKINA:  Asked and answered. |
| 08:57AM | 3 | THE COURT:  You may answer, go ahead. |
| 08:57AM | 4 | THE WITNESS:  Yes, I did text him that. |
| 08:57AM | 5 | BY MR. KENNEDY: |
| 08:57AM | 6 | Q    All right.  Now, let's move up to what is marked as Number |
| 08:58AM | 7 | 24.  There is no more texts from Mr. Miller to you between |
| 08:58AM | 8 | 6:42:36 and 7:47:48, correct? |
| 08:58AM | 9 | A    He texted "K," right, at 6:44. |
| 08:58AM | 10 | Q    At 6:42 he says -- at 6:44 he says "K," right? |
| 08:58AM | 11 | A    Yes. |
| 08:58AM | 12 | Q    And then it's all the way to 7:47:48, one hour and three |
| 08:58AM | 13 | minutes roughly later, you text him:  "Call you right back." |
| 08:58AM | 14 | Correct? |
| 08:58AM | 15 | A    Correct. |
| 08:58AM | 16 | Q    There is no text from Miller to prompt a call back, |
| 08:58AM | 17 | correct? |
| 08:58AM | 18 | A    Yes. |
| 08:58AM | 19 | Q    Miller called you, right?  That's why you said, "Call you |
| 08:59AM | 20 | right back," correct? |
| 08:59AM | 21 | A    Most likely. |
| 08:59AM | 22 | Q    Well, he wouldn't have you call him if you were with him |
| 08:59AM | 23 | physically, right? |
| 08:59AM | 24 | A    Yes. |
| 08:59AM | 25 | Q    There's no text from him, correct? |

| | | |
|---|---|---|
| 08:59AM | 1 | A    Correct. |
| 08:59AM | 2 | Q    When you say, "Call you right back," he called you.  You |
| 08:59AM | 3 | know that, sir. |
| 08:59AM | 4 | A    He probably did, sir. |
| 08:59AM | 5 | Q    And so very quickly, 12 seconds later -- |
| 08:59AM | 6 | MR. KENNEDY:  If we move to the next page, page 4, and |
| 08:59AM | 7 | go down to the bottom, Ms. King.  So that -- it's very small. |
| 08:59AM | 8 | Thank you so much. |
| 08:59AM | 9 | BY MR. KENNEDY: |
| 08:59AM | 10 | Q    On the earlier page it was 7:47:48 when you texted "Call |
| 09:00AM | 11 | you right back."  12 seconds later at 7:48, he says "K." |
| 09:00AM | 12 | And that "he" is Miller, right? |
| 09:00AM | 13 | A    Yes. |
| 09:00AM | 14 | Q    And then at 8:11:38, he says "Brah." |
| 09:00AM | 15 | A    Correct. |
| 09:00AM | 16 | Q    In a text.  Right? |
| 09:00AM | 17 | A    Yes. |
| 09:00AM | 18 | Q    "He" being Miller, correct? |
| 09:00AM | 19 | A    Yes. |
| 09:00AM | 20 | Q    And then 12 seconds later at 8:11:50, he texts you a third |
| 09:00AM | 21 | time:  "No more all night."  Right? |
| 09:00AM | 22 | A    Yes. |
| 09:00AM | 23 | Q    Quickly within -- it looks like 11 seconds, you text back: |
| 09:00AM | 24 | "I know, coming now."  Right? |
| 09:01AM | 25 | A    Yes. |

| | | | |
|---|---|---|---|
| 09:01AM | 1 | Q | So he's waiting on you, and now you're coming now again, |
| 09:01AM | 2 | | correct? |
| 09:01AM | 3 | A | Yes, I'm meeting him. |
| 09:01AM | 4 | Q | And he says a minute later at 8:13:11 at 19:  "How far |
| 09:01AM | 5 | | you?" |
| 09:01AM | 6 | A | Yes. |
| 09:01AM | 7 | Q | And you say at 8:14:15:  I'm at Ala's, 5 to 10 mins." |
| 09:01AM | 8 | | Right? |
| 09:01AM | 9 | A | Correct. |
| 09:01AM | 10 | Q | Ala's being Ala Moana shopping center, correct? |
| 09:01AM | 11 | A | Yes. |
| 09:01AM | 12 | Q | And you're about to come now to Sheridan Park to see |
| 09:01AM | 13 | | Miller again, correct? |
| 09:01AM | 14 | A | Yes. |
| 09:01AM | 15 | Q | You're meeting Sunnie Kim at Ala Moana shopping center, |
| 09:02AM | 16 | | correct? |
| 09:02AM | 17 | A | No, I met Sunnie Kim at Sheridan Park. |
| 09:02AM | 18 | Q | Oh, you met her there with Miller? |
| 09:02AM | 19 | A | Not with Miller. |
| 09:02AM | 20 | Q | Oh, so you're at Ala Moana shopping center shopping at |
| 09:02AM | 21 | | this point? |
| 09:02AM | 22 | A | No. |
| 09:02AM | 23 | Q | All right.  You're coming to Miller, and you know you |
| 09:02AM | 24 | | don't even have to ask, do you?  You know where he's at, |
| 09:02AM | 25 | | Sheridan Park, right? |

09:02AM    1    A    Yes.

09:02AM    2    Q    Nowhere in the text does he say where he's at.  You've

09:02AM    3    been there before to see him by yourself, correct?

09:02AM    4    A    Yes, I did meet Wayne at Sheridan Park.

09:02AM    5    Q    And that's the end of the text on October 17, 2017,

09:03AM    6    correct?

09:03AM    7    A    I believe so.

09:03AM    8    Q    We can move over to the next page just to make certain.

09:03AM    9         MR. KENNEDY:  If you blow up number 17, Ms. King.

09:03AM   10    BY MR. KENNEDY:

09:03AM   11    Q    This shows 12:27:32 p.m. the next day, correct?

09:03AM   12    A    Correct.

09:03AM   13    Q    All right.

09:03AM   14         MR. KENNEDY:  Now, we can take down Government

09:03AM   15    exhibit -- or Exhibit 5-37.

09:03AM   16    BY MR. KENNEDY:

09:03AM   17    Q    So you meet with Miller after you say "I'm coming" to

09:03AM   18    Sheridan Park, right?

09:03AM   19    A    Yes.

09:03AM   20    Q    And so Miller tells you he needs money for to pay his

09:03AM   21    friend, yes?

09:03AM   22    A    Yes.

09:03AM   23    Q    Miller tells you he needs money for the cost of purchasing

09:03AM   24    the van, correct?

09:03AM   25    A    Yes.

09:04AM  1  Q    Yesterday -- oh, excuse me, on Thursday you told this jury

09:04AM  2  there was no van, correct?

09:04AM  3          MR. AKINA:  Objection mischaracterizes the witness's

09:04AM  4  testimony.

09:04AM  5          THE COURT:  You may answer.

09:04AM  6          THE WITNESS:  Yes.

09:04AM  7          THE COURT:  Overruled.

09:04AM  8          THE WITNESS:  Yes.

09:04AM  9  BY MR. KENNEDY:

09:04AM  10  Q    Yes, you did, you told him there was no van, and today now

09:04AM  11  you're telling them there is one, right?

09:04AM  12  A    Yes.

09:04AM  13  Q    So you said one thing on one day to this jury and another

09:04AM  14  thing today to this jury, correct?

09:04AM  15  A    Correct.

09:04AM  16  Q    And Miller tells you he needs money for the cost of

09:04AM  17  destroying the van, correct?

09:04AM  18  A    Yes.

09:04AM  19  Q    And you told the FBI this back in May of last -- 2023, and

09:04AM  20  on Thursday you said they got it wrong, didn't you?

09:04AM  21  A    I don't -- can you -- I don't remember that part, sir.

09:05AM  22  Q    You said there was no van.  You never said that.

09:05AM  23  A    Can you repeat that, please?

09:05AM  24  Q    You said there was no van.  You said that -- when I asked

09:05AM  25  you the question, I said, Didn't you tell the FBI that Miller

09:05AM   1    told you he needed money to pay for a van?  And you said, no,

09:05AM   2    you didn't tell him that.  Do you recall that?

09:05AM   3    A    I do recall that.

09:05AM   4    Q    All right.  Now, that's a lie because there never was a

09:05AM   5    van, was there?

09:05AM   6    A    Well, that's what Miller was asking me the money -- I

09:05AM   7    didn't know if there was a van or not there.  That's what he

09:05AM   8    was asking me.

09:05AM   9    Q    Mr. Lee was in Miller's Crown Vic the entire time.  He

09:05AM   10   never got moved out of any vehicle, sir.

09:05AM   11           MR. AKINA:  Objection.  Is there a question?

09:06AM   12   BY MR. KENNEDY:

09:06AM   13   Q    Isn't that true, you were at Sheridan Park and you saw

09:06AM   14   him?

09:06AM   15   A    I did not see Mr. Lee at Sheridan Park, nor did I see the

09:06AM   16   Crown Vic that you're talking about.

09:06AM   17   Q    Mr. Robert Lee never left the vehicle that he was

09:06AM   18   kidnapped in.  You know that, sir.

09:06AM   19   A    That's incorrect, I do not know that.  Miller -- when I

09:06AM   20   saw Miller, he was in a light color sedan, not a --

09:06AM   21   Q    A light-colored sedan.  Not a dark-colored sedan.

09:06AM   22   A    That is correct, sir.

09:06AM   23   Q    I see.  All right.  Not red or dark.

09:06AM   24   A    Not red or dark.

09:06AM   25   Q    Okay.  Now, you told the jury last Thursday that you and

| 09:07AM | 1 | | Mr. Miller drove around for 30 to 60 minutes after you met him |
| 09:07AM | 2 | | at Sheridan Park. |
| 09:07AM | 3 | A | That's correct. |
| 09:07AM | 4 | Q | You drove over to meet him, right? |
| 09:07AM | 5 | A | Yes. |
| 09:07AM | 6 | Q | That text came in at 8:14, when you said you were coming, |
| 09:07AM | 7 | | right? |
| 09:07AM | 8 | A | Yes. |
| 09:07AM | 9 | Q | You say that you drove around, and he also asked you again |
| 09:07AM | 10 | | for money, right? |
| 09:07AM | 11 | A | Correct. |
| 09:07AM | 12 | Q | And then you said that instead of driving him back to |
| 09:07AM | 13 | | where you picked him up at Sheridan Park, you drove him to the |
| 09:07AM | 14 | | Fisherman's Wharf. |
| 09:07AM | 15 | A | Correct. |
| 09:07AM | 16 | Q | Back to the scene of the crime. |
| 09:08AM | 17 | A | I do not know if that was the scene of the crime. |
| 09:08AM | 18 | Q | And so he was at Sheridan Park and you drove him to a |
| 09:08AM | 19 | | different location, right? |
| 09:08AM | 20 | A | Correct. |
| 09:08AM | 21 | Q | And you know where it's at? |
| 09:08AM | 22 | A | No, I do not, sir. |
| 09:08AM | 23 | Q | So you didn't return him to his car. |
| 09:08AM | 24 | A | I dropped him off where he wanted to be dropped off at. |
| 09:08AM | 25 | Q | Back at the scene of a crime where he had just kidnapped |

09:08AM    1    somebody, that's what you're telling the jury.

09:08AM    2            MR. AKINA:  Objection.  Mischaracterizes the witness's

09:08AM    3    testimony.

09:08AM    4            THE COURT:  You may answer.

09:08AM    5            THE WITNESS:  I just explained to you that I do not

09:08AM    6    know where the crime took place.

09:08AM    7    BY MR. KENNEDY:

09:08AM    8    Q    Now, after you were arrested by the SWAT team for

09:08AM    9    threatening Sunnie Kim, you told the FBI that Sunnie Kim asked

09:08AM   10    you when you met with her on the 17th of October how much it

09:09AM   11    cost to kill Mr. Lee.

09:09AM   12    A    Correct.

09:09AM   13    Q    And you say that she made a gesture across her throat.

09:09AM   14    A    Yes.

09:09AM   15    Q    Now, this is after you were arrested for threatening her

09:09AM   16    in December of 2022, correct?

09:09AM   17    A    No, that's not correct.

09:09AM   18    Q    Well, what I mean is the first time you told this to the

09:09AM   19    FBI was after you had been arrested for threatening her.

09:09AM   20    Correct?

09:09AM   21    A    That's correct.

09:09AM   22    Q    And so your deal with her on the first day you met her was

09:09AM   23    50/50 split, right?

09:09AM   24    A    Correct.

09:09AM   25    Q    And no monies --

| | | |
|---|---|---|
| 09:09AM | 1 | A    Not 50/50 split.  It was 50 percent of whatever was |
| 09:09AM | 2 | collected. |
| 09:10AM | 3 | Q    Okay.  Whatever was collected, 50 percent, 50/50, right? |
| 09:10AM | 4 | A    Correct. |
| 09:10AM | 5 | Q    Okay.  So you're telling the jury that someone who said, |
| 09:10AM | 6 | "How much does it cost to kill?" did this across their throat, |
| 09:10AM | 7 | simply paid you $90,000 when they got nothing?  That's what |
| 09:10AM | 8 | you're trying to sell? |
| 09:10AM | 9 | A    That is the truth, sir. |
| 09:10AM | 10 | Q    That's the truth. |
| 09:10AM | 11 | A    Yes. |
| 09:10AM | 12 | Q    Someone who went like this across their throat just gave |
| 09:10AM | 13 | up $90,000. |
| 09:10AM | 14 | A    That's true, sir. |
| 09:10AM | 15 | Q    That too, the first time you told that was after you had |
| 09:10AM | 16 | threatened Sunnie Kim and were arrested by the SWAT, correct? |
| 09:10AM | 17 | A    That is not correct, because I didn't threaten Sunnie Kim |
| 09:10AM | 18 | at any point. |
| 09:10AM | 19 |      MR. KENNEDY:  Now, if we go back to Exhibit 5-37, and |
| 09:11AM | 20 | if we go to -- let's see, I believe it would be the fourth |
| 09:11AM | 21 | page if I'm -- actually it would be the third.  Down at -- if |
| 09:11AM | 22 | we go to the bottom of the page, Ms. King.  Thank you, Ashley. |
| 09:11AM | 23 | BY MR. KENNEDY: |
| 09:11AM | 24 | Q    If we look at the first text on October 18, 2017, once |
| 09:11AM | 25 | again Miller is texting you, right? |

| 09:11AM | 1 | A | Yes. |

09:11AM    2    Q    "Call me ASAP."  Correct?

09:11AM    3    A    Correct.

09:11AM    4    Q    And it's at 12:27:32 in the afternoon.

09:11AM    5    A    Correct.

09:12AM    6    Q    Roughly four hours later he texts you:  "Pres, I just got

09:12AM    7    to take care of my boys something, then I can wait till

09:12AM    8    tomorrow is Thursday."  Correct?

09:12AM    9    A    Correct.

09:12AM   10    Q    About a half an hour later you text:  "I'm doing an -- I'm

09:12AM   11    doing an estimate right now, braddah."  Said:  "Hold on, and

09:12AM   12    then I'm going to meet him at shop right after this and get

09:12AM   13    back to you."

09:12AM   14         Do you see that?

09:12AM   15    A    Yes.

09:12AM   16    Q    Miller texts back at 4:35:24:  "Who?"  Correct?

09:12AM   17    A    Correct.

09:12AM   18    Q    Not Mike, right?

09:12AM   19    A    Not Mike.

09:12AM   20    Q    Not Bro, right?

09:12AM   21    A    Not Bro.

09:12AM   22    Q    Not Mr. Miske, right?

09:12AM   23    A    Correct.

09:12AM   24    Q    You have to type back, "Bro."  Right?

09:13AM   25    A    Yes.

| | | |
|---|---|---|
| 09:13AM | 1 | Q    And so if we -- he doesn't know, does he?  He asks: |
| 09:13AM | 2 | "Who?" |
| 09:13AM | 3 | A    Because braddah -- |
| 09:13AM | 4 | Q    No, sir, he asked, "Who?"  Correct? |
| 09:13AM | 5 | A    Correct. |
| 09:13AM | 6 | Q    All right.  Now, if we move up:  "What about your guy, he |
| 09:13AM | 7 | come tru?" is what you text at 4:36, right? |
| 09:13AM | 8 | Oh, outgoing:  "What about your guy, he come tru?" |
| 09:13AM | 9 | MR. KENNEDY:  Thank you for correcting me. |
| 09:13AM | 10 | BY MR. KENNEDY: |
| 09:13AM | 11 | Q    Miller texts:  "You that."  Right? |
| 09:13AM | 12 | A    Yes. |
| 09:13AM | 13 | Q    "Your guy" is Mr. Kim, right? |
| 09:14AM | 14 | A    Yes. |
| 09:14AM | 15 | Q    Tony Kim, right? |
| 09:14AM | 16 | A    Yes. |
| 09:14AM | 17 | Q    He doesn't text, Not your girl, Sunnie Kim, correct? |
| 09:14AM | 18 | A    Yes. |
| 09:14AM | 19 | MR. KENNEDY:  We can take that down. |
| 09:14AM | 20 | Now, if we can pull up Exhibit 5268, I want to |
| 09:14AM | 21 | transition to another topic. |
| 09:14AM | 22 | And that is not yet in evidence, Your Honor, and it |
| 09:14AM | 23 | should be in the 5000 notebook. |
| 09:14AM | 24 | THE COURT:  Happen to know which one? |
| 09:14AM | 25 | MR. KENNEDY:  It is in 268, so it would be probably in |

| | | |
|---|---|---|
| 09:14AM | 1 | the first one, Your Honor, because it would be in the first |
| 09:14AM | 2 | group, I hope. |
| 09:14AM | 3 | THE COURT:  I've got it.  It's in the second binder. |
| 09:14AM | 4 | MR. KENNEDY:  Thank you for letting me know, Your |
| 09:15AM | 5 | Honor. |
| 09:15AM | 6 | THE COURT:  You want to show this to the witness? |
| 09:15AM | 7 | MR. KENNEDY:  Yes.  Can we pull it up? |
| 09:15AM | 8 | THE COURT:  Yes, you may. |
| 09:15AM | 9 | MR. KENNEDY:  Thank you, Ms. King. |
| 09:15AM | 10 | And it is not yet in evidence. |
| 09:15AM | 11 | BY MR. KENNEDY: |
| 09:15AM | 12 | Q    Sir, do you recognize what's been marked as 5000-268? |
| 09:15AM | 13 | A    Yeah, it says Kama'aina Termite and Pest Control. |
| 09:15AM | 14 | Q    All right.  So you -- to give some -- you were working at |
| 09:15AM | 15 | O'ahu Termite and Pest Control, correct, in 2020? |
| 09:15AM | 16 | A    Yes. |
| 09:15AM | 17 | Q    And in -- from 2015 on to 2019, correct? |
| 09:15AM | 18 | A    From 2015 to 2019, I did get -- my paychecks did come from |
| 09:15AM | 19 | Kama'aina Termite and Pest Control. |
| 09:15AM | 20 | Q    And as I understood it, you had -- from your testimony |
| 09:15AM | 21 | last week, you had worked for Kama'aina and for O'ahu at |
| 09:15AM | 22 | various times during the same period, correct? |
| 09:15AM | 23 | A    Correct. |
| 09:16AM | 24 | Q    All right. |
| 09:16AM | 25 | MR. KENNEDY:  Your Honor, I would move |

09:16AM   1    Exhibit 5000-268 into evidence at this time.

09:16AM   2              THE COURT:  Any objection?

09:16AM   3              MR. AKINA:  No objection.

09:16AM   4              THE COURT:  All right.  Without objection, 5000-268 is

09:16AM   5    admitted.

09:16AM   6              (Exhibit 5000-268 was received in evidence.)

09:16AM   7              MR. KENNEDY:  May we publish it?

09:16AM   8              THE COURT:  Yes, you may.

09:16AM   9    BY MR. KENNEDY:

09:16AM   10   Q    Now, you had mentioned something about reputation.  Now it

09:16AM   11   looks like during this time period in 2013, it looks like

09:16AM   12   Kama'aina was able to get first place in Hawaii's Best, right?

09:16AM   13   A    That is correct.

09:16AM   14   Q    And also in 2019 as well?

09:16AM   15   A    Correct.

09:16AM   16   Q    And the sorts of things that they offer and -- then

09:16AM   17   there's a bit about a warm thanks and eight years in a row

09:16AM   18   being voted into Hawaii's Best, correct?

09:16AM   19   A    Correct.

09:16AM   20   Q    Structural fumigation is one of the areas that they --

09:17AM   21   that company did, Mike's company, right?

09:17AM   22   A    Correct.

09:17AM   23   Q    General pest control?

09:17AM   24   A    Correct.

09:17AM   25   Q    Ground treatment?

| | | | |
|---|---|---|---|
| 09:17AM | 1 | A | Correct. |
| 09:17AM | 2 | Q | Centricon? |
| 09:17AM | 3 | A | Correct. |
| 09:17AM | 4 | Q | Bed bugs? |
| 09:17AM | 5 | A | Correct. |
| 09:17AM | 6 | Q | Rodents? |
| 09:17AM | 7 | A | Correct. |
| 09:17AM | 8 | Q | Pest birds? |
| 09:17AM | 9 | A | Correct. |
| 09:17AM | 10 | Q | And termite inspection reports? |
| 09:17AM | 11 | A | Correct. |
| 09:17AM | 12 | | MR. KENNEDY:  All right.  Now, if we move to |
| 09:17AM | 13 | | Exhibit 5000-264, which is not yet in evidence, Your Honor. |
| 09:17AM | 14 | | THE COURT:  Go ahead. |
| 09:17AM | 15 | | BY MR. KENNEDY: |
| 09:17AM | 16 | Q | Do you recognize Exhibit 5000-264? |
| 09:17AM | 17 | A | Yes. |
| 09:17AM | 18 | Q | Do you recognize the church? |
| 09:17AM | 19 | A | I don't recognize the church, but that's what it looks |
| 09:17AM | 20 | | like. |
| 09:17AM | 21 | Q | Does Kaumakapili ring a bill? |
| 09:18AM | 22 | A | Sorry? |
| 09:18AM | 23 | Q | Does Kaumakapili run a bell -- ring a bell with you? |
| 09:18AM | 24 | A | No. |
| 09:18AM | 25 | Q | Okay.  This is 2013.  Before I ask this, let me ask you to |

| | | |
|---|---|---|
| 09:18AM | 1 | take a look at Exhibit 5000-248 before I move this into |
| 09:18AM | 2 | evidence. |
| 09:18AM | 3 | Now, you're working at Kama'aina in 2020, correct? |
| 09:18AM | 4 | A    Yes. |
| 09:18AM | 5 | Q    All right.  And if -- you're familiar with this calendar, |
| 09:18AM | 6 | right? |
| 09:18AM | 7 | A    I believe I've seen it. |
| 09:18AM | 8 | Q    All right.  Well, let's flip through the pages just for |
| 09:18AM | 9 | you to make certain that you recognize it. |
| 09:18AM | 10 | A    (Peruses document.) |
| 09:19AM | 11 | Q    Now, that you had a chance to see it, do you recognize |
| 09:19AM | 12 | what's been shown in the 2020 calendar? |
| 09:19AM | 13 | A    Yes, pictures. |
| 09:19AM | 14 | MR. KENNEDY:  All right.  At this time, Your Honor, I |
| 09:19AM | 15 | would move Exhibit 5000-248 into evidence. |
| 09:19AM | 16 | MR. AKINA:  No objection. |
| 09:19AM | 17 | THE COURT:  Without objection -- |
| 09:19AM | 18 | MR. KENNEDY:  May we publish, Your Honor? |
| 09:19AM | 19 | THE COURT:  Yes.  5000-248 is admitted. |
| 09:19AM | 20 | (Exhibit 5000-248 was received in evidence.) |
| 09:19AM | 21 | BY MR. KENNEDY: |
| 09:19AM | 22 | Q    All right.  So last week you talked to the jury about the |
| 09:19AM | 23 | fact that you were in sales, right? |
| 09:19AM | 24 | A    Correct. |
| 09:19AM | 25 | Q    And marketing, right? |

09:19AM    1    A    Yes, I did help out with that.

09:19AM    2    Q    And calendars and things like that are part of promotional

09:19AM    3    material that businesses use, right?

09:19AM    4    A    Yes.

09:19AM    5         MR. KENNEDY:  Okay.  So if we flip to the next page,

09:19AM    6    Ms. King.

09:19AM    7    BY MR. KENNEDY:

09:20AM    8    Q    Now, we move to this page, you're familiar with the

09:20AM    9    Shangri La fumigation in 2019 done by Kama'aina Termite and

09:20AM    10   Pest Control?

09:20AM    11   A    Not totally, but I do know that they -- they did this

09:20AM    12   fumigation.  I wasn't on site or I didn't -- this wasn't my

09:20AM    13   job.

09:20AM    14   Q    Okay.  Let's move -- you're familiar with it, but it

09:20AM    15   wasn't your sales job.

09:20AM    16   A    Yes.

09:20AM    17   Q    All right.  Familiar with the fumigation job at the Neal

09:20AM    18   S. Blaisdell concert hall?

09:20AM    19   A    I don't believe I was working there when they did this

09:20AM    20   fumigation.

09:20AM    21   Q    All right.  But in terms of sales and marketing, it's

09:20AM    22   something that was used that it had happened in the past before

09:20AM    23   you started working?

09:20AM    24   A    Correct.

09:20AM    25   Q    All right.  Let's move on.  Familiar with this Portlock

09:20AM   1   home fumigation that is shown here on the east side of

09:20AM   2   Honolulu?

09:20AM   3   A    I seen this picture before, but like I said, it wasn't my

09:21AM   4   particular job or I wasn't on this job site.

09:21AM   5   Q    All right.  So oftentimes in sales you would get a

09:21AM   6   customer, and then complete and follow it up whether it's a

09:21AM   7   fumigation or other services, right?

09:21AM   8   A    Correct.

09:21AM   9   Q    Okay.  And this one just wasn't your job.

09:21AM   10  A    Yeah.

09:21AM   11  Q    Okay.  Moving on.  Queen Emma Summer Palace, are you

09:21AM   12  familiar with this in 2019?

09:21AM   13  A    Not really.  I -- I know that they had performed this

09:21AM   14  fumigation, but like I said, neither was it my -- my job or I

09:21AM   15  wasn't on site.

09:21AM   16  Q    Okay.  I can do this.  All right.  You're familiar with it

09:21AM   17  because you were working at that point with O'ahu Termite and

09:21AM   18  Pest Control, right?

09:21AM   19  A    I was familiar with it because I heard that name going

09:21AM   20  around.  I mean somebody had said it in the office --

09:21AM   21  Q    Okay.

09:21AM   22  A    -- that's what the job was.

09:21AM   23  Q    All right.  Moving on to St. Louis School, Bertram Hall,

09:22AM   24  were you familiar with that in 2016 when you were working?

09:22AM   25  A    I don't remember them doing this particular job.

09:22AM  1  Q    Okay.  You were working in 2016 with Kama'aina at that

09:22AM  2  time?

09:22AM  3  A    Yes.

09:22AM  4  Q    Okay.  Moving on to May of 2020, in the materials, were

09:22AM  5  you are familiar with the bed bugs and the King Kamehameha IV

09:22AM  6  on the Big Island?

09:22AM  7  A    Yes, I did -- I did hear about this particular job.

09:22AM  8  Q    All right.  Moving on.  Poinciana Manor up in Kailua, were

09:22AM  9  you familiar with this job that was done by Kama'aina Termite

09:22AM  10  and Pest Control?

09:22AM  11  A    I'm not totally familiar with this job.

09:22AM  12  Q    Knew about it, but it wasn't a job that you were involved

09:22AM  13  with?

09:22AM  14  A    Yeah, I seen this picture before, but it wasn't something

09:22AM  15  that I was involved with.

09:23AM  16  Q    Okay.  All right.  Moving on.  The Waikiki Shell, prior to

09:23AM  17  your working, were you familiar with it when you came to work

09:23AM  18  at Kama'aina Termite and Pest Control?

09:23AM  19  A    Familiar being that I've seen this picture before.

09:23AM  20  Q    Okay.  All right.  Moving on.  Anything about the private

09:23AM  21  residence in this fumigation click a bell as to whether this

09:23AM  22  was something that you personally were involved with?

09:23AM  23  A    Not to my knowledge.

09:23AM  24  Q    Fair enough.  Let's move on to the next.  I asked you

09:23AM  25  about the church.  Anything about that now that is familiar to

| | | |
|---|---|---|
| 09:23AM | 1 | you now that you see the name? |
| 09:23AM | 2 | A    No, not really.  I mean I seen this -- I seen this picture |
| 09:23AM | 3 | before, but I don't know where it's located or I don't know |
| 09:23AM | 4 | what church this is. |
| 09:23AM | 5 | Q    Okay.  All right.  Moving on.  This would be a picture of |
| 09:24AM | 6 | when you're -- it's not you, but someone who is out talking |
| 09:24AM | 7 | with someone about entering into a contract, correct? |
| 09:24AM | 8 | A    Correct. |
| 09:24AM | 9 | Q    All right.  Moving on.  Familiar with the 2019 work over |
| 09:24AM | 10 | at Iolani Palace in -- in the mobile fumigation chamber? |
| 09:24AM | 11 | A    Yes, I did -- I did hear about this. |
| 09:24AM | 12 | Q    Okay.  Wasn't your job as well? |
| 09:24AM | 13 | A    No, this wasn't my job. |
| 09:24AM | 14 | Q    Okay.  But it was during your time that you're working |
| 09:24AM | 15 | there in 2019, right? |
| 09:24AM | 16 | A    Yes. |
| 09:24AM | 17 | Q    Okay. |
| 09:24AM | 18 | MR. KENNEDY:  All right.  Now, at this time, Your |
| 09:24AM | 19 | Honor, I would move 5000-248 and 5000-264 -- I guess 5000-264 |
| 09:24AM | 20 | into evidence. |
| 09:24AM | 21 | THE COURT:  248 already has been admitted. |
| 09:24AM | 22 | MR. AKINA:  Lack of foundation for 264. |
| 09:25AM | 23 | THE COURT:  Objection is sustained.  That's with |
| 09:25AM | 24 | respect to 264. |
| 09:25AM | 25 | MR. KENNEDY:  All right.  If we pull up 5000-257, |

| | | |
|---|---|---|
| 09:25AM | 1 | which is not yet in evidence. |
| 09:25AM | 2 | THE COURT: Yes. |
| 09:25AM | 3 | BY MR. KENNEDY: |
| 09:25AM | 4 | Q Are trade shows one of the things that Kama'aina and O'ahu |
| 09:25AM | 5 | Termite and Pest Control did? |
| 09:25AM | 6 | A Yes. |
| 09:25AM | 7 | Q Were you involved with any trade shows for Kama'aina? |
| 09:25AM | 8 | A No. I -- I did say sit at one of their booths when I |
| 09:25AM | 9 | first started when Mike hadn't acquired O'ahu Termite. |
| 09:25AM | 10 | Q All right. Were you at the Blaisdell trade show in 2019? |
| 09:26AM | 11 | A I was at the Blaisdell trade show. |
| 09:26AM | 12 | Q Familiar with this booth at the Blaisdell trade show in |
| 09:26AM | 13 | 2019? |
| 09:26AM | 14 | A Yes, it does look familiar. |
| 09:26AM | 15 | MR. KENNEDY: At this time, Your Honor, I would move |
| 09:26AM | 16 | 5000-257 into evidence. |
| 09:26AM | 17 | MR. AKINA: No objection. |
| 09:26AM | 18 | THE COURT: Without objection, 5000-257 is admitted. |
| 09:26AM | 19 | You may publish. |
| 09:26AM | 20 | (Exhibit 5000-257 was received in evidence.) |
| 09:26AM | 21 | MR. KENNEDY: Can we publish it? |
| 09:26AM | 22 | THE COURT: Yes, you may. |
| 09:26AM | 23 | MR. KENNEDY: Thank you, sir. |
| 09:26AM | 24 | BY MR. KENNEDY: |
| 09:26AM | 25 | Q So at the trade shows there are homeowners that come? |

| | | | |
|---|---|---|---|
| 09:26AM | 1 | A | Yes. |
| 09:26AM | 2 | Q | Businesses that come? |
| 09:26AM | 3 | A | Correct. |
| 09:26AM | 4 | Q | And you share with them promotional materials? |
| 09:26AM | 5 | A | Correct. |
| 09:26AM | 6 | Q | And that's the purpose of it is as well, right? |
| 09:26AM | 7 | A | Yes. |
| 09:26AM | 8 | Q | Okay.  Moving on to Exhibits 5000-018.  Are you familiar |
| 09:27AM | 9 | | with the 2020 fumigation work at the Polynesian Cultural |
| 09:27AM | 10 | | Center? |
| 09:27AM | 11 | A | Yes. |
| 09:27AM | 12 | Q | Were you on site? |
| 09:27AM | 13 | A | No, I was not on site. |
| 09:27AM | 14 | Q | Were you familiar with it in meetings that were held? |
| 09:27AM | 15 | A | Yes, I did listen in on a few meetings. |
| 09:27AM | 16 | | MR. KENNEDY:  All right.  Your Honor, I would at this |
| 09:27AM | 17 | | time move 5000-018 through 5000-036, which are all photographs |
| 09:27AM | 18 | | of the Polynesian Cultural Center in 2020? |
| 09:27AM | 19 | | MR. AKINA:  Objection.  No foundation. |
| 09:27AM | 20 | | THE COURT:  Sustained. |
| 09:27AM | 21 | | BY MR. KENNEDY: |
| 09:27AM | 22 | Q | Have you seen this photograph, Polynesian Cultural Center |
| 09:27AM | 23 | | from 2020? |
| 09:27AM | 24 | A | I do not remember seeing -- I might have seen it, but I |
| 09:28AM | 25 | | don't remember seeing this particular picture. |

09:28AM   1   Q    All right.  You're not -- do you recall seeing any

09:28AM   2   photographs of that work at the Polynesian Cultural Center in

09:28AM   3   2020?

09:28AM   4   A    No, I don't -- I don't remember --

09:28AM   5   Q    Okay.

09:28AM   6   A    -- seeing pictures of it.

09:28AM   7   Q    If you don't remember, you don't remember.

09:28AM   8        Moving on to Exhibit 5000-087, which has not been put

09:28AM   9   into evidence.

09:28AM   10       Do you recognize the individuals shown in 5000-087?

09:28AM   11  A    I recognize Mike Warden.

09:28AM   12  Q    All right.

09:28AM   13  A    I do not recognize the other person.

09:28AM   14  Q    Okay.  With respect to the Queen Emma Summer Palace work

09:28AM   15  in 2019, were you involved with that at all?

09:28AM   16  A    No.

09:28AM   17  Q    All right.  Have you seen or used any of the promotional

09:28AM   18  material in your job in sales during this time regarding the

09:29AM   19  Queen Emma Summer Palace job in 2019?

09:29AM   20  A    No, I've never used the Queen Emma Summer Palace --

09:29AM   21  Q    Okay.

09:29AM   22  A    -- in any of my jobs that I did.

09:29AM   23  Q    Okay.  Moving on to 5000-093, the mobile fumigation

09:29AM   24  chamber, 2019, Iolani Palace?

09:29AM   25  A    No.

09:29AM   1    Q    Have you used any of this material in your work with

09:29AM   2    Kama'aina Termite and Pest Control or O'ahu Termite and Pest

09:29AM   3    Control?

09:29AM   4    A    No, I haven't, sir.

09:29AM   5    Q    All right.  Moving on to 5000-121.  Do you recognize

09:29AM   6    what's shown on 5000-121?

09:29AM   7    A    The Doris Duke.

09:29AM   8    Q    All right.  Were you personally involved in any of the

09:30AM   9    work in 2018 with the Doris Duke Estate, Shangri La fumigation?

09:30AM   10   A    No, I was not.

09:30AM   11   Q    All right.  Moving on to 5000-128.  Do you recognize what

09:30AM   12   is tented in 5000-128?

09:30AM   13   A    This looks like the Ala Moana boathouse -- I mean, the Ala

09:30AM   14   Moana clubhouse.

09:30AM   15   Q    Okay.  Do you recognize the Waikiki Yacht Club?

09:30AM   16   A    Correct.

09:30AM   17   Q    Were you involved in the 2020 Waikiki Yacht Club

09:30AM   18   fumigation?

09:30AM   19   A    I didn't sell this job, but I was a part of it, meaning I

09:30AM   20   gave an estimate at a way higher price than the Kama'aina

09:30AM   21   person, the Kama'aina salesperson, and so we worked together

09:31AM   22   into -- into securing this job.

09:31AM   23         MR. KENNEDY:  All right.  At this point I would move

09:31AM   24   5000-128 to 5000-145.

09:31AM   25         THE COURT:  Any objection?

09:31AM  1          MR. AKINA:  No objection.

09:31AM  2          THE COURT:  Okay.  Without objection, 5000-128 through

09:31AM  3   5000-145, so it looks like about 18 exhibits, are admitted.

09:31AM  4   You may publish.

09:31AM  5               (Exhibits 5000-128 through 5000-145

09:31AM  6                   were received in evidence.)

09:31AM  7          MR. KENNEDY:  May we publish 5000-128?

09:31AM  8          THE COURT:  Yes.

09:33AM  9          MR. KENNEDY:  Let's quickly go through, 5000-129, 130,

09:33AM  10  131, 132, 133, 134, 135, 136, 137, 138, 139, 140, 141, 142,

09:34AM  11  143, and 144 and 145.

09:34AM  12  BY MR. KENNEDY:

09:34AM  13  Q    This was in May of 2020, correct?

09:34AM  14  A    I don't know the date, but I'm assuming you're correct.

09:34AM  15  Q    So at the same time that Kama'aina Termite and Pest

09:34AM  16  Control is doing this job, they're also doing the Mauna Kea

09:34AM  17  Hotel fumigation on the Big Island, correct?

09:34AM  18  A    I'm not sure, sir.

09:34AM  19  Q    All right.  I show you -- you're not familiar with the

09:34AM  20  Mauna Kea Hotel fumigation?

09:34AM  21  A    I'm familiar with it because it was a big project, but I

09:34AM  22  don't remember when we were doing that particular job.

09:34AM  23  Q    Okay.  I showed you this because I believe last week you

09:34AM  24  said that, you know, O'ahu Termite and Pest Control had a

09:35AM  25  better reputation than Kama'aina Termite and Pest Control.  Do

09:35AM   1   you recall that?

09:35AM   2   A    Yes, I recall that.

09:35AM   3   Q    Now, O'ahu Termite and Pest Control started in the 1970s,

09:35AM   4   right?

09:35AM   5   A    I believe so.

09:35AM   6   Q    Okay.  And at a certain point in about 1999 to 2000, you

09:35AM   7   understand because you started working at Kama'aina Termite and

09:35AM   8   Pest Control, that Kama'aina did all the fumigations for O'ahu

09:35AM   9   Termite and Pest Control, correct?

09:35AM  10   A    Correct.

09:35AM  11   Q    And so O'ahu focused on other aspects of pest control

09:35AM  12   other than fumigation, correct?

09:35AM  13   A    When I worked there or --

09:35AM  14   Q    Before and when you worked there up to a certain point,

09:35AM  15   yes.

09:35AM  16   A    When -- I don't -- I can't speak before that, but when I

09:35AM  17   worked there we concentrated on everything, and fumigation was

09:36AM  18   at the top of the list.

09:36AM  19   Q    Right.  But let me stop you there.  You started working in

09:36AM  20   2015, right?

09:36AM  21   A    Correct.

09:36AM  22   Q    So you weren't aware that prior to that for about at least

09:36AM  23   15 years, Kama'aina Termite and Pest Control had done all the

09:36AM  24   fumigations for O'ahu.  Is that a fair statement?

09:36AM  25   A    Yes, that's a fair statement.

09:36AM   1   Q    Okay.  In 2015, Kama'aina Termite and Pest Control was

09:36AM   2   still doing the fumigations for O'ahu Termite and Pest Control,

09:36AM   3   correct?

09:36AM   4   A    Yes.

09:36AM   5   Q    They did it through 2015, right?

09:36AM   6   A    Correct.

09:36AM   7   Q    They did it through 2016, correct?

09:36AM   8   A    Yes.

09:36AM   9   Q    In 2017, they did it, but something changed, correct?

09:36AM  10   A    Yes.

09:36AM  11   Q    O'ahu Termite and Pest Control became an entity, right?

09:36AM  12   A    Yes.

09:36AM  13   Q    Because Mr. Miske took it over, right?  It was sold to

09:36AM  14   him, right?

09:36AM  15   A    That's what I've been told.

09:37AM  16   Q    And in the beginning Kama'aina Termite and Pest Control

09:37AM  17   did the fumigations for O'ahu Pest -- Termite and Pest Control

09:37AM  18   as they had prior in 2015 and 2016, correct?

09:37AM  19   A    Yes.

09:37AM  20   Q    Eventually when Mr. Miske had it, eventually you got blue

09:37AM  21   tarps, right?

09:37AM  22   A    Yes.

09:37AM  23   Q    And O'ahu started doing fumigations for the first time.

09:37AM  24   A    Yes, we did have -- we did have one dedicated crew too.

09:37AM  25   Q    And so that dedicated crew would go out to places which

| | | |
|---|---|---|
| 09:37AM | 1 | were tented, right? |
| 09:37AM | 2 | A    They would go out and put up the tents and take them down. |
| 09:37AM | 3 | Q    Right.  And the fumigation would be done by Kama'aina |
| 09:37AM | 4 | Termite and Pest Control, correct? |
| 09:37AM | 5 | A    I'm not understanding your question, sir.  When -- |
| 09:38AM | 6 | Q    When they -- in the beginning before you got the blue |
| 09:38AM | 7 | tents -- |
| 09:38AM | 8 | A    Yes. |
| 09:38AM | 9 | Q    -- then the dedicated crew from Kama'aina Termite and Pest |
| 09:38AM | 10 | Control would go out and actually shoot the Vikane gas into the |
| 09:38AM | 11 | home, correct? |
| 09:38AM | 12 | A    Yes, the Kama'aina crew would go and do the tenting for |
| 09:38AM | 13 | O'ahu Termite. |
| 09:38AM | 14 | Q    Right.  Eventually, eventually you got a crew and you got |
| 09:38AM | 15 | blue tents, right? |
| 09:38AM | 16 | A    Correct. |
| 09:38AM | 17 | Q    Because the jury has seen the red and black for Kama'aina |
| 09:38AM | 18 | Termite, correct? |
| 09:38AM | 19 | A    Yes. |
| 09:38AM | 20 | Q    And so then now O'ahu Termite and Pest Control was doing |
| 09:38AM | 21 | something new, fumigations, right? |
| 09:38AM | 22 | A    No, I don't think that's correct. |
| 09:38AM | 23 | Q    Oh, they didn't do it in 2015, right? |
| 09:38AM | 24 | A    No, it was -- Kama'aina was doing their tent fumigations, |
| 09:38AM | 25 | correct. |

09:38AM  1  Q    Right.  So O'ahu Termite and Pest Control was doing ground
09:39AM  2  service and other things on their own, but when they needed
09:39AM  3  fumigation, they turned and had Kama'aina Termite and Pest
09:39AM  4  Control do them, correct?
09:39AM  5  A    Correct.
09:39AM  6  Q    And that good reputation came from Kama'aina's fumigation
09:39AM  7  work in addition to O'ahu Termite and Pest Control's other work
09:39AM  8  with pest control, correct?
09:39AM  9  A    I wouldn't say it was due to Kama'aina's good reputation
09:39AM  10  and good work.  There was a lot of customers that would cancel
09:39AM  11  jobs on the day of the job because Kama'aina showed up, and it
09:39AM  12  wasn't an O'ahu Termite crew.
09:39AM  13  Q    Sure.  Sure.  Because they're doing three times the amount
09:39AM  14  of fumigations as anybody on the island, right?
09:39AM  15  A    That's correct.
09:39AM  16  Q    And so if you're doing that sort of volume of time -- time
09:39AM  17  again somebody might not be happy, right?
09:39AM  18  A    Correct.
09:39AM  19  Q    Everything doesn't go perfect every time in business,
09:40AM  20  right?
09:40AM  21  A    It doesn't.
09:40AM  22  Q    Things happen, right?
09:40AM  23  A    Things happen.
09:40AM  24  Q    So if you're doing three times the volume of others,
09:40AM  25  you're probably going to have maybe a complaint or more or two,

09:40AM   1   right?

09:40AM   2   A    Most likely.

09:40AM   3   Q    Okay.  But as you've seen, nobody on the island was doing

09:40AM   4   the large jobs that I've shown you, correct?

09:40AM   5   A    Not to my knowledge.

09:40AM   6   Q    The one that was doing it was Kama'aina Termite and Pest

09:40AM   7   Control, correct?

09:40AM   8   A    Correct.

09:40AM   9         MR. KENNEDY:  I want to move to -- and, Your Honor, I

09:40AM  10   believe this would be in the exhibit binder for 5003.

09:41AM  11         THE COURT:  I've got the binder.

09:41AM  12         MR. KENNEDY:  All right.  And I would like to show the

09:41AM  13   witness Exhibit 5003-008.

09:41AM  14         THE COURT:  Okay.

09:41AM  15   BY MR. KENNEDY:

09:41AM  16   Q    Do you recognize what's been marked 5003-008, sir?

09:41AM  17   A    Yes.

09:41AM  18   Q    What is it?

09:41AM  19   A    It is myself and Chaunce at a booth for Realtors, I

09:41AM  20   believe.

09:42AM  21         MR. KENNEDY:  All right.  At this time, Your Honor, I

09:42AM  22   would move Exhibit 5003-008 into evidence.

09:42AM  23         MR. AKINA:  No objection.

09:42AM  24         THE COURT:  Without objection, Exhibit 5003-008 is

09:42AM  25   admitted.

09:42AM    1                (Exhibit 5003-008 was received in evidence.)

09:42AM    2                MR. KENNEDY:  May we publish, please?

09:42AM    3                THE COURT:  Yes, you may.

09:42AM    4                MR. KENNEDY:  Thank you.

09:42AM    5    BY MR. KENNEDY:

09:42AM    6    Q    So we saw a booth for Kama'aina Termite and Pest Control

09:42AM    7    earlier.  Is this a similar booth at a similar trade show?

09:42AM    8    A    Yes.

09:42AM    9    Q    Is it a different trade show?  Are you able to recognize

09:42AM   10    where you're at?

09:42AM   11    A    I believe this is a different trade show.  This is for

09:42AM   12    just Realtors.

09:42AM   13    Q    Okay.

09:42AM   14    A    Not the public.

09:42AM   15    Q    So you're talking about there are trade shows there are

09:42AM   16    for the public.  I believe you said this was just for Realtors,

09:42AM   17    right?

09:42AM   18    A    Yes.

09:42AM   19    Q    And Realtors have a real need for termite and pest control

09:42AM   20    services, right?

09:42AM   21    A    Yes.

09:42AM   22    Q    And that would involve termite inspection reports?

09:42AM   23    A    Termite inspection reports, fumigations.

09:43AM   24    Q    And so the termite inspection report would be something

09:43AM   25    that a buyer is looking for before they're going to put their

09:43AM    1    hard earned money down and buy a home, right?

09:43AM    2    A    I believe the termite inspection report is required before

09:43AM    3    a house -- a home is sold or a condo is sold.

09:43AM    4    Q    So it's now required because the problem is so great you

09:43AM    5    need it before anyone will buy or sell.

09:43AM    6    A    Yes.

09:43AM    7    Q    All right.  And so this is a specialty trade show in

09:43AM    8    addition to the other trade shows, right?

09:43AM    9    A    Yes.

09:43AM    10   Q    All right.  Moving?

09:43AM    11          MR. KENNEDY:  On to Exhibit 5003-007.  If we just pull

09:43AM    12   it up before we play it.

09:43AM    13          (Video was played for the jury.)

09:43AM    14          We can just stop it, Ms. King, for a second.

09:43AM    15   BY MR. KENNEDY:

09:44AM    16   Q    Do you recall a fumigation at King's Chapel in 2020 during

09:44AM    17   COVID?

09:44AM    18   A    No, I don't believe it was a fumigation.

09:44AM    19   Q    Or a -- I'm sorry.  Thank you for correcting me.

09:44AM    20          Do you recall work done by O'ahu Termite and Pest

09:44AM    21   Control on -- in 2020 during COVID?

09:44AM    22   A    Yes.

09:44AM    23          MR. KENNEDY:  And can we stop it?

09:44AM    24   BY MR. KENNEDY:

09:44AM    25   Q    You do recall it?

09:44AM    1    A    Yes, I do recall.

09:44AM    2    Q    Do you recall that in the footage that we're looking at

09:44AM    3    you personally spoke?

09:44AM    4    A    Yes, I did.

09:44AM    5         MR. KENNEDY:  Okay.  At this time I would offer

09:44AM    6    5003-007 into evidence.

09:44AM    7         THE COURT:  Any objection, Counsel?

09:44AM    8         MR. AKINA:  No objection, Your Honor.

09:44AM    9         THE COURT:  Without objection, 5003-7 is admitted.

09:44AM    10        (Exhibit 5003-007 was received in evidence.)

09:44AM    11        MR. KENNEDY:  May we publish and also then use the

09:44AM    12   sound?

09:44AM    13        THE COURT:  Yes, you may play the video.

09:45AM    14        MR. KENNEDY:  Thank you, Your Honor.

09:45AM    15        Oops, looks like we don't have sound.  Let's see if we

09:45AM    16   can get that worked out.

09:45AM    17        Still no sound.  Still no sound.  I apologize.

09:45AM    18   Technology sometimes.

09:45AM    19        Can we go back to the beginning.

09:45AM    20        (Video was played for the jury.)

09:45AM    21   BY MR. KENNEDY:

09:45AM    22   Q    So at this time you were with O'ahu Termite and Pest

09:47AM    23   Control, correct?

09:47AM    24   A    Yes.

09:47AM    25   Q    And you're providing a service to this church, right?

09:47AM   1   A    Yes.

09:47AM   2   Q    During COVID, correct?

09:47AM   3   A    Correct.

09:47AM   4        MR. KENNEDY:  Moving on to Exhibit 5003-009.

09:47AM   5   BY MR. KENNEDY:

09:47AM   6   Q    Before we play it, are you familiar with an individual by

09:47AM   7   the name of Wes Otani?

09:47AM   8   A    Yes, I've met Wes.

09:47AM   9   Q    Wes Otani worked for Terminix for a while.  Are you aware

09:48AM  10   of that?

09:48AM  11   A    Yes.

09:48AM  12   Q    And then he worked at Douglas Products, right?

09:48AM  13   A    Correct.

09:48AM  14   Q    And Douglas Products is the manufacturer for Vikane,

09:48AM  15   right?

09:48AM  16   A    The distributor.

09:48AM  17   Q    The distributor.

09:48AM  18   A    I don't know if they make it or not.

09:48AM  19   Q    And are you familiar with the training program that

09:48AM  20   fumigators and other authorized technicians have to go through

09:48AM  21   here in the state to do this job?

09:48AM  22   A    I'm not familiar.

09:48AM  23   Q    Did you attend the four-part training that Wes Otani did

09:48AM  24   for all the folks working for Kama'aina Termite and Pest

09:48AM  25   Control and O'ahu Termite and Pest Control regarding fumigating

| | | |
|---|---|---|
| 09:48AM | 1 | a house inside, outside, everything involved? |
| 09:48AM | 2 | A    I've sat in and attended Wes Otani's -- I guess he came in |
| 09:49AM | 3 | and gave an education class on -- we took -- we took that |
| 09:49AM | 4 | before -- I mean we saw Wes and listened to him, and did |
| 09:49AM | 5 | practice tests for our own tests, but I haven't sat in on every |
| 09:49AM | 6 | seminar that Wes has come and done for the companies. |
| 09:49AM | 7 | Q    Understood.  Let me show you just the first one of a |
| 09:49AM | 8 | four-part training and see if it looks familiar to you to be -- |
| 09:49AM | 9 | if you were one of the many individuals that was there, okay? |
| 09:49AM | 10 | A    Yes. |
| 09:49AM | 11 |     MR. AKINA:  Your Honor, I would object to this being |
| 09:49AM | 12 | played in the presence of the jury without the witness having |
| 09:49AM | 13 | an opportunity to identify it or review it. |
| 09:49AM | 14 |     THE COURT:  I thought that's what we were doing. |
| 09:49AM | 15 |     MR. KENNEDY:  That is what I was doing.  And if we can |
| 09:49AM | 16 | just do it without the sound. |
| 09:49AM | 17 |     THE COURT:  Yes. |
| 09:49AM | 18 |     MR. KENNEDY:  So that only Mr. Kimoto can view it, but |
| 09:49AM | 19 | the jury -- to see if he is familiar with it, and then I'll ask |
| 09:50AM | 20 | you some follow-up questions. |
| 09:50AM | 21 |     (Video was played without the sound for the witness.) |
| 09:50AM | 22 | BY MR. KENNEDY: |
| 09:50AM | 23 | Q    Sir, do you recall ever being out at a house with a group |
| 09:50AM | 24 | of people, 50 or more, with a training with Mr. Wes Otani? |
| 09:50AM | 25 | A    Yes, I do recall that. |

09:51AM   1   Q    Okay.  Does this look like a training that you personally
09:51AM   2   attended?
09:51AM   3   A    Yes.
09:51AM   4   Q    Okay.  And as we're just looking at it, their training was
09:51AM   5   outside of the house in terms of what to look for, correct?
09:51AM   6   A    Yes.
09:51AM   7   Q    Going around the house to determine the problems and
09:51AM   8   things that come up when you're fumigating, correct?
09:51AM   9   A    That's correct.
09:51AM  10   Q    Going inside the house to talk about problems that arise
09:51AM  11   inside the house?
09:51AM  12   A    Correct.
09:51AM  13   Q    And then down in the basement making certain placement of
09:51AM  14   fans and other things, correct?
09:51AM  15   A    Correct.
09:51AM  16   Q    All right.  And so you personally believe you were at this
09:51AM  17   training?
09:51AM  18   A    Yes.
09:51AM  19        MR. KENNEDY:  Okay.  We can stop it now.
09:51AM  20        At this time, Your Honor, I would move 5003-009
09:51AM  21   through 5003-12 into evidence.
09:52AM  22        MR. AKINA:  Objection.  Hearsay.
09:52AM  23        MR. KENNEDY:  I would say that, Your Honor -- do
09:52AM  24   this -- I'm sorry, Your Honor, I didn't hear the Court's
09:52AM  25   ruling, and I started to jump the gun.  I apologize.

| | | |
|---|---|---|
| 09:52AM | 1 | THE COURT:  Yes, so 5000-9 -- 5003-9 is admitted. |
| 09:52AM | 2 | (Exhibit 5003-9 was received in evidence.) |
| 09:52AM | 3 | THE COURT:  The objection is overruled.  There is no |
| 09:52AM | 4 | foundation -- I don't know what 5003-10, 11 or 12 depict.  We |
| 09:52AM | 5 | have asked the witness not one thing about any of those three. |
| 09:52AM | 6 | MR. KENNEDY:  Let's pull up 5003-10 since -- |
| 09:52AM | 7 | THE COURT:  I know you said it was a four-part |
| 09:52AM | 8 | training. |
| 09:52AM | 9 | MR. KENNEDY:  I do. |
| 09:52AM | 10 | THE COURT:  I was listening, but I don't know if -- |
| 09:52AM | 11 | MR. KENNEDY:  I agree. |
| 09:52AM | 12 | THE COURT:  -- 10, 11, 12 are parts 2, 3 and 4 or not. |
| 09:52AM | 13 | MR. KENNEDY:  You are right.  And so I'm pulling up |
| 09:52AM | 14 | 5003-010 so that Mr. Kimoto can look at it. |
| 09:52AM | 15 | BY MR. KENNEDY: |
| 09:53AM | 16 | Q    Sir, do you see what has been previously marked as |
| 09:53AM | 17 | 5003-010? |
| 09:53AM | 18 | A    Yes. |
| 09:53AM | 19 | Q    Do you recognize Wes Otani? |
| 09:53AM | 20 | A    Yes, I do. |
| 09:53AM | 21 | Q    Is it around the house at a different location talking |
| 09:53AM | 22 | about different issues involved with fumigation? |
| 09:53AM | 23 | A    Yes. |
| 09:53AM | 24 | Q    And this is a training that you personally were at? |
| 09:53AM | 25 | A    Yes.  I'm actually in this video at the beginning. |

09:53AM    1    Q    And I think you said you were actually in the -- in the

09:53AM    2    picture at this point.

09:53AM    3    A    Not at this point, but --

09:53AM    4    Q    But earlier.

09:53AM    5    A    Earlier, yes.

09:53AM    6         MR. KENNEDY:  Your Honor, I move 5003-010 into

09:53AM    7    evidence.

09:53AM    8         THE COURT:  Same objection, Counsel?

09:53AM    9         MR. AKINA:  Yes, Your Honor.

09:53AM    10        THE COURT:  All right.  Same ruling.  Overruled.

09:53AM    11   5003-10 is admitted.

09:53AM    12        (Exhibit 5003-010 was received in evidence.)

09:53AM    13        MR. KENNEDY:  Let's move on to 5003-011.

09:53AM    14   BY MR. KENNEDY:

09:53AM    15   Q    Do you recognize Wes Otani?

09:54AM    16   A    Yes, I do.

09:54AM    17   Q    Is this the same training?

09:54AM    18   A    This is the same training.

09:54AM    19   Q    And you are personally still at this training?

09:54AM    20   A    Yes.

09:54AM    21   Q    He's inside the house now?

09:54AM    22   A    Correct.

09:54AM    23   Q    All right.  And so we're at a different portion of it.

09:54AM    24        MR. KENNEDY:  At this time, Your Honor, I'd move

09:54AM    25   5003-11 into evidence.

09:54AM    1                    MR. AKINA:  Same objection.

09:54AM    2                    THE COURT:  All right.  Same ruling.  Objection is

09:54AM    3    overruled.  The exhibit is admitted, 5003-11.

09:54AM    4                    (Exhibit 5003-011 was received in evidence.)

09:54AM    5                    MR. KENNEDY:  Moving on to 5003-12.  If you could just

09:54AM    6    play it for Mr. Kimoto.

09:54AM    7                    (Video played.)

09:54AM    8    BY MR. KENNEDY:

09:54AM    9    Q      Do you recognize Wes Otani?

09:54AM    10   A      Yes.

09:54AM    11   Q      Same training?

09:54AM    12   A      Same training.

09:54AM    13   Q      Looks like we're at a different location in the house?

09:54AM    14   A      Correct.

09:54AM    15   Q      Regarding -- are you still at the training?

09:54AM    16   A      Yes, I believe so.

09:54AM    17                    MR. KENNEDY:  All right.  At this time, Your Honor, I

09:55AM    18   would move 5003-12 into evidence.

09:55AM    19                    MR. AKINA:  Same objection, hearsay.

09:55AM    20                    THE COURT:  All right.  Same ruling, the objection is

09:55AM    21   overruled.  5003-12 is admitted.

09:55AM    22                    And now you may publish any or all of those four

09:55AM    23   exhibits, 5003-9 through 5003-12.

09:55AM    24                    (Exhibit 5003-012 was received in evidence.)

09:55AM    25                    MR. KENNEDY:  Thank you, Your Honor.

| | | |
|---|---|---|
| 09:55AM | 1 | Let's start with 5003-009. |
| 09:55AM | 2 | (Video played.) |
| 09:55AM | 3 | BY MR. KENNEDY: |
| 09:55AM | 4 | Q    So this training is about termite fumigation; is that |
| 09:55AM | 5 | correct, sir? |
| 09:55AM | 6 | A    Yes. |
| 09:55AM | 7 | Q    Do you see Delia Fabro-Miske in the picture? |
| 09:59AM | 8 | A    Yes. |
| 09:59AM | 9 | Q    So now the folks here are folks who are workers at |
| 10:03AM | 10 | Kama'aina Termite and Pest Control? |
| 10:04AM | 11 | A    Yes, I believe both companies. |
| 10:04AM | 12 | Q    Both companies are there, right? |
| 10:04AM | 13 | A    Yes. |
| 10:04AM | 14 | Q    Wes Otani is a distributor with Douglas, correct? |
| 10:04AM | 15 | A    Yes. |
| 10:04AM | 16 | Q    You could see Vikane on his shirt, right? |
| 10:04AM | 17 | A    Yes. |
| 10:04AM | 18 | Q    And Mr. Miske has put on this training for his workers, |
| 10:04AM | 19 | correct? |
| 10:04AM | 20 | A    Correct. |
| 10:04AM | 21 | Q    All right.  And so Mr. Otani is asking questions rather |
| 10:04AM | 22 | than just giving answers, right? |
| 10:04AM | 23 | A    Yes. |
| 10:04AM | 24 | Q    So he's opening it up so that there is a give and take, |
| 10:04AM | 25 | right? |

| | | | |
|---|---|---|---|
| 10:04AM | 1 | A | Correct. |
| 10:04AM | 2 | Q | So that everybody learns what problems can arise, right? |
| 10:04AM | 3 | A | Yes. |
| 10:04AM | 4 | Q | And that it's not so simple that it's -- if it's just a |
| 10:04AM | 5 | | bush, what do you do, right? |
| 10:04AM | 6 | A | Correct. |
| 10:04AM | 7 | Q | How far do you keep the tarp, correct? |
| 10:04AM | 8 | A | Yes. |
| 10:04AM | 9 | Q | And so this is something you needed to know in terms of |
| 10:04AM | 10 | | sales so that you could communicate to customers, right? |
| 10:04AM | 11 | A | Yes. |
| 10:04AM | 12 | Q | All right. |
| 10:05AM | 13 | | MR. KENNEDY:  Moving on to 5003-010. |
| 10:05AM | 14 | | Looks like we lost our sound. |
| 10:05AM | 15 | | (Video played.) |
| 10:05AM | 16 | | BY MR. KENNEDY: |
| 10:05AM | 17 | Q | Up on the deck, do you see Delia Fabro-Miske? |
| 10:05AM | 18 | A | Yes. |
| 10:05AM | 19 | Q | When he's mentioning George, is it George Perry? |
| 10:06AM | 20 | A | Correct. |
| 10:06AM | 21 | Q | So the cubing deals with the amount of gas that is needed |
| 10:07AM | 22 | | within the tent structure, correct? |
| 10:07AM | 23 | A | Yes, the cubing is the measurement of the home. |
| 10:07AM | 24 | Q | So what was pointed out there is you needed a ground seal |
| 10:07AM | 25 | | to make certain that the gas that's shot into the structure |

10:07AM  1   remains in the structure to kill termites and pests, right?

10:08AM  2   A    Yes.

10:08AM  3   Q    And that the distance the tarp would be out adds to the

10:08AM  4   cubing when you're doing the measurements to determine how much

10:08AM  5   gas to use, right?

10:08AM  6   A    Correct.

10:08AM  7   Q    And the type of pests that you're dealing with can change

10:08AM  8   the amount of gas that is needed, correct?

10:08AM  9   A    Correct.

10:08AM  10  Q    So all of those factors go into, as Mr. Otani said,

10:08AM  11  getting the kill, right?

10:08AM  12  A    Correct.

10:08AM  13  Q    Because what the customer wants, whether it's a business

10:08AM  14  or whether it's a home, is the pests dead and don't come back,

10:08AM  15  right?

10:08AM  16  A    The pests dead.  We can't -- we can't guarantee them not

10:08AM  17  coming back.

10:08AM  18  Q    The only thing about the island is that at some point

10:08AM  19  you'll have to do something to eliminate the pests.  It will

10:08AM  20  kill them for a time, correct?

10:08AM  21  A    Yes, correct.

10:08AM  22       MR. KENNEDY:  Please continue, and I apologize.

10:17AM  23       (Video played.)

10:17AM  24       THE COURT:  Could you pause the video, please?

10:17AM  25       MR. KENNEDY:  Please pause.

| | | |
|---|---|---|
| 10:17AM | 1 | THE COURT: How much playing time does this exhibit |
| 10:17AM | 2 | have remaining? |
| 10:17AM | 3 | MR. KENNEDY: I don't see it on the bottom, Your |
| 10:17AM | 4 | Honor. I would have to check -- |
| 10:17AM | 5 | THE COURT: All right. That's why I'm asking. |
| 10:17AM | 6 | MR. KENNEDY: Do you happen to have that, Ms. King? |
| 10:17AM | 7 | MS. KING: Two more minutes. |
| 10:17AM | 8 | MR. KENNEDY: Two more minutes. |
| 10:17AM | 9 | THE COURT: All right. Let's go ahead and finish it |
| 10:17AM | 10 | then, and then we'll take a break. Go ahead. Thank you. |
| 10:17AM | 11 | (Video played.) |
| 10:19AM | 12 | THE COURT: All right. So let's go ahead and -- now |
| 10:19AM | 13 | that this particular exhibit has completed playing, that's -10, |
| 10:19AM | 14 | we'll go ahead and take our first break of the day. |
| 10:19AM | 15 | As we do so, I know all of our jurors have missed me |
| 10:19AM | 16 | saying this, but please refrain from discussing the substance |
| 10:19AM | 17 | of this case with anyone, including each other, until I advise |
| 10:19AM | 18 | otherwise; do not access any media or other accounts of this |
| 10:19AM | 19 | case that may be out there; and then finally, do not conduct |
| 10:19AM | 20 | any independent investigations into the facts, circumstance or |
| 10:19AM | 21 | persons involved. |
| 10:19AM | 22 | Let's take about a 15-minute break, and then we will |
| 10:19AM | 23 | resume with Mr. Kimoto at that time. |
| 10:20AM | 24 | (Proceedings were recessed at 10:20 a.m. to 10:44 |
| 10:44AM | 25 | a.m.) |

10:44AM    1              THE COURT:  All right.  Back from our first morning

10:44AM    2    break.

10:44AM    3              Mr. Ott, got used to your new seat there?

10:44AM    4              So we were in the middle of the series of four videos

10:45AM    5    that Mr. Kennedy was playing.

10:45AM    6              And so you're free to resume whenever you're ready.

10:45AM    7              MR. KENNEDY:  Thank you, sir.

10:45AM    8              If we could pull up 5003-011.

10:45AM    9              And publish it to the jury?

10:45AM   10              THE COURT:  You may.  This has been admitted.

10:45AM   11              (Video was played for the jury.)

10:45AM   12    BY MR. KENNEDY:

10:54AM   13    Q    Sir, he's talking about in this introductory portion of

10:55AM   14    5003-011 about Vikane and the gas, and what you need to do

10:55AM   15    inside the home, correct?

10:55AM   16    A    Yes.

10:55AM   17    Q    And so you were at this.  And the jury has it in evidence.

10:55AM   18    He's going to answer questions about what to do inside the

10:55AM   19    house in this area for close to 48 minutes, so I'm not going

10:55AM   20    play it all for the jury.

10:55AM   21              But this is to educate both Kama'aina's and O'ahu's

10:55AM   22    individuals working for Mr. Miske, correct?

10:55AM   23    A    Correct.

10:55AM   24    Q    And so this is a give and take so everyone can understand

10:55AM   25    the details and how someone like Wes Otani at Douglas Products

| 10:55AM | 1 | to reach out to, to ask these technical questions and make |
| 10:55AM | 2 | certain that everybody understands how to do the job right, |
| 10:55AM | 3 | correct? |
| 10:55AM | 4 | A    Correct. |
| 10:55AM | 5 | MR. KENNEDY:  All right.  If we move on to just |
| 10:55AM | 6 | 5003-12. |
| 10:56AM | 7 | (Continued playing of the video.) |
| 10:59AM | 8 | BY MR. KENNEDY: |
| 11:00AM | 9 | Q    So inside the house, the earlier one -- the jury will have |
| 11:00AM | 10 | this -- that was 48 minutes, and we watched a little of it. |
| 11:00AM | 11 | For this portion is another 24 minutes.  So we're spending |
| 11:00AM | 12 | close to an hour and a half just talking about what to do |
| 11:00AM | 13 | inside the house to make certain you have the gas right, the |
| 11:00AM | 14 | aeration right, the area covered, so that in the end the |
| 11:00AM | 15 | fumigation is done correct. |
| 11:00AM | 16 | A    Correct. |
| 11:00AM | 17 | Q    And part of this is there are -- I think you know -- |
| 11:01AM | 18 | Department of Agricultural folks there at this training for |
| 11:01AM | 19 | watching Wes Otani teach the skills necessary for folks |
| 11:01AM | 20 | involved in fumigation, correct? |
| 11:01AM | 21 | A    I don't know.  I know there was one person that I didn't |
| 11:01AM | 22 | recognize at this training session, but I don't know what -- I |
| 11:01AM | 23 | mean where he worked or what he was there for. |
| 11:01AM | 24 | Q    All right.  And did you ever get a certification or -- you |
| 11:01AM | 25 | know, for that training that you attended here? |

11:01AM   1   A    I -- I don't remember.

11:01AM   2   Q    Okay.  Fair enough.

11:01AM   3         All right.  So all total, we're talking over two

11:01AM   4   hours' worth of hands-on training by Mr. Miske for the folks

11:01AM   5   working for him, correct?

11:01AM   6   A    Provided by Mr. Miske --

11:01AM   7   Q    Yes.

11:01AM   8   A    -- done by Wes Otani, correct.

11:01AM   9   Q    Yes.  And Wes Otani, once again, Douglas Products,

11:02AM  10   background at Terminix, and the distributor for Vikane, right?

11:02AM  11   A    Yes.

11:02AM  12   Q    And someone that also came to the office and gave

11:02AM  13   trainings as well, correct?

11:02AM  14   A    Correct.

11:02AM  15   Q    All right.  I want to move to a different exhibit,

11:02AM  16   9010-101, which is a video and an audio.

11:02AM  17         Did you at sales meetings and other meetings inside

11:02AM  18   the office give training yourself?

11:02AM  19   A    I don't think -- I never gave training.  That wasn't my

11:02AM  20   strong point.

11:02AM  21   Q    Okay.  But just in terms of a meeting --

11:02AM  22         MR. KENNEDY:  If we pull up Exhibit 9010-101.

11:02AM  23   BY MR. KENNEDY:

11:02AM  24   Q    -- see if you recognize this before we play it.

11:02AM  25   A    Yes, that is a -- that's a sales meeting.

11:02AM    1    Q    Okay.  Now, where is this meeting at?

11:02AM    2    A    This is in the board room at the Kama'aina Termite and

11:02AM    3    Pest Control office.

11:03AM    4    Q    Okay.  And do you see yourself?

11:03AM    5    A    Yes, I do.

11:03AM    6    Q    And where are you?

11:03AM    7    A    I'm standing in the front with the black shirt and I have

11:03AM    8    a hat on.

11:03AM    9    Q    All right.  And is this in the board room and this is a

11:03AM    10   meeting that you're having?

11:03AM    11   A    Correct.

11:03AM    12              MR. KENNEDY:  All right.  Your Honor, at this time I

11:03AM    13   would move into evidence 9010-101.

11:03AM    14              MR. AKINA:  Objection on hearsay.  Also to the extent

11:03AM    15   this is a prior statement of the witness, I don't think the

11:03AM    16   foundation has been laid for it to be entered into as either

11:03AM    17   consistent or inconsistent.

11:03AM    18              THE COURT:  The objection is overruled.

11:03AM    19              Is this on one of your exhibit lists?

11:03AM    20              MS. PANAGAKOS:  Yes.

11:03AM    21              MR. KENNEDY:  It should be.

11:03AM    22              THE COURT:  Which one?

11:03AM    23              MR. KENNEDY:  It should be I believe on the

11:03AM    24   supplemental.

11:03AM    25              THE COURT:  Which one?

| | | |
|---|---|---|
| 11:03AM | 1 | MS. PANAGAKOS:  The third supplemental, Your Honor. |
| 11:03AM | 2 | And it's -- the exhibits on the list were added to the binder. |
| 11:04AM | 3 | THE COURT:  Well, we'll resolve it later on.  I don't |
| 11:04AM | 4 | have it. |
| 11:04AM | 5 | 9010-101 is admitted.  You may publish. |
| 11:04AM | 6 | (Exhibit 9010-101 was received in evidence.) |
| 11:04AM | 7 | MR. KENNEDY:  Looks like we have lost the sound. |
| 11:04AM | 8 | (Video was played for the jury.) |
| 11:04AM | 9 | BY MR. KENNEDY: |
| 11:05AM | 10 | Q    Sir, you're talking at this meeting about when problems |
| 11:05AM | 11 | arise, correct? |
| 11:05AM | 12 | A    Correct. |
| 11:05AM | 13 | Q    And that it's always better to, you know, have |
| 11:05AM | 14 | communication, right? |
| 11:05AM | 15 | A    Yes. |
| 11:05AM | 16 | Q    And so one of the things that happens, you have maybe at |
| 11:05AM | 17 | Kama'aina Termite and Pest Control at points close to a hundred |
| 11:05AM | 18 | people working? |
| 11:05AM | 19 | A    That's fair to say. |
| 11:05AM | 20 | Q    And so communication is key, right? |
| 11:05AM | 21 | A    Yes. |
| 11:05AM | 22 | Q    And so one of the things that was developed is a use of |
| 11:05AM | 23 | signal, correct? |
| 11:05AM | 24 | A    Correct. |
| 11:05AM | 25 | Q    And a use of slack? |

11:05AM    1    A    Correct.

11:05AM    2    Q    Can you tell the ladies and gentlemen of the jury what

11:05AM    3    signal is.

11:05AM    4    A    Signal is a texting app that we -- that we use to

11:05AM    5    communicate with everybody that's in the company.  There's

11:05AM    6    different categories for it.  I mean office, there's managers,

11:06AM    7    technicians, fumigators, sales team.

11:06AM    8    Q    What is Slack?

11:06AM    9    A    Slack is another form of communication that -- texting app

11:06AM    10    that we -- that we used for the same -- for the same things.

11:06AM    11    Q    So, sir, I want to show you what has been marked as

11:06AM    12    Exhibit 910-084 (sic).

11:06AM    13        MR. KENNEDY:  And this has not yet been admitted, Your

11:06AM    14    Honor.

11:06AM    15    BY MR. KENNEDY:

11:06AM    16    Q    Do you recognize what has been marked as 9010-084, sir?

11:06AM    17    A    Yes.  Phone numbers.

11:06AM    18    Q    All right.  And if we move to the second page.  Are you

11:06AM    19    able to read that on your screen, sir?

11:06AM    20    A    Can you enlarge it?

11:06AM    21    Q    Absolutely.

11:06AM    22        MR. KENNEDY:  Blow up the first part, Ms. King.

11:07AM    23        THE WITNESS:  (Peruses document.)  Yes, I read it.

11:07AM    24    BY MR. KENNEDY:

11:07AM    25    Q    All right.  And can you see the lower portion, sir?

11:07AM  1   A    In green?

11:07AM  2   Q    Yes.

11:07AM  3   A    Yes.

11:07AM  4   Q    All right.  And then moving to the next page.  Can you see

11:07AM  5   that as well?

11:07AM  6   A    Yes.

11:07AM  7   Q    And moving to the final page.

11:07AM  8   A    Yes.

11:07AM  9   Q    All right.  Do you recognize it as the 2019 managers

11:07AM  10  Signal group thread?

11:07AM  11  A    Yes.

11:07AM  12       MR. KENNEDY:  All right.  At this time I would move to

11:08AM  13  admit 910 -- 9010-084.  It consists of four pages, 001 through

11:08AM  14  004, Your Honor.

11:08AM  15       THE COURT:  Any objection?

11:08AM  16       MR. AKINA:  No objection.

11:08AM  17       MR. KENNEDY:  May I publish?

11:08AM  18       THE COURT:  You may.  That exhibit is admitted.

11:08AM  19  That's 9010-084.

11:08AM  20       (Exhibit 9010-084 was received in evidence.)

11:08AM  21  Q    All right.  So you just mentioned that this is the 2019

11:08AM  22  managers Signal thread, correct?

11:08AM  23  A    Yes.

11:08AM  24  Q    And so everyone who is a manager is on this thread so that

11:08AM  25  folks know what's happening at the managerial level, correct?

| 11:08AM | 1 | A | Yes. |

11:08AM    1    A    Yes.

11:08AM    2    Q    And you are --

11:08AM    3         MR. KENNEDY:  If we blow up the top portion --

11:08AM    4    BY MR. KENNEDY:

11:08AM    5    Q    -- indicated as Pres, right?

11:08AM    6    A    Correct.

11:08AM    7    Q    And the number is 1-808-859-2855?

11:08AM    8    A    No.

11:08AM    9    Q    2822.  I'm sorry.

11:08AM    10   A    Correct.

11:08AM    11   Q    I need to get closer.

11:09AM    12        Now, that's your iPhone 6, right?

11:09AM    13   A    I don't remember what number iPhone that was, but that is

11:09AM    14   my phone number, sir.

11:09AM    15   Q    And that one is an iPhone 6, not a burner phone, right?

11:09AM    16   A    That one was purchased initially as a phone to be used by

11:09AM    17   only myself and Mike.

11:09AM    18   Q    All right.  And so it's now being used within a

11:09AM    19   companywide managers group thread, correct?

11:09AM    20   A    Yes.

11:09AM    21   Q    All right.  And MJ is Mr. Miske?

11:09AM    22   A    Yes.

11:09AM    23   Q    All right.  And the other managers here are listed, right?

11:09AM    24   A    Correct.

11:09AM    25        MR. KENNEDY:  All right.  If we move to the second

11:09AM   1   page.

11:09AM   2   BY MR. KENNEDY:

11:09AM   3   Q    And this is a group created, right?

11:09AM   4   A    Yes.

11:09AM   5   Q    So this is the 2019 version of who the managers are and

11:09AM   6   who is going to be in communication about what's happening with

11:10AM   7   Kama'aina Termite and Pest Control, correct?

11:10AM   8   A    Yes.

11:10AM   9   Q    And O'ahu press -- Termite and Pest Control.

11:10AM  10   A    Correct.

11:10AM  11   Q    I'll spit it out in a second.  Thank you, sir.

11:10AM  12        So if we move to -- and then this continues for the

11:10AM  13   full year, and so on this thread we just have a few pages, but

11:10AM  14   the jobs, the issues, the things that come up are all

11:10AM  15   communicated by this use of Signal, right?

11:10AM  16   A    Yes.

11:10AM  17   Q    Okay.  Now, within Signal you can use Slack as well,

11:10AM  18   right?

11:10AM  19   A    I believe Slack is a different platform.

11:10AM  20   Q    It is, but it can also then take photographs and attach it

11:10AM  21   to messages within Signal, correct?

11:10AM  22   A    Yes.

11:10AM  23   Q    Okay.  And so I'll get to that.  So in this managers

11:11AM  24   thread, from time to time something that's happening at a job

11:11AM  25   site a picture will be taken, and so the managers have the

11:11AM   1    ability to see exactly what's happening at the house, correct?

11:11AM   2    A    Correct.

11:11AM   3    Q    And it's like a checklist.  If there are ten things you

11:11AM   4    have to do, the person goes in, they do one, take a picture;

11:11AM   5    second one, take a picture; third one, take a picture, all the

11:11AM   6    way through, and then the managers can see exactly what's going

11:11AM   7    on at the house, right?

11:11AM   8    A    Correct.

11:11AM   9    Q    All right.

11:11AM   10        MR. KENNEDY:  Now, if we move to 9010-085, which is

11:11AM   11   not yet in evidence.

11:11AM   12   BY MR. KENNEDY:

11:11AM   13   Q    Do you recognize 9010-085?

11:11AM   14   A    Yes.  It's a list of phone numbers.

11:11AM   15   Q    Okay.

11:11AM   16        MR. KENNEDY:  And then if we move to the second page.

11:11AM   17   If we blow up the top portion.

11:11AM   18   BY MR. KENNEDY:

11:11AM   19   Q    And just read that to yourself.

11:11AM   20   A    The one in blue?

11:12AM   21   Q    The one in blue, and then you can read the one in green if

11:12AM   22   you can read it.

11:12AM   23   A    (Peruses document.)

11:12AM   24   Q    And just let me know when you're done.

11:12AM   25   A    I'm finished.

11:12AM   1    Q    Okay.  Move to the third page.  Can you read that or do
11:12AM   2    you need it blown up, sir?
11:12AM   3    A    Just blown up a little.
11:12AM   4    Q    Okay, will do.
11:12AM   5         MR. KENNEDY:  Ms. King, if you can do that.  Thank you
11:12AM   6    so much.
11:12AM   7    BY MR. KENNEDY:
11:12AM   8    Q    On to the next page.
11:12AM   9         MR. KENNEDY:  And if you could blow up the portion.
11:12AM   10   BY MR. KENNEDY:
11:12AM   11   Q    And do you recognize on the fourth page a message from
11:13AM   12   you?
11:13AM   13   A    Yes.
11:13AM   14   Q    Okay.
11:13AM   15        MR. KENNEDY:  Moving on to the fifth page.
11:13AM   16        And then on to the 6th page.
11:13AM   17   BY MR. KENNEDY:
11:13AM   18   Q    All right.  Do you recognize that as the 2020 new managers
11:13AM   19   Signal group thread?
11:13AM   20   A    Yes.
11:13AM   21   Q    All right.  And so if managers change, then you create a
11:13AM   22   new thread so that each individual who is a manager has access
11:13AM   23   to everything that's going on in terms of that thread, correct?
11:13AM   24   A    Correct.
11:13AM   25   Q    All right.

11:13AM    1          MR. KENNEDY:  At this time, Your Honor, I'd move

11:13AM    2    910-085 (sic) into evidence.  It is six pages, 001 through 006.

11:13AM    3          MR. AKINA:  No objection.

11:13AM    4          THE COURT:  Without objection, 9010-085 is admitted.

11:13AM    5    You may publish.

11:13AM    6          (Exhibit 9010-085 was received in evidence.)

11:13AM    7    BY MR. KENNEDY:

11:13AM    8    Q    Once again, this is just six pages, but during the course

11:13AM    9    of the year you would have all the communications that's going

11:13AM   10    on with managers inside that thread, correct?

11:14AM   11    A    Correct.

11:14AM   12          MR. KENNEDY:  Moving on to 9010-086, which is not yet

11:14AM   13    in evidence.

11:14AM   14    BY MR. KENNEDY:

11:14AM   15    Q    And before I do that, both yourself and Mr. Miske were on

11:14AM   16    that thread, correct?

11:14AM   17    A    This thread in front of me, sir?

11:14AM   18    Q    The one from the previous one.  Do you need to see it

11:14AM   19    again?

11:14AM   20    A    Yes, please.

11:14AM   21          MR. KENNEDY:  Okay.  If we could go back to 9010-085.

11:14AM   22          THE WITNESS:  Yes.

11:14AM   23    BY MR. KENNEDY:

11:14AM   24    Q    All right.  And so "MJ owner" is at the top, correct?

11:14AM   25    A    Correct.

11:14AM   1   Q    And you are indicated as "Pres Oahu," right?

11:14AM   2   A    Yes.

11:14AM   3   Q    At the number, the last four digits being 2822.

11:14AM   4   A    Correct.

11:14AM   5   Q    All right.

11:14AM   6        MR. KENNEDY:  Let's move on to 910-086 (sic).

11:14AM   7   BY MR. KENNEDY:

11:14AM   8   Q    Now, you mentioned there were other threads.  Was there

11:15AM   9   also a sales thread for the folks who were just in the sales

11:15AM  10   area for Kama'aina Termite and Pest Control and O'ahu Termite

11:15AM  11   and Pest Control?

11:15AM  12   A    Yes.

11:15AM  13   Q    All right.  Moving to the second page of 9010-086.  Do you

11:15AM  14   need that blown up, sir?

11:15AM  15   A    Yeah.  (Peruses document.)  I read it.

11:15AM  16        MR. KENNEDY:  All right.  Moving on to the next page.

11:15AM  17        Moving on to the next page.

11:15AM  18        Moving on to the next page.

11:15AM  19        And moving on to the next page.

11:15AM  20   BY MR. KENNEDY:

11:16AM  21   Q    Do you recognize that as the 2020 new Signal sales group

11:16AM  22   thread?

11:16AM  23   A    Yes.

11:16AM  24   Q    And so that specific thread is folks like yourself who are

11:16AM  25   a manager, right?

| 11:16AM | 1 | A | Correct. |
| 11:16AM | 2 | Q | Folks like Mr. Miske, who's the owner? |
| 11:16AM | 3 | A | Correct. |

11:16AM   4   Q   But also folks who are just sales related activities so
11:16AM   5   that everyone is on the same thread and being able to
11:16AM   6   communicate, right?

11:16AM   7   A   Correct.

11:16AM   8   Q   Using new technology, right?

11:16AM   9   A   Correct.

11:16AM  10   Q   State of the art, right?

11:16AM  11   A   I don't know if it's state of the art, but --

11:16AM  12   Q   But it works, doesn't it?

11:16AM  13   A   -- it works.

11:16AM  14       MR. KENNEDY:  I would move 9010-086 into evidence.

11:16AM  15       MR. AKINA:  No objection.

11:16AM  16       THE COURT:  Without objection, 9010-86 is admitted.

11:16AM  17       (Exhibit 9010-086 was received in evidence.)

11:16AM  18       MR. KENNEDY:  Moving on to 9010-087, which is not yet
11:17AM  19   in evidence.

11:17AM  20   BY MR. KENNEDY:

11:17AM  21   Q   Do you recognize 9010-087?

11:17AM  22   A   Yes.

11:17AM  23   Q   All right.  Do you see "MJ owner" for Mr. Miske?

11:17AM  24   A   Yes.

11:17AM  25   Q   Do you see on here yourself?

| | | | |
|---|---|---|---|
| 11:17AM | 1 | A | Yes, I do. |
| 11:17AM | 2 | Q | All right.  And you are indicated as "Pres," dash, |
| 11:17AM | 3 | | correct? |
| 11:17AM | 4 | A | Pres - Oahu. |
| 11:17AM | 5 | Q | All right. |
| 11:17AM | 6 | | MR. KENNEDY:  And if we go through the second page. |
| 11:17AM | 7 | | Moving on to the third page. |
| 11:17AM | 8 | | Moving on to the fourth page. |
| 11:17AM | 9 | | Moving on to the -- I think we are at the end.  If we |
| 11:18AM | 10 | | go back to the front. |
| 11:18AM | 11 | | BY MR. KENNEDY: |
| 11:18AM | 12 | Q | Do you recognize this as the 2020 new fume Signal group |
| 11:18AM | 13 | | thread? |
| 11:18AM | 14 | A | Correct. |
| 11:18AM | 15 | Q | And "fume" is short for fumigation? |
| 11:18AM | 16 | A | Correct. |
| 11:18AM | 17 | Q | So now this is the group thread for everyone that's doing |
| 11:18AM | 18 | | fumigations for Kama'aina Termite and Pest Control and O'ahu |
| 11:18AM | 19 | | Termite and Pest Control, correct? |
| 11:18AM | 20 | A | Not everyone.  This is just for the people that drive the |
| 11:18AM | 21 | | trucks and -- I mean drive the trucks for the fumigation crew. |
| 11:18AM | 22 | Q | Okay. |
| 11:18AM | 23 | A | Not all the fumigators are on this thread. |
| 11:18AM | 24 | Q | On this thread, it's the folks who are driving the trucks, |
| 11:18AM | 25 | | right? |

11:18AM   1   A    Driving the trucks and -- and management.

11:18AM   2   Q    And management, right?

11:18AM   3   A    Correct, and the fume desk.

11:18AM   4        MR. KENNEDY:  And so at this time I'd move 910-087

11:18AM   5   (sic) into evidence.  It is four pages, 0001 through 0004.

11:19AM   6        THE COURT:  Any objection?

11:19AM   7        MR. AKINA:  No objection to this exhibit.

11:19AM   8        THE COURT:  Without objection, 9010-087 is admitted.

11:19AM   9        (Exhibit 9010-087 was received in evidence.)

11:19AM   10  BY MR. KENNEDY:

11:19AM   11  Q    If we move just to page 3, do you see a notation there?

11:19AM   12       MS. PANAGAKOS:  Counsel --

11:19AM   13       MR. KENNEDY:  Can we publish?

11:19AM   14       THE COURT:  You may.

11:19AM   15  BY MR. KENNEDY:

11:19AM   16  Q    So on 9010-087, do you see the "kill the old fume thread

11:19AM   17  and use this thread"?

11:19AM   18  A    Yes.

11:19AM   19  Q    All right.  And so what's happening is new people have

11:19AM   20  been added, maybe people have gone off.  So you're getting rid

11:19AM   21  of what was the last year's thread so that you can start anew

11:19AM   22  each year, correct?

11:19AM   23  A    No, these -- these threads could be -- it's not for

11:20AM   24  every -- like it's not annually.  It could be any -- any time.

11:20AM   25  Q    Okay.  So you started a new thread -- if we go to page 2,

| | | |
|---|---|---|
| 11:20AM | 1 | it looks like in March of 2020. |
| 11:20AM | 2 | A    Correct. |
| 11:20AM | 3 | Q    So the top message is you created the group, right? |
| 11:20AM | 4 | A    Yes. |
| 11:20AM | 5 | Q    All right.  And then blow it is the individuals who are to |
| 11:20AM | 6 | be added to the group, right? |
| 11:20AM | 7 | A    Correct. |
| 11:20AM | 8 | Q    All right.  And Delz is on there.  Is that Delia |
| 11:20AM | 9 | Fabro-Miske? |
| 11:20AM | 10 | A    Correct. |
| 11:20AM | 11 | Q    All right.  And so those folks have been added to this |
| 11:20AM | 12 | Signal thread, correct? |
| 11:20AM | 13 | A    Correct. |
| 11:20AM | 14 | Q    All right.  And so when we go to page 3, the old thread is |
| 11:20AM | 15 | now stopped, and now you have a new thread because you've got |
| 11:20AM | 16 | new members, so you're continually updating it to make it |
| 11:20AM | 17 | current, correct? |
| 11:20AM | 18 | A    Correct. |
| 11:21AM | 19 | MR. KENNEDY:  All right.  If we look at 9010-088, |
| 11:21AM | 20 | which is not yet in evidence. |
| 11:21AM | 21 | Look at the first page, then let's move to the second |
| 11:21AM | 22 | page. |
| 11:21AM | 23 | Move to the third page. |
| 11:21AM | 24 | And then we can blow up the bottom portion. |
| 11:21AM | 25 | BY MR. KENNEDY: |

| | | |
|---|---|---|
| 11:21AM | 1 | Q    Do you recognize this as a 2020 companywide Signal group |
| 11:21AM | 2 | thread? |
| 11:21AM | 3 | A    Yes, that's what -- |
| 11:21AM | 4 | MR. KENNEDY:  Okay.  At this time, Your Honor, I would |
| 11:21AM | 5 | move 9010-088 into evidence. |
| 11:21AM | 6 | THE COURT:  Mr. Akina? |
| 11:21AM | 7 | MR. AKINA:  No objection. |
| 11:21AM | 8 | THE COURT:  Without objection, 9010-88 is admitted. |
| 11:21AM | 9 | (Exhibit 9010-088 was received in evidence.) |
| 11:22AM | 10 | MR. KENNEDY:  May we publish? |
| 11:22AM | 11 | THE COURT:  You may. |
| 11:22AM | 12 | BY MR. KENNEDY: |
| 11:22AM | 13 | Q    So the participants are listed on the first page, correct? |
| 11:22AM | 14 | A    Yes. |
| 11:22AM | 15 | Q    And then if we move to the second page, additional |
| 11:22AM | 16 | participants are listed, correct? |
| 11:22AM | 17 | A    Yes. |
| 11:22AM | 18 | Q    And then if we move to the third page, additional |
| 11:22AM | 19 | participants are identified? |
| 11:22AM | 20 | A    Correct. |
| 11:22AM | 21 | MR. KENNEDY:  And then if we blow up the bottom |
| 11:22AM | 22 | portion. |
| 11:22AM | 23 | BY MR. KENNEDY: |
| 11:22AM | 24 | Q    This is now on March 13th of 2020, this is a companywide |
| 11:22AM | 25 | thread:  "We'll add remaining employees once Signal is |

11:22AM   1   downloaded on their phones."  Correct?

11:22AM   2   A    Correct.

11:22AM   3   Q    So everyone is getting Signal downloaded on their phones

11:22AM   4   so that they can have messaging capabilities companywide,

11:22AM   5   correct?

11:22AM   6   A    Correct.

11:22AM   7   Q    Through manager threads, through fumigation threads,

11:23AM   8   through sales threads and companywide threads.

11:23AM   9   A    Correct.

11:23AM  10   Q    All right.  And then if we look at a portion of this

11:23AM  11   thread -- and so the companywide thread would tend to be a

11:23AM  12   longer thread since there are more participants, correct?

11:23AM  13   A    Yes, there's more -- there are definitely more

11:23AM  14   participants.

11:23AM  15   Q    All right.  So if we look at 9010-089, which is a portion

11:23AM  16   of that thread, do you recognize the first page, sir?

11:23AM  17   A    Yes.

11:23AM  18           MR. KENNEDY:  Let's move to the second page and move

11:23AM  19   to the third page.

11:23AM  20           All right.  And then if we blow up the bottom portion.

11:23AM  21   BY MR. KENNEDY:

11:24AM  22   Q    Okay.  Do you recognize this thread that you yourself are

11:24AM  23   on?

11:24AM  24   A    Yes.

11:24AM  25           MR. KENNEDY:  All right.  At this time, Your Honor, I

11:24AM   1   would move 9010-089 into evidence, which is ten pages, 001

11:24AM   2   through 0010.

11:24AM   3              THE COURT:  Any objection?

11:24AM   4              MR. AKINA:  No objection.

11:24AM   5              THE COURT:  9010-89 is admitted.

11:24AM   6              (Exhibit 9010-089 was received in evidence.)

11:24AM   7              THE COURT:  You may publish.

11:24AM   8              MR. KENNEDY:  Can we publish, please?  Thank you.

11:24AM   9              All right.  If we move through the first page.  Then

11:24AM  10   to the second page.  Then to the third page.

11:24AM  11              And then if we blow up the portion that is in green,

11:24AM  12   please, Ms. King.

11:24AM  13   BY MR. KENNEDY:

11:24AM  14   Q    All right.  Do you see that sales team, "We are going to

11:24AM  15   try and push fumigation with Coronavirus fogging treatment as

11:25AM  16   an add-on for your information."

11:25AM  17              Do you see that?

11:25AM  18   A    Yes.

11:25AM  19   Q    Okay.  And the video that we saw was an example at the

11:25AM  20   King's Chapel of what we're talking about here in terms of

11:25AM  21   fogging treatment, correct?

11:25AM  22   A    Correct.

11:25AM  23              MR. KENNEDY:  All right.  If we move to the sixth

11:25AM  24   page.

11:25AM  25   BY MR. KENNEDY:

11:25AM   1    Q    Do you see -- if we blow up the top portion, do you see

11:25AM   2    that there is an attachment inside the Signal, which is a

11:25AM   3    document that is attached?

11:25AM   4    A    Yes.

11:25AM   5    Q    And then there's a thread that if this wasn't a piece of

11:25AM   6    paper with a computer or a phone, you can click on it, and then

11:25AM   7    you're able to see what is attached, right?

11:25AM   8    A    Yes.

11:25AM   9    Q    All right.  And it's very small there.  So if we move to

11:25AM   10   page 10, this would be what was shown in that attachment, just

11:26AM   11   printed out so that it can be a PDF, because we're not using

11:26AM   12   the internet to click and be able to pull it right out of the

11:26AM   13   thread like you would on your phone, correct?

11:26AM   14   A    Correct.

11:26AM   15   Q    All right.  So this is the disinfectant that was shown in

11:26AM   16   that video at King's Chapel, correct?

11:26AM   17   A    I believe so, yeah.

11:26AM   18   Q    And so the label itself indicates that this Nisus -- if

11:26AM   19   I'm pronouncing it correct, N-I-S-U-S, D-S-V -- is a broad

11:26AM   20   spectrum disinfectant sanitizer.

11:26AM   21        MR. KENNEDY:  All right.  And then if we go down a

11:26AM   22   little bit with the pullout, Ms. King.

11:26AM   23        Okay.  If we go up a little higher.

11:26AM   24   BY MR. KENNEDY:

11:26AM   25   Q    Okay.  Can be used for everyday cleanings, but then DSV is

| | | |
|---|---|---|
| 11:26AM | 1 | also labeled to kill the following pathogens on hard nonporous |
| 11:27AM | 2 | surfaces, and then there's an indication of human Coronavirus, |
| 11:27AM | 3 | correct? |
| 11:27AM | 4 | A    Correct. |
| 11:27AM | 5 | MR. KENNEDY:  All right.  And if we move down on this |
| 11:27AM | 6 | label.  If we keep going.  Keep going.  Okay. |
| 11:27AM | 7 | BY MR. KENNEDY: |
| 11:27AM | 8 | Q    So then the company N-I-S-U-S, Nisus, there's an asterisk |
| 11:27AM | 9 | next to it, and EPA has determined that Nisus DSV is effective |
| 11:27AM | 10 | against SARS-COVID-2, the cause of COVID-19, correct? |
| 11:27AM | 11 | A    Correct. |
| 11:27AM | 12 | Q    So that's what you were using in the video that we saw |
| 11:27AM | 13 | when everybody was still locked down and cleaning the church, |
| 11:27AM | 14 | correct? |
| 11:27AM | 15 | A    Yes. |
| 11:27AM | 16 | Q    And so the Signal thread allowed that to be attached so |
| 11:27AM | 17 | that everyone on that thread could see that, the information |
| 11:27AM | 18 | would go out companywide, right? |
| 11:27AM | 19 | A    Yes. |
| 11:28AM | 20 | MR. KENNEDY:  Now, if we move to 9010-090. |
| 11:28AM | 21 | BY MR. KENNEDY: |
| 11:28AM | 22 | Q    You recognize this?  And "this," I mean 9010-090. |
| 11:28AM | 23 | A    Yes. |
| 11:28AM | 24 | MR. KENNEDY:  Moving to the second page. |
| 11:28AM | 25 | Moving to the third page. |

| | | |
|---|---|---|
| 11:28AM | 1 | And moving to the fourth page. |
| 11:28AM | 2 | BY MR. KENNEDY: |
| 11:28AM | 3 | Q   Is that the 2020 office Signal group thread? |
| 11:28AM | 4 | A   Yes. |
| 11:28AM | 5 | Q   All right.  And so this is just another thread to make |
| 11:28AM | 6 | certain that other folks who are generally just in the office |
| 11:28AM | 7 | helping to schedule jobs are on a thread and can communicate |
| 11:28AM | 8 | with all the folks that they need to that are on this list, |
| 11:28AM | 9 | correct? |
| 11:28AM | 10 | A   Correct. |
| 11:28AM | 11 | Q   And so Mr. Miske is listed on the first page. |
| 11:29AM | 12 | MR. KENNEDY:  And at this point I would move 9010-090 |
| 11:29AM | 13 | into evidence, Your Honor. |
| 11:29AM | 14 | MR. AKINA:  No objection. |
| 11:29AM | 15 | THE COURT:  Without objection, 9010-90 is admitted. |
| 11:29AM | 16 | (Exhibit 9010-090 was received in evidence.) |
| 11:29AM | 17 | Q   Now, that I've published it, and the jury can see it, up |
| 11:29AM | 18 | at the top "MJ owner" for Mr. Miske? |
| 11:29AM | 19 | A   Correct. |
| 11:29AM | 20 | Q   D-E-L-Z, Delz, is Delia Fabro-Miske? |
| 11:29AM | 21 | A   Correct. |
| 11:29AM | 22 | Q   All right.  Down one, two, three is yourself, Pres-Oahu? |
| 11:29AM | 23 | A   Correct. |
| 11:29AM | 24 | Q   All right.  And so the three of you are also on the office |
| 11:29AM | 25 | group thread so that -- and everyone else here can see what's |

11:29AM   1   happening inside the office to make certain we're coordinating

11:29AM   2   everything so that the business is run right, correct?

11:29AM   3   A     Correct.

11:29AM   4   Q     All right.  Now, we talked about Signal.  Inside the

11:29AM   5   office you also used WhatsApp, correct?

11:30AM   6   A     I believe so, but I don't remember using it -- I don't

11:30AM   7   remember using it for a while.

11:30AM   8   Q     Okay.

11:30AM   9              MR. KENNEDY:  If we pull up 91 -- excuse me --

11:30AM  10   9010-091.

11:30AM  11   BY MR. KENNEDY:

11:30AM  12   Q     And let's see if you recognize that.

11:30AM  13   A     Yes, I do.

11:30AM  14              MR. KENNEDY:  All right.  Moving to the second page.

11:30AM  15              And moving to the third page.

11:30AM  16              Moving to the fourth page.

11:30AM  17              Moving to the fifth page.

11:30AM  18              The sixth page.  Seventh page.  The eighth page.  The

11:31AM  19   ninth page.

11:31AM  20   BY MR. KENNEDY:

11:31AM  21   Q     Sir, is this an example of the WhatsApp 2020 companywide

11:31AM  22   group thread?

11:31AM  23   A     Yes.

11:31AM  24              MR. KENNEDY:  At this time I would move 9010-091 into

11:31AM  25   evidence.

| | | |
|---|---|---|
| 11:31AM | 1 | THE COURT:  Any objection? |
| 11:31AM | 2 | MR. AKINA:  No objection. |
| 11:31AM | 3 | THE COURT:  9010-91 is admitted without objection. |
| 11:31AM | 4 | (Exhibit 9010-91 was received in evidence.) |
| 11:31AM | 5 | MR. KENNEDY:  All right.  May we publish? |
| 11:31AM | 6 | THE COURT:  You may. |
| 11:31AM | 7 | BY MR. KENNEDY: |
| 11:31AM | 8 | Q    Okay.  And so on the first page, once again we have the |
| 11:31AM | 9 | individuals who are on the thread? |
| 11:31AM | 10 | A    Correct. |
| 11:31AM | 11 | Q    The administrator of this is Napua, right, at the top? |
| 11:31AM | 12 | A    Correct. |
| 11:31AM | 13 | Q    And then Delz is on here, Delia Fabro-Miske? |
| 11:31AM | 14 | A    Correct. |
| 11:31AM | 15 | Q    All right.  As we move down, PK is on there, correct, |
| 11:31AM | 16 | Brian Marinas? |
| 11:31AM | 17 | A    Correct. |
| 11:31AM | 18 | Q    All right.  MJ is Mr. Miske? |
| 11:31AM | 19 | A    Correct. |
| 11:31AM | 20 | Q    All right. |
| 11:31AM | 21 | MR. KENNEDY:  As we keep moving.  All right.  If we |
| 11:31AM | 22 | move to the next page. |
| 11:32AM | 23 | And if we blow up underneath what I believe was in |
| 11:32AM | 24 | blue for the jury. |
| 11:32AM | 25 | BY MR. KENNEDY: |

11:32AM   1   Q    Okay.  So Napua has created the group companywide here?

11:32AM   2   A    Yes.

11:32AM   3   Q    All right.  And then there is a system message that comes

11:32AM   4   after its created, right?

11:32AM   5   A    Yes.

11:32AM   6   Q    Okay.  So for a business, that means that no one can

11:32AM   7   obtain these communications on a competing business, right?

11:32AM   8   A    No.

11:32AM   9   Q    And so that's one reason that it is used, right, to keep

11:32AM  10   communication within the business from folks who are

11:32AM  11   competitors, right?

11:32AM  12   A    I don't know if that's true or not, but it was used to

11:33AM  13   communicate within the company.

11:33AM  14   Q    All right.

11:33AM  15   A    I don't know what the reasons were for it.

11:33AM  16   Q    Okay.  It was just used.

11:33AM  17   A    Correct.

11:33AM  18   Q    And then there is this system message that comes up that

11:33AM  19   just says:  "Message -- messages and calls are end to end

11:33AM  20   encrypted.  No one outside of this chat, not even WhatsApp" --

         21        THE COURT REPORTER:  If you are reading, you will need

         22   to slow down.

         23        MR. KENNEDY:  I can, and I apologize.

         24   BY MR. KENNEDY:

         25   Q    "Messages and calls are end to end encrypted.  No one

11:33AM    1    outside of this chat, not even WhatsApp, can read or listen to

11:33AM    2    them.  Tap to learn more."

11:33AM    3        That comes up as a system message once you create the

11:33AM    4    group, right?

11:33AM    5    A    Correct.

11:33AM    6    Q    Okay.  If we move on then to -- move through to the next

11:33AM    7    page.  There is once again the ability to provide attachments,

11:33AM    8    correct?

11:33AM    9    A    Yes.

11:33AM    10        MR. KENNEDY:  All right.  And then if we move to the

11:34AM    11   next page.

11:34AM    12        And then to the next page.  And then to 6.

11:34AM    13   BY MR. KENNEDY:

11:34AM    14   Q    There is also another attachment, right?

11:34AM    15   A    Yes.

11:34AM    16   Q    And so that means within the company, everyone that has

11:34AM    17   their phones can then click on those attachments and see

11:34AM    18   photographs, not just words and texts, right?

11:34AM    19   A    Correct.

11:34AM    20   Q    All right.  So if we move to page 7, then we can see the

11:34AM    21   progress with this tenting of this building, correct?

11:34AM    22   A    Correct.

11:34AM    23   Q    As one of the attachments that an individual can just

11:34AM    24   click on that, and then they're able to see what's happening at

11:34AM    25   a location where they're not at, right?

11:34AM   1   A   Correct.

11:34AM   2          MR. KENNEDY:  All right.  Move to the next.

11:34AM   3   BY MR. KENNEDY:

11:34AM   4   Q   And then we can see the progress on this tenting of this

11:34AM   5   building, correct?

11:34AM   6   A   Correct.

11:34AM   7   Q   And in there you can see the boom truck that is being used

11:35AM   8   that Kama'aina Termite and Pest Control had for these type of

11:35AM   9   jobs that no one else on the island was doing, correct?

11:35AM  10   A   Correct.

11:35AM  11   Q   And moving to the last, now you have another picture that

11:35AM  12   can be communicated to everyone on the thread to see where they

11:35AM  13   are at this job in real time on their phone, right?

11:35AM  14   A   Yes.

11:35AM  15          MR. KENNEDY:  Moving to 9010-092.

11:35AM  16   BY MR. KENNEDY:

11:35AM  17   Q   Do you see the first page?

11:35AM  18   A   Yes.

11:35AM  19   Q   All right.  Do you recognize that first page?

11:35AM  20   A   Yes.

11:35AM  21          MR. KENNEDY:  Moving to the second page.  And then the

11:35AM  22   third page.

11:35AM  23   BY MR. KENNEDY:

11:35AM  24   Q   Do you recognize what is 9010-092?

11:35AM  25   A   Yes, a list of numbers.

| | | | |
|---|---|---|---|
| 11:35AM | 1 | Q | Okay.  Is this the WhatsApp 2020 managers group thread? |
| 11:36AM | 2 | A | Yes. |
| 11:36AM | 3 | | MR. KENNEDY:  Okay.  At this time I would move |
| 11:36AM | 4 | | 9010-092 into evidence. |
| 11:36AM | 5 | | MR. AKINA:  No objection. |
| 11:36AM | 6 | | THE COURT:  9010-92 is admitted without objection. |
| 11:36AM | 7 | | (Exhibit 9010-092 was received in evidence.) |
| 11:36AM | 8 | | MR. KENNEDY:  May we publish? |
| 11:36AM | 9 | | THE COURT:  Yes. |
| 11:36AM | 10 | BY MR. KENNEDY: | |
| 11:36AM | 11 | Q | So on the terms of the participants on the first page, MJ |
| 11:36AM | 12 | | is Mr. Miske? |
| 11:36AM | 13 | A | Correct. |
| 11:36AM | 14 | Q | Preston 2 is yourself? |
| 11:36AM | 15 | A | The -- yes. |
| 11:36AM | 16 | Q | All right.  Burton is on there? |
| 11:36AM | 17 | A | Correct. |
| 11:36AM | 18 | Q | Burton Kong, right? |
| 11:36AM | 19 | A | Yes. |
| 11:36AM | 20 | Q | Delz is on there, Delia Fabro-Miske? |
| 11:36AM | 21 | A | Correct. |
| 11:36AM | 22 | Q | Napua, who is the administrator of this thread, is on |
| 11:36AM | 23 | | there? |
| 11:36AM | 24 | A | Correct. |
| 11:36AM | 25 | Q | PK, Brian Marinas is on there, right? |

| | | | |
|---|---|---|---|
| 11:36AM | 1 | A | Yes. |
| 11:36AM | 2 | Q | And then JRGM is on there, correct? |
| 11:37AM | 3 | A | Yes. |
| 11:37AM | 4 | Q | Okay. |
| 11:37AM | 5 | | MR. KENNEDY:  Could we move to the next page. |
| 11:37AM | 6 | | And if we blow up the top page. |
| 11:37AM | 7 | BY MR. KENNEDY: |
| 11:37AM | 8 | Q | This is a thread that Napua is creating for the managers, |
| 11:37AM | 9 | | correct? |
| 11:37AM | 10 | A | Yes. |
| 11:37AM | 11 | Q | In WhatsApp, right? |
| 11:37AM | 12 | A | Yes. |
| 11:37AM | 13 | | MR. KENNEDY:  All right.  We can take down 9010-092. |
| 11:37AM | 14 | BY MR. KENNEDY: |
| 11:37AM | 15 | Q | I want to ask you some questions about Slack, okay? |
| 11:37AM | 16 | A | Okay. |
| 11:37AM | 17 | Q | All right.  When you're using Slack, it's another |
| 11:37AM | 18 | | communication device, correct? |
| 11:37AM | 19 | A | Yes. |
| 11:37AM | 20 | Q | And it has many different channels, right? |
| 11:37AM | 21 | A | Yes. |
| 11:37AM | 22 | Q | You can program over a hundred channels, right? |
| 11:37AM | 23 | A | That sounds correct. |
| 11:37AM | 24 | Q | All right.  And so within Kama'aina Termite and Pest |
| 11:37AM | 25 | | Control and O'ahu Termite and Pest Control you had a clearance |

11:38AM   1   channel, right?

11:38AM   2   A    Um, I don't understand what that is.

11:38AM   3   Q    A clearance channel is a channel devoted to the steps that

11:38AM   4   are taken before you clear a property and turn it over to the

11:38AM   5   homeowner.  Do you remember that clearance channel?

11:38AM   6   A    Oh, yes.

11:38AM   7   Q    Okay.  So you have a specific channel that's there for

11:38AM   8   clearance, right?

11:38AM   9   A    For clearing the homes, yes.

11:38AM  10   Q    And the individual who's doing it has a series of steps,

11:38AM  11   and they take a picture to document that the steps are being

11:38AM  12   done, correct?

11:38AM  13   A    Correct.

11:38AM  14   Q    And so anyone on the channel doesn't have to just take

11:38AM  15   their word, they can click on an attachment, see step 1, done;

11:38AM  16   step 2, done; step 3, done, correct?

11:38AM  17   A    Correct.  But I don't believe that I was -- I don't

11:38AM  18   remember being on that channel and seeing all of those pictures

11:38AM  19   and what you're explaining to the jury.

11:39AM  20   Q    I remember that you might not have been, but of course, if

11:39AM  21   it was a home that you were doing, you were waiting for that

11:39AM  22   information so that you could go to the homeowner or whoever

11:39AM  23   that you were the salesperson to tell them it was now clear,

11:39AM  24   everything is ready to go, you can get back into the home,

11:39AM  25   right?

11:39AM   1   A     Not necessarily all of my homes.  But it wasn't my job to

11:39AM   2   give because I didn't know when the home got uncovered, and I

11:39AM   3   didn't know when they cleared the house.  So it wasn't -- it

11:39AM   4   was up to another person in the office to call the customer and

11:39AM   5   let them know that -- that their home was safe to return.

11:39AM   6   Q     Okay.  So it's your customer, so someone working in the

11:39AM   7   office did that for you.

11:39AM   8   A     They did that for everybody.

11:39AM   9   Q     And yourself if it was your sales.

11:39AM  10   A     Correct.

11:39AM  11   Q     Okay.  There was also a fumigation channel, right?

11:39AM  12   A     Yes.

11:39AM  13   Q     There was a fumigation shoot channel, correct?

11:39AM  14   A     I -- I don't -- I don't remember seeing a fumigation shoot

11:40AM  15   channel.

11:40AM  16   Q     Okay.  And George Perry had that fumigation truck,

11:40AM  17   correct?

11:40AM  18   A     He had one of the trucks.

11:40AM  19   Q     And on that truck they could shoot the gas, correct?

11:40AM  20   A     Yes.

11:40AM  21   Q     The Vikane, right?

11:40AM  22   A     They carried the Vikane gas.

11:40AM  23   Q     Right.  So if you have a number of trucks, trucks can go

11:40AM  24   out, tent the property, get it ready for the gas to be shot,

11:40AM  25   correct?

11:40AM  1  A    Correct.

11:40AM  2  Q    Then George Perry can bring his crew there, he has the

11:40AM  3  Vikane gas, it's ready to go, it's a team effort.  He hooks it

11:40AM  4  up, and then makes certain that the Vikane gas is then shot,

11:40AM  5  correct?

11:40AM  6  A    That would be ideal.

11:40AM  7  Q    Okay.  There were companywide Slack channels, correct?

11:40AM  8  A    Yes.

11:40AM  9  Q    Managers-wide Slack channels, right?

11:40AM  10  A    Yes.

11:40AM  11  Q    Safety compliance channels with Slack?

11:40AM  12  A    Yes.

11:40AM  13  Q    Sales, correct?

11:40AM  14  A    Correct.

11:40AM  15  Q    Marketing?

11:41AM  16  A    Correct.

11:41AM  17  Q    Open projects?

11:41AM  18  A    Um, I apologize.  I don't remember.

11:41AM  19  Q    It's okay.  If you don't remember, you don't remember.

11:41AM  20       And a technical one for technical issues, right?

11:41AM  21  A    Yes.

11:41AM  22  Q    And office, right?

11:41AM  23  A    Correct.

11:41AM  24  Q    And then within Slack there were files that could keep the

11:41AM  25  documents of the photographs so that if there's any question,

11:41AM  1   you have a visual image to show what was done inside the home,

11:41AM  2   correct?

11:41AM  3   A    That might be on the fumigation Slack, but I -- I didn't

11:41AM  4   see -- I don't remember seeing all the steps that the

11:41AM  5   fumigation crew took and the pictures that they also took.

11:41AM  6   Q    All right.  You just knew that that was a channel that was

11:41AM  7   used for that purpose.

11:41AM  8   A    There may -- yeah, there may have been a channel that was

11:41AM  9   used for that purpose.

11:42AM  10  Q    Okay.  And then Slack allowed you to have direct messaging

11:42AM  11  like you would on an any other communication platform, right?

11:42AM  12  A    Correct.

11:42AM  13  Q    And then individuals like yourself had a channel, right?

11:42AM  14  A    You mean for the company?

11:42AM  15  Q    Yeah, on Slack.

11:42AM  16  A    Correct.

11:42AM  17  Q    Mr. Miske had one, correct?

11:42AM  18  A    Correct.

11:42AM  19  Q    Delia Fabro-Miske had one?

11:42AM  20  A    Correct.

11:42AM  21  Q    Mike Warden had one?

11:42AM  22  A    Correct.

11:42AM  23  Q    George Perry had one?

11:42AM  24  A    Correct.

11:42AM  25  Q    Larry Kapu had one?

11:42AM    1    A    Correct.

11:42AM    2    Q    Individuals had their own channels as well that they could

11:42AM    3    communicate, correct?

11:42AM    4    A    Yes.

11:42AM    5         MR. KENNEDY:  So if we pull up 9010-093.

11:42AM    6    BY MR. KENNEDY:

11:42AM    7    Q    Do you recognize what is marked as 9010-093?

11:42AM    8    A    Yes.

11:42AM    9    Q    Is it a Slack image of photographs taken on a Slack

11:43AM    10   fumigation channel for Kama'aina Termite and Pest Control?

11:43AM    11   A    Yes -- well, that's what -- what's what the door tag says.

11:43AM    12        MR. KENNEDY:  At this time I would move 9010-094 (sic)

11:43AM    13   into evidence.

11:43AM    14        MR. AKINA:  Objection, lack of foundation.

11:43AM    15        THE COURT:  Sustained.

11:43AM    16        MR. KENNEDY:  Let's move to 9010-095.

11:43AM    17   BY MR. KENNEDY:

11:43AM    18   Q    Do you recognize 9010-095?

11:43AM    19   A    Yes.

11:43AM    20   Q    Is it a signal communication on the clearance channel?

11:43AM    21   A    Yes.

11:43AM    22   Q    Does it involve yourself?

11:43AM    23   A    Yes.

11:43AM    24   Q    And does it involve Cody?

11:43AM    25   A    Yes.

11:43AM    1                    MR. KENNEDY:  At this time I would move 9010-095 into

11:43AM    2    evidence.

11:43AM    3                    MR. AKINA:  Objection.  Hearsay.

11:44AM    4                    THE COURT:  Overruled.  9010-95 is admitted.  You may

11:44AM    5    publish.

11:44AM    6                    (Exhibit 9010-95 was received in evidence.)

11:44AM    7    BY MR. KENNEDY:

11:44AM    8    Q    So 9010-095 is you -- @Cody says:  "You're sending that to

11:44AM    9    Cody?  I thanks, Bro."

11:44AM   10    A    Yes.

11:44AM   11    Q    And then Cody does -- using a fist like a fist bump,

11:44AM   12    correct?

11:44AM   13    A    Correct.

11:44AM   14    Q    All right.  And down below Cody is able to indicate to

11:44AM   15    you:  "At this address, arrived at 3:30, entered home with

11:44AM   16    specters -- spectros, and checked all areas in room."

11:44AM   17              Do you see that?

11:44AM   18    A    Yes.

11:44AM   19    Q    "All gas levels reading at 0 ppms."  Do you see that?

11:44AM   20    A    Correct.

11:44AM   21    Q    "No visible damage noticed."  Right?

11:44AM   22    A    Yes.

11:44AM   23    Q    "Collected two placards and one lockbox"?

11:45AM   24    A    Yes.

11:45AM   25    Q    "Confirmed with customer regarding" -- or "re entry via

11:45AM    1    phone, customer very happy and appreciative with the services

11:45AM    2    done."

11:45AM    3    A    Yes.

11:45AM    4    Q    All right.  And in this there are photographs taken to

11:45AM    5    document what the words are in the communication, right?

11:45AM    6    A    Yes.

11:45AM    7    Q    Okay.  Moving to 9010-096.  Is this a document that you

11:45AM    8    recognize?

11:45AM    9    A    Yes.

11:45AM   10    Q    Does it involve Cody?

11:45AM   11    A    Yes.

11:45AM   12    Q    And does it involve you?

11:45AM   13    A    Correct.

11:45AM   14    Q    On the signal channel?

11:45AM   15    A    Yes.

11:45AM   16         MR. KENNEDY:  At this time I would move 9010-096 into

11:45AM   17    evidence.

11:45AM   18         THE COURT:  Mr. Akina?

11:45AM   19         MR. AKINA:  Same objection, Your Honor.  Hearsay.

11:45AM   20         THE COURT:  Objection is overruled.  9010-96 is

11:45AM   21    admitted.  You may publish.

11:45AM   22         (Exhibit 9010-96 was received in evidence.)

11:46AM   23    BY MR. KENNEDY:

11:46AM   24    Q    All right.  So now this is for different properties?

11:46AM   25    A    Correct.

| | | |
|---|---|---|
| 11:46AM | 1 | Q    Once again, communicating with you by words in real time |
| 11:46AM | 2 | and also with photographs documenting what was done, correct? |
| 11:46AM | 3 | A    Yes. |
| 11:46AM | 4 | Q    All right.  Moving down to the property down below. |
| 11:46AM | 5 | So you're confirming information verbally but also |
| 11:46AM | 6 | with photographs that are attached, correct? |
| 11:46AM | 7 | A    Yes. |
| 11:46AM | 8 | MR. KENNEDY:  All right.  Moving to 9010-097. |
| 11:46AM | 9 | BY MR. KENNEDY: |
| 11:46AM | 10 | Q    Do you recognize 9010-097? |
| 11:46AM | 11 | A    Yeah, I recognize -- I recognize my name at the bottom. |
| 11:46AM | 12 | Q    Okay.  Is it a communication from Jason to you? |
| 11:47AM | 13 | A    Yes. |
| 11:47AM | 14 | MR. KENNEDY:  All right.  At this time I move 9010-097 |
| 11:47AM | 15 | into evidence. |
| 11:47AM | 16 | MR. AKINA:  Same hearsay objection, Your Honor. |
| 11:47AM | 17 | THE COURT:  All right.  Same ruling, overruled. |
| 11:47AM | 18 | 9010-097 is admitted. |
| 11:47AM | 19 | (Exhibit 9010-097 was received in evidence.) |
| 11:47AM | 20 | MR. KENNEDY:  May we publish, Your Honor? |
| 11:47AM | 21 | THE COURT:  Yes, you may. |
| 11:47AM | 22 | BY MR. KENNEDY: |
| 11:47AM | 23 | Q    All right.  Here Jason is communicating on the top |
| 11:47AM | 24 | portion:  "Met with homeowner, gave her the key, all rooms and |
| 11:47AM | 25 | fridge reading 0 ppm."  Correct? |

| | | | |
|---|---|---|---|
| 11:47AM | 1 | A | Yes. |
| 11:47AM | 2 | Q | "One clam shell, three signs, 1 lb, no visible damage." |
| 11:47AM | 3 | | Correct? |
| 11:47AM | 4 | A | Correct. |
| 11:47AM | 5 | Q | And then there are photographs underneath, correct? |
| 11:47AM | 6 | A | Yes. |
| 11:47AM | 7 | Q | All right.  Moving down to the -- in this one:  "Two clam |
| 11:47AM | 8 | | shells, three signs, 1 lb, no visible damage at 3:35." |
| 11:48AM | 9 | | Similar information, correct? |
| 11:48AM | 10 | A | Yes. |
| 11:48AM | 11 | Q | Once again, showing both communication real time, but also |
| 11:48AM | 12 | | photographs to make certain that there is documentation of what |
| 11:48AM | 13 | | is done, correct? |
| 11:48AM | 14 | A | Correct. |
| 11:48AM | 15 | | MR. KENNEDY:  All right.  Pull this down, Ms. King. |
| 11:48AM | 16 | | BY MR. KENNEDY: |
| 11:48AM | 17 | Q | Now, I want to show you what's been marked as 9010-104. |
| 11:48AM | 18 | | Do you recognize what 9010-104 is? |
| 11:48AM | 19 | A | It looks like a house being fumigated with a Kama'aina |
| 11:48AM | 20 | | truck. |
| 11:48AM | 21 | Q | All right.  Do you recognize the truck? |
| 11:48AM | 22 | A | Yes. |
| 11:48AM | 23 | Q | Is it George Perry's truck? |
| 11:48AM | 24 | A | I've seen him driving this truck before. |
| 11:48AM | 25 | Q | Okay.  Do you see anything that would look like it is |

11:49AM    1    carrying gas?

11:49AM    2    A    Yes.

11:49AM    3    Q    What do you see?

11:49AM    4    A    I see on the right -- the right-hand side of the truck

11:49AM    5    there is two Vikane -- it looks like Vikane cylinders.

11:49AM    6            MR. KENNEDY:  Okay.  At this time I would move

11:49AM    7    9010-104 into evidence.

11:49AM    8            MR. AKINA:  Lack of foundation, speculation.

11:49AM    9            THE COURT:  Overruled.  The exhibit is admitted,

11:49AM    10    9010-104.

11:49AM    11            (Exhibit 9010-104 was received in evidence.)

11:49AM    12            MR. KENNEDY:  May we publish?

11:49AM    13            THE COURT:  You may.

11:49AM    14    BY MR. KENNEDY:

11:49AM    15    Q    So now you indicated that -- if you could do on the

11:49AM    16    screen, could you circle inside the truck where you see the

11:49AM    17    Vikane cylinders.

11:49AM    18    A    (Witness complies.)

11:49AM    19    Q    All right.

11:49AM    20            MR. KENNEDY:  And then if we move to Exhibit 9010-098,

11:50AM    21    which is not yet admitted.

11:50AM    22    BY MR. KENNEDY:

11:50AM    23    Q    Do you recognize the house and that truck?

11:50AM    24    A    I recognize the Kama'aina tent on that house and I

11:50AM    25    recognize the truck.

| | | |
|---|---|---|
| 11:50AM | 1 | MR. KENNEDY:  Okay.  Move 9010-098 into evidence. |
| 11:50AM | 2 | MR. AKINA:  No objection. |
| 11:50AM | 3 | THE COURT:  9010-98 is admitted without objection. |
| 11:50AM | 4 | You may publish. |
| 11:50AM | 5 | (Exhibit 9010-98 was received in evidence.) |
| 11:50AM | 6 | BY MR. KENNEDY: |
| 11:50AM | 7 | Q    And so this once again is the truck that we were just |
| 11:50AM | 8 | looking at. |
| 11:50AM | 9 | MR. KENNEDY:  If we look at 9010-099, which is not yet |
| 11:50AM | 10 | in evidence. |
| 11:50AM | 11 | BY MR. KENNEDY: |
| 11:50AM | 12 | Q    Do you recognize from the earlier photographs the house |
| 11:50AM | 13 | and the truck? |
| 11:50AM | 14 | A    I recognize the tents on the house and I recognize the |
| 11:50AM | 15 | truck. |
| 11:50AM | 16 | MR. KENNEDY:  Okay.  I would move 9010-099 into |
| 11:51AM | 17 | evidence. |
| 11:51AM | 18 | MR. AKINA:  No objection. |
| 11:51AM | 19 | THE COURT:  9010-99 is admitted without objection. |
| 11:51AM | 20 | You may publish. |
| 11:51AM | 21 | (Exhibit 9010-099 was received in evidence.) |
| 11:51AM | 22 | MR. KENNEDY:  May we publish? |
| 11:51AM | 23 | THE COURT:  Yes. |
| 11:51AM | 24 | BY MR. KENNEDY: |
| 11:51AM | 25 | Q    All right.  And then you can see the cylinders with the |

11:51AM   1   Vikane gas on the right side of that truck, correct?

11:51AM   2   A   Correct.

11:51AM   3   Q   Over on the tented property you can see a placard, right?

11:51AM   4   A   Correct.

11:51AM   5   Q   All right.  And so at this point it appears that the house

11:51AM   6   is fully tented, we're ready to go with shooting gas into the

11:51AM   7   house, correct?

11:51AM   8   A   That's what it appears, yes.

11:51AM   9   Q   Okay.

11:51AM  10       MR. KENNEDY:  Let's look at 9010-100.

11:51AM  11   BY MR. KENNEDY:

11:51AM  12   Q   Do you recognize what is depicted in 9010-100?

11:51AM  13   A   It looks like a home with Kama'aina fumigation tents.

11:52AM  14       MR. KENNEDY:  All right.  At this point I would move

11:52AM  15   9010-100 into evidence.

11:52AM  16       MR. AKINA:  No objection.

11:52AM  17       THE COURT:  9010-100 is admitted without objection.

11:52AM  18   You may publish.

11:52AM  19       (Exhibit 9010-100 was received in evidence.)

11:52AM  20       MR. KENNEDY:  May we publish?

11:52AM  21       THE COURT:  Yes, you may publish.

11:52AM  22       MR. KENNEDY:  And, Ms. King, can you move in on the

11:52AM  23   portion that has the white with -- it looks like red lettering

11:52AM  24   from a distance?

11:52AM  25   BY MR. KENNEDY:

11:52AM   1   Q    Hard to get it close enough, but is that a placard?

11:52AM   2   A    Yes.

11:52AM   3   Q    Does it indicate that fumigation is happening?

11:52AM   4   A    Yes.

11:52AM   5   Q    And that's part of what is to be placed on the -- whether

11:52AM   6   it's a home, a business or whatever, when it's being fumigated,

11:52AM   7   correct?

11:52AM   8   A    Yes.

11:52AM   9   Q    Okay.

11:52AM   10       MR. KENNEDY:  Now, moving to 9010-102.  This is a -- a

11:52AM   11   video.  If we just pull up the first for Mr. Kimoto.

11:52AM   12   BY MR. KENNEDY:

11:53AM   13   Q    Do you recognize what is shown in 9010-102?

11:53AM   14   A    It looks like a scale.

11:53AM   15   Q    Okay.  And in addition to the scale, do you see anything

11:53AM   16   else in the screen?

11:53AM   17   A    I see a Vikane cylinder and somebody's hand.

11:53AM   18       MR. KENNEDY:  Okay.  At this time, Your Honor, I would

11:53AM   19   move 9010-102 into evidence.

11:53AM   20       MR. AKINA:  Objection.  Lack of foundation.

11:53AM   21       THE COURT:  Sustained.

11:53AM   22   BY MR. KENNEDY:

11:53AM   23   Q    Are you familiar with how Vikane gas is then used in

11:53AM   24   fumigation?

11:53AM   25   A    Can you repeat that question, please?

11:53AM   1    Q    Are you familiar with how Vikane gas is used in

11:53AM   2    fumigation?

11:53AM   3    A    I'm familiar with what it does, but I wouldn't know how to

11:54AM   4    shoot the gas.

11:54AM   5    Q    Okay.  So you wouldn't know if this is a video of the gas

11:54AM   6    being shot or not; is that correct?

11:54AM   7    A    No.

11:54AM   8    Q    Okay.  Fair enough.  Let's move on then.

11:54AM   9         Now, the other day you talked about the fishing

11:54AM   10   vessel, the Rachel.  Do you recall that?

11:54AM   11   A    Yes.

11:54AM   12   Q    All right.  And you mentioned that there were times when

11:54AM   13   cash was paid to the crew, correct?

11:54AM   14   A    Correct.

11:54AM   15   Q    All right.  Were you aware that for every one of those

11:54AM   16   crew members, there was a check that was cut for that crew

11:54AM   17   member?

11:54AM   18   A    No, I was not.

11:54AM   19   Q    Were you aware that those crew members were not U.S.

11:54AM   20   citizens, so they had to remain on the vessel when it's in port

11:54AM   21   in Honolulu?

11:54AM   22   A    Yes, I did know that.

11:54AM   23   Q    So since they can't go to a bank, were you aware that a

11:55AM   24   check could be cut to them, cashed, and then cash would be

11:55AM   25   provided to them, but the check would be a record of the

11:55AM   1    amounts paid to them?

11:55AM   2    A    No, I was not aware of that.

11:55AM   3    Q    And I take it that you're aware that they couldn't walk

11:55AM   4    off the boat or they would be here illegally and arrested,

11:55AM   5    correct?

11:55AM   6    A    Yes, I'm aware of that.

11:55AM   7    Q    Okay.  So to pay them, one way to do that is to cut a

11:55AM   8    check, get it cashed, and provide them with the cash, right?

11:55AM   9    A    Correct.

11:55AM  10    Q    Particularly if they're from another country and they're

11:55AM  11    out at sea fishing commercially for weeks on end, correct?

11:55AM  12    A    Correct.

11:55AM  13    Q    Now, the other day you also mentioned that something about

11:55AM  14    that terrible day in November of 2015, the 17th, when Caleb and

11:56AM  15    Mr. Fraser -- Caleb Miske and Mr. Fraser, Jonathan Fraser, were

11:56AM  16    in that accident.

11:56AM  17    A    Correct.

11:56AM  18    Q    All right.  And you talked to the jury about Mr. Miske's

11:56AM  19    reaction.

11:56AM  20    A    Correct.

11:56AM  21    Q    Now, were you aware that bruising comes after a period of

11:56AM  22    time for someone, it doesn't automatically just come out?

11:56AM  23    A    Yes, I'm aware of that.

11:56AM  24    Q    Okay.  So were you aware that there was a photograph taken

11:56AM  25    which would show bruising moving from the right shoulder across

11:56AM   1   to the left hip on Mr. Miske?

11:56AM   2           MR. AKINA:  Objection.  Outside the scope.

11:56AM   3           THE COURT:  Overruled.  Go ahead.

11:56AM   4           THE WITNESS:  Yes, I was told by Mike about that.

11:56AM   5   BY MR. KENNEDY:

11:56AM   6   Q    And were you aware that in looking at that photograph,

11:57AM   7   doctors indicated it looked like a seatbelt bruising from the

11:57AM   8   right to the left?

11:57AM   9   A    I wasn't aware of that.  I was -- I mean, I wasn't aware

11:57AM  10   that the doctors had said that.  Mike had told me about the

11:57AM  11   bruise and told me what the bruise looked like was.

11:57AM  12   Q    Okay.  And were you aware that the driver of the truck who

11:57AM  13   made a left turn at 35 miles an hour was the cause of the

11:57AM  14   accident?

11:57AM  15   A    No, I was not aware of that.

11:57AM  16   Q    Were you aware that Mike sued that individual, Jared

11:57AM  17   Ishiki, and his company for the fact that that individual made

11:57AM  18   a 35-mile-an-hour left turn on a yellow?

11:57AM  19           MR. AKINA:  Objection.  This is also outside the scope

11:57AM  20   of the witness's testimony.

11:58AM  21           THE COURT:  Overruled.  Go ahead.

11:58AM  22           THE WITNESS:  No -- I mean, I was aware that Mike had

11:58AM  23   lawsuits going on with -- in connection to the accident, but I

11:58AM  24   was -- I was not aware of who the lawsuits were against.

11:58AM  25   BY MR. KENNEDY:

11:58AM    1    Q    Were you aware that an expert was retained who indicated

11:58AM    2    that that bruising could only come from the passenger's side

11:58AM    3    seatbelt, right to left?

11:58AM    4    A    I was not aware of that.

11:58AM    5    Q    Were you aware that Mr. Miske blamed himself because he

11:58AM    6    had taken away the Toyota Tacoma truck that Caleb had prior to

11:58AM    7    that accident?

11:58AM    8    A    Yes, Mike -- Mike had told me on an occasion that he does

11:58AM    9    blame himself for taking away the truck from Caleb before the

11:58AM    10   accident.

11:58AM    11   Q    And you went to the hospital from time to time, I take it,

11:58AM    12   to see Caleb?

11:58AM    13   A    Yeah, I -- I had been there on a few occasions.

11:59AM    14   Q    So in the beginning you were aware that there was a

11:59AM    15   question as to whether they needed to amputate his leg or not

11:59AM    16   due to an infection, correct?

11:59AM    17   A    Yes.

11:59AM    18   Q    And you're aware that Mike had to make that decision,

11:59AM    19   right?

11:59AM    20   A    Yes, I -- I was aware of that.

11:59AM    21   Q    And that he had one doctor telling him one thing and

11:59AM    22   another doctor telling him another.

11:59AM    23         MR. AKINA:  Your Honor, I'm going to object to this

11:59AM    24   line of questioning.  It's hearsay.  It's calling on the

11:59AM    25   defendant's statements.

11:59AM   1                  THE COURT:  Overruled.  Go ahead.

11:59AM   2                  THE WITNESS:  Can -- can you repeat the question, sir?

11:59AM   3       BY MR. KENNEDY:

11:59AM   4       Q    Were you aware that one doctor, the specialist was telling

11:59AM   5       him to keep the leg, when his regular doctor was saying you

11:59AM   6       should amputate?

11:59AM   7       A    I don't remember having that conversation with Mike.

11:59AM   8       Q    And do you remember after a couple of months Caleb began

12:00PM   9       to get better, and then the infection moved to his heart?

12:00PM   10      A    I do remember that.

12:00PM   11      Q    And that he was moments away from dying at that point.

12:00PM   12      A    Yeah, I -- I do remember at a point we came -- we came to

12:00PM   13      that.

12:00PM   14      Q    And then he lived and he began to go through

12:00PM   15      rehabilitation, and it looked like he was going to be able to

12:00PM   16      leave the hospital and rehabilitate.

12:00PM   17      A    Yes, I do remember that.

12:00PM   18      Q    And while this was happening, his wife Delia Fabro-Miske

12:00PM   19      had a child Nila, and he was able to hold his child in his

12:00PM   20      arms.

12:00PM   21      A    Yes, I did -- I did see a picture of that.

12:00PM   22      Q    And were you aware that Mike was making efforts to get a

12:00PM   23      one-story unit available so Caleb could rehab?

12:00PM   24                  MR. AKINA:  Objection.  Hearsay.

12:00PM   25                  THE COURT:  Overruled.  Go ahead.

12:01PM   1            THE WITNESS:  I -- I don't remember having that

12:01PM   2    conversation, sir.

12:01PM   3    BY MR. KENNEDY:

12:01PM   4    Q    And then the infection moved from the heart to his brain,

12:01PM   5    and he died.

12:01PM   6    A    Yes, I -- I do remember that.

12:01PM   7    Q    And you know that Mike blames himself for not amputating

12:01PM   8    that leg.

12:01PM   9    A    I do not know -- I never had a conversation with Mike

12:01PM  10    about him blaming himself about ampu- -- because he didn't

12:01PM  11    amputate the leg that Caleb passed.  The only conversation that

12:01PM  12    we had was about him blaming himself for taking the truck away

12:01PM  13    before the accident.

12:01PM  14    Q    Now, you talked about a time where Mike asked you to help

12:02PM  15    Delia if he was ever arrested, correct?

12:02PM  16    A    Yes.

12:02PM  17    Q    And if arrested, he wanted you to help her run the

12:02PM  18    business.

12:02PM  19    A    Correct.

12:02PM  20    Q    And he asked you to do this, right?

12:02PM  21    A    Yes.

12:02PM  22    Q    He didn't think you would be arrested, right?

12:02PM  23    A    No, he didn't.

12:02PM  24    Q    And he didn't think Delia would be arrested, right?

12:02PM  25    A    No, he didn't.

12:02PM   1    Q    Because there would be no reason to ask if he thought so,

12:02PM   2    correct?

12:02PM   3    A    No.

12:02PM   4    Q    Now, on the -- last week you mentioned that you saw press

12:02PM   5    regarding Mr. Fraser's disappearance on Saturday, July 30th,

12:02PM   6    2016.  Do you recall that?

12:02PM   7    A    Yes.

12:02PM   8    Q    Are you aware there was no press on that Saturday?

12:02PM   9    A    No, I'm not aware.

12:03PM  10    Q    That his disappearance had not even been reported?

12:03PM  11    A    No, sir.  I'm not aware of that.

12:03PM  12    Q    Now, sir, you've entered into a plea agreement here,

12:03PM  13    correct?

12:03PM  14    A    Correct.

12:03PM  15    Q    And originally one of the charges against you was Count 1,

12:03PM  16    a RICO conspiracy, correct?

12:03PM  17    A    Correct.

12:03PM  18    Q    And in that RICO conspiracy, you were charged with a --

12:03PM  19    what's known as a special sentencing factor.  Do you recall

12:03PM  20    that?

12:03PM  21    A    Could you -- could you repeat the question, please?

12:03PM  22    Q    Yes.  In the charge you yourself personally were charged

12:03PM  23    with something called a special sentencing factor in violation

12:04PM  24    of the drug statute, Title 21, United States Code, Sections

12:04PM  25    846, 841(a)(1) and 841(b)(1).  Do you recall that as part of

12:04PM    1    the RICO charge against you?

12:04PM    2    A    Yes.

12:04PM    3    Q    That charge carried a statutory maximum of life in prison.

12:04PM    4    A    Yes.

12:04PM    5    Q    The RICO conspiracy is to be dismissed after sentencing,

12:04PM    6    but not yet, correct?

12:04PM    7    A    Correct.

12:04PM    8    Q    Because your plea agreement means that you have to testify

12:04PM    9    for them.

12:04PM    10              MR. AKINA:  Objection as to "testify for them."

12:04PM    11              THE COURT:  Sustained.

12:04PM    12    BY MR. KENNEDY:

12:04PM    13    Q    Charge Count 16 was conspiracy to distribute and possess

12:04PM    14    with the intent to distribute controlled substances.  Do you

12:05PM    15    recall that charge?

12:05PM    16    A    Yes.

12:05PM    17    Q    And once again, that was in violation of title 21, United

12:05PM    18    States Code, Sections 846, 841(b)(1)(A, and 841(b)(1)(C) and

12:05PM    19    841(b)(1)(D).  Do you recall that charge?

12:05PM    20    A    Yes.

12:05PM    21    Q    The (b)(1)(A) portion makes that charge a statutory

12:05PM    22    maximum of life in prison, correct?

12:05PM    23    A    Correct.

12:05PM    24    Q    That too will be dismissed but only after sentencing,

12:05PM    25    correct?

12:05PM   1   A    Correct.

12:05PM   2   Q    And we talked last week about how the witness tampering

12:05PM   3   charges have already been dismissed, right?

12:05PM   4   A    Correct.

12:05PM   5   Q    But without prejudice, which means they can be brought

12:05PM   6   back by the government at any time.

12:05PM   7   A    Correct.

12:05PM   8   Q    In your plea agreement, you agreed to certain facts.

12:06PM   9   Fair?

12:06PM   10  A    Fair.

12:06PM   11  Q    Last week you told this jury that you only learned about

12:06PM   12  the kidnapping that was done by Mr. Miller and Mr. Ortiz on

12:06PM   13  October 17, 2017, after it had already happened.

12:06PM   14  A    Correct.

12:06PM   15  Q    In your plea agreement you agreed that beginning no later

12:06PM   16  than May 2017, you agreed to willfully and unlawfully seize,

12:06PM   17  confine, kidnap, abduct, and carry away for money, ransom or

12:06PM   18  reward, Victim 3, Robert Lee, correct?

12:06PM   19  A    Correct.

12:06PM   20  Q    So you told this jury you didn't know about it until

12:07PM   21  October 17, 2017, but in this courtroom when you entered your

12:07PM   22  plea, you told them that you were in the conspiracy no later

12:07PM   23  than May of 2017, correct?

12:07PM   24        MR. AKINA:  Objection, Your Honor.  This

12:07PM   25  mischaracterizes the plea agreement.

| | | |
|---|---|---|
| 12:07PM | 1 | THE COURT:  Sustained. |
| 12:07PM | 2 | MR. AKINA:  Move to strike counsel's comments, Your |
| 12:07PM | 3 | Honor. |
| 12:07PM | 4 | THE COURT:  Counsel's comments I'll remind the jury |
| 12:07PM | 5 | are not evidence of anything, including counsel's questions. |
| 12:07PM | 6 | BY MR. KENNEDY: |
| 12:08PM | 7 | Q    Sir, there was no trip to the gym, was there? |
| 12:08PM | 8 | A    That was -- that's false.  There was a trip to the gym. |
| 12:08PM | 9 | Q    There was no trip back to the office, was there? |
| 12:08PM | 10 | A    False again. |
| 12:08PM | 11 | Q    And there was no erase board? |
| 12:08PM | 12 | A    That is also false. |
| 12:08PM | 13 | Q    And Mr. Miske didn't know a thing about this kidnapping. |
| 12:08PM | 14 | It was you and Miller, correct? |
| 12:08PM | 15 | A    Not correct.  Mr. Miske did know about the kidnapping. |
| 12:08PM | 16 | Q    And you're looking for a better sentence by testifying |
| 12:08PM | 17 | here today that way. |
| 12:08PM | 18 | A    I'm hoping to get a better sentence by testifying |
| 12:08PM | 19 | truthfully, sir. |
| 12:08PM | 20 | MR. KENNEDY:  Nothing further. |
| 12:08PM | 21 | THE COURT:  All right.  Before -- Mr. Akina, before |
| 12:08PM | 22 | redirect, why don't we go ahead and take our second break of |
| 12:08PM | 23 | the day.  We're about an hour and a half into this latest |
| 12:09PM | 24 | session. |
| 12:09PM | 25 | So I'll remind our jurors as we go to break to |

12:09PM   1   refrain, please, from discussing the substance of this case

12:09PM   2   with anyone, including each another; to refrain from accessing

12:09PM   3   any media or other accounts of this case that may be out there;

12:09PM   4   and then finally, please do not conduct any independent

12:09PM   5   investigation into the facts, circumstances or persons

12:09PM   6   involved.

12:09PM   7            It's about ten after now, so let's try to get started

12:09PM   8   right around 12:30.

12:09PM   9            (Proceedings were recessed at 12:09 p.m. to 12:33

12:33PM  10   p.m.)

12:33PM  11            THE COURT:  All right.  Back from our second break.

12:33PM  12   The record should reflect the return of all 17 jurors.  The

12:33PM  13   witness Mr. Kimoto is back on the stand.  The presence of

12:33PM  14   counsel and parties.

12:33PM  15            Mr. Akina, you may begin with redirect when you're

12:33PM  16   ready.

12:33PM  17            MR. AKINA:  Thank you, Your Honor.

12:33PM  18                      REDIRECT EXAMINATION

12:33PM  19   BY MR. AKINA:

12:33PM  20   Q    Mr. Kimoto, I'm going to ask you some questions about your

12:33PM  21   plea agreement, okay?

12:33PM  22   A    Yes.

12:33PM  23   Q    As part of your plea agreement, are you testifying here at

12:33PM  24   this trial?

12:33PM  25   A    Yes.

12:33PM   1    Q    And what is your understanding pursuant to the plea

12:33PM   2    agreement of your obligation when you testify at this trial?

12:33PM   3    A    My understanding is that I need to tell the truth about --

12:33PM   4    I need to tell the truth with every question that is asked of

12:33PM   5    me.

12:33PM   6    Q    And what happens if you don't tell the truth to your plea

12:33PM   7    agreement?

12:33PM   8    A    If I do not tell the truth, and you find that I've lied

12:34PM   9    here on the stand, that I would be in a worse off position than

12:34PM  10    I am -- that I would be when we first started this.

12:34PM  11    Q    You understand you could open yourself up to perjury

12:34PM  12    charges, right?

12:34PM  13    A    Yes.

12:34PM  14    Q    And the plea agreement that includes the dismissal of

12:34PM  15    certain charges after your sentencing, what could happen to

12:34PM  16    that if you lie to -- lie here at this trial?

12:34PM  17    A    You guys could charge me with that.

12:34PM  18    Q    It could come back, right?

12:34PM  19    A    Correct.

12:34PM  20    Q    Or it wouldn't be dismissed at all.

12:34PM  21    A    Yes.

12:34PM  22    Q    Now, some of the charges that may be dismissed that

12:34PM  23    defense counsel asked you about, you remember acknowledging

12:34PM  24    that the statutory maximum was life in prison for those?

12:34PM  25    A    I remember it being said to me by my attorney, but not in

12:34PM    1    full detail.

12:34PM    2    Q    And the charge that you did plead guilty to, the

12:34PM    3    conspiracy to commit kidnapping, do you understand that the

12:34PM    4    maximum statutory penalty for that is also life in prison?

12:35PM    5    A    Yes, I do recognize that.

12:35PM    6    Q    And that's the charge that is still -- that you could be

12:35PM    7    sentenced on -- that you will be sentenced on, correct?

12:35PM    8    A    Correct.

12:35PM    9    Q    Now, the kidnapping that you testified about, as part of

12:35PM    10   your plea agreement, did you acknowledge that you were part of

12:35PM    11   that conspiracy starting from May of 2017?

12:35PM    12   A    Yes.

12:35PM    13   Q    And what -- what event does that line up with?

12:35PM    14   A    That event lines up with when I met Sunnie for lunch that

12:35PM    15   day at the Kaka'ako restaurant.

12:35PM    16   Q    And at that lunch, she -- that's when the initial request

12:35PM    17   was made to help collect the debt?

12:35PM    18   A    Yes.

12:35PM    19   Q    And at that point did -- was a kidnapping discussed?

12:36PM    20   A    At that point, a kidnapping was not discussed.

12:36PM    21   Q    And after your next meeting with Ms. Kim where she gives

12:36PM    22   you the Post-it note, and you gave that Post-it note -- made

12:36PM    23   sure that the defendant got that Post-it note, at that point

12:36PM    24   had you discussed a kidnapping with anybody?

12:36PM    25   A    No.  I did not discuss that kidnapping.

12:36PM    1    Q    At that point, and then afterwards several months later in
12:36PM    2    October, when the defendant brought you back to Kama'aina
12:36PM    3    Termite and told you that Wayne Miller had the accountant, had
12:36PM    4    you heard anything about a kidnapping before that point in
12:36PM    5    time?
12:36PM    6    A    No, I did not.
12:36PM    7    Q    So when was the first time that you realized that a
12:36PM    8    kidnapping was going to take place or had taken place?
12:36PM    9    A    On October 17th.
12:36PM    10    Q    And who did you learn about the kidnapping from first?
12:36PM    11    A    The defendant, Mike.
12:36PM    12    Q    Not Wayne Miller?
12:36PM    13    A    Not Wayne.
12:36PM    14    Q    And so even though you didn't realize that a kidnapping
12:37PM    15    would take place, you still pled guilty to being a part of that
12:37PM    16    conspiracy all the way back in -- starting from the summer of
12:37PM    17    2017?
12:37PM    18    A    Yes.
12:37PM    19    Q    Is that because you took responsibility for your actions?
12:37PM    20    A    Because, yes, I did take responsibility for my action.
12:37PM    21    That's the only way that I could move on from this.
12:37PM    22    Q    And you acknowledge that that did play some role in the
12:37PM    23    kidnapping, right?
12:37PM    24    A    Yes.
12:37PM    25    Q    And I want to clear up a couple of things.  With the

12:37PM   1    fumigations that you did for Ms. Kim, how many total were

12:37PM   2    there?

12:37PM   3    A    There was two fumigations.

12:37PM   4    Q    And the first fumigation, when was that?

12:37PM   5    A    That was in 2017.

12:37PM   6    Q    And when did that take place in relation to the kidnapping

12:37PM   7    events?

12:37PM   8    A    That was before the kidnapping.

12:38PM   9    Q    And I think you had testified on direct that that was

12:38PM   10   when -- at around time when Ms. Kim first approached you to ask

12:38PM   11   for help with the debt?

12:38PM   12   A    Yes.

12:38PM   13   Q    Was there a prior fumigation before that?

12:38PM   14   A    No, there was not a prior fumigation before that.

12:38PM   15   Q    So -- so the second fumigation, when did that take place

12:38PM   16   with reference to the kidnapping?

12:38PM   17   A    That happened after the kidnapping.

12:38PM   18   Q    Wayne Miller, how do you know Wayne Miller?

12:38PM   19   A    I knew Wayne Miller through Mike.

12:38PM   20   Q    And back in 2017, could you describe the frequency with

12:38PM   21   which you would interact with Wayne Miller?

12:38PM   22   A    I really didn't see Wayne too often.  He would -- he would

12:38PM   23   contact me to -- if he needed to get in contact with Mike and

12:39PM   24   Mike wasn't available or answering his texts or calls, then he

12:39PM   25   would ask me -- he would -- he would contact me through text or

12:39PM  1    calling me to see if I knew where Mike was.

12:39PM  2    Q    And so for the kidnapping, do you know what vehicle, if

12:39PM  3    any, Wayne Miller used to carry out the kidnapping?

12:39PM  4    A    I do not know what vehicle Wayne used to carry out the

12:39PM  5    kidnapping.  I just know that I seen him -- when I met with

12:39PM  6    him, I seen him in a light-colored sedan.

12:39PM  7    Q    But you have no personal knowledge of which exact vehicle

12:39PM  8    was actually used by Wayne Miller?

12:39PM  9    A    No, I do not.

12:39PM  10   Q    You were asked a question by defense counsel that the

12:39PM  11   first time you mentioned Ms. Kim's request to kill the

12:40PM  12   accountant was only after your 2022 arrest, correct?

12:40PM  13   A    I'm sorry, I missed --

12:40PM  14   Q    Do you recall being -- do you remember being asked that

12:40PM  15   question by defense counsel?

12:40PM  16   A    Yes, I do.

12:40PM  17   Q    And the time in 2022 when you were arrested for the

12:40PM  18   witness tampering charge?

12:40PM  19   A    Yes.

12:40PM  20   Q    At that point in time, prior to your arrest, had you told

12:40PM  21   the government anything?

12:40PM  22   A    No.

12:40PM  23   Q    Had you entered into any type of plea agreement with the

12:40PM  24   government at that point?

12:40PM  25   A    No.

12:40PM    1    Q    Had you even come in for a proffer with the government up

12:40PM    2    to that point?

12:40PM    3    A    No.

12:40PM    4    Q    And what's your understanding of a proffer?

12:40PM    5    A    A proffer is when I come in and speak about, I guess, what

12:40PM    6    I did.

12:40PM    7    Q    With the government.

12:40PM    8    A    With the government.

12:40PM    9    Q    And there are agents there as well?

12:40PM    10    A    There are agents, yes.

12:40PM    11    Q    And so it wasn't until 2023 that you decided to enter into

12:41PM    12    a plea agreement; is that correct?

12:41PM    13    A    Yes.

12:41PM    14    Q    And as part of those discussions, did you proffer with the

12:41PM    15    government and agents?

12:41PM    16    A    Yes.

12:41PM    17    Q    And on the first -- do you remember meeting the first time

12:41PM    18    on May 24th, 2023?

12:41PM    19    A    It -- it was around that time.

12:41PM    20    Q    And the first meeting that you had, is that when you

12:41PM    21    discussed and explained your involvement in the kidnapping?

12:41PM    22    A    I believe we did go over what had -- what had happened.

12:41PM    23    Q    And at that first meeting did you also explain or reveal

12:41PM    24    to the government and agents that Ms. Kim had made the request

12:41PM    25    about killing the accountant?

12:41PM   1   A    Yes.

12:41PM   2   Q    And at that first meeting did you explain to the

12:41PM   3   government and agents about the defendant's involvement and

12:41PM   4   Wayne Miller's involvement?

12:41PM   5   A    Yes.

12:41PM   6   Q    Was that consistent with how you testified at this trial?

12:41PM   7   A    Yes.

12:42PM   8            MR. AKINA:  Could we show the witness Exhibit 5-37,

12:42PM   9   which is in evidence, page 3, please?

12:42PM   10            THE COURT:  Yes, go ahead.

12:42PM   11            MR. AKINA:  And permission to publish?

12:42PM   12            THE COURT:  Yes.

12:42PM   13   BY MR. AKINA:

12:42PM   14   Q    You were asked about some text messages on cross-

12:42PM   15   examination.  If we could focus in on messages 13, 14 and 15,

12:42PM   16   please.

12:42PM   17            Looking at message 15 where -- where you text Wayne

12:42PM   18   Miller:  "I'm doing an estimate right now.  Braddah said hold

12:42PM   19   on, and I'm going to meet him at shop right after this and get

12:42PM   20   back to you."

12:42PM   21            Do you see that?

12:43PM   22   A    Yes.

12:43PM   23   Q    And when the defense counsel asked you about "braddah,"

12:43PM   24   who that could mean to you, you were about to explain

12:43PM   25   something.  Do you recall that?

| | | | |
|---|---|---|---|
| 12:43PM | 1 | A | Yes. |
| 12:43PM | 2 | Q | Can you explain to the jury what you were going to say? |
| 12:43PM | 3 | A | I was going to say that that's not what Mike's nickname |
| 12:43PM | 4 | | was, braddah. So that's why Wayne is probably confused and |
| 12:43PM | 5 | | asking me who when I say "braddah," because we never would use |
| 12:43PM | 6 | | names on texts or phone calls. |
| 12:43PM | 7 | Q | And why wouldn't you use names on texts and phone calls? |
| 12:43PM | 8 | A | In case the government or law enforcement was listening in |
| 12:43PM | 9 | | or tapping and viewing our texts, we didn't want to put |
| 12:43PM | 10 | | anybody -- anybody's name in these texts. |
| 12:43PM | 11 | Q | So up to October 2017, what was the defendant's -- I guess |
| 12:43PM | 12 | | what name was he most commonly referred to by as a nickname? |
| 12:44PM | 13 | A | I would refer to Mike as "Bro," or we would -- I would |
| 12:44PM | 14 | | just use initials like MM. |
| 12:44PM | 15 | Q | Okay. And so here you use "braddah" instead. Why? |
| 12:44PM | 16 | A | Because I was running this -- I was running this text |
| 12:44PM | 17 | | fast, and I just had said "braddah," thinking that Wayne would |
| 12:44PM | 18 | | understand who I was talking about because referring -- it goes |
| 12:44PM | 19 | | back to "Braddah said hold on, and I'm going to meet him at the |
| 12:44PM | 20 | | shop." That's the only person that that could -- that could be |
| 12:44PM | 21 | | in relation to. |
| 12:44PM | 22 | Q | And you mentioned that you didn't put names in text |
| 12:44PM | 23 | | messages. Is that why you put "Bro" after Wayne Miller asked |
| 12:44PM | 24 | | you who you were referring to? |
| 12:44PM | 25 | A | Yes. |

12:45PM   1              MR. AKINA:  Now, we can take this exhibit down.

12:45PM   2   BY MR. AKINA:

12:45PM   3   Q    There was a phone number ending in 2822.  Do you remember

12:45PM   4   that phone number?

12:45PM   5   A    Yes.

12:45PM   6   Q    And that was the phone that you were using during the time

12:45PM   7   that you worked for the defendant?

12:45PM   8   A    Yes.

12:45PM   9   Q    And was this that burner phone that you were referencing

12:45PM  10   that the defendant had asked you to go and get?

12:45PM  11   A    Yes.

12:45PM  12   Q    And at the time when you got that phone, how many did you

12:45PM  13   purchase in total?

12:45PM  14   A    Sorry.  Could you repeat?

12:45PM  15   Q    How many phones did you purchase in total at that time?

12:45PM  16   A    I purchased two phones.

12:45PM  17   Q    And what were they for?

12:45PM  18   A    Those two phones were to be used for me and Mike to

12:45PM  19   communicate through.

12:45PM  20   Q    And so how did this phone number ending in 2822 go from a

12:45PM  21   burner phone dedicated to communications with the defendant to

12:45PM  22   now being a phone that was being used, you know, in other

12:46PM  23   aspects of business?

12:46PM  24   A    From what I remember, I believe that I used the number

12:46PM  25   when texting two of Mike's phones.

| | | |
|---|---|---|
| 12:46PM | 1 | Q    When you say "the number," which number are you saying? |
| 12:46PM | 2 | A    I used the 2822 to text two of Mike's phones.  The one -- |
| 12:46PM | 3 | the one that I purchased with my -- with the 2822 number and |
| 12:46PM | 4 | another number associated with Mike. |
| 12:46PM | 5 | Q    And so after you texted the defendant at another number |
| 12:46PM | 6 | that wasn't that burner that you purchased for him, is that |
| 12:46PM | 7 | when the use for 2822 changed? |
| 12:46PM | 8 | A    Yes, that's when it -- that's not exactly when it changed, |
| 12:46PM | 9 | but that's when it changed where we couldn't use that phone -- |
| 12:46PM | 10 | both those phones to communicate with, because now the phones |
| 12:46PM | 11 | were dirty now, we call it, because it was -- I texted the |
| 12:46PM | 12 | number that law enforcement was probably -- was most likely |
| 12:46PM | 13 | viewing our texts or reviewing our phone calls on.  And now I |
| 12:47PM | 14 | introduced two new numbers into -- to get their -- I mean to |
| 12:47PM | 15 | get their attention now. |
| 12:47PM | 16 | Q    Do you remember being shown some videos involving Wes |
| 12:47PM | 17 | Otani on cross-examination? |
| 12:47PM | 18 | A    Yes. |
| 12:47PM | 19 | Q    And he was providing trainings to fumigation staff? |
| 12:47PM | 20 | A    Yes. |
| 12:47PM | 21 | Q    Do you know why that particular training was offered by |
| 12:47PM | 22 | the defendant? |
| 12:47PM | 23 | A    I -- I don't -- I don't know why, sir. |
| 12:47PM | 24 | MR. AKINA:  Could we show the witness Exhibit 1-843, |
| 12:47PM | 25 | which is not in evidence, and going to page 8 of that. |

| | | |
|---|---|---|
| 12:47PM | 1 | BY MR. AKINA: |
| 12:48PM | 2 | Q    Do you recognize this photo? |
| 12:48PM | 3 | A    Yes. |
| 12:48PM | 4 | Q    What does this photo show? |
| 12:48PM | 5 | A    This photo shows -- this photo shows employees filling out |
| 12:48PM | 6 | best of -- Hawaii's Best of. |
| 12:48PM | 7 | Q    Which employees? |
| 12:48PM | 8 | A    In this picture it shows Kama'aina employees. |
| 12:48PM | 9 | Q    And are you familiar with the practice of employees |
| 12:48PM | 10 | filling out Hawaii's Best ballots? |
| 12:48PM | 11 | A    Yes, I participated in this. |
| 12:48PM | 12 | Q    And does this picture show Kama'aina employees filling out |
| 12:48PM | 13 | Hawaii Best ballots? |
| 12:49PM | 14 | A    Correct. |
| 12:49PM | 15 | MR. AKINA:  Your Honor, this particular page is part |
| 12:49PM | 16 | of a greater exhibit.  I have it separately marked as a |
| 12:49PM | 17 | separate one, which we can submit as Exhibit 1-843-A, and I can |
| 12:49PM | 18 | hand that up to the Court. |
| 12:49PM | 19 | THE COURT:  Are you offering it? |
| 12:49PM | 20 | MR. AKINA:  Yes, I'm offering it into evidence at this |
| 12:49PM | 21 | time. |
| 12:49PM | 22 | THE COURT:  Any objection? |
| 12:49PM | 23 | MR. KENNEDY:  No objection. |
| 12:49PM | 24 | THE COURT:  Without objection, Exhibit 1-843 Alpha is |
| 12:49PM | 25 | admitted. |

12:49PM    1              (Exhibit 1-843-A was received in evidence.)

12:49PM    2              MR. AKINA:  For the purposes of today, Your Honor,

12:49PM    3    could we just display this page of this exhibit for the jury?

12:49PM    4              THE COURT:  Yes.

12:49PM    5              MR. AKINA:  Thank you.

12:49PM    6              Now, if we could zoom in on the bottom half of the

12:49PM    7    picture.

12:49PM    8    BY MR. AKINA:

12:49PM    9    Q    Okay.  You see that red shirt, the long-sleeved red shirt?

12:49PM   10    A    Yes.

12:49PM   11    Q    What type of shirt is that?

12:49PM   12    A    That's an authorized technician Kama'aina shirt.

12:50PM   13    Q    And do you see these stacks of papers in front of this

12:50PM   14    individual, what is that?

12:50PM   15    A    The stacks of papers are newspaper -- newspaper ballots

12:50PM   16    for the Hawaii's Best of 2018.

12:50PM   17    Q    And do you see stacks of numerous ballots in front of the

12:50PM   18    employees?

12:50PM   19    A    Yes.

12:50PM   20    Q    And so you mentioned that you had participated in doing

12:50PM   21    this.  So what is -- what is your understanding of how Hawaii's

12:50PM   22    Best awards are -- are awarded?

12:50PM   23    A    It's a vote by the public.

12:50PM   24    Q    And what relation, if any, do these type of ballots have

12:50PM   25    to that determination, that vote?

12:50PM  1    A    The more votes you get, I guess, that's the how the best

12:50PM  2    of is awarded.

12:50PM  3    Q    And can you explain how you participated in that?

12:50PM  4    A    I participated by filling out numerous of these ballot

12:51PM  5    forms, and not turning it in, but we -- I don't know who would

12:51PM  6    turn it in, but we would just leave it -- we would just fill it

12:51PM  7    out and leave it -- leave it for somebody to turn in.

12:51PM  8    Q    And why did you do that?

12:51PM  9    A    Because I was asked by the defendant.

12:51PM  10        MR. AKINA:  If we could zoom out of this.

12:51PM  11   BY MR. AKINA:

12:51PM  12   Q    What room -- do you know what room this is taking place

12:51PM  13   in?

12:51PM  14   A    This is the Kama'aina board room.

12:51PM  15   Q    Is this that same board room where you were giving that

12:51PM  16   training in that video that you were shown on cross?

12:51PM  17   A    Yes.

12:51PM  18   Q    Did this happen on just one year, during one year?

12:51PM  19   A    No, this happened numerous years.

12:51PM  20   Q    Of the years that you worked for the defendant from 2015

12:51PM  21   to 2020, approximately how many of those years to your

12:52PM  22   knowledge did it take place?

12:52PM  23   A    I would say at least -- at least two.

12:52PM  24        MR. AKINA:  We can take this exhibit down.

12:52PM  25   BY MR. AKINA:

| | | |
|---|---|---|
| 12:52PM | 1 | Q    Do you recall being shown several manager threads on |
| 12:52PM | 2 | cross-examination? |
| 12:52PM | 3 | A    Yes. |
| 12:52PM | 4 | Q    And you were asked some questions about the individuals |
| 12:52PM | 5 | who were on those threads? |
| 12:52PM | 6 | A    Yes. |
| 12:52PM | 7 | Q    Did you see Michael Masutani's name on those -- any of |
| 12:52PM | 8 | those threads? |
| 12:52PM | 9 | A    I don't -- I don't think I saw Michael Masutani's name on |
| 12:53PM | 10 | those threads. |
| 12:53PM | 11 | Q    And did you see Devin Kimoto's name on any of those |
| 12:53PM | 12 | threads? |
| 12:53PM | 13 | A    I did not see my brother's name on those threads. |
| 12:53PM | 14 | MR. AKINA:  Could we show Exhibit 5000-129? |
| 12:53PM | 15 | And I would ask defense counsel if it's readily |
| 12:53PM | 16 | available? |
| 12:53PM | 17 | This is already in evidence. |
| 12:53PM | 18 | THE COURT:  Go ahead. |
| 12:54PM | 19 | BY MR. AKINA: |
| 12:54PM | 20 | Q    You were asked questions on cross-examination about the |
| 12:54PM | 21 | Oahu yacht club fumigation.  Do you remember that? |
| 12:54PM | 22 | A    I think this is the Waikiki one. |
| 12:54PM | 23 | Q    My mistake, sorry.  Waikiki Yacht Club. |
| 12:54PM | 24 | And then can you explain to the jury how you worked |
| 12:54PM | 25 | with another company to ensure the contract? |

12:54PM  1    A    So I got called out to this particular property for an

12:54PM  2    estimate.  I went through the estimate -- I mean I went and did

12:54PM  3    the estimate before submitting my estimated cost to fumigate

12:54PM  4    this property.

12:54PM  5        I found out that somebody else from Kama'aina -- I

12:54PM  6    mean I found out somebody from Kama'aina went as a Kama'aina

12:54PM  7    salesperson, and I went as an O'ahu sales inspector.  We both

12:55PM  8    agreed that one of us would go higher and a lot higher for the

12:55PM  9    pricing for this job, and the other one would come in at a

12:55PM  10   reasonable price.

12:55PM  11       This -- this particular fumigation isn't -- it isn't

12:55PM  12   an easy one.  It's considered a difficult fumigation.  So by --

12:55PM  13   by myself and the Kama'aina salesperson going, we -- what we

12:55PM  14   would do is we would split the sale, so we would still both

12:55PM  15   benefit.  But I -- I agreed to be the one to go higher on this

12:55PM  16   sale because I didn't want the headache of trying to manage the

12:55PM  17   expectations from the Waikiki Yacht harbor on this tent

12:55PM  18   fumigation.

12:55PM  19   Q    And was that the only time that you did something like

12:56PM  20   that while working at O'ahu Termite?

12:56PM  21   A    That -- no, it wasn't the only time.  I did it on quite a

12:56PM  22   few occasions where we would -- we would have to report at the

12:56PM  23   end of our day what estimates we did and what we sold.  We

12:56PM  24   would have to report that on -- in the -- I mean in the sales,

12:56PM  25   either the Slack or Signal.  Everybody was required to report

12:56PM   1   how much they sold that day and what estimates they did.

12:56PM   2              So that's how we would know where each of us went to

12:56PM   3   so we could see if we -- so we could see if we went to the same

12:56PM   4   customer's house.  And if we did, then we would work together

12:56PM   5   in securing that sale and we would split -- would split that

12:56PM   6   sale.

12:56PM   7              MR. AKINA:  Thank you.  No further questions.

12:57PM   8              THE COURT:  All right.  Mr. Kimoto, you may step down

12:57PM   9   with the marshal's assistance.

12:57PM  10              MR. KENNEDY:  Your Honor, can I have some follow-up?

12:57PM  11              THE COURT:  No.

12:57PM  12              MR. KENNEDY:  Just a couple of questions.

12:57PM  13              THE COURT:  Your next witness.

12:57PM  14              MR. INCIONG:  Wayne Miller, Your Honor.

12:58PM  15              Did you want him brought in right now, Your Honor?

12:58PM  16              THE COURT:  It's up to you.

12:58PM  17              MR. INCIONG:  I think --

12:58PM  18              THE COURT:  You want to take a break?

12:58PM  19              MR. INCIONG:  -- if we could take the jury out just

12:58PM  20   briefly.

12:58PM  21              THE COURT:  All right.  Why don't we go ahead and do

12:58PM  22   that then.

12:58PM  23              It's going to take a little bit of time to switch

12:58PM  24   witnesses.  So we'll excuse the jury.  And once we have

12:58PM  25   Mr. Miller situated, we'll call you right back in.  It

12:58PM   1   shouldn't be more than just a few minutes.

01:10PM   2              (A recess was taken from 12:58 p.m. to 1:10 p.m.)

01:10PM   3              THE COURT:  All right.  Back from our brief break.

01:10PM   4   Has the witness -- the witness needs to be sworn.

01:10PM   5              THE CLERK:  Please raise your right hand.

01:10PM   6                          WAYNE MILLER,

01:10PM   7   called as a witness, having been first duly sworn, was examined

01:10PM   8   and testified as follows:

01:10PM   9              THE CLERK:  Please state your full name, spelling your

01:10PM  10   last name for the record.

01:10PM  11              THE WITNESS:  Wayne Miller.  Last name M-I-L-L-E-R.

01:10PM  12              THE COURT:  Mr. Inciong.

01:10PM  13              MR. INCIONG:  Thank you, Your Honor.

01:10PM  14                      DIRECT EXAMINATION

01:10PM  15   BY MR. INCIONG:

01:10PM  16   Q    Good afternoon, Mr. Miller.  How old are you, sir?

01:10PM  17   A    Forty.

01:10PM  18   Q    It looks like you are currently incarcerated; is that

01:10PM  19   correct?

01:10PM  20   A    Correct.

01:10PM  21   Q    Who are you in the custody of?

01:10PM  22   A    I'm in the custody of United States Marshals.

01:10PM  23   Q    How long have you been in custody?

01:10PM  24   A    Almost five years.

01:10PM  25   Q    Why are you in custody?

| 01:10PM | 1 | A | I pled guilty to this charge. |
| 01:11PM | 2 | Q | What charge are you referring to? |
| 01:11PM | 3 | A | Racketeering conspiracy. |
| 01:11PM | 4 | Q | When did you plead guilty to that charge? |
| 01:11PM | 5 | A | December 2020. |
| 01:11PM | 6 | Q | Is that a felony charge you pled guilty to? |
| 01:11PM | 7 | A | Yes. |
| 01:11PM | 8 | Q | Were you represented by counsel at the time that you |
| 01:11PM | 9 | | entered that guilty plea? |
| 01:11PM | 10 | A | Yes. |
| 01:11PM | 11 | Q | Who is your attorney? |
| 01:11PM | 12 | A | Max Mizono. |
| 01:11PM | 13 | Q | Is Mr. Mizono an attorney here in Honolulu? |
| 01:11PM | 14 | A | Yes. |
| 01:11PM | 15 | Q | Has Mr. Mizono represented you throughout your -- the |
| 01:11PM | 16 | | proceedings? |
| 01:11PM | 17 | A | Yes. |
| 01:11PM | 18 | Q | Including up to today? |
| 01:11PM | 19 | A | Yes. |
| 01:11PM | 20 | Q | Did Mr. Mizono advise you as to the possible or applicable |
| 01:11PM | 21 | | guideline range that you would be facing for pleading guilty to |
| 01:11PM | 22 | | racketeering conspiracy? |
| 01:11PM | 23 | A | Yes. |
| 01:11PM | 24 | Q | What is your understanding of what you could be facing for |
| 01:11PM | 25 | | pleading guilty to that charge? |

01:11PM   1   A   Life.

01:11PM   2   Q   Pursuant to your plea agreement, are you facing a specific

01:12PM   3   maximum penalty?

01:12PM   4   A   Yes.

01:12PM   5   Q   What is that maximum?

01:12PM   6   A   Twenty years.

01:12PM   7   Q   So that's less than the applicable guideline range you

01:12PM   8   talked about.

01:12PM   9   A   Yes.

01:12PM   10   Q   Did you pleading guilty to racketeering conspiracy

01:12PM   11   pursuant to what's called an information?

01:12PM   12   A   Yes.

01:12PM   13   Q   Did you waive your right to be indicted and instead pled

01:12PM   14   guilty to that information?

01:12PM   15   A   Yes.

01:12PM   16   Q   What is your understanding of the general terms of your

01:12PM   17   plea agreement that you entered into with the government?

01:12PM   18   A   I pled guilty to -- to a racketeering conspiracy.  I

01:12PM   19   agreed that I committed those crimes under racketeering law.

01:12PM   20   Q   Okay.  Were there any charges that were dismissed or any

01:12PM   21   other promises made to you as part of that plea agreement?

01:12PM   22   A   Yes.

01:12PM   23   Q   Could you describe what those are?

01:12PM   24   A   Drugs and firearms and kidnapping.

01:12PM   25   Q   Okay.  Did the plea agreement also cap your sentence at

01:13PM   1   20 years, as I think you testified to a moment ago?

01:13PM   2   A    Yes.

01:13PM   3   Q    Under the plea agreement do you have the right to request

01:13PM   4   a sentence even below 20 years?

01:13PM   5   A    Yes.

01:13PM   6   Q    Are you familiar with the term "acceptance of

01:13PM   7   responsibility"?

01:13PM   8   A    Yes.

01:13PM   9   Q    Did the plea agreement award you any sort of benefit for

01:13PM  10   acceptance of responsibility?

01:13PM  11   A    They -- they went down three points on me.

01:13PM  12   Q    And that's in the calculation of your guideline range?

01:13PM  13   A    Yes.

01:13PM  14   Q    Did your plea agreement include a cooperation agreement?

01:13PM  15   A    Yes.

01:13PM  16   Q    Could you explain basically the general terms of your

01:13PM  17   cooperation agreement.

01:13PM  18   A    Testify truthfully, cooperate with law enforcement, and

01:13PM  19   tell the truth.

01:13PM  20   Q    Are you testifying today freely and voluntarily?

01:13PM  21   A    Yes.

01:13PM  22   Q    Has anyone threatened or coerced you in any way in order

01:13PM  23   to get you to testify today?

01:13PM  24   A    No.

01:13PM  25   Q    What are you hoping to gain from testifying in this

01:14PM    1    matter?

01:14PM    2    A    A lower sentence.

01:14PM    3    Q    What will determine if you do in fact receive a lower

01:14PM    4    sentence?

01:14PM    5         Is there a process that will -- that determines

01:14PM    6    whether or not that happens in the end?

01:14PM    7    A    Yes.

01:14PM    8    Q    Okay.  Do you know what that -- those steps are?

01:14PM    9    A    I forgot.

01:14PM    10   Q    Okay.  We'll come back to it in a minute.

01:14PM    11        Do you recall who makes the decision -- final decision

01:14PM    12   as to whether or not you do in fact receive a lower sentence?

01:14PM    13   A    Yes.

01:14PM    14   Q    Who is that?

01:14PM    15   A    The judge.

01:14PM    16   Q    Have you been promised or guaranteed a reduced sentence by

01:14PM    17   anyone from the government in this case?

01:14PM    18   A    No.

01:14PM    19   Q    Have you been promised anything in return for your

01:14PM    20   testimony in this case?

01:14PM    21   A    No.

01:14PM    22   Q    Did you previously testify before what's called a grand

01:14PM    23   jury in this matter, sir?

01:14PM    24   A    Yes.

01:14PM    25   Q    Do you recall when you testified before the grand jury?

01:15PM    1    A    2019, about mid-2019.

01:15PM    2    Q    Okay.  Do you recall were you under oath during that

01:15PM    3    testimony?

01:15PM    4    A    Yes.

01:15PM    5    Q    Do you recall if you were also under penalty of perjury if

01:15PM    6    you testified dishonestly during that proceeding?

01:15PM    7    A    Yes.

01:15PM    8    Q    Were you represented at that time by your counsel you

01:15PM    9    referred to, Mr. Mizono?

01:15PM    10   A    Yes.

01:15PM    11   Q    Prior to coming to court today, did you have access to the

01:15PM    12   grand jury transcript of your testimony from --

01:15PM    13   A    Yes.

01:15PM    14   Q    And have you reviewed that particular grand jury

01:15PM    15   transcript?

01:15PM    16   A    Yes.

01:15PM    17   Q    Does that transcript accurately reflect your statements to

01:15PM    18   the grand jury on that day in the summer of 2019?

01:15PM    19   A    Yes.

01:15PM    20   Q    So let me go back and ask you a couple of questions about

01:15PM    21   your plea agreement.  Now, you mentioned that you pled guilty

01:15PM    22   to racketeering conspiracy, correct?

01:15PM    23   A    Yes.

01:15PM    24   Q    Did you also admit to being a member of the Miske

01:15PM    25   Enterprise?

| | | | |
|---|---|---|---|
| 01:15PM | 1 | A | Yes. |

01:15PM    2    Q    Were there other members of the Miske Enterprise that you

01:16PM    3    agreed to commit the racketeering offenses you referenced

01:16PM    4    earlier?

01:16PM    5    A    Yes.

01:16PM    6    Q    Who are some of those people?

01:16PM    7    A    Myself, Mike Miske, Jake Smith, Harry Kauhi, Lance

01:16PM    8    Bermudez.

01:16PM    9    Q    Okay.  In your view, was there a leader of this

01:16PM    10    enterprise?

01:16PM    11    A    Yes.

01:16PM    12    Q    Who was that?

01:16PM    13    A    Mike Miske.

01:16PM    14    Q    Is there any doubt from your knowledge or your experience

01:16PM    15    as to who the leader of the Miske Enterprise was?

01:16PM    16    A    No.

01:16PM    17    Q    Do you see the individual you identified as the leader of

01:16PM    18    the Miske Enterprise in court today?

01:16PM    19    A    Yes.

01:16PM    20    Q    Could you identify where that person is seated and what

01:16PM    21    they're wearing for the record, please.

01:16PM    22    A    He is over there, gray long sleeve, collared shirt on.

01:16PM    23        MR. INCIONG:  Your Honor, may the record reflect that

01:16PM    24    Mr. Miller has identified Michael Miske?

01:16PM    25        THE COURT:  Yes, the record should reflect the

01:17PM    1    witness, Mr. Miller's identification of the defendant

01:17PM    2    Mr. Miske.

01:17PM    3              MR. INCIONG:  Thank you, Your Honor.

01:17PM    4    BY MR. INCIONG:

01:17PM    5    Q    How did you -- or how do you know Mr. Miske, sir?

01:17PM    6    A    We grew up in the same town.

01:17PM    7    Q    What town -- what town is that.

01:17PM    8    A    Waimanalo.

01:17PM    9    Q    That's here on the island of Oahu?

01:17PM   10    A    Yes.

01:17PM   11    Q    For members of the jury that are from our neighbor islands

01:17PM   12    who may not be familiar, could you describe where or what part

01:17PM   13    of the island that is?

01:17PM   14    A    On the east side of the island, small town, one road, one

01:17PM   15    stoplight, one blinking light.

01:17PM   16    Q    About how old were you when you met Mr. Miske?

01:17PM   17    A    I was in my teens.

01:17PM   18    Q    What year were you born?

01:17PM   19    A    '83.

01:17PM   20    Q    So this would have been in the mid to late '90s?

01:17PM   21    A    Yes.

01:17PM   22    Q    Do you recall how you first became -- knew Mr. Miske or

01:17PM   23    how you got to meet him?

01:17PM   24    A    Being from a small town, you -- you really hear about

01:18PM   25    people before you -- before you meet them.  And, yeah, we just

| | | |
|---|---|---|
| 01:18PM | 1 | heard about each other.  We started meeting each other |
| 01:18PM | 2 | through -- through mutual friends and created a relationship |
| 01:18PM | 3 | from that. |
| 01:18PM | 4 | Q    Okay.  So what was one of the first things that you |
| 01:18PM | 5 | noticed or knew about Mr. Miske growing up in Waimanalo? |
| 01:18PM | 6 | A    He always had -- he always had nice -- nice things, nice |
| 01:18PM | 7 | cars, nice -- nice bikes, old school cars.  He always had nice |
| 01:18PM | 8 | stuff. |
| 01:18PM | 9 | Q    Okay.  Did that catch your attention? |
| 01:18PM | 10 | A    Yes. |
| 01:18PM | 11 | Q    Now, how would you -- well, before I ask you that, was |
| 01:18PM | 12 | Mr. Miske your age? |
| 01:18PM | 13 | A    No. |
| 01:18PM | 14 | Q    Older than you, younger than you? |
| 01:18PM | 15 | A    Older. |
| 01:18PM | 16 | Q    How much older? |
| 01:18PM | 17 | A    About ten years. |
| 01:18PM | 18 | Q    So if you were in your teens when you first met him, then |
| 01:19PM | 19 | he was in his 20s? |
| 01:19PM | 20 | A    Yes. |
| 01:19PM | 21 | Q    What were some of the kind of earliest conversations that |
| 01:19PM | 22 | you recall having with Mr. Miske? |
| 01:19PM | 23 | A    I used to -- when I was younger, he always used to -- he |
| 01:19PM | 24 | used to school me.  You know, like I was -- I was young.  I was |
| 01:19PM | 25 | doing -- I was doing a lot of little petty crimes, stealing |

01:19PM  1   from tourists, robbing tourists at the beach, you know.

01:19PM  2            And when I used to talk to him, he used to be like,

01:19PM  3   "'eh, why you -- why you keep doing these little -- little

01:19PM  4   petty crimes here and there, you know.  Trying to target people

01:19PM  5   that matter, you know, like he always used to -- he used to

01:19PM  6   always like shoot -- shoot that kind of stuff to me.

01:19PM  7   Q    Okay.  So what did -- what did you understand him to mean

01:19PM  8   when he said "target people that matter"?  What are people that

01:19PM  9   matter?

01:19PM 10   A    Target people that -- that you don't gotta -- I don't

01:20PM 11   gotta -- I don't gotta rob somebody every day for a little bit

01:20PM 12   of money, you know.  Target bigger drug dealers that giving

01:20PM 13   smaller drug dealers some -- some drugs and like that, yeah.

01:20PM 14   Q    So the advice was these people had more money?

01:20PM 15   A    Yes.

01:20PM 16   Q    Okay.  Was there any other advantage to -- you said

01:20PM 17   robbing drug dealers, any other advantage to robbing that kind

01:20PM 18   of target?

01:20PM 19   A    Yes.

01:20PM 20   Q    What was that?

01:20PM 21   A    He told me like -- you know, like drug dealers, they're

01:20PM 22   not going to really call the cops, so, you know.  They cannot

01:20PM 23   really cause heat like -- like robbing tourists or robbing cars

01:20PM 24   and shit like that.

01:20PM 25   Q    So let me go back a little bit in time.  You said that you

01:20PM   1   were doing petty crimes at a young age, correct?

01:20PM   2   A    Yes.

01:20PM   3   Q    How young are we talking about?

01:20PM   4   A    Young.  I was doing it at a -- at a young age.  Elementary

01:20PM   5   school.

01:21PM   6   Q    Okay.  Tell the jury about your -- your home life and your

01:21PM   7   family life at that time.

01:21PM   8   A    Oh, family life wasn't -- wasn't great.  Wasn't -- I like

01:21PM   9   to say I raised myself.  They never -- my parents never told me

01:21PM  10   I was doing wrong or I was doing right, you know, whatever.  I

01:21PM  11   was made to make decisions on my own and -- and figure out

01:21PM  12   basically if that was right or wrong on my own.

01:21PM  13   Q    Okay.  Did the decision whether you go to school

01:21PM  14   regularly, was that left up to you?

01:21PM  15   A    Yes.

01:21PM  16   Q    And how did you decide?

01:21PM  17   A    I mean they would -- they would send me to school, but I

01:21PM  18   was -- I would go to school, and I just knew school wasn't for

01:21PM  19   me.  You know, so I -- I would constantly leave school

01:21PM  20   basically every day, you know.  And I would find out like the

01:21PM  21   only way your parents would find out is if the school calls

01:22PM  22   home, and at that time it was answering machines.  So all you

01:22PM  23   had to do was go home, erase the message from the school, and

01:22PM  24   they would never find out.

01:22PM  25   Q    So your parents were not aware you are skipping school

01:22PM   1   regularly?

01:22PM   2   A    No.

01:22PM   3   Q    What were you doing when you were supposed to be in school

01:22PM   4   and you were -- you were not there?

01:22PM   5   A    I mean, I started off innocent.  That was probably the

01:22PM   6   worst thing I was doing at the time then.  I was going to the

01:22PM   7   beach.  I was cutting school, going to the beach.  And so in my

01:22PM   8   teens started off like that.  I was going to the beach just to

01:22PM   9   go to the beach, boogie board.

01:22PM  10   Q    Okay.  But did that change?

01:22PM  11   A    Yes.

01:22PM  12   Q    What did that change to?

01:22PM  13   A    Well, I was at the beach.  I always -- I used to play

01:22PM  14   sports at that time, so I was used to -- even if I was playing

01:22PM  15   sports, I was still watching people.  Like people in my

01:22PM  16   neighborhood was stealing from cars, stealing from tourists and

01:23PM  17   everything like that.

01:23PM  18        So when I started going to the beach, even though my

01:23PM  19   attention was just to go to the beach, I started looking like,

01:23PM  20   Hey, these tourists are just leaving their bags, I can go over

01:23PM  21   and steal stuff from them, you know.  And progressed from

01:23PM  22   there.  I started going to the beach just to steal from them at

01:23PM  23   that point, you know.  And I was still young.  I'm not even --

01:23PM  24   you know, I'm not even in my teens yet, and that's what --

01:23PM  25   that's what it progressed to.

01:23PM   1   Q    Okay.  So going to the beach became not just going to the

01:23PM   2   beach, you were going there to steal from tourists.

01:23PM   3   A    Yeah.  Not even going to the beach to -- to bodysurf and

01:23PM   4   to -- you know.  At that time I never had money, you know, so I

01:23PM   5   was -- we was grabbing -- we was going to boogie board, but I

01:23PM   6   never have one boogie, so I had to steal a tray from

01:23PM   7   MacDonald's or something and use that.  So when I started

01:23PM   8   stealing from tourists, I could buy my own board, I could buy

01:23PM   9   fins, buy my friends some stuff.  I was young.

01:24PM  10   Q    Okay.  Did it stop there or did that lead to bigger

01:24PM  11   things?

01:24PM  12   A    Yeah, from there it just got worse from there.

01:24PM  13   Q    Okay.  What do you mean by "worse"?  Tell us what things

01:24PM  14   you're talking about.

01:24PM  15   A    I started stealing -- I started stealing cars from there.

01:24PM  16   I started going to -- I started traveling to different --

01:24PM  17   different beaches, stealing from houses, robbing houses.  Yeah,

01:24PM  18   just -- just got worse from there.

01:24PM  19   Q    Okay.  Now, was this about the time that -- then that you

01:24PM  20   met Mr. Miske that you referenced?

01:24PM  21   A    Yes.

01:24PM  22   Q    So how would you describe your relationship with Mr. Miske

01:24PM  23   after you had gotten to know him and he had given you this --

01:24PM  24   this advice about picking people that mattered?

01:24PM  25   A    Like I say, our relationship started off great, you know.

01:24PM  1    I was -- I was somebody.  He was somebody I looked up to.  You

01:25PM  2    know, he had -- even though it was -- was negative feedback to

01:25PM  3    you guys, to me my life revolved around that, you know.  I

01:25PM  4    mean, around committing crimes, you know.  My -- my ideal of

01:25PM  5    doing good throughout my whole life, all up until I caught this

01:25PM  6    case, was -- was just not getting caught.  You know.  So that

01:25PM  7    was my -- that was my -- that was mindset, you know, pretty

01:25PM  8    much throughout my whole life.

01:25PM  9            Meeting Mike, yeah, I mean it was great.  Our

01:25PM  10   relationship was great.  Every time I seen him, we had mutual

01:25PM  11   friends.  We had great -- I had great times with him.  Great,

01:25PM  12   great times with him, you know.  Went from talking -- we went

01:25PM  13   from just knowing mutual friends to talking, to talking more,

01:26PM  14   to talking more, hanging out more.  He would invite me to his

01:26PM  15   house.  Let me drive his cars.  Let me ride his bikes.  You

01:26PM  16   know.  Sleep on his couch.

01:26PM  17            I used to -- at his house, I used to go over there.  I

01:26PM  18   mean it was simple.  He had frozen rice balls in his freezer,

01:26PM  19   we used to pop them in the microwave, put some canned goods on

01:26PM  20   top of that.  I mean always talking, always -- always joking,

01:26PM  21   always laughing.  But our conversations started getting deeper

01:26PM  22   and deeper.

01:26PM  23   Q    Okay.  So at this point, I mean how would you describe

01:26PM  24   your relationship then?  Was he like a big brother to you, a

01:26PM  25   father figure, a close friend?  How would you describe it?

| | | | |
|---|---|---|---|
| 01:26PM | 1 | A | I would say -- I would say all of the above.  You know. |
| 01:26PM | 2 | Q | Is it hard for you testifying here today? |
| 01:27PM | 3 | A | Yes.  Very hard. |
| 01:27PM | 4 | Q | Tell the jury why. |
| 01:27PM | 5 | A | I was -- I was -- I knew this guy a long, long time.  Very |
| 01:27PM | 6 | | close with him, very close with -- with his son.  Yeah, it |
| 01:27PM | 7 | | was -- it was hard.  I never thought it was going to be this |
| 01:27PM | 8 | | hard, but it's even harder now that I'm actually sitting here. |
| 01:27PM | 9 | Q | Okay.  You said that -- |
| 01:27PM | 10 | A | It's hard -- hard to testify against somebody that -- that |
| 01:27PM | 11 | | you was so close to for very, very long time. |
| 01:27PM | 12 | Q | You're 40 now, you said, right? |
| 01:27PM | 13 | A | Forty, yes. |
| 01:27PM | 14 | Q | So you met him in your teens, so you've known him at least |
| 01:27PM | 15 | | 25 years.  Is that accurate? |
| 01:27PM | 16 | A | Yes. |
| 01:27PM | 17 | Q | And you said one of the things that stood out to you or |
| 01:27PM | 18 | | made you notice Mr. Miske was he always had nice things. |
| 01:27PM | 19 | A | Yes. |
| 01:27PM | 20 | Q | So what do you mean by nice things? |
| 01:28PM | 21 | A | Like I said earlier, he always had -- always had nice |
| 01:28PM | 22 | | stuff.  He always had the nicest cars, the nicest -- the nicest |
| 01:28PM | 23 | | trucks, the nicest bikes.  You know, I seen him with a nice |
| 01:28PM | 24 | | car, I wanted the same car.  I seen him with a Mercedes, I |
| 01:28PM | 25 | | wanted one Mercedes.  I seen him with a bike -- I am not |

01:28PM   1   talking bicycle.  I'm talking like -- like choppers, you know,

01:28PM   2   like real nice bikes.

01:28PM   3   Q     Motorcycles?

01:28PM   4   A     Motorcycles, yeah.

01:28PM   5   Q     Did you ever see Mr. Miske carrying large quantities of

01:28PM   6   cash, money?

01:28PM   7   A     Yeah, on him he always had -- he always had wads of cash

01:28PM   8   on him, like at least a wad of cash on him.  He keep one wad of

01:28PM   9   cash, I would say that big.  Big bills in the middle.  He get

01:28PM  10   his license, couple of cards or whatever he was carrying,

01:28PM  11   rubber band around the -- around the stack like that.  At all

01:29PM  12   times until -- as long as I known him, I always seen him with

01:29PM  13   that till -- till the last days that I seen him.

01:29PM  14   Q     Now, would you say that when you became this -- you know,

01:29PM  15   your relationship got to this level of closeness that you

01:29PM  16   described, did your outlook on life change in any way?

01:29PM  17   A     Yes.

01:29PM  18   Q     Tell the jury how.

01:29PM  19   A     I was just -- at that time I was being -- I was -- I was

01:29PM  20   open to listening and doing more and more worse shit.  You

01:29PM  21   know.  I don't know -- I don't know how else for say 'em.  I no

01:29PM  22   like swear in front of you guys, but --

01:29PM  23   Q     Okay.  So you said before you were looking basically --

01:29PM  24   what was important to you was not to get caught, correct?

01:29PM  25   A     Yes.  That was -- that was me telling myself I'm doing

01:30PM   1   good by just not getting caught.  To me not getting caught was

01:30PM   2   actually doing good in life.  You know.  Like that was -- that

01:30PM   3   was how messed up my -- my thinking was.

01:30PM   4   Q   So when he counseled you and told you that you should pick

01:30PM   5   these people that mattered, did you view that as being good --

01:30PM   6   good advice as a way not to get caught?

01:30PM   7   A   Yes.

01:30PM   8   Q   So did you ever follow that advice and actually carry out

01:30PM   9   any crimes against drug dealers that he -- he recommended?

01:30PM   10  A   Yes.

01:30PM   11  Q   On more than one occasion?

01:30PM   12  A   Yeah, I cannot -- I cannot be specific.  It was a long

01:30PM   13  time -- long, long time ago.

01:30PM   14  Q   Okay.  So without knowing any specifics, but you did --

01:30PM   15  you did do that at that time?

01:30PM   16  A   Yeah, yeah.  But I was -- I was doing -- I was doing a lot

01:31PM   17  of stuff during that time, so...

01:31PM   18  Q   So during that period were you aware of -- was Mr. Miske

01:31PM   19  employed?  Did he have any businesses he was running at the

01:31PM   20  time?

01:31PM   21  A   Well, he was -- he was working at the -- he was working at

01:31PM   22  the movies, but he had on -- he had -- he had a few shops.  He

01:31PM   23  had a tint shop, and then after that he had -- he had Kama'aina

01:31PM   24  fumigation termite.

01:31PM   25  Q   Kama'aina Termite and Pest Control?

01:31PM   1   A   Yes.

01:31PM   2   Q   Did that come later or was that --

01:31PM   3   A   Yes.

01:31PM   4   Q   -- or did that exist at the time you met him?

01:31PM   5   A   No, no, just...

01:31PM   6   Q   Okay.  So when you say working for the movies, explain

01:31PM   7   what that means to the jury.

01:31PM   8   A   Working transportation like moving equipment to where --

01:31PM   9   to where they film at and -- yeah, stuff like that.  Transport

01:32PM  10   anything that they got to do at the -- on the movie sets.

01:32PM  11   Q   Is this a union job?

01:32PM  12   A   Yes.

01:32PM  13   Q   And the tint shop, you said he was running a tint shop?

01:32PM  14   A   Yes.

01:32PM  15   Q   You mean window tinting on vehicles?

01:32PM  16   A   Yes.

01:32PM  17   Q   Do you know where that was located?

01:32PM  18   A   Queen Street.

01:32PM  19   Q   In Honolulu?

01:32PM  20   A   Yes.

01:32PM  21   Q   So opposite side of Waimanalo where -- where you grew up.

01:32PM  22   A   Yes, Downtown area by Ward -- by that Ward area right

01:32PM  23   down -- I don't know if you guys are familiar with that, but

01:32PM  24   used to have Sports Authority, McDonald's, and that area.

01:32PM  25   Q   Okay.  All right.

01:32PM    1    A    One gas station.

01:32PM    2    Q    So after -- after you committed these robberies of the

01:32PM    3    drug dealers, did you tell Mr. Miske you had done those or was

01:32PM    4    he aware that you were -- you had followed his advice?

01:32PM    5                MR. KENNEDY:  Objection on relevance, Your Honor.

01:32PM    6                THE COURT:  Overruled.

01:32PM    7                Go ahead.

01:32PM    8                THE WITNESS:  Huh?

01:32PM    9                THE COURT:  Go ahead, you can answer the question.

01:32PM    10               THE WITNESS:  Oh.  What was the question again?

01:32PM    11   BY MR. INCIONG:

01:32PM    12   Q    Was Mr. Miske aware, either from you telling him or

01:33PM    13   otherwise, that you had been robbing drug dealers now that he

01:33PM    14   had recommended it?

01:33PM    15               MR. KENNEDY:  Objection.  Hearsay.

01:33PM    16               THE COURT:  Overruled.  Go ahead.

01:33PM    17               THE WITNESS:  Say that again now.

01:33PM    18   BY MR. INCIONG:

01:33PM    19   Q    Did Mr. Miske know that you were robbing these drug

01:33PM    20   dealers as you had discussed with him?

01:33PM    21   A    Yes.

01:33PM    22   Q    Did you have discussions with him then about more serious

01:33PM    23   crimes after that?

01:33PM    24   A    Yes.

01:33PM    25   Q    Tell us about that.

01:33PM  1  A    So I would say around -- around those times right there,
01:33PM  2  we were already -- we were already in the 2000s, right?  So I
01:33PM  3  think our relationship grew, it was at the strongest I think
01:33PM  4  has ever been.  And this is in the 2000s already.
01:33PM  5        So he's -- at that point he's fully got my -- whatever
01:33PM  6  he said was -- was right, you know, even if it was wrong,
01:33PM  7  whatever he said was right in my eyes.  So he would -- he would
01:34PM  8  shoot stuff to me like, Hey, what you think about -- what you
01:34PM  9  think hitting a home run or something like that, you know.  And
01:34PM  10  saying "home run" is referring to -- to killing somebody.  You
01:34PM  11  know.  And I would look at him, and at that time I was like,
01:34PM  12  Why not?  You know.  So...
01:34PM  13  Q    Were you surprised that he asked you that?
01:34PM  14  A    No.
01:34PM  15  Q    Did you know immediately what he meant by the term, quote,
01:34PM  16  home run?
01:34PM  17  A    Yes.
01:34PM  18  Q    How did you know what he meant by home run?
01:34PM  19  A    Like I said, I think our -- our relationship was the
01:34PM  20  strongest it has ever been at that -- at that point right
01:34PM  21  there.  You know, like he can -- he can tell me one word, and I
01:34PM  22  would -- I would figure out the terms that he was using, and
01:35PM  23  vice versa with him too.
01:35PM  24  Q    Did Mr. Miske use similar terms or analogies with you like
01:35PM  25  home run?

01:35PM   1   A     Yes, he would -- I mean he would -- in terms -- in terms

01:35PM   2   of baseball, first base.  Hey, first base somebody, knocking

01:35PM   3   somebody out.  Second base, bat somebody down.  Third base,

01:35PM   4   they just redline them, put them in the hospital, don't kill

01:35PM   5   'em.  You know, that was phrases that -- that he would use.

01:35PM   6   He -- and when he used first, second, or third or fourth

01:35PM   7   base -- I mean home run, that would be the meaning of that, of

01:35PM   8   those terms.

01:35PM   9   Q     So when you answered Mr. Miske, Yeah, why not, if you were

01:35PM  10   willing to do a home run, what was his reaction?

01:35PM  11   A     He got -- he got all excited.  He got excited.  He was --

01:35PM  12   he was happy to hear that I was -- that I was agreeing with

01:35PM  13   him.

01:36PM  14   Q     Did your relationship change after that?

01:36PM  15   A     Yes.

01:36PM  16   Q     How so?

01:36PM  17   A     Huh?

01:36PM  18   Q     How did your relationship change after that specific

01:36PM  19   question and answer?

01:36PM  20   A     It got -- just got -- continued to get stronger.

01:36PM  21   Continued to grow, continued to -- yeah, we was having deep

01:36PM  22   conversations, you know, at that -- during those times.  But...

01:36PM  23   Q     So at that point was the home run or any of the bases, was

01:36PM  24   that just conversation or did he actually ask you to carry out

01:36PM  25   anything with any specific person?

01:36PM 1   A    Oh, during the time -- this is long time ago.  So -- so

01:36PM 2   towards that point he always hated -- so I can remember this --

01:36PM 3   this really all I can remember from those times, you know, but

01:36PM 4   he always hated Joe Boy.  You know, this -- this --

01:36PM 5   Q    Who is Joe Boy?

01:36PM 6   A    This guy from our hometown, he live in the same town as

01:37PM 7   us, Joe Boy Tavares.  You know.

01:37PM 8   Q    Did you know who Joe Boy Tavares was?

01:37PM 9   A    Yes.

01:37PM 10  Q    Why did Mr. Miske say he hated Joe Boy Tavares?

01:37PM 11  A    This is -- this is a long time ago.  He just always hate

01:37PM 12  -- that's somebody that he just always hated.  Ever since I

01:37PM 13  could remember, he just hated this guy.  Might have many

01:37PM 14  reasons.  If -- if I can think of one, him saying that -- that

01:37PM 15  he was fooling around with one of his girlfriends or something

01:37PM 16  like that, you know.

01:37PM 17  Q    Did he ask you to take any action regarding Joe Boy

01:37PM 18  Tavares?

01:37PM 19  A    Yeah, he told me -- he used to tell me -- this is long

01:37PM 20  time ago, so I'm phrasing as best as I can.  But he used tell

01:37PM 21  me, 'eh, you always in Nalo.  Which is our hometown.  I'm

01:37PM 22  always there.

01:37PM 23       This guy goes chicken fights every week, he got to

01:38PM 24  come home.  There's only few roads that he can come home

01:38PM 25  through.  You know.  Keep -- keep an eye on him, you know.  Let

01:38PM  1   me know what he -- hey, he go over here, he come home this way

01:38PM  2   every time.  You know, I see him over here, let him know.

01:38PM  3   Stuff like that.

01:38PM  4   Q    So when you say "Nalo," you are referring to Waimanalo.

01:38PM  5   A    Yes.

01:38PM  6   Q    That's a nickname for Waimanalo.

01:38PM  7   A    Yeah, that's the last -- that's the last four letters

01:38PM  8   of -- of where we from.

01:38PM  9   Q    So you were basically keeping tabs on Joe Boy Tavares for

01:38PM  10  him.

01:38PM  11  A    Yes.

01:38PM  12  Q    Would you report back to him and tell him where you had

01:38PM  13  seen him or what --

01:38PM  14  A    Yeah, I would -- I would report -- I will tell him some

01:38PM  15  stuff.  I would tell him, Yeah, I seen him over here.  He

01:38PM  16  mainly take this road, you know, stuff like that.  What he was

01:38PM  17  driving.  And then he would come back to me telling me like,

01:38PM  18  Hey, this is where he works and -- yeah.

01:38PM  19  Q    Okay.  So during that period, the late '90s going up to

01:39PM  20  the early 2000s, was it anything ever more than that, than just

01:39PM  21  keeping tabs?

01:39PM  22  A    No, we just -- we just -- we close, but he just -- you

01:39PM  23  know what I mean, he just testing the waters at that time to

01:39PM  24  see how far we can go with that.

01:39PM  25  Q    Okay.

01:39PM    1              THE COURT:  Mr. Inciong, we're about ten minutes over.

01:39PM    2    Would now be a good time?

01:39PM    3              MR. INCIONG:  That's fine, Your Honor.

01:39PM    4              THE COURT:  All right.  So we are about 1:40 in the

01:39PM    5    afternoon, and at this point our 17-person jury I think will

01:39PM    6    recess for the day.  Tomorrow morning we'll start at 8:30.

01:39PM    7    Mr. Miller will retake the stand on direct examination.

01:39PM    8              So as we go to break, I'll remind each of you once

          9    again to refrain from discussing the substance of this case

         10    with anyone, including each another; to refrain from accessing

         11    any media or other accounts of this case that may be out there;

         12    and then finally, please do not conduct any independent

         13    investigation into the facts, persons involved, or

01:39PM   14    circumstances.

01:39PM   15              We'll see you tomorrow morning at 8:30.

01:40PM   16              (Proceedings were concluded at 1:40 p.m.)

         17

         18

         19

         20

         21

         22

         23

         24

         25

```
 1                    COURT REPORTER'S CERTIFICATE

 2            I, Gloria T. Bediamol, Official Court Reporter, United

 3   States District Court, District of Hawaii, do hereby certify

 4   that pursuant to 28 U.S.C. §753 the foregoing is a complete,

 5   true, and correct transcript from the stenographically reported

 6   proceedings held in the above-entitled matter and that the

 7   transcript page format is in conformance with the regulations

 8   of the Judicial Conference of the United States.

 9

10            DATED at Honolulu, Hawaii, March 28, 2024.

11

12

13                                   /s/ Gloria T. Bediamol

14                                   GLORIA T. BEDIAMOL.

15                                   RMR, CRR, FCRR

16

17

18

19

20

21

22

23

24

25
```