1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF HAWAII

3
    UNITED STATES OF AMERICA,    )    CRIMINAL NO. 19-00099-DKW
4                                )
              Plaintiff,         )    Honolulu, Hawaii
5                                )
         vs.                     )    January 30, 2024
6                                )
    MICHAEL J. MISKE, JR.,       )
7                                )
              Defendant.         )
8    _____ )

9
                  TRANSCRIPT OF JURY TRIAL (DAY 14)
10            BEFORE THE HONORABLE DERRICK K. WATSON,
            CHIEF UNITED STATES DISTRICT COURT JUDGE
11

12   APPEARANCES:

13   For the Plaintiff:          MARK INCIONG, ESQ.
                                 MICHAEL DAVID NAMMAR, ESQ
14                               WILLIAM KE AUPUNI AKINA, ESQ.
                                 Office of the United States Attorney
15                               PJKK Federal Building
                                 300 Ala Moana Boulevard, Suite 6100
16                               Honolulu, Hawaii  96850

17   For the Defendant:         LYNN E. PANAGAKOS, ESQ.
                                 841 Bishop St., Ste 2201
18                               Honolulu, HI 96813

19                               MICHAEL JEROME KENNEDY, ESQ.
                                 Law Offices of Michael Jerome
20                               Kennedy, PLLC
                                 333 Flint Street
21                               Reno, NV 89501

22
     Official Court Reporter:    Gloria T. Bediamol, RPR RMR CRR FCRR
23                               United States District Court
                                 300 Ala Moana Boulevard
24                               Honolulu, Hawaii 96850

25   Proceedings recorded by machine shorthand, transcript produced
     with computer-aided transcription (CAT).

1                           I N D E X

2
GOVERNMENTS WITNESSES:                              PAGE NO.
3
  WAYNE MILLER (CONTINUED EXAMINATION)
4
      RESUMED DIRECT EXAMINATION BY MR. INCIONG         5
5

6

7    EXHIBITS:                                       PAGE NO.

8    Exhibit 1-15-C was received in evidence            7
     Exhibit 3-2 was received in evidence               9
9    Exhibit 1-763 was received in evidence            19
     Exhibits 9-110 and 9-111 were received in evidence 37
10   Exhibit 9-112 was received in evidence            40
     Exhibit 4-60 was received in evidence             48
11   Exhibit 4-62 was received in evidence             49
     Exhibit 4-61 was received in evidence             51
12   Exhibit 1-854 was received in evidence            52
     Exhibit 9-008 was received in evidence            59
13   Exhibit 9-114 was received in evidence            78
     Exhibit 9-115 was received in evidence            81
14   Exhibit 1-59 was received in evidence             98
     Exhibit 1-1023 was received in evidence          102
15   Exhibit 1-856 was received in evidence           105
     Exhibit 1-44 was received in evidence            111
16   Exhibit 1-1079 was received in evidence          112
     Exhibit 1-1080 was received in evidence          113
17   Exhibit 1-1081 was received in evidence          114
     Exhibit 4-107 was received in evidence           127
18   Exhibit 4-110 was received in evidence           128
     Exhibit 4-108 was received in evidence           129
19   Exhibit 1-66 was received in evidence            130
     Exhibit 7-005 was received in evidence           147
20   Exhibit 7-006 was received in evidence           148
     Exhibit 7-008 was received in evidence           153
21   Exhibit 7-008-A was received in evidence         154
     Exhibit 7-010 was received in evidence           156
22

23

24

25

1                        I N D E X  (CONTINUED)

2      EXHIBITS:                                              PAGE NO.

3
        Exhibit 7-010-A was received in evidence            157
4       Exhibit 7-011 was received in evidence              158
        Exhibit 7-011-A was received in evidence            159
5       Exhibit 7-014 was received in evidence              160
        Exhibit 7-014-A was received in evidence            161
6       Exhibit 7-008-C was received in evidence            163
        Exhibit 7-008-D was received in evidence            166
7       Exhibit 7-008-E was received in evidence            176
        Exhibit 7-13-D was received in evidence             180
8       Exhibit 7-14-C was received in evidence             184
        Exhibit 7-14-D was received in evidence             186
9       Exhibit 7-17 was received in evidence               199
        Exhibit 7-23 was received in evidence               201
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

|          |    |                                                                     |
|----------|----|---------------------------------------------------------------------|
|          | 1  | January 30, 2024                                      8:30 a.m.      |
| 08:30AM  | 2  | THE CLERK:  Criminal Number 19-00099-DKW-KJM, United                 |
| 08:30AM  | 3  | States of America versus Michael J. Miske, Jr.                       |
| 08:30AM  | 4  | This case has been called for jury trial, Day 14.                    |
| 08:30AM  | 5  | Counsel, please make your appearances for the record.               |
| 08:30AM  | 6  | MR. INCIONG:  Good morning, Your Honor.  Mark Inciong,              |
| 08:30AM  | 7  | Michael Nammar and KeAupuni Akina for the United States.  With       |
| 08:30AM  | 8  | us again are our paralegal Kari Sherman and FBI Special Agent        |
| 08:30AM  | 9  | Thomas Palmer.                                                       |
| 08:30AM  | 10 | THE COURT:  Good morning.                                            |
| 08:30AM  | 11 | MR. KENNEDY:  Good morning, Your Honor.  Michael                    |
| 08:30AM  | 12 | Kennedy here with Lynn Panagakos, Michael Miske, and Ms. King        |
| 08:30AM  | 13 | is joining us as well this morning.                                  |
| 08:30AM  | 14 | THE COURT:  All right.  Good morning to all four of                  |
| 08:30AM  | 15 | you.  You may be seated.                                             |
| 08:30AM  | 16 | And good morning to the 17 persons on our jury.  As we               |
| 08:30AM  | 17 | begin this trial day, I'll remind you where we were.  We             |
| 08:30AM  | 18 | adjourned yesterday, Mr. Miller had only recently taken the          |
| 08:30AM  | 19 | stand.  Mr. Inciong was about half an hour, I think it was,          |
| 08:30AM  | 20 | into his direct examination.  So that is where we will resume        |
| 08:30AM  | 21 | this morning.                                                        |
| 08:30AM  | 22 | Mr. Inciong, when you're ready.                                      |
| 08:31AM  | 23 | MR. INCIONG:  Thank you, Your Honor.                                |
| 08:31AM  | 24 | WAYNE MILLER,                                                        |
| 08:31AM  | 25 | (Resumed the stand.)                                                 |

| | | |
|---|---|---|
| 08:31AM | 1 | RESUMED DIRECT EXAMINATION |
| 08:31AM | 2 | BY MR. INCIONG: |
| 08:31AM | 3 | Q    Good morning, Mr. Miller. |
| 08:31AM | 4 | A    Good morning. |
| 08:31AM | 5 | Q    So yesterday do you recall one of the first things we |
| 08:31AM | 6 | talked about was the plea agreement that you entered into in |
| 08:31AM | 7 | this case? |
| 08:31AM | 8 | A    Yes. |
| 08:31AM | 9 | THE COURT:  Mr. Inciong, I'm sorry, can I just |
| 08:31AM | 10 | interrupt you one second. |
| 08:31AM | 11 | Mr. Miller, I will remind you we did not ask you to |
| 08:31AM | 12 | retake the same oath that you took yesterday, but I will remind |
| 08:31AM | 13 | you that you remain subject to that oath.  Do you understand |
| 08:31AM | 14 | that? |
| 08:31AM | 15 | THE WITNESS:  Yes. |
| 08:31AM | 16 | THE COURT:  Okay.  I apologize. |
| 08:31AM | 17 | MR. INCIONG:  No problem.  Thank you. |
| 08:31AM | 18 | BY MR. INCIONG: |
| 08:31AM | 19 | Q    Do you recall discussing your plea agreement, Mr. Miller? |
| 08:31AM | 20 | A    Yes. |
| 08:31AM | 21 | Q    And what was the charge that you pled guilty to in that |
| 08:31AM | 22 | plea agreement? |
| 08:31AM | 23 | A    Racketeering conspiracy. |
| 08:31AM | 24 | Q    Were there some specific racketeering acts that you |
| 08:31AM | 25 | admitted to as part of your plea agreement? |

| | | | |
|---|---|---|---|
| 08:31AM | 1 | A | Yes. |
| 08:31AM | 2 | Q | Can you tell the jury what those were? |
| 08:31AM | 3 | A | Murder, murder for hire, drugs, kidnapping, obstruction -- |
| 08:31AM | 4 | | obstruction of justice. |
| 08:31AM | 5 | Q | When you say "drugs," are you referring to drug |
| 08:31AM | 6 | | distribution? |
| 08:31AM | 7 | A | Yes. |
| 08:32AM | 8 | Q | You also identified Mr. Miske as the leader of the |
| 08:32AM | 9 | | enterprise that you admitted to being a part of as well, |
| 08:32AM | 10 | | correct? |
| 08:32AM | 11 | A | Yes. |
| 08:32AM | 12 | Q | Did you agree with Mr. Miske to commit or attempt to |
| 08:32AM | 13 | | commit each of those racketeering acts you just described, |
| 08:32AM | 14 | | murder, murder for hire, kidnapping, drug distribution, and |
| 08:32AM | 15 | | obstruction of justice? |
| 08:32AM | 16 | A | Yes. |
| 08:32AM | 17 | Q | You also named a number of other enterprise members that |
| 08:32AM | 18 | | you had agreed with as well yesterday.  Do you recall that? |
| 08:32AM | 19 | A | Yes. |
| 08:32AM | 20 | Q | Did you agree with at least some of those members to |
| 08:32AM | 21 | | commit or attempt to commit those same racketeering acts as |
| 08:32AM | 22 | | well? |
| 08:32AM | 23 | A | Yes. |
| 08:32AM | 24 | Q | Now, yesterday you talked a little bit about growing up in |
| 08:32AM | 25 | | Waimanalo, correct? |

08:32AM    1    A    Correct.

08:32AM    2    Q    So I wanted to show you a couple of maps at this point

08:32AM    3    just to kind of give us a frame of reference, okay?

08:32AM    4         MR. INCIONG:  Your Honor, if we could show to

08:32AM    5    Mr. Miller Exhibit 1-15-C.  This was added in our supplemental

08:32AM    6    exhibit list yesterday.

08:33AM    7         THE COURT:  All right.

08:33AM    8    BY MR. INCIONG:

08:33AM    9    Q    Does that image appear on the screen in front of you, sir?

08:33AM    10   A    Yes.

08:33AM    11   Q    Do you recognize what that is?

08:33AM    12   A    Yes.

08:33AM    13   Q    How do you recognize that?

08:33AM    14   A    This is Oahu, the island.

08:33AM    15   Q    Does that map -- are you also looking -- looking at that

08:33AM    16   are you able to tell where Waimanalo is located on that map?

08:33AM    17   A    Yes.

08:33AM    18        MR. INCIONG:  Your Honor, I would move to admit

08:33AM    19   Exhibit 1-15-C.

08:33AM    20        THE COURT:  Any objection?

08:33AM    21        MR. KENNEDY:  No objection.

08:33AM    22        THE COURT:  Without objection, Exhibit 1-15-C is

08:33AM    23   admitted.  You may publish.

08:33AM    24        (Exhibit 1-15-C was received in evidence.)

08:33AM    25        MR. INCIONG:  Thank you, Your Honor.

| | | |
|---|---|---|
| 08:33AM | 1 | BY MR. INCIONG: |
| 08:33AM | 2 | Q    So if you could -- you can use your finger on the touch |
| 08:33AM | 3 | screen, I believe, Mr. Miller.  If you can just circle or put |
| 08:33AM | 4 | an X on -- on the area of Waimanalo where you described |
| 08:33AM | 5 | yesterday where you grew up. |
| 08:33AM | 6 | A    (Witness complies.) |
| 08:33AM | 7 | Q    Okay.  So just off -- you're off the coast there -- |
| 08:33AM | 8 | A    Yeah. |
| 08:33AM | 9 | Q    -- on the southeast tip of the island? |
| 08:33AM | 10 | A    Yes. |
| 08:33AM | 11 | MR. INCIONG:  Could I have Exhibit 3-2, please, pulled |
| 08:33AM | 12 | up for Mr. Miller only. |
| 08:33AM | 13 | BY MR. INCIONG: |
| 08:34AM | 14 | Q    Do you recognize the map that's shown in Exhibit 3-2, sir? |
| 08:34AM | 15 | A    Yes. |
| 08:34AM | 16 | Q    How do you recognize that? |
| 08:34AM | 17 | A    That's my -- that's my hometown where I grew up. |
| 08:34AM | 18 | Q    Does that -- that map accurately show Waimanalo as you |
| 08:34AM | 19 | know it? |
| 08:34AM | 20 | A    Yes. |
| 08:34AM | 21 | MR. INCIONG:  Your Honor, I would move to admit |
| 08:34AM | 22 | Exhibit 3-2. |
| 08:34AM | 23 | THE COURT:  Any objection? |
| 08:34AM | 24 | MR. KENNEDY:  No objection. |
| 08:34AM | 25 | THE COURT:  Without objection, 3-2 is admitted, and |

08:34AM   1   you may publish.

08:34AM   2                    (Exhibit 3-2 was received in evidence.)

08:34AM   3              MR. INCIONG:   Thank you, Your Honor.

08:34AM   4   BY MR. INCIONG:

08:34AM   5   Q    Now, Mr. Miller, this is the map of Waimanalo, correct?

08:34AM   6   A    Yes.

08:34AM   7   Q    So does this show where you grew up as a boy where you --

08:34AM   8   where you testified about yesterday?

08:34AM   9   A    Yes.

08:34AM  10   Q    Could you indicate approximately, you know, where -- where

08:34AM  11   your neighborhood was on that map?

08:34AM  12   A    I grew up in this area right here (indicating).  I mean

08:34AM  13   this whole town is little, so I grew up right there.

08:34AM  14   Q    Okay.  So --

08:34AM  15   A    Right by that church right there.

08:35AM  16   Q    All right.  So that's right near Kalanianaole Highway?

08:35AM  17   A    Yes.

08:35AM  18   Q    And close to the beach, Waimanalo Beach as well?

08:35AM  19   A    Yes.

08:35AM  20   Q    Okay.  Yesterday you talked about Joe Boy Tavares.  Do you

08:35AM  21   recall that?

08:35AM  22   A    Yes.

08:35AM  23   Q    And you had said that you had kept an eye or kept tabs on

08:35AM  24   Joe Boy Tavares at some point on behalf of Mr. Miske, correct?

08:35AM  25   A    Yes.

| | | | |
|---|---|---|---|
| 08:35AM | 1 | Q | Where did Joe Boy Tavares live approximately?  If you can |
| 08:35AM | 2 | | show on this map as well. |
| 08:35AM | 3 | | Can you -- can you put a little darker X or bigger X |
| 08:35AM | 4 | | on that spot, just to be sure.  There we go. |
| 08:35AM | 5 | A | (Witness complies.) |
| 08:35AM | 6 | Q | So that green circle, that's the approximate area? |
| 08:35AM | 7 | A | I think so, because no more name, but I'm pretty sure it |
| 08:35AM | 8 | | was right there. |
| 08:35AM | 9 | Q | Okay.  Do you have -- did you have a term or what you |
| 08:35AM | 10 | | called that part of that area of Waimanalo? |
| 08:35AM | 11 | A | Yes. |
| 08:35AM | 12 | Q | What did you call that? |
| 08:35AM | 13 | A | Back roads. |
| 08:35AM | 14 | Q | Because is that literally the back of Waimanalo leading |
| 08:36AM | 15 | | right up to only the mountains are behind it? |
| 08:36AM | 16 | A | Yes. |
| 08:36AM | 17 | Q | What kind of property did Joe Boy Tavares live on?  Was it |
| 08:36AM | 18 | | home, a ranch or a farm? |
| 08:36AM | 19 | A | Like one ranch farmhouse. |
| 08:36AM | 20 | Q | Were there animals that were kept there that you knew |
| 08:36AM | 21 | | about? |
| 08:36AM | 22 | A | Yes. |
| 08:36AM | 23 | Q | What kind? |
| 08:36AM | 24 | A | Chickens. |
| 08:36AM | 25 | Q | I think when we left off yesterday you talked about you |

08:36AM    1    had kind of escalated your crimes.  You had gone from stealing

08:36AM    2    from tourists to doing robberies, robbing from drug dealers.

08:36AM    3    Did any of those robberies involve firearms?  Were you armed

08:36AM    4    during that time?

08:36AM    5    A    Yes.

08:36AM    6    Q    Let me take you to the year 2021 -- actually the very end

08:36AM    7    of the year, December of 2021.  Did you rob a bank at that

08:36AM    8    time?

08:36AM    9    A    December of '21?

08:37AM    10    Q    I'm sorry, 2001.  My mistake.  December 2001.

08:37AM    11    A    Oh, yes.

08:37AM    12    Q    My apologies.  What bank did you rob?

08:37AM    13    A    Bank in Kailua.

08:37AM    14    Q    How did that come about?

08:37AM    15    A    A couple of us, we just -- it wasn't planned or anything.

08:37AM    16    We was at the -- we was at the beach kicking back, and then

08:37AM    17    just talking about 'em, and we just ended up going.  And we

08:37AM    18    just painted the whole --

08:37AM    19    Q    So who is "we," first of all?

08:37AM    20    A    Me, my friend Gavin Koa and Ikaika Garcia.

08:37AM    21    Q    Okay.  So you said it wasn't planned.

08:37AM    22    A    It wasn't planned.

08:37AM    23    Q    So you were at the beach.

08:37AM    24    A    Yeah.

08:37AM    25    Q    So how did -- how did the idea come about then?

08:37AM   1    A    We just was talking, we just -- we just bullshitting

08:37AM   2    around talking about 'em, and then -- first it was only two of

08:37AM   3    us, and then one of my friends was on his way to -- he had to

08:37AM   4    go to some type of prom or something.

08:37AM   5            And then -- so we went -- I forget where we went, but

08:38AM   6    we went somewhere and stole -- stole a car, drove through

08:38AM   7    Kaneohe, through Aikahi, through Kailua, and then just ended up

08:38AM   8    on -- on that bank right there that we -- that we ended up

08:38AM   9    robbing.

08:38AM   10   Q    Had you gotten the idea from watching any particular

08:38AM   11   movie?

08:38AM   12   A    Oh, yeah, yeah.  So first we was talking -- we was talking

08:38AM   13   about watching a movie on Point Break, and --

08:38AM   14   Q    What is the movie Point Break about?

08:38AM   15   A    About some surfers that -- that rob banks.

08:38AM   16   Q    Had you watched that movie recently at the time you were

08:38AM   17   talking about it?

08:38AM   18   A    I don't know if I watched it, but we was -- we was talking

08:38AM   19   about 'em.

08:38AM   20   Q    Okay.  Is that where you got the idea from?

08:38AM   21   A    Yes.

08:38AM   22   Q    All right.  So how did you select the particular bank that

08:38AM   23   you happened to choose?

08:38AM   24   A    Well, like I said, we was driving -- after we stole the

08:38AM   25   car, we was driving through Kaneohe, Aikahi, Kailua.  And --

08:38AM  1    and was just -- was in a secluded area, so, yeah, we just

08:39AM  2    pulled up right there.  And -- and I turned -- I turned around

08:39AM  3    looked both of them, and they was like putting their masks on,

08:39AM  4    ready to go.

08:39AM  5            We opened the door.  I kicked in the door.  I was the

08:39AM  6    only one that had a gun, you know.  And so I stood by the door.

08:39AM  7    When I kicked open the door, everybody -- before I even said

08:39AM  8    anything, everybody just immediately laid down.  The two other

08:39AM  9    guys jumped over the counter, went around to each one and

08:39AM  10   grabbed money, and then -- and then we left, drove that car,

08:39AM  11   switched cars, jumped in another car, and then -- then drove

08:39AM  12   away.

08:39AM  13   Q    How old were you at the time?

08:39AM  14   A    Eighteen years old.

08:39AM  15   Q    Had you just graduated from high school earlier that year?

08:39AM  16   A    Yes, sir.

08:39AM  17   Q    How old were the two other people with you?

08:39AM  18   A    I'm not sure.  I'm not sure.  I'm not sure.

08:39AM  19   Q    Do you know were they under 18?

08:39AM  20   A    They might have been, but we was all born in the -- in the

08:40AM  21   same year.

08:40AM  22   Q    Okay.  Now, you mentioned that you saw -- when you turned

08:40AM  23   around to look in the back seat, you saw the other two putting

08:40AM  24   masks on.

08:40AM  25   A    Yes.

08:40AM  1    Q    Were you wearing a mask as well?

08:40AM  2    A    Yes.

08:40AM  3    Q    You said you were the only one armed?

08:40AM  4    A    Yes.

08:40AM  5    Q    Do you recall what kind of gun you had?

08:40AM  6    A    A smaller shot -- smaller shotgun, was about that big

08:40AM  7    (indicating).

08:40AM  8    Q    So you left the bank, you dropped the stolen car, got into

08:40AM  9    another car, drove away.

08:40AM  10   A    Yes.

08:40AM  11   Q    Were you apprehended that day?

08:40AM  12   A    No.

08:40AM  13   Q    Did you think you got away with it?

08:40AM  14   A    Yes.

08:40AM  15   Q    Did Mr. Miske have anything to do with that bank robbery?

08:40AM  16   A    No.

08:40AM  17   Q    Did you rob another bank after that?

08:40AM  18   A    Yes.

08:40AM  19   Q    How much longer -- how much later did that happen?

08:40AM  20   A    I don't know, maybe less than a year.

08:40AM  21   Q    Where was that bank?

08:40AM  22   A    Pearl City.

08:40AM  23   Q    How did that come about?

08:40AM  24   A    Pretty much the same thing.  Same thing, one less guy.

08:41AM  25   Same -- same -- one of the same guys but one less.

08:41AM    1    Q    And were you -- did you get arrested on the day you robbed

08:41AM    2    that second bank?

08:41AM    3    A    No.

08:41AM    4    Q    Did you think you had gotten away with that?

08:41AM    5    A    Yes.

08:41AM    6    Q    So at that time did you feel like you could get away with

08:41AM    7    these types -- sorts of crimes?

08:41AM    8    A    Yes.

08:41AM    9    Q    Did you rob any other banks after that?

08:41AM    10    A    No.

08:41AM    11    Q    Were you eventually arrested for those bank robberies?

08:41AM    12    A    Yes.

08:41AM    13    Q    When were you arrested?

08:41AM    14    A    2005.

08:41AM    15    Q    So quite a bit of time had passed, correct?

08:41AM    16    A    Right.

08:41AM    17    Q    Where were you arrested?

08:41AM    18    A    In Las Vegas.

08:41AM    19    Q    What were you doing in Las Vegas at the time.

08:41AM    20    A    My -- my girlfriend at the time was going to school at

08:41AM    21    UNLV.

08:41AM    22    Q    So were you brought back to Hawaii to face the charges?

08:41AM    23    A    Yes.

08:41AM    24    Q    Was that case handled right here in this courthouse?

08:41AM    25    A    Yes -- not this one, but --

| | | | |
|---|---|---|---|
| 08:42AM | 1 | Q | The federal courthouse? |
| 08:42AM | 2 | A | Yes. |
| 08:42AM | 3 | Q | It was not a state case, correct? |
| 08:42AM | 4 | A | No. |
| 08:42AM | 5 | Q | Did you fight the charges? |
| 08:42AM | 6 | A | No. |
| 08:42AM | 7 | Q | So you pled guilty? |
| 08:42AM | 8 | A | Yes. |
| 08:42AM | 9 | Q | What were the terms of your -- your plea agreement with |
| 08:42AM | 10 | | the government, if you recall? |
| 08:42AM | 11 | A | They -- they dropped one, and I pled guilty to the other |
| 08:42AM | 12 | | one. |
| 08:42AM | 13 | Q | Was there a firearm charge as well? |
| 08:42AM | 14 | A | Yes. |
| 08:42AM | 15 | Q | What was that? |
| 08:42AM | 16 | A | Just using a gun in the commission of a crime. |
| 08:42AM | 17 | Q | Okay.  Now, when you were -- that case was being handled |
| 08:42AM | 18 | | or being processed through the system, did you have an |
| 08:42AM | 19 | | attorney? |
| 08:42AM | 20 | A | Yes. |
| 08:42AM | 21 | Q | Did you have any communication with Mr. Miske after you |
| 08:42AM | 22 | | were arrested for that charge? |
| 08:42AM | 23 | A | Yes. |
| 08:42AM | 24 | Q | What was your -- the nature of your communication with |
| 08:42AM | 25 | | Mr. Miske? |

08:42AM    1    A    Just we -- we was -- we was real good friends, so we used

08:42AM    2    to -- we used to talk, we used to write, we used to -- yeah.

08:43AM    3    Q    Okay.  Did he offer to help you in any way with your case?

08:43AM    4    A    Yes.

08:43AM    5    Q    How so?

08:43AM    6    A    He just asked me if -- he told me he had -- he had an

08:43AM    7    attorney, this guy named Reggie Minn, if I wanted to -- but at

08:43AM    8    that time I was pleading guilty, so...

08:43AM    9    Q    So you didn't take him up on that offer?

08:43AM   10    A    No.

08:43AM   11    Q    Did you cooperate with the government during that case?

08:43AM   12    A    No.

08:43AM   13    Q    Why not?

08:43AM   14    A    I mean that wasn't even in my -- that wasn't even in my --

08:43AM   15    in my head -- cooperating wasn't even in my head at that time.

08:43AM   16    You know, like it wasn't even part of my vocabulary.

08:43AM   17    Q    Okay.  Well, looking back --

08:43AM   18    A    My thoughts.

08:43AM   19    Q    Looking back, did you have information against Mr. Miske,

08:43AM   20    for example, that you could have provided to the government had

08:43AM   21    that been in your vocabulary?

08:43AM   22    A    Yeah.  I mean...

08:43AM   23    Q    So what -- do you remember when you actually pled guilty

08:43AM   24    approximately to the bank robbery and the firearm charge?

08:44AM   25    A    2005.

08:44AM   1   Q   So the same year you were arrested?

08:44AM   2   A   Yes.

08:44AM   3   Q   Were you sentenced shortly after that?

08:44AM   4   A   Yes.

08:44AM   5   Q   What sentence did you receive?

08:44AM   6   A   Almost ten years, hundred-something months.  Nine years

08:44AM   7   and something.

08:44AM   8   Q   So you were a convicted felon at that point?

08:44AM   9   A   Yes.

08:44AM   10   Q   Where did you serve your prison sentence, sir?

08:44AM   11   A   In a BOP on the mainland.  Multiple.

08:44AM   12   Q   All right.  As you were getting ready to be sentenced in

08:44AM   13   that case, did you have individuals write letters in support of

08:44AM   14   you that they could submit to the court?

08:44AM   15   A   Yes.

08:44AM   16   Q   Was Mr. Miske one of those?

08:44AM   17   A   Yes.

08:44AM   18           MR. INCIONG:  Your Honor, if I could have

08:44AM   19   Exhibit 1-763 pulled up for Mr. Miller?

08:44AM   20           THE COURT:  Yes, go ahead.

08:44AM   21   BY MR. INCIONG:

08:44AM   22   Q   Mr. Miller, do you recognize Exhibit 1-763?

08:44AM   23   A   Yes.

08:44AM   24   Q   How do you recognize that?

08:45AM   25   A   It's -- it's a letter from Mike Miske.

08:45AM  1   Q    Is that the letter specifically that he submitted to the
08:45AM  2   court on your behalf in the bank robbery case?
08:45AM  3   A    Yes.
08:45AM  4          MR. INCIONG:  Your Honor, I would ask the Court to
08:45AM  5   take judicial notice of this court-filed document, and move to
08:45AM  6   admit it based on Mr. Miller's foundation of this letter.
08:45AM  7          THE COURT:  Any objection?
08:45AM  8          MR. KENNEDY:  Just renewing the earlier objection,
08:45AM  9   Your Honor.
08:45AM  10         THE COURT:  All right.  That objection is overruled.
08:45AM  11  This exhibit will come into evidence.  That's 1-763.  You may
08:45AM  12  publish.
08:45AM  13         (Exhibit 1-763 was received in evidence.)
08:45AM  14         MR. INCIONG:  Thank you, Your Honor.
08:45AM  15  BY MR. INCIONG:
08:45AM  16  Q    Now, Mr. Miller, this is the letter that was submitted
08:45AM  17  it's dated March 30th of 2006, correct?
08:45AM  18  A    Correct.
08:45AM  19  Q    Prior to coming to court today, did you have a chance to
08:45AM  20  review and read the letter?
08:45AM  21  A    Yes.
08:45AM  22  Q    Are the contents of that letter accurate?
08:46AM  23  A    Yes.
08:46AM  24  Q    Does that accurately describe your relationship with
08:46AM  25  Mr. Miske at that time?

08:46AM  1   A    Yes.

08:46AM  2   Q    I'd like to focus on a couple of areas of this letter.  If

08:46AM  3   you can look at, please, the third paragraph starting with

08:46AM  4   "Miller" in quotes.

08:46AM  5        It says:  "Miller, the nickname that I've called him

08:46AM  6   for the past 11 years, and I have been really good friends for

08:46AM  7   a long time."

08:46AM  8        So that -- that's all accurate?

08:46AM  9   A    Yes.

08:46AM  10  Q    Miller is what he called you?

08:46AM  11  A    Yes.

08:46AM  12  Q    And I think -- I believe yesterday you testified how you

08:46AM  13  referred to him.  Do you remember that, testifying to that?

08:46AM  14  A    Yes.

08:46AM  15  Q    What did you call Mr. Miske typically?

08:46AM  16  A    Mikey.

08:46AM  17  Q    Anything else?

08:46AM  18  A    I can't -- I can't think of it right now.

08:46AM  19  Q    So let's read -- the next sentence says:  "I'm a little

08:46AM  20  older but only by several years."

08:47AM  21       Yesterday you testified as to how much age difference

08:47AM  22  there is, correct?

08:47AM  23  A    Yes.

08:47AM  24  Q    How -- how much older is Mr. Miske than you?

08:47AM  25  A    Almost ten years.

08:47AM   1   Q    Okay.  And then the next sentence:  "We managed to become

08:47AM   2   tight friends even with the age difference."

08:47AM   3        Is that true?

08:47AM   4   A    Yes.

08:47AM   5   Q    The next sentence:  "There are plenty of friends that I

08:47AM   6   keep in touch from my younger days, but of all -- out of all

08:47AM   7   these many acquaintances," in quotes, "there is only a select

08:47AM   8   few that I consider to be my true friends."

08:47AM   9        And then the next paragraph:  "Miller is definitely

08:47AM  10   one of those rare friends that I can always count on to be

08:47AM  11   there for me if I ever needed anything."

08:47AM  12        Is that true?

08:47AM  13   A    Yes.

08:47AM  14   Q    "That's the number one quality that I admire in Miller is

08:47AM  15   his loyalty as a friend.  Not only is he reliable, but he's got

08:47AM  16   to be one of the funniest guys around because he's constantly

08:47AM  17   making you laugh."

08:47AM  18        Does that accurately describe your relationship?

08:48AM  19   A    Yes.

08:48AM  20   Q    Okay.  Now, if we go to the next paragraph, the second to

08:48AM  21   last line of that paragraph beginning with, "I truly feel" --

08:48AM  22   do you see that portion?

08:48AM  23        I think it's highlighted now at the end of that first

08:48AM  24   line.  "I truly feel and strongly believe that deep down inside

08:48AM  25   Miller is a good person who unfortunately has made bad choices

08:48AM    1    in his short and young life."

08:48AM    2              Do you see that?

08:48AM    3    A    Yes.

08:48AM    4    Q    Do you agree with that?

08:48AM    5    A    Yes.

08:48AM    6    Q    And then the next paragraph down:  "He has a heart that is

08:48AM    7    genuine, and I sincerely value him as a friend.  I have two

08:48AM    8    brothers in my family, and I consider Miller like my third

08:48AM    9    brother."

08:48AM    10              MR. INCIONG:  Oh, looks like we lost our signal.

08:48AM    11              The third paragraph from the bottom:  "He has a heart

08:49AM    12    that is genuine," please.

08:49AM    13              Can we enlarge that?

08:49AM    14    BY MR. INCIONG:

08:49AM    15    Q    Can you see that, sir?  Can you see that okay?

08:49AM    16              Would you say that's accurate?

08:49AM    17    A    Yes.

08:49AM    18    Q    You testified yesterday I believe when I asked how you

08:49AM    19    considered this relationship, and I said brother, father

08:49AM    20    figure, friend, and I believe your answer was all of the above?

08:49AM    21    A    Yes.

08:49AM    22              MR. INCIONG:  Okay.  Thank you.  We can take that

08:49AM    23    down.

08:49AM    24    BY MR. INCIONG:

08:49AM    25    Q    So you were sent to the mainland for prison -- to prison,

08:49AM   1    correct?

08:49AM   2    A    Correct.

08:49AM   3    Q    Did you continue to have any contact or communications

08:49AM   4    with Mr. Miske while you were in prison?

08:49AM   5    A    Yes.

08:49AM   6    Q    What kinds of communication did you have?

08:49AM   7    A    Talking, letters.  You know, normal -- that's the only way

08:50AM   8    you can communicate in prison at the time.

08:50AM   9    Q    Okay.  Did you maintain your friendship with him?

08:50AM   10   A    Yes.

08:50AM   11   Q    Would you say it stayed the same or did it kind of fall

08:50AM   12   off a little bit because of the distance and the time?

08:50AM   13   A    Nah.  Stayed the -- stayed the same.  Maybe we got even

08:50AM   14   closer.  You know, I used to talk to him a lot.

08:50AM   15   Q    So that was a long prison sentence, right?

08:50AM   16   A    Yes.

08:50AM   17   Q    And you maintained that contact throughout?

08:50AM   18   A    Yes.

08:50AM   19   Q    As your release date started to approach, you were going

08:50AM   20   to get out at some point obviously, correct?

08:50AM   21   A    Correct.

08:50AM   22   Q    Did you and Mr. Miske have conversations about life after

08:50AM   23   you were released from prison?

08:50AM   24   A    Well, he told me he -- at those times he was telling me he

08:50AM   25   got -- he was growing, he was -- he did a lot of stuff.  He got

| | | |
|---|---|---|
| 08:50AM | 1 | more connections, you know.  Stuff like that.  Job connections. |
| 08:50AM | 2 | Q    Okay. |
| 08:51AM | 3 | A    And he told me he was doing very well. |
| 08:51AM | 4 | Q    So did you talk with him about any plans for you as far as |
| 08:51AM | 5 | what you were going to do when you got out? |
| 08:51AM | 6 | A    Yeah, he told me when I got out, I could -- if I wanted to |
| 08:51AM | 7 | work at -- if I wanted to work at the movies, he could -- he |
| 08:51AM | 8 | could do that.  If I wanted to -- if I wanted to get in to on |
| 08:51AM | 9 | the docks, he could do that. |
| 08:51AM | 10 | Q    So these are union jobs you're referencing? |
| 08:51AM | 11 | A    Yes. |
| 08:51AM | 12 | Q    So this is like the stevedores at the docks? |
| 08:51AM | 13 | A    Yes. |
| 08:51AM | 14 | Q    Is that the Teamsters that work with the transportation |
| 08:51AM | 15 | for the movies? |
| 08:51AM | 16 | A    Yes. |
| 08:51AM | 17 | Q    Were you interested in -- in either of those? |
| 08:51AM | 18 | A    Yes. |
| 08:51AM | 19 | Q    So when -- when did you actually -- when were you |
| 08:51AM | 20 | scheduled to be released from prison? |
| 08:51AM | 21 | A    2013. |
| 08:51AM | 22 | Q    So just prior to being released from prison, did you have |
| 08:51AM | 23 | some medical issues? |
| 08:51AM | 24 | A    Yes. |
| 08:51AM | 25 | Q    What were your medical issues? |

08:51AM  1    A    I had one of my -- my aorta ripped -- my aortic valve

08:52AM  2    ripped, and I had -- they took me to the hospital.  I was in --

08:52AM  3    I was in Oregon at the time, incarcerated in Oregon.  And one

08:52AM  4    of my valves ripped, so they rushed me to the hospital, they

08:52AM  5    put in a new -- they put a new valve in there, and I stay in

08:52AM  6    the hospital for some time, and then they brought me back.

08:52AM  7    Q    So this is -- sounds like there was a surgery involved?

08:52AM  8    A    Yes.

08:52AM  9    Q    Was there -- was this a life-threatening situation?

08:52AM  10   A    Yes.

08:52AM  11   Q    Describe that.

08:52AM  12   A    Yeah, I had -- I had a slim chance of surviving that,

08:52AM  13   but -- yeah, it was open heart surgery, they cut me open, put a

08:52AM  14   whole new valve -- aortic valve in my -- in my heart.

08:52AM  15   Q    But the surgery was successful?

08:52AM  16   A    Yes.

08:52AM  17   Q    You survived that obviously?

08:52AM  18   A    Yes.

08:52AM  19   Q    How long were you in the hospital before you were released

08:53AM  20   back into the prison?

08:53AM  21   A    I was in there for some time.  Some weeks I would say.

08:53AM  22   Q    But eventually you were cleared and went back into the

08:53AM  23   facility?

08:53AM  24   A    Yes.

08:53AM  25   Q    Were there complications that happened after that?

08:53AM   1   A    Yes.  A few weeks after when I came back, I started some

08:53AM   2   new medication, some -- some blood thinners that I had to take.

08:53AM   3   So they couldn't get the -- the levels the same, and a clot --

08:53AM   4   one blood clot went into that valve, so they had to rush me

08:53AM   5   back to the hospital.

08:53AM   6   Q    Okay.  How did they treat that situation?

08:53AM   7   A    Same thing.  They had to cut 'em back open, go inside,

08:53AM   8   pull that clot out, and sew me back up.  And I stayed in the

08:53AM   9   hospital again for -- for a few weeks.

08:53AM   10  Q    So that was the second open heart surgery?

08:53AM   11  A    Yes.

08:53AM   12  Q    But you came out of that okay as well?

08:53AM   13  A    Yes.

08:53AM   14  Q    All right.  So eventually did that delay your release at

08:53AM   15  all from prison?

08:53AM   16  A    Yeah, because I was scheduled to go to the halfway house

08:54AM   17  but I was in the hospital.  So when I came back, they got all

08:54AM   18  the paperwork together and then --

08:54AM   19  Q    Okay.  So you were released from prison into a halfway

08:54AM   20  house.

08:54AM   21  A    Yes.

08:54AM   22  Q    Where was that halfway house?

08:54AM   23  A    In Honolulu.

08:54AM   24  Q    Okay.  So you came back to Hawaii for that.

08:54AM   25  A    Yes.

08:54AM    1    Q    All right.  So during this time when all of this was going

08:54AM    2    on with your surgeries and so forth, are you still in

08:54AM    3    communication with Mr. Miske?

08:54AM    4    A    Yes.

08:54AM    5    Q    Does he know when you're going to be arriving in Hawaii?

08:54AM    6    A    Yes.

08:54AM    7    Q    Okay.  So when you arrived and landed in Honolulu, was

08:54AM    8    there anybody there to greet you?

08:54AM    9    A    Yes.

08:54AM    10    Q    Who was there?

08:54AM    11    A    Miske -- Mike Miske and his brother Johnnie Stancil.

08:54AM    12    Q    Were you surprised to see them there?

08:54AM    13    A    No.

08:54AM    14    Q    You were expecting that?

08:54AM    15    A    Yes.

08:54AM    16    Q    So what did you do as soon as you were picked up by

08:54AM    17    Mr. Miske and Mr. Stancil?

08:54AM    18    A    We started talking.  We started just -- I had to get right

08:54AM    19    to the halfway house, so we only had -- only had like

08:55AM    20    20 minutes to actually get to the halfway house from getting

08:55AM    21    off the plane.  So we stopped at Zippy's.  We was talking,

08:55AM    22    stopped at Zippy's, couple Zip Pacs, and they took me to the

08:55AM    23    halfway house and dropped me off.

08:55AM    24    Q    Okay.  So was there any discussion in that, I guess,

08:55AM    25    short -- you know, short time from the airport to Zippy's to

08:55AM   1   the halfway house as to what you were going to be doing?

08:55AM   2   A    Yeah, well, he told me right there, Hey, when you get

08:55AM   3   inside there, tell them -- let them know you got one job

08:55AM   4   already.  You get one job, you already hired, they're waiting

08:55AM   5   for you, you can start tomorrow.

08:55AM   6   Q    When you say "he," who are you referring to?

08:55AM   7   A    Mike Miske.

08:55AM   8   Q    Did he say what this job was?

08:55AM   9   A    No.  Just -- was really just one job on paper, just to get

08:55AM  10   me out of the halfway house.

08:55AM  11   Q    So how did that work?  How did you -- what did you tell

08:55AM  12   the halfway house?

08:55AM  13   A    Yeah, I went in there, got all my stuff together.  The

08:56AM  14   next day -- I got there at night, so it was already night, it

08:56AM  15   was already dark.  So the next day when the -- when the staff

08:56AM  16   came in -- when the halfway house staff came in, I told them --

08:56AM  17   I told them, Hey, I already have a job waiting.  I don't

08:56AM  18   gotta -- I don't gotta go out and get -- get applications and

08:56AM  19   everything like that.  So, yeah, that -- I told them, and then

08:56AM  20   they made me fill out some paperwork.

08:56AM  21        I called up Miske, asked him what -- what I had to put

08:56AM  22   down, his name.  One other guy Alfredo Cabael, I had to put his

08:56AM  23   number down.  And -- yeah, he -- so the next day after I came,

08:56AM  24   Miske came to the halfway house, dropped me off bags of

08:56AM  25   clothes, a phone.  Everything I needed, he came to the halfway

08:57AM   1   house and dropped that off.

08:57AM   2   Q    Did he give you any money?

08:57AM   3   A    Yeah, he gave me some money.

08:57AM   4   Q    Was there anything about the money that caught your

08:57AM   5   attention?

08:57AM   6   A    I mean not really.  He always got -- he always got money,

08:57AM   7   just in -- he just peel off some -- some off his wad that he

08:57AM   8   had, and he gave me -- he gave me one stack of money like that.

08:57AM   9   Q    Okay.  Now, when you went and told the halfway house that

08:57AM  10   you -- you already had a job already, did you really believe

08:57AM  11   you actually had a job?

08:57AM  12   A    No.  It was just -- it was just -- it was just to get out

08:57AM  13   the halfway house.  It was just to leave the halfway house.

08:57AM  14   Q    So were you given instructions on how -- to indicate how

08:57AM  15   you were going paid or what your hours were?

08:57AM  16   A    Yeah, he told me that -- Miske told me that, Hey, we just

08:57AM  17   going to put down as salary so -- so these people cannot keep

08:58AM  18   track of your hours, and you're going to be on call.  You know,

08:58AM  19   like we don't gotta put down set hours when you're going to

08:58AM  20   work.  So you just call.  Most of the time I called Alfredo --

08:58AM  21   Fredo Cabael.

08:58AM  22   Q    So you mentioned his name again.  So who is Alfredo

08:58AM  23   Cabael?

08:58AM  24   A    One of Mikey's -- one of these guys that used to work for

08:58AM  25   Mikey.

08:58AM   1   Q    Worked for him at where?  At what --

08:58AM   2   A    Kama'aina.

08:58AM   3   Q    Kama'aina Termite and Pest Control?

08:58AM   4   A    Yeah, he used to work -- he used to work at all -- at

08:58AM   5   every one -- at every one of his businesses.

08:58AM   6   Q    Okay.  Had you met Mr. Cabael before you got out of

08:58AM   7   prison?

08:58AM   8   A    Yes.

08:58AM   9   Q    So did you tell the -- the folks at the halfway house that

08:58AM  10   you had this job salary and you were on call?

08:58AM  11   A    Yes.

08:58AM  12   Q    So how did you establish when you had to work?  How did

08:58AM  13   you tell them?

08:58AM  14   A    It wasn't established.  It was -- it was on call daily.

08:58AM  15   So it's like they give you -- they give you -- if you're

08:59AM  16   supposed to work down -- like I had -- I had an on-call day, so

08:59AM  17   it would be eight hours work, one hour lunch, two hours to get

08:59AM  18   there, because I was supposed to be catching a bus.  So now I'm

08:59AM  19   filling out this paperwork to where I can be gone from the

08:59AM  20   halfway house for half of the day.  You know, eight hours

08:59AM  21   working, one hour lunch, two hours to get there, two hours to

08:59AM  22   get back.

08:59AM  23        And -- and if I couldn't make it back on time, usually

08:59AM  24   Fredo used to call the halfway house and say, Hey, we working

08:59AM  25   overtime, we stay at -- we working at -- in Kahuku or Hauula or

08:59AM   1   something, and we going need about four more hours.  So now I'm

08:59AM   2   gone 18 hours a day.

08:59AM   3   Q    Okay.  So Fredo is Alfredo Cabael?

08:59AM   4   A    Yes.

08:59AM   5   Q    So you said you were supposed to be taking the bus.  Were

09:00AM   6   you taking the bus to work?

09:00AM   7   A    No.

09:00AM   8   Q    So how were you being transported?

09:00AM   9   A    Whoever was available, whoever was in the area, if Miske

09:00AM   10  was in the area, he would pick me up.  If Fredo was in the

09:00AM   11  area, he would pick me up.  Yeah.

09:00AM   12  Q    So were you working?

09:00AM   13  A    No.

09:00AM   14  Q    So what were you doing for these 12 or 14 hours a day when

09:00AM   15  you were gone?

09:00AM   16  A    I was catching up with people.  Catching up -- catching

09:00AM   17  with my family, hanging out with Miske, hanging out with Fredo.

09:00AM   18  Q    So did -- did this on-call schedule, was it required by

09:00AM   19  the halfway house that somebody had to call them every day to

09:00AM   20  tell them you were needed, or how did that work?

09:00AM   21  A    Yes.  Well, I would -- I would since I was on call, I'd go

09:00AM   22  down there every morning.  If I felt like leaving at 9:00 in

09:00AM   23  the morning, I would just go down there, fill out nine -- I

09:00AM   24  mean -- yeah, I start work at 11:00, that means I can leave at

09:00AM   25  9:00.  Eight hours plus the lunch, that's nine hours, two hours

| | | |
|---|---|---|
| 09:01AM | 1 | transportation.  I would fill 'em out, they would call -- they |
| 09:01AM | 2 | would call Fredo, confirm 'em, and they would let me out, let |
| 09:01AM | 3 | me right out the door. |
| 09:01AM | 4 | Q    So when you say "they," you mean the halfway house would |
| 09:01AM | 5 | call Alfredo Cabael? |
| 09:01AM | 6 | A    The halfway house.  Yes. |
| 09:01AM | 7 | Q    And Alfredo Cabael knew about this arrangement. |
| 09:01AM | 8 | A    Yes. |
| 09:01AM | 9 | Q    So did you ever do any work for Kama'aina Termite and Pest |
| 09:01AM | 10 | Control during that time? |
| 09:01AM | 11 | A    During?  No. |
| 09:01AM | 12 | Q    Were you paid by Mr. Miske? |
| 09:01AM | 13 | A    Yes. |
| 09:01AM | 14 | Q    How were you paid? |
| 09:01AM | 15 | A    He would give me the -- he would give me the stubs, the |
| 09:01AM | 16 | paychecks with the stub on top. |
| 09:01AM | 17 | Q    Okay.  I'll ask you about that in a minute. |
| 09:01AM | 18 | But how long did this go on for where you were calling |
| 09:01AM | 19 | out every day and being gone for -- |
| 09:01AM | 20 | A    Pretty much the whole time I was in the halfway house. |
| 09:02AM | 21 | Since I got there -- since couple days after I got there all |
| 09:02AM | 22 | the way till -- till I found my own home apartment. |
| 09:02AM | 23 | Q    How long was that approximately? |
| 09:02AM | 24 | A    I'd say six -- six, eight months maybe. |
| 09:02AM | 25 | Q    Okay.  Did T.J. Mahoney ever catch on or have questions |

| | | |
|---|---|---|
| 09:02AM | 1 | about whether this was really a legitimate job? |
| 09:02AM | 2 | A    Yeah, they had -- they had questions, but -- but like |
| 09:02AM | 3 | Fredo -- if they had questions, Fredo would call -- like they |
| 09:02AM | 4 | would be like, Hey, you worked -- you worked -- how the hell |
| 09:02AM | 5 | you work 19 hours yesterday, you come back, and you're not even |
| 09:02AM | 6 | dirty.  You know, you're not even -- you're supposed to be |
| 09:02AM | 7 | fumigating houses.  They would question me like that, and, you |
| 09:02AM | 8 | know, I would be like, We got a shower in -- in our -- in our |
| 09:02AM | 9 | shop over there. |
| 09:02AM | 10 | But like I would leave and then come back, and then |
| 09:03AM | 11 | tell them, Yeah, I got to go right back to work.  So Fredo |
| 09:03AM | 12 | would call and say, Hey, we need him back right now or -- or he |
| 09:03AM | 13 | going be fired, you know.  So... |
| 09:03AM | 14 | Q    So Mr. Cabael would tell the halfway house that you would |
| 09:03AM | 15 | be fired if you weren't allowed to leave again? |
| 09:03AM | 16 | A    Yes. |
| 09:03AM | 17 | Q    Did Mr. Miske ever do that? |
| 09:03AM | 18 | A    I'm not sure if he ever did, but I know he used to call |
| 09:03AM | 19 | 'em for me for -- if we was going to the bay, ride jet skis or |
| 09:03AM | 20 | something like on a Saturday, I would have him call.  If I |
| 09:03AM | 21 | couldn't get in touch with Fredo, I would call Miske, and he |
| 09:03AM | 22 | would call and tell them, Hey, we need him at work right now. |
| 09:03AM | 23 | Q    Now, you mentioned some pay stubs.  Did the halfway house |
| 09:03AM | 24 | require some sort of documentation or proof that you were |
| 09:03AM | 25 | actually working during that time? |

| | | | |
|---|---|---|---|
| 09:03AM | 1 | A | Yes. |
| 09:03AM | 2 | Q | You were also on supervised release as well, correct? |
| 09:03AM | 3 | A | Yes. |
| 09:03AM | 4 | Q | So who were you being supervised by? |
| 09:04AM | 5 | A | By the halfway house. |
| 09:04AM | 6 | Q | But was there someone from the court also that was |
| 09:04AM | 7 | | supervising you? |
| 09:04AM | 8 | A | The supervised release is after the halfway house. |
| 09:04AM | 9 | Q | Okay.  All right.  So that hadn't started yet. |
| 09:04AM | 10 | A | That hadn't -- that never start yet. |
| 09:04AM | 11 | Q | All right.  So the -- when they told you that they needed |
| 09:04AM | 12 | | to have, you know, documentation, what did you do? |
| 09:04AM | 13 | A | I gave them the -- the pay stubs. |
| 09:04AM | 14 | Q | Okay.  But how did you -- how did that come about is my |
| 09:04AM | 15 | | question?  Where did those pay stubs come from? |
| 09:04AM | 16 | A | From Miske. |
| 09:04AM | 17 | Q | So he just gave them to you?  Or explain to the jury how |
| 09:04AM | 18 | | that -- the pay stubs were even given to you. |
| 09:04AM | 19 | A | Yeah, he would just -- he would just give them to me and |
| 09:04AM | 20 | | tell me, Hey -- if I told him, Hey, I got to turn this in on |
| 09:04AM | 21 | | this day, he would have them for me on his desk.  He would tell |
| 09:04AM | 22 | | me, Hey, just pick them up -- stop by if I'm not there, grab |
| 09:04AM | 23 | | 'em off my desk, or he would hand 'em to me when he seen me. |
| 09:04AM | 24 | | Because I was -- I was -- we was together almost |
| 09:04AM | 25 | | pretty much every day at that point.  I just got out of prison. |

09:05AM  1    We were catching up a lot.  I'm together with him every day.

09:05AM  2    Q    But did you tell Mr. Miske that you needed to have -- you

09:05AM  3    needed pay stubs to show the people at the halfway house?

09:05AM  4    A    Yes.

09:05AM  5    Q    And that's why he gave them to you?

09:05AM  6    A    Yes.

09:05AM  7         MR. INCIONG:  Your Honor, could I have exhibits --

09:05AM  8    well, first, we'll start with 9-110 shown to Mr. Miller,

09:05AM  9    please?

09:05AM  10        THE COURT:  9-110?

09:05AM  11        MR. INCIONG:  Correct.

09:05AM  12        THE COURT:  Okay.  Mr. Inciong, you mentioned -- you

09:05AM  13   asked Mr. Miller if T.J. Mahoney caught on or had questions.

09:05AM  14   What is T.J. Mahoney?

09:05AM  15        MR. INCIONG:  Thank you, Your Honor.

09:05AM  16   BY MR. INCIONG:

09:05AM  17   Q    Is T.J. Mahoney the name of the halfway house you were in?

09:05AM  18   A    Yes.

09:05AM  19   Q    Okay.  That's where you were --

09:05AM  20   A    Yeah, that's where I was -- when I got out, that's --

09:05AM  21   T.J. Mahoney is where Miske and his brother dropped me off at

09:05AM  22   the day I got out.  That's the name of the halfway house.

09:05AM  23   Q    That's where you were required to go once you were

09:06AM  24   released from prison?

09:06AM  25   A    Yes.  It's a four-story building, men on one side, female

| | | |
|---|---|---|
| 09:06AM | 1 | on the other side, all the staff on the bottom, a little |
| 09:06AM | 2 | parking lot in the front. |
| 09:06AM | 3 | Q    That's located in Honolulu? |
| 09:06AM | 4 | A    Yes. |
| 09:06AM | 5 | Q    Okay.  So, Mr. Miller, do you see Exhibit 9-110 in front |
| 09:06AM | 6 | of you? |
| 09:06AM | 7 | A    Yes. |
| 09:06AM | 8 | Q    Do you recognize what's shown there? |
| 09:06AM | 9 | A    Yes. |
| 09:06AM | 10 | Q    How do you recognize that? |
| 09:06AM | 11 | A    I mean, I recognize the Kama'aina, of course, but got my |
| 09:06AM | 12 | name on 'em. |
| 09:06AM | 13 | Q    Okay.  Can I have you look at 9-111 next, please. |
| 09:06AM | 14 |      Similar document but a different document nonetheless. |
| 09:06AM | 15 | Do you recognize that? |
| 09:06AM | 16 | A    Yes. |
| 09:06AM | 17 | Q    How do you recognize that? |
| 09:06AM | 18 | A    Same thing, got my name on the -- on the check. |
| 09:06AM | 19 | Q    Now, these are -- do you see the dates that are listed on |
| 09:06AM | 20 | that check -- |
| 09:06AM | 21 | A    Yes. |
| 09:06AM | 22 | Q    -- on those two checks? |
| 09:06AM | 23 |      Is that after -- a little bit after the period we're |
| 09:07AM | 24 | talking about when you were first released from prison into the |
| 09:07AM | 25 | halfway house? |

| | | |
|---|---|---|
| 09:07AM | 1 | A    Oh, yes.  This is -- that date right there is like a whole |
| 09:07AM | 2 | year after I got out of the halfway house. |
| 09:07AM | 3 | Q    But were you continuing to receive these pay stubs from |
| 09:07AM | 4 | Mr. Miske during that time? |
| 09:07AM | 5 | A    Yes. |
| 09:07AM | 6 | Q    Are these pay stubs similar in nature to the types that |
| 09:07AM | 7 | you were receiving when you first started producing them to |
| 09:07AM | 8 | T.J. Mahoney? |
| 09:07AM | 9 | A    Yes. |
| 09:07AM | 10 | MR. INCIONG:  Your Honor, I would move to admit |
| 09:07AM | 11 | Exhibits 9-110 and 9-111. |
| 09:07AM | 12 | THE COURT:  Any objection? |
| 09:07AM | 13 | MR. KENNEDY:  No objection. |
| 09:07AM | 14 | THE COURT:  Without objection, 9-110 and 9-111 are |
| 09:07AM | 15 | each admitted.  You may publish. |
| 09:07AM | 16 | (Exhibits 9-110 and 9-111 were received in evidence.) |
| 09:07AM | 17 | MR. INCIONG:  Thank you, Your Honor. |
| 09:07AM | 18 | BY MR. INCIONG: |
| 09:07AM | 19 | Q    So starting with 9-110, so this is a pay stub that |
| 09:07AM | 20 | Mr. Miske provided to you during -- in this particular case it |
| 09:07AM | 21 | was 2015, correct? |
| 09:07AM | 22 | A    Yes. |
| 09:07AM | 23 | Q    But were these the same types of pay stubs that you gave |
| 09:08AM | 24 | to T.J. Mahoney when you were first released from prison? |
| 09:08AM | 25 | A    Yes. |

09:08AM   1   Q    Did you actually work for any of these checks?

09:08AM   2   A    No.

09:08AM   3   Q    Now, from looking at that exhibit, is that just a pay tub

09:08AM   4   or is that the entire check, that being the check that you

09:08AM   5   would tear off to deposit and then the pay stub that is

09:08AM   6   attached?

09:08AM   7   A    Yes.  That's the whole thing right here, yeah.

09:08AM   8   Q    Okay.  So were you turning in these checks without cashing

09:08AM   9   them on some occasions?

09:08AM   10  A    Yes.  Yeah, I wasn't -- I wasn't paying attention, I was

09:08AM   11  just turning them in to him to -- because that's what you got

09:08AM   12  to do.

09:08AM   13  Q    So whether you were getting the money from these checks

09:08AM   14  and cashing them, that didn't even matter to you.

09:08AM   15  A    Yeah, I wasn't -- yeah, I guess I wasn't even thinking

09:08AM   16  about that at the time.

09:08AM   17  Q    So you were turning these checks in to T.J. Mahoney,

09:09AM   18  correct?

09:09AM   19  A    These ones are the ones that -- ones like this, yeah.

09:09AM   20  Q    Okay.  The ones that -- good question.  Let me separate

09:09AM   21  that.

09:09AM   22        So in 2013 you were turning these checks in to who?

09:09AM   23  A    To T.J. Mahoney.

09:09AM   24  Q    In 2015 you were no longer on super- -- at the halfway

09:09AM   25  house, correct?

| | | | |
|---|---|---|---|
| 09:09AM | 1 | A | No. |
| 09:09AM | 2 | Q | So who were you turning the checks in to at that time? |
| 09:09AM | 3 | A | My -- the probation officer. |
| 09:09AM | 4 | Q | Okay.  That was required as part of your supervised |
| 09:09AM | 5 | | release? |
| 09:09AM | 6 | A | Yes. |
| 09:09AM | 7 | Q | So as you explained, once you got out of the halfway |
| 09:09AM | 8 | | house, then you were on supervised release? |
| 09:09AM | 9 | A | Yes. |
| 09:09AM | 10 | Q | And U.S. Probation was supervising you? |
| 09:09AM | 11 | A | Yes. |
| 09:09AM | 12 | Q | These were the pay stubs that you produced to U.S. |
| 09:09AM | 13 | | Probation? |
| 09:09AM | 14 | A | Yes. |
| 09:09AM | 15 | Q | Were you working -- actually working for Kama'aina at that |
| 09:09AM | 16 | | time in 2015? |
| 09:09AM | 17 | A | No. |
| 09:09AM | 18 | Q | Did you ever work for Kama'aina? |
| 09:09AM | 19 | A | Like back in the days, I don't -- like back in the days, I |
| 09:09AM | 20 | | used -- I used to help him, like I used to -- I used to like -- |
| 09:10AM | 21 | | when he had like the tint and everything like that, I used |
| 09:10AM | 22 | | to -- |
| 09:10AM | 23 | Q | Okay. |
| 09:10AM | 24 | A | -- I used to detail cars and stuff like that. |
| 09:10AM | 25 | Q | Well, let me narrow my -- my question.  So after you got |

09:10AM   1   out of prison in 2013, did you ever work for Kama'aina?

09:10AM   2   A    No.

09:10AM   3        MR. INCIONG:  Could I have Exhibit 9-112 pulled up,

09:10AM   4   please, for Mr. Miller?

09:10AM   5   BY MR. INCIONG:

09:10AM   6   Q    Do you recognize that document, sir?

09:10AM   7   A    Yes.

09:10AM   8   Q    What is that?

09:10AM   9   A    Oh, that's -- that's like the report that you got to turn

09:10AM  10   in to -- to your probation officer.

09:10AM  11   Q    And does this -- do you recognize this as one of the

09:10AM  12   reports that you turned in when you were on supervised release

09:10AM  13   for the bank robbery?

09:10AM  14   A    Yes.

09:10AM  15        MR. INCIONG:  Your Honor, I would move to admit

09:10AM  16   Exhibit 9-112.

09:10AM  17        THE COURT:  Any objection?

09:11AM  18        MR. KENNEDY:  No objection.

09:11AM  19        THE COURT:  Without objection, 9-112 is admitted.  You

09:11AM  20   may publish.

09:11AM  21        (Exhibit 9-112 was received in evidence.)

09:11AM  22        MR. INCIONG:  Thank you, Your Honor.

09:11AM  23   BY MR. INCIONG:

09:11AM  24   Q    So if we look at that exhibit --

09:11AM  25        MR. INCIONG:  If we could highlight part B, that

09:11AM   1    center area, to show Mr. Miller and have the jury to look at

09:11AM   2    that.

09:11AM   3    BY MR. INCIONG:

09:11AM   4    Q    Do you see that box, sir?

09:11AM   5    A    Yes.

09:11AM   6    Q    So that lists your place of employment, correct?

09:11AM   7    A    Yes.

09:11AM   8    Q    And it's listed as Kama'aina Termite control, correct?

09:11AM   9    A    Yes.

09:11AM   10   Q    Did you actually work there?

09:11AM   11   A    No.

09:11AM   12   Q    It lists the name of your supervisor as Alfredo Cabael.

09:11AM   13   A    Yes.

09:11AM   14   Q    Was Alfredo Cabael your supervisor?

09:11AM   15   A    Yeah, that's what -- I mean that's what I had to put down

09:11AM   16   right there.

09:11AM   17   Q    But I mean was he actually supervising any real work?

09:11AM   18   A    No, no.  No.

09:11AM   19   Q    Your position held as shift, what did that mean?

09:12AM   20   A    I don't -- I don't know.  I was just filling in the --

09:12AM   21   Q    It wasn't -- it wasn't correct because you weren't

09:12AM   22   working, correct?

09:12AM   23   A    No.

09:12AM   24   Q    Okay.  So full time, that was -- was that correct?

09:12AM   25   A    No.

09:12AM    1    Q    So was this still a continuation basically of that same
09:12AM    2    disguised work that you had given to T.J. Mahoney when you
09:12AM    3    first were released from prison?
09:12AM    4    A    Yes.
09:12AM    5    Q    Now, you said when you got out you were spending a lot of
09:12AM    6    time with Mr. Miske every day catching up and so forth.
09:12AM    7         You had been in prison for several years, right?
09:12AM    8    A    Yes.
09:12AM    9    Q    So had things changed in Mr. Miske's life that you could
09:12AM   10    observe having that gap in time between when you went away to
09:12AM   11    prison and when you came back?
09:12AM   12    A    Yes.
09:12AM   13    Q    What are some of those things that you noticed that
09:12AM   14    changed?
09:12AM   15    A    He had -- he had -- he had more companies.  His companies
09:13AM   16    was way bigger.  He had -- he had new trucks.  He had -- yeah,
09:13AM   17    he had a lot of stuff going on.  He had -- he had the
09:13AM   18    nightclub, he had solar, Kama'aina -- the termite, he had
09:13AM   19    plumbing.  Yeah, he had a lot of stuff -- he had a lot of stuff
09:13AM   20    going on, you know.
09:13AM   21    Q    So that was very different from when you went off to
09:13AM   22    prison.
09:13AM   23    A    Yes.
09:13AM   24    Q    So let's start with the company Kama'aina Termite and Pest
09:13AM   25    Control.

09:13AM    1    A    Yes.

09:13AM    2    Q    You said that was -- that was way bigger?

09:13AM    3    A    Yeah.

09:13AM    4    Q    What do you mean by that specifically?

09:13AM    5    A    I mean he had -- just from -- just from the people that

09:13AM    6    was working there, he built up the office, he had both sides on

09:13AM    7    his shop now.  He had upstairs, downstairs, on both sides.  He

09:13AM    8    had built in the back above, he had built offices up there.

09:13AM    9    Q    Okay.

09:13AM    10    A    Yeah, he had one good operation, you know.  He told me

09:14AM    11    he -- he told me, Yeah, I moved up a little bit since you've

09:14AM    12    been gone, you know.

09:14AM    13              MR. INCIONG:  Can I have Exhibit 5-2 shown to

09:14AM    14    Mr. Miller, please.

09:14AM    15    BY MR. INCIONG:

09:14AM    16    Q    Mr. Miller, do you see that exhibit, that map?

09:14AM    17    A    Yes.

09:14AM    18    Q    Do you recognize what's shown there?

09:14AM    19    A    Yes.

09:14AM    20    Q    How do you recognize that?

09:14AM    21    A    That's Queen Street and Ward Avenue.  That's -- yeah, I've

09:14AM    22    been there a lot.

09:14AM    23    Q    Does that map accurately show that area?

09:14AM    24    A    Yes.

09:14AM    25    Q    Is this the general area where the business Kama'aina

09:14AM   1    Termite and Pest Control was located?

09:14AM   2    A    Yes.

09:14AM   3            MR. INCIONG:  Your Honor, I would move to admit

09:14AM   4    Exhibit 5-2, please.

09:14AM   5            THE COURT:  It's already admitted --

09:14AM   6            MR. KENNEDY:  Your Honor, I believe it's already in

09:14AM   7    evidence.

09:14AM   8            MR. INCIONG:  Oh, my -- my apologies if it is.

09:14AM   9            THE COURT:  You can publish.

09:14AM   10           MR. INCIONG:  May I publish it, Your Honor?

09:14AM   11           THE COURT:  Yes.

09:14AM   12           MR. INCIONG:  Thank you.

09:14AM   13   BY MR. INCIONG:

09:14AM   14   Q    So that's the -- the area of Queen Street and Ward, like

09:15AM   15   you said?

09:15AM   16   A    Yes.

09:15AM   17   Q    The red dot, is that generally where Kama'aina Termite and

09:15AM   18   Pest Control is located?

09:15AM   19   A    Yes, I think -- I think the -- where the red is, that's

09:15AM   20   the gun shop on the other side of -- it says --

09:15AM   21   Q    So next door is -- would be more accurate?

09:15AM   22   A    Yeah.  I think so.

09:15AM   23   Q    But generally, that's -- that's where it's located?

09:15AM   24   A    Yes.

09:15AM   25           MR. INCIONG:  Could we have Exhibit 5-2-A shown to

| | | |
|---|---|---|
| 09:15AM | 1 | Mr. Miller, please? |
| 09:15AM | 2 | THE COURT:  Yes. |
| 09:15AM | 3 | BY MR. INCIONG: |
| 09:15AM | 4 | Q    Do you recognize what's shown in this exhibit, sir? |
| 09:15AM | 5 | A    Yes. |
| 09:15AM | 6 | Q    And is that -- how do you recognize that? |
| 09:15AM | 7 | A    That's the downtown area, Ward area.  Got the harbor right |
| 09:15AM | 8 | here.  Queen Street, yeah. |
| 09:15AM | 9 | Q    And is this basically just a wider, a broader view of the |
| 09:15AM | 10 | slide you looked at a second ago? |
| 09:15AM | 11 | A    Yes. |
| 09:15AM | 12 | Q    Does that accurately show 5-2-A? |
| 09:15AM | 13 | A    Yes. |
| 09:15AM | 14 | MR. INCIONG:  That's previously been admitted, Your |
| 09:16AM | 15 | Honor, I believe.  Can I publish that to Mr. Miller? |
| 09:16AM | 16 | THE COURT:  Yes, it has been and, yes, you may. |
| 09:16AM | 17 | MR. INCIONG:  Thank you. |
| 09:16AM | 18 | BY MR. INCIONG: |
| 09:16AM | 19 | Q    So, Mr. Miller, again, this is -- this is the Kaka'ako |
| 09:16AM | 20 | area that you described? |
| 09:16AM | 21 | A    Yes. |
| 09:16AM | 22 | Q    And the red dot there again shows generally where the |
| 09:16AM | 23 | business Kama'aina Termite and Pest Control was and is located |
| 09:16AM | 24 | on Queen Street? |
| 09:16AM | 25 | A    Yes. |

09:16AM   1                    MR. INCIONG:  All right.  Could we show Mr. Miller

09:16AM   2      Exhibit 5-22, please.

09:16AM   3      BY MR. INCIONG:

09:16AM   4      Q    Do you recognize what's shown in this photograph, sir?

09:16AM   5      A    Yes.

09:16AM   6                    MR. INCIONG:  Your Honor, this has been previously

09:16AM   7      admitted.  May I publish that?

09:16AM   8                    THE COURT:  Yes.

09:16AM   9                    MR. INCIONG:  Thank you.

09:16AM  10      BY MR. INCIONG:

09:16AM  11      Q    So what's shown in this photo, Mr. Miller?

09:16AM  12      A    That's the -- that's the shop right there.  That's what --

09:16AM  13      that's what we used to call 'em.

09:16AM  14      Q    Is this where you were spending a lot of time with

09:16AM  15      Mr. Miske when you were released from prison in 2013?

09:17AM  16      A    Yes.

09:17AM  17      Q    And you spent -- did you spent a lot of time there in the

09:17AM  18      years going forward as well?

09:17AM  19      A    Yes.

09:17AM  20      Q    Now, you described -- I think you mentioned that one thing

09:17AM  21      that had changed about the business about it being bigger was

09:17AM  22      you mentioned trucks as well?

09:17AM  23      A    Yes.

09:17AM  24      Q    What did you notice that was different about the -- the

09:17AM  25      trucks associated with that business?

09:17AM  1    A    When I -- when I left, I used to -- I used to go with him

09:17AM  2    down to some -- when he used to buy these little Toyotas and

09:17AM  3    put the flatbeds on top.  And when I came out, he had -- he had

09:17AM  4    big Fords 450s, and -- yeah, he had a pretty good setup going.

09:17AM  5    Q    Okay.  Was this also the same location that some of the

09:17AM  6    other businesses were located that you mentioned, Kama'aina

09:17AM  7    Plumbing and solar?

09:17AM  8    A    Yes.  Solar was in -- solar was in the back upstairs,

09:18AM  9    plumbing was on the right side.

09:18AM  10   Q    And you mentioned a nightclub that was now in the picture.

09:18AM  11   A    Yes.

09:18AM  12   Q    What nightclub was that?

09:18AM  13   A    M Nightclub.

09:18AM  14   Q    Was -- Mr. Miske was owner of that nightclub?

09:18AM  15   A    Yes.

09:18AM  16   Q    Did you ever go to that nightclub?

09:18AM  17   A    Yes.

09:18AM  18        MR. INCIONG:  Could I have Exhibit 4-60 shown to

09:18AM  19   Mr. Miller, please.

09:18AM  20   BY MR. INCIONG:

09:18AM  21   Q    Do you recognize this map, Mr. Miller?

09:18AM  22   A    Yes.

09:18AM  23   Q    How do you recognize that?

09:18AM  24   A    That's the same downtown area, Punchbowl.

09:18AM  25   Q    Does this area -- this map show where the M Nightclub was

09:18AM   1   located?  Not specifically, but is this -- location-wise, is it

09:18AM   2   in this area?

09:18AM   3   A    Yeah, right there.  Well, I'd say the Waterfront Plaza, in

09:19AM   4   that area right there.  The Han's Korean barbecue right across

09:19AM   5   Subway.

09:19AM   6   Q    Okay.  So is Exhibit 4-60 an accurate map of that general

09:19AM   7   area?

09:19AM   8   A    Yes.

09:19AM   9            MR. INCIONG:  Your Honor, I would move to admit 4-60,

09:19AM  10   please.

09:19AM  11            THE COURT:  Any objection?

09:19AM  12            MR. KENNEDY:  No objection.

09:19AM  13            THE COURT:  4-60 is admitted without objection.  You

09:19AM  14   may publish.

09:19AM  15            (Exhibit 4-60 was received in evidence.)

09:19AM  16            MR. INCIONG:  Thank you, Your Honor.

09:19AM  17   BY MR. INCIONG:

09:19AM  18   Q    Sir, could you just draw a circle approximately where the

09:19AM  19   M Nightclub was located on this map, Mr. Miller?

09:19AM  20   A    About right there (indicating).

09:19AM  21   Q    So that's the area, the major streets there are Punchbowl

09:19AM  22   and Ala Moana Boulevard?

09:19AM  23   A    Yes.

09:19AM  24   Q    Are you familiar with what's known as Restaurant Row?

09:19AM  25   A    Yes.

| | | |
|---|---|---|
| 09:19AM | 1 | Q    Is that area where the M Nightclub was located? |
| 09:19AM | 2 | A    Yes. |
| 09:19AM | 3 |         MR. INCIONG:  Could we show Exhibit 4-61, please, to |
| 09:19AM | 4 | Mr. Miller. |
| 09:19AM | 5 |         Actually let me go to 4-62, please, first.  Sorry. |
| 09:19AM | 6 | BY MR. INCIONG: |
| 09:20AM | 7 | Q    Do you recognize what's shown in this photo, Mr. Miller? |
| 09:20AM | 8 | A    Yes. |
| 09:20AM | 9 | Q    How do you recognize that? |
| 09:20AM | 10 | A    I drove past 'em a lot of times.  That's the front of the |
| 09:20AM | 11 | Restaurant Row.  Ruth's Chris Steakhouse right there. |
| 09:20AM | 12 | Q    And is that where the M Nightclub is located |
| 09:20AM | 13 | approximately? |
| 09:20AM | 14 | A    Yes. |
| 09:20AM | 15 |         MR. INCIONG:  Your Honor, I would move to admit |
| 09:20AM | 16 | Exhibit 4-62. |
| 09:20AM | 17 |         THE COURT:  Any objection, Counsel? |
| 09:20AM | 18 |         MR. KENNEDY:  No objection. |
| 09:20AM | 19 |         THE COURT:  Without objection, 4-62 is admitted.  You |
| 09:20AM | 20 | may publish. |
| 09:20AM | 21 |         (Exhibit 4-62 was received in evidence.) |
| 09:20AM | 22 |         MR. INCIONG:  Thank you, Your Honor. |
| 09:20AM | 23 | BY MR. INCIONG: |
| 09:20AM | 24 | Q    So this -- as you indicated, this is the front of |
| 09:20AM | 25 | Restaurant Row? |

| | | | |
|---|---|---|---|
| 09:20AM | 1 | A | Yes. |
| 09:20AM | 2 | Q | So that's along Ala Moana Boulevard then? |
| 09:20AM | 3 | A | Yes. |
| 09:20AM | 4 | Q | And this is where the M Nightclub was located? |
| 09:20AM | 5 | A | Yes. |

09:20AM  6          MR. INCIONG:  Could I show Mr. Miller Exhibit 4-62 --
09:20AM  7  I'm sorry -- 4-61, please.
09:20AM  8  BY MR. INCIONG:
09:20AM  9  Q    Do you recognize what's shown in that photo, Mr. Miller?
09:20AM 10  A    Yes.
09:20AM 11  Q    How do you recognize that?
09:20AM 12  A    That's right outside the -- the M Nightclub.  Yeah, when
09:21AM 13  I -- when I came home, if I'm correct, I think he just got
09:21AM 14  that, because I remember him telling me he bought that place
09:21AM 15  too, that little -- that little thing right outside there,
09:21AM 16  right outside the M.
09:21AM 17  Q    Does that accurately -- that photo accurately show that --
09:21AM 18  that little bar that you just described?
09:21AM 19  A    Yes.
09:21AM 20          MR. INCIONG:  Your Honor, I would move to admit
09:21AM 21  Exhibit 4-61 at this time.
09:21AM 22          THE COURT:  Any objection?
09:21AM 23          MR. KENNEDY:  No objection, Your Honor.
09:21AM 24          THE COURT:  All right.  4-61 then is admitted without
09:21AM 25  objection.  You may publish.

09:21AM   1              (Exhibit 4-61 was received in evidence.)

09:21AM   2              MR. INCIONG:  Thank you, Your Honor.

09:21AM   3    BY MR. INCIONG:

09:21AM   4    Q    So Mr. Miske owned this as well, he said?

09:21AM   5    A    Yeah.

09:21AM   6    Q    And this was located basically right outside the -- the

09:21AM   7    front door of the M Nightclub?

09:21AM   8    A    Yes.  And right there, had a little hot dog stand that

09:21AM   9    used to be right there.

09:21AM   10   Q    Now, you mentioned you've actually been to the

09:22AM   11   M Nightclub, correct?

09:22AM   12   A    Yes.

09:22AM   13   Q    How many times would you say you went to the M Nightclub?

09:22AM   14   A    Been there a lot.

09:22AM   15   Q    And this was all after you had been released from prison?

09:22AM   16   A    Yes.

09:22AM   17              MR. INCIONG:  Your Honor, I would move to -- or, I'm

09:22AM   18   sorry, can I please have Exhibit 1-854 shown just to

09:22AM   19   Mr. Miller.

09:22AM   20   BY MR. INCIONG:

09:22AM   21   Q    Do you recognize this photograph, sir?

09:22AM   22   A    Yes.

09:22AM   23   Q    How do you recognize that?

09:22AM   24   A    That's me in that -- in that picture.

09:22AM   25   Q    Okay.  And you recognize at least some of the other people

09:22AM    1    in that picture?

09:22AM    2    A    Yes.

09:22AM    3    Q    Do you recognize where that picture was taken?

09:22AM    4    A    Yes.

09:22AM    5    Q    How do you recognize that?

09:22AM    6    A    That's the inside of the -- of the M, these little --

09:22AM    7    these little pillars right here, he had 'em custom -- that was

09:22AM    8    custom made from some artist in Cali.

09:22AM    9    Q    Does that picture accurately show yourself and the other

09:22AM   10    individuals inside the M Nightclub?

09:22AM   11    A    Yes.

09:22AM   12              MR. INCIONG:  Your Honor, I would move to admit 1-854.

09:23AM   13              THE COURT:  Any objection?

09:23AM   14              MR. KENNEDY:  No objection, Your Honor.

09:23AM   15              THE COURT:  Without objection, 1-854 is admitted.  You

09:23AM   16    may publish.

09:23AM   17              (Exhibit 1-854 was received in evidence.)

09:23AM   18              MR. INCIONG:  Thank you, Your Honor.

09:23AM   19    BY MR. INCIONG:

09:23AM   20    Q    So, Mr. Miller, if you could -- I guess start from --

09:23AM   21    we'll go left to right, and tell who -- who you recognize or

09:23AM   22    who you know that are pictured in this photo.

09:23AM   23    A    So this is my -- this is my son's mom right here.

09:23AM   24    Q    Okay.  All right.

09:23AM   25    A    That's me right here.

09:23AM    1    Q    Okay.

09:23AM    2    A    Mikey right here.  Dusky Boy.  I don't know who that -- I

09:23AM    3    can't figure out who this guy is right here, but -- but this is

09:23AM    4    Johnnie right here.  Johnnie Stancil.

09:23AM    5    Q    Okay.  So we'll go back in reverse order, I guess.  So on

09:23AM    6    the far right then is John Stancil?

09:23AM    7    A    Yes.

09:23AM    8    Q    Okay.  You can't tell who the person next to him is?

09:23AM    9    A    I just -- I know him, but I just cannot think of his name,

09:24AM   10    I don't know.

09:24AM   11    Q    So the person then -- one person over to the left in the

09:24AM   12    white V-neck t-shirt you said that's Dusky Boy.  What -- do you

09:24AM   13    know his full name or real name?

09:24AM   14    A    Dusky Toledo.

09:24AM   15    Q    Okay.  And then the middle next to Mr. Toledo, who is

09:24AM   16    that?

09:24AM   17    A    Right here this is -- that's Mikey -- Mike Miske right

09:24AM   18    there.

09:24AM   19    Q    Okay.  And then that's you with Mr. Miske has his arm

09:24AM   20    around?

09:24AM   21    A    Yes, he got his arm around -- he got is arm around Dusky

09:24AM   22    right here, and then me right there.

09:24AM   23    Q    Okay.  And then next to you is you indicated your -- your

09:24AM   24    son's mother?

09:24AM   25    A    That's my -- yeah, that's my baby mama right here.

54

| | | |
|---|---|---|
| 09:24AM | 1 | Q    Now, you said you recognized this photo, and I think the |
| 09:24AM | 2 | circle is still there and I guess it's the upper left-hand |
| 09:24AM | 3 | corner of the pillars.  Tell us why -- or tell the jury why you |
| 09:24AM | 4 | recognize or remember those pillars. |
| 09:24AM | 5 | A    At first when I -- I remember coming home and looking at |
| 09:25AM | 6 | all of this -- this kind of stuff right here, and I was like -- |
| 09:25AM | 7 | I was like I don't believe he paying for somebody doing this |
| 09:25AM | 8 | type of thing right here, you know. |
| 09:25AM | 9 | Q    What do you mean by that, paying for doing what? |
| 09:25AM | 10 | A    Like, I don't know, I guess they call 'em art, but to me |
| 09:25AM | 11 | it look like somebody just slapping, you know, just throwing |
| 09:25AM | 12 | some paint around on some -- on some paper. |
| 09:25AM | 13 | Q    Did Mr. Miske explain to you how he had had that done or |
| 09:25AM | 14 | how -- who did that for him? |
| 09:25AM | 15 | A    He had a friend that used to -- that used to do that and |
| 09:25AM | 16 | he used to do all types of art for him, making t-shirts and |
| 09:25AM | 17 | stuff like that. |
| 09:25AM | 18 | Q    Okay.  When you would go to the M, did you -- did you have |
| 09:25AM | 19 | to pay for drinks or food or anything that you had there? |
| 09:25AM | 20 | A    No. |
| 09:25AM | 21 | Q    Ever? |
| 09:25AM | 22 | A    No. |
| 09:25AM | 23 | Q    Now, there was -- were there other businesses or business |
| 09:26AM | 24 | ventures that Mr. Miske told you about that he had gotten |
| 09:26AM | 25 | involved in since you had been away at prison? |

| | | |
|---|---|---|
| 09:26AM | 1 | A    Um, yeah, we named -- we named his businesses, right.  He |
| 09:26AM | 2 | had the whole Kama'aina thing going on, he had the club going |
| 09:26AM | 3 | on, and -- and, yeah, he had some fishing boats and stuff like |
| 09:26AM | 4 | that.  Yeah. |
| 09:26AM | 5 | Q    Okay.  So what did you know or what did he tell you about |
| 09:26AM | 6 | the fishing boats? |
| 09:26AM | 7 | A    He was just telling me that -- that he used to -- he |
| 09:26AM | 8 | bought this boat and he was fishing and selling 'em at the |
| 09:26AM | 9 | auction and stuff.  Yeah. |
| 09:26AM | 10 | Q    So this is a commercial fishing boat. |
| 09:26AM | 11 | A    Yeah, commercial fishing boat.  Big -- big long liner, |
| 09:26AM | 12 | like long lines come off the boat to catch fish. |
| 09:26AM | 13 | Q    Did you ever see that boat? |
| 09:26AM | 14 | A    Yes. |
| 09:26AM | 15 | Q    Do you recall the name of it? |
| 09:26AM | 16 | A    I cannot -- I cannot remember the name right now.  I know |
| 09:26AM | 17 | the name, but I just cannot remember right now. |
| 09:26AM | 18 | Q    So that was operating still as a business when you -- you |
| 09:27AM | 19 | came out of prison? |
| 09:27AM | 20 | A    Yes. |
| 09:27AM | 21 | MR. INCIONG:  Could I show Mr. Miller Exhibit 9-008, |
| 09:27AM | 22 | please? |
| 09:27AM | 23 | BY MR. INCIONG: |
| 09:27AM | 24 | Q    Do you see -- I guess that's two photos there, Mr. Miller. |
| 09:27AM | 25 | Do you recognize what's shown there? |

09:27AM  1  A    Yes.

09:27AM  2  Q    How do you recognize that?

09:27AM  3  A    That's -- that's going into the bunker.

09:27AM  4  Q    You've been there before?

09:27AM  5  A    Yes.

09:27AM  6  Q    Who took you there?

09:27AM  7  A    I used to go with -- with Fredo.  And -- most of the time

09:27AM  8  I go there with Fredo.

09:27AM  9  Q    And Fredo is Alfredo Cabael?

09:27AM  10  A    Yes.

09:27AM  11  Q    Is that picture or those two pictures, those accurately

09:27AM  12  depict that area outside of -- looks like the entryway to the

09:27AM  13  bunker you just mentioned?

09:27AM  14  A    Yeah.  The bunker, you gotta drive on.

09:27AM  15          MR. INCIONG:  Your Honor, may I move to admit 9-008 or

09:28AM  16  9-8 at this time, please?

09:28AM  17          THE COURT:  Any objection?

09:28AM  18          MR. KENNEDY:  Yes, Your Honor.  The objection would be

09:28AM  19  I'm not sure when this photograph was taken.

09:28AM  20          THE COURT:  All right.  Would you -- would you ask

09:28AM  21  Mr. Miller that?

09:28AM  22          MR. INCIONG:  Sure.

09:28AM  23  BY MR. INCIONG:

09:28AM  24  Q    Mr. Miller, when was the -- what was the time period that

09:28AM  25  you went to this -- this actual bunker in person with

09:28AM    1    Mr. Cabael, as you just described?

09:28AM    2    A    I used to go -- when I got out when I was in the halfway

09:28AM    3    house, I used to be with him, and he used to be always going

09:28AM    4    over here.

09:28AM    5    Q    So that would be beginning in 2013 or so?

09:28AM    6    A    Yes.

09:28AM    7    Q    Does that -- do those photos accurately show that area as

09:28AM    8    you saw them when you went there beginning in 2013?

09:28AM    9    A    I mean just -- I know the road.  If that bottom road is

09:29AM   10    down like that, because you got a drive pass 'em, yeah, like --

09:29AM   11    like old military housing I think on the top, you got to drive

09:29AM   12    down and go around that bend.  So if that's that bend right

09:29AM   13    here, that's what I -- that's what I remember more.

09:29AM   14    Q    Okay.  And then the top picture, does that -- does that

09:29AM   15    look like how you recall when you went to visit that -- that

09:29AM   16    location?

09:29AM   17    A    Yeah, kind of similar.  I not really taking in the sign,

09:29AM   18    but like I said, if that's the same road that go around right

09:29AM   19    here, that's what -- that's what I remember.

09:29AM   20          MR. INCIONG:  Okay.  Your Honor, I would move to admit

09:29AM   21    9-8.

09:29AM   22          THE COURT:  Any objection?

09:29AM   23          MR. KENNEDY:  Yes, Your Honor.  Could we have a

09:29AM   24    sidebar?

09:29AM   25          THE COURT:  The objection was the date.  We have

| | | |
|---|---|---|
| 09:29AM | 1 | resolved the date.  Is there still -- there's a different |
| 09:29AM | 2 | objection now? |
| 09:29AM | 3 | MR. KENNEDY:  Yes. |
| 09:30AM | 4 | (Sidebar on the record:) |
| 09:30AM | 5 | THE COURT:  All right.  What's the objection? |
| 09:30AM | 6 | MR. KENNEDY:  The objection is relevance, Your Honor. |
| 09:30AM | 7 | The fireworks that the government seeks to introduce was |
| 09:30AM | 8 | between 2009 and 2012.  Mr. Miller was in prison, so there's no |
| 09:30AM | 9 | relevance to him seeing something in 2013.  And that's why I |
| 09:30AM | 10 | was asking when the picture was taken. |
| 09:30AM | 11 | So I would object on relevance because he was in |
| 09:30AM | 12 | either -- I think he was at Sheridan during the time period |
| 09:30AM | 13 | that I understand the fireworks evidence that is being offered |
| 09:30AM | 14 | I believe for Count 1 would be involved. |
| 09:30AM | 15 | THE COURT:  Mr. Inciong. |
| 09:30AM | 16 | MR. INCIONG:  He doesn't have to be out of prison for |
| 09:30AM | 17 | it to be relevant.  The next questions are going to be whether |
| 09:30AM | 18 | he was told what that bunker was used for by Mr. Miske, and |
| 09:31AM | 19 | that it was used for fireworks, that he had been selling |
| 09:31AM | 20 | fireworks while he was in prison. |
| 09:31AM | 21 | THE COURT:  He was told that by whom? |
| 09:31AM | 22 | MR. INCIONG:  Mr. Miske. |
| 09:31AM | 23 | THE COURT:  All right.  Anything else? |
| 09:31AM | 24 | MR. INCIONG:  No. |
| 09:31AM | 25 | THE COURT:  Anything else, Mr. Kennedy? |

09:31AM    1              MR. KENNEDY:  Your Honor, him visiting the fireworks

09:31AM    2    place with Mr. Cabael in 2013 would not be relevant to that.  I

09:31AM    3    don't believe that ever happened.

09:31AM    4              THE COURT:  All right.

09:31AM    5                        (End of sidebar.)

09:31AM    6              THE COURT:  The objection is overruled.  Exhibit 9-8

09:31AM    7    is admitted.  You may publish if you wish.

09:31AM    8              (Exhibit 9-008 was received in evidence.)

09:31AM    9              MR. INCIONG:  Thank you, Your Honor.

09:31AM   10         If we could enlarge just the top photo, please, at

09:31AM   11    this time.

09:31AM   12    BY MR. INCIONG:

09:31AM   13    Q    So, Mr. Miller, you mentioned that you actually visited

09:32AM   14    this place with Mr. Cabael, correct?

09:32AM   15    A    Yes.

09:32AM   16    Q    Did you actually ever go into the bunkers that you

09:32AM   17    mentioned that are -- that are contained here or --

09:32AM   18    A    Yes.

09:32AM   19    Q    What did you -- what was inside the bunker?

09:32AM   20    A    Had a bunch of extra stuff that was -- when I went in

09:32AM   21    there, it was more like a storage, you know.

09:32AM   22    Q    Did you have considerations with Mr. Miske about what he

09:32AM   23    had used that bunker for?

09:32AM   24    A    Yeah.

09:32AM   25    Q    What did he tell you?

09:32AM   1   A     Oh, he told me that that's what they used to use for

09:32AM   2   fireworks long time.

09:32AM   3   Q     What fireworks are you talking about?

09:32AM   4   A     He told me he had some -- he had some fireworks that --

09:32AM   5   that he used to -- he used to bring in.  Like -- like, you

09:32AM   6   know, like they do in Waikiki.

09:32AM   7   Q     So we're not talking about sparklers?

09:32AM   8   A     No, no, not sparklers.

09:32AM   9   Q     Commercial grade?

09:32AM   10  A     Yeah, like aerials.  Big -- big aerials.

09:33AM   11  Q     He told you he brought these in.  Where did he say from?

09:33AM   12  Brought them in from where?

09:33AM   13  A     He told me he had a company, and he used to bring those in

09:33AM   14  before.  Him and this other guy Kalani, he used to tell me

09:33AM   15  that, but --

09:33AM   16  Q     Did he tell you where the fireworks came from?

09:33AM   17  A     China.

09:33AM   18  Q     Did he tell you whether he had ever gone to China?

09:33AM   19  A     He told me he went to China.  He told me he went to China.

09:33AM   20  Q     Did he ever indicate to you the quantity of or how many --

09:33AM   21  how long that he did this for?

09:33AM   22  A     I mean he -- he just said he had a lot, but he never break

09:33AM   23  down how much the -- the quantity was that he had.

09:33AM   24  Q     Did he tell you whether he made any money off of that?

09:33AM   25  A     He told me he made -- he told me he made some -- he made a

09:33AM  1    lot of money.

09:33AM  2    Q    What's a lot of money?

09:33AM  3    A    He told me he made some M's, some millions.

09:33AM  4    Q    "M's" means --

09:33AM  5    A    Yeah.

09:33AM  6    Q    -- means millions?

09:33AM  7    A    Yes.  And he told me he was -- he was partners with this

09:33AM  8    guy Kalani, Kalani Nuuanu, from where we from too.  But he just

09:34AM  9    told me like, Hey, like, man, I feel bad, you know, but fuck

09:34AM  10   it, it is what it is, you know.

09:34AM  11   Q    He felt bad about what?

09:34AM  12   A    About -- about ripping him off.

09:34AM  13   Q    Okay.  Well, tell us about that.

09:34AM  14   A    I don't know much to say about that.  He was just telling

09:34AM  15   me that -- that he sold -- he sold -- like he was selling

09:34AM  16   fireworks out the back door, and then he went fake the -- the

09:34AM  17   break-in because there was -- the ATF was coming, and he had to

09:34AM  18   make like they went cut the locks and make like the thing was

09:34AM  19   stolen, so when they go -- when they go there and inspect the

09:34AM  20   containers, the bunkers, they can see the thing got stolen.

09:34AM  21   You know.

09:34AM  22   Q    Okay.  So let me have -- let me ask a couple of follow-up

09:34AM  23   questions about that.

09:34AM  24        So first of all, when you say he was selling it out

09:34AM  25   the back door, you mean he was selling the fireworks on the

09:34AM   1   black market?

09:34AM   2   A     Yes.

09:34AM   3   Q     He was not selling them legally?

09:35AM   4   A     No, he wasn't selling them legally.

09:35AM   5   Q     And you mentioned something about the ATF was on to him.

09:35AM   6   What do you mean by that?

09:35AM   7   A     He said like they was -- they was coming for an inspection

09:35AM   8   or something like that for see if all the fireworks was

09:35AM   9   accounted for, and the thing was gone.  So -- so he told me he

09:35AM  10   had to -- they had to -- they had to stage like when they cut

09:35AM  11   the locks, and so when they came, the ATF would look and they

09:35AM  12   would be able to say, Hey, the fireworks got stolen.  That's

09:35AM  13   why it's not there.

09:35AM  14   Q     So you mean he staged a theft of the fireworks?

09:35AM  15   A     Yes.

09:35AM  16   Q     So that was going to be the explanation to the ATF as to

09:35AM  17   why the fireworks were gone?

09:35AM  18   A     Yes.  The ATF or whoever was inspecting 'em, that was

09:35AM  19   going to be the -- whatever law was coming or people that was

09:35AM  20   coming, that was going to be the explanation why the thing was

09:35AM  21   gone.

09:35AM  22   Q     Did Mr. Miske ever tell you that he believed he was under

09:35AM  23   investigation by anyone other than the ATF during that time?

09:36AM  24   A     During that time?  Yeah, well, he would tell me the feds.

09:36AM  25   He used the feds.

09:36AM  1   Q    So what -- what did he say?

09:36AM  2   A    He told me like the feds got a hard on for him.  They

09:36AM  3   always had a hard on for him.  That's what he would tell me.

09:36AM  4   Q    Did he tell you how he knew that the ATF was investigating

09:36AM  5   him?

09:36AM  6   A    He would tell me -- like he would tell me he heard like

09:36AM  7   that.  You know, like as in I heard from somebody that -- that

09:36AM  8   knew very well what they was doing.

09:36AM  9   Q    Were there any other examples of that where he told you he

09:36AM  10  had heard things of --

09:36AM  11  A    Yeah, I cannot -- I cannot think of it right now.

09:36AM  12  Q    Do you recall any -- anything like that in regard to the

09:36AM  13  fishing boat?

09:36AM  14  A    Oh, yeah, yeah, yeah.  Yeah.

09:36AM  15  Q    Explain that.

09:36AM  16  A    Okay.  So I just still in the -- I was just getting out of

09:37AM  17  prison right there.  So -- so one day we're kicking back,

09:37AM  18  whatever, and he -- and he tells me his -- his boat got

09:37AM  19  surrounded by -- his fishing boat -- I cannot think of the

09:37AM  20  name, but the big long liner -- you know, get maybe 10, 15

09:37AM  21  people on the crew.

09:37AM  22         But he told me out there the Coast Guard surround

09:37AM  23  them, and -- and they thought he was -- they thought he was

09:37AM  24  bringing in drugs.  But he wasn't because somebody told him

09:37AM  25  that -- somebody got -- knew what was happening and told him

09:37AM   1    that -- that, Hey, they intercepted one call from me telling my
09:37AM   2    boat captain that -- that make sure you get that white dog.
09:37AM   3    And he saw he had a white dog in California, and this guy is an
09:37AM   4    animal lover, you know.
09:37AM   5         So they thought the white dog was him telling the
09:37AM   6    captain like grab white -- grab drugs or something like that,
09:37AM   7    you know, because they did a big -- they did a big Coast
09:38AM   8    Guard -- they brought in -- they brought in submarines to look
09:38AM   9    under his boat, cameras to look in every one of his fishes,
09:38AM   10   but, yeah, it was really a white dog, and, you know, he was
09:38AM   11   laughing.  You know, we was all laughing at them because they
09:38AM   12   thought that.
09:38AM   13   Q    So Mr. Miske is telling you that this is his account of
09:38AM   14   what happened with the search and the Coast Guard and so forth,
09:38AM   15   correct?
09:38AM   16   A    Yes.
09:38AM   17   Q    But it was a really -- it was a white dog, yes?
09:38AM   18   A    Yeah, it was really -- yeah, it was really -- it was
09:38AM   19   really a white dog.  He never like -- he never like the dog --
09:38AM   20   this guy loved animals, like he took in -- he took in stray
09:38AM   21   dogs, you know, dogs he never even know.  He's a -- he's an
09:38AM   22   animal lover.  So --
09:38AM   23   Q    So this white dog was his son's dog?
09:38AM   24   A    Was his son's dog, yeah.  His son was coming back from --
09:38AM   25   from -- I don't know where his son was coming back from.  I

09:38AM  1    think Alaska or something like that.  Because he was gone --
09:38AM  2    when I first came out of prison, I think he was with his mom in
09:38AM  3    Alaska, and he was coming back, but -- when you come back to
09:39AM  4    Hawaii, you got to put your dog through quarantine, and he
09:39AM  5    never like the dog go through quarantine.  So I think --
09:39AM  6    Q    So he sent the fishing boat to pick up the dog?
09:39AM  7    A    Yeah.  If the boat was in the area -- I don't know if he
09:39AM  8    just sent it there or what, but if the boat was in the area,
09:39AM  9    the thing -- it wasn't there to pick up any drugs.  It was for
09:39AM 10    grab his dog and bring 'em back.  And he told me he heard --
09:39AM 11    somebody had told him that, Hey, they told me that -- they told
09:39AM 12    me that -- the conversation was the reason why they raid my
09:39AM 13    boat was because I told the captain, Make sure you grab the
09:39AM 14    white dog.
09:39AM 15    Q    So did Mr. Miske tell you that this was someone that he
09:39AM 16    had information from or was this just hearsay that he heard the
09:39AM 17    comment from?
09:39AM 18    A    Yeah, like somebody he -- he heard information from.
09:39AM 19    That's not -- and this is going on while they -- while they
09:39AM 20    still -- while they still on the boat looking in the fishes and
09:39AM 21    stuff like that, you know.
09:39AM 22    Q    This would have been --
09:39AM 23    A    And he was like, Fuck these, fuckers.  They're going to
09:40AM 24    have to pay for the fishes now.  This is big fishes, not no
09:40AM 25    long liners they catch, like 150-, 200-pound tunas.  So they

09:40AM   1   going with the camera inside and looking at every fish and --

09:40AM   2   Q    So Mr. Miske received this information as this was

09:40AM   3   happening.

09:40AM   4   A    Yeah, like while -- while this was happening he's already

09:40AM   5   telling me about the -- about the white dog situation, and

09:40AM   6   they -- and they looking under his boat, the Coast Guard.

09:40AM   7   Q    So did you from that point on, did you refer to that term

09:40AM   8   to describe other situations, meaning the term "white dog"?

09:40AM   9   A    Yes.

09:40AM   10  Q    And what did that mean going forward then?

09:40AM   11  A    Well, I mean, from -- to me and him the term "white dog"

09:40AM   12  was like -- was like they looking for something that -- that is

09:40AM   13  not right.  They looking for something they not going to find.

09:40AM   14  They looking for the wrong -- they looking for the wrong thing.

09:40AM   15  Q    So I think you mentioned that Mr. Miske said that he

09:41AM   16  had -- he had upgraded his status since you had gotten out of

09:41AM   17  prison.  Is that what you said, something --

09:41AM   18  A    Yeah, it would be like, Hey, I'm --

09:41AM   19  Q    So he was doing well?

09:41AM   20  A    Yeah, I'm moving up, boy.

09:41AM   21  Q    You mentioned before that right when you first met

09:41AM   22  Mr. Miske that he also had nice cars, nice things.  When you

09:41AM   23  got out of prison, did you still see some of those same things?

09:41AM   24  A    I had -- came out of prison, he had nicer cars, you know.

09:41AM   25  Q    Did you -- did you recognize any cars that you had seen

09:41AM    1    from when you first met him?

09:41AM    2    A    Oh, yeah, yeah.  So -- so I remember we was sitting in his

09:41AM    3    office one day, and he was like, Hey, you remember baby girl?

09:41AM    4    And that's what he used to call his -- he had one baby window

09:41AM    5    Bug back in the days, you know, which I never remember at the

09:41AM    6    time.  But he was showing me a picture of a long time ago, and

09:41AM    7    he was like, Yeah, I got that back.  Like he bought the Bug

09:41AM    8    back, that's what -- yeah.

09:42AM    9    Q    This is a -- when you say a Bug, this is a Volkswagon Bug?

09:42AM    10   A    Yeah, old school Bug like, you know, 1950s.  Yeah, nice --

09:42AM    11   nice Bug, little baby window.

09:42AM    12   Q    So he had owned it when you first met him, and then sold

09:42AM    13   it?

09:42AM    14   A    He got rid of it and then got it back.

09:42AM    15   Q    And then bought it back.  Okay.

09:42AM    16        Was he still -- or where was Mr. Miske living to your

09:42AM    17   knowledge at this time when you first got out?

09:42AM    18   A    Huh?

09:42AM    19   Q    Where was Mr. Miske living?

09:42AM    20   A    At this time he was living -- he was living in Kailua, but

09:42AM    21   he had -- he was living in Kailua.  He had -- he had a little

09:42AM    22   apartment over there in town.

09:42AM    23   Q    The place he was living in Kailua, was that the same place

09:42AM    24   that he had lived when -- before you went to prison?

09:42AM    25   A    Yes.

09:42AM   1   Q    Had he purchased any other properties that you knew of?

09:42AM   2   A    Oh, yeah.  He had -- he wasn't living there, but he had

09:43AM   3   his -- he used to call it Lumahai.  That was this one property

09:43AM   4   at that time, wasn't -- nothing was built on it.

09:43AM   5   Q    Lumahai referenced to what?  Is that the street that it

09:43AM   6   was on?

09:43AM   7   A    That's the -- that's the street, yeah.

09:43AM   8   Q    Did you ever go to visit this property?

09:43AM   9   A    Yes.

09:43AM  10   Q    What was the state of it when you first saw it?

09:43AM  11   A    It was dirt.  Was -- was dirt.  I remember -- I remember

09:43AM  12   first -- one of the first times that I went there with him,

09:43AM  13   open the gate, it was just dirt -- it was just dirt and

09:43AM  14   equipment.  It wasn't even -- cement wasn't poured or nothing.

09:43AM  15        But I remember standing on the top looking down at the

09:43AM  16   property like that, and he was like, Hey, you see that rock out

09:43AM  17   there, I -- I own that fucking rock too.  You know.  And -- and

09:43AM  18   I was like, What you mean you own the rock?  He said, Yeah, I

09:43AM  19   own it.  That fucking rock out there, I own that rock.  But

09:43AM  20   trust me, I don't want it.  You know, if somebody get hurt on

09:43AM  21   that rock, then they going to sue me or something like that.

09:44AM  22        But, yeah, that's -- that's what I remember about that

09:44AM  23   conversation, him telling me about that -- specifically telling

09:44AM  24   me he owned that rock.

09:44AM  25   Q    And what part of the island was this property?

09:44AM    1    A    Hawaii Kai.  Hawaii Kai, Portlock area right before

09:44AM    2    Hanauma Bay.

09:44AM    3    Q    Was there any like well-known landmark or attraction type

09:44AM    4    place in that area that's close to the property that you know

09:44AM    5    of?

09:44AM    6    A    Yeah, Hanauma Bay was right there.

09:44AM    7    Q    Okay.  Did Mr. Miske ever have conversations with you

09:44AM    8    about the process of -- of building a structure or a residence

09:44AM    9    on that property?

09:44AM    10    A    What?

09:44AM    11    Q    Was Mr. Miske going to build something on that property?

09:44AM    12    A    Yeah, a house.

09:44AM    13    Q    A house?

09:44AM    14    A    Yeah.

09:44AM    15    Q    Okay.  And how did he indicate to you how he was paying

09:44AM    16    for that?

09:44AM    17    A    He told me he was paying in cash.  He told me that --

09:44AM    18    yeah, he was paying the workers in cash.  He told me that

09:45AM    19    that -- that -- he used to always tell me like, Lumahai is

09:45AM    20    sucking up my cash.

09:45AM    21    Q    Did you have any conversation with him about how much he

09:45AM    22    paid for the -- just the lot or the property itself?

09:45AM    23    A    Nah, I cannot remember that.

09:45AM    24    Q    Okay.  So did Mr. Miske ever tell you what he was doing

09:45AM    25    to -- to come up with the money to -- to pay for the building

09:45AM  1   of the house since it was draining his -- his cash?

09:45AM  2   A    I mean, he had -- he had the nightclub at that time, you

09:45AM  3   know, so he used to -- he used to have this guy Jason, he used

09:45AM  4   to bring him cash from the -- from the nightclub every week.

09:45AM  5   Not every week but constantly.

09:45AM  6   Q    Okay.  Let me go back and ask you a couple of questions

09:45AM  7   about the nightclub first.  Did Mr. Miske tell you how he had

09:45AM  8   acquired the M Nightclub?

09:45AM  9   A    He told me he caught -- he caught Sammy for him.  Told me

09:46AM  10  he was supposed to buy it for Sammy -- from Sammy, I mean.

09:46AM  11  Q    So he bought the club from Sammy?

09:46AM  12  A    Yes.

09:46AM  13  Q    Who is Sammy?

09:46AM  14  A    Sammy Kuuana.

09:46AM  15  Q    Did you know Sammy Kuuana?

09:46AM  16  A    Yes.

09:46AM  17  Q    Did Mr. Miske tell you what the price or the terms of

09:46AM  18  the -- the purchase of the club were?

09:46AM  19  A    He was supposed to like -- I don't know, like he supposed

09:46AM  20  to give -- like he gave Sammy some cash, and he was supposed to

09:46AM  21  give Sammy more cash, and then they had worked out something on

09:46AM  22  the side.  But I know after he gave him the -- after he gave

09:46AM  23  him the first payment, he was telling me he just said, Fuck

09:46AM  24  this guy.

09:46AM  25  Q    So he never paid the -- the balance that was owed?

```
09:46AM   1   A    Yeah, I mean, not -- not that I know of.

09:46AM   2   Q    Now, you mentioned that there was a guy you referred to as

09:46AM   3   Jason.  Do you recall Jason's last name?

09:46AM   4   A    Yokoyama.

09:46AM   5        MR. INCIONG:  Could we show Mr. Miller Exhibit 1-039,

09:46AM   6   please?

09:46AM   7   BY MR. INCIONG:

09:47AM   8   Q    Do you recognize who's shown in that photo, sir?

09:47AM   9   A    Yes.

09:47AM  10   Q    How do you recognize that?

09:47AM  11   A    I know him, just Jason -- yeah, Jason Yokoyama.

09:47AM  12   Q    And that photo accurately shows him as you -- as you know

09:47AM  13   how he looks?

09:47AM  14   A    Yes.

09:47AM  15        MR. INCIONG:  Okay.  Sorry, Your Honor, I believe this

09:47AM  16   is -- this is in, so I won't move to admit it.  May we publish

09:47AM  17   it at this time?

09:47AM  18        THE COURT:  You may.

09:47AM  19   BY MR. INCIONG:

09:47AM  20   Q    So this is Jason Yokoyama?

09:47AM  21   A    Yes.

09:47AM  22   Q    Did you meet Mr. Yokoyama?

09:47AM  23   A    Yes.

09:47AM  24   Q    When did you first meet him?

09:47AM  25   A    When I -- when I came out.
```

```
09:47AM   1    Q    From your understanding, what was Mr. Yokoyama's
09:47AM   2    relationship to Mr. Miske?
09:47AM   3    A    They used to -- Jason -- the way -- the way Miske used to
09:47AM   4    explain it to me was like he was like his -- you know, he blend
09:47AM   5    right in.  He not -- like no tattoos.  He used to be in the
09:47AM   6    military.  Just a clean cut small guy, not intimidating, you
09:48AM   7    know, but he used to do different odds and ends for -- for
09:48AM   8    Miske.
09:48AM   9    Q    So he was -- he was employed by Mr. Miske in some
09:48AM  10    capacity?
09:48AM  11    A    Yes.
09:48AM  12    Q    Did he do any work for Mr. Miske at the M Nightclub that
09:48AM  13    you knew about?
09:48AM  14    A    Yes.  I -- from what I know, like he was like -- he was
09:48AM  15    like part-owner running 'em, or if not the manager, you know.
09:48AM  16    Q    So when you would go to the M Nightclub, would you see
09:48AM  17    Mr. Yokoyama there?
09:48AM  18    A    Yes.
09:48AM  19    Q    Did he appear to be working?
09:48AM  20    A    Yes.
09:48AM  21    Q    Did he appear to be the person running the place?
09:48AM  22    A    Yes.
09:48AM  23    Q    Okay.  Now, you said that he would bring Mr. Miske cash.
09:48AM  24    Did you witness --
09:48AM  25    A    Yes.
```

| | | | |
|---|---|---|---|
| 09:48AM | 1 | Q | Did you witness that? |
| 09:48AM | 2 | A | Yes. |
| 09:48AM | 3 | Q | So describe -- start with give one example that you recall |
| 09:48AM | 4 | | that happened. |
| 09:48AM | 5 | A | We were in -- we were in his office sitting down. |
| 09:49AM | 6 | Q | And when you say "in his office," you're talking about |
| 09:49AM | 7 | | Mr. Miske's office? |
| 09:49AM | 8 | A | Mr. Miske's office on Queen Street, that little -- that |
| 09:49AM | 9 | | little red dot that we was at.  When you walk into his |
| 09:49AM | 10 | | office -- when you walk into his shop, his office is on -- is |
| 09:49AM | 11 | | on the left-hand side.  So we were inside there, get couches, |
| 09:49AM | 12 | | get seats.  We're talking -- we always talking, me and Miske. |
| 09:49AM | 13 | | Jason comes in and he talking going back and forth. |
| 09:49AM | 14 | | Miske is telling him like, Hey, this fucking -- this thing |
| 09:49AM | 15 | | is -- this thing is -- everything is not adding up. |
| 09:49AM | 16 | | And then I shot one back in, Because he's skimming |
| 09:49AM | 17 | | this fucking thing every -- every week with these bags Jason |
| 09:49AM | 18 | | bringing in, small little bags.  You know, like happy birthday |
| 09:49AM | 19 | | bags can fit teddy bears inside.  We all started laughing. |
| 09:49AM | 20 | | Jason brings the bag in, gives it to Miske, puts it in -- in a |
| 09:50AM | 21 | | drawer. |
| 09:50AM | 22 | Q | Okay.  So let me ask you a few follow-up questions to |
| 09:50AM | 23 | | that.  So when Mr. Miske said, These things not adding up, what |
| 09:50AM | 24 | | did he -- what did he mean by that? |
| 09:50AM | 25 | A | Yeah, like the -- the profits and stuff like that. |

09:50AM  1    Q    That the club was not profitable?

09:50AM  2    A    Yeah.

09:50AM  3    Q    So you said you shot something back.  What did you mean by

09:50AM  4    that?

09:50AM  5    A    Yeah, I shot back at him like, Because you skimming this

09:50AM  6    -- you skimming this fucking thing every week.  And we all

09:50AM  7    started laughing because the bag was still sitting on the -- on

09:50AM  8    the counter at that time, the little -- the little bag.

09:50AM  9    Q    So how did you know there was money in the bag?

09:50AM  10   A    I -- that's not the -- okay, that's the time I remember

09:50AM  11   that's the time I saying, but many times we stay in there

09:50AM  12   he's -- he's just dropping the bags, we're not talking about

09:50AM  13   'em.  But I remember that -- that incident right there.

09:50AM  14   Q    So was this a regular occurrence that Mr. Yokoyama would

09:50AM  15   show up with these -- these gift bags?

09:50AM  16   A    Yes.

09:50AM  17   Q    And Mr. Miske said he -- he would take the bag and put it

09:50AM  18   in his drawer?

09:51AM  19   A    Yeah, he get one drawer on the side that, like every

09:51AM  20   time -- every time he need cash, he open that drawer and that's

09:51AM  21   where he kept his -- that's where he kept his cash.

09:51AM  22   Q    Did you ever see inside that drawer yourself?

09:51AM  23   A    Yes.

09:51AM  24   Q    And what did you see inside that drawer?

09:51AM  25   A    Always had money inside there.  Always had -- had stacks

09:51AM    1    of cash inside there.  Wads of cash.

09:51AM    2    Q    Could you tell from looking inside the -- the types of

09:51AM    3    bills or the amount of money?

09:51AM    4    A    Yeah, I mean you'd just see wads of cash, 100s, 20s.

09:51AM    5    Yeah.

09:51AM    6    Q    Did you ever ask Mr. Miske for money and he got it -- gave

09:51AM    7    it to you out of that drawer?

09:51AM    8    A    Yes.  That drawer, he would constantly open it at all

09:51AM    9    times of the day.

09:51AM   10    Q    Okay.  Now, so you're still in T.J. Mahoney.  You're there

09:51AM   11    for six to nine months approximately?

09:52AM   12    A    Yes.

09:52AM   13    Q    Were you actually working on obtaining any real employment

09:52AM   14    during that time?

09:52AM   15    A    Oh, during that time I was trying to get my -- trying to

09:52AM   16    get my CDL.

09:52AM   17    Q    What is your CDL?

09:52AM   18    A    Commercial driver's license.

09:52AM   19    Q    Why were you trying to get your CDL?

09:52AM   20    A    Because for work -- for work at the movies, to drive at

09:52AM   21    the movies you needed your CDL to get into the union.

09:52AM   22    Q    So you were trying to get into the Teamsters union?

09:52AM   23    A    Yes.

09:52AM   24    Q    Who set that up for you?

09:52AM   25    A    Miske.  Who set up what?  What you talking about, getting

09:52AM    1    the driver's license?

09:52AM    2    Q    The Teamsters job.

09:52AM    3    A    Oh, yeah, Miske.

09:52AM    4    Q    So were there certain steps that you had to take to get

09:52AM    5    your -- your commercial driver's license?

09:52AM    6    A    Yeah, you gotta -- you gotta go down there see this guy.

09:52AM    7    He do like side jobs on the side, but you go over there a few

09:53AM    8    weeks, drive the truck, make sure you know all the parts on the

09:53AM    9    truck, how to reverse the trucks into stalls and stuff like

09:53AM    10   that.  And you take the test on his truck.

09:53AM    11   Q    So did the fact that you were a convicted felon now at

09:53AM    12   that time, did that create any obstacles to getting into the

09:53AM    13   union or getting your commercial driver's license?

09:53AM    14   A    No.

09:53AM    15        MR. INCIONG:  Could we show Mr. Miller Exhibit 9-114,

09:53AM    16   please.

09:53AM    17   BY MR. INCIONG:

09:53AM    18   Q    Mr. Miller, do you recognize this document?

09:53AM    19   A    Hmm?

09:53AM    20   Q    Do you recognize this document?

09:54AM    21        Do you recognize that?

09:54AM    22   A    Yeah, I mean I reading 'em, yeah.

09:54AM    23   Q    Okay.  Have you seen this before?

09:54AM    24   A    Yes.

09:54AM    25   Q    How do you recognize this?

09:54AM    1    A    Get my name on top.

09:54AM    2    Q    There's a reference to a TWIC, T-W-I-C.  Do you know what

09:54AM    3    that is?

09:54AM    4    A    Yeah, that's -- that you need to -- you need that to

09:54AM    5    like -- anywhere to do like on the docks and stuff like that or

09:54AM    6    military bases.

09:54AM    7    Q    Okay.  So at the time you were trying to get your CDL and

09:54AM    8    trying to get into the -- the movies, were you also thinking

09:54AM    9    about the stevedores or getting into the docks?

09:54AM    10    A    Yeah, I was -- I was thinking about 'em.  But --

09:54AM    11    Q    Was that another option that Mr. Miske had said he could

09:54AM    12    arrange for you?

09:54AM    13    A    Yes.  Yeah, he told me --

09:54AM    14    Q    Go ahead.

09:54AM    15    A    He told me -- he was telling me if I wanted to go there,

09:54AM    16    but -- so his brother Johnnie used to -- he used to work there

09:55AM    17    at the time.  So he was telling me, he was like, 'eh, I'm

09:55AM    18    telling you, man, you don't want to -- you don't want to go out

09:55AM    19    there and work on the docks.  They gotta -- they actually doing

09:55AM    20    some hard work in the sun, they sweating, they pulling these

09:55AM    21    heavy ass rods into the containers.  He said, don't -- Don't go

09:55AM    22    work on the docks.  Work at the movies, you get paid the same,

09:55AM    23    and it's just easier, you know.

09:55AM    24    Q    Okay.  So that's partly why at least you decided to take

09:55AM    25    the -- the movies job?

| | | |
|---|---|---|
| 09:55AM | 1 | A    Yes. |
| 09:55AM | 2 | Q    But when you were still thinking about the stevedores, was |
| 09:55AM | 3 | this letter, Exhibit 9-114, was that submitted on your behalf? |
| 09:55AM | 4 | A    Yes. |
| 09:55AM | 5 |      MR. INCIONG:  Your Honor, I would move to admit |
| 09:55AM | 6 | Exhibit 9-114. |
| 09:55AM | 7 |      THE COURT:  Any objection? |
| 09:55AM | 8 |      MR. KENNEDY:  Your Honor, could I see the -- the |
| 09:55AM | 9 | letter? |
| 09:55AM | 10 |      No objection. |
| 09:55AM | 11 |      THE COURT:  Without objection, 9-114 is admitted. |
| 09:56AM | 12 |       (Exhibit 9-114 was received in evidence.) |
| 09:56AM | 13 |      MR. INCIONG:  May I publish that, Your Honor? |
| 09:56AM | 14 |      THE COURT:  Yes, you may. |
| 09:56AM | 15 | BY MR. INCIONG: |
| 09:56AM | 16 | Q    So, Mr. Miller, this is the letter that was submitted on |
| 09:56AM | 17 | behalf -- on your behalf by Pomai Bird? |
| 09:56AM | 18 |      If you look at the bottom, the operations manager, did |
| 09:56AM | 19 | you know Pomai Bird? |
| 09:56AM | 20 | A    If I do, I no remember her. |
| 09:56AM | 21 | Q    Did she ever talk to you about putting this letter |
| 09:56AM | 22 | together for you? |
| 09:56AM | 23 | A    No. |
| 09:56AM | 24 | Q    If you look at -- let's start with the -- |
| 09:56AM | 25 |      MR. INCIONG:  If we can enlarge the first paragraph, |

09:56AM  1   please.

09:56AM  2   BY MR. INCIONG:

09:56AM  3   Q    Starting with that, it says that earlier this year -- and

09:56AM  4   this is dated December 30, 2013, so this is when you were

09:56AM  5   released from prison to the halfway house, correct?

09:56AM  6   A    Yes.

09:56AM  7   Q    That you were hired as a full-time technician in May, and

09:56AM  8   you began your field training immediately.  Was that true?

09:56AM  9   A    No.

09:56AM  10  Q    You go down to the next paragraph, it says:  "During these

09:57AM  11  several months that Wayne has worked with us, staff members as

09:57AM  12  well as clients have commented on his pleasant, easygoing

09:57AM  13  personality.  Thus far all reviews have been very positive.  He

09:57AM  14  is always punctual, reliable, responsible, and gets along with

09:57AM  15  everyone he comes into contact with."

09:57AM  16       Was that true?

09:57AM  17  A    No.

09:57AM  18  Q    Why was that not true?

09:57AM  19  A    I mean, what you mean why?

09:57AM  20  Q    You weren't -- you weren't working there, correct?

09:57AM  21  A    Yeah, I wasn't working.

09:57AM  22  Q    But that -- so none of that paragraph is accurate.

09:57AM  23  A    No.

09:57AM  24       MR. INCIONG:  Could we go to the next paragraph,

09:57AM  25  please.

| | | |
|---|---|---|
| 09:57AM | 1 | BY MR. INCIONG: |
| 09:57AM | 2 | Q    It says:  "Since then," which is referencing your hiring, |
| 09:57AM | 3 | "our pest control customer service base has already shown an |
| 09:57AM | 4 | increase of 23 percent within our commercial sector.  These |
| 09:57AM | 5 | numbers reflect the dedication and commitment from the entire |
| 09:57AM | 6 | staff.  However, Wayne has proven to be an asset to the |
| 09:58AM | 7 | corporation and has definitely contributed to our company's |
| 09:58AM | 8 | success.  In September, Wayne was promoted to on-duty shift |
| 09:58AM | 9 | supervisor because of his diligence and knowledge." |
| 09:58AM | 10 | Is any of that true? |
| 09:58AM | 11 | A    No. |
| 09:58AM | 12 | MR. INCIONG:  Your Honor, could I have Mr. Miller look |
| 09:58AM | 13 | at Exhibit 9-115 next, please? |
| 09:58AM | 14 | THE COURT:  Yes. |
| 09:58AM | 15 | BY MR. INCIONG: |
| 09:58AM | 16 | Q    Mr. Miller, do you recognize that exhibit? |
| 09:58AM | 17 | A    Yes. |
| 09:58AM | 18 | Q    Have you seen that before? |
| 09:58AM | 19 | A    Yes. |
| 09:58AM | 20 | Q    Again, is this another similar letter to the last one that |
| 09:58AM | 21 | was submitted to you on behalf of your application to be |
| 09:58AM | 22 | employed by the stevedores union? |
| 09:58AM | 23 | A    Yes -- no, that was for the TWIC, right? |
| 09:58AM | 24 | Q    Or the -- right, the TWIC.  I'm sorry. |
| 09:58AM | 25 | A    Yeah, yeah. |

09:58AM    1    Q    The TWIC application.  And this was the same time period

09:58AM    2    again that -- after you had been released from the halfway

09:59AM    3    house in 2013?

09:59AM    4    A    Yes.

09:59AM    5              MR. INCIONG:  Your Honor, I would move to admit 9-115.

09:59AM    6              THE COURT:  Any objection?

09:59AM    7              MR. KENNEDY:  No objection.

09:59AM    8              THE COURT:  Without objection, 9-115 is admitted.  You

09:59AM    9    may publish.

09:59AM   10              (Exhibit 9-115 was received in evidence.)

09:59AM   11              MR. INCIONG:  Thank you, Your Honor.

09:59AM   12    BY MR. INCIONG:

09:59AM   13    Q    So again, Mr. Miller, do you know David Melton, who is

09:59AM   14    listed as the general manager, who signed this letter?

09:59AM   15    A    Yeah, I know Dave.

09:59AM   16    Q    How do you know Mr. Melton?

09:59AM   17    A    You know, I know he was big haole guy, baldheaded.

09:59AM   18    Q    How do you know him, though, from where?

09:59AM   19    A    He used to always be at -- when I got out he, used to

09:59AM   20    always be at the shop.  Like he was -- he was like the -- I

09:59AM   21    don't know what he was over there, but general manager there.

09:59AM   22    Q    The shop you're referring to is Kama'aina Termite and Pest

09:59AM   23    Control?

09:59AM   24    A    Yes.

09:59AM   25    Q    And so if we look at --

| | | |
|---|---|---|
| 09:59AM | 1 | MR. INCIONG: If we can focus on that first paragraph |
| 09:59AM | 2 | of that letter, please. |
| 09:59AM | 3 | BY MR. INCIONG: |
| 09:59AM | 4 | Q   So Mr. Melton says, as general manager, that he supervised |
| 10:00AM | 5 | Wayne Miller since your hire in May 2013, that you initially |
| 10:00AM | 6 | started as a full-time technician, and that you are now one of |
| 10:00AM | 7 | the on-duty shift supervisors.  Is any of that true? |
| 10:00AM | 8 | A    No. |
| 10:00AM | 9 | Q    I'll have you look at the -- |
| 10:00AM | 10 | MR. INCIONG: Highlight the next paragraph, please. |
| 10:00AM | 11 | BY MR. INCIONG: |
| 10:00AM | 12 | Q   "Our customers have enjoyed working with Wayne.  We have |
| 10:00AM | 13 | not received any complaints, nor had to reprimand him for |
| 10:00AM | 14 | anything at all.  His work ethic is remarkable as he continues |
| 10:00AM | 15 | to strive and achieve our monthly quotas.  Wayne has proven to |
| 10:00AM | 16 | be a very motivated individual and a great addition to our |
| 10:00AM | 17 | team." |
| 10:00AM | 18 | Is any of that accurate? |
| 10:00AM | 19 | A    No.  No. |
| 10:00AM | 20 | MR. INCIONG: Okay.  Next paragraph then, please. |
| 10:00AM | 21 | BY MR. INCIONG: |
| 10:00AM | 22 | Q    It says:  "We believe Wayne does not pose any kind of |
| 10:00AM | 23 | security risk.  Therefore, we are asking that TSA withdraw its |
| 10:01AM | 24 | initial denial and grant him a TWIC," T-W-I-C. |
| 10:01AM | 25 | So this letter was sent specifically to try and get |

10:01AM    1    you this security clearance?

10:01AM    2    A    Yes.

10:01AM    3    Q    Were you told by -- or did you know from any other source

10:01AM    4    that these letters were being written on your behalf?

10:01AM    5    A    I don't know.  I no really remember that market for -- I

10:01AM    6    just -- like if I went put 'em all together and send them to

10:01AM    7    them, that's --

10:01AM    8    Q    Well, okay --

10:01AM    9    A    I never read 'em.

10:01AM   10    Q    Let me ask you this:  Did you ask Mr. Melton to write this

10:01AM   11    letter for you?

10:01AM   12    A    No.

10:01AM   13    Q    Did you ask Pomai Bird to write Exhibit 9-114 for you?

10:01AM   14    A    No, you know what.  I no remember if -- I no remember.

10:01AM   15    Q    Okay.

10:01AM   16    A    And I don't remember if I was there or what, but I no

10:01AM   17    remember asking them for the -- for the letters or if I --

10:01AM   18    Q    But the contents of these letters were not -- were not

10:01AM   19    true.

10:01AM   20    A    No.  As far as me working there and being -- being the --

10:02AM   21    what they say?  Shift supervisor, yeah, I don't know about --

10:02AM   22    yeah, none of that is true.  20 percent increase and all that.

10:02AM   23    Q    Okay.  All right.  So during this time --

10:02AM   24    A    It was just to get the TWIC, right.

10:02AM   25    Q    Pardon me?

10:02AM   1   A     I said this was all just to get the TWIC.

10:02AM   2   Q     Okay.  That was the security clearance that you needed.

10:02AM   3   A     Yes.

10:02AM   4            MR. INCIONG:  All right.  We can take that down.

10:02AM   5   BY MR. INCIONG:

10:02AM   6   Q     Now, other than the M Nightclub, the money issue that you

10:02AM   7   talked about before, did Mr. Miske ever complain to you about

10:02AM   8   other problems that he had that arose out of the M Nightclub?

10:02AM   9   A     Yeah, at that time he was -- I don't know if it arose out

10:02AM  10   of the M, though, but I know he was -- I cannot remember the

10:02AM  11   stuff, but he had some cases going on that he used to complain

10:03AM  12   about, and I know he had to go to -- he had to go to cell block

10:03AM  13   one time and like stay there overnight.  But I no remember the

10:03AM  14   details.

10:03AM  15   Q     When you say cases, what are you referring to?

10:03AM  16   A     Like -- like whatever cases he had, assault cases and

10:03AM  17   stuff like that.

10:03AM  18   Q     Did Mr. Miske ever indicate to you how he wanted to

10:03AM  19   resolve that case?

10:03AM  20   A     Yeah, I cannot remember, Mark.

10:03AM  21   Q     Okay.

10:03AM  22   A     But I remember him complaining about it.  Because the guy

10:03AM  23   Galmiche, right, I remember him always complaining about the

10:03AM  24   guy Galmiche, but I don't know if that happened at the M,

10:03AM  25   that's why.  That's one of those cases I remember him always

10:03AM   1   complaining about.

10:03AM   2   Q    All right.  Well, whether -- let's take aside whether or

10:03AM   3   not that happened at the M or not, but you remember this -- the

10:03AM   4   name Galmiche?

10:03AM   5   A    Yeah.

10:03AM   6   Q    Why do you remember that name?

10:04AM   7   A    Huh?

10:04AM   8   Q    Why do you remember that name?

10:04AM   9   A    Somebody he used to always complain about.

10:04AM  10   Q    And what --

10:04AM  11   A    This guy no like drop 'em.  He like money.  I don't like

10:04AM  12   give 'em no money, you know.  But if I do something to him,

10:04AM  13   they going know that's me.  Like he used to always say that

10:04AM  14   kind of stuff.

10:04AM  15   Q    Okay.  So when did you actually get released from the

10:04AM  16   halfway house on to supervised release where you were living on

10:04AM  17   your own?

10:04AM  18   A    I actually get released from the halfway house

10:04AM  19   January 14th.

10:04AM  20   Q    2014?

10:04AM  21   A    Yes.

10:04AM  22   Q    Where did you move to?

10:04AM  23   A    Pearl City, one condo in Pearl City.

10:04AM  24   Q    Were you living by yourself?

10:04AM  25   A    No.

| | | | |
|---|---|---|---|
| 10:04AM | 1 | Q | Who were you living with? |
| 10:04AM | 2 | A | My -- my son's mom.  My -- |
| 10:04AM | 3 | Q | Were you working -- actually working anywhere now at this |
| 10:04AM | 4 | | point? |
| 10:04AM | 5 | A | No, not at this point. |
| 10:04AM | 6 | Q | So what are you doing at the time? |
| 10:04AM | 7 | A | I still collecting -- well, I just got out of the halfway |
| 10:04AM | 8 | | house, I still -- I still getting the stubs from -- from Miske |
| 10:04AM | 9 | | to turn in to -- to turn in to my probation officer so it looks |
| 10:05AM | 10 | | like I'm still working. |
| 10:05AM | 11 | Q | Okay.  Now, that you're at the halfway house, you can come |
| 10:05AM | 12 | | and go as you please, correct? |
| 10:05AM | 13 | A | Yes. |
| 10:05AM | 14 | Q | You don't have to get a call every day to say you're |
| 10:05AM | 15 | | needed for work or anything like that, right? |
| 10:05AM | 16 | A | No. |
| 10:05AM | 17 | Q | So does your contact or communication, does it decrease |
| 10:05AM | 18 | | with Mr. Miske now that you're -- you're living with your |
| 10:05AM | 19 | | girlfriend in Pearl City? |
| 10:05AM | 20 | A | No, no, no, stayed good.  It was good. |
| 10:05AM | 21 | Q | Okay.  So the times that you weren't with Mr. Miske, how |
| 10:05AM | 22 | | would you typically communicate with him? |
| 10:05AM | 23 | A | Most of the time if we're not talking about meeting up |
| 10:05AM | 24 | | somewhere, but he used to always call me or send message to me |
| 10:05AM | 25 | | meet him at certain places and, you know, meet him at -- meet |

| | | |
|---|---|---|
| 10:05AM | 1 | down the road from his shop, got a little beach by John |
| 10:05AM | 2 | Dominis, and meet me down there at the beach, meet me down |
| 10:05AM | 3 | there at the -- at the bay.  You know, meet me at certain |
| 10:06AM | 4 | places just want -- just to talk. |
| 10:06AM | 5 | Q    Why not just call you directly and talk over the phone? |
| 10:06AM | 6 | A    Yeah, sometimes we never like -- not like we was talking |
| 10:06AM | 7 | about shocker or anything, you know. |
| 10:06AM | 8 | Q    What do you mean? |
| 10:06AM | 9 | A    I mean most of the times we was just -- we never like |
| 10:06AM | 10 | be -- what's that called?  If somebody was listening, if he |
| 10:06AM | 11 | always thought the feds was on him, you know.  And he was right |
| 10:06AM | 12 | about that. |
| 10:06AM | 13 | Q    Did you ever communicate with him over the telephone? |
| 10:06AM | 14 | A    Yeah.  Yeah. |
| 10:06AM | 15 | Q    Were there specific or certain phones that you used to do |
| 10:06AM | 16 | that? |
| 10:06AM | 17 | A    Yeah, I had one regular phone or he would send message to |
| 10:06AM | 18 | me, but we always had little burners on the side. |
| 10:06AM | 19 | Q    What do you mean by "burners on the side"? |
| 10:06AM | 20 | A    Burners, like phones you can just toss away after that. |
| 10:06AM | 21 | You know, but even on those phones we never used to -- me and |
| 10:06AM | 22 | him never used -- we used to always just call, What you doing? |
| 10:07AM | 23 | We going to meet up.  Or even for just eat lunch sometimes, |
| 10:07AM | 24 | we're not talking about something, sometimes something comes |
| 10:07AM | 25 | up.  But we always had burner phones to contact each other. |

10:07AM   1   Q    Did Mr. Miske ever provide you with burner phones?

10:07AM   2   A    Yes.

10:07AM   3   Q    How many burner phones would you have at any particular

10:07AM   4   time?

10:07AM   5   A    A lot -- I had a lot.

10:07AM   6   Q    What is a lot?

10:07AM   7   A    More than five.

10:07AM   8   Q    When you were with Mr. Miske in person, were there certain

10:07AM   9   ways you would communicate at times, rather than just talking

10:07AM   10  to each other?

10:07AM   11  A    Yeah.  Most of the time -- majority of the time if -- if

10:07AM   12  I'm more than talking to him, and it's about -- it's not about

10:07AM   13  something that -- that we don't want nobody to hear, then he

10:07AM   14  would grab his phone -- one of his phones and type 'em like in

10:07AM   15  the notes, he would type what he was telling me and show 'em to

10:07AM   16  me on his phone like that.

10:08AM   17        But if we was at his office, he would -- he would --

10:08AM   18  he gotta a board on his office that he would write down

10:08AM   19  whatever -- whatever he wanted to say, he would write 'em down

10:08AM   20  on the glass board and tell me, Hey, read that, you know.  And

10:08AM   21  he would tell me, What's up?  And I would go over there and

10:08AM   22  write the response, you know, and then he would erase 'em.

10:08AM   23  Yeah, if --

10:08AM   24  Q    So is this -- are you trying to say when you had these

10:08AM   25  sorts of conversations, you're talking about criminal topics?

10:08AM   1    A    Yes.

10:08AM   2    Q    So when he would put in the notes in the phone and show

10:08AM   3    you the message, how would you respond?  Same way or would you

10:08AM   4    talk to him back?

10:08AM   5    A    Yeah.  No, I would either type 'em back to him or -- or

10:08AM   6    give 'em like one -- like one okay or something like that.

10:08AM   7    Q    Do you find that strange that that's how he wanted to

10:08AM   8    communicate with you?

10:08AM   9    A    No, it was always -- that's the -- that's the relationship

10:09AM  10    we had.  You know, wasn't -- wasn't living honest lives to

10:09AM  11    where we could just talk about anything we wanted to.  That's

10:09AM  12    the relationship we had.  That's the relationship we created.

10:09AM  13    Q    During this time Mr. Miske told you that he -- he believed

10:09AM  14    or he knew he was under investigation?

10:09AM  15    A    Yeah.  And he -- he would always -- he would tell me that

10:09AM  16    these guys, the feds get a hard on for him.  These fuckers got

10:09AM  17    one hard on for me.  You know.

10:09AM  18         MR. INCIONG:  Can I show Mr. Miller Exhibit 1-778,

10:09AM  19    please?

10:09AM  20         THE COURT:  Yes.  And we're ten minutes after 10:00,

10:09AM  21    if you would give some thought to an appropriate time to break.

10:09AM  22         MR. INCIONG:  Okay, Your Honor.  I have just a few

10:09AM  23    quick pictures, and if we can take a break after that --

10:09AM  24         THE COURT:  Sure.

10:09AM  25         MR. INCIONG:  -- if that works.

| | | |
|---|---|---|
| 10:09AM | 1 | THE COURT:  Yes. |
| 10:09AM | 2 | MR. INCIONG:  Thank you. |
| 10:09AM | 3 | 1-778 has actually been admitted, I believe, Your |
| 10:09AM | 4 | Honor.  If I could publish that? |
| 10:09AM | 5 | THE COURT:  Yes, go ahead. |
| 10:09AM | 6 | BY MR. INCIONG: |
| 10:09AM | 7 | Q    So, Mr. Miller, this has already been admitted into |
| 10:10AM | 8 | evidence, but do you recognize what's shown in that picture? |
| 10:10AM | 9 | A    Yes. |
| 10:10AM | 10 | Q    What is that? |
| 10:10AM | 11 | A    That's his office right there.  That's his -- that's his |
| 10:10AM | 12 | office right there. |
| 10:10AM | 13 | Earlier when I was talking about the -- the desk |
| 10:10AM | 14 | that -- so this is his chair right here.  If that's the same |
| 10:10AM | 15 | chair, he had that chair for a long time, like he was -- he was |
| 10:10AM | 16 | attached to that chair. |
| 10:10AM | 17 | Q    So you just -- you drew a circle over it, looks like a |
| 10:10AM | 18 | black -- the back of a black office type chair that's on the |
| 10:10AM | 19 | lower right-hand corner of the picture? |
| 10:10AM | 20 | A    Yes. |
| 10:10AM | 21 | Q    Okay. |
| 10:10AM | 22 | A    And this is his desk -- this is where he sit right here. |
| 10:10AM | 23 | This is his desk, this is his chair, and this is the -- when we |
| 10:10AM | 24 | was talking about the drawer earlier. |
| 10:10AM | 25 | Q    Yes. |

10:10AM    1    A    Right down there.

10:10AM    2    Q    So the drawer is on the left side of the desk, if you're

10:10AM    3    sitting at the desk facing towards that window?

10:10AM    4    A    Yes.

10:10AM    5    Q    All right.  And when you say "his office," whose office

10:11AM    6    are you referring to?

10:11AM    7    A    Mike Miske.

10:11AM    8    Q    And this is the office specifically located where?

10:11AM    9    A    On Queen Street, the shop.  We call 'em the shop.  Is the

10:11AM    10   glass broken?  Go ahead.  I just noticed that.

10:11AM    11   Q    Okay.  So let me have you look at Exhibit 1-779, please.

10:11AM    12         MR. INCIONG:  This has also been previously admitted,

10:11AM    13   I believe, Your Honor.

10:11AM    14         THE COURT:  Yes, it has.  Go ahead.

10:11AM    15   BY MR. INCIONG:

10:11AM    16   Q    So this is -- this is another photo.  Do you recognize

10:11AM    17   this, Mr. Miller?

10:11AM    18   A    Yes.

10:11AM    19   Q    What does this show?

10:11AM    20   A    That's the -- when you're looking -- that's the opposite

10:11AM    21   angle in his office.

10:11AM    22   Q    Okay.  So the -- the desk that's shown there, that's the

10:11AM    23   one that you just referenced which the drawer that has the

10:11AM    24   money in would be -- from this angle on the right side, but

10:11AM    25   it's on the left side if you're sitting at the desk in that

10:11AM   1   chair?

10:11AM   2   A    Yes.

10:11AM   3   Q    That armchair, the black chair that's behind the desk,

10:11AM   4   that's the one you referenced as -- that's his chair?

10:12AM   5   A    Yes.

10:12AM   6   Q    All right.  Do you see anything behind the desk that's --

10:12AM   7   that you notice as well or recall on the wall?

10:12AM   8   A    Okay.  So -- so that's that board that I was just talking

10:12AM   9   about earlier --

10:12AM   10  Q    Yes.

10:12AM   11  A    -- where he -- where he write messages to me.  If he

10:12AM   12  writing something down, he writes it on that wall -- on that --

10:12AM   13  on that glass right there.

10:12AM   14  Q    And then that's --

10:12AM   15  A    Looks like glass, but that's like one dry erase glass

10:12AM   16  where you could write -- like if he was telling me something he

10:12AM   17  never wanted nobody to hear, he would write 'em on that board,

10:12AM   18  and then tell it to me, and then, what, or something like that,

10:12AM   19  then erase 'em.

10:12AM   20  Q    Okay.  Let me have you look at one last photo then on that

10:12AM   21  same topic, Exhibit 1-571.

10:12AM   22       MR. INCIONG:  If we could show that to Mr. Miller.  I

10:12AM   23  believe this has also been previously admitted.

10:13AM   24       THE COURT:  Yes.  Go ahead.

10:13AM   25       MR. INCIONG:  May I publish that, Your Honor?

| | | |
|---|---|---|
| 10:13AM | 1 | THE COURT:  You may. |
| 10:13AM | 2 | BY MR. INCIONG: |
| 10:13AM | 3 | Q    So, Mr. Miller, do you see what's been marked as |
| 10:13AM | 4 | Exhibit 1-571? |
| 10:13AM | 5 | A    Yes. |
| 10:13AM | 6 | Q    Is that the -- the erasable board you were just |
| 10:13AM | 7 | referencing? |
| 10:13AM | 8 | A    Yes. |
| 10:13AM | 9 | Q    How often would Mr. Miske write on this board when you |
| 10:13AM | 10 | were meeting with him at that office? |
| 10:13AM | 11 | A    A lot.  A lot.  If we talking, we talking about something, |
| 10:13AM | 12 | you know, that -- because most of the time we talk, if we talk |
| 10:13AM | 13 | about something, we talking like in code.  Like we're not |
| 10:13AM | 14 | actually saying what we saying, or if he like get one message |
| 10:13AM | 15 | to me, he would write 'em on this -- he would write 'em right |
| 10:13AM | 16 | here. |
| 10:13AM | 17 | Q    And then erase it after? |
| 10:13AM | 18 | A    And erase 'em, yeah.  This boy had many messages.  A lot |
| 10:13AM | 19 | of messages on top.  Look like cars on 'em right now, but -- |
| 10:14AM | 20 | yeah, he had a lot of messages on there. |
| 10:14AM | 21 | MR. INCIONG:  Your Honor, we could break here, I |
| 10:14AM | 22 | think, if that's -- |
| 10:14AM | 23 | THE COURT:  All right.  So we have been going for |
| 10:14AM | 24 | about an hour and 45 minutes.  Let's go ahead and take our |
| 10:14AM | 25 | first break of the morning and the day. |

10:14AM    1              As we go to break, I'll remind our jurors to, once

           2    again, refrain from discussing the substance of this case with

           3    anyone, including one another, until I advise you otherwise; to

           4    refrain from accessing any media or other accounts of this case

           5    that may be out there; and then finally, please do not conduct

           6    any independent investigation into the facts, circumstances or

10:14AM    7    persons involved.

10:14AM    8              Let's try to keep it to about a 15-minute break and

10:14AM    9    resume right around 10:30.

10:15AM   10              (Proceedings were recessed at 10:15 a.m. to 10:34

10:26AM   11    a.m.)

10:34AM   12              THE COURT:  All right.  Back from our morning break.

10:34AM   13              Mr. Inciong, you may resume your direct examination of

10:34AM   14    Mr. Miller.

10:34AM   15              MR. INCIONG:  Thank you, Your Honor.

10:34AM   16    BY MR. INCIONG:

10:34AM   17    Q    Mr. Miller, when we left off you were talking about the

10:34AM   18    time you spent in Mr. Miske's office at Kama'aina Termite and

10:34AM   19    Pest Control, and you were describing the clear board, correct?

10:34AM   20    A    Yes.

10:34AM   21    Q    You spent a lot of time in that office?

10:34AM   22    A    Yes.

10:34AM   23    Q    I'd like you to look at Exhibit 1-59 at this time, please.

10:34AM   24              Do you recognize whose picture is there?

10:34AM   25    A    Yeah, I recognize her, but I don't know her name.

| | | |
|---|---|---|
| 10:34AM | 1 | Q    Okay.  If you didn't know her name, but -- where do you |
| 10:35AM | 2 | recognize her from? |
| 10:35AM | 3 | A    I remember seeing her at the shop. |
| 10:35AM | 4 | Q    Does this photo of her accurately show how she looked at |
| 10:35AM | 5 | that time when you were spending time at the Kama'aina Termite |
| 10:35AM | 6 | and Pest Control shop? |
| 10:35AM | 7 | A    Yes. |
| 10:35AM | 8 | MR. INCIONG:  Your Honor, I would move to admit |
| 10:35AM | 9 | Exhibit 1-59. |
| 10:35AM | 10 | THE COURT:  Mr. Kennedy? |
| 10:35AM | 11 | MR. KENNEDY:  I would object, Your Honor.  Lack of |
| 10:35AM | 12 | foundation. |
| 10:35AM | 13 | THE COURT:  Sustained. |
| 10:35AM | 14 | BY MR. INCIONG: |
| 10:35AM | 15 | Q    Mr. Miller, you said that you recognized this person from |
| 10:35AM | 16 | when you were at the shop. |
| 10:35AM | 17 | A    Yes. |
| 10:35AM | 18 | Q    Okay.  How would -- how would you -- what contact or |
| 10:35AM | 19 | interaction, if any, did you have with this person when you |
| 10:35AM | 20 | were there? |
| 10:35AM | 21 | A    I didn't have -- I really don't have no contact with her, |
| 10:35AM | 22 | because -- the only thing I notice her, I remember her because |
| 10:35AM | 23 | every time she would come, like she would ask us -- Miske would |
| 10:35AM | 24 | ask us, Hey, let me talk to her real quick, you know.  So I |
| 10:35AM | 25 | would have to leave, and they -- he would shut the door and |

| | | |
|---|---|---|
| 10:35AM | 1 | then go -- go in there with her.  So I never -- I never |
| 10:36AM | 2 | remember have no -- I don't remember having any contact with |
| 10:36AM | 3 | her if I did. |
| 10:36AM | 4 | Q    You were never introduced to her that you recall? |
| 10:36AM | 5 | A    No. |
| 10:36AM | 6 | Q    But you recall seeing her at the shop? |
| 10:36AM | 7 | A    Yes. |
| 10:36AM | 8 | Q    On more than one occasion? |
| 10:36AM | 9 | A    Yes.  But like I said, every time we seen her, she -- if |
| 10:36AM | 10 | we was in the office, Miske would tell us, Hey, let me talk to |
| 10:36AM | 11 | her or stuff like that.  He wouldn't -- they I wouldn't -- I |
| 10:36AM | 12 | wouldn't know conversation what they was talking about or |
| 10:36AM | 13 | whatnot. |
| 10:36AM | 14 | Q    You would be asked to leave? |
| 10:36AM | 15 | A    Yes. |
| 10:36AM | 16 | Q    That's how -- that's how you remember her? |
| 10:36AM | 17 | A    I wasn't asked to leave, but I would be -- he would be |
| 10:36AM | 18 | like, Hey, let me talk to her real quick, you know.  And then |
| 10:36AM | 19 | that would be like -- yeah, I guess he ask me for leave, |
| 10:36AM | 20 | like -- but I would leave the office when he said that. |
| 10:36AM | 21 | Q    Okay.  So it's because of that that's why you remember her |
| 10:36AM | 22 | and what she looks like? |
| 10:36AM | 23 | A    Yes. |
| 10:36AM | 24 |              MR. INCIONG:  Your Honor, I would move to admit 1-59. |
| 10:36AM | 25 |              THE COURT:  During what time frame was this? |

10:36AM    1    BY MR. INCIONG:

10:36AM    2    Q    What -- so this is -- we're talking about the period when

10:36AM    3    you got released from the halfway house --

10:36AM    4    A    Yes.

10:37AM    5    Q    -- in 2013 onward.

10:37AM    6    A    Yes.

10:37AM    7    Q    Is that the time frame you're referencing?

10:37AM    8    A    Yes.

10:37AM    9    Q    Was this a period over months or years that you would see

10:37AM    10   her there?

10:37AM    11   A    Yeah, I would see her -- not often, you know, but I seen

10:37AM    12   her there a few times when I -- and I was there a lot, you

10:37AM    13   know.

10:37AM    14            MR. INCIONG:  Your Honor, may I move to admit at this

10:37AM    15   time?

10:37AM    16            THE COURT:  Mr. Kennedy?

10:37AM    17            MR. KENNEDY:  Objection remains, Your Honor.

10:37AM    18            THE COURT:  All right.  The objection is overruled.

10:37AM    19            You recognize this person, you just don't know her

10:37AM    20   name.  Is that fair?

10:37AM    21            THE WITNESS:  Yes.  I recognize her and the little --

10:37AM    22   the little contact that we did have was like just walking by,

10:37AM    23   though, but she would always go into the office and would

10:37AM    24   mainly just be them talking.  And I would say -- because he --

10:37AM    25   if I was there or whoever was there with me, he would ask us,

| 10:37AM | 1 | Let me talk to her.  You know, I gotta talk to her. |
| 10:37AM | 2 | THE COURT:  All right.  You may publish, Mr. Inciong. |
| 10:38AM | 3 | MR. INCIONG:  Thank you, Your Honor. |
| 10:38AM | 4 | (Exhibit 1-59 was received in evidence.) |
| 10:38AM | 5 | BY MR. INCIONG: |
| 10:38AM | 6 | Q    So although I understand you don't know her name, this is |
| 10:38AM | 7 | the woman that you -- you recognize from being asked to leave |
| 10:38AM | 8 | or at least give Mr. Miske privacy to speak with her, correct? |
| 10:38AM | 9 | A    Yes. |
| 10:38AM | 10 | Q    Was that unusual for you to be asked to leave so he could |
| 10:38AM | 11 | speak to anybody? |
| 10:38AM | 12 | A    At that time I wasn't -- I never really asked questions. |
| 10:38AM | 13 | You know, that was his -- that was his business, you know, but |
| 10:38AM | 14 | this short little lady, you know. |
| 10:38AM | 15 | Q    Okay.  My question is, were you regularly asked to leave |
| 10:38AM | 16 | or give him privacy to talk to people, or was that a rarity? |
| 10:38AM | 17 | A    Yeah, I wasn't -- wasn't usually asked to leave, but when |
| 10:38AM | 18 | she was there, I was asked to leave. |
| 10:38AM | 19 | Q    Okay.  All right.  Understood. |
| 10:38AM | 20 | A    He wanted to talk in private without anybody there. |
| 10:38AM | 21 | Q    Okay.  Now, other than the Kama'aina office, were there |
| 10:38AM | 22 | any other places that you would regularly speak with Mr. Miske |
| 10:38AM | 23 | so you would have privacy or you wouldn't be detected? |
| 10:39AM | 24 | A    That I would speak to Miske? |
| 10:39AM | 25 | Q    Yes. |

```
10:39AM   1    A    Yeah, few places.

10:39AM   2    Q    Okay.  Tell the jury.

10:39AM   3    A    I think I told him before, but if you go straight down

10:39AM   4    Ward by -- by get one restaurant called John Dominis, you know,

10:39AM   5    and park over there, and you can walk.  You know, we used -- if

10:39AM   6    the beach surfers go surf over there and get one long walkway

10:39AM   7    going all the way down in that Kaka'ako area, get like hills

10:39AM   8    that go like that (indicating), and we used to talk and walk

10:39AM   9    along the rocks and -- yeah, we used to talk over there.

10:39AM  10    Q    Okay.  Are you familiar with the Honolulu Club?

10:39AM  11    A    Yes.

10:39AM  12    Q    How do you know about the Honolulu Club?

10:39AM  13    A    That's where -- that's where Miske used to -- that's his

10:39AM  14    gym he used to work out at.

10:39AM  15    Q    Did you ever meet him there?

10:39AM  16    A    Yes.

10:39AM  17    Q    To work out?

10:39AM  18    A    No, I mean he got -- when I got out, he got us memberships

10:40AM  19    and stuff, but we never -- I never used to go there for

10:40AM  20    workout, but I used to go there for meet him too.  They get one

10:40AM  21    spiral parking that go up into Honolulu Club, underground

10:40AM  22    parking where you can drive up like one spiral, cars parked

10:40AM  23    like that.  But we used to go over there just to -- just to

10:40AM  24    talk.  We used to go in that area and just walk back and forth

10:40AM  25    and talk.
```

10:40AM   1    Q    So that's the parking lot of the Honolulu Club?

10:40AM   2    A    Parking lot of the Honolulu Club, yeah.

10:40AM   3    Q    Are you familiar with Maunalua Bay?

10:40AM   4    A    Yes.

10:40AM   5    Q    How do you know about Maunalua Bay?

10:40AM   6    A    That's where we used to go ride -- ride jet skis,

10:40AM   7    barbecue, and bring our families and stuff like that.  Hawaii

10:40AM   8    Kai, it's in Hawaii Kai, that little -- that little bay over

10:40AM   9    there.

10:40AM   10   Q    Did you meet for those occasions a lot?

10:40AM   11   A    Yes.

10:40AM   12   Q    How frequently would you say?

10:40AM   13   A    At least couple times a month, you know, on the weekends

10:41AM   14   and stuff like that.

10:41AM   15   Q    Okay.  So I'm going to show you Exhibit 1-15-C, which was

10:41AM   16   previously admitted earlier today, just for reference.

10:41AM   17          MR. INCIONG:  If I could show that to the jury as

10:41AM   18   well, Your Honor, please.

10:41AM   19          THE COURT:  Yes, go ahead.

10:41AM   20   BY MR. INCIONG:

10:41AM   21   Q    So this is the -- the map of Oahu you saw earlier,

10:41AM   22   correct?

10:41AM   23   A    Yes.

10:41AM   24   Q    So if you could just draw a circle or an X approximately

10:41AM   25   where Maunalua Bay is located.

| | | |
|---|---|---|
| 10:41AM | 1 | A     (Witness complies.)  We stay right around -- right in that |
| 10:41AM | 2 | area right there. |
| 10:41AM | 3 | Q     Okay.  So again, this is on the southeast end of Oahu, |
| 10:41AM | 4 | correct? |
| 10:41AM | 5 | A     Yes. |
| 10:41AM | 6 | MR. INCIONG:  Could I show Mr. Miller 1-1022 at this |
| 10:41AM | 7 | time, please? |
| 10:41AM | 8 | Your Honor, this has been admitted I believe as well |
| 10:42AM | 9 | previously. |
| 10:42AM | 10 | THE COURT:  Yes, go ahead. |
| 10:42AM | 11 | MR. INCIONG:  Can I publish that? |
| 10:42AM | 12 | THE COURT:  Yes. |
| 10:42AM | 13 | BY MR. INCIONG: |
| 10:42AM | 14 | Q     Mr. Miller, do you recognize what's shown here? |
| 10:42AM | 15 | A     Yes. |
| 10:42AM | 16 | Q     What is this? |
| 10:42AM | 17 | A     This is the -- this is the Hawaii Kai area right there. |
| 10:42AM | 18 | Q     And is that showing Kalanianaole Highway where it goes -- |
| 10:42AM | 19 | or leads up to -- |
| 10:42AM | 20 | A     Yes. |
| 10:42AM | 21 | Q     -- Maunalua Bay? |
| 10:42AM | 22 | A     Yes. |
| 10:42AM | 23 | Q     Where -- or is there a certain area or place that you |
| 10:42AM | 24 | would meet at Maunalua Bay when you jet skied and barbecue like |
| 10:42AM | 25 | you just described? |

| | | |
|---|---|---|
| 10:42AM | 1 | A     Before -- when -- before we used to go like over here, but |
| 10:42AM | 2 | then after we started going over here. |
| 10:42AM | 3 | Q     Okay.  What do you mean -- before and after what? |
| 10:42AM | 4 | A     Like when I first came home, I don't know why we was going |
| 10:42AM | 5 | over here, but we used to just -- we used to park right there, |
| 10:42AM | 6 | park the trucks right there, dump the tail -- drop the tailgate |
| 10:42AM | 7 | down, and -- yeah, we used to go right there. |
| 10:43AM | 8 | Q     Okay.  And then you switched location for some reason? |
| 10:43AM | 9 | A     Yeah. |
| 10:43AM | 10 | Q     All right. |
| 10:43AM | 11 | A     Found a better location, I guess. |
| 10:43AM | 12 | Q     Let me have you look at 1-023. |
| 10:43AM | 13 | MR. INCIONG:  I believe that has been previously |
| 10:43AM | 14 | admitted. |
| 10:43AM | 15 | THE COURT:  Yes, it has. |
| 10:43AM | 16 | MR. INCIONG:  I'm sorry, 1-023.  I'm sorry.  I'm |
| 10:43AM | 17 | sorry.  Let me say this one more time.  1-023. |
| 10:43AM | 18 | There we go.  Thank you.  1-1023. |
| 10:43AM | 19 | THE COURT:  Yes.  1-1023 has been admitted. |
| 10:43AM | 20 | (Exhibit 1-1023 was received in evidence.) |
| 10:43AM | 21 | MR. INCIONG:  I'll say this the most confusing way I |
| 10:43AM | 22 | can. |
| 10:43AM | 23 | BY MR. INCIONG: |
| 10:43AM | 24 | Q     So do you recognize what's shown in that picture? |
| 10:43AM | 25 | A     Yes. |

10:43AM   1   Q   How do you recognize that?

10:43AM   2   A   That's where we -- that's where we used to hang out right

10:43AM   3   here.

10:43AM   4   Q   Okay.

10:43AM   5   A   Right -- right in this area.

10:43AM   6   Q   And this is the second location that you moved to later

10:43AM   7   on?

10:43AM   8   A   Yeah.

10:43AM   9   Q   Okay.  And that was the normal meeting spot?

10:44AM   10  A   Yes.

10:44AM   11  Q   Now, you mentioned that you would ride jet skis when you

10:44AM   12  went there; is that correct?

10:44AM   13  A   Yes.

10:44AM   14  Q   Did Mr. Miske have a special fondness for jet skis?

10:44AM   15  A   Yes.

10:44AM   16  Q   Would you ride jet skis with Mr. Miske?

10:44AM   17  A   Yes.

10:44AM   18  Q   Was it just for fun or were there other purposes of riding

10:44AM   19  the jet skis?

10:44AM   20  A   Most of the times it was just was for fun, you know, but

10:44AM   21  sometimes like if we would talk, he would -- we would go out

10:44AM   22  somewhere.  We would go to the sandbar, just let the skis float

10:44AM   23  right there, put the -- put the life jackets on like that, and

10:44AM   24  just kick back over there and talk about whatever, whatever we

10:44AM   25  was talking about.  Yeah.

| | | |
|---|---|---|
| 10:44AM | 1 | Q    Were you just talking about casual things or was there -- |
| 10:44AM | 2 | A    Yeah, we was doing that.  We was never talking casual, you |
| 10:44AM | 3 | know.  We not talking about what we can get from Zippy's that |
| 10:45AM | 4 | night. |
| 10:45AM | 5 | Q    Okay.  So you mentioned the life vests.  What were you |
| 10:45AM | 6 | trying to -- I didn't understand what you were saying about the |
| 10:45AM | 7 | life vests. |
| 10:45AM | 8 | A    Yeah, well, he would always -- if we talking about what -- |
| 10:45AM | 9 | if we talking about something we don't want nobody to hear, he |
| 10:45AM | 10 | would always like, Hey, I don't know who -- the skis, I don't |
| 10:45AM | 11 | know what they doing.  I not by them all day.  And the life |
| 10:45AM | 12 | jackets, take them off.  He don't know if they get devices for |
| 10:45AM | 13 | listen to him or whatnot, you know.  But he would make me take |
| 10:45AM | 14 | off the life jacket.  He would take off his, put 'em on the |
| 10:45AM | 15 | skis, and get one sandbar over there that we used to just kick |
| 10:45AM | 16 | back over there and talking.  And the skis used to be like a |
| 10:45AM | 17 | little bit away from us. |
| 10:45AM | 18 | Q    So just the two of you are speaking at that point with |
| 10:45AM | 19 | nobody else around? |
| 10:45AM | 20 | A    No. |
| 10:45AM | 21 |        MR. INCIONG:  Can I show the witness Exhibit 1-856? |
| 10:45AM | 22 |        This is actually a video.  If we could just show the |
| 10:46AM | 23 | still frame without playing it, just to make sure the -- the |
| 10:46AM | 24 | witness recognizes it first. |
| 10:46AM | 25 |        1-856. |

10:46AM   1   BY MR. INCIONG:

10:46AM   2   Q    Mr. Miller, prior to coming to court today, did you have a

10:47AM   3   chance to view this video?

10:47AM   4   A    Yes.

10:47AM   5   Q    Did you recognize that?

10:47AM   6   A    Yes.

10:47AM   7   Q    Did you recognize who was depicted in the video?

10:47AM   8   A    Yes.

10:47AM   9   Q    Did you recognize where that is -- that video is shown?

10:47AM  10   A    Yes.

10:47AM  11   Q    Is this the -- the area generally that you were just

10:47AM  12   describing?

10:47AM  13   A    Yes.  That out in the -- that right there is out in the

10:47AM  14   bay, though.

10:47AM  15   Q    But this is the same bay that you were talking about where

10:47AM  16   you would meet and jet ski regularly and meet with Mr. Miske?

10:47AM  17   A    Yes.

10:47AM  18        MR. INCIONG:  Your Honor, I would move to admit 1-856.

10:47AM  19        MR. KENNEDY:  No objection, Your Honor.

10:47AM  20        THE COURT:  Without objection, 1-856 is admitted, and

10:47AM  21   you may play the video.

10:47AM  22        (Exhibit 1-856 was received in evidence.)

10:47AM  23        MR. INCIONG:  Thank you, Your Honor.

10:47AM  24        (Video was played for the jury.)

10:47AM  25   BY MR. INCIONG:

10:48AM   1   Q     Okay.  Mr. Miller, there was no volume there, but without

10:49AM   2   the volume, I can still ask you what I -- what I want to.

10:49AM   3            First of all, who did you recognize in that video?

10:49AM   4   A     That's me and -- me and my son's mom.

10:49AM   5   Q     Whose jet skis were you riding?

10:49AM   6   A     Miske's.

10:49AM   7   Q     There was another jet ski where you couldn't see the --

10:49AM   8   the driver that was in the picture too.  Was that Mr. Miske's

10:49AM   9   jet ski as well?

10:49AM  10   A     Yes.

10:49AM  11   Q     This area that you were jet skiing, is that in Maunalua

10:49AM  12   Bay?

10:49AM  13   A     Yes.

10:49AM  14   Q     And is this the meeting place where you would meet

10:49AM  15   regularly for both socially and to meet with Mr. Miske?

10:49AM  16   A     Yes.

10:49AM  17            MR. INCIONG:  Okay.  So we could take that down.

10:49AM  18   Thank you.

10:49AM  19   BY MR. INCIONG:

10:49AM  20   Q     Mr. Miller, you indicated that now kind of in the

10:49AM  21   chronology we were going, you were released from the halfway

10:49AM  22   house, you were living in the apartment in Pearl City.  This

10:49AM  23   was early 2014, correct?

10:50AM  24   A     Yes.

10:50AM  25   Q     You were attempting to get your commercial driver's

| | | |
|---|---|---|
| 10:50AM | 1 | license to work for the Teamsters, correct? |
| 10:50AM | 2 | A     Yes. |
| 10:50AM | 3 | Q     While you were waiting for that process, what were you |
| 10:50AM | 4 | doing?  If you weren't working, how were you spending your |
| 10:50AM | 5 | time? |
| 10:50AM | 6 | A     During that time I started -- I started selling drugs.  I |
| 10:50AM | 7 | started selling... |
| 10:50AM | 8 | Q     How did that come about? |
| 10:50AM | 9 | A     I was talking with one of my -- me and my friends, my |
| 10:50AM | 10 | childhood friends that I grew up with, it was Ali'i, Mike B., |
| 10:50AM | 11 | they was already doing 'em already, you know.  And I was in the |
| 10:50AM | 12 | process where I never had nothing going on, so I started -- I |
| 10:50AM | 13 | started selling drugs during that time. |
| 10:50AM | 14 | Q     What drugs are we talking about? |
| 10:50AM | 15 | A     Ice and -- and coke. |
| 10:50AM | 16 | Q     Mike B.'s full name is what? |
| 10:50AM | 17 | A     Buntenbah. |
| 10:50AM | 18 | Q     Ali'i's full name is what? |
| 10:51AM | 19 | A     Kaanoi. |
| 10:51AM | 20 | Q     What is his first name? |
| 10:51AM | 21 | A     Ali'i -- or Justin. |
| 10:51AM | 22 | Q     All right.  So what types of amounts were you selling? |
| 10:51AM | 23 | A     I was selling large amounts.  I was selling -- I was |
| 10:51AM | 24 | getting -- I was getting large amounts of ice and -- and coke. |
| 10:51AM | 25 | Q     So are you talking pound quantities? |

10:51AM    1    A    Yes.

10:51AM    2    Q    All right.  When you were in prison serving your bank

10:51AM    3    robbery and your gun sentence, did you make contacts for people

10:51AM    4    there that had drug -- drug network contacts?

10:51AM    5    A    Yes.

10:51AM    6    Q    Did you stay in touch with any of those people?

10:51AM    7    A    Yes.

10:51AM    8    Q    After you started selling drugs in 2014, did you reach out

10:51AM    9    to any of those people?

10:51AM   10    A    Yeah, so -- so 2014 was -- was when I started.  I started

10:51AM   11    with them was like had one period in that time, it was like

10:51AM   12    hard to get.  So Mike B. at the time was -- I was giving

10:52AM   13    Mike B. like large amounts, and he would get -- he would get

10:52AM   14    rid of 'em like that, you know, that day, and he would tell

10:52AM   15    me -- he would tell me, Man, there's a drought right now of

10:52AM   16    drugs, of coke.  And he was, If -- if we could get more, I

10:52AM   17    could sell hundred right now just like that, a hundred kilos,

10:52AM   18    he would say.  You know, so --

10:52AM   19    Q    So this is cocaine you're referring to specifically?

10:52AM   20    A    Cocaine I'm referring to.

10:52AM   21    Q    Okay.

10:52AM   22    A    We were selling ice too, but -- but more of the cocaine

10:52AM   23    was in demand at that time.

10:52AM   24    Q    Okay.

10:52AM   25    A    So -- yeah, so me and Mike B., Michael Buntenbah, we're

10:52AM  1   talking and I'm telling him, Hey, I get some -- I got some
10:52AM  2   connections that -- that I can get some contacts up there that
10:52AM  3   I was -- that I can contact and maybe we can try get something
10:52AM  4   going.  Because the -- the money amount was like -- for what
10:53AM  5   was going up there and what was going down here was like a lot.
10:53AM  6   Q     Okay.  Let me just make sure we understand.  So you're
10:53AM  7   talking -- when you say "the money up there and the money down
10:53AM  8   here," you're talk about the price for cocaine --
10:53AM  9   A     Yes.
10:53AM  10  Q     -- up there is where?
10:53AM  11  A     Yes, up there in LA, in California, on the mainland.
10:53AM  12  Q     And then the price here in Hawaii was much more?
10:53AM  13  A     Much more than that, yeah.
10:53AM  14  Q     So you could make a big profit --
10:53AM  15  A     Yeah.
10:53AM  16  Q     -- if you bought it in LA and brought it back to Hawaii?
10:53AM  17  A     Yes.
10:53AM  18  Q     Okay.  So when you say you were trying to set something
10:53AM  19  up, what do you mean -- what do you mean by that?  Is this a
10:53AM  20  one-time thing you're trying to do or --
10:53AM  21  A     No, I trying to -- I get -- I had the thing going with
10:53AM  22  Mike B., with Ali'i, with -- with Sammy and with Dusky Boy.
10:53AM  23  You know, we was kind of doing our own thing.  And all of them
10:53AM  24  wanted to -- Sammy wanted to grab -- Sammy like to grab like
10:53AM  25  over ten keys.  Dusky Boy, same thing.  Mike B. could sell --

| | | |
|---|---|---|
| 10:54AM | 1 | as he told me before, if we had hundred keys, he could sell 'em |
| 10:54AM | 2 | like that, one week. |
| 10:54AM | 3 | And, yeah, so I started reaching out -- I started |
| 10:54AM | 4 | reaching out to -- to guys up there in California. |
| 10:54AM | 5 | Q    Okay.  Did you make contact with any of those people? |
| 10:54AM | 6 | A    Yes. |
| 10:54AM | 7 | Q    Okay.  Before we go forward and have you tell what |
| 10:54AM | 8 | happened next, I want to show you a few photos first of some of |
| 10:54AM | 9 | the people that you mentioned that are -- that are involved |
| 10:54AM | 10 | here. |
| 10:54AM | 11 | MR. INCIONG:  So could we show Mr. Miller Exhibit 1-44 |
| 10:54AM | 12 | at this time, please? |
| 10:54AM | 13 | THE COURT:  Yes. |
| 10:54AM | 14 | BY MR. INCIONG: |
| 10:54AM | 15 | Q    Do you see that photo, Mr. Miller? |
| 10:54AM | 16 | A    Yes. |
| 10:54AM | 17 | Q    Do you recognize who that is? |
| 10:54AM | 18 | A    Yes. |
| 10:54AM | 19 | Q    Who is that? |
| 10:54AM | 20 | A    Mike Buntenbah. |
| 10:54AM | 21 | Q    Does that show how Mr. Buntenbah appears -- or appeared |
| 10:54AM | 22 | when you last saw him? |
| 10:54AM | 23 | A    Yes.  He had a beard, but -- |
| 10:54AM | 24 | Q    Other than that, that looks like him? |
| 10:54AM | 25 | A    Yes. |

10:54AM   1              MR. INCIONG:  Your Honor, I would move to admit
10:55AM   2   Exhibit 1-44.
10:55AM   3              THE COURT:  Any objection?
10:55AM   4              MR. KENNEDY:  No objection.
10:55AM   5              THE COURT:  Without objection, 1-44 is admitted.  You
10:55AM   6   may publish.
10:55AM   7                  (Exhibit 1-44 was received in evidence.)
10:55AM   8              MR. INCIONG:  Thank you, Your Honor.
10:55AM   9              And, Your Honor, may I utilize the face board as
10:55AM  10   well --
10:55AM  11              THE COURT:  Yes.
10:55AM  12              MR. INCIONG:  -- for the first time?
10:55AM  13              THE COURT:  Yes.
10:55AM  14              MR. INCIONG:  Thank you.
10:55AM  15   BY MR. INCIONG:
10:55AM  16   Q    So while we are doing that, Mr. Miller, if I could have
10:55AM  17   you look next at Exhibit 1-1079.
10:55AM  18              THE COURT:  The face board may be used only with
10:55AM  19   admitted exhibits and only after giving defense counsel an
10:55AM  20   opportunity to object if they wish.
10:55AM  21              MR. INCIONG:  Yes, Your Honor.
10:55AM  22   BY MR. INCIONG:
10:55AM  23   Q    Do you recognize the exhibit in 1-1079?
10:55AM  24   A    Yes.
10:55AM  25   Q    Who do you -- or how do you know that person?

| | | |
|---|---|---|
| 10:55AM | 1 | A    That's my friend Ali'i. |
| 10:55AM | 2 | Q    Does that photo accurately show who you know as Ali'i who |
| 10:55AM | 3 | is Justin Wilcox? |
| 10:55AM | 4 | A    Yes. |
| 10:56AM | 5 |         MR. INCIONG:  Your Honor, I would move to admit |
| 10:56AM | 6 | 1-1079. |
| 10:56AM | 7 |         THE COURT:  Any objection? |
| 10:56AM | 8 |         MR. KENNEDY:  As soon as I flip to it. |
| 10:56AM | 9 |         MR. INCIONG:  It's on the first supplemental exhibit |
| 10:56AM | 10 | list -- |
| 10:56AM | 11 |         MR. KENNEDY:  I will write it in. |
| 10:56AM | 12 |         MR. INCIONG:  -- 1-1079. |
| 10:56AM | 13 |         MR. KENNEDY:  No objection, Your Honor. |
| 10:56AM | 14 |         THE COURT:  Without objection, 1-1079 is admitted. |
| 10:56AM | 15 | You may publish. |
| 10:56AM | 16 |         (Exhibit 1-1079 was received in evidence.) |
| 10:56AM | 17 |         MR. INCIONG:  And may I place that on the face board |
| 10:56AM | 18 | as well? |
| 10:56AM | 19 |         THE COURT, yes you may. |
| 10:56AM | 20 | BY MR. INCIONG: |
| 10:56AM | 21 | Q    Okay.  Mr. Miller, let me have you look next at |
| 10:56AM | 22 | Exhibit 1-1080. |
| 10:56AM | 23 |         THE COURT:  Just for the record too, because I'm |
| 10:56AM | 24 | looking at the Realtime, the admitted exhibit is 1-1079. |
| 10:56AM | 25 |         MR. INCIONG:  Yes.  Thank you. |

| | | |
|---|---|---|
| 10:56AM | 1 | BY MR. INCIONG: |
| 10:56AM | 2 | Q    Mr. Miller, do you recognize what's shown in |
| 10:56AM | 3 | Exhibit 1-1080 or recognize the person? |
| 10:56AM | 4 | A    Yes. |
| 10:56AM | 5 | Q    How do you recognize that person? |
| 10:56AM | 6 | A    I know him, it's Sammy.  Sammy Kuuana. |
| 10:56AM | 7 | Q    Is this a photo of the Sammy Kuuana that you just |
| 10:57AM | 8 | referenced in your testimony? |
| 10:57AM | 9 | A    Yes. |
| 10:57AM | 10 | MR. INCIONG:  Your Honor, I would move to admit |
| 10:57AM | 11 | Exhibit 1-1080. |
| 10:57AM | 12 | THE COURT:  Mr. Kennedy, any objection? |
| 10:57AM | 13 | MR. KENNEDY:  No objection, Your Honor. |
| 10:57AM | 14 | THE COURT:  Without objection, 1-1080 is admitted. |
| 10:57AM | 15 | You may publish. |
| 10:57AM | 16 | (Exhibit 1-1080 was received in evidence.) |
| 10:57AM | 17 | MR. INCIONG:  May I public that, Your Honor, and -- |
| 10:57AM | 18 | THE COURT:  Yes. |
| 10:57AM | 19 | MR. INCIONG:  -- place that on the face board as well? |
| 10:57AM | 20 | THE COURT:  Yes. |
| 10:57AM | 21 | BY MR. INCIONG: |
| 10:57AM | 22 | Q    Lastly, Mr. Miller, please look at Exhibit 1-1081. |
| 10:57AM | 23 | Do you recognize who's shown in that picture? |
| 10:57AM | 24 | A    Yes. |
| 10:57AM | 25 | Q    How do you recognize that person? |

| | | | |
|---|---|---|---|
| 10:57AM | 1 | A | I know, that's my friend Dusky Boy. |
| 10:57AM | 2 | Q | And what is Dusky's full name? |
| 10:57AM | 3 | A | Dusky Toledo. |
| 10:57AM | 4 | Q | Does that picture accurately show Mr. Toledo? |
| 10:57AM | 5 | A | Yes. |

10:57AM   6         MR. INCIONG:  Your Honor, I would move to admit

10:57AM   7   Exhibit 1-1081.

10:58AM   8         THE COURT:  Any objection?

10:58AM   9         MR. KENNEDY:  No objection, Your Honor.

10:58AM  10         THE COURT:  Without objection, 1-1081 is admitted.

10:58AM  11   You may publish.

10:58AM  12         (Exhibit 1-1081 was received in evidence.)

10:58AM  13         MR. INCIONG:  May I publish that?  Thank you.

10:58AM  14         THE COURT:  Yes.

10:58AM  15   BY MR. INCIONG:

10:58AM  16   Q   So, Mr. Miller, these are the -- and we'll get all of the

10:58AM  17   pictures up in a second here, but these are the individuals

10:58AM  18   that you were speaking with regarding setting up this cocaine

10:58AM  19   network?

10:58AM  20   A   Yes.

10:58AM  21   Q   So when you made contact with the -- the individuals that

10:58AM  22   you had originally knew from your prison sentence, what sort of

10:58AM  23   meetings, if any, did you have with them?

10:58AM  24   A   Well, at first we started -- we started talking, you know,

10:58AM  25   just -- just small talk, and then towards the -- as it

| | | |
|---|---|---|
| 10:58AM | 1 | progressed, the guys that I ended up doing 'em with, couple of |
| 10:58AM | 2 | guys that -- couple guys got sent down, you know.  Like they |
| 10:59AM | 3 | got sent down for talk to me.  We would talk about -- we was |
| 10:59AM | 4 | talking about prices because the prices was -- was going up and |
| 10:59AM | 5 | down, and we was talking about quantities, you know. |
| 10:59AM | 6 | So -- they came down here, I was talking to them, and |
| 10:59AM | 7 | they told me they going report back to -- to their guys in |
| 10:59AM | 8 | the -- in the mainland and California. |
| 10:59AM | 9 | Q    Okay.  So some of these individuals actually came to |
| 10:59AM | 10 | Hawaii to meet with you in person. |
| 10:59AM | 11 | A    Yes.  Two of them. |
| 10:59AM | 12 | Q    Two people, okay.  And who -- was there anyone else |
| 10:59AM | 13 | present besides you and these -- these two people from |
| 10:59AM | 14 | California -- |
| 10:59AM | 15 | A    No. |
| 10:59AM | 16 | Q    -- at the meetings? |
| 10:59AM | 17 | A    No. |
| 10:59AM | 18 | Q    Okay?  So what was decided, if anything, at the -- at |
| 10:59AM | 19 | these meetings? |
| 10:59AM | 20 | A    I was telling them how much -- how much I can do, how |
| 10:59AM | 21 | much -- how much we wanted to do, and they was telling me |
| 10:59AM | 22 | that -- that they got told, Hey, we can get 'em to anywhere, |
| 11:00AM | 23 | just not Hawaii.  You know, like they could get 'em to anywhere |
| 11:00AM | 24 | in the mainland, any -- any states up there, just not Hawaii. |
| 11:00AM | 25 | So at that point I went back to Mike B., and I told |

11:00AM   1   Mike B. -- we was talking about 'em, and Mike B. told me that,

11:00AM   2   Hey, I can get 'em -- I get one way that I can get 'em back.

11:00AM   3   We just got to shoot 'em up to California.  You know, they went

11:00AM   4   back already.  Me and Mike B. was talking, Mike B. tells me,

11:00AM   5   Hey, get one way I can get 'em back, we can shoot 'em up to

11:00AM   6   California.

11:00AM   7   Q    Okay.

11:00AM   8   A    So -- go ahead.

11:00AM   9   Q    All right.  So that was the -- the transportation part was

11:00AM   10  one issue?

11:00AM   11  A    Yes.

11:00AM   12  Q    So did you discuss with Mike B. exactly how you were going

11:00AM   13  to get it back from California?

11:00AM   14  A    Yes.  Yes.

11:00AM   15  Q    So tell us about that.

11:00AM   16  A    So he told me all we got to do is get 'em up to -- get 'em

11:00AM   17  up to San Francisco, and he had -- he had a TSA agent up there

11:01AM   18  or he knew somebody who had a TSA agent -- I don't know the

11:01AM   19  details, that was his part of 'em -- that could actually get

11:01AM   20  'em back for us.

11:01AM   21  Q    Okay.  So where was the -- the meeting going to take place

11:01AM   22  to actually obtain the drugs?  What city?

11:01AM   23  A    In LA.

11:01AM   24  Q    All right.  How were you going to get the drugs from LA to

11:01AM   25  San Francisco?

| | | |
|---|---|---|
| 11:01AM | 1 | A    I was -- we was going to drive 'em up there.  They was |
| 11:01AM | 2 | going to take care of that part. |
| 11:01AM | 3 | Q    Who is "they"? |
| 11:01AM | 4 | A    The Mexicans, they had that part all down like they had |
| 11:01AM | 5 | compartments inside cars.  They had -- they had houses where |
| 11:01AM | 6 | they could keep these cars to put the drugs inside. |
| 11:01AM | 7 | Q    So where did things stand then when -- after you met with |
| 11:01AM | 8 | the individuals from California when they went back, what was |
| 11:01AM | 9 | the agreement at that point? |
| 11:01AM | 10 | A    Well, it wasn't really set yet because -- because the |
| 11:01AM | 11 | transportation issue, you know. |
| 11:01AM | 12 | Q    Okay. |
| 11:01AM | 13 | A    So I started telling them like, Hey, we was just going to |
| 11:01AM | 14 | come up there already.  I just wanted to -- at that point |
| 11:02AM | 15 | Mike B. was -- like he was, Hey, we got a do this now, Bro, |
| 11:02AM | 16 | and -- because the price is expensive at that time for coke. |
| 11:02AM | 17 | So I was relaying back to them, I was telling them, |
| 11:02AM | 18 | Hey, we going come up there, you know.  We going to come up |
| 11:02AM | 19 | there, we just going get to we can going to break the ice, and |
| 11:02AM | 20 | we going come up there this time and we get the -- we get one |
| 11:02AM | 21 | way for bring 'em back already. |
| 11:02AM | 22 | Q    Was there a quantity of cocaine that you told them you |
| 11:02AM | 23 | wanted to purchase on this first -- first time? |
| 11:02AM | 24 | A    The quantity wasn't really set yet, but was -- was at |
| 11:02AM | 25 | least 10 -- at least 10 -- was going to be at least 10 kilos. |

| | | |
|---|---|---|
| 11:02AM | 1 | Q    How much were 10 kilos going to cost you? |
| 11:02AM | 2 | A    I forget -- I forget the price now.  I forget the -- the |
| 11:02AM | 3 | price.  Well, the actual agreement that was -- that was made. |
| 11:02AM | 4 | A couple hundred -- it was in the hundreds of thousands, |
| 11:02AM | 5 | though. |
| 11:02AM | 6 | Q    So who was going to be the source of the money to buy the |
| 11:03AM | 7 | drugs? |
| 11:03AM | 8 | A    Okay.  So -- so going back now, I'm setting this all up |
| 11:03AM | 9 | with -- with Sammy, with Dusky Boy, with Mike B.  So in the |
| 11:03AM | 10 | midst of it, I'm -- I'm still down here selling drugs with all |
| 11:03AM | 11 | of these guys.  And I'm -- the initial money was supposed to |
| 11:03AM | 12 | come from them.  You know, Sammy wanted to be a part of it, |
| 11:03AM | 13 | Mike B. had some money, Dusky Boy had some money. |
| 11:03AM | 14 | While I'm selling drugs, I stopped at Miske's -- the |
| 11:03AM | 15 | shop, and I told him, I say, Hey, Bro, I never have some money |
| 11:03AM | 16 | on me.  And at that time was either -- I think it was Ali'i, I |
| 11:03AM | 17 | had to give Ali'i some money.  I told Mike, Hey, just let me |
| 11:04AM | 18 | borrow some money, I need like ten grand or something.  I'm not |
| 11:04AM | 19 | sure of the amount. |
| 11:04AM | 20 | And I grab 'em from him, took 'em to Ali'i, and like |
| 11:04AM | 21 | the next day I came back and gave him his money back.  And at |
| 11:04AM | 22 | that point he asked me, What the -- what you doing?  And I look |
| 11:04AM | 23 | at him, because I never know he was -- he was interested.  So I |
| 11:04AM | 24 | told him the plan, I told him, Hey, this is what was -- this is |
| 11:04AM | 25 | what was going on.  This is who I doing 'em with. |

11:04AM   1               And then he was like -- he look at me, he was like,
11:04AM   2    Why you doing it with 30?  You know, he called -- Sammy, he
11:04AM   3    called him 30.  Everybody we call him 30, but from back in when
11:04AM   4    we was younger.
11:04AM   5    Q    This is Sam Kuuana?
11:04AM   6    A    Yes.  This is Sam Kuuana.  So -- so Miske is telling me
11:04AM   7    that at that point.  And then I look at him, and I ask him, I
11:05AM   8    say, Why?  What -- you like do 'em?  He said, Yeah.  Fucking,
11:05AM   9    we go do 'em.
11:05AM   10              I was telling him about the numbers and stuff like
11:05AM   11   that.  'eh, we can get it at this price.  I think it was almost
11:05AM   12   like -- I was just giving you a number, if we buying 'em for 30
11:05AM   13   grand in LA, the price in Hawaii was in the 60s and 70s, you
11:05AM   14   know, and you had to have the cash for 'em right away.  It
11:05AM   15   wasn't handed to you and bring it back a week later.  And
11:05AM   16   that's what Mike B. was for.
11:05AM   17              So after breaking down the numbers to him, he
11:05AM   18   wanted -- he wanted to do 'em.  You know, he said, Man, this
11:05AM   19   fucking -- this fucking Lumahai is just sucking up all my cash,
11:05AM   20   you know.  And I said -- I said, Hey, whatever, but I need --
11:05AM   21   this thing was already rolling when Miske got involved.  You
11:05AM   22   know, I was already planning for do 'em with these other
11:05AM   23   people.  So when he got involved, I told him, I said, Hey, I
11:06AM   24   gotta go already.  They -- they're already waiting for us up
11:06AM   25   there.  Me and Mike B. was planning on going and everything

| | | |
|---|---|---|
| 11:06AM | 1 | like that.  So -- |
| 11:06AM | 2 | Q    Let me interrupt you right there.  I apologize.  Let me |
| 11:06AM | 3 | just ask a few follow-up questions before we get too far along. |
| 11:06AM | 4 | So you said that you had asked Mr. Miske to borrow |
| 11:06AM | 5 | some money initially. |
| 11:06AM | 6 | A    Yes. |
| 11:06AM | 7 | Q    And do you recall where you went and got the money from |
| 11:06AM | 8 | him? |
| 11:06AM | 9 | A    Oh, from his office.  We was in his office, yeah. |
| 11:06AM | 10 | Q    From that same drawer that you referenced earlier? |
| 11:06AM | 11 | A    Yes. |
| 11:06AM | 12 | Q    And then you were able to pay him back, like was it the |
| 11:06AM | 13 | next day, you said? |
| 11:06AM | 14 | A    I brought it back -- the next time I seen him, already I |
| 11:06AM | 15 | just -- I had the money.  I just never have 'em in my pocket |
| 11:06AM | 16 | that day, and -- and I had to give 'em -- I had to give 'em to |
| 11:06AM | 17 | Ali'i. |
| 11:06AM | 18 | Q    So is that what caught his attention, the fact that you |
| 11:06AM | 19 | repaid him so quickly? |
| 11:06AM | 20 | A    Yes. |
| 11:06AM | 21 | Q    And what's what -- how this whole conversation started? |
| 11:06AM | 22 | A    Yeah, that's how the -- how the -- because I had just -- I |
| 11:06AM | 23 | had just gotten out of prison, you know, so -- so he was -- and |
| 11:06AM | 24 | I was -- we was together every day, but I wasn't -- I wasn't |
| 11:07AM | 25 | talking to him about 'em at that point.  That was the initial |

11:07AM    1    conversation that we had when -- when I gave him back that

11:07AM    2    money, he was like, Hey, what you -- what you up to, boy?

11:07AM    3            And that's when I broke down what I was doing, what I

11:07AM    4    was planning to do, and that's when -- what's when he told me

11:07AM    5    tell, Why the fuck you doing it with -- with 30?  And then

11:07AM    6    that's when -- that initial point right there is when he wanted

11:07AM    7    to be involved, you know.  And he told me he wanted to -- he

11:07AM    8    wanted to do more, but just for break the ice, he wanted to do

11:07AM    9    'em over and over.  You know what I mean, like he wanted to

11:07AM    10   leave his money in there and just give him his cut from what I

11:07AM    11   was -- from what I was making every -- every time that we did

11:07AM    12   'em.

11:07AM    13   Q    So were you looking to do it as a long-term thing as well?

11:07AM    14   A    Yes.

11:07AM    15   Q    Okay.  Did Mr. Miske indicate that at least part of the

11:07AM    16   reason for this was the -- the money he needed to build the

11:07AM    17   house?

11:07AM    18   A    Yeah, the -- the only thing he told me about that, he told

11:08AM    19   me -- he used to tell me this all the time, but he told me that

11:08AM    20   the Lumahai was just -- was just sucking up all his -- all his

11:08AM    21   cash.  The cement, the -- he was telling me like that.

11:08AM    22   Q    Okay.  So once Mr. Miske showed that he was interested and

11:08AM    23   wanted to be a partner in this, I guess, did that affect

11:08AM    24   anybody else that you had talked to originally?

11:08AM    25   A    Yeah, well, I never -- because this thing was moving, I

11:08AM   1   was just telling them be ready, but when -- when he wanted

11:08AM   2   to -- to come, I like -- I even -- I never reach out to them

11:08AM   3   after that.  I just -- he had the money.

11:08AM   4          I think that night after I wen' talk to him,

11:08AM   5   immediately I told him I said, Hey, I need the -- I need the

11:08AM   6   scripts right now because this thing -- it's already rolling,

11:08AM   7   so I need the scripts right now.  And he was like, Hey, meet me

11:08AM   8   over here in Kailua on this -- on this street, wherever it was

11:08AM   9   in Keolu, at this time 7:00 at night.

11:09AM   10   Q    Okay.  Let me stop -- let me stop you right there for a

11:09AM   11   second.  So when you say "scripts," what do you mean by

11:09AM   12   "scripts"?

11:09AM   13   A    Money.  That's what we used to call money.

11:09AM   14   Q    All right.  So you said you didn't even -- you didn't tell

11:09AM   15   the other -- I think you said "them."  Who did you mean you

11:09AM   16   didn't tell once Mr. Miske was going to give you money?

11:09AM   17   A    I never went back to Sammy and them, you know.

11:09AM   18   Q    Was Michael Buntenbah still involved?

11:09AM   19   A    Yes.

11:09AM   20   Q    Was Dusky Toledo still involved?

11:09AM   21   A    No, I never go back to them -- when I talking about I

11:09AM   22   never go back to -- Mike B. wasn't the one of the guys that was

11:09AM   23   going to give me the money.

11:09AM   24   Q    Okay.

11:09AM   25   A    It was Sammy and Dusky Boy that was going to do this.

11:09AM    1    Q    Okay.  So those are the two you were referring to saying

11:09AM    2    you didn't go back to them.

11:09AM    3    A    Yes.

11:09AM    4    Q    Because Mr. Miske was effectively taking their place as

11:09AM    5    far as providing the money?

11:09AM    6    A    Yes.

11:09AM    7    Q    Did you have any of your own money that you were putting

11:09AM    8    into this?

11:09AM    9    A    Yes.

11:09AM   10    Q    So I think you were about to tell us about how you got the

11:09AM   11    money from Mr. Miske.  So you described he asked you to meet in

11:10AM   12    Kailua?

11:10AM   13    A    Yeah, so -- so I was leaving already at this point.  They

11:10AM   14    was waiting for us.  Mike B. had his connection in San

11:10AM   15    Francisco who was also waiting for us.  And even -- so when

11:10AM   16    Mike B., when we was talking, even his connect in San Francisco

11:10AM   17    was telling Mike like -- like, hey, they couldn't even get coke

11:10AM   18    up there in San Francisco, you know, so he was kind of

11:10AM   19    surprised that when Mike B. was telling them we coming up there

11:10AM   20    and we're going to use your whatever it was.

11:10AM   21         But, yeah, anyways, back to that -- after the

11:10AM   22    conversation with Miske, I'm telling him, hey, I'm leaving in

11:10AM   23    the next few days.  And if you like go, we need to go get the

11:10AM   24    scripts.  So he told me meet me in Kailua that night at this

11:10AM   25    time.  He was also precise when we meeting.  But anyways, later

11:10AM   1   on that night I go to where he told me for go, and I see him

11:11AM   2   pull up in a white Lexus.  So he pull up by me in a white Lexus

11:11AM   3   in Keolu Hills in that -- so Keolu Hills is a little bluff area

11:11AM   4   in Kailua in the town, a lot of windy roads and stuff like

11:11AM   5   that, residential area.

11:11AM   6        So he pulled up next to me.  We following each other,

11:11AM   7   he's driving through these windy hills, pull over on the side

11:11AM   8   of the road, and I start talking to him and I tell him if I

11:11AM   9   don't leave -- if I don't tonight or tomorrow, I'll be gone

11:11AM  10   already, you know.  So he pops the -- he goes to his car, he

11:11AM  11   grabs out the money, like one bag, one box of money.  He grabs

11:11AM  12   out the money, gives it to me, and -- and from there I leave.

11:11AM  13        That night when I get back I open the bag -- I opened

11:12AM  14   the money that he gave me, and I'm looking at it and it's --

11:12AM  15   it's a lot of like wad -- like some small bills.  And when I

11:12AM  16   say small bills, like 20s and 50s, and just wadded up like -- I

11:12AM  17   don't know if you know how $20 in thousand dollars is like a

11:12AM  18   wad like that big (indicating).  You know, so he had -- it was

11:12AM  19   like a bunch of those, and I remember looking at 'em and I was

11:12AM  20   like, Fuck, how am I going to get this -- look like kind of

11:12AM  21   couple million dollars right here in smaller bills.

11:12AM  22        So I started grabbing 'em, I start smelling 'em.  It

11:12AM  23   was like old and -- and sticky, like the money was real sticky.

11:12AM  24   I rubber band it up, it was kind of sticky.  And I immediately

11:12AM  25   contact him, go back to meet him and tell him like, Hey, what's

11:13AM   1   up with all these -- all these smaller bills?  And he was

11:13AM   2   like -- he told me, he said, Hey, you told me you was -- you

11:13AM   3   told me you was leaving soon.

11:13AM   4           So this was at the Dent house.  The dent -- he had one

11:13AM   5   of his girlfriends he used to call her the Dent, she used to

11:13AM   6   work at a dentist office.  And at that time he told me, This is

11:13AM   7   all I had, this was at the Dent's house.  You know, you told me

11:13AM   8   you was leaving soon.  You never told me -- so he was like, Do

11:13AM   9   what you gotta do, like change 'em out or something, but that's

11:13AM  10   all I can -- that's all I have access to right now at the time.

11:13AM  11   Q    Okay.  Let me interrupt you right there and ask you a

11:13AM  12   couple of questions.  So what was the plan on how you were

11:13AM  13   going to get this money to Los Angeles to purchase the cocaine?

11:13AM  14   A    We was taking 'em up there ourselves, me and Mike B.

11:13AM  15   Q    How?

11:13AM  16   A    We was taking it on the plane, putting it on suitcases --

11:13AM  17   I was getting to that, we was putting it in suitcases and --

11:13AM  18   and taking 'em up.

11:13AM  19   Q    Okay.  In the check baggage or carry-on?

11:13AM  20   A    No, carry-on.

11:13AM  21   Q    So why was it important whether the bills were small or

11:14AM  22   large?

11:14AM  23   A    We was carry one carry-on, and we was stuffing the bills.

11:14AM  24   We wasn't -- like had clothes right here in the suitcase, and

11:14AM  25   then the bills was going stacked up all the way around like

11:14AM  1    that in the suitcase.  So if you was to stack up a bunch of

11:14AM  2    $20, $1,000 stacks that look like that, would be hard to do.

11:14AM  3    Q    So 20s would take up more space than larger bills like

11:14AM  4    100s?

11:14AM  5    A    Yes.

11:14AM  6    Q    Is that why it was important?

11:14AM  7    A    Yes.

11:14AM  8    Q    Now, let me have you look -- you described an area where

11:14AM  9    this meeting met -- where you met with Mr. Miske.  Let me have

11:14AM  10   you look at Exhibit 4-107.

11:14AM  11          MR. INCIONG:  Please, if you could slow that to

11:14AM  12   Mr. Miller.

11:14AM  13   BY MR. INCIONG:

11:14AM  14   Q    Do you recognize what's shown in that map, Mr. Miller?

11:14AM  15   A    Yes.

11:14AM  16   Q    Does this show the Keolu Hills area of Kailua that you

11:14AM  17   just described?

11:14AM  18   A    Yes.

11:14AM  19   Q    And that's where you met with Mr. Miske on this occasion

11:15AM  20   in the summer of 2014?

11:15AM  21   A    Yes.

11:15AM  22          MR. INCIONG:  Your Honor, I would move to admit

11:15AM  23   Exhibit 4-107.

11:15AM  24          THE COURT:  Mr. Kennedy, any objection?

11:15AM  25          MR. KENNEDY:  No objection.

11:15AM   1              THE COURT:  Without objection, Exhibit 4-107 is

11:15AM   2    admitted.  You may publish.

11:15AM   3              (Exhibit 4-107 was received in evidence.)

11:15AM   4              MR. INCIONG:  Thank you, Your Honor.

11:15AM   5    BY MR. INCIONG:

11:15AM   6    Q    Now, Mr. Miller, you were describing this meeting and

11:15AM   7    driving winding roads and so forth.  Is this that area?

11:15AM   8    A    Yes.

11:15AM   9    Q    Is this the area that Mr. Miske lived as well?

11:15AM  10    A    Yes.

11:15AM  11    Q    The red dot that's shown there, is that approximately

11:15AM  12    where Mr. Miske's residence was?

11:15AM  13    A    Oh, right here.  Yeah.

11:15AM  14    Q    Okay.

11:15AM  15    A    Corner lot.

11:15AM  16    Q    All right.

11:15AM  17    A    Corner lot.

11:15AM  18              MR. INCIONG:  If I could have Exhibit 4-110 shown next

11:15AM  19    to Mr. Miller.

11:15AM  20    BY MR. INCIONG:

11:15AM  21    Q    Do you recognize what's shown in that picture?

11:15AM  22    A    Yes.

11:15AM  23    Q    How do you recognize that?

11:15AM  24    A    It's the street where he lived.

11:16AM  25    Q    And when you say "he," that's Mr. Miske?

11:16AM    1    A    Mr. Miske, yeah.

11:16AM    2    Q    Does that accurately show the -- the street that he lives

11:16AM    3    on?

11:16AM    4    A    Yes.

11:16AM    5    Q    Or lived on?

11:16AM    6    A    It's the front view of his house, looking out the house.

11:16AM    7         MR. INCIONG:  Your Honor, I would move to admit

11:16AM    8    Exhibit 4-110.

11:16AM    9         THE COURT:  Mr. Kennedy?

11:16AM    10        MR. KENNEDY:  No objection.

11:16AM    11        THE COURT:  Without objection, 4-110 is admitted.  You

11:16AM    12   may publish.

11:16AM    13        (Exhibit 4-110 was received in evidence.)

11:16AM    14        MR. INCIONG:  Thank you.

11:16AM    15   BY MR. INCIONG:

11:16AM    16   Q    So this is, as you said, Mr. Miller, looking down the

11:16AM    17   street from Mr. Miske's house?

11:16AM    18   A    Yes.

11:16AM    19   Q    I'm going to show you 4-108 next, please.

11:16AM    20        Do you recognize what's shown there?

11:16AM    21   A    Yes.

11:16AM    22   Q    How do you recognize that?

11:16AM    23   A    This is his house.  This is looking at his little -- he

11:16AM    24   loved this house right here.

11:16AM    25   Q    Does that photo accurately show Mr. Miske's residence at

| | | |
|---|---|---|
| 11:16AM | 1 | that time? |
| 11:16AM | 2 | A    Yes. |
| 11:16AM | 3 | MR. INCIONG:  Your Honor, I would move to admit |
| 11:16AM | 4 | Exhibit 4-108. |
| 11:16AM | 5 | THE COURT:  Any objection? |
| 11:16AM | 6 | MR. KENNEDY:  No objection, Your Honor. |
| 11:16AM | 7 | THE COURT:  Without objection, 4-10 -- 108 -- excuse |
| 11:16AM | 8 | me, 4-108 is admitted. |
| 11:16AM | 9 | (Exhibit 4-108 was received in evidence.) |
| 11:16AM | 10 | MR. INCIONG:  Thank you, Your Honor. |
| 11:16AM | 11 | THE COURT:  You may publish. |
| 11:17AM | 12 | MR. INCIONG:  May I publish?  Thank you. |
| 11:17AM | 13 | BY MR. INCIONG: |
| 11:17AM | 14 | Q    So this is the front view of Mr. Miske's residence at that |
| 11:17AM | 15 | time? |
| 11:17AM | 16 | A    Yes. |
| 11:17AM | 17 | Q    Now, you referred to one of Mr. Miske's -- Mr. Miske's |
| 11:17AM | 18 | girlfriend at the time as Dent or the Dent? |
| 11:17AM | 19 | A    Yes. |
| 11:17AM | 20 | Q    Did you know this person's actual name? |
| 11:17AM | 21 | A    Tori Clegg. |
| 11:17AM | 22 | Q    I'm going to show you Exhibit 1-0066, please.  Or 1-66. |
| 11:17AM | 23 | Do you recognize the picture -- or the person in that |
| 11:17AM | 24 | picture? |
| 11:17AM | 25 | A    Yes. |

11:17AM   1   Q    How do you recognize that?

11:17AM   2   A    I know her, that's Tori.

11:17AM   3   Q    Does this photo accurately show Ms. Clegg as you knew her

11:17AM   4   about that time?

11:17AM   5   A    Yes.

11:17AM   6           MR. INCIONG:  Your Honor, I would move to admit

11:17AM   7   Exhibit 1-66 at this time.

11:17AM   8           THE COURT:  Any objection?

11:17AM   9           MR. KENNEDY:  No objection, Your Honor.

11:17AM  10           THE COURT:  Without objection, Exhibit 1-66 is

11:18AM  11   admitted.  You may publish.

11:18AM  12           (Exhibit 1-66 was received in evidence.)

11:18AM  13           MR. INCIONG:  Thank you, Your Honor.

11:18AM  14   BY MR. INCIONG:

11:18AM  15   Q    So you indicated a few minutes ago that Mr. Miske said he

11:18AM  16   got the money from the Dent's house.

11:18AM  17   A    Yes.

11:18AM  18   Q    Correct?

11:18AM  19           Did you know where that house was in relation to

11:18AM  20   Mr. Miske's house?

11:18AM  21   A    Right down the road.  I don't know exactly where, but --

11:18AM  22   Q    Same area?

11:18AM  23   A    Yeah, same area.  I think that's her grandma's house.

11:18AM  24   Q    Okay.  And that's where Mr. Miske indicated he had gotten

11:18AM  25   the -- the money that he gave to you that you described in the

11:18AM   1   small bills and sticky?

11:18AM   2   A    Yeah.  Well, it wasn't all small bills, but had one large

11:18AM   3   amount of small bills.

11:18AM   4   Q    Okay.

11:18AM   5   A    But had some 100s in there.

11:18AM   6   Q    Okay.  And I think you stated the type of car that

11:18AM   7   Mr. Miske had arrived in when he gave you the money in that

11:18AM   8   area.

11:18AM   9   A    Yes.  Yes.

11:18AM   10  Q    What kind of car was that?

11:18AM   11  A    A white Lexus.

11:18AM   12  Q    Had you seen that car before?

11:18AM   13  A    Yes.

11:18AM   14  Q    Did you know whose car that was?

11:18AM   15  A    That was Tori's car.

11:18AM   16  Q    Tori Clegg?

11:19AM   17  A    Or one that looked like Tori's car, but --

11:19AM   18  Q    Okay.  So what did you do, if anything, regarding the --

11:19AM   19  the money situation that was wet and -- or sticky, I should

11:19AM   20  say?

11:19AM   21  A    Yeah, so when I told him that, he was like, Yeah,

11:19AM   22  that's -- I got that from the Dent's house.  That's how -- you

11:19AM   23  rush 'em, you told me you need 'em, you got 'em.

11:19AM   24       So I went back -- at that time I was still -- I was

11:19AM   25  still talking to Sammy at that point, and Sammy already had his

| | | |
|---|---|---|
| 11:19AM | 1 | money like kind of -- kind of ready to go.  I wasn't telling |
| 11:19AM | 2 | him that I was doing 'em, but I took whatever 20s and stuff, |
| 11:19AM | 3 | small bills that I had, and I told him, I said, I gotta do |
| 11:19AM | 4 | something.  Just change this out for me.  So he changed out |
| 11:19AM | 5 | some bills.  He gave me some -- he gave me larger.  He gave me |
| 11:19AM | 6 | $100 bills for the -- for the smaller bills that I had. |
| 11:19AM | 7 | Q    No questions asked? |
| 11:19AM | 8 | A    No questions asked.  I was -- I had a good name at that |
| 11:20AM | 9 | time, you know.  I got one good name.  I was -- I wasn't known |
| 11:20AM | 10 | for doing that to people that I know. |
| 11:20AM | 11 | Q    Okay.  Mr. Miller, we've got several pictures on the face |
| 11:20AM | 12 | board here, but I want to show you one that's probably familiar |
| 11:20AM | 13 | to you that's already been in evidence. |
| 11:20AM | 14 | MR. INCIONG:  If we could show Mr. Miller |
| 11:20AM | 15 | Exhibit 1-43. |
| 11:20AM | 16 | This is in -- this has been admitted, I believe, Your |
| 11:20AM | 17 | Honor. |
| 11:20AM | 18 | THE COURT:  It has been. |
| 11:20AM | 19 | MR. INCIONG:  May I publish that to the jury? |
| 11:20AM | 20 | THE COURT:  Yes. |
| 11:20AM | 21 | BY MR. INCIONG: |
| 11:20AM | 22 | Q    Who -- who is this? |
| 11:20AM | 23 | A    That's me. |
| 11:20AM | 24 | Q    Does this photo show how you appeared around this time, |
| 11:20AM | 25 | 2014? |

11:20AM    1    A    2014, I mean I was a little more slim in 2014.

11:20AM    2    Q    Okay.  But other than that, that's a photo of you?

11:20AM    3    A    Yes.

11:20AM    4    Q    Okay.  So you switched the money out for the larger bills

11:20AM    5    from Mr. Kuuana.

11:20AM    6    A    Yes.

11:20AM    7    Q    Correct?

11:20AM    8         Does Mr. Kuuana know that you're taking that money to

11:20AM    9    LA to purchase the cocaine?

11:20AM   10    A    No. I never -- I never tell him nothing.  I just was kind

11:21AM   11    of in a rush, and I was -- I was telling him and --

11:21AM   12    Q    Did you leave for LA the next day?

11:21AM   13    A    Yes.  We -- I left fast to LA.  We -- so after that all

11:21AM   14    happened, Mike B. -- Mike B., he was getting in touch with me,

11:21AM   15    like he was trying to tell me like -- he was like, We should

11:21AM   16    ship the -- we should ship up the money.  You know, I shipped

11:21AM   17    it before.

11:21AM   18         I said, I was like, Dude, this is not -- this is not

11:21AM   19    my shit, and this is the first time we're going to do 'em with

11:21AM   20    these -- with these guys.  So I gotta go, he's -- and then he

11:21AM   21    was like, All right, let's go.  Fuck it.

11:21AM   22         So we went to his -- we went to his house soon after I

11:21AM   23    got the money -- after I changed out the bills, Mike B. was

11:21AM   24    waiting for me already.  Our tickets was booked, we was ready

11:21AM   25    to go.  I went down to Mike B.'s house, and -- and me and him

| | | |
|---|---|---|
| 11:22AM | 1 | started stuffing the money inside our carry-on suitcases.  So |
| 11:22AM | 2 | we started -- we started putting 'em in bundles like that and |
| 11:22AM | 3 | then packing 'em up against the sides of the suitcase like |
| 11:22AM | 4 | that. |
| 11:22AM | 5 | Q    How much money are we talking about? |
| 11:22AM | 6 | A    Oh, hundreds of thousands, you know.  Maybe three, maybe |
| 11:22AM | 7 | more, but it was -- I cannot remember the amount, but it was a |
| 11:22AM | 8 | lot.  It was a lot money.  I mean, enough to fit -- enough to |
| 11:22AM | 9 | fit all in the walls like that, double-stacked up like that in |
| 11:22AM | 10 | two carry-on size rolling suitcases. |
| 11:22AM | 11 | Q    This is $100 bills? |
| 11:22AM | 12 | A    Yes, $100 bills. |
| 11:22AM | 13 | Q    Why did Mike B. -- Michael Buntenbah want to ship the |
| 11:22AM | 14 | money? |
| 11:22AM | 15 | A    He never like carry 'em on.  You know, at first he was |
| 11:22AM | 16 | like, Fuck, we're going carry all this money.  And then we was |
| 11:22AM | 17 | talking back and forth, you know.  And then he was like, We |
| 11:22AM | 18 | should -- we should have shipped it.  And I was like, No, we |
| 11:23AM | 19 | gotta -- we gotta go up there, Bro.  We gotta -- I gotta meet |
| 11:23AM | 20 | 'em, take them the money.  They gotta -- everything will be |
| 11:23AM | 21 | good like that.  So he just agreed with me. |
| 11:23AM | 22 | Q    So you were not concerned about having this money |
| 11:23AM | 23 | intercepted going through security at the airport? |
| 11:23AM | 24 | A    Well, we was talking, right.  And between me and Mike B., |
| 11:23AM | 25 | we was talking and we was like, Hey, these guys is more worried |

11:23AM   1    about toothpaste and shampoo, you know, than money.  That's

11:23AM   2    what we was -- that's what we was saying.

11:23AM   3    Q    And you were confident that you weren't going to get

11:23AM   4    caught with it?

11:23AM   5    A    Yeah, like I -- like if I can recall, I remember like them

11:23AM   6    stopping people that had like, You gotta take this water out.

11:23AM   7    You know what I mean.  Like it wasn't -- we never had no --

11:23AM   8    nothing that would make them stop us, no -- no toothpaste, no

11:23AM   9    nothing in the bag, so the thing was going straight through the

11:23AM   10   belt.

11:23AM   11   Q    And so you went through, no problem.

11:23AM   12   A    Straight through, no problems.

11:23AM   13   Q    All right.  Do you recall if anybody assisted you making

11:24AM   14   your travel arrangements, your flights or hotel or anything

11:24AM   15   like that?

11:24AM   16   A    What you mean?

11:24AM   17   Q    Did you book your flights yourself or did somebody else do

11:24AM   18   that for you?

11:24AM   19   A    I can't remember.  I don't remember who did 'em.

11:24AM   20   Q    So you and Mike traveled -- Mike B. traveled on the same

11:24AM   21   flight?

11:24AM   22   A    Yeah.  We was traveled on the same flight, we were

11:24AM   23   sitting -- we were sitting next to each other.

11:24AM   24   Q    So what happens when you get to LA?

11:24AM   25   A    So we get to LA, I think it's overnight flight, whatever.

| | | |
|---|---|---|
| 11:24AM | 1 | But we land -- when we land it was in the morning, so a lot of |
| 11:24AM | 2 | traffic in LA.  The traffic was real backed up.  So the guys |
| 11:24AM | 3 | that I was in contact with was like, Hey, let's -- let's just |
| 11:24AM | 4 | wait till the traffic goes down, you know. |
| 11:24AM | 5 | So me and Mike B. went to a -- went to a hotel right |
| 11:24AM | 6 | there.  Outside of LAX they get like whole row of hotels by the |
| 11:24AM | 7 | airport.  So we call one -- we went to the hotel, checked in, |
| 11:25AM | 8 | got some rest, waited -- waited for them to contact me. |
| 11:25AM | 9 | Q    Did you get a call that they were ready to meet you? |
| 11:25AM | 10 | A    Yeah, after -- after the traffic went down, headed to |
| 11:25AM | 11 | sundown, I got the -- I got word from them that -- that it was |
| 11:25AM | 12 | ready, they were sending somebody to pick me up. |
| 11:25AM | 13 | Q    So someone came and picked you up? |
| 11:25AM | 14 | A    Yeah, someone came and picked me up. |
| 11:25AM | 15 | Q    Did you just go or did Michael Buntenbah go with you? |
| 11:25AM | 16 | A    No, Mike B. stayed at -- he stayed at the hotel.  I went |
| 11:25AM | 17 | by myself. |
| 11:25AM | 18 | Q    Why did you go by yourself? |
| 11:25AM | 19 | A    Because I was the one contacting them.  You know, Mike B. |
| 11:25AM | 20 | was -- he wasn't involved in the -- Mike B.'s part wasn't to |
| 11:25AM | 21 | get everything from them, set everything up.  I never told them |
| 11:25AM | 22 | I was bringing anybody with me, so -- |
| 11:25AM | 23 | Q    Okay. |
| 11:25AM | 24 | A    -- I never like to freak out if I just show up with one |
| 11:25AM | 25 | white guy. |

11:25AM  1    Q    Okay.  So did you know the person who came to pick you up

11:25AM  2    at the -- at the hotel?

11:25AM  3    A    Well, the person that came to pick me up was one of the

11:26AM  4    same persons that -- that flew down and talk to me about --

11:26AM  5    Q    Okay.  So you knew him from that prior trip?

11:26AM  6    A    Yeah.  Yeah, that's the only time I --

11:26AM  7    Q    So do you know that this person took you?

11:26AM  8    A    Huh?

11:26AM  9    Q    Do you know where this person took you?

11:26AM  10   A    Yeah, they took me to one house in -- they just took me to

11:26AM  11   a house.  It was a nice -- it was a nice neighborhood, but

11:26AM  12   having a gate in front of the house.  We drove -- I not

11:26AM  13   familiar with the area, but we drove to a neighborhood maybe

11:26AM  14   half an hour away or something like that.  But we drove into a

11:26AM  15   neighborhood.  The front of the house had one fence, we pulled

11:26AM  16   up on the side, and -- and got out.  I went inside -- I don't

11:26AM  17   know if he stayed out or what, but I went inside and met the --

11:26AM  18   the main guy that I was meeting and discussing how we going to

11:26AM  19   do everything after this.  You know, I went into the house --

11:26AM  20   Q    Let me interrupt you just for one second.  So when you

11:27AM  21   say, We discussed how we were going to do everything after

11:27AM  22   this, what do you mean by that?  What's "after this"?

11:27AM  23   A    Yeah, well, the plan was to -- to -- we were just breaking

11:27AM  24   ice on that one.  You know, that's why we was only there for

11:27AM  25   that or whatever they was going to get at that point.  And we

11:27AM  1    wanted to -- I wanted to keep going, and that's -- that's what

11:27AM  2    I was telling him.

11:27AM  3    Q    So was this kind of like a test run or a trial run?

11:27AM  4    A    Yeah, this was the first time, yeah.  So we was talking

11:27AM  5    about -- he was telling me, he was like, Hey, don't worry about

11:27AM  6    the -- don't worry about the transportation after this.  By the

11:27AM  7    next time we're going to have -- we're going to have everything

11:27AM  8    set up to -- to get down to Hawaii and everything like that,

11:27AM  9    you know.

11:27AM  10   Q    So you wouldn't have to worry about getting the drugs back

11:27AM  11   like you --

11:27AM  12   A    Yeah, going up to -- going up to San Francisco, and he was

11:27AM  13   telling me no worry about the -- getting 'em to San Francisco

11:27AM  14   also because we get cars, we get guys that just -- they follow

11:28AM  15   each other.  If one getting pulled over, they still get couple

11:28AM  16   cars going up to different places.

11:28AM  17   Q    So was there anyone else at this house besides you two,

11:28AM  18   you and the person that --

11:28AM  19   A    Oh, no, had more.  Had some people that was just -- that

11:28AM  20   was just there.  Like you could tell they was like Mexican gang

11:28AM  21   bangers, you know, tattoos, LA hats and stuff like that.  Yeah.

11:28AM  22   Q    Was anyone armed that you could see?

11:28AM  23   A    I seen one gun when was there, you know.  I seen one gun

11:28AM  24   when I was in the house, yeah, but I never -- I never feel -- I

11:28AM  25   wasn't -- I was kind of tripping out.  You know, I was like,

| | | |
|---|---|---|
| 11:28AM | 1 | Hey, I'm here, they could just -- they could just shoot me. |
| 11:28AM | 2 | But once I went talk to the guy and I realize like, Hey, these |
| 11:28AM | 3 | guys, they're more interested in making continuous money than |
| 11:28AM | 4 | just doing a one-time shot, you know, like they seen how |
| 11:28AM | 5 | serious keep going and everything being ready and stuff like |
| 11:28AM | 6 | that.  So -- |
| 11:29AM | 7 | Q    So did you have the money with you at that point? |
| 11:29AM | 8 | A    Yes. |
| 11:29AM | 9 | Q    So 300,000 or so? |
| 11:29AM | 10 | A    Yeah. |
| 11:29AM | 11 | Q    And you're there by yourself? |
| 11:29AM | 12 | A    Yes. |
| 11:29AM | 13 | Q    Okay.  Did they count or check the money? |
| 11:29AM | 14 | A    Yeah, so -- so I pull up, I go into the house, shake the |
| 11:29AM | 15 | guy's hand.  We talking, they got on the table -- they got |
| 11:29AM | 16 | tables and they got money counters set up on the table.  They |
| 11:29AM | 17 | putting the money -- the money is flipping through, brrrrr, |
| 11:29AM | 18 | through the machine like that, and they got -- they got stuff |
| 11:29AM | 19 | to check if any of them was counterfeit.  You know, they had |
| 11:29AM | 20 | like -- I forget what they had, but -- I remember them checking |
| 11:29AM | 21 | if any of the bills was counterfeit and coming out of the -- |
| 11:29AM | 22 | the money counting machine. |
| 11:29AM | 23 | Q    Okay.  So were they satisfied that the money was all there |
| 11:29AM | 24 | and legit? |
| 11:29AM | 25 | A    Yeah.  Everything was there, everything was good. |

11:29AM  1   Q    What about the drugs?

11:29AM  2   A    Yeah.  So, okay, so we're talking.  We're not counting.

11:30AM  3   The other guys is over there only table.  You know, me and the

11:30AM  4   guy that -- the guy is talking the whole time.  Get other guys,

11:30AM  5   all they was doing was counting the money, you know.

11:30AM  6        So after they counted the money, all the money was

11:30AM  7   good, then the guy that was doing 'em, he took the money, came

11:30AM  8   right back with the -- with the drugs, with the coke.  And so

11:30AM  9   he brought 'em in, we still talking he opened up the coke like

11:30AM  10  that, and then the guy that brought 'em in was talking to the

11:30AM  11  guy that I'm talking to.  And they talking in Spanish,

11:30AM  12  whatever, but he wanted him to check and make sure, Hey, this

11:30AM  13  thing is stamped, you know.  And he was the last guy for touch

11:30AM  14  'em, so -- so the other guy had to make me verify that -- that

11:30AM  15  everything was good.

11:30AM  16       So we tested 'em, he scoop 'em out, test 'em, cook 'em

11:31AM  17  like into one ball.  Everything was good.  We checked every

11:31AM  18  stamp that was on the -- that was on the bricks and -- and,

11:31AM  19  yeah.  So after I said everything was good, he started

11:31AM  20  packaging everything up.  His guy started packaging everything

11:31AM  21  up.

11:31AM  22  Q    Okay.  So how did you understand that the drugs were going

11:31AM  23  to get there from the house up to the -- the connection that

11:31AM  24  Mike Buntenbah had in San Francisco?

11:31AM  25  A    So after -- the guy was -- we still talking at this point.

11:31AM  1   We discussing -- you know, he -- he like do more.  His guys

11:31AM  2   like do what I'm talking about.  And I told 'em, I said, Hey, I

11:31AM  3   get guys that they got money for 'em.  Everything is good.

11:31AM  4   Just -- just bring 'em down.  We talking, the other guys

11:31AM  5   they're packaging everything up, and they had one garage car

11:31AM  6   set up to where they had compartments that -- that all this

11:31AM  7   coke, all the bricks go into.

11:32AM  8   Q    Like secret concealed compartments?

11:32AM  9   A    Yeah, concealed compartments.  It wasn't out like -- just

11:32AM  10  threw 'em in the trunk, you know.  You had to put them inside

11:32AM  11  compartments that was made just for that.  Like they had cars

11:32AM  12  that was made just for that.

11:32AM  13  Q    Okay.  So that was how they were going to get the drugs up

11:32AM  14  to San Francisco?

11:32AM  15  A    Yes.

11:32AM  16  Q    Were you going to drive with them?

11:32AM  17  A    Well, at first we wasn't, but I wanted to -- I wanted to

11:32AM  18  make sure everything that went smooth, you know.  So after all

11:32AM  19  of that is done, we come to one agreement and everything, they

11:32AM  20  send -- they send one car to pick up Mike B., who is still at

11:32AM  21  the hotel texting me like, Hey, what the fuck is going on?

11:32AM  22       So they sent one car to pick up Mike B.  He comes

11:32AM  23  back, texts me, Hey, I'm outside.  We come -- I come outside,

11:32AM  24  we shake -- I shake hands to everybody in the house.  I come

11:32AM  25  outside, Mike B. is waiting outside with the car that's

11:32AM  1   supposed to drive us up to -- they set up one car and one

11:33AM  2   driver that was supposed to drive us up to Frisco.

11:33AM  3   Q    Okay.

11:33AM  4   A    So jump in the car, everybody else -- all the cars lined

11:33AM  5   up waiting for us.  The car that's coming out the garage with

11:33AM  6   the coke inside, he come up like that and he pulls in front of

11:33AM  7   us, maybe get three cars in front of him, he pull right here,

11:33AM  8   got couple cars back, and then we're the last car.

11:33AM  9        So everybody leaves.  We go maybe 20 minutes to the

11:33AM  10  freeway, we go for jump on the freeway, and then that's when

11:33AM  11  the helicopters come.  The cars is coming from different

11:33AM  12  directions on the freeway.  They blocking off the next exit.

11:33AM  13  Q    You say "cars," you're talking about law enforcement?

11:33AM  14  A    Yeah, yeah.  Unmarked cars, that's like they just got the

11:33AM  15  lights on the inside.

11:33AM  16  Q    Okay.

11:33AM  17  A    Yeah, so they're blocking us off.  And I'm looking at

11:33AM  18  Mike B. and he's looking at me like, What the fuck, Dude?  And

11:34AM  19  I'm like, Hey, it's over.  You know, I don't know what the

11:34AM  20  fuck -- I don't know what to tell you.  I'm kind of in -- kind

11:34AM  21  of in shock right there, you know.

11:34AM  22  Q    So who was in the car that you were riding in besides you

11:34AM  23  and Mike B.?

11:34AM  24  A    Me and Mike B. and the driver.  I don't think the driver

11:34AM  25  even spoke English.

11:34AM  1  Q    Okay.

11:34AM  2  A    But --

11:34AM  3  Q    So you get pulled over?

11:34AM  4  A    Yeah, we get pulled over -- well, we get more than pulled

11:34AM  5  over.  Like they got a lot of cars, a lot of -- lot of

11:34AM  6  helicopters, like they forcing us to like drive into the wall,

11:34AM  7  you know.  They got -- they get guns out, pulling us out the

11:34AM  8  car, pulling us up against the wall.  You know.  Yeah, it was

11:34AM  9  over with.

11:34AM  10  Q    So you're taken into custody?

11:34AM  11  A    Taken into custody, yeah.  Everybody was taken, right.

11:34AM  12  That was -- I was -- they was asking everybody when they had up

11:34AM  13  against -- Hey, anybody got any medical issues and stuff like

11:34AM  14  that.  I told them I had -- I had heart surgery, I just need my

11:35AM  15  medication.

11:35AM  16       So they took everybody down to the -- to the booking

11:35AM  17  station.  When they was there, if we went walk right in, as

11:35AM  18  soon as I went in there, the guy who took me was, Hey, you got

11:35AM  19  to go to the medical, right?  You got medical -- I said, Yeah.

11:35AM  20  So he took me straight to the hospital.  And I was at the

11:35AM  21  hospital just waiting.  I was just waiting for the doctor.  It

11:35AM  22  was a long line at the hospital.  I'm waiting for the doctor.

11:35AM  23  The officers that is with me is waiting in the room for me.

11:35AM  24       And maybe a few hours after I get to the -- to the

11:35AM  25  hospital, the law comes back and he starts telling me, I'm

11:35AM  1   going to -- he took off my handcuffs, and I was kind of in

11:35AM  2   shock.  I was like, What the hell is going on?  He was telling

11:35AM  3   me -- showed me a bunch of phones, and he had one bag with

11:36AM  4   phones, all of our phones inside.  And I was -- I was still

11:36AM  5   kind of in shock.  So I grabbed my phone out the bag.  He was

11:36AM  6   like, Hey, you got anything to say?  And I was like, No.

11:36AM  7         So I told him, I'm free to go?  And he was like,

11:36AM  8   You're free to go.  I don't even got my shoes on at this point.

11:36AM  9   I just got socks.  I'm in the hospital with cuffs, and he's

11:36AM  10  uncuffing it.  And I was like, Fuck.

11:36AM  11        I jumped in the car -- I jumped in the taxi headed to

11:36AM  12  the hospital.  I got one call from Mike B., and he was like --

11:36AM  13  I was, Hey, Dude, I'm at the airport.  Where you at?  He said,

11:36AM  14  Oh, I'm headed to the airport right now.  Wait for me over

11:36AM  15  there.

11:36AM  16        So I'm kind of tripping out, like I'm looking at him

11:36AM  17  like, Hey, they let us go.  You know.  And he was like --

11:36AM  18  Mike B. said, I gotta go -- I said, I'm going home already,

11:36AM  19  fuck this.  This is too much for me, you know.  If they're

11:36AM  20  going to let me go -- they're going to let me go, I'm out of

11:37AM  21  here, I'm going home.

11:37AM  22        So Mike B. said, These guys in Frisco, they still

11:37AM  23  waiting for me.  They don't know what happened.  I gotta go up

11:37AM  24  there and let them know what the fuck is going on.  And --

11:37AM  25  yeah, that was the -- that was the whole scenario right there.

11:37AM   1   Q     So were you ever told why they released you?

11:37AM   2   A     No.  Yeah, no.

11:37AM   3   Q     So I think you said you left the hospital directly to the

11:37AM   4   airport.  Is that what you meant?

11:37AM   5   A     Yes.

11:37AM   6   Q     With no shoes?

11:37AM   7   A     Yeah, got no shoes on.  You know, I never have shoes on.

11:37AM   8   I had to -- because I remember in the hospital when you go to

11:37AM   9   the stuff, they take your shoe laces and shit like that, you

11:37AM  10   know.  So my shoes was off, I was in the hospital with socks,

11:37AM  11   with shackles and handcuffs and everything.

11:37AM  12         And when the -- when the detective came -- because I

11:37AM  13   had two regular -- whatever they was with me.  The two law guys

11:38AM  14   that was with me was just there for watch me.  So the main guy

11:38AM  15   came over there in charge of whatever case that was doing, and

11:38AM  16   he took off my cuffs and said, Hey, we letting you go.  Do you

11:38AM  17   have anything to say?  You should talk to us, you know, like

11:38AM  18   that.  And I was like, No, I can go?  I can go home?  And he

11:38AM  19   was like, Yeah, you are free to go.

11:38AM  20   Q     So you just got out of there.

11:38AM  21   A     Huh?

11:38AM  22   Q     So you just got out of there.

11:38AM  23   A     Yeah, I got -- I didn't even wait for the doctor to come.

11:38AM  24   Like the doctor, we was waiting for hours for them to come and

11:38AM  25   check me out so I could go back, but as soon as he told me I

11:38AM   1   was free, I was like -- I just left.  I never even wait for the

11:38AM   2   doctor.  I was out of there.  I was just glad to be -- you

11:38AM   3   know.

11:38AM   4   Q    Did you catch a flight back to Hawaii that same day?

11:38AM   5   A    Yeah, I came -- I came right back to Hawaii.  Mike B. shot

11:38AM   6   up to Frisco first.  Mike Buntenbah.

11:38AM   7   Q    Okay.  And you mentioned that the officer came to you and

11:38AM   8   he had a bag of phones, and you took how many phones?

11:38AM   9   A    I don't -- I remember I took my phone.  I had one

11:39AM   10  Blackberry, you know, the one you can just shoot messages with.

11:39AM   11  I took that one and I threw that one away.  But --

11:39AM   12  Q    But there were other phones that you had had in the car

11:39AM   13  that you left that you didn't claim?

11:39AM   14  A    Yeah.  Yeah, I never see those until later, you know.

11:39AM   15  Q    So you had taken a number of phones with you initially?

11:39AM   16  A    Yeah.  Yeah, like I had -- I had a number of phones, one

11:39AM   17  phone for one person.

11:39AM   18  Q    So let me have you look at Exhibit 7-005, please.

11:39AM   19       Do you recognize what's shown in that photo?

11:39AM   20  A    Yes.

11:39AM   21  Q    How do you recognize that?

11:39AM   22  A    Because I was there with that, that's how we -- that's how

11:39AM   23  we -- that's how when the thing was getting packaged up, that's

11:39AM   24  how it was getting packaged up.

11:40AM   25  Q    This is what you purchased at the meeting in LA that you

11:40AM    1    just described?

11:40AM    2    A    Yes.

11:40AM    3    Q    And this is what was seized by law enforcement after you

11:40AM    4    were stopped?

11:40AM    5    A    Yes.

11:40AM    6          MR. INCIONG:  Your Honor, I would move to admit 7-5.

11:40AM    7          THE COURT:  Any objection?

11:40AM    8          MR. KENNEDY:  No objection.

11:40AM    9          THE COURT:  Without objection, 7-5 is admitted.  You

11:40AM    10    may publish.

11:40AM    11          (Exhibit 7-005 was received in evidence.)

11:40AM    12          MR. INCIONG:  Thank you, Your Honor.

11:40AM    13    BY MR. INCIONG:

11:40AM    14    Q    So, Mr. Miller, what is shown here?

11:40AM    15    A    That's -- that's 10 kilos of cocaine.

11:40AM    16    Q    So each one of those rectangular shaped packages is a kilo

11:40AM    17    of coke?

11:40AM    18    A    Yes.

11:40AM    19    Q    That's what you purchased with Mr. Miske's money in July

11:40AM    20    of 2014?

11:40AM    21    A    Yes.  So when I say -- when I say the word "bricks,"

11:40AM    22    that's what -- that's what I was referring to.

11:40AM    23    Q    Let me have you look at one other photo, 7-006 -- or I

11:40AM    24    should say 7-6.

11:40AM    25          Do you recognize what's shown in that?

11:40AM    1    A    Yes.

11:40AM    2    Q    Is that just another -- another view, another

11:40AM    3    configuration of that same item you were just discussing?

11:41AM    4    A    Yes.

11:41AM    5    Q    Does this accurately show on the bricks as you saw them

11:41AM    6    when you purchased them in July of 2014?

11:41AM    7    A    Yes.

11:41AM    8         MR. INCIONG:  Your Honor, I would move to admit 7-6.

11:41AM    9         THE COURT:  Without objection?

11:41AM   10         MR. KENNEDY:  No objection.

11:41AM   11         THE COURT:  All right.  So without objection, 7-6 is

11:41AM   12    admitted.  You may publish.

11:41AM   13         (Exhibit 7-006 was received in evidence.)

11:41AM   14         MR. INCIONG:  Thank you, Your Honor.

11:41AM   15    BY MR. INCIONG:

11:41AM   16    Q    And, Mr. Miller, this just shows those bricks stacked in a

11:41AM   17    different manner than manner before?

11:41AM   18    A    Yes.

11:41AM   19    Q    But it's still the same 10 kilos?

11:41AM   20    A    Yes.

11:41AM   21         MR. INCIONG:  All right.  You can take that down now

11:41AM   22    for the moment.

11:41AM   23    BY MR. INCIONG:

11:41AM   24    Q    So you fly home?

11:41AM   25    A    Yes.

11:41AM   1   Q    What do you do when you get home to Hawaii?

11:41AM   2   A    Well, first thing when -- when I got home, I was -- I was

11:41AM   3   tired.  I was -- I took one small -- I took one small nap.  You

11:41AM   4   know, I was trying to just -- I was trying to just get my head

11:41AM   5   together.  And that's -- after that the first person I

11:41AM   6   contacted -- after I went home, you know, got some rest, first

11:42AM   7   person I contacted was Miske, and I told him, Hey, I gotta -- I

11:42AM   8   gotta meet you.  It's important.  You know, so --

11:42AM   9   Q    And you met him in person?

11:42AM  10   A    Met him in person.

11:42AM  11   Q    Do you recall where?

11:42AM  12   A    Keolu Hills, in that area where he live out.  I was

11:42AM  13   driving down there for meet him.  So when I met him, we did the

11:42AM  14   same thing, he was in -- he was in his truck -- I think he was

11:42AM  15   in his truck.  He had a silver Tacoma at that time.  But when I

11:42AM  16   met him down there, I followed him through the hills again.

11:42AM  17   He -- he always did that for see if anybody following us or

11:42AM  18   not.

11:42AM  19        But we went deep up into the hills, all the way to the

11:42AM  20   top.  Not by his house but on the other end, almost by the

11:42AM  21   bluffs.  And he parked.  I wen' park behind him, walked up to

11:42AM  22   his -- walked up to his truck, jumped into his truck.  I told

11:42AM  23   him, I got a talk to you.

11:43AM  24        And he immediately reached for the radio, he turned up

11:43AM  25   the radio, and -- and I started telling him like in not -- not

11:43AM   1    loud in code, like, hey -- I explained to him what happened.  I
11:43AM   2    told him the whole deal, what wen' happened, what wen' down and
11:43AM   3    everything like that, you know.
11:43AM   4    Q    What was his reaction.
11:43AM   5    A    At first he was like -- at first he was like just -- just
11:43AM   6    staring like down, and then after that he was like, Listen,
11:43AM   7    main thing -- he told me, Main thing, you good.  Main thing,
11:43AM   8    you all right.
11:43AM   9         But I know what he was thinking because in that
11:43AM  10    conversation had a lot of time where we would stop talking and
11:43AM  11    just -- and just feel each other out.  So I know he was
11:43AM  12    thinking like I'm bullshitting him or some shit like that
11:43AM  13    because of -- because of what I just told him.  You know, it's
11:43AM  14    kind of like, Hey, he just gave me the money, and you telling
11:43AM  15    me this happened.  Sound like I full of shit, but I wasn't.
11:44AM  16    You know, I was telling him -- I was telling him what happened,
11:44AM  17    and he was like -- hey, main thing, you all right.  He was
11:44AM  18    like, Main thing, you all right.  He was grabbing me and
11:44AM  19    everything, Main thing, you good.  He was texting me showing me
11:44AM  20    things like that, and I was responding to him by typing back on
11:44AM  21    his phone.  So we're talking for a while in his truck.  We're
11:44AM  22    communicating, whether we're talking or we -- we typing
11:44AM  23    messages to each other.
11:44AM  24         We get out the car -- we get out the truck.  He said,
11:44AM  25    Let's take a walk.  We start walking, and we start walking --

11:44AM   1   that's how -- when we started walking I started -- that's when

11:44AM   2   I knew that he was kind of worried because when we was walking

11:44AM   3   up in the bluffs, he was like looking inside cars for see if

11:44AM   4   people was trying -- trying to listen to us or see us talking.

11:44AM   5   We just kept walking around cars, walking down looking in cars.

11:44AM   6           And he was feeling me out, just telling me, Listen,

11:45AM   7   everything going be all right.  You know, fuck 'em, that's only

11:45AM   8   money.  You know, trying to make me feel better, and I did for

11:45AM   9   a little bit, you know.  And yeah, that was -- that was the

11:45AM   10   initial conversation about -- about that up there in the -- in

11:45AM   11   the bluffs.

11:45AM   12   Q    Okay.  Well, we'll come back to that in a minute, but I

11:45AM   13   want to talk to you about some of the phones that were seized

11:45AM   14   in Los Angeles by law enforcement when you were arrested.

11:45AM   15   A    Okay.

11:45AM   16   Q    Okay.  You said you had taken a number of phones up there

11:45AM   17   with you, correct?

11:45AM   18   A    Yes.

11:45AM   19   Q    You didn't bring all of them back with you?

11:45AM   20   A    No.

11:45AM   21   Q    All right.  Tell the jury again why you had these

11:45AM   22   different phones.

11:45AM   23   A    I had different phones to talk to -- one phone for one

11:45AM   24   person, you know.  Like if I'm talking to Mike B., me and

11:45AM   25   Mike B. get phones just for talk to each other or he get -- he

| | | |
|---|---|---|
| 11:45AM | 1 | get one phone and he get talking to me and maybe two other guys |
| 11:45AM | 2 | on his phone. |
| 11:46AM | 3 | Q    Okay. |
| 11:46AM | 4 | MR. INCIONG:  Your Honor, may I approach with -- I |
| 11:46AM | 5 | have a couple of actual physical items of evidence that I would |
| 11:46AM | 6 | like to show Mr. Miller.  If I could approach him with 7-8, |
| 11:46AM | 7 | which is a telephone. |
| 11:46AM | 8 | THE COURT:  All right. |
| 11:46AM | 9 | You've shown that to Mr. Kennedy as well? |
| 11:46AM | 10 | MR. INCIONG:  I did, Your Honor. |
| 11:46AM | 11 | MR. KENNEDY:  He did, Your Honor. |
| 11:46AM | 12 | THE COURT:  All right.  Thank you. |
| 11:46AM | 13 | BY MR. INCIONG: |
| 11:46AM | 14 | Q    Mr. Miller, I am just showing you -- or have placed in |
| 11:46AM | 15 | front of you what's been marked as Exhibit 7-8.  Do you |
| 11:47AM | 16 | recognize that item? |
| 11:47AM | 17 | A    Yes. |
| 11:47AM | 18 | Q    How do you recognize that? |
| 11:47AM | 19 | A    This is my phone.  We went through 'em, I noticed the |
| 11:47AM | 20 | contacts that was on 'em. |
| 11:47AM | 21 | Q    Okay.  So prior to coming to court today, did you have a |
| 11:47AM | 22 | chance to look at that phone? |
| 11:47AM | 23 | A    Yes. |
| 11:47AM | 24 | Q    And as you indicated, did you power that on and look at -- |
| 11:47AM | 25 | scroll through some of the content, the contact list and so |

11:47AM    1    forth?

11:47AM    2    A    Yes.

11:47AM    3    Q    Did you recognize that as being your phone?

11:47AM    4    A    Yes.

11:47AM    5    Q    Is this one of the phones that was seized from you in Los

11:47AM    6    Angeles when you were arrested in July of 2014?

11:47AM    7    A    Yes.

11:47AM    8    Q    Does that phone look at least similar condition as it did

11:47AM    9    when you last had it in July?

11:47AM    10    A    Yes.

11:47AM    11          MR. INCIONG:  Your Honor, I would move to admit

11:47AM    12    Exhibit 7-8 at this time.

11:47AM    13          THE COURT:  Any objection?

11:47AM    14          MR. KENNEDY:  No objection.

11:47AM    15          THE COURT:  Without objection, Exhibit 7-8 is

11:47AM    16    admitted.

11:47AM    17          (Exhibit 7-008 was received in evidence.)

11:47AM    18          MR. INCIONG:  Thank you, Your Honor.

11:47AM    19          I think if we can show Mr. Miller Exhibit 7-8-A on the

11:47AM    20    screen in front of him, please.

11:47AM    21          THE COURT:  Go ahead.

11:48AM    22    BY MR. INCIONG:

11:48AM    23    Q    Mr. Miller, do you recognize what's shown in this photo?

11:48AM    24    A    Yes.

11:48AM    25    Q    Is that a photo of the phone that you have in front of you

11:48AM   1   marked Exhibit 7-8?

11:48AM   2   A    Yes.

11:48AM   3           MR. INCIONG:  Your Honor, I would move to admit 7-8-A.

11:48AM   4           THE COURT:  Any objection?

11:48AM   5           MR. KENNEDY:  No objection.

11:48AM   6           THE COURT:  Without objection, 7-8-Alpha is admitted.

11:48AM   7   You may show it to the jury if you wish.

11:48AM   8           (Exhibit 7-008-A was received in evidence.)

11:48AM   9           MR. INCIONG:  Thank you, Your Honor.

11:48AM  10   BY MR. INCIONG:

11:48AM  11   Q    So this is one of the phones that you had with you in Los

11:48AM  12   Angeles when you were arrested?

11:48AM  13   A    Yes.

11:48AM  14           MR. INCIONG:  May I show Mr. Miller Exhibit 7-10 at

11:48AM  15   this time, Your Honor?  This is another physical item.

11:48AM  16           THE COURT:  Yes.

11:48AM  17           MR. INCIONG:  A telephone.

11:48AM  18           THE COURT:  Yes.  If you would show it to

11:48AM  19   Mr. Kennedy --

11:48AM  20           MR. INCIONG:  Yes.

11:48AM  21           THE COURT:  -- before the witness.  Thank you.

11:49AM  22   BY MR. INCIONG:

11:49AM  23   Q    Mr. Miller, I'm showing you what's -- what's been marked

11:49AM  24   as Exhibit 7-10.  Do you recognize that phone?

11:49AM  25   A    Yes.

11:49AM   1   Q    How did you recognize that?

11:49AM   2   A    I went through the text messages, and I knew that -- that

11:49AM   3   was mines.

11:49AM   4   Q    Is that phone in substantially the same condition as when

11:49AM   5   you last saw it in July of 2014?

11:49AM   6   A    Yeah.

11:49AM   7   Q    And you actually powered that phone on and were you able

11:49AM   8   to look at some of the contents as well?

11:49AM   9   A    Yes.

11:49AM  10        MR. INCIONG:  Your Honor, I would move to admit

11:49AM  11   Exhibit 7-10.

11:49AM  12        THE COURT:  Any objection?

11:49AM  13        MR. KENNEDY:  Your Honor, can I just ask a question of

11:50AM  14   the witness to determine whose phone?

11:50AM  15        THE COURT:  Well, if you have an objection, you can

11:50AM  16   make an objection.

11:50AM  17        MR. KENNEDY:  I object on foundation.  We don't

11:50AM  18   know --

11:50AM  19        THE COURT:  Sustained.

11:50AM  20        MR. KENNEDY:  -- whose phone it is.

11:50AM  21   BY MR. INCIONG:

11:50AM  22   Q    Mr. Miller, when you looked at this particular phone, did

11:50AM  23   you recognize this as being your phone or someone else's phone

11:50AM  24   when you looked at the contents?

11:50AM  25   A    Yeah, we went through the -- if this is the one we went --

| | | |
|---|---|---|
| 11:50AM | 1 | if this the one we went through, I noticed this phone because |
| 11:50AM | 2 | the messages that was inside, I knew I sent those messages. |
| 11:50AM | 3 | Q    There were certain text messages that you saw that you |
| 11:50AM | 4 | knew you had sent that you saw on that phone? |
| 11:50AM | 5 | A    Yes. |
| 11:50AM | 6 | MR. INCIONG:  Your Honor, I would move to admit 7-10. |
| 11:50AM | 7 | THE COURT:  Any objection? |
| 11:50AM | 8 | MR. KENNEDY:  No objection now that I know that it's |
| 11:50AM | 9 | Mr. Miller's phone and not someone else's. |
| 11:50AM | 10 | THE COURT:  All right.  Without objection, 7-10 is |
| 11:50AM | 11 | admitted. |
| 11:50AM | 12 | (Exhibit 7-010 was received in evidence.) |
| 11:50AM | 13 | MR. INCIONG:  Your Honor, may I show Exhibit 7-10-A to |
| 11:50AM | 14 | Mr. Miller? |
| 11:50AM | 15 | THE COURT:  Yes. |
| 11:50AM | 16 | BY MR. INCIONG: |
| 11:50AM | 17 | Q    Do you recognize that particular photo, Mr. Miller? |
| 11:51AM | 18 | A    Yes. |
| 11:51AM | 19 | Q    Is this a photo of Exhibit 7-10 which is in front of you? |
| 11:51AM | 20 | A    Yes. |
| 11:51AM | 21 | MR. INCIONG:  Your Honor, I would move to admit 7-10-A |
| 11:51AM | 22 | and ask to publish. |
| 11:51AM | 23 | THE COURT:  All right.  Any objection? |
| 11:51AM | 24 | MR. KENNEDY:  No objection, Your Honor. |
| 11:51AM | 25 | THE COURT:  Without objection, 7-10-Alpha is admitted. |

11:51AM   1   You may publish.

11:51AM   2             (Exhibit 7-010-A was received in evidence.)

11:51AM   3             MR. INCIONG:  Thank you.

11:51AM   4   BY MR. INCIONG:

11:51AM   5   Q    So this is another phone that was seized in Los Angeles,

11:51AM   6   correct?

11:51AM   7   A    Yes.

11:51AM   8             MR. INCIONG:  Your Honor, may I approach Mr. Miller

11:51AM   9   with 7-11, another telephone?

11:51AM   10            THE COURT:  Yes, you may after showing it to

11:51AM   11  Mr. Kennedy.  Thank you.

11:52AM   12  BY MR. INCIONG:

11:52AM   13  Q    Do you recognize what's been marked as 7-11, Mr. Miller?

11:52AM   14  A    Yes.

11:52AM   15  Q    How do you recognize that?

11:52AM   16  A    So, listen, I only recognize these phones because I know

11:52AM   17  the text messages that was sent and that was mine, you know.

11:52AM   18  Q    Right.  So that's what I'm asking you, sir.  So the

11:52AM   19  question is how do you recognize that phone?

11:52AM   20  A    I mean, that's -- that's my phone.

11:52AM   21  Q    Like did you power that phone on or look at the contents?

11:52AM   22  A    Yes.

11:52AM   23  Q    Did you recognize any of the contents?

11:52AM   24  A    Yes.

11:52AM   25  Q    Did you recognize that as being one of the phones you had

11:52AM   1    in LA with you in July of 2014?

11:52AM   2    A    Yes.

11:52AM   3    Q    Is that phone in substantially the same condition as when

11:52AM   4    you last had it in 2014?

11:52AM   5    A    Yes.

11:52AM   6             MR. INCIONG:  Your Honor, I would move to admit

11:52AM   7    Exhibit 7-11.

11:52AM   8             THE COURT:  Any objection, Mr. Kennedy?

11:52AM   9             MR. KENNEDY:  No objection.

11:52AM  10             THE COURT:  Without objection, 7-11 is admitted.

11:52AM  11             (Exhibit 7-011 was received in evidence.)

11:53AM  12             MR. INCIONG:  Thank you, Your Honor.  And may I show

11:53AM  13    Mr. Miller Exhibit 7-11-A on the screen in front of him,

11:53AM  14    please?

11:53AM  15             THE COURT:  Yes, you may.

11:53AM  16    BY MR. INCIONG:

11:53AM  17    Q    Mr. Miller, do you recognize what's shown in that photo?

11:53AM  18    A    Yes.

11:53AM  19    Q    Is that a photo of the item you have in front of you

11:53AM  20    marked 7-11?

11:53AM  21    A    Yes.

11:53AM  22             MR. INCIONG:  Your Honor, I would move to admit

11:53AM  23    7-11-A.

11:53AM  24             THE COURT:  All right.  Any objection?

11:53AM  25             MR. KENNEDY:  No objection, Your Honor.

11:53AM    1              THE COURT:  Without objection, 7-11-Alpha is admitted.

11:53AM    2    You may show it to the jury.

11:53AM    3              (Exhibit 7-011-A was received in evidence.)

11:53AM    4              MR. INCIONG:  Thank you, Your Honor.

11:53AM    5    BY MR. INCIONG:

11:53AM    6    Q    So, Mr. Miller, this is another phone that you had with

11:53AM    7    you in Los Angeles in July 2014?

11:53AM    8    A    Yes.

11:53AM    9              MR. INCIONG:  All right.  Can I have 7-14, please?

11:53AM    10             May I show 7-14 to the witness, Your Honor?

11:53AM    11             THE COURT:  Yes.

11:53AM    12             MR. INCIONG:  And I'll show it to defense counsel

11:53AM    13   first.

11:54AM    14             THE COURT:  We're also getting to the point in time,

11:54AM    15   Mr. Inciong, where we should likely take our second break.  So

11:54AM    16   whenever that is right, let me know.

11:54AM    17             MR. INCIONG:  If I can just have couple more minutes,

11:54AM    18   Your Honor?

11:54AM    19             THE COURT:  Yes.

11:54AM    20             MR. INCIONG:  Thank you.

11:54AM    21   BY MR. INCIONG:

11:54AM    22   Q    Mr. Miller, do you recognize what's been marked as

11:54AM    23   Exhibit 7-14?

11:54AM    24   A    Yes.

11:54AM    25   Q    How do you recognize that?

| | | |
|---|---|---|
| 11:54AM | 1 | A    From going through the phone, from the text messages that |
| 11:54AM | 2 | I sent. |
| 11:54AM | 3 | Q    And you were able to do that prior to testifying today? |
| 11:54AM | 4 | A    Yes. |
| 11:54AM | 5 | Q    And based on the content that you saw, you recognize that |
| 11:54AM | 6 | as your phone? |
| 11:54AM | 7 | A    Yes. |
| 11:54AM | 8 | Q    Specifically one that you had with you in July of 2014? |
| 11:54AM | 9 | A    Yes. |
| 11:54AM | 10 | Q    And did you actually write your initials and sticker on |
| 11:55AM | 11 | that phone to acknowledge that? |
| 11:55AM | 12 | A    Yes. |
| 11:55AM | 13 | MR. INCIONG:  Your Honor, I would move to admit 7-14. |
| 11:55AM | 14 | THE COURT:  Any objection? |
| 11:55AM | 15 | MR. KENNEDY:  No objection. |
| 11:55AM | 16 | THE COURT:  Without objection, 7-14 is admitted. |
| 11:55AM | 17 | (Exhibit 7-014 was received in evidence.) |
| 11:55AM | 18 | MR. INCIONG:  And then, Your Honor, just last thing |
| 11:55AM | 19 | before we break, if I could show Mr. Miller 7-14-A? |
| 11:55AM | 20 | THE COURT:  Yes. |
| 11:55AM | 21 | BY MR. INCIONG: |
| 11:55AM | 22 | Q    Do you see that exhibit, Mr. Miller? |
| 11:55AM | 23 | A    Yes. |
| 11:55AM | 24 | Q    Do you recognize that? |
| 11:55AM | 25 | A    Yes. |

| | | |
|---|---|---|
| 11:55AM | 1 | Q    Is that a photo of the phone you have in front of you |
| 11:55AM | 2 | marked Exhibit 7-14? |
| 11:55AM | 3 | A    Yes. |
| 11:55AM | 4 | MR. INCIONG:  Your Honor, I would move to admit |
| 11:55AM | 5 | 7-14-Alpha. |
| 11:55AM | 6 | THE COURT:  Any objection? |
| 11:55AM | 7 | MR. KENNEDY:  No objection. |
| 11:55AM | 8 | THE COURT:  Without objection, 7-14-Alpha is admitted. |
| 11:55AM | 9 | (Exhibit 7-014-A was received in evidence.) |
| 11:55AM | 10 | MR. INCIONG:  Can I publish that, Your Honor? |
| 11:55AM | 11 | THE COURT:  Yes, you may. |
| 11:55AM | 12 | BY MR. INCIONG: |
| 11:55AM | 13 | Q    And, Miller -- sorry, Mr. Miller, this is again another |
| 11:55AM | 14 | phone you had with you when you were arrested in Los Angeles in |
| 11:55AM | 15 | 2014? |
| 11:55AM | 16 | A    Yes. |
| 11:55AM | 17 | MR. INCIONG:  Your Honor, we can stop there then. |
| 11:55AM | 18 | THE COURT:  All right.  We are at the point of the |
| 11:55AM | 19 | trial day where we're going to take our second break. |
| 11:56AM | 20 | As we go to break, I'll remind the jurors to refrain |
| | 21 | from discussing the substance of this case with anyone, |
| | 22 | including each other, until I advise you otherwise; to refrain |
| | 23 | from conducting any independent investigation into the facts, |
| | 24 | circumstances or persons involved; and finally, please do not |
| | 25 | access any media or other accounts of this case that may be out |

11:56AM   1   there.

11:56AM   2           It is just about noon, so let's try to get back here

11:56AM   3   by about 12:15.  That will leave us a little more than an hour

11:56AM   4   to finish up the trial day.

11:56AM   5           (Proceedings were recessed at 11:56 a.m. to 12:20

12:06PM   6   p.m.)

12:20PM   7           THE COURT:  The second break of the day.  The record

12:20PM   8   should reflect the return of all of our jurors, the parties and

12:20PM   9   their lawyers.

12:20PM  10           Mr. Inciong, you may resume.

12:20PM  11           MR. INCIONG:  Thank you, Your Honor.

12:20PM  12   BY MR. INCIONG:

12:20PM  13   Q    Mr. Miller, you had indicated you recognized these phones

12:20PM  14   by the contents that you had reviewed, correct?

12:20PM  15   A    Yes.

12:20PM  16   Q    So I'd like to go through some of that content in specific

12:20PM  17   with you.

12:20PM  18           MR. INCIONG:  If we could start, Your Honor, with

12:20PM  19   Exhibit 7-8-C.  This has been agreed to by stipulation as

12:20PM  20   an extraction from one of Mr. Miller's phones, the white

12:20PM  21   iPhone 4S.

12:20PM  22           THE COURT:  Well, when you say this has been agreed to

12:20PM  23   by stipulation, there are lots of exhibits that have been

12:21PM  24   agreed to for purposes of admissibility and there are other

12:21PM  25   stipulations that are less than that.  So --

12:21PM   1                MR. INCIONG:  Right.  Yeah, let me -- let me expand on

12:21PM   2   that.  This has been admitted for foundation and authenticity.

12:21PM   3   I would move to admit Exhibit 7-8-C as the contents of --

12:21PM   4   specifically the contacts list from this particular phone.

12:21PM   5                THE COURT:  All right.  Any objection?  I'll start

12:21PM   6   there.

12:21PM   7                MR. KENNEDY:  Your Honor, no objection.  However, I

12:21PM   8   believe it's not all the contacts of that phone, and with that

12:21PM   9   stipulation, I would agree that it should be admitted.

12:21PM  10                MR. INCIONG:  That's correct, Your Honor.

12:21PM  11                THE COURT:  All right.  With that stipulation,

12:21PM  12   7-8-Charlie is admitted.  You may publish.

12:21PM  13                (Exhibit 7-008-C was received in evidence.)

12:21PM  14                MR. INCIONG:  May we publish that?

12:21PM  15                THE COURT:  Yes.

12:21PM  16                MR. INCIONG:  So if we could start with box number 1,

12:21PM  17   please.  If you could enlarge that for both the jury and the

12:21PM  18   witness to see.

12:21PM  19   BY MR. INCIONG:

12:22PM  20   Q    So, Mr. Miller, this is from the contacts list from your

12:22PM  21   white iPhone 4S.  Contact number 1 there, do you see that

12:22PM  22   listed as the name as Cuzspam?

12:22PM  23   A    Yes.

12:22PM  24   Q    Who is Cuzspam?

12:22PM  25   A    Sammy Kuuana.

12:22PM    1    Q    Sammy Kuuana is one of the people you described that was

12:22PM    2    initially going to put up some of the money for the cocaine

12:22PM    3    deal?

12:22PM    4    A    Yes.

12:22PM    5    Q    Okay.  And that number is listed -- associated with him as

12:22PM    6    (808) 589-8890?

12:22PM    7    A    Yes.

12:22PM    8         MR. INCIONG:  All right.  If we could move down,

12:22PM    9    please.

12:22PM   10    BY MR. INCIONG:

12:22PM   11    Q    Number 2 and 21A, those are still Cuzspam.  Do you see

12:22PM   12    that?

12:22PM   13    A    Yes.

12:22PM   14    Q    That's the same person?

12:22PM   15    A    Yes.

12:22PM   16         MR. INCIONG:  Okay.  Could we scroll drawn.

12:22PM   17    BY MR. INCIONG:

12:22PM   18    Q    Number 3 is Cuzspam?

12:22PM   19    A    Yes.

12:22PM   20    Q    That's the same person as well?

12:22PM   21    A    Yes.

12:22PM   22    Q    All right.  We can skip 4 and 5 for now.

12:23PM   23         I wanted to ask you -- we'll go down to the second

12:23PM   24    page, the first box -- Drew is a name that we saw multiple

12:23PM   25    entries for as well.  Who is Drew?

12:23PM    1    A    That's one of my friends.

12:23PM    2    Q    Was he involved in the cocaine thing at all?

12:23PM    3    A    No.

12:23PM    4    Q    He was just a contact you had on your phone?

12:23PM    5    A    Yes.

12:23PM    6         MR. INCIONG:  Okay.  Could we scroll down.

12:23PM    7    BY MR. INCIONG:

12:23PM    8    Q    The next entry I want you to look at is number 7.  Do you

12:23PM    9    see that?

12:23PM    10   A    Yes.

12:23PM    11   Q    It's capital M, small letter b?

12:23PM    12   A    Yes.

12:23PM    13   Q    Who is that number for?

12:23PM    14   A    Mike Buntenbah.

12:23PM    15   Q    Mike Buntenbah is the person you described that

12:23PM    16   accompanied you to Los Angeles?

12:23PM    17   A    Yes.

12:23PM    18   Q    And his name is (808) 292-1555?

12:23PM    19   A    Yes.

12:23PM    20   Q    Okay.

12:23PM    21        MR. INCIONG:  All right.  If we could turn next then

12:23PM    22   to -- and show Mr. Miller Exhibit 7-8-D, as in dog.

12:24PM    23        Mr. Miller, have you seen this document before?

12:24PM    24   A    Yes.

12:24PM    25   Q    Did you review this prior to your testimony today?

12:24PM    1    A    Yes.

12:24PM    2    Q    And does this show some of the text messaging that you

12:24PM    3    were involved in before you went on this trip to Los Angeles in

12:24PM    4    2014?

12:24PM    5    A    Yes.

12:24PM    6         MR. INCIONG:  Your Honor, I would move to admit -- the

12:24PM    7    foundation and authenticity has been stipulated to as an

12:24PM    8    extraction from this phone.  I would move to admit based on the

12:24PM    9    relevance just laid by Mr. Miller.

12:24PM    10         THE COURT:  Any objection, Mr. Kennedy?

12:24PM    11         MR. KENNEDY:  Counsel, is it a -- just a one-page?

12:24PM    12         MR. INCIONG:  No, I'm sorry, it is not.  It is

12:24PM    13    multiple pages.  There are 17 pages in total, I believe.

12:24PM    14         MR. KENNEDY:  Did you say seven?

12:25PM    15         MR. INCIONG:  Seventeen, I believe.

12:25PM    16         MR. KENNEDY:  Seventeen?  Could you just go to the

12:25PM    17    end?

12:25PM    18         MR. INCIONG:  Sure.

12:25PM    19         MR. KENNEDY:  No objection, Your Honor.

12:25PM    20         THE COURT:  Without objection, Exhibit 7-8-Delta is

12:25PM    21    admitted.

12:25PM    22         (Exhibit 7-008-D was received in evidence.)

12:25PM    23         MR. INCIONG:  Thank you, Your Honor.

12:25PM    24         And if we could actually go to the very end of that

12:25PM    25    document, I believe these appear in reverse order

12:25PM   1   chronologically.

12:25PM   2          THE COURT:  Yes, you may publish.

12:25PM   3          MR. INCIONG:  Thank you.

12:25PM   4          So starting at the bottom, if we could highlight the

12:25PM   5   first couple text messages.

12:25PM   6   BY MR. INCIONG:

12:25PM   7   Q    So, Mr. Miller, do you see the message numbered 75?

12:25PM   8   A    Yes.

12:25PM   9   Q    That's an outgoing message.  Do you see that?

12:25PM  10   A    Yes.

12:25PM  11   Q    And do you see where it says:  "Yo, where you going be

12:25PM  12   today?  Gotta plan this out right so everything works out"?

12:25PM  13   A    Yes.

12:25PM  14   Q    Do you recall sending that particular text message?

12:26PM  15   A    Not -- I mean not really, yeah.

12:26PM  16   Q    Okay.  Let me have you --

12:26PM  17          MR. INCIONG:  Let's scroll up then.

12:26PM  18   BY MR. INCIONG:

12:26PM  19   Q    If we look at text message number 73 --

12:26PM  20   A    Yeah.

12:26PM  21   Q    -- do you see that -- do you see the date there, July 14

12:26PM  22   of 2014?

12:26PM  23   A    Right.

12:26PM  24   Q    Another outgoing message.  Do you see the message, "I

12:26PM  25   going under the grid"?

12:26PM   1   A     Yeah.  This is outgoing from my phone?

12:26PM   2   Q     Yes.

12:26PM   3   A     Okay.

12:26PM   4   Q     What did -- what did that text message mean?

12:26PM   5   A     Who am I texting?

12:26PM   6   Q     Well, you tell me.

12:26PM   7   A     This was a long time ago.  Mark.

12:26PM   8         MR. INCIONG:  Okay.  Let me -- let me have you scroll

12:26PM   9   up.

12:26PM  10   BY MR. INCIONG:

12:26PM  11   Q     Look at --

12:27PM  12         MR. INCIONG:  Stop there, please.

12:27PM  13   BY MR. INCIONG:

12:27PM  14   Q     -- 70 -- message 72.

12:27PM  15   A     I need to --

12:27PM  16   Q     Do you see that, the same date, July 14th, "All burners"?

12:27PM  17   A     Yes.

12:27PM  18   Q     And then the message up above that, "No phones"?

12:27PM  19   A     Yes.

12:27PM  20   Q     What does that signify?  "All burners" is --

12:27PM  21   A     Yeah, I -- I not communicating through my whole -- you

12:27PM  22   gotta read me this whole thing, though, so I can tell you

12:27PM  23   who -- who I'm going at this with.

12:27PM  24   Q     Okay.  Well, let's scroll up and we'll go through them one

12:27PM  25   by one.  Read them to yourself, and then give us the context.

| | | | |
|---|---|---|---|
| 12:27PM | 1 | | So we're up to number 70.  Do you see that one? |
| 12:27PM | 2 | A | Yes. |
| 12:27PM | 3 | Q | Okay.  69? |
| 12:27PM | 4 | A | Yeah. |
| 12:27PM | 5 | Q | 68? |
| 12:27PM | 6 | A | Yes. |
| 12:27PM | 7 | Q | 67? |
| 12:28PM | 8 | A | Yes. |
| 12:28PM | 9 | Q | 66? |
| 12:28PM | 10 | A | Yes. |
| 12:28PM | 11 | Q | What does that say? |
| 12:28PM | 12 | A | That's an incoming. |
| 12:28PM | 13 | Q | Right.  What does -- what is the message that was |
| 12:28PM | 14 | | received? |
| 12:28PM | 15 | A | Asking for Mai's full name. |
| 12:28PM | 16 | Q | Why was that question being asked of you? |
| 12:28PM | 17 | A | Well, I think I reading 'em, if that's -- I don't know. |
| 12:28PM | 18 | Q | Okay.  Well, let's continue to scroll up. |
| 12:28PM | 19 | | 65, you reply, correct? |
| 12:28PM | 20 | | MR. INCIONG:  Hold on.  Stop there. |
| 12:28PM | 21 | BY MR. INCIONG: | |
| 12:28PM | 22 | Q | You see message 65 -- |
| 12:28PM | 23 | A | Yes. |
| 12:28PM | 24 | Q | -- outgoing message on July 15th? |
| 12:28PM | 25 | A | Yes. |

| | | | |
|---|---|---|---|
| 12:28PM | 1 | Q | You respond with Sara Maile Tufele? |
| 12:29PM | 2 | A | Yes. |
| 12:29PM | 3 | Q | Who's name is that? |
| 12:29PM | 4 | A | That's my -- my son's mom. |
| 12:29PM | 5 | | MR. INCIONG:  Let's scroll up then, please. |
| 12:29PM | 6 | | BY MR. INCIONG: |
| 12:29PM | 7 | Q | Do you see that incoming message on July 17th? |
| 12:29PM | 8 | A | Yes. |
| 12:29PM | 9 | Q | Okay.  That's addressed to you? |
| 12:29PM | 10 | A | Yes.  This is all different.  This is all different people |
| 12:29PM | 11 | | I'm texting.  It's not the same conversation. |
| 12:29PM | 12 | Q | Okay.  So who were you texting? |
| 12:29PM | 13 | A | So on this one right here, I think this is Sammy's wife |
| 12:29PM | 14 | | texting me. |
| 12:29PM | 15 | Q | Okay.  Who is Sammy's wife? |
| 12:29PM | 16 | A | Star.  Star Kuuana. |
| 12:29PM | 17 | Q | Okay.  Why would you -- why were you texting her in the |
| 12:29PM | 18 | | days leading up to before you left for LA? |
| 12:29PM | 19 | A | Okay, so now -- so that day -- she worked for Hawaiian |
| 12:29PM | 20 | | Airlines, so she was booking my -- she was booking my flight. |
| 12:29PM | 21 | Q | Okay. |
| 12:29PM | 22 | A | Yeah. |
| 12:29PM | 23 | Q | And that was the flight to Los Angeles for the cocaine |
| 12:29PM | 24 | | deal. |
| 12:29PM | 25 | A | Yes. |

12:29PM   1   Q    Okay.  Is that why she needed -- why did she need your --

12:30PM   2   A    So -- so keep going.  I recognizing this conversation

12:30PM   3   right here with her.

12:30PM   4   Q    Okay.  All right.  So we can continue to scroll up.

12:30PM   5   A    Yeah, so see we're going backwards now.  I'm -- I'm

12:30PM   6   texting her this.  I'm texting her.  You started backwards.

12:30PM   7   You started backwards.

12:30PM   8   Q    We're going in chronological order, Mr. Miller.  So if you

12:30PM   9   go up, that's the order we went, but we can continue to scroll

12:30PM  10   up here.

12:30PM  11   A    Yeah.

12:30PM  12   Q    So the next message is incoming message, correct?

12:30PM  13   A    Yeah.

12:30PM  14   Q    And those are times?

12:30PM  15   A    Yeah.

12:30PM  16   Q    "And got K fares," what did that mean?

12:30PM  17   A    Yeah, like I'm sending that out -- no, she's sending that

12:30PM  18   in, she's telling me got K fares.  That's earlier the messages

12:30PM  19   was book me direct or whatever it was.  So at that time right

12:30PM  20   there, now this conversation -- so I'm meeting -- I'm

12:31PM  21   meeting -- this is leading up to me leaving.

12:31PM  22   Q    Okay.

12:31PM  23   A    So I'm trying to meet Sammy again now in this conversation

12:31PM  24   for -- to -- I think he's waiting for me somewhere.

12:31PM  25   Q    Okay.  And you're arranging your flights as well?

12:31PM    1    A    Yeah.

12:31PM    2    Q    All right.  So are those flight times that are listed that

12:31PM    3    you're choosing from?

12:31PM    4    A    Yeah.

12:31PM    5         MR. INCIONG:  Okay.  So if we can scroll up then,

12:31PM    6    please.

12:31PM    7    BY MR. INCIONG:

12:31PM    8    Q    So that's -- you send a text message on July 17th at

12:31PM    9    10:12 -- I'm sorry, 10:42?

12:31PM    10   A    Yeah.  That's why I say you going backwards, going from 62

12:31PM    11   to 61.

12:31PM    12   Q    Mr. Miller, just answer the question, please.  Is this a

12:31PM    13   text message you sent out on that day?

12:31PM    14   A    Yeah.

12:31PM    15   Q    And what are you saying there in that message?

12:31PM    16   A    "Fly out first flight Sunday morning."

12:31PM    17   Q    So that's when you want to go to LA?

12:31PM    18   A    What day is this?  Yeah.

12:32PM    19   Q    Okay.  You sent the next message a minute later, "Back to

12:32PM    20   LA"?

12:32PM    21   A    Yeah.

12:32PM    22   Q    So this again travel for your trip to and from Los

12:32PM    23   Angeles?

12:32PM    24   A    Yeah.

12:32PM    25   Q    So if we can scroll up.  This is an incoming message?

12:32PM    1    A    Yes.

12:32PM    2    Q    So you said, "Tomorrow"?

12:32PM    3    A    Yes.

12:32PM    4    Q    So you're trying to decide on the -- the date that you're

12:32PM    5    going to fly out?

12:32PM    6    A    Yes.

12:32PM    7    Q    Okay.  So this message that came into to you on July 17th

12:32PM    8    at 10:43 a.m., "Am I checking to LA tomorrow or Sunday?"

12:32PM    9         Do you recall who sent you that message?

12:32PM    10   A    Yes, it's got to be Star.

12:32PM    11   Q    And she's the one that worked for Hawaiian Airlines?

12:32PM    12   A    Yes.  If this is her, then yeah.  But this is her.  I

12:33PM    13   remember that message she sending me, I'm telling when --

12:33PM    14   Q    I think I might have said 10:43 a.m.  It was actually

12:33PM    15   10:43 p.m., my mistake.

12:33PM    16         MR. INCIONG:  Okay.  If we could scroll up to the next

12:33PM    17   messages.

12:33PM    18   BY MR. INCIONG:

12:33PM    19   Q    So this is incoming message a few minutes later.  Are you

12:33PM    20   giving -- getting your flight times at that point in message

12:33PM    21   57?

12:33PM    22   A    On the 17th?

12:33PM    23   Q    9:00 p.m. -- I'm sorry -- "6:00 p.m. LAX to Honolulu

12:33PM    24   tomorrow.  Sunday, Honolulu to LAX, 9:00 a.m."

12:33PM    25   A    See, you getting me mixed up.  This might be the 17th.  As

12:33PM    1    I read 'em, I think LAX to Honolulu, I think she's booking

12:33PM    2    the -- the guys that came down to meet me.  Because I'm reading

12:34PM    3    it, "6:00 p.m., LAX to Honolulu tomorrow."

12:34PM    4    Q    Okay.

12:34PM    5    A    You know what I mean?

12:34PM    6    Q    Okay.

12:34PM    7    A    That's why I'm getting screwed up with this.

12:34PM    8    Q    Okay.  So let me ask just a couple of questions about

12:34PM    9    that.  So there was multiple travel arrangements that were

12:34PM   10    going on at this time.  Would that be fair to say?

12:34PM   11    A    Yes.

12:34PM   12    Q    So you were preparing to fly to LA.

12:34PM   13    A    Yes.

12:34PM   14    Q    But before that happened, is that when the people from

12:34PM   15    California were coming to meet you?

12:34PM   16    A    Yes.

12:34PM   17    Q    Was Starlynn Kuuana helping you with those arrangements as

12:34PM   18    well?

12:34PM   19    A    Yeah.

12:34PM   20    Q    Okay.

12:34PM   21    A    And that's -- that's what I reading, this is a different

12:34PM   22    text.  I'm getting mixed up.

12:34PM   23    Q    Okay.  Thank you for the clarification.

12:34PM   24          MR. INCIONG:  So if we roll up -- scroll up, please.

12:34PM   25    BY MR. INCIONG:

| | | | |
|---|---|---|---|
| 12:34PM | 1 | Q | "Is there an earlier flight tomorrow," you text out that. |
| 12:34PM | 2 | | So that's continuing just to make arrangements at that point, |
| 12:34PM | 3 | | correct? |
| 12:34PM | 4 | A | Yeah. |
| 12:34PM | 5 | Q | Okay.  I think we can keep going up, this is just more of |
| 12:34PM | 6 | | the same, you're finalizing your -- either your or the |
| 12:35PM | 7 | | individuals coming in from LA, their flight arrangements? |
| 12:35PM | 8 | A | Yeah.  Yeah. |
| 12:35PM | 9 | Q | Did you handle or pay for the flights for the people |
| 12:35PM | 10 | | coming from LA to meet you? |
| 12:35PM | 11 | A | Yeah, yeah, yeah. |
| 12:35PM | 12 | Q | Was that part of the deal? |
| 12:35PM | 13 | A | Well, it wasn't part of the deal, but I just told them, |
| 12:35PM | 14 | | Hey, come down -- you know, when I was communicating with them |
| 12:35PM | 15 | | I told them, Come down here, I'll pick you guys up from the |
| 12:35PM | 16 | | airport.  And that's what this conversation is. |
| 12:35PM | 17 | Q | Okay. |
| 12:35PM | 18 | | MR. INCIONG:  All right.  So we can keep scrolling up. |
| 12:35PM | 19 | | We can just keep going up a little bit further. |
| 12:35PM | 20 | | BY MR. INCIONG: |
| 12:35PM | 21 | Q | I want you to look at message number 50. |
| 12:35PM | 22 | A | Yeah. |
| 12:35PM | 23 | Q | There's an incoming message that same date, but now 11 -- |
| 12:35PM | 24 | | I'm sorry, 11:32 p.m., and under the message is a series of |
| 12:35PM | 25 | | letters.  Do you see that, OTYYSC? |

| | | | |
|---|---|---|---|
| 12:35PM | 1 | A | Yeah. |
| 12:35PM | 2 | Q | Is that a confirmation code? |
| 12:35PM | 3 | A | Oh, yeah, confirmation, yeah. |
| 12:35PM | 4 | Q | All right.  So this is again more -- more travel |
| 12:35PM | 5 | | arrangements that you're making? |
| 12:36PM | 6 | A | Yeah. |
| 12:36PM | 7 | Q | Okay.  All right.  So I think we get the idea from that. |
| 12:36PM | 8 | | Let me have you look next at Exhibit 7-8-E, as in |
| 12:36PM | 9 | | Edward. |
| 12:36PM | 10 | | Have you reviewed these messages before -- |
| 12:36PM | 11 | A | Yes. |
| 12:36PM | 12 | Q | -- Mr. Miller? |
| 12:36PM | 13 | | And did you recognize this as being a conversation or |
| 12:36PM | 14 | | messages you exchanged with Mike Buntenbah when you were in Los |
| 12:36PM | 15 | | Angeles? |
| 12:36PM | 16 | A | Yes. |
| 12:36PM | 17 | | MR. INCIONG:  Your Honor, I would move to admit -- |
| 12:36PM | 18 | | foundation and authenticity as stipulated to by the parties and |
| 12:36PM | 19 | | based on Mr. Miller's foundation for relevance, I would move to |
| 12:36PM | 20 | | admit the exhibit. |
| 12:36PM | 21 | | THE COURT:  Any objection? |
| 12:36PM | 22 | | MR. KENNEDY:  No objection. |
| 12:36PM | 23 | | THE COURT:  Without objection, 7-8-E is admitted. |
| 12:36PM | 24 | | (Exhibit 7-008-E was received in evidence.) |
| 12:36PM | 25 | | MR. INCIONG:  Thank you, Your Honor. |

| | | |
|---|---|---|
| 12:36PM | 1 | So I believe -- there's actually two pages.  So if we |
| 12:37PM | 2 | can start up on page 1. |
| 12:37PM | 3 | BY MR. INCIONG: |
| 12:37PM | 4 | Q   So there's -- there's a message here that you sent to MB |
| 12:37PM | 5 | on July 21st, 2014, at 7:22 p.m.  Do you see that? |
| 12:37PM | 6 | A   Yes. |
| 12:37PM | 7 | Q   Are you in Los Angeles at this point? |
| 12:37PM | 8 | A   Yes. |
| 12:37PM | 9 | Q   And your message to MB is:  "He's out front." |
| 12:37PM | 10 | A   Yes. |
| 12:37PM | 11 | Q   What did you mean by that? |
| 12:37PM | 12 | A   So the -- they sent the car to pick him up, because |
| 12:37PM | 13 | everything was done and we was just waiting.  At this point |
| 12:37PM | 14 | right there we -- everything is done, the deal is done.  So we |
| 12:37PM | 15 | just loading up the car and everything like that.  I told him, |
| 12:37PM | 16 | I got a pick up my friend, he staying at the hotel. |
| 12:37PM | 17 | So when we're talking, they send the guy, and I'm -- |
| 12:37PM | 18 | I'm texting -- they don't got Mike B.'s number, so I'm texting |
| 12:37PM | 19 | Mike B., Hey, the guy is out front to pick you up, white |
| 12:37PM | 20 | Cadillac.  That's what he's driving. |
| 12:38PM | 21 | Q   Okay.  All right.  So if we go down to the next message, |
| 12:38PM | 22 | that's what you text exactly, right? |
| 12:38PM | 23 | A   Yeah. |
| 12:38PM | 24 | Q   You text a follow-up text, "White Cadillac." |
| 12:38PM | 25 | A   Yes. |

12:38PM   1   Q    That was the car that Mr. Buntenbah should be looking for?

12:38PM   2   A    Yes.

12:38PM   3   Q    So he's at the hotel when you're sending him this?

12:38PM   4   A    Yes.

12:38PM   5   Q    You're at the drug house?

12:38PM   6   A    Yes.

12:38PM   7        MR. INCIONG:  All right.  Can we go down to the next

12:38PM   8   bubble.

12:38PM   9   BY MR. INCIONG:

12:38PM  10   Q    So is this Mr. B -- Mr. Buntenbah responding to you?

12:38PM  11   A    Yes.

12:38PM  12   Q    He sends you a text at 7:31 p.m. on July 21st?

12:38PM  13   A    Yes.

12:38PM  14   Q    And he says:  "I'm in."

12:38PM  15   A    Yes.

12:38PM  16   Q    What does that mean?

12:38PM  17   A    He's -- he's in the car.  He's on way.

12:38PM  18   Q    All right.

12:38PM  19   A    That was the response to me telling him they outside,

12:38PM  20   white Cadillac, he texted me back, "I'm in."

12:38PM  21   Q    Okay.

12:38PM  22        MR. INCIONG:  And if we could go to the final bubble

12:38PM  23   on that exhibit.

12:38PM  24   BY MR. INCIONG:

12:38PM  25   Q    Do you recognize this?

12:38PM   1    A    Yes.

12:38PM   2    Q    Is this your response --

12:38PM   3    A    Yes.

12:38PM   4    Q    -- to Mr. Buntenbah telling you that he's in?

12:38PM   5    A    Yes.

12:38PM   6    Q    You text him at 7:31 p.m.:  "Thank God."

12:39PM   7    A    Yes.

12:39PM   8    Q    Why did you say, "Thank God"?

12:39PM   9    A    I was kind of -- I was ready to leave the house too.  I

12:39PM  10    was done, and he was on the way with -- we was headed up to San

12:39PM  11    Francisco, I told him, Hey, we good to go.

12:39PM  12    Q    You said earlier you were kind of freaking out when you

12:39PM  13    were at that house.

12:39PM  14    A    Yeah.

12:39PM  15    Q    Were you relaxed now by this point or were you still kind

12:39PM  16    of worried?

12:39PM  17    A    Yeah, I was more relaxed because everything was done, you

12:39PM  18    know, but I just was -- I was ready to get out of there.

12:39PM  19              MR. INCIONG:  Could we go next to Exhibit 17-3-D,

12:39PM  20    please.

12:39PM  21              THE COURT:  17?

12:39PM  22              MR. INCIONG:  17 -- I'm sorry -- 7 -- sorry, Your

12:39PM  23    Honor.  7-13-D.  7-13-D.

12:39PM  24    BY MR. INCIONG:

12:40PM  25    Q    Do you recall reviewing -- and take a minute, Mr. Miller.

| 12:40PM | 1 | We can scroll down if you need to see them all, but do you |

12:40PM    1    We can scroll down if you need to see them all, but do you

12:40PM    2    recall reviewing this series of text messages prior to court

12:40PM    3    today?

12:40PM    4    A    Yes.

12:40PM    5    Q    Okay.  Do you recognize these as text messages between

12:40PM    6    yourself and Michael Buntenbah when you were in -- getting

12:40PM    7    ready for the trip to LA?

12:40PM    8    A    Yes.

12:40PM    9          MR. INCIONG:  Your Honor, I would move to admit

12:40PM    10    Exhibit 7-13-D.  The foundation has been stipulated to, and

12:40PM    11    based on Mr. Miller's description, I believe they are relevant.

12:40PM    12          THE COURT:  Any objection?

12:40PM    13          MR. KENNEDY:  If I could see the last page and the

12:40PM    14    first page?  Is this the last page?  Okay.  And the first page,

12:40PM    15    please.

12:40PM    16          No objection.

12:40PM    17          THE COURT:  Without objection, Exhibit 7-13-D, as in

12:41PM    18    delta, is admitted.  You may publish.

12:41PM    19        (Exhibit 7-13-D was received in evidence.)

12:41PM    20          MR. INCIONG:  Thank you, Your Honor.

12:41PM    21          If we could start at the bottom, I guess it's page 6,

12:41PM    22    so we go in order chronologically.

12:41PM    23    BY MR. INCIONG:

12:41PM    24    Q    So this is a message that you received from Mr. Buntenbah

12:41PM    25    saying:  "We going Sunday."  Is that correct?

12:41PM  1   A    No, I think that's -- that's outgoing.  This is my phone

12:41PM  2   telling him "We going Sunday."

12:41PM  3   Q    Are you -- well, let me ask you this:  Are you sure this

12:41PM  4   particular phone is your phone or do you just recognize the

12:41PM  5   chats here?

12:41PM  6   A    Yeah, I recognize the chats.

12:41PM  7   Q    Okay.  So do you see under -- next to number -- number 25,

12:41PM  8   native messages, the next column over, do you see that phone

12:41PM  9   number (808) 292-1555 --

12:41PM  10  A    Yeah.

12:42PM  11  Q    -- and White is the owner?  Were you White or did you know

12:42PM  12  somebody else to be White?

12:42PM  13  A    No, that wasn't me.

12:42PM  14  Q    So the message "We going Sunday" on July 19, 2014, does

12:42PM  15  that coincide with you getting ready to go on your trip to LA?

12:42PM  16  A    Yes.

12:42PM  17       MR. INCIONG:  Can we scroll up then.

12:42PM  18  BY MR. INCIONG:

12:42PM  19  Q    There's two in particular I want you to look at.

12:42PM  20       MR. INCIONG:  We can keep going.  Keep going.

12:42PM  21       You can keep going.  Okay.  If you can roll back down.

12:42PM  22  BY MR. INCIONG:

12:42PM  23  Q    Okay.  So you see this text message right here?

12:42PM  24  A    Yes.

12:42PM  25  Q    Number 13.  This is a message sent by White, the owner of

12:43PM   1    this phone.  It says:  "Shoulda have just sent it."

12:43PM   2    A    Okay.  So this is Mike B.'s phone right here.

12:43PM   3    Q    Okay.

12:43PM   4    A    And he's telling me -- when he says "Shoulda just sent

12:43PM   5    it," he wanted to send the money to LA instead of us carrying

12:43PM   6    it up.  So we're talking in person and everything like that,

12:43PM   7    but he's -- he's telling me we should have just sent it up.

12:43PM   8    Q    This is reference to when you were explaining before the

12:43PM   9    conversation you had where he wanted to mail it and you wanted

12:43PM  10    to carry it?

12:43PM  11    A    Yes.

12:43PM  12    Q    Okay.  There's one other text message I want to have you

12:43PM  13    look at then.

12:43PM  14         MR. INCIONG:  Keep going up.  Stop right there.

12:43PM  15    BY MR. INCIONG:

12:43PM  16    Q    So this one again is sent by White, the owner of this --

12:43PM  17    this phone, saying:  "I get more den' you."

12:43PM  18         I'm sorry, this is an incoming.  My mistake.  This is

12:43PM  19    incoming message to White --

12:43PM  20    A    Yes.

12:43PM  21    Q    -- to Michael Buntenbah.

12:43PM  22    A    Yeah.

12:43PM  23    Q    Did you send that message?

12:43PM  24    A    Yes.

12:43PM  25    Q    And what did you mean by that?

12:43PM   1   A    Like I was carrying more money than him.

12:44PM   2   Q    Why did that matter?

12:44PM   3   A    Because he was -- like he was adamant about sending 'em

12:44PM   4   up, and I was telling him like I carrying more than -- more

12:44PM   5   than you.  Like he wanted to send, he never like go -- he never

12:44PM   6   like go, but I told him, I said, We gotta go because I gotta

12:44PM   7   talk -- I gotta talk to them in person, you know.

12:44PM   8   Q    Okay.

12:44PM   9            MR. INCIONG:  All right.  We can take Exhibit 13 --

12:44PM   10  7-13-D down, please.  And then the last -- second to last one,

12:44PM   11  I should say, in this series, 7-14-C, as in Charles.

12:44PM   12  BY MR. INCIONG:

12:44PM   13  Q    Do you see that exhibit, Mr. Miller?

12:44PM   14  A    Yes.

12:44PM   15  Q    Have you seen that prior to coming to court today?

12:44PM   16  A    Yes.

12:44PM   17  Q    Did you recognize this as the contacts list in one of the

12:44PM   18  phones that was seized from you in Los Angeles in July of 2014?

12:44PM   19  A    Yes.

12:44PM   20           MR. INCIONG:  Your Honor, I would move to admit

12:44PM   21  7-14-C.  This has also been stipulated to as far as foundation.

12:45PM   22           THE COURT:  All right.  Mr. Kennedy?

12:45PM   23           MR. KENNEDY:  Is it just one page, Counsel, or two?

12:45PM   24           MR. INCIONG:  It is one page.

12:45PM   25           THE COURT:  No, two pages.

| 12:45PM | 1 | MR. INCIONG:  I'm sorry.  Two pages. |

12:45PM  1              MR. INCIONG:  I'm sorry.  Two pages.

12:45PM  2              MR. KENNEDY:  No objection.

12:45PM  3              THE COURT:  Without objection, 7-14-Charlie is

12:45PM  4  admitted.  You may publish.

12:45PM  5              (Exhibit 7-14-C was received in evidence.)

12:45PM  6              MR. INCIONG:  Thank you, Your Honor.

12:45PM  7              So if we can start at box number 1.

12:45PM  8  BY MR. INCIONG:

12:45PM  9  Q    This is contact number 1 listed in your phone, Arod?

12:45PM  10  A    Yes.

12:45PM  11  Q    Is that one of the people you were communicating with in

12:45PM  12  setting up the -- the drug deal that you were going to meet

12:45PM  13  with here in Hawaii?

12:45PM  14  A    Yes.

12:45PM  15              MR. INCIONG:  Could we go down to number 2.

12:45PM  16  BY MR. INCIONG:

12:45PM  17  Q    That's the same contact name, correct?

12:45PM  18  A    Yes.

12:45PM  19              MR. INCIONG:  Okay.  Keep going down.  Keep going to

12:45PM  20  number 4, please.

12:45PM  21  BY MR. INCIONG:

12:46PM  22  Q    So this is a different contact name, that's just the

12:46PM  23  letter E.  Do you see that?

12:46PM  24  A    Yes.

12:46PM  25  Q    Is that another one of the --

| | | |
|---|---|---|
| 12:46PM | 1 | A   One of the Mexicans, yeah. |
| 12:46PM | 2 |     MR. INCIONG:  Okay.  Keep going.  One down, please. |
| 12:46PM | 3 | BY MR. INCIONG: |
| 12:46PM | 4 | Q   Okay.  Number 7, do you see the name Gomez? |
| 12:46PM | 5 | A   Yes. |
| 12:46PM | 6 | Q   Do you recognize that as another one of the individuals |
| 12:46PM | 7 | you were discussing the cocaine deal with? |
| 12:46PM | 8 | A   Yes. |
| 12:46PM | 9 |     MR. INCIONG:  One down, please. |
| 12:46PM | 10 | BY MR. INCIONG: |
| 12:46PM | 11 | Q   Okay.  And Gomez, that's the same -- the same name, |
| 12:46PM | 12 | correct? |
| 12:46PM | 13 | A   Yes. |
| 12:46PM | 14 | Q   Now, you've mentioned before that you had different phones |
| 12:46PM | 15 | to talk to different people, right? |
| 12:46PM | 16 | A   Yes. |
| 12:46PM | 17 | Q   So what was this particular phone used for?  Who were you |
| 12:46PM | 18 | talking to with this phone? |
| 12:46PM | 19 | A   Just the -- just the Mexicans in this one. |
| 12:46PM | 20 | Q   Only them, nobody else? |
| 12:46PM | 21 | A   Yeah. |
| 12:46PM | 22 | Q   So you had that phone specifically for that purpose? |
| 12:46PM | 23 | A   Yes. |
| 12:46PM | 24 | Q   Okay.  All right.  So the last exhibit I want you to look |
| 12:47PM | 25 | at in this chain, Mr. Miller, is Exhibit 7-14-D, as in dog. |

12:47PM    1                 And We can scroll down if you need to see it all, but

12:47PM    2    have you seen this chain of text messages prior to coming to

12:47PM    3    court today?

12:47PM    4    A    Yes.

12:47PM    5    Q    Do you recognize it as being your chat conversations with

12:47PM    6    these individuals you just identified in 7-14-C in preparing

12:47PM    7    your discussions or this LA coke deal?

12:47PM    8    A    Yes.

12:47PM    9                 MR. INCIONG:  Your Honor, I would move to admit

12:47PM    10   7-14-D, which the foundation and authenticity has been

12:47PM    11   stipulated to by the parties.

12:47PM    12                THE COURT:  Mr. Kennedy, any objection?

12:47PM    13                MR. KENNEDY:  If we could just go back to the first

12:47PM    14   page, Your Honor.

12:47PM    15                THE COURT:  Yes.  It's a 13-page document.

12:47PM    16                MR. KENNEDY:  No objection.

12:47PM    17                THE COURT:  Without objection, 7-14-Delta is admitted.

12:48PM    18   You may publish.

12:48PM    19              (Exhibit 7-14-D was received in evidence.)

12:48PM    20                MR. INCIONG:  Thank you, Your Honor.  Thank you.

12:48PM    21   BY MR. INCIONG:

12:48PM    22   Q    So, Mr. Miller, this is a -- there are quite a few

12:48PM    23   messages here.  We don't need to go through all of them, I

12:48PM    24   don't believe, but if we can start at the bottom and again

12:48PM    25   going in chronological order.

12:48PM   1              So this is a message -- outgoing message that you sent

12:48PM   2   on July 17, 2014, saying:  "I'll pay everything."

12:48PM   3   A   Yes.

12:48PM   4   Q   So that was -- that was the deal you had or you offered to

12:48PM   5   the people from California?

12:48PM   6   A   Yes.

12:48PM   7              MR. INCIONG:  Okay.  So if we can just scroll up.

12:48PM   8   BY MR. INCIONG:

12:48PM   9   Q   Then you say:  "We can straighten everything out first."

12:48PM  10   A   Yes.

12:48PM  11   Q   Do you recall sending that message?

12:48PM  12   A   Yes.

12:48PM  13   Q   What did you mean by that?

12:48PM  14   A   Straighten out everything that -- that we was going do --

12:48PM  15   that we was planning on doing on the coke deal.

12:48PM  16   Q   So the negotiations basically?

12:48PM  17   A   Yeah.

12:48PM  18   Q   All right.  "Chill out and talk."

12:48PM  19   A   Yes.

12:49PM  20   Q   So that's what you meant by that, just more negotiating?

12:49PM  21   A   Yes.

12:49PM  22   Q   Okay.  This is a message that you send that same day:

12:49PM  23   "Come out tomorrow night and head back by Monday."

12:49PM  24   A   Yes.

12:49PM  25   Q   So it was going to be a quick trip for the weekend?

12:49PM  1   A    Mm-hmm.

12:49PM  2   Q    Was your plan then to follow them fairly quickly after --

12:49PM  3   A    Yeah.

12:49PM  4   Q    -- and go to LA to meet them?  Yes?

12:49PM  5   A    Yes.

12:49PM  6        MR. INCIONG:  All right.  You can keep going up.  Keep

12:49PM  7   scrolling up.  So we can stop here.

12:49PM  8   BY MR. INCIONG:

12:49PM  9   Q    So this is an incoming message that you received on

12:49PM  10  July 17th at about 9:50 in the morning, and the message is:

12:49PM  11  "Yeah, we down, Bro.  How will this work out?"

12:49PM  12  A    Yes.

12:49PM  13  Q    So are you talking about how you guys will meet or are you

12:49PM  14  talking about how the negotiation will go --

12:49PM  15  A    Yeah.

12:49PM  16  Q    -- as far as the terms?

12:49PM  17  A    Yeah, how everything will go down.

12:50PM  18       MR. INCIONG:  All right.  We can keep scrolling up

12:50PM  19  then.

12:50PM  20  BY MR. INCIONG:

12:50PM  21  Q    So you respond to that message saying:  "Set things up

12:50PM  22  right so we can come to an agreement on everything, and I'll

12:50PM  23  head back with you guys."

12:50PM  24  A    Yes.

12:50PM  25  Q    So that was the plan?

12:50PM   1   A    Yes.

12:50PM   2   Q    Is that what happened?

12:50PM   3   A    No, not -- not immediately with them.

12:50PM   4   Q    So you went back -- you went to LA a couple of days later.

12:50PM   5   A    Yes.

12:50PM   6           MR. INCIONG:  All right.  You can scroll up, please.

12:50PM   7           THE WITNESS:  But the thing was rolling, you know,

12:50PM   8   like the plan was going.  So when they came down, everything

12:50PM   9   was -- everything ready to go.

12:50PM  10   BY MR. INCIONG:

12:50PM  11   Q    Okay.  All right.  So this is -- if you look at message

12:50PM  12   54, so you're -- then are you telling them there that basically

12:50PM  13   you'll make the arrangements for their travel and so forth?

12:50PM  14   A    Yes.

12:50PM  15           MR. INCIONG:  So you can scroll up.

12:50PM  16   BY MR. INCIONG:

12:50PM  17   Q    So this is just back and forth --

12:50PM  18   A    Yes.

12:50PM  19   Q    -- finalizing the arrangements?

12:51PM  20   A    Yes.

12:51PM  21           MR. INCIONG:  Okay.  Keep going, please.  Keep going.

12:51PM  22   You can keep going.  So stop here.

12:51PM  23   BY MR. INCIONG:

12:51PM  24   Q    So this is an incoming message you received.  Still on

12:51PM  25   July 17th, now this is 10:27 p.m., with a name and a date of

12:51PM  1    birth.

12:51PM  2    A    Yeah.

12:51PM  3    Q    Do you see that, Jorge Aaron Sandoval --

12:51PM  4    A    Yes.

12:51PM  5    Q    -- and the date of birth?

12:51PM  6    A    Yes.

12:51PM  7    Q    Was that for the flight arrangements?

12:51PM  8    A    Yes.  That's one of the Mexicans that came down to meet.

12:51PM  9    Q

12:51PM  10            MR. INCIONG:  So keep going up, please.

12:51PM  11   BY MR. INCIONG:

12:51PM  12   Q    Okay.  There's another name and date of birth in message

12:51PM  13   46.

12:51PM  14   A    Yes.

12:51PM  15   Q    Same purpose?

12:51PM  16   A    Yes.

12:51PM  17            MR. INCIONG:  Okay.  Keep going up, please.  Keep

12:52PM  18   going.  Keep going.  Keep going.

12:52PM  19   BY MR. INCIONG:

12:52PM  20   Q    Oh, if you stop here, this message 37, is that another

12:52PM  21   confirmation number?

12:52PM  22   A    Yes.

12:52PM  23   Q    So this is all just flight arrangements being finalized?

12:52PM  24   A    Yes.

12:52PM  25            MR. INCIONG:  Keep going, please.

| | | |
|---|---|---|
| 12:52PM | 1 | BY MR. INCIONG: |
| 12:52PM | 2 | Q    There you're telling them on message 35 Hawaiian Airlines? |
| 12:52PM | 3 | A    Yes. |
| 12:52PM | 4 | Q    So was Starlynn Kuuana helping you with these |
| 12:52PM | 5 | reservations? |
| 12:52PM | 6 | A    Yes. |
| 12:52PM | 7 | MR. INCIONG:  Okay.  Keep going.  Keep going.  Keep |
| 12:52PM | 8 | going. |
| 12:52PM | 9 | BY MR. INCIONG: |
| 12:53PM | 10 | Q    Okay.  So message 29, you get an incoming message there |
| 12:53PM | 11 | on -- still on the 17th of July, just before midnight, and it |
| 12:53PM | 12 | says basically the name is spelled wrong, correct? |
| 12:53PM | 13 | A    Yes. |
| 12:53PM | 14 | Q    So did you have to change the reservation? |
| 12:53PM | 15 | A    I don't think needed to. |
| 12:53PM | 16 | Q    Okay.  So we go up to the next message, and do you see |
| 12:53PM | 17 | that? |
| 12:53PM | 18 | A    Yeah. |
| 12:53PM | 19 | Q    You say:  "I'll have her change it right now." |
| 12:53PM | 20 | A    Yes. |
| 12:53PM | 21 | Q    Who is "her"? |
| 12:53PM | 22 | A    Star. |
| 12:53PM | 23 | Q    Starlynn Kuuana? |
| 12:53PM | 24 | A    Yes. |
| 12:53PM | 25 | MR. INCIONG:  Okay.  Keep going up, please.  Keep |

12:53PM   1   going up.

12:53PM   2   BY MR. INCIONG:

12:53PM   3   Q    Okay.  So on message 25, you get an incoming message on

12:53PM   4   the next day, July 18th, 2014, and says:  "We about to land."

12:54PM   5        Were you meeting them at the airport?

12:54PM   6   A    Yes.

12:54PM   7        MR. INCIONG:  Okay.  You can scroll up.

12:54PM   8   BY MR. INCIONG:

12:54PM   9   Q    You reply in message 24:  "Early, Bro."

12:54PM  10   A    Yes.

12:54PM  11        MR. INCIONG:  Okay.  Keep scrolling up.

12:54PM  12   BY MR. INCIONG:

12:54PM  13   Q    So on the 18th there at 2:24 p.m., you send a message:

12:54PM  14   "I'll be there about 20 minutes."

12:54PM  15   A    Yes.

12:54PM  16   Q    So you were on your way to pick them up?

12:54PM  17   A    Yes.

12:54PM  18        MR. INCIONG:  All right.  Keep going up.

12:54PM  19   BY MR. INCIONG:

12:54PM  20   Q    And then you get a message at -- at 2:27 p.m. saying:

12:54PM  21   "Just landed in paradise."

12:54PM  22   A    Yes.

12:54PM  23   Q    So did you pick them up at the airport?

12:54PM  24   A    Yes.

12:54PM  25   Q    And then you had the meeting?

12:54PM    1    A    Yes.

12:54PM    2    Q    And that set everything in motion?

12:54PM    3    A    Everything in motion right there.

12:54PM    4    Q    Okay.

12:54PM    5          MR. INCIONG:  All right.  You can take that down.

12:54PM    6    Thank you.

12:54PM    7    BY MR. INCIONG:

12:54PM    8    Q    All right.  So before we got into the contents that were

12:54PM    9    on the phone, you described the first meeting you had with

12:55PM   10    Mr. Miske in Keolu Hills where you were out walking around, and

12:55PM   11    you said that's when you knew --

12:55PM   12    A    This was after -- after --

12:55PM   13    Q    Right, after you -- I'm fast-forwarding now to after you

12:55PM   14    had gotten released, after your arrest you flew back to Hawaii.

12:55PM   15    A    Yes.

12:55PM   16    Q    You said the first person you contacted after you got back

12:55PM   17    was Mr. Miske, right?

12:55PM   18    A    I don't know if he was the first person I contacted.  But

12:55PM   19    I contacted him as soon as I got back.

12:55PM   20    Q    Okay.  You met him in Keolu Hills?

12:55PM   21    A    Met him in Keolu Hills.

12:55PM   22    Q    You said you knew he was worried when he was looking in

12:55PM   23    cars?

12:55PM   24    A    Yes.

12:55PM   25    Q    Okay.  What -- what did you believe he was worried about?

12:55PM   1   A     I mean, when I -- when I was telling him the story, he was

12:55PM   2   trying to -- he was trying to register at first, you know.  I

12:55PM   3   know he was trying -- he was thinking like, like I ripped him

12:55PM   4   off or -- you know.  But he was -- he was trying to calm me

12:55PM   5   down at that point, and he said, That's only money.  You know.

12:55PM   6   Q     But at that point Mr. Miske is out a lot of money?

12:56PM   7   A     Huh?  Yeah.

12:56PM   8   Q     Like $300,000 or so, correct?

12:56PM   9   A     Yep.

12:56PM   10   Q     Okay.  Was there anything else he was concerned about that

12:56PM   11   he relayed to you?

12:56PM   12   A     Well, he thought I was setting him up, you know.

12:56PM   13   Q     So what do you mean by "setting him up"?

12:56PM   14   A     Like -- like this happened, and he thought I was trying to

12:56PM   15   set him up, you know.  I know -- I knew that was going through

12:56PM   16   his head because I said -- he was -- when he was -- when we was

12:56PM   17   walking through Keolu Hills, after we got out of his truck, he

12:56PM   18   started looking in cars and stuff like that, you know.  So I

12:56PM   19   was -- I was looking, I was like, damn, this guy -- he thinks

12:56PM   20   I'm trying to set him up because this just happened.

12:56PM   21   Q     "Setting him up" meaning cooperating with law enforcement?

12:56PM   22   A     Yes.  Yeah.

12:56PM   23   Q     So anything else that he did to determine if you were

12:56PM   24   cooperating with law enforcement or not?

12:56PM   25   A     I can't -- I can't remember at the time.  It was that

12:56PM   1   night you talking about?

12:56PM   2   Q    Okay.  Well, take us -- take me through.  You were there.

12:56PM   3   So how does that conversation go that evening?  You're walking

12:57PM   4   around, and what are you talking about?

12:57PM   5   A    We're walking around, we're talking about -- well, he

12:57PM   6   just -- he just expressing his concern, but he -- I know it was

12:57PM   7   going through his head because he -- his actions is doing other

12:57PM   8   things.  Like he going through, he looking at cars and stuff

12:57PM   9   like that, and he's doubting that this -- that this happened,

12:57PM  10   you know.  So, yeah.

12:57PM  11   Q    So did you ever meet with Mr. Miske and anyone else to

12:57PM  12   discuss this further?

12:57PM  13   A    Yes.

12:57PM  14   Q    Who?

12:57PM  15   A    I met with -- I met with Tommy Otake after within the

12:57PM  16   next -- within the next few days after that.

12:57PM  17   Q    Who is Tommy Otake?

12:57PM  18   A    That was Miske's lawyer.

12:57PM  19   Q    Who set this meeting up?

12:57PM  20   A    Miske.

12:57PM  21   Q    And how did you -- how did you find out about it?

12:57PM  22   A    Oh, I never know he was setting 'em up.  We was just -- he

12:57PM  23   told me for come meet him one day.  I forget where we met.  It

12:57PM  24   might have been at the shop or whatever.  But he told me go

12:57PM  25   check out Tommy, you know.

| | | | |
|---|---|---|---|
| 12:58PM | 1 | Q | Did you know who he meant when he said, Go check out |
| 12:58PM | 2 | | Tommy? |
| 12:58PM | 3 | A | Yeah. |
| 12:58PM | 4 | Q | Did you know what -- or why you were meeting Tommy? |
| 12:58PM | 5 | A | Yeah. |
| 12:58PM | 6 | Q | Why? |
| 12:58PM | 7 | A | For talk about this -- this -- what just went down. |
| 12:58PM | 8 | Q | Had you ever met Mr. Otake before? |
| 12:58PM | 9 | A | Yes. |
| 12:58PM | 10 | Q | In what context? |
| 12:58PM | 11 | A | In what context?  Like he -- |
| 12:58PM | 12 | Q | Where had you met him before? |
| 12:58PM | 13 | A | It was around.  Tommy was -- you know, Tommy used to come |
| 12:58PM | 14 | | around.  I don't know if I met him at his office.  Miske used |
| 12:58PM | 15 | | to go there -- he used to go there a lot. |
| 12:58PM | 16 | Q | Okay.  So where did you meet with Mr. Otake? |
| 12:58PM | 17 | A | We met at a -- at a school in Waikiki.  So when we -- by |
| 12:58PM | 18 | | the time we got there, Tommy was already -- he was already |
| 12:58PM | 19 | | parked there standing outside of his truck already. |
| 12:58PM | 20 | Q | So what kind of school in Waikiki was this? |
| 12:58PM | 21 | A | One school in Waikiki, it was like an elementary school or |
| 12:58PM | 22 | | something like that. |
| 12:58PM | 23 | Q | So you didn't go to Mr. Otake's office? |
| 12:59PM | 24 | A | No. |
| 12:59PM | 25 | Q | Do you know why the meeting was at the school? |

12:59PM  1   A    I don't know.  I don't know why it was at the school, but

12:59PM  2   I wasn't thinking nothing at the time.  But we just -- I

12:59PM  3   remember pulling up, and -- and then Miske was, Hey, we meet

12:59PM  4   Tommy, we'll talk to Tommy about this.

12:59PM  5       Then pulled up, we parked.  Tommy was parked, he was

12:59PM  6   outside of his truck already, like walking around underneath

12:59PM  7   the banyan tree.  Then we pulled up over there, and he was

12:59PM  8   like, Hey, tell him -- tell him what happened.  Miske was like,

12:59PM  9   Hey, tell him what happened.

12:59PM  10      You know, because -- because leading up to this, even

12:59PM  11  Miske was kind of doubting me, like -- like in this couple of

12:59PM  12  days from when it happened, I got back to when we met Tommy, in

12:59PM  13  those days he always -- he always used to be like, You

12:59PM  14  sure this -- you know, you sure this fucking happened?  Like he

12:59PM  15  would just throw shots at me like that.

12:59PM  16  Q    So he was asking you specifically if it really happened

12:59PM  17  how you said it?

12:59PM  18  A    Yeah, yeah.  I was kind of -- like I was like -- I was

01:00PM  19  getting offended at the time, you know, because I wasn't -- I

01:00PM  20  never have any reason for him to doubt me at that time.

01:00PM  21  Q    So what was the purpose of Mr. Otake hearing your story?

01:00PM  22  A    Oh, for see if something like that really wen' happen.

01:00PM  23  And like -- like if they would really let me go, you know.

01:00PM  24  Q    So did you tell Mr. Otake the story that -- basically what

01:00PM  25  you told this jury a little bit ago?

01:00PM  1   A    Yeah, I cannot remember the exact words that I told Tommy,

01:00PM  2   but I told him the story of what happened, you know, and mainly

01:00PM  3   why they let me go and would they let me go if this had

01:00PM  4   happened.

01:00PM  5   Q    And what was the -- what was Mr. Otake's reaction to

01:00PM  6   hearing that?

01:00PM  7   A    I mean, he took -- he was shocked too.  He was -- I would

01:00PM  8   say he was shocked when I was telling him what happened, and

01:00PM  9   the fact that they let -- that they let me go, he was -- he was

01:00PM  10  kind of shocked, you know.  He took 'em in and gave me -- we

01:01PM  11  was talking, but the clear thing that -- that the point got

01:01PM  12  across to me was -- was, Hey, if anybody come talk to you,

01:01PM  13  don't -- don't tell them nothing.  Just tell them I'm your

01:01PM  14  attorney, you know, like that.

01:01PM  15  Q    So let me have you look at Exhibit 7-17, please.

01:01PM  16       Do you see that exhibit, Mr. Miller?

01:01PM  17  A    Yes.

01:01PM  18  Q    Do you recognize what's shown in that map, that area?

01:01PM  19  A    Yes.  Monsarrat, Kapahulu.  The zoo right there.

01:01PM  20  Q    Okay.  So it's part of Waikiki area?

01:01PM  21  A    Yes.

01:01PM  22  Q    Does that accurately show that area as you know it?

01:01PM  23  A    Yes.

01:01PM  24       MR. INCIONG:  Your Honor, I would move to admit

01:01PM  25  Exhibit 7-17 at this time.

01:01PM  1              THE COURT:  Any objection?

01:01PM  2              MR. KENNEDY:  No objection.

01:01PM  3              THE COURT:  Without objection, 7-17 is admitted.  You

01:01PM  4     may publish.

01:01PM  5                   (Exhibit 7-17 was received in evidence.)

01:02PM  6              MR. INCIONG:  Thank you, Your Honor.

01:02PM  7     BY MR. INCIONG:

01:02PM  8     Q    So the -- that's the area of Waikiki.  Like you said, the

01:02PM  9     zoo.  Do you see Kapahulu Avenue there?

01:02PM 10     A    Yes.

01:02PM 11     Q    Could you just draw an X or line to indicate where that

01:02PM 12     is.

01:02PM 13     A    (Witness complies.)

01:02PM 14     Q    Okay.  Is this in the area, the vicinity of where you met

01:02PM 15     with Mr. Miske and Mr. Otake?

01:02PM 16     A    Yes.

01:02PM 17     Q    Do you see that -- the red dot there that's next to Thomas

01:02PM 18     Jefferson Elementary School?

01:02PM 19     A    Yes.

01:02PM 20     Q    Is that the elementary school that you met at?

01:02PM 21     A    I'm not sure, but I'm pretty sure it was that one, you

01:02PM 22     know, because I remember pulling into the school because it

01:02PM 23     caught me off guard, you know, when we was going over there.

01:02PM 24     He never tell me we was going to see Tommy until we was

01:02PM 25     actually seeing Tommy.  You know.

01:02PM   1   Q    And this meeting was held in the parking lot of the --

01:02PM   2   A    In the parking lot, yeah.  I remember we had one big

01:02PM   3   banyan tree, and we pulled up right there, and Tommy was

01:02PM   4   already waiting for us.

01:02PM   5   Q    Okay.  Well, let me show you Exhibit 7-23, see if you

01:03PM   6   recognize that.

01:03PM   7         Do you see that exhibit?

01:03PM   8   A    Yes.

01:03PM   9   Q    Do you recognize that?

01:03PM  10   A    Yes.

01:03PM  11   Q    Is this basically like a Google Earth view of the map that

01:03PM  12   you were just looking at but close --

01:03PM  13   A    Yes.

01:03PM  14   Q    Okay.  You mentioned a banyan tree that you recall.

01:03PM  15   A    Yes.

01:03PM  16   Q    Does that banyan tree look to be in the same location as

01:03PM  17   the one you recall?

01:03PM  18   A    Yeah.  Right.  Boom.

01:03PM  19   Q    Okay.  So does this photo accurately show that area that

01:03PM  20   you believe you met with Mr. Otake --

01:03PM  21   A    Yeah.

01:03PM  22   Q    -- when he got back you got back from LA?

01:03PM  23   A    Yeah, I'm pretty sure that's where -- that's where it was.

01:03PM  24         MR. INCIONG:  Your Honor, I'd move to admit 7-23.

01:03PM  25         THE COURT:  Any objection?

01:03PM    1                MR. KENNEDY:  No objection.

01:03PM    2                THE COURT:  7-23 is admitted without objection.  You

01:03PM    3    may publish.

01:03PM    4                (Exhibit 7-23 was received in evidence.)

01:03PM    5                MR. INCIONG:  Thank you, Your Honor.

01:03PM    6    BY MR. INCIONG:

01:03PM    7    Q    So, Mr. Miller, you circled the -- is that the banyan tree

01:04PM    8    that you recall being in the middle of the parking lot?

01:04PM    9    A    Yes.

01:04PM   10    Q    So this is the parking lot right along Kapahulu Avenue --

01:04PM   11    A    Yes.

01:04PM   12    Q    -- where you met with Mr. Otake?

01:04PM   13    A    Yes.

01:04PM   14    Q    Okay.  So how long would you say this meeting took?  How

01:04PM   15    long were you there talking to him?

01:04PM   16    A    I would give an estimate maybe -- maybe half an hour.

01:04PM   17    Q    Was Mr. Otake asking you questions about what had

01:04PM   18    happened?

01:04PM   19    A    Yeah, we was -- I mean we was talking about the -- we was

01:04PM   20    talking about 'em.  I no remember the words, but I know we was

01:04PM   21    talking about 'em, and he was asking me questions and I was

01:04PM   22    giving him the -- the feedback, but -- yeah, the main thing we

01:04PM   23    discussed at the end was -- was like when Miske told me, Hey

01:04PM   24    you heard him, right?  If anybody -- if anything happen, tell

01:04PM   25    'em Tommy is your -- you don't even got to tell them your name,

01:04PM  1    you know.  Like he always used to tell me that kind of stuff.

01:04PM  2    Q    So who is telling you this?

01:04PM  3    A    Miske.

01:04PM  4    Q    Was that the only time you met with Mr. Otake, to discuss

01:05PM  5    this incident in Los Angeles?

01:05PM  6    A    No, I know I met -- I know I met him more, but I cannot --

01:05PM  7    I don't recall.  At least one more time it was.

01:05PM  8    Q    Was there anything different or additional discussed at

01:05PM  9    the other meetings?

01:05PM  10   A    I no remember.

01:05PM  11   Q    So after that meeting, did Mr. Miske continue to be

01:05PM  12   skeptical of your story or was he satisfied at that point?

01:05PM  13   A    I know he was skeptical, but he wasn't -- you know, he

01:05PM  14   wasn't -- he wasn't acting out of the ordinary.  You know,

01:05PM  15   after that -- after that meeting we started talking about -- we

01:05PM  16   still in the same couple days after that meeting.  So we start

01:05PM  17   talking about -- about how we get his money back.  You know,

01:05PM  18   they -- you know, he felt calm already.  He was -- I never got

01:05PM  19   arrested, we went talk to Tommy.  I was -- I was still coming

01:05PM  20   around.  I was there every day at this -- not every day, but I

01:06PM  21   was there a lot at his shop with him.  We eating at night.

01:06PM  22   So...

01:06PM  23   Q    So what do you mean by you said you were talking about how

01:06PM  24   to get his money back?

01:06PM  25   A    We talking -- okay.  So in that time frame, in that couple

01:06PM   1     days that we talked to Tommy or whatever, I meet him at the

01:06PM   2     Honolulu Club parking lot, and we pull up in the parking lot,

01:06PM   3     we talking.   And we talking about how I told him that -- that

01:06PM   4     Sammy was still -- was the one that was supposed to have done

01:06PM   5     the deal.   Like Sammy was a part of the deal, but he wasn't

01:06PM   6     aware -- Sammy wasn't aware that -- that the deal went bad up

01:06PM   7     there already.

01:06PM   8             So we started talking about like, Hey, fuck him, tell

01:06PM   9     him -- tell him -- just go over there like the deal was still

01:06PM   10    being set up.   You know, like the thing was still going down.

01:06PM   11    Q    Who said that?

01:06PM   12    A    Miske.

01:06PM   13    Q    Okay.   So tell him the deal was still going down?

01:07PM   14    A    Yeah, because he never know -- Sammy never know what

01:07PM   15    happened, I was freed.   All of this happened in LA.   Sammy was

01:07PM   16    down here still, he never know what was going on.

01:07PM   17    Q    Okay.   So what was the purpose of telling Sammy that

01:07PM   18    nothing happened, the deal was still going on?

01:07PM   19    A    Yeah, just for get the money back.   He was like, Hey, tell

01:07PM   20    Sammy the deal is still going down, and his deal is still going

01:07PM   21    down.   He don't know that we got arrested and let go and

01:07PM   22    everything like that.   So tell Sammy this deal is going down,

01:07PM   23    get the money, tell him, Hey, everything is still good, grab

01:07PM   24    the money from him and give 'em back to me.

01:07PM   25    Q    Give it back to Mr. Miske?

| | | | |
|---|---|---|---|
| 01:07PM | 1 | A | Yes. |
| 01:07PM | 2 | Q | So what were you going to tell Mr. Kuuana then after he |
| 01:07PM | 3 | | didn't get any drugs in return for that money? |
| 01:07PM | 4 | A | No, like Miske used to tell me, brah, fuck him.  He |
| 01:07PM | 5 | | used -- I like burn him on the club, you know what I mean.  He |
| 01:07PM | 6 | | not going do nothing. |
| 01:07PM | 7 | Q | So this was basically his idea to get his money back? |
| 01:07PM | 8 | A | Yeah.  That was his idea for get -- for get his money |
| 01:08PM | 9 | | back, yeah.  Call Sammy. |
| 01:08PM | 10 | Q | Did you contact Mr. Kuuana? |
| 01:08PM | 11 | A | Yes. |
| 01:08PM | 12 | Q | Did you tell him, Hey, the deal is good, I need your |
| 01:08PM | 13 | | money? |
| 01:08PM | 14 | A | Yes. |
| 01:08PM | 15 | Q | Did he give you the money? |
| 01:08PM | 16 | A | Yes. |
| 01:08PM | 17 | Q | How much money did he give you? |
| 01:08PM | 18 | A | A lot.  Over -- over 300, you know. |
| 01:08PM | 19 | Q | 300,000? |
| 01:08PM | 20 | A | Yeah. |
| 01:08PM | 21 | Q | How did you get that money? |
| 01:08PM | 22 | A | He gave 'em to me.  I told him that everything was set up, |
| 01:08PM | 23 | | like the deal going, let me get the money.  And I was still a |
| 01:08PM | 24 | | trusted person at that point.  So... |
| 01:08PM | 25 | Q | What did you do with the money? |

01:08PM  1   A    I gave 'em to Miske.

01:08PM  2   Q    Where?

01:08PM  3   A    So I -- okay.  Going back to Sammy, I tell him, Hey, the

01:08PM  4   deal is still going on.  After I'm talking to Miske, I go see

01:08PM  5   Sammy, telling him everything is going on.  Sammy, that night

01:08PM  6   he goes and grabs the money from wherever it's at, he gives the

01:08PM  7   money to me.

01:08PM  8           So now I got to go and tell Sammy, Hey, I got ripped

01:08PM  9   off.  You know, Sammy was looking at me like, What?  You know.

01:09PM 10   So I just told him, Hey, I got ripped off, your money is gone.

01:09PM 11   And I -- I never call him back after that.  He was -- Sam was

01:09PM 12   getting ripped off all the time and he never do nothing.  So at

01:09PM 13   least he took --

01:09PM 14   Q    How much time passed after you got the money from Sammy

01:09PM 15   did you tell him you got ripped off and the money was gone?

01:09PM 16   A    Few days.  Maybe the next day.

01:09PM 17   Q    Okay.  So in the meantime, what do you do with the money?

01:09PM 18   A    I'm holding -- I'm holding the money.  At this point I got

01:09PM 19   the money now.  So I go back to Miske and I tell him, wasn't --

01:09PM 20   maybe at his club or something like that, I tell him, Hey, I

01:09PM 21   got -- I got the scripts.  You know.  So that's money.  And he

01:09PM 22   was like, You got 'em?  I was like, Yeah.  So he told me, Hey,

01:09PM 23   just hold it.  Hold 'em, and I going -- I going tell you when

01:09PM 24   for -- for bring 'em.  So...

01:09PM 25   Q    So where did you hold the money?

01:10PM   1   A    We had -- we had burner cars around, you know.  So we had

01:10PM   2   cars that -- that we used to -- that we just parked all around

01:10PM   3   the -- the island, you know, in parking spots where different

01:10PM   4   cars park every day so people not going to notice.

01:10PM   5   Q    When you say "a burner car," what do you mean by "a burner

01:10PM   6   car"?

01:10PM   7   A    Like one burner phone, a car -- a disposable car.  You

01:10PM   8   know, stuff -- to hold stuff in, stuff to follow people in.

01:10PM   9   It's not in your name, so you're not going to be able to trace

01:10PM  10   'em back to you.

01:10PM  11   Q    Who acquired these burner cars?

01:10PM  12   A    A lot of people, me, Kaulana Freitas, Jason Yokoyama.

01:10PM  13   Yeah.

01:10PM  14   Q    Who was paying for the cars?

01:10PM  15   A    Miske.

01:10PM  16   Q    Were you aware --

01:10PM  17   A    Oh, like -- I know when I would do 'em, like if I would

01:10PM  18   pay for 'em, he would give me the money back, whatever the

01:10PM  19   thing was, or he would give me the money before and I would go

01:10PM  20   grab 'em.

01:10PM  21   Q    So you had these burner cars just parked at various

01:11PM  22   places?

01:11PM  23   A    Yeah, all over the island.  You know, some in Pearl City,

01:11PM  24   some in Makiki, some downtown.

01:11PM  25   Q    How was it kept track of where these cars were?

01:11PM   1   A    I mean I already -- I knew where the thing was.  I knew

01:11PM   2   where all the cars was.

01:11PM   3   Q    Okay.

01:11PM   4   A    The ones that I wen' park, I know where the thing was.  Or

01:11PM   5   if like Jason was dropping 'em off to me, I would be the one

01:11PM   6   parking 'em.

01:11PM   7   Q    Okay.  So you were told to hold the money in one of these

01:11PM   8   burner cars?

01:11PM   9   A    Yes.

01:11PM  10   Q    That's parked on the road?

01:11PM  11   A    Yes.

01:11PM  12   Q    You weren't concerned that the money would be stolen?

01:11PM  13   A    Well, I know one of -- one of the cars was like one family

01:11PM  14   car, a family looking car, like almost like a van.  So I

01:11PM  15   remember when we got -- when we got cars like that, had like

01:11PM  16   baby seats inside and had -- had like the "Baby on Board"

01:11PM  17   sticker -- not the sticker, but the little suction thing.

01:11PM  18        And he was like, Look, if you was trying to steal cars

01:11PM  19   and you seen baby seats and the little "Baby on Board," you

01:12PM  20   would break into this car and steal 'em?  And I would be like,

01:12PM  21   That makes sense, you know.  So --

01:12PM  22   Q    You mean you would or you would not break into those cars?

01:12PM  23   A    No, you wouldn't.  You wouldn't -- you see one baby seat,

01:12PM  24   you're not going to get -- like if you're breaking into cars,

01:12PM  25   you're not going get people breaking into this car, you know, a

01:12PM    1    family looking car.

01:12PM    2    Q    Okay.

01:12PM    3    A    And -- yeah, so -- so we used to use those cars, like had

01:12PM    4    guns inside those cars and was parked all over the place.

01:12PM    5    Q    You would store -- you would store guns in those cars?

01:12PM    6    A    Yes.

01:12PM    7    Q    Okay.  So the "Baby on Board" suction cup thing, was that

01:12PM    8    something that was already in this car you're talking about?

01:12PM    9    A    Yeah, yeah, it was in the car.

01:12PM   10    Q    Did you ever place them in other cars?

01:12PM   11    A    Yes.

01:12PM   12    Q    At whose direction?

01:12PM   13    A    Yeah, Miske used to tell me that's the -- like that's --

01:12PM   14    you're not going to look at those -- you know, if you going

01:12PM   15    steal one car, you're not -- you going to look for cars with

01:12PM   16    nice rims and -- if you going to steal one car and it get one

01:12PM   17    sticker like that and baby seat inside, you not going to break

01:12PM   18    into that car and lift 'em up and find guns, you know.

01:13PM   19          So I was living in Pearl City at that time, and one of

01:13PM   20    the those cars that we had, I had 'em parked on the street

01:13PM   21    where plenty cars parked, and that's where I was holding the --

01:13PM   22    the money at that time.

01:13PM   23    Q    Okay.

01:13PM   24    A    Waiting to -- waiting for his call to tell me, Hey, bring

01:13PM   25    it -- bring it over here.

01:13PM  1    Q    Okay.  Did he eventually call you and ask for it?

01:13PM  2    A    Yes.

01:13PM  3    Q    Approximately how much -- how long did you have to hold

01:13PM  4    the money for?

01:13PM  5    A    If I got 'em that week, by that weekend I was already

01:13PM  6    meeting him to -- to pass the money on.

01:13PM  7    Q    So how did you get the money to him specifically?

01:13PM  8    A    I drove 'em down there.  I drove --

01:13PM  9    Q    Where is "down there"?

01:13PM  10   A    So he called me up and he was like, Hey, let's go -- let's

01:13PM  11   go to the bay, ride skis.  We went there often, so it wasn't

01:13PM  12   no -- wasn't no surprise.  And he was like, Hey, bring that

01:13PM  13   down.

01:13PM  14        So I went down, I parked at the bay inside the parking

01:13PM  15   lot inside where the boats -- where the boats get launched at.

01:14PM  16   And I jump in with him, we go driving around, we stop at the

01:14PM  17   library, you know, Hawaii Kai Public Library that you can go

01:14PM  18   underneath.  So we stop over there.  Again, I'm thinking that

01:14PM  19   he's -- he's double-checking if anybody following us or not.

01:14PM  20   We stop over there, we park, we start talking.  And we talking

01:14PM  21   about different shit, the thing is done, I got the money

01:14PM  22   already.  It's in -- it's in the car waiting for him to grab

01:14PM  23   it.

01:14PM  24        We talking about other stuff, fueling up the jet skis,

01:14PM  25   buying some stuff from Zippy's and whatnot.  And so in the time

01:14PM  1    that we talking, Jason Yokoyama pulls up, he communicating with

01:14PM  2    Miske.  He pulls up to the boat ramp over there in that area,

01:14PM  3    and me and Miske -- like me and Miske pulls up over there, and

01:14PM  4    Miske tells me, Hey, give the money to -- give the money to

01:15PM  5    Jason.

01:15PM  6    Q    Okay.  So did you hand it to Jason or did you put it in

01:15PM  7    his car?  Tell us how -- where the money went.

01:15PM  8    A    Yeah, so Jason -- where I was parked at, Jason pulled up

01:15PM  9    next to me like that, he popped the trunk, I grabbed the money

01:15PM  10   out of my car, gave 'em to Jason.  Jason -- him and Jason

01:15PM  11   walked away, started talking, and then Jason never stayed at

01:15PM  12   the bay with us.  He left.

01:15PM  13   Q    Okay.  So is this the same bay, the beach area that you

01:15PM  14   would always go to for barbecues, jet skis, the same place?

01:15PM  15   A    The parking lot area.

01:15PM  16   Q    Okay.  So the money was contained in what?

01:15PM  17   A    That specific money had some loose money, but those

01:15PM  18   specific money was in FoodSaver bags, stacked up neat like

01:15PM  19   that, piled up like that.

01:15PM  20   Q    Was this in a duffel bag, suitcase or --

01:16PM  21   A    No, this is a -- this is a FoodSaver bag, just stacks of

01:16PM  22   $100 bills all the way down.

01:16PM  23   Q    Okay.  And what was the -- what were the packages of money

01:16PM  24   contained in that you handed to Mr. Yokoyama?

01:16PM  25   A    It was in a bag.  I don't know what kind of bag, but I

01:16PM    1    gave it to him in a bag.  But I remember that -- that money

01:16PM    2    because the thing was nicely -- everything was neat.  Yeah.

01:16PM    3    Q    Okay.  All right.  So was there any -- was that whole

01:16PM    4    cocaine LA thing done at that point?

01:16PM    5    A    Yeah.

01:16PM    6    Q    You didn't try to get that going again after what

01:16PM    7    happened?

01:16PM    8    A    No, I was done -- I was done already.  I was done.

01:16PM    9    Q    Okay.  So this is the summer of 2014, correct?

01:16PM    10    A    Yes.

01:16PM    11    Q    Fast-forward a couple of months in that year, did you have

01:16PM    12    a child later that year?

01:16PM    13    A    Yes.

01:17PM    14    Q    When was that?

01:17PM    15    A    October 14th.

01:17PM    16    Q    Is that your first child?

01:17PM    17    A    Yes.

01:17PM    18    Q    Are you working yet at the movies or anything like that

01:17PM    19    during this time?

01:17PM    20    A    I might have -- I might have started around that time or a

01:17PM    21    little -- little bit after.

01:17PM    22    Q    All right.  Were there any other business ventures you had

01:17PM    23    gone into with Mr. Miske that you had partnered with him --

01:17PM    24    A    Yeah.

01:17PM    25    Q    -- in like legitimate business ventures?

01:17PM    1    A    Yeah.

01:17PM    2    Q    What was that?

01:17PM    3    A    We was -- we was opening up -- we was going into a food

01:17PM    4    truck that we was supposed to do.

01:17PM    5    Q    And what were you going to sell out of that food truck?

01:17PM    6    A    Poke.

01:17PM    7    Q    And whose idea was that?

01:17PM    8    A    I think that was -- that was both of ours, but -- I was

01:17PM    9    talking to him about 'em, we was looking 'em up.  My friend

01:17PM    10   that was doing 'em in the Big Island was -- he was like the

01:17PM    11   number one restaurant on -- on Yelp and stuff like that.

01:17PM    12   Q    All right.  So did that actually happen?

01:18PM    13   A    Yeah, yeah, we did for a little while.

01:18PM    14   Q    So who -- who bankrolled or funded the startup for the

01:18PM    15   business?

01:18PM    16   A    Both of us.

01:18PM    17   Q    Was it successful?

01:18PM    18   A    No.

01:18PM    19   Q    Were you involved at all really or --

01:18PM    20   A    I mean just -- as far as the money, yeah, but that's about

01:18PM    21   it.

01:18PM    22   Q    You weren't working in the -- making poke in the food

01:18PM    23   truck?

01:18PM    24   A    No, no.  No.

01:18PM    25   Q    Okay.  I want to take you -- kind of fast-forward a little

| | | |
|---|---|---|
| 01:18PM | 1 | bit then to the next summer, summer of 2015.  Did you have some |
| 01:18PM | 2 | recurring or flare-ups with the medical issues that you |
| 01:18PM | 3 | described earlier? |
| 01:18PM | 4 | A    Yes. |
| 01:18PM | 5 | Q    Okay.  How did that come about or come to light? |
| 01:18PM | 6 | A    I was -- I went to see my doctor, just regular routine |
| 01:18PM | 7 | checkup.  They did some -- some CT scans, and the doctor said |
| 01:18PM | 8 | that my -- parts of my aorta was -- was also tearing. |
| 01:19PM | 9 | Q    All right.  Was the doctor able to -- or identify the |
| 01:19PM | 10 | cause of this or at least have an idea? |
| 01:19PM | 11 | A    Yes. |
| 01:19PM | 12 | Q    And what was the diagnosis? |
| 01:19PM | 13 | A    I don't know.  It sounded like it was Marfan's, you know, |
| 01:19PM | 14 | but my -- |
| 01:19PM | 15 | THE COURT REPORTER:  I'm sorry, it sounded like what? |
| 01:19PM | 16 | Did you say Marfan's? |
| 01:19PM | 17 | THE WITNESS:  Yeah. |
| 01:19PM | 18 | Q    Do you know how to spell Marfan's? |
| 01:19PM | 19 | A    No. |
| 01:19PM | 20 | Q    Okay.  Marfan's syndrome? |
| 01:19PM | 21 | A    Yeah.  But she wasn't sure, though, that's why -- I never |
| 01:19PM | 22 | really asked questions. |
| 01:19PM | 23 | Q    All right.  Did you have follow-up testing to determine if |
| 01:19PM | 24 | that was the case? |
| 01:19PM | 25 | A    Yeah. |

01:19PM   1   Q    Where did you go for that?

01:19PM   2   A    I went -- I went to Texas.

01:19PM   3   Q    And did it turn out that the diagnosis was accurate?

01:19PM   4   A    Yeah.

01:19PM   5   Q    What is Marfan's syndrome?

01:19PM   6   A    I don't really know, but I know for me my aorta was

01:20PM   7   ripping, if that's describing that.  I'm not a doctor.

01:20PM   8   Q    Did you learn whether that was a hereditary condition?

01:20PM   9   A    Yeah, could have been.

01:20PM  10   Q    So was there recommended action that you take once that

01:20PM  11   was discovered?

01:20PM  12   A    Yes.

01:20PM  13   Q    What was that?  What did you need to have done?

01:20PM  14   A    Yeah, well, they -- in Houston, the doctor over there told

01:20PM  15   me that, Hey, we -- we can fix that, we can put a whole new

01:20PM  16   valve inside there from top to bottom, instead of just that

01:20PM  17   arch.  Because he said in the -- it might not be right now, but

01:20PM  18   in the long run that going happen to you again, like your valve

01:20PM  19   going rip again.

01:20PM  20   Q    All right.  So did you have to make a couple of trips to

01:20PM  21   Texas for that?

01:20PM  22   A    Yes.

01:20PM  23   Q    Okay.  The first was to get the confirmation --

01:20PM  24   A    Yeah.

01:20PM  25   Q    -- that you had Marfan's syndrome?

| 01:20PM | 1  |   | Did you schedule a surgery? |
|---------|----|---|-----------------------------|

01:20PM    2    A    Yes.

01:20PM    3    Q    When was that surgery scheduled for?

01:20PM    4    A    2015.

01:21PM    5    Q    What part of the year, do you remember?

01:21PM    6    A    Later on in the year, November, December, around there.

01:21PM    7    Q    Okay.  So before you went back to Texas for that surgery,

01:21PM    8    was there a really serious car accident that you remember

01:21PM    9    hearing about?

01:21PM   10    A    Yes.

01:21PM   11    Q    Okay.  Who was involved in that car accident?

01:21PM   12    A    Caleb -- Caleb Miske, Mike's -- Mike's son, and -- and

01:21PM   13    Caleb's friend Jonathan Fraser.

01:21PM   14    Q    How did you find out about the accident?

01:21PM   15    A    Mike B. called me that -- that night of the accident,

01:21PM   16    Mike B. called me and said, Hey, I'm trying to get in touch --

01:21PM   17    trying to get in touch with Mike.  Call him up and tell him his

01:21PM   18    son just got into an accident.

01:21PM   19    Q    So Mike B. was saying he was trying to get in touch with

01:21PM   20    Mike Miske?

01:21PM   21    A    Yeah, he's calling -- he's calling me -- I'm working at

01:21PM   22    that point, so I'm at home sleeping, and my phone just kept

01:21PM   23    ringing, ringing, ringing, so I picked it up and it was Mike B.

01:22PM   24    telling me that he was trying to get in touch with Miske

01:22PM   25    because his son just got into a big accident.

01:22PM  1   Q    All right.  Were you able to contact Mr. Miske?

01:22PM  2   A    Yes.

01:22PM  3   Q    And you told him what had happened?

01:22PM  4   A    Yes.  I told him Mike B. just called me and, you know, his

01:22PM  5   son had been taken to Queens Hospital.

01:22PM  6   Q    What did you do next?

01:22PM  7   A    I got ready, I put some clothes on, and I went down to the

01:22PM  8   hospital.

01:22PM  9   Q    Was Mr. Miske there already?

01:22PM  10  A    Yes.

01:22PM  11  Q    Who else was there?

01:22PM  12  A    Me, Miske, his brother Johnnie, and Russell Boy.

01:22PM  13  Q    Who is Russell Boy?

01:22PM  14  A    Russell Boy Moscato, that's one of Miske's good friends.

01:22PM  15  Q    So could you tell was it a serious situation?

01:22PM  16  A    Yeah.  I mean they said he was -- he was in critical

01:22PM  17  condition at that time.

01:22PM  18  Q    And when you say "he," who are you referring to?

01:22PM  19  A    Caleb.

01:22PM  20  Q    What about Jonathan Fraser?

01:22PM  21  A    I don't think -- I don't think -- I don't know if I knew

01:23PM  22  anything about him that night.

01:23PM  23  Q    Okay.  All right.  So did -- what was Mr. Miske's demeanor

01:23PM  24  during this time?  I imagine he was very worried.

01:23PM  25  A    Yeah.  I mean, he was -- he was worried.  He was worried.

01:23PM   1   He was trying to stay -- he was trying to stay positive, but I

01:23PM   2   mean, that's his only son, so he was worried, yeah.

01:23PM   3   Q    Did -- did you receive any information while you were

01:23PM   4   there with Mr. Miske as to the circumstances, like how the

01:23PM   5   accident had happened or --

01:23PM   6   A    I don't know -- I don't know if it was that night, you

01:23PM   7   know, that night that he was telling me that everything

01:23PM   8   happened or was because -- after that wen' happen, that initial

01:23PM   9   night I was there for a little while, I was there till late,

01:23PM  10   and I had to go work the next day.  So I left that night, went

01:23PM  11   home, sleep, went to work, and then came right back to the

01:24PM  12   hospital.  And pretty much did that every day until I left.

01:24PM  13   Q    Okay.  So Mr. Miske is there I'm assuming --

01:24PM  14   A    Yes.

01:24PM  15   Q    -- every time you're there?

01:24PM  16   A    Every day.

01:24PM  17   Q    Okay.  Did you have any conversation with him as to the

01:24PM  18   cause of the accident during this time?

01:24PM  19   A    Yes.  So in -- in one of those days that I'm there, first

01:24PM  20   time he tells me about the accident.  You know, he said --

01:24PM  21   Q    And what did he tell you?

01:24PM  22   A    He's telling me about the -- what the firemens told him.

01:24PM  23   He said the firemens -- he found out from a fireman or

01:24PM  24   something like that that the seatbelt was going the opposite

01:24PM  25   direction, your son wasn't the driver.

| | | | |
|---|---|---|---|
| 01:24PM | 1 | Q | Okay. |
| 01:24PM | 2 | A | Yeah, so -- |
| 01:24PM | 3 | Q | Did Mr. Miske believe that according to what he told you? |
| 01:24PM | 4 | A | Yes.  Yeah, he was -- |
| 01:24PM | 5 | Q | So if Mr. -- if Caleb was not the driver, then who was -- |
| 01:24PM | 6 | | would've had to have been the driver? |
| 01:24PM | 7 | A | Yeah, he said Fraser was -- was the driver, but -- so in |
| 01:25PM | 8 | | those conversations when he was telling me that Fraser was the |
| 01:25PM | 9 | | driver, I guess the kid Fraser is now -- now getting released |
| 01:25PM | 10 | | already.  You know, like he wasn't in bad condition.  But |
| 01:25PM | 11 | | they're telling Miske that the seatbelt is going in the -- in |
| 01:25PM | 12 | | the direction that he was the passenger. |
| 01:25PM | 13 | Q | Did that seem to matter to Mr. Miske? |
| 01:25PM | 14 | A | Yeah. |
| 01:25PM | 15 | Q | Why? |
| 01:25PM | 16 | A | He said -- I mean he said -- like at that point he was -- |
| 01:25PM | 17 | | he brought this up like maybe one time.  Okay, like he was |
| 01:25PM | 18 | | like -- he was like, This kid left.  He never even come visit |
| 01:25PM | 19 | | my son.  You know, he's out there saying he wasn't the driver. |
| 01:25PM | 20 | | And that's when he brought up like, Hey, if something |
| 01:25PM | 21 | | happen to my son, this kid has gotta go.  That's the first time |
| 01:25PM | 22 | | he brought 'em up, you know.  And then when I say he gotta go, |
| 01:25PM | 23 | | like he wanted to kill him if something had happened to his |
| 01:26PM | 24 | | son. |
| 01:26PM | 25 | Q | You understood that's what he meant when he said, If |

01:26PM    1    something happens to my son, the kid's gotta go?

01:26PM    2    A    Yes.

01:26PM    3    Q    The "kid" being Jonathan Fraser?

01:26PM    4    A    Yes.  Yes.  Because like he's looking, like this kid is

01:26PM    5    still running around, he not even coming to visit my son.  You

01:26PM    6    know what I mean, telling everybody he is not the driver.  So

01:26PM    7    it was agitating him.

01:26PM    8            So in the beginning after those few conversations, he

01:26PM    9    never bring 'em up at all.  You know, he was trying to -- he

01:26PM   10    was trying to stay positive as to like -- like, Hey, if there

01:26PM   11    is a God, you know what I mean, if you can help him out this

01:26PM   12    time.

01:26PM   13    Q    Were you aware of whether this was a one-car accident or

01:26PM   14    whether it was a two-car accident?  Did you know any of those

01:26PM   15    circumstances?

01:26PM   16    A    Yeah, yeah, I heard about the -- like there was a car

01:26PM   17    accident, and they was going fast.

01:26PM   18    Q    So it was a collision --

01:26PM   19    A    It was a collision.

01:26PM   20    Q    -- between two cars.

01:27PM   21    A    Yeah.

01:27PM   22    Q    Did Mr. Miske ever bring up the fact that the other driver

01:27PM   23    was at fault?

01:27PM   24    A    No.

01:27PM   25    Q    Did you ever hear the name Jared Ishiki?

| | | | |
|---|---|---|---|
| 01:27PM | 1 | A | No. |
| 01:27PM | 2 | Q | Do you know who that is? |
| 01:27PM | 3 | A | No. |
| 01:27PM | 4 | Q | So how long is Caleb Miske in the hospital for? |
| 01:27PM | 5 | A | He's in for -- he's in there for a long time, from the |
| 01:27PM | 6 | | accident till he's -- till he passed away. |
| 01:27PM | 7 | Q | Okay.  We'll get to that in a minute.  But -- so this is |
| 01:27PM | 8 | | over a period of many months, several months? |
| 01:27PM | 9 | A | Yeah, I would -- I would say, yeah. |
| 01:27PM | 10 | Q | You said you had your surgery scheduled in Texas for later |
| 01:27PM | 11 | | that year. |
| 01:27PM | 12 | A | Yes. |
| 01:27PM | 13 | Q | Did you go and have that surgery? |
| 01:27PM | 14 | A | Yes. |
| 01:27PM | 15 | Q | Was Caleb Miske still in the hospital? |
| 01:27PM | 16 | A | Yes. |
| 01:27PM | 17 | Q | When you left for your surgery, what was Caleb Miske's |
| 01:27PM | 18 | | condition? |
| 01:27PM | 19 | A | He was -- he was still in bad shape.  He was in bad shape. |
| 01:27PM | 20 | | I was there every day with them. |
| 01:27PM | 21 | Q | What kind of conversation would you have with Mr. Miske |
| 01:28PM | 22 | | regarding Caleb and his progress? |
| 01:28PM | 23 | A | I mean, he would give me updates, but when he was -- when |
| 01:28PM | 24 | | Caleb was fighting, he was trying to -- he was trying to stay |
| 01:28PM | 25 | | positive.  Like he wasn't talking about -- he wasn't -- he |

01:28PM   1   wasn't trying to put like some bad vibes towards -- towards his

01:28PM   2   son.  He was like, Hey, if my son can make 'em through this.

01:28PM   3   You know, he never talk about -- after that initial

01:28PM   4   conversations about Fraser --

01:28PM   5   Q    Right.

01:28PM   6   A    -- he never talk about 'em after that, you know.  He

01:28PM   7   just -- everything was on Caleb trying to get better, making

01:28PM   8   the right decisions for him.

01:28PM   9   Q    Okay.  So do you go then and have your surgery in Houston?

01:28PM  10   A    Yes.

01:28PM  11   Q    So what kind surgery was this?

01:28PM  12   A    Oh, it was another -- it was another open -- they cut me

01:28PM  13   open again -- cut me open again for place a whole new aortic

01:28PM  14   valve inside me, mechanical valve.

01:28PM  15   Q    So this is the third then open heart surgery you've had.

01:28PM  16   A    Yes.

01:28PM  17   Q    So the first two that you had in Oregon, you said, right?

01:29PM  18   A    Yes.

01:29PM  19   Q    Did you receive pain killers for -- for that to treat the

01:29PM  20   pain after the surgery --

01:29PM  21   A    In --

01:29PM  22   Q    -- in Oregon?

01:29PM  23   A    I mean, they gave you -- I was in prison, so they no give

01:29PM  24   you like the oxys and stuff.  They give you just regular pain

01:29PM  25   killers, you know, like Percocet and stuff like that.  But

01:29PM   1    nothing to the extent of what they gave me in Houston.

01:29PM   2    Q    Okay.  So what did you get in Houston that was different?

01:29PM   3    A    Well, in Houston -- well, I was in the surgery.  When I

01:29PM   4    came out of surgery -- it was a big surgery, so they had to cut

01:29PM   5    me open, put a whole new valve inside there.  They gave me one

01:29PM   6    little button.  You know, they told me every time you're in

01:29PM   7    pain, just hit that button.  And I just kept hitting the

01:29PM   8    button.

01:29PM   9    Q    So this is pain medication that's coming through the IV

01:29PM  10    while you're in the hospital and you can self-administer?

01:29PM  11    A    Yes.  Yeah, they no tell you nothing.  Just tell you if

01:29PM  12    you in pain, just hit the button.  I just kept hitting the

01:29PM  13    button, yeah.

01:29PM  14    Q    Was the surgery successful?

01:30PM  15    A    Yes.

01:30PM  16    Q    How long did you have to recover in Texas before you came

01:30PM  17    back to Hawaii?

01:30PM  18    A    Oh, not long.  Maybe -- maybe a week or something like

01:30PM  19    that.  Maybe two weeks I flew back.

01:30PM  20    Q    Were you still -- some recuperation time was still

01:30PM  21    involved?

01:30PM  22    A    Yeah, yeah, I still couldn't -- I still couldn't move.  I

01:30PM  23    couldn't even stand up.  I had fluid just leaking out of my --

01:30PM  24    my wound and stuff like that.  So...

01:30PM  25    Q    Were you prescribed pain medication for when you got home?

01:30PM  1   A    Yeah, so when I came home, that's when -- that's when I
01:30PM  2   started getting -- I went back to my regular doctor, and she
01:30PM  3   was like, Yeah, I cannot help you with this.  You're in a major
01:30PM  4   amount of pain.  You got blood leaking out your wounds every
01:30PM  5   day.  So she sent me to a -- she said, Go see a pain management
01:30PM  6   specialist.
01:30PM  7   Q    Did you do that?
01:30PM  8   A    Yeah.
01:30PM  9   Q    Where was this pain management specialist?
01:30PM  10  A    In -- in Hawaii Kai.
01:30PM  11  Q    And what did they -- what could they do for you?
01:30PM  12  A    They would look at me, like, Hey, what are you taking now?
01:31PM  13  And I shown him what I was taking.  And he was like, No, no,
01:31PM  14  you need -- you need the top one, the highest dose, you know.
01:31PM  15  So he gave me the -- right away I went from -- I went from just
01:31PM  16  taking regular Vicodin or whatever they was giving me straight
01:31PM  17  to oxy, the highest dose that you could get.
01:31PM  18  Q    Had you ever taken oxycodone before?
01:31PM  19  A    No, that was the first time.
01:31PM  20  Q    So when you say the highest dosage, do you recall the
01:31PM  21  dosage that he prescribed for you?
01:31PM  22  A    Whatever the highest dose was, the little blue ones.  The
01:31PM  23  little -- I no remember the number, but it was a little --
01:31PM  24  little blue pills.
01:31PM  25  Q    How frequently were you advised to take the pain

01:31PM   1   medication?

01:31PM   2   A     They told me take em' every two hours.  They said just

01:31PM   3   take one every two hours, but I was already -- I started off

01:31PM   4   taking one, but after that the next -- two hours after that I

01:31PM   5   was already taking two.  You know, I just went crazy from

01:31PM   6   there.

01:31PM   7               THE COURT:  Mr. Inciong, we're at the end of the trial

01:31PM   8   day.

01:31PM   9               MR. INCIONG:  Okay.  That's fine.

01:32PM   10              THE COURT:  All right.  So we're at 1:31, 1:32, and we

01:32PM   11  will take our leave for the day.

01:32PM   12              As the jurors are excused, I will remind you again to

01:32PM   13  refrain from discussing the substance of this case with anyone,

01:32PM   14  including each other, until I advise otherwise; to refrain from

01:32PM   15  accessing any media or other accounts of this case that may be

01:32PM   16  out there; and finally, please do not conduct any independent

01:32PM   17  investigation on your own into the facts, circumstances or

01:32PM   18  persons involved.

01:32PM   19              So we will see you here tomorrow morning at 8:30,

01:32PM   20  where we will resume with Mr. Miller's direct examination.

01:32PM   21              (The jury was excused at 1:32 p.m., and the following

01:32PM   22  proceedings were held in open court:)

01:33PM   23              THE COURT:  One housekeeping issue before we leave for

01:33PM   24  the day.

01:33PM   25              Mr. Inciong, in 7-23, it's an exhibit that was

01:33PM   1    admitted, and you went over it with Mr. Miller, the photo does

01:33PM   2    not match the exhibit list description.

01:33PM   3                MR. INCIONG:  7-23?

01:33PM   4                THE COURT:  Yes.

01:33PM   5                MR. INCIONG:  Okay.

01:33PM   6                THE COURT:  So 7-23 looks to be an aerial Google view

01:33PM   7    of Jefferson Elementary --

01:33PM   8                MR. INCIONG:  Right.

01:33PM   9                THE COURT:  -- in Waikiki.  The exhibit list

01:33PM  10    description says that it is Waikiki Elementary.

01:33PM  11                MR. INCIONG:  Okay.  I think we -- we swapped it out,

01:33PM  12    but we didn't change the description.  So we'll take care of

01:33PM  13    that.  Thank you, Your Honor.

01:33PM  14                THE COURT:  There will be many amendments of the

01:33PM  15    various exhibit lists.  There already have been.  So next time

01:33PM  16    you correct it, please address it.

01:33PM  17                MR. INCIONG:  I will.

01:33PM  18                THE COURT:  Thank you.

01:33PM  19                MR. INCIONG:  Thank you for bringing it up.

01:34PM  20                (Proceedings were concluded at 1:34 p.m.)

         21

         22

         23

         24

         25

```
 1              COURT REPORTER'S CERTIFICATE

 2         I, Gloria T. Bediamol, Official Court Reporter, United

 3    States District Court, District of Hawaii, do hereby certify

 4    that pursuant to 28 U.S.C. §753 the foregoing is a complete,

 5    true, and correct transcript from the stenographically reported

 6    proceedings held in the above-entitled matter and that the

 7    transcript page format is in conformance with the regulations

 8    of the Judicial Conference of the United States.

 9

10         DATED at Honolulu, Hawaii, March 29, 2024.

11

12

13                             /s/ Gloria T. Bediamol

14                             GLORIA T. BEDIAMOL.

15                             RMR, CRR, FCRR

16

17

18

19

20

21

22

23

24

25
```