1              IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF HAWAII

3

4   UNITED STATES OF AMERICA,        )  CR. NO. 19-00099-DKW-KJM
                                     )
5               Plaintiff,           )  Honolulu, Hawaii
                                     )
6        vs.                         )  April 25, 2024
                                     )
7   MICHAEL J. MISKE, JR.,           )  JURY TRIAL - DAY 57
                                     )
8               Defendant.           )  (CONTINUED TESTIMONY OF
    _____)  GOVERNMENT'S WITNESS HPD
9                                       CAPTAIN THOMAS CHANG)

10            PARTIAL TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE DERRICK K. WATSON
11         CHIEF UNITED STATES DISTRICT COURT JUDGE

12  APPEARANCES:

13  For the Government:        MARK A. INCIONG, AUSA
                              MICHAEL DAVID NAMMAR, AUSA
14                            WILLIAM KEAUPUNI AKINA, AUSA
                              AISLINN AFFINITO, AUSA
15                            Office of the United States Attorney
                              Prince Kuhio Federal Building
16                            300 Ala Moana Boulevard, Suite 6100
                              Honolulu, Hawaii 96850
17
    For the Defendant:        LYNN E. PANAGAKOS, ESQ.
18                            841 Bishop Street, Suite 2201
                              Honolulu, Hawaii 96813
19
                              MICHAEL JEROME KENNEDY, ESQ.
20                            Law Offices of Michael Jerome
                              Kennedy, PLLC
21                            333 Flint Street
                              Reno, Nevada 89501
22
    Official Court            ANN B. MATSUMOTO, RPR
23  Reporter:                 United States District Court
                              300 Ala Moana Boulevard, Room C-338
24                            Honolulu, Hawaii 96850

25  Proceedings recorded by machine shorthand, transcript produced
    with computer-aided transcription (CAT).

1                          I N D E X

2    WITNESS:                                    PAGE NO.

3    FOR THE GOVERNMENT:

4     HPD CAPTAIN THOMAS CHANG (CONTINUED EXAMINATION)

5      RESUMED CROSS-EXAMINATION BY MR. KENNEDY        4

6      REDIRECT EXAMINATION BY MR. INCIONG           18

7      RECROSS-EXAMINATION BY MR. KENNEDY           21

8

9                        E X H I B I T S

10    None.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   THURSDAY, APRIL 25, 2024                    8:44 A.M. O'CLOCK
 2                            *  *  *  *  *
 3            (Start of partial transcript:)
 4            (Open court in the presence of the jury.)
 5            COURTROOM MANAGER:  Criminal Number 19-00099-DKW-KJM,
 6   United States of America versus Michael J. Miske, Junior.
 7            This case has been called for jury trial, Day 57.
 8            Counsel, please make your appearances for the record.
 9            MR. INCIONG:  Good morning, Your Honor.  Mark
10   Inciong, Michael Nammar, KeAupuni Akina, and Aislinn Affinito
11   for the United States.  Also present are Kari Sherman and FBI
12   Special Agent Tom Palmer.  Good morning.
13            THE COURT:  Good morning.
14            MR. KENNEDY:  Good morning, Your Honor.  Michael
15   Kennedy with Lynn Panagakos, Michael Miske, Ashley King, and
16   Josh Barry.  And good morning to each of you.
17            THE COURT:  Good morning.  And you may all be seated.
18            Good morning to our 16-person jury.
19            Good morning to our witness, who's still on the
20   stand, Captain Chang.
21            And, sir, I will remind you, although we will not
22   take the time to re-swear you, you do remain subject to the
23   same oath that you took at the start of your testimony.
24            Do you understand that?
25            THE WITNESS:  Yes, Your Honor.
```

1          THE COURT:  All right.  Mr. Kennedy, I think you

2     were, I think, close to at least finishing up your cross

3     yesterday, and you may resume that when you're ready.

4          MR. KENNEDY:  Thank you, Your Honor.

5          THOMAS CHANG, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN.

6          RESUMED CROSS-EXAMINATION

7     BY MR. KENNEDY:

8     Q    Good morning, sir.

9     A    Good morning, sir.

10    Q    Now, I -- when you spoke with Ashley Wong, she told you

11    that Mr. Lyman and Tatofi, that she asked them if they could

12    follow her home when she got picked up by Delia because she was

13    scared.  Do you recall that?

14    A    Yes.

15    Q    And that was from the wedding, according to Ashley Wong,

16    correct?

17    A    Yes.

18    Q    All right.  And then you spoke with Mr. Lyman, and he told

19    you that he and Mr. Tatofi went to look for Mr. Fraser and his

20    vehicle earlier than that, correct?

21    A    Yes.

22    Q    And that he told you that at about 10:00 o'clock p.m. he

23    and Mr. Tatofi picked up Ashley Wong in the area around her

24    residence and took her to her dad's house, correct?

25    A    Yes.

1  Q    Mr. Lyman never told you that he and Mr. Tatofi followed

2  Ashley Wong and Delia from the wedding, correct?

3  A    I'm -- I'm sorry?

4  Q    Mr. Lyman never told you that he and Mr. Tatofi followed

5  Ms. Wong and Delia from the wedding, correct?

6  A    I don't recall.  Maybe if -- can I look at my report --

7  Q    Absolutely.

8  A    -- to refresh my memory?

9         MR. KENNEDY:  Let's see if we can pull that up, if we

10  can pull up 7100, dash, 002.  And I believe if we --

11         And I believe that's in the original exhibit list,

12  Your Honor.

13         THE COURT:  Okay.  I have it.  Thank you.

14         MR. KENNEDY:  All right.  And if we can pull that up

15  and go to page 0024.

16  BY MR. KENNEDY:

17  Q    And, sir, I believe if it's this particular area, if we

18  can blow that up for you so it's easier to read.

19       Please take a moment and read that to yourself, and just

20  let me know when you're finished.

21  A    (Complies.)

22       Okay, sir.  Sorry, can you ask me that question again?

23  Q    Sure.  Mr. Lyman did not tell you that he and Mr. Tatofi

24  followed Ms. Wong and Delia from the wedding, correct?

25  A    No.

1    Q    Mr. Lyman also told you that he wasn't aware of anyone who

2    had a grudge against Mr. Fraser, correct?

3    A    He told me -- yes.

4              MR. KENNEDY:  We can take that down.

5    BY MR. KENNEDY:

6    Q    And Mr. Lyman didn't tell you that he followed the vehicle

7    because Ms. Wong was scared, correct?

8    A    No.

9    Q    Now, you also spoke with a Mr. Tatofi, correct?

10   A    Yes.

11   Q    And he told you that he and Mr. Lyman went to look for

12   Mr. Fraser and his vehicle but not -- but didn't see it,

13   correct?

14   A    Yes.

15   Q    And Mr. Tatofi told you that about at ten o'clock he and

16   Mr. Lyman picked up Ms. Wong in the area around her residence

17   and took her to her dad's house, correct?

18   A    Yes.

19   Q    Mr. Tatofi never told you that he and Mr. Lyman followed

20   Ms. Wong and Delia from the wedding, correct?

21   A    No.

22   Q    And Mr. Tatofi didn't tell you that he did so because

23   Ms. Wong was scared, correct?

24   A    No.

25   Q    Now, you spoke with a Carrie Fisher [sic], correct?

1   A     Yes.

2   Q     And that would be the stepmom for Mr. Fraser?

3   A     Yes.

4   Q     All right.  She told you that she didn't want Ms. Wong or

5   Mr. Fraser to hang out with Mike Miske because of a lawsuit

6   against Caleb Miske and his insurance company to cover the

7   medical expenses for Mr. Fraser, correct?

8   A     Yes.

9   Q     And neither Carrie Fraser nor William Fraser told you that

10  they had kicked Ms. Wong and Mr. Fraser out of their house,

11  correct?

12  A     No.

13          MR. INCIONG:  Objection, misstates the evidence.

14          THE COURT:  You mean Carrie Fisher?

15          MR. KENNEDY:  Carrie Fraser.  If I misspoke, I

16  apologize.

17          THE COURT:  You said Carrie Fisher the first time.

18  Carrie Fisher is Princess Leia, if I remember.

19          MR. KENNEDY:  I know.  I know.  And I have it stuck

20  in my head, Your Honor, as I was doing it, which may be, you

21  know.  So let me rephrase it because I had -- I had Fisher in

22  my head.

23          THE COURT:  I thought we might have a celebrity on

24  our witness list.

25          MR. KENNEDY:  Well, you know, we might be able to add

1   one.  We've got enough of them over there.  But we can always

2   talk to Samuel L. Jackson.

3   BY MR. KENNEDY:

4   Q    Ms. Carrie Fraser -- to correct my error, sir -- and

5   William Fraser didn't tell you that they had kicked Ms. Wong

6   and Mr. Fraser out of the house, did they?

7            MR. INCIONG:  Objection.

8   A    No.

9            MR. INCIONG:  Misstates the evidence.

10           THE COURT:  Overruled.  Go ahead.

11  A    No.

12  BY MR. KENNEDY:

13  Q    Now, Mr. Fraser didn't share with you that he saw

14  Mr. Fraser in a heated argument outside the Xclusive vape shop

15  just days before he went missing, correct?

16  A    Sorry.  William Fraser?

17  Q    William Fraser.

18  A    No.

19  Q    Now, you also learned that Mr. Miske told the Fraser

20  family he blamed the hospital for his son's death, correct?

21  A    Yes.

22  Q    And that he blamed the driver of the truck turning left on

23  the yellow light for the accident?

24  A    I'm not too sure.  I know that he, Mr. Fraser, Johnathan

25  Fraser was blamed for the accident.

1   Q    What they told you was that early on, that Mr. Miske had a

2   photograph of bruising that he showed the family, correct?

3   A    I didn't hear anything of that.

4   Q    And the bruising started at the right shoulder and went

5   across this way (indicates), correct?

6         MR. INCIONG:  Objection.  The witness just testified

7   he didn't hear anything about that.

8         THE COURT:  Sustained.

9   BY MR. KENNEDY:

10  Q    Sir, you don't recall that being told to you about showing

11  the photograph, correct?

12  A    Nobody told me anything about a photograph, no.

13  Q    Okay.  Now, you gave some testimony about canvassing the

14  neighborhood where Mr. Fraser and Ms. Wong were living,

15  correct?

16  A    Yes.

17  Q    No one complained about the dog barking at all?

18  A    No.

19  Q    Now, you talked to a number of friends of Mr. Fraser,

20  correct?

21  A    Yes.

22  Q    All right.

23  A    Just the two.

24  Q    Okay.  There was a -- a Patrick --

25  A    Oh.

1    Q    It's Hengsbach, and it's spelled H-E-N-G-S-B-A-C-H.  You

2    spoke with him?

3    A    Yes.

4    Q    And he told you that the last time he saw Mr. Fraser was

5    about two weeks before he went missing at the vape shop,

6    correct?

7    A    Yes.

8    Q    And Mr. Tatofi told you that the last time he saw

9    Mr. Fraser at the vape shop or anywhere before he went missing

10   was about a week before that, correct?

11   A    I believe so.

12   Q    And Mr. Lyman said that the last time he saw Mr. Fraser

13   was about two to three days before he went missing at the vape

14   shop, correct?

15   A    Yes.

16   Q    All right.  Now, Ms. Wong told you that Mr. Fraser had no

17   active cell phone, right?

18   A    Yes.

19   Q    But that he uses his -- the Apple iPhone 5C to communicate

20   via Instagram, correct?

21   A    Yes, through the Wi-Fi.

22   Q    All right.  During the portion of your participation in

23   this missing persons case, did you review that phone to confirm

24   that Mr. Fraser in fact used the Apple iPhone 5C to communicate

25   via Instagram?

```
 1   A    No.

 2   Q    Did you seek to have an extraction of the phone

 3   information to confirm that?

 4   A    No.

 5   Q    All right.  Now, Ms. Wong related that Mr. Fraser was

 6   missing and some items were also missing from the house,

 7   correct?

 8   A    Yes.

 9   Q    And so one of those items was the vehicle key, right?

10   A    Yes.

11   Q    That she related was the sole key to that vehicle,

12   correct?

13   A    I believe so.

14   Q    A wallet was missing, right?

15   A    Yes.

16   Q    Which $20 had been placed in, correct?

17   A    Yes.

18   Q    A -- some rubber slippers that were Johnathan's were

19   missing, correct?

20   A    Yes.

21   Q    And she related that he always wore a cap, and a gray and

22   yellow baseball cap was also missing, correct?

23   A    Yes.

24   Q    And the vehicle itself was missing as well?

25   A    Yes.
```

1    Q    All right.  And so among the items in the wallet was his

2    Hawaii identification card, correct?

3    A    I believe so.

4    Q    All right.  So -- and I believe also there may have been a

5    belt that was missing as well, correct?

6    A    Yes.

7    Q    All right.  And so Mr. Fraser's car, his car key, his

8    wallet, a belt, a hat, all were missing as well?

9    A    Yes.

10   Q    And the last time Ms. Wong saw him he was asleep in the

11   bed, correct?

12   A    Yes.

13   Q    All right.  Now, Ms. Wong told you that she made a call to

14   Mr. Miske around -- I think she said somewhere around eleven

15   o'clock, correct?

16   A    Sorry.  That's the --

17   Q    P.m.

18   A    That's the first night, the first call.

19   Q    All right.  And that Mr. Miske said he was sleeping, he

20   had not seen Mr. Fraser, but if there was anything he could do,

21   just let him know, correct?

22   A    Yes.

23   Q    All right.  By almost nine o'clock that next morning she

24   was already telling you, later, that she thought that Delia and

25   Mike might be involved with the disappearance, correct?

1  A    I'm sorry.  Not at nine o'clock, but when I met with

2  her --

3  Q    In the afternoon?

4  A    Yes, afternoon.  Yep.

5  Q    I apologize.

6       Did you understand from the original officer who took her

7  statement that -- did you get a chance to review that?

8  A    Yes.

9  Q    Okay.  And now I'll just focus on your statement.

10  During -- in your report you indicated that she thought that

11  already by that afternoon that Mr. Miske or Delia might be

12  involved in his disappearance, correct?

13  A    Yes.

14  Q    And that it may be were the words that you chose that she

15  told you, correct?

16  A    I'm sorry.  The may be?

17  Q    In your report --

18  A    Yes.

19  Q    -- you accurately described what she was telling you,

20  correct?

21  A    Yes.

22  Q    And she was telling you that he might be involved,

23  correct?

24  A    Yes.

25  Q    And that Delia might be involved, correct?

1    A    Yes.

2    Q    Now, in your missing persons investigation, did you get a

3    chance at all to review the Honolulu Police Department incident

4    report regarding the accident that occurred with Mr. Fraser and

5    Caleb Miske back on November 17th of 2015?

6    A    I do remember taking a look at it, sir.

7    Q    Okay.  And so you understand that the driver of the truck,

8    Mr. Ishiki, was being looked at for negligent homicide and

9    negligent injury due to that accident, correct?

10               MR. INCIONG:  Objection, beyond the scope, relevance.

11               THE COURT:  I'm not sure what you're trying to get

12   out of this.  Where this is headed?  Why is this relevant?

13               MR. KENNEDY:  It's relevant, Your Honor, due to

14   trying to determine whether or not we've heard testimony about

15   a grudge.  We've heard other testimony and who's being blamed,

16   and so I'm just asking the officer during his missing persons

17   investigation, looking into what's being said or not said.

18               THE COURT:  All right.  The objection's overruled.

19               Go ahead.

20   BY MR. KENNEDY:

21   Q    So you under -- by reviewing that report you understood

22   that Mr. Ishiki was being investigated for negligent homicide

23   and negligent injury, the homicide to Mr. Miske because he had

24   died and the negligent injury to Mr. Fraser due to his left

25   turn into oncoming traffic on a yellow light, correct?

1   A    I -- I don't remember the negligent homicide.  I remember

2   reading the accident report.  That's all I can recall.

3   Q    Okay.

4            MR. KENNEDY:  If we pull up just for the witness --

5            MR. INCIONG:  I'm going to renew the objection, Your

6   Honor.

7            MR. KENNEDY:  All right.

8   BY MR. KENNEDY:

9   Q    So do you recall reading the -- well, let me ask you this.

10           Do you recall reading that report that I referred to or

11  just the accident report?

12  A    Just remember trying to read the report to see who the

13  driver and passenger was of that accident.  I don't know about

14  any criminal case.  I can't recall.

15           MR. KENNEDY:  Your Honor, may I just approach with

16  the first page after I show the government and see if this is

17  the report that he reviewed?

18           THE COURT:  Go ahead.  Go ahead.

19           MR. KENNEDY:  (Hands document to counsel and the

20  witness.)

21  BY MR. KENNEDY:

22  Q    Sir, I'm showing you, just to take a look, it's 15-40 --

23  excuse me, 15-460922.  Just take a look at that front page and

24  let me know if --

25           THE COURT:  This is not a marked exhibit?

1           MR. KENNEDY:  It is not.  That's why I just

2    approached, to see if --

3    A    Just reading the Jared Ishiki, I -- I didn't read this

4    report.

5    Q    All right.  Fair enough.

6           MR. KENNEDY:  May I approach, Your Honor?

7           THE COURT:  Yes.

8    BY MR. KENNEDY:

9    Q    Sir, if we could just pull up what's been admitted into

10   evidence, I believe it's 2-23.

11          MR. KENNEDY:  I think that's with the government's

12   original, Your Honor.  I'm not certain, but I believe so.

13          THE COURT:  Yes.  I have it.  Go ahead.

14   BY MR. KENNEDY:

15   Q    Now, the "6233" represents where Mr. Fraser and Ms. Wong

16   were staying, correct?

17   A    Yes.

18   Q    All right.  And I believe that you indicated -- if we move

19   to -- let me ask you this question.

20          In terms of any video evidence or surveillance, were you

21   able to capture any video evidence from any surveillance camera

22   from this direction in terms of your investigation?

23   A    No.

24   Q    All right.

25          MR. KENNEDY:  And so if we can pull up

1  Exhibit 9168-150, which I believe was the --

2            Hang on a second, Your Honor, and I can tell you.

3            That's either the 37th or the 38th, I believe.  Let's

4  see.

5            I'm sorry.  The -- it's actually -- I believe it's

6  the 40th.

7            THE COURT:  Yes.  I have it.

8            MR. KENNEDY:  If we can pull that up?

9            THE COURT:  Yes.  Go ahead.

10            MR. KENNEDY:  And publish that as well, since it's

11  been admitted?

12            THE COURT:  Yes.

13  BY MR. KENNEDY:

14  Q    The reason I asked you that question is that you became

15  aware in the investigation that on August 7th Mr. Fraser's

16  vehicle was found at 6122 Summer Street, correct?

17  A    Yes.

18  Q    And so on this particular route, I take it that you were

19  not able to uncover any surveillance during your investigation,

20  correct?

21  A    Yes, for my investigation.  But I'm not sure if Detective

22  Nakasato was able to recover.  I'm not sure.

23  Q    When he comes, we'll ask him those questions.  I just

24  wanted to limit it to --

25  A    Not --

1  Q    -- your investigation.

2  A    -- for my investigation, yes.

3  Q    Okay.  So if we go back to 2-23, the video evidence that

4  you were able to capture, was that around this area (indicates)

5  for that house?

6  A    I believe so.

7  Q    Okay.

8        MR. KENNEDY:  I have nothing further.  Thank you,

9  Your Honor.

10        THE COURT:  Redirect?

11        MR. INCIONG:  Thank you, Your Honor.

12                    REDIRECT EXAMINATION

13  BY MR. INCIONG:

14  Q    Captain Chang, when you contacted Carrie Fraser, Johnathan

15  Fraser's stepmother, she told you a whole bunch of reasons why

16  she didn't want -- she would not have approved of Johnathan

17  moving into the Hawaii Kai condo, correct?

18  A    Yes.

19  Q    It was more than just the fact that there was this

20  lawsuit, right?

21  A    Yes.

22  Q    In fact, didn't she tell you that she didn't -- she would

23  not have allowed it because of the history between Johnathan

24  Fraser and Mr. Miske, because Mr. Miske had been blaming

25  Johnathan for the accident?

1  A    Yes.

2  Q    Did she also tell you that Fraser had received threats

3  from the Miske family and that she thought that Mike Miske had

4  something to do with his disappearance?

5  A    Yes.

6  Q    Did she also tell you that one to two years before

7  Mr. Miske had accused Johnathan Fraser of stealing his watch

8  and had him beat up and his teeth knocked out?

9  A    Yes.

10 Q    Did she also tell you that there had been a falling out

11 with Caleb over that watch, and everyone was surprised they

12 were even in the car together when they found out about the

13 collision?

14 A    Yes.

15 Q    You were asked about whether you had looked at phones and

16 some other additional investigation.  When you took this case

17 it was July 31st; is that correct?

18 A    Yes.

19 Q    And was it within just a day or two that this case was

20 reassigned to Detective Nakasato?

21 A    Yes.

22 Q    Did you have time to do all the follow-up that you would

23 have otherwise?

24 A    No.

25 Q    You noted in your testimony that there were a number of

1    circumstances that had been described to you by Ashley that

2    were unusual regarding the disappearance of Mr. Fraser,

3    correct?

4    A    Yes.

5    Q    Was one of those Delia inviting Ashley to the spa day,

6    which she'd never done before?

7    A    Yes.

8    Q    Was the timing of that unusual to you as well, that that

9    would be the day that also Mr. Fraser disappears when she had

10   described to you that they were almost never apart?

11   A    Yes.

12   Q    Was it also suspicious a circumstance to you that this

13   tribute car had been purchased by Mr. Miske after there'd been

14   this -- this animosity and -- and accusations as to who was the

15   driver?

16   A    Yes.

17   Q    You were asked on cross-examination about not being told

18   specific drugs that Mr. Fraser was taking, correct?

19   A    Yes.

20   Q    Whether or not he had short-term memory issues as a result

21   of the accident, correct?

22   A    Yes.

23   Q    And you said that those things could have been important,

24   could have been relevant in your investigation, correct?

25   A    Yes.

1   Q    Assuming all those things were in fact in play at the time

2   Johnathan went missing, would that have made any of the things

3   you noted that were suspicious any less suspicious?

4   A    No.

5              MR. INCIONG:  I have nothing further, Your Honor.

6              THE COURT:  All right.  Any recross?

7                          RECROSS-EXAMINATION

8   BY MR. KENNEDY:

9   Q    Mr. Fraser was 21 years old, correct?

10  A    I believe so.

11  Q    So he was an adult, on his own.  And when his mother --

12  stepmom said she wouldn't allow it, she had already kicked him

13  out of the house, right?

14  A    I didn't know anything about kicking him -- I mean him

15  getting kicked out of the house.

16  Q    You didn't know that they were left to, once again, find a

17  place to stay?  No one told you about that?

18  A    No.

19             MR. KENNEDY:  Nothing further.

20             THE COURT:  Captain, you may step down.  Thank you,

21  sir.

22             THE WITNESS:  Thank you.

23                                        (Witness excused.)

24             (End of partial transcript.)

25                          * * * * *

```
 1                    COURT REPORTER CERTIFICATE

 2             I, Ann B. Matsumoto, Official Court Reporter, United

 3    States District Court, District of Hawaii, do hereby certify

 4    that pursuant to 28 U.S.C. Sec. 753 the foregoing is a

 5    complete, true, and correct transcript of the stenographically

 6    recorded proceedings held in the above-entitled matter and that

 7    the transcript page format is in conformance with the

 8    regulations of the Judicial Conference of the United States.

 9             DATED at Honolulu, Hawaii, June 30, 2024.

10

11

12
                         /s/ Ann B. Matsumoto
13                       ANN B. MATSUMOTO, RPR

14

15

16

17

18

19

20

21

22

23

24

25
```