08:32AM

1                    IN THE UNITED STATES DISTRICT COURT

2                      FOR THE DISTRICT OF HAWAII

3
      UNITED STATES OF AMERICA,    )      CRIMINAL NO. 19-00099-DKW
4                                  )
                Plaintiff,         )      Honolulu, Hawaii
5                                  )
           vs.                     )      July 22, 2024
6                                  )
      MICHAEL J. MISKE, JR.,       )
7                                  )
                Defendant.         )
8     _____)

9
                     TRANSCRIPT OF JURY TRIAL (DAY 104)
10                BEFORE THE HONORABLE DERRICK K. WATSON,
               CHIEF UNITED STATES DISTRICT COURT JUDGE
11
      APPEARANCES:
12
      For the Plaintiff:          MARK INCIONG, ESQ.
13                                MICHAEL DAVID NAMMAR, ESQ
                                  WILLIAM KE AUPUNI AKINA, ESQ.
14                                AISLINN AFFINITO, ESQ.
                                  Office of the United States Attorney
15                                PJKK Federal Building
                                  300 Ala Moana Boulevard, Suite 6100
16                                Honolulu, Hawaii  96850

17    For the Defendant:          LYNN E. PANAGAKOS, ESQ.
                                  841 Bishop St., Ste 2201
18                                Honolulu, HI 96813

19                                MICHAEL JEROME KENNEDY, ESQ.
                                  Law Offices of Michael Jerome
20                                Kennedy, PLLC
                                  333 Flint Street
21                                Reno, NV 89501

22    Official Court Reporter:    Gloria T. Bediamol, RPR RMR CRR FCRR
                                  United States District Court
23                                300 Ala Moana Boulevard
                                  Honolulu, Hawaii 96850
24
        Proceedings recorded by machine shorthand, transcript produced
25    with computer-aided transcription (CAT).

```
1                          I N D E X

2    GOVERNMENT WITNESSES:                              PAGE NO.

3    CRYSTAL YOUNG

4         DIRECT EXAMINATION BY MS. AFFINITO               30

5    GREGORY TURNER

6         DIRECT EXAMINATION BY MR. AKINA                  43

7    EXHIBITS:                                          PAGE NO.

8    Exhibit 11-3 was received in evidence                 32
     Exhibit 11-11 was received in evidence                35
9    Exhibit 11-8 was received in evidence                 36
     Exhibit 11-20 was received in evidence                40
10   Exhibit 11-6 was received in evidence                 46
     Exhibit 11-9 was received in evidence                 48
11   Exhibit 11-25 was received in evidence                51
     Exhibit 11-22 was received in evidence                54
12   Exhibit 11-34 was received in evidence                56
     Exhibit 11-19 was received in evidence                58
13   Exhibit 11-28 was received in evidence                62
     Exhibit 11-51 was received in evidence                67
14   Exhibit 11-54 was received in evidence                69
     Exhibit 11-36 was received in evidence                70
15   Exhibit 11-41 was received in evidence                73
     Exhibit 11-53 was received in evidence                75
16   Exhibit 11-55 was received in evidence                77
     Exhibit 11-56 was received in evidence                79
17   Exhibit 11-59 was received in evidence                80
     Exhibit 11-60 was received in evidence                82
18   Exhibit 11-67 was received in evidence                86
     Exhibit 9-1199 was received in evidence               88
19   Exhibit 11-72 was received in evidence                91
     Exhibit 11-71 was received in evidence                92
20   Exhibits 11-73 through 11-79 were received in         97
     evidence
21   Exhibits 11-80 through 11-82 and 11-84 through        102
     11-89 were received in evidence
22   Exhibit 11-63 was received in evidence               107
     Exhibit 11-91 was received in evidence               112
23

24

25
```

| | | |
|---|---|---|
| | 1 | July 22, 2024                                          8:41 a.m. |
| | 2 | (Open court out of the presence of the jury.) |
| 08:41AM | 3 | THE CLERK:  Criminal Number 19-00099-DKW-KJM, United |
| 08:41AM | 4 | States of America versus Michael J. Miske, Jr. |
| 08:41AM | 5 | This case has been called for jury trial, Phase 2, |
| 08:41AM | 6 | Day 104. |
| 08:41AM | 7 | Counsel, please make your appearances for the record. |
| 08:42AM | 8 | MR. INCIONG:  Good morning, Your Honor.  Mark Inciong, |
| 08:42AM | 9 | KeAupuni Akina, Aislinn Affinito, and Michael Nammar for the |
| 08:42AM | 10 | United States.  Today we have our paralegal Collin Vickers with |
| 08:42AM | 11 | us as well as FBI Special Agent Tom Palmer. |
| 08:42AM | 12 | THE COURT:  Good morning. |
| 08:42AM | 13 | MR. KENNEDY:  Good morning, Your Honor.  Michael |
| 08:42AM | 14 | Kennedy with Lynn Panagakos, Michael Miske, Ashley King, and |
| 08:42AM | 15 | Josh Barry. |
| 08:42AM | 16 | THE COURT:  Good morning.  You may be seated. |
| 08:42AM | 17 | Before we bring the jury in, there are a few issues to |
| 08:42AM | 18 | review regarding matters that were brought to my attention over |
| 08:42AM | 19 | this past weekend. |
| 08:42AM | 20 | In no particular order, there is the issue of what the |
| 08:42AM | 21 | defense refers to as the government's late production of |
| 08:42AM | 22 | forfeiture trial exhibits.  That is not only the introduction |
| 08:42AM | 23 | of the issue, it is the end of the issue as far as I'm aware. |
| 08:42AM | 24 | So does someone wish to elaborate on this? |
| 08:42AM | 25 | MS. PANAGAKOS:  Your Honor, we received 99 new |

08:42AM  1  exhibits late last night -- I mean, well, 8:20 last night, and

08:43AM  2  that the government intends to use for the forfeiture hearing.

08:43AM  3  And we just haven't had sufficient time to review and make use

08:43AM  4  of them.  I mean, I haven't even been able to print them out

08:43AM  5  and select what I would use for cross-examination.  You know, I

08:43AM  6  just completely -- not enough time to prepare to use them.

08:43AM  7  So --

08:43AM  8          THE COURT:  Are these 99 exhibits that have -- that

08:43AM  9  are not in --

08:43AM  10          MS. PANAGAKOS:  Correct.

08:43AM  11          THE COURT:  -- the 10,000 binders I have behind me?

08:43AM  12          MS. PANAGAKOS:  Correct.

08:43AM  13          THE COURT:  These are brand new exhibits that you had

08:43AM  14  not previously been notified as having been exhibits.

08:43AM  15          MS. PANAGAKOS:  Correct.  We got five summary charts

08:43AM  16  on Saturday, which are included within the 99.  So five on

08:43AM  17  Saturday and the rest of the 99 last night, yeah.

08:43AM  18          THE COURT:  All right.  Who wants to address this for

08:43AM  19  the government?

08:43AM  20          MR. INCIONG:  Your Honor, we filed them as soon as we

08:43AM  21  could.  It was not a case of, you know, waiting until --

08:43AM  22  obviously we didn't have a verdict until Thursday afternoon,

08:44AM  23  and we were working on it over the weekend and deciding what we

08:44AM  24  needed and what we didn't need, trying to be as efficient as

08:44AM  25  possible.

| | | |
|---|---|---|
| 08:44AM | 1 | I would point out during the defense case we never got |
| 08:44AM | 2 | an exhibit list before 10:00 p.m. on any day.  In many cases it |
| 08:44AM | 3 | was 1:00 or 2:00 in the morning, and that was -- so, I mean, |
| 08:44AM | 4 | this is kind of the way it's been in this case. |
| 08:44AM | 5 | MS. PANAGAKOS:  Your Honor, may I respond to that? |
| 08:44AM | 6 | THE COURT:  Yes, of course. |
| 08:44AM | 7 | MS. PANAGAKOS:  Our exhibit lists that were filed the |
| 08:44AM | 8 | night before were impeachment exhibits to cross-examine |
| 08:44AM | 9 | witnesses, not -- |
| 08:44AM | 10 | MR. INCIONG:  I'm talking about the defense case. |
| 08:44AM | 11 | MS. PANAGAKOS:  And we did have -- you know, the one |
| 08:44AM | 12 | time that's analogous is with the Ken Hines summaries, and the |
| 08:44AM | 13 | government was given extra time to go over them. |
| 08:44AM | 14 | And that's all I'm asking.  I mean, I wouldn't object |
| 08:44AM | 15 | to the direct testimony today, but if we could just -- I guess |
| 08:44AM | 16 | my proposal would be to have Mr. Hines, who is here, be able to |
| 08:44AM | 17 | sit in on today's hearing and have the direct testimony today, |
| 08:44AM | 18 | and let me cross the IRS people tomorrow. |
| 08:45AM | 19 | THE COURT:  How many of these 99 exhibits did the |
| 08:45AM | 20 | government intend to offer through the witnesses that are |
| 08:45AM | 21 | identified for today?  All of them? |
| 08:45AM | 22 | MR. INCIONG:  I would estimate half, Your Honor. |
| 08:45AM | 23 | MS. PANAGAKOS:  Your Honor, I would just also point |
| 08:45AM | 24 | out that some of them weren't even in the discovery from -- you |
| 08:45AM | 25 | know, that's how new they are. |

08:45AM  1          THE COURT:  Okay.  So the government -- so,
08:45AM  2   Ms. Panagakos, as I understand her objection, isn't saying that
08:45AM  3   these exhibits should be excluded.  It's just that she needs
08:45AM  4   more time to prepare.  So given the disclosure at 8:18 last
08:45AM  5   night, it doesn't seem unreasonable of a request to me.
08:45AM  6          So the government has a choice.  You can wait until
08:46AM  7   tomorrow's proceedings and utilize the witnesses that are --
08:46AM  8   that you intend to introduce these -- one or more of these 99
08:46AM  9   exhibits or you can present them on direct, as Ms. Panagakos
08:46AM  10  has offered that they don't have an objection to that.  But if
08:46AM  11  their direct is done today, the cross-examination would be
08:46AM  12  reserved until tomorrow to give her another day or another
08:46AM  13  evening to review these documents.  It doesn't matter to me
08:46AM  14  what -- what the government chooses to do.
08:46AM  15         Okay.  So that's the first issue.
08:46AM  16         The second one is relating to the use of hearsay.
08:46AM  17  Does anyone -- I've read the two briefs on this subject.  Does
08:46AM  18  anyone wish to be heard further?  Otherwise, I'm prepared to
08:46AM  19  rule.
08:46AM  20         MR. AKINA:  Yes, Your Honor.
08:46AM  21         THE COURT:  Mr. Akina.
08:47AM  22         MR. AKINA:  A couple of responses to the defense's
08:47AM  23  objection.  This is clearly -- we're clearly now past the
08:47AM  24  conviction stage, past the guilt stage.  This is the forfeiture
08:47AM  25  stage.  It's under sentencing.  So that's how it's structured

08:47AM  1    under the rules.  That's what every case I've seen has

08:47AM  2    indicated, Supreme Court down to this district.

08:47AM  3            There is -- just because the trier of fact has

08:47AM  4    changed, judge versus jury, that doesn't change the burden of

08:47AM  5    proof.  It doesn't change standard of proof either.  This is

08:47AM  6    part of sentencing.  That's why we have preponderance of the

08:47AM  7    evidence standard.  That's what the committee notes, the 32.2

08:47AM  8    notes.  That's the same reason why admissible -- hearsay is

08:47AM  9    admissible in this type of proceeding.  There's a different set

08:47AM  10   of rules now.  The rules are now it must be relevant and

08:47AM  11   reliable.

08:47AM  12           The distinction the defense tries to draw, I don't

08:48AM  13   really see it.  The distinction between a judge making the

08:48AM  14   decision versus a jury making the decision, that's going to be

08:48AM  15   the same decision that they have to come to the conclusion of.

08:48AM  16   What's the nexus?  Rule 32.2 lays out -- besides that, lays out

08:48AM  17   the same procedure.

08:48AM  18           So for those reasons -- I would also note we didn't

08:48AM  19   identify anything specific.  We did indicate -- included some

08:48AM  20   case law about coconspirator statements at the time we were

08:48AM  21   considering maybe doing that.  We don't plan on introducing

08:48AM  22   coconspirator statements at this phase of the trial as well,

08:48AM  23   but nonetheless, I don't think that changes the standard.

08:48AM  24           THE COURT:  Okay.  Ms. Panagakos or Mr. Kennedy.

08:48AM  25           MS. PANAGAKOS:  Yes, Your Honor.  You know, Mr. Akina

08:48AM  1    says he doesn't see a difference between judge and jury.
08:48AM  2    There's obviously a big one.  Rule 32.2 does not talk about
08:48AM  3    admissibility of hearsay when it's before the jury.  You know,
08:49AM  4    there will be a different time, at sentencing or maybe before
08:49AM  5    sentencing, when the court issues a preliminary order of
08:49AM  6    forfeiture.  That's not this proceeding.  That's what 32.2, the
08:49AM  7    first section on what the court can consider.
08:49AM  8         I mean it's very clear.  The language of the rule says
08:49AM  9    what the court can consider.  And that's at a different stage,
08:49AM 10    which is sentencing.  This is Phase 2 of a jury trial.  They
08:49AM 11    didn't cite a single case where hearsay was admissible to a
08:49AM 12    jury of where the sentencing standard as to what evidence can
08:49AM 13    be considered is what applies to a jury, they didn't set a
08:49AM 14    single case which says that.
08:49AM 15         You know, I would note that there is the circuit split
08:49AM 16    on the standard of proof.  You know, that may be resolved by
08:49AM 17    the Supreme Court some day.  You know, we have our objection
08:49AM 18    preserved on that.  But, you know, that also goes to why it
08:49AM 19    should be the Rules of Evidence should apply.
08:49AM 20         And now they're saying they didn't -- I'm sorry, Your
08:49AM 21    Honor.
08:49AM 22         THE COURT:  No, go ahead.
08:49AM 23         MS. PANAGAKOS:  Now they're saying they don't intend
08:50AM 24    to introduce coconspirator statements.  Well, what hearsay do
08:50AM 25    they introduce?  I mean, there at least has to be -- if Your

08:50AM  1   Honor is going to apply the sentencing due process standard,
08:50AM  2   which we object to for the reasons we cited, you know, there at
08:50AM  3   least has to be some showing of reliability and some extrinsic
08:50AM  4   evidence we could cross on, and we don't even know what that
08:50AM  5   is.  So we'd at least need to know that in advance.  Thank you,
08:50AM  6   Your Honor.
08:50AM  7        THE COURT:  All right.  So in addressing this issue --
08:50AM  8   and for the record, the relevant briefs are at Docket 1724 and
08:50AM  9   1726 -- the government cites a number of cases.  In my mind,
08:50AM  10  the two principle ones are the Davila and Haleamau cases.  Both
08:50AM  11  of those cases involve the determination that hearsay is
08:50AM  12  permitted in forfeiture proceedings before the court.
08:51AM  13       The defense quarrels with those two citations, but of
08:51AM  14  course offers none of its own relating to the use of hearsay in
08:51AM  15  any kind of proceedings.  The defendant tries to distinguish
08:51AM  16  the government -- all of the government's cases, including
08:51AM  17  Haleamau and Davila, but does not offer any authority of its
08:51AM  18  own, except for one.  The one exception is Federal Rule of
08:51AM  19  Evidence 1101.  And there that citation is for the proposition
08:51AM  20  that the Federal Rules of Evidence apply and do not apply in
08:51AM  21  certain circumstances.
08:51AM  22       And the enumerated proceedings that 1101 says the
08:51AM  23  Rules of Evidence do not apply, according to the defense, is
08:51AM  24  forfeiture.  It does not say -- does not provide an exception
08:52AM  25  for the Rules of Evidence in forfeiture proceedings.  And while

08:52AM  1  that is objectively true, 1101(d)(3) says that the rules do not

08:52AM  2  apply in sentencing proceedings.  Forfeiture is part of

08:52AM  3  sentencing.  The government has made that assertion, and

08:52AM  4  there's been no argument or citation to the contrary by the

08:52AM  5  defense.  That is a material issue.

08:52AM  6         But like Mr. Akina, I do not see there being a

08:52AM  7  material difference, a substantive difference in who the fact

08:52AM  8  finder is.  So where these courts have said that hearsay is

08:52AM  9  permitted in forfeiture proceedings before the court, I see no

08:52AM  10 difference -- no reason to rule otherwise when those same

08:53AM  11 proceedings come before the jury.

08:53AM  12        Now, that doesn't mean that all hearsay is permitted,

08:53AM  13 and I don't think either side, including the government, is

08:53AM  14 suggesting otherwise.  There must be some indicia of

08:53AM  15 reliability, and the fact that it's hearsay is perhaps right

08:53AM  16 away some indicia of unreliability.  But so long as that

08:53AM  17 standard is met, what the government refers to as both

08:53AM  18 procedural or substantive reliability, I see no reason why that

08:53AM  19 could not be as a matter of law allowed for consideration by

08:53AM  20 the -- by the jury.

08:53AM  21        I can't provide more specifics because I've been given

08:53AM  22 no more specifics in terms of what hearsay the government sees

08:53AM  23 as coming down the pipe over the next couple of days.  So we

08:53AM  24 will have to reserve until that occurs.

08:53AM  25        The last issue that was briefed over the weekend

08:54AM  1  relates to the defense motion that is styled to preclude the

08:54AM  2  government from arguing forfeiture theories which are

08:54AM  3  inadequate as a matter of law.  The relevant briefs are at 1725

08:54AM  4  and I'm not sure what the government's opposition was docketed

08:54AM  5  at, perhaps at 1727, but I'm not certain of that.

08:54AM  6      MR. KENNEDY:  Your Honor, just so the record is clear,

08:54AM  7  I believe it's at 1728.

08:54AM  8      THE COURT:  All right.  Thank you.  My version that I

08:54AM  9  have in front of me is an undocketed copy that I think we got

08:54AM  10  via email.

08:54AM  11      All right.  Who wishes to be heard on this?  It seems

08:54AM  12  like the defense ought to go first, it's their motion.

08:54AM  13      MS. PANAGAKOS:  Thank you, Your Honor.  You know,

08:54AM  14  during jury instructions we objected to the RME fraud

08:54AM  15  instruction, folded into the wire fraud instruction, which the

08:54AM  16  Court sustained that objection.  And now we're -- now it's --

08:55AM  17      THE COURT:  I sustained the objection to including --

08:55AM  18  including specific language regarding RME fraud in the jury

08:55AM  19  instructions, but I did not sustain the objection with respect

08:55AM  20  to whether the government can proceed with RME fraud as a

08:55AM  21  theory.  And in fact, I don't think the government did abstain

08:55AM  22  or abdicate that theory in -- in what remained of the

08:55AM  23  proceedings, including closings thereafter.

08:55AM  24      MS. PANAGAKOS:  Right, Your Honor, and that, you know,

08:55AM  25  we made a general Rule 29 motion as to Count 1, but there was

| | | |
|---|---|---|
| 08:55AM | 1 | no substantive wire fraud count charging the RME fraud theory. |
| 08:55AM | 2 | So there was no, you know, procedural vehicle to move to |
| 08:55AM | 3 | dismiss a count pursuant to Rule 29. |
| 08:55AM | 4 | So now that we're at the forfeiture phase, and in |
| 08:55AM | 5 | looking at Special Agent Turner's affidavit, and he's on the |
| 08:56AM | 6 | witness list, it looks like from my reading of the affidavit |
| 08:56AM | 7 | that legally inadequate theory was presented.  The theory being |
| 08:56AM | 8 | that we're arguing is inadequate is that -- you know, that the |
| 08:56AM | 9 | license is not -- they did not obtain property by making a |
| 08:56AM | 10 | false statement to the DCCA. |
| 08:56AM | 11 | Now, if there are other false statements made to |
| 08:56AM | 12 | customers, that's a different issue.  But simply saying, you |
| 08:56AM | 13 | know, PCO -- I have license PCO 24, that we're arguing is not a |
| 08:56AM | 14 | false statement. |
| 08:56AM | 15 | And so that's the only argument is that narrow |
| 08:56AM | 16 | argument that we're trying to preclude -- Forfeiture Verdict |
| 08:56AM | 17 | Number 3 asks whether or not, you know, these items are |
| 08:56AM | 18 | proceeds of racketeering activity.  And so we're seeking to |
| 08:56AM | 19 | preclude the argument that they're proceeds of wire fraud based |
| 08:56AM | 20 | on the issuance of the license pursuant to the false statement. |
| 08:57AM | 21 | If there's a particular statement made to a customer that the |
| 08:57AM | 22 | government contends is false, that's a different issue. |
| 08:57AM | 23 | But many of these customers were told nothing about |
| 08:57AM | 24 | licensing.  I mean, they are -- you know, it's the distinction |
| 08:57AM | 25 | between -- you know, you hold yourself out as licensed, which |

08:57AM  1    they are, each of these entities have a license.  It's -- you

08:57AM  2    know, in holding yourself out as licensing -- as licensed,

08:57AM  3    you're not saying, I'm complying with every rule about

08:57AM  4    principal RMEs, and my principal RME is on site, and this means

08:57AM  5    my contract is signed by the person who is authorized to sign

08:57AM  6    it.  All of those representations are not folded into a simple

08:57AM  7    representation that I'm licensed.

08:57AM  8         You know, so -- and if Mr. Miske signed a contract

08:57AM  9    instead of Mr. Kansaki, that's not a false statement.  So

08:57AM  10   that's the argument we're trying to preclude.

08:57AM  11        THE COURT:  But as much as we know about the jury's

08:57AM  12   verdict on Count 1, as a subissue within Count 1, the jury was

08:58AM  13   asked to make findings with regard to the number of acts, if

08:58AM  14   any, on various types of racketeering activity.  Wire fraud

08:58AM  15   being one of those.  And in response to that query and that

08:58AM  16   responsibility by the jury, they elected a finding of two or

08:58AM  17   more acts of wire fraud.

08:58AM  18        Now, we don't know what kind of wire fraud.  There

08:58AM  19   were a number of different events that the government cited as

08:58AM  20   the basis, but that is as much as we know.  And now you're

08:58AM  21   saying that we should tell the jury they can't consider RME

08:58AM  22   fraud as one of the types of wire fraud that can connect

08:58AM  23   Mr. Miske's conduct to the various types of property at issue

08:58AM  24   here?

08:58AM  25        MS. PANAGAKOS:  No.  I'm not saying the jury should be

08:58AM  1    instructed.  I'm saying the government should limit its
08:58AM  2    instructions to false statements made to customers.  I'm not
08:59AM  3    saying that, you know, because they obtained the license
08:59AM  4    through alleged false statements, that means the customers were
08:59AM  5    defrauded.  That the argument should be, you know, limited to,
08:59AM  6    tailored to what false statements were made to customers.
08:59AM  7         THE COURT:  Okay.  Mr. Inciong, did you want to
08:59AM  8    respond, or Mr. Akina?
08:59AM  9         MR. INCIONG:  Ms. Affinito will.
08:59AM  10        THE COURT:  Ms. Affinito, okay.
08:59AM  11        MS. AFFINITO:  Thank you, Your Honor.  So the purpose
08:59AM  12   of the forfeiture portion of this trial is to determine whether
08:59AM  13   property has a sufficient nexus to the crime of conviction,
08:59AM  14   which is racketeering conspiracy.  It's not any sort of
08:59AM  15   underlying substantive charges or even specific racketeering
08:59AM  16   acts.  It's the general racketeering conspiracy.
08:59AM  17        And the jury may consider any relevant conduct or
08:59AM  18   evidence that establishes that nexus.  Indeed, before the jury
08:59AM  19   is the entirety of evidence that was presented at trial, which
08:59AM  20   includes uncharged conduct that served as enterprise proof, as
09:00AM  21   well as lawful conduct that might have served as evidence of
09:00AM  22   the conspiracy, as well as all of the evidence surrounding the
09:00AM  23   RME fraud.  They've already heard all of this evidence, and
09:00AM  24   they're permitted to consider it in determining whether there
09:00AM  25   is a sufficient nexus.

09:00AM  1          The government is not limited to specific legal

09:00AM  2     theories which the jury is not going to be deciding the

09:00AM  3     sufficiency is of at this stage.  And again, it doesn't make

09:00AM  4     sense to preclude them from hearing additional evidence or

09:00AM  5     argument on RME fraud when they've already considered it and

09:00AM  6     potentially convicted the defendant on it.

09:00AM  7          The RME fraud was presented as a racketeering act, and

09:00AM  8     we maintain that the way it was presented, it was a different

09:00AM  9     and legally sufficient theory.  It's based on obtaining

09:00AM  10    money -- not property, not licenses -- it was based on

09:00AM  11    obtaining money from customers by making misrepresentations to

09:01AM  12    them.  Those misrepresentation happen to be whether the

09:01AM  13    companies are properly licensed.

09:01AM  14         But in any event, the government is not limited to

09:01AM  15    racketeering acts to establish the necessary nexus between

09:01AM  16    forfeitable property and the racketeering conspiracy.  It can

09:01AM  17    rely on conduct like, for example, the separate DCCA fraud not

09:01AM  18    presented by the government as wire fraud if it helps establish

09:01AM  19    that nexus.  Thank you.

09:01AM  20         THE COURT:  Anything else with respect to this motion,

09:01AM  21    not just the RME fraud issue?

09:01AM  22         MS. PANAGAKOS:  Your Honor, just one of the points we

09:01AM  23    made in our motion is that, you know, we're trying to prevent

09:01AM  24    an end run around Cleveland.  And Cleveland, obviously the

09:01AM  25    defendants used the license to then conduct their business.

| | | |
|---|---|---|
| 09:01AM | 1 | And that's, you know, the distinction between -- you can't -- I |
| 09:01AM | 2 | mean, you can't just get end run around the case by saying you |
| 09:01AM | 3 | can't then use your license.  If it's separate false |
| 09:01AM | 4 | statements, that's a different story, but the use of a license |
| 09:01AM | 5 | is not in itself a false statement.  The representation that |
| 09:01AM | 6 | you now have the license is not a false statement.  That's what |
| 09:02AM | 7 | we're trying to preclude.  Thank you, Your Honor. |
| 09:02AM | 8 | THE COURT:  Anything else? |
| 09:02AM | 9 | MS. AFFINITO:  No, Your Honor. |
| 09:02AM | 10 | THE COURT:  Motion is denied. |
| 09:02AM | 11 | Openings.  Both sides wish to enter an opening |
| 09:02AM | 12 | argument on Phase 2?  I assume that to be the case, but maybe I |
| 09:02AM | 13 | shouldn't. |
| 09:02AM | 14 | MR. INCIONG:  Yes. |
| 09:02AM | 15 | THE COURT:  All right.  I assume they're also |
| 09:02AM | 16 | relatively brief? |
| 09:02AM | 17 | MR. INCIONG:  Yes, very. |
| 09:02AM | 18 | THE COURT:  All right.  And the defense wishes to make |
| 09:02AM | 19 | an opening as well? |
| 09:02AM | 20 | MS. PANAGAKOS:  Yes, Your Honor. |
| 09:02AM | 21 | And before we start, can -- would it be all right if |
| 09:02AM | 22 | Ken Hines sits in this portion of the trial? |
| 09:02AM | 23 | THE COURT:  Who's -- who's Ken Hines? |
| 09:02AM | 24 | MS. PANAGAKOS:  Oh, Ken Hines is the -- our witness. |
| 09:02AM | 25 | He testified at the trial, and -- |

09:02AM    1              THE COURT:  We had hundreds of witnesses.  I'm sorry,
09:02AM    2    I don't recall who Ken Hines is.
09:02AM    3              MS. PANAGAKOS:  Right.  He testified as our expert
09:02AM    4    with regard to summaries of tax returns and how much tax was
09:02AM    5    reported, the former IRS agent.  And I'm just asking for an
09:02AM    6    exception to the exclusionary rule for this portion of the
09:03AM    7    proceedings, especially in light of the late production of the
09:03AM    8    exhibits, he will be able to help me get ready tonight.
09:03AM    9              THE COURT:  Any issue along that?
09:03AM    10             MR. INCIONG:  No, Your Honor.
09:03AM    11             THE COURT:  Mr. Inciong is saying the government has
09:03AM    12   no problem.
09:03AM    13             MS. PANAGAKOS:  Thank you.
09:03AM    14             MR. KENNEDY:  I'll go let him know, Your Honor.
09:03AM    15             THE COURT:  All right.  Let's get the jury in then.
09:03AM    16             And I don't know if we have communicated this yet, but
09:03AM    17   we were able to, as I said we would try to do, secure the
09:03AM    18   presence for the balance of Phase 2 of two alternate jurors.
09:03AM    19   We went down the list, and we only had to go down the list of
09:03AM    20   two -- positions 1 and 2 to secure the two that we needed.  So
09:03AM    21   the alternates that you'll see walk in in just a couple of
09:03AM    22   minutes here are Alternates 1 and 2 from Phase 1.
09:03AM    23             Alternates 3 and 4, by the way, have been instructed
09:04AM    24   with the same admonitions that we previously set in the event
09:04AM    25   that we need them.  We have not discharged either one of them

| | | |
|---|---|---|
| 09:04AM | 1 | yet. |
| 09:04AM | 2 | MR. AKINA:  Your Honor, as to the option that you gave |
| 09:04AM | 3 | the government on whether to call witnesses today or |
| 09:04AM | 4 | tomorrow -- |
| 09:04AM | 5 | THE COURT:  Yes. |
| 09:04AM | 6 | MR. AKINA:  -- we have two witnesses planned for |
| 09:04AM | 7 | today, and I expect that the estimate we gave the Court is |
| 09:04AM | 8 | going to be shorter.  It's possible that we could wrap it up in |
| 09:04AM | 9 | less than a day.  Our preference would be to wait till tomorrow |
| 09:04AM | 10 | to start their direct examination.  We can go forward with |
| 09:04AM | 11 | openings today.  We leave that up to Your Honor's discretion, |
| 09:04AM | 12 | but that what we would elect to do. |
| 09:04AM | 13 | THE COURT:  Just openings? |
| 09:04AM | 14 | MR. AKINA:  I think personally it would make sense to |
| 09:04AM | 15 | do it all at the same time, but I'll leave that up to Your |
| 09:04AM | 16 | Honor. |
| 09:04AM | 17 | THE COURT:  What do you mean?  You mean delay openings |
| 09:04AM | 18 | till tomorrow? |
| 09:04AM | 19 | MR. AKINA:  Correct.  And I'm not asking for that, but |
| 09:05AM | 20 | I'm just -- |
| 09:05AM | 21 | THE COURT:  So what would we accomplish today? |
| 09:05AM | 22 | Nothing? |
| 09:05AM | 23 | MR. AKINA:  That's what we would accomplish. |
| 09:05AM | 24 | THE COURT:  All right.  Then you don't have the |
| 09:05AM | 25 | option.  Those witnesses will be presented today. |

| | | |
|---|---|---|
| 09:07AM | 1 | (Open court in the presence of the jury.) |
| 09:07AM | 2 | THE CLERK:  Criminal Number 19-00099-DKW-KJM, United |
| 09:07AM | 3 | States of America versus Michael J. Miske, Jr. |
| 09:07AM | 4 | This case has been called for jury trial, Phase 2, |
| 09:07AM | 5 | Day 104. |
| 09:07AM | 6 | Counsel, please make your appearances for the record. |
| 09:07AM | 7 | MR. INCIONG:  Good morning, Your Honor.  Mark Inciong, |
| 09:07AM | 8 | KeAupuni Akina, Aislinn Affinito, and Michael Nammar for the |
| 09:07AM | 9 | United States.  Today we have our paralegal Collin Vickers |
| 09:07AM | 10 | joining us for the first time, and FBI Special Agent Tom Palmer |
| 09:07AM | 11 | is present as well.  Good morning. |
| 09:07AM | 12 | THE COURT:  Good morning. |
| 09:07AM | 13 | MR. KENNEDY:  Good morning, Your Honor.  Michael |
| 09:07AM | 14 | Kennedy with Lynn Panagakos, Michael Miske, Ashley King, and |
| 09:07AM | 15 | Josh Barry. |
| 09:07AM | 16 | Good morning to each of you. |
| 09:07AM | 17 | THE COURT:  Good morning.  You may be seated. |
| 09:07AM | 18 | Good morning to our 14-member Phase 2 jury.  I hope |
| 09:07AM | 19 | everyone was able to get a little bit of rest over the -- what |
| 09:07AM | 20 | was a three-day break from this trial at least. |
| 09:08AM | 21 | The inception of Phase 2 will begin as the beginning |
| 09:08AM | 22 | of Phase 1 began, which is to say the prosecution and the |
| 09:08AM | 23 | defense will have an opportunity to address you first through |
| 09:08AM | 24 | what is known as an opening statement. |
| 09:08AM | 25 | As you now undoubtedly know, an opening statement is |

| | | |
|---|---|---|
| 09:08AM | 1 | an outline of what each party intends to prove and is offered |
| 09:08AM | 2 | to help you follow the evidence that is to come over the next |
| 09:08AM | 3 | two or three days.  What counsel say to you in an opening |
| 09:08AM | 4 | statement is not itself evidence.  That does not mean, however, |
| 09:08AM | 5 | that you should not pay careful attention to what the lawyers |
| 09:08AM | 6 | say, because you should.  An opening statement may help you to |
| 09:08AM | 7 | better understand and follow the evidence. |
| 09:08AM | 8 | And we'll start with the government. |
| 09:09AM | 9 | Ms. Affinito. |
| 09:09AM | 10 | MS. AFFINITO:  So good morning and welcome back. |
| 09:09AM | 11 | We're here to discuss the forfeiture of Michael Miske's assets |
| 09:09AM | 12 | due to their nexus to his criminal racketeering enterprise. |
| 09:09AM | 13 | You've already found Mr. Miske guilty of conspiring to engage |
| 09:09AM | 14 | in racketeering activity.  You've already determined that he |
| 09:09AM | 15 | agreed to commit a multitude of racketeering acts.  That is the |
| 09:09AM | 16 | starting point. |
| 09:09AM | 17 | So you're going to hear that under our laws there are |
| 09:09AM | 18 | three buckets of property that are forfeitable.  Any interests |
| 09:09AM | 19 | the defendant acquired or maintained as part of a conspiracy is |
| 09:09AM | 20 | forfeitable.  Mr. Miske's entire interests in the enterprise, |
| 09:10AM | 21 | even if you think part of that enterprise was not tainted by |
| 09:10AM | 22 | racketeering activity, is forfeitable as is any of the property |
| 09:10AM | 23 | that was used to promote or further the affairs of the |
| 09:10AM | 24 | enterprise, and finally, any property constituting proceeds of |
| 09:10AM | 25 | racketeering activity or derived from those proceeds, whether |

09:10AM  1    directly or indirectly, is forfeitable.  All of it.

09:10AM  2         Now, sometimes it can be tricky to disentangle what

09:10AM  3    are racketeering proceeds or what someone's interests in an

09:10AM  4    enterprise is or how to trace those proceeds back.  Sometimes.

09:10AM  5         But not here.  You've heard six months' worth of

09:10AM  6    evidence establishing that Michael Miske's businesses operated

09:10AM  7    to promote and further his criminal enterprise and his

09:10AM  8    racketeering activity.  The Miske Enterprise encompassed his

09:10AM  9    entire family of businesses which was built upon fraud upon

09:10AM  10   fraud upon fraud, and through which he engaged in a seemingly

09:11AM  11   endless stream of racketeering activity.

09:11AM  12        Fraudulent RME licenses to get these companies up and

09:11AM  13   running, to maintain their operation, and to deceive customers

09:11AM  14   about their qualifications.  Like Kama'aina Termite getting its

09:11AM  15   initial license back in 2000 by lying to the DCCA that Harry

09:11AM  16   Kansaki was going to serve as the principal RME and was a 51

09:11AM  17   percent owner.  Forging signatures left and right on contracts,

09:11AM  18   on permits, on license applications, on documents to obtain

09:11AM  19   pesticides, underreporting income from Mr. Miske's businesses

09:11AM  20   on his tax returns, and then using that unreported income to

09:11AM  21   fund his extravagant lifestyle, using his house at 6 Lumahai,

09:11AM  22   which was instructed by his own companies as collateral for the

09:11AM  23   bank fraud that he committed, structuring financial

09:11AM  24   transactions for his fishing operation to avoid CTRs and the

09:11AM  25   scrutiny of law enforcement, and using Kama'aina company

09:12AM    1    employees and resources to commit obstruction of justice
09:12AM    2    against this very court.
09:12AM    3         Michael Miske's companies operated criminally to
09:12AM    4    promote and further the affairs of his racketeering enterprise,
09:12AM    5    and everything he acquired, everything his companies generated
09:12AM    6    through racketeering activity were derived from the proceeds of
09:12AM    7    it.
09:12AM    8         And on top of the evidence you've already seen and
09:12AM    9    heard, you're going to see additional evidence of how
09:12AM    10   particular assets are tied and traced back to the Miske
09:12AM    11   Enterprise.  How Michael Miske acquired and maintained bank
09:12AM    12   accounts and real estate and other assets through his
09:12AM    13   racketeering activity.  You'll see how he used some of the
09:12AM    14   assets themselves to promote and further the affairs of his
09:12AM    15   enterprise like his bank accounts, and you'll see additional
09:12AM    16   evidence of how he used the racketeering proceeds to purchase
09:12AM    17   assets like real estate, luxury vehicles, boats, and artwork.
09:12AM    18        You're also going to get additional jury instructions
09:13AM    19   from the Court later, but for this forfeiture phase you're
09:13AM    20   going to consider the evidence under a completely different
09:13AM    21   standard than before, and it's a much lower burden of proof.
09:13AM    22   As you'll hear, you're not being asked to decide anything
09:13AM    23   beyond a reasonable doubt.  The applicable burden of proof here
09:13AM    24   is a much lower standard called preponderance of the evidence,
09:13AM    25   and it basically means more probably true than not.

09:13AM  1          So the United States is seeking to forfeit Mr. Miske's

09:13AM  2   real estate assets, boats, cars, artwork, and money from his

09:13AM  3   personal and business bank accounts.  And at the end of this

09:13AM  4   much shorter trial, we will ask that you find all of these

09:13AM  5   assets forfeitable as property that Mr. Miske acquired and

09:13AM  6   maintained through racketeering activity, that was used to

09:13AM  7   promote and further the affairs of the enterprise, and that

09:13AM  8   constitutes or was derived from proceeds of his racketeering

09:14AM  9   activity.  Thank you.

09:14AM  10         THE COURT:  Mr. Kennedy or Ms. Panagakos for the

09:14AM  11  defense, please.

09:14AM  12         MS. PANAGAKOS:  Good morning, ladies and gentlemen.

09:14AM  13  Among the instructions you'll be given is to -- that you'll be

09:14AM  14  told that the previous instructions that you were provided last

09:14AM  15  week continue to govern, and one of those instructions -- well,

09:14AM  16  those instructions concerning racketeer -- racketeering

09:14AM  17  activity continue to govern.

09:14AM  18         Like Ms. Affinito said, there are three buckets

09:14AM  19  whether an interest was acquired -- whether an asset was

09:14AM  20  acquired or maintained in violation of Count 1, whether it's

09:14AM  21  proceeds of Count 1.  And the proceeds you'll see in the

09:14AM  22  special verdict form, you're going to be asked whether it's

09:14AM  23  proceeds of racketeering activity.  And that's why I bring your

09:15AM  24  attention to remembering that instruction.

09:15AM  25         And then when you look at the assets, there's a number

| | | |
|---|---|---|
| 09:15AM | 1 | of assets, like Ms. Affinito said, and a number of them are |
| 09:15AM | 2 | tied to the four and a half million dollars that Kama'aina |
| 09:15AM | 3 | Termite and Pest Control earned on the Keola La'i condominium |
| 09:15AM | 4 | job. |
| 09:15AM | 5 | Now, with regard to licensing, there was no evidence |
| 09:15AM | 6 | presented to you as to what Mr. Harry Kansaki's ownership was |
| 09:15AM | 7 | in the company in 2000.  The earliest tax returns where |
| 09:15AM | 8 | Mr. Miske reported a hundred percent ownership I believe were |
| 09:15AM | 9 | in 2009 or 2010.  Mr. Hughford Manolo said that Mr. Kansaki was |
| 09:15AM | 10 | in fact the RME in the earlier years, and he was present and |
| 09:15AM | 11 | supervised and worked directly with Mr. Manolo.  So we don't |
| 09:15AM | 12 | know.  It's not accurate -- there is no evidence to support the |
| 09:15AM | 13 | assertion that the license was obtained by fraud to begin with. |
| 09:16AM | 14 | Now, with regard to the Nordic Construction job, at |
| 09:16AM | 15 | that time Mr. Miske was the owner of Kama'aina Termite.  He |
| 09:16AM | 16 | reported that to the IRS, and he had his own pest control |
| 09:16AM | 17 | operator's license and he was an RME of Kama'aina Termite and |
| 09:16AM | 18 | Pest Control.  He held himself out as the president and person |
| 09:16AM | 19 | in charge of Kama'aina Termite in all his dealings with Nordic |
| 09:16AM | 20 | Construction.  They were never deceived about the existence of |
| 09:16AM | 21 | some other person.  He was the person that they thought was in |
| 09:16AM | 22 | charge, and he was in fact in charge and he was licensed to be |
| 09:16AM | 23 | in charge. |
| 09:16AM | 24 | They were not -- if you'll recall Instruction 42, |
| 09:16AM | 25 | which talks about whether or not Nordic Construction was |

09:16AM   1    defrauded, which goes to whether or not its proceeds of
09:16AM   2    racketeering activity, they were never deceived about the
09:16AM   3    nature of their bargain.  That was in the instruction.  In
09:16AM   4    order to be wire fraud, in order to be proceeds of that
09:16AM   5    racketeering activity, Nordic Construction would've had to have
09:16AM   6    been deceived about the essential nature of the bargain.  They
09:17AM   7    weren't.  They bargained to -- for the service of Kama'aina
09:17AM   8    Termite, a company they knew to be managed by Mr. Miske, and
09:17AM   9    they got a successful fumigation job.
09:17AM  10        So what was purchased with money from that job that
09:17AM  11    you'll be asked to render forfeiture verdict on, one is the
09:17AM  12    Rachel, the commercial fishing boat.  That boat operated
09:17AM  13    lawfully.  You heard from Frank Crivello about the lawful
09:17AM  14    fishing activities that that boat derived its income from.
09:17AM  15    There was an issue as to how workers were paid, but that -- the
09:17AM  16    payment to workers is not -- those were monies out.  Those
09:17AM  17    weren't proceeds in, and it didn't -- it wasn't relevant to how
09:17AM  18    the Rachel was acquired or maintained in the ownership of the
09:17AM  19    Kama'aina family of businesses.  They didn't keep it free
09:18AM  20    structuring, and they didn't use proceeds of any illegal act to
09:18AM  21    keep it.  They purchased it outright.  Kama'aina Holdings was
09:18AM  22    the entity that purchased it outright for 900-something
09:18AM  23    thousand dollars with money from the Nordic job.
09:18AM  24        So we're asking you to find that Nordic money
09:18AM  25    untainted because that job was a success.  That company got the

09:18AM    1    benefit of its bargain.  They were not deceived.  There was

09:18AM    2    never an intent to cheat Nordic.  And that's how the Rachel was

09:18AM    3    purchased.

09:18AM    4          And then the Rachel engaged in fishing -- commercial

09:18AM    5    fishing activity for many years, and then that derived income

09:18AM    6    that was fully reported on the tax returns.  And then with that

09:18AM    7    money the Boston Whaler was purchased, the Painkiller.  And

09:18AM    8    that was purchased in 2016.  There is no nexus between that

09:18AM    9    boat and the alleged -- and the structuring.  The structuring

09:18AM    10   that was presented to you took place from 2012 to 2014.  This

09:18AM    11   boat, the Painkiller, was purchased in 2016 with a down payment

09:19AM    12   from fishing revenues alone, and alone that was repaid with

09:19AM    13   fishing revenues, lawful money.

09:19AM    14         A third asset that was purchased with the Nordic

09:19AM    15   Construction money is a residence on Paokano Loop in Kailua.

09:19AM    16   That was purchased with Nordic Construction money, and then

09:19AM    17   it -- it paid for itself largely with rental income, rental

09:19AM    18   income from that property.

09:19AM    19         So that is one bucket of assets that we would ask you

09:19AM    20   to find not subject to forfeiture for those reasons, and for

09:19AM    21   additional reasons as the evidence is presented and during

09:19AM    22   closing.

09:19AM    23         There's another bucket of assets which is the bank

09:19AM    24   accounts.  Those bank accounts -- there were bank accounts that

09:19AM    25   were -- funds from bank accounts were seized in July 2020.  So

09:19AM   1   the money in those bank accounts were from, you know, the time

09:19AM   2   period prior to 2020.  There are two Kama'aina Termite and Pest

09:19AM   3   Control accounts, there's an O'ahu Termite and Pest management

09:20AM   4   account, a plumbing account and a personal account.

09:20AM   5        So the Kama'aina Termite and Pest Control accounts

09:20AM   6   were generated -- and the revenues -- I believe the evidence is

09:20AM   7   going to show that the money in the Kama'aina Termite bank

09:20AM   8   accounts were revenues earned from fumigation and pest control

09:20AM   9   jobs, nothing else.

09:20AM  10        And at that time period Delia Fabro-Miske was the RME.

09:20AM  11   There's been no evidence that she -- that there were any false

09:20AM  12   statements made to anyone with regard to the -- her license.

09:20AM  13   The company held itself out as licensed.  It was licensed with

09:20AM  14   PCO824 from the beginning to the end.

09:20AM  15        And so those revenues we'd ask you to find to be

09:20AM  16   lawfully earned, not acquired or maintained in violation of

09:20AM  17   RICO and not the proceeds of any racketeering activity.

09:20AM  18        Oahu Termite and Pest Management, that covers a time

09:20AM  19   period when Michael Worden was the RME.  Now, he admits he was

09:21AM  20   the RME until -- and he moved away at a certain period of time,

09:21AM  21   and he didn't remove himself as the RME.  So the time period

09:21AM  22   governing the funds in that account are when Michael Worden was

09:21AM  23   the RME.  He testified he was, and whether or not he was in

09:21AM  24   compliance with the rules regarding the RME when he moved away,

09:21AM  25   there were no statements made to customers who paid O'ahu

09:21AM  1    Termite for its services with regard to that.  So there was no

09:21AM  2    intent to cheat Oahu Termite and Pest Management customers.

09:21AM  3    They paid for services that were rendered, and that money is

09:21AM  4    not acquired or maintained in violation of the RICO statute,

09:21AM  5    the Count 1 -- in violation of Count 1.

09:21AM  6            And then there's Mr. Miske's personal account which

09:21AM  7    has money, that I think will be presented as a commingled

09:21AM  8    account, so there will be money that is simply untainted by any

09:21AM  9    argument.  There will be money that comes from Kama'aina

09:22AM  10   Holdings, which is fishing revenues, which the fishing activity

09:22AM  11   was lawful, and then money from the Kama'aina Termite

09:22AM  12   fumigations.

09:22AM  13           One big job that relates to these -- the Kama'aina

09:22AM  14   Termite money and an asset purchased with it, one asset is the

09:22AM  15   Ferrari.  The Ferrari was purchased with funds from the

09:22AM  16   Maunakea job.  The Maunakea contract was signed by Delia, the

09:22AM  17   RME.  The job was performed.  There were issues that couldn't

09:22AM  18   be resolved because of the charges in this case, but there was

09:22AM  19   no fraud.  The Maunakea -- there was no fraud, there was no

09:22AM  20   deception of Maunakea.  Kama'aina Termite, a licensed company,

09:22AM  21   bid the job, got the job, performed the work to the best of its

09:22AM  22   ability, and couldn't finish with its warranty work because of

09:22AM  23   this case.  But that's where the Ferrari comes from.

09:22AM  24           There are other vehicles.  There's a red Volkswagen.

09:22AM  25   You saw pictures of a young Mr. Miske with his girlfriend Andi

| | | |
|---|---|---|
| 09:22AM | 1 | at the time and a young Caleb.  That vehicle was purchased |
| 09:23AM | 2 | sometime in the '90s before any evidence of tainted funds at |
| 09:23AM | 3 | all.  The green Volkswagen, which was turned into a tribute |
| 09:23AM | 4 | car, the 1951 green Volkswagen, and it was originally red, but, |
| 09:23AM | 5 | anyway, it was purchased in 2009, again before any of the |
| 09:23AM | 6 | evidence of the monies in this case. |
| 09:23AM | 7 | So the collective vehicles, that was a personal hobby. |
| 09:23AM | 8 | I'm not talking about the Hawaii Partners vehicles.  I'm |
| 09:23AM | 9 | talking about collector -- the Volkswagens, the ones you saw |
| 09:23AM | 10 | pictures of, those are personal collector vehicles that were |
| 09:23AM | 11 | purchased with personal funds outside of the affairs of the |
| 09:23AM | 12 | RICO conspiracy. |
| 09:23AM | 13 | And then there's gifts which have no connection to any |
| 09:23AM | 14 | taint at all.  You heard from the artist Slick as to gifts that |
| 09:23AM | 15 | he supplied, and they're seeking to forfeit those as well, and |
| 09:23AM | 16 | we'd ask you to, you know, find that those are not subject to |
| 09:23AM | 17 | forfeiture because they're untainted gifts.  And there are |
| 09:24AM | 18 | other artworks which are gifts as well.  Thank you. |
| 09:24AM | 19 | THE COURT:  The exclusionary rule continues to apply |
| 09:24AM | 20 | to this Phase 2, with the exception of Mr. Hines with the |
| 09:24AM | 21 | government's consent. |
| 09:24AM | 22 | Is the government prepared for as its first witness? |
| 09:24AM | 23 | MS. AFFINITO:  Yes, Your Honor.  The government calls |
| 09:24AM | 24 | Crystal Young. |
| 09:24AM | 25 | THE CLERK:  Please raise your right hand. |

| | | |
|---|---|---|
| 09:24AM | 1 | CRYSTAL YOUNG, |
| 09:24AM | 2 | called as a witness, having been first duly sworn, was examined |
| 09:24AM | 3 | and testified as follows: |
| 09:24AM | 4 | THE CLERK:  Please state your name, spelling your last |
| 09:25AM | 5 | name for the record. |
| 09:25AM | 6 | THE WITNESS:  Crystal Young, Y-O-U-N-G. |
| 09:25AM | 7 | DIRECT EXAMINATION |
| 09:25AM | 8 | BY MS. AFFINITO: |
| 09:25AM | 9 | Q    Good morning. |
| 09:25AM | 10 | A    Good morning. |
| 09:25AM | 11 | Q    Ms. Young, would you please remind the jury what you do. |
| 09:25AM | 12 | A    I'm a revenue agent with the Internal Revenue Service. |
| 09:25AM | 13 | Q    And you work out of the LA field office? |
| 09:25AM | 14 | A    Yes. |
| 09:25AM | 15 | Q    And you previously testified at trial about your review of |
| 09:25AM | 16 | accounting and tax records; is that correct? |
| 09:25AM | 17 | A    Yes. |
| 09:25AM | 18 | Q    So I want to direct your attention to the work that |
| 09:25AM | 19 | Kama'aina Termite did for the Keola La'i job.  Are you familiar |
| 09:25AM | 20 | with the payments that Kama'aina Termite received in connection |
| 09:25AM | 21 | with this work? |
| 09:25AM | 22 | A    Yes. |
| 09:25AM | 23 | Q    And how were those payments received? |
| 09:25AM | 24 | A    A couple of the payments were directly deposited -- or put |
| 09:25AM | 25 | into the bank account of Kama'aina Termite, and then three |

| | | |
|---|---|---|
| 09:25AM | 1 | payments were also put into the Title Guaranty escrow account. |
| 09:26AM | 2 | Q    Okay.  And what happened to the three payments that were |
| 09:26AM | 3 | put in the escrow account? |
| 09:26AM | 4 | A    They were eventually disbursed. |
| 09:26AM | 5 | Q    Okay.  And I guess, was there any activity before they |
| 09:26AM | 6 | were disbursed? |
| 09:26AM | 7 | A    Yes, they were put into an interest-bearing bank account |
| 09:26AM | 8 | for the -- on behalf of Kama'aina Termite. |
| 09:26AM | 9 | Q    Okay.  And then did you review records of the Keola La'i |
| 09:26AM | 10 | escrow account, other bank account records and accounting |
| 09:26AM | 11 | records, to determine where the payments were ultimately |
| 09:26AM | 12 | disbursed? |
| 09:26AM | 13 | A    Yes. |
| 09:26AM | 14 | Q    And did you prepare a summary of those records focusing on |
| 09:26AM | 15 | transactions that you determined to be relevant to this |
| 09:26AM | 16 | forfeiture proceeding? |
| 09:26AM | 17 | A    Yes. |
| 09:26AM | 18 |     MS. AFFINITO:  I'd like to show the witness only |
| 09:26AM | 19 | Government's Exhibit 11-3 from the -- I believe it's the 47th |
| 09:26AM | 20 | supplement. |
| 09:26AM | 21 |     THE COURT:  Go ahead. |
| 09:28AM | 22 |     MS. AFFINITO:  Looks like we're having a problem.  We |
| 09:28AM | 23 | can use the ELMO. |
| 09:28AM | 24 | BY MS. AFFINITO: |
| 09:28AM | 25 | Q    All right.  So can you see the document that I've placed |

09:29AM   1   under the ELMO?

09:29AM   2   A    Yes.

09:29AM   3   Q    Okay.  Is this a copy of the summary that you've prepared?

09:29AM   4   A    Yes.

09:29AM   5   Q    Okay.  And does it show how payments were received from

09:29AM   6   the Keola La'i job into the escrow account?

09:29AM   7   A    Yes.

09:29AM   8   Q    And then does it show the accounts and destinations into

09:29AM   9   which those payments were ultimately disbursed?

09:29AM  10   A    Yes.

09:29AM  11        MS. AFFINITO:  Your Honor, we would move to admit and

09:29AM  12   publish Exhibit 11-3.

09:29AM  13        THE COURT:  Any objection?

09:29AM  14        MS. PANAGAKOS:  No objection, Your Honor.

09:29AM  15        THE COURT:  11-3 is admitted then without objection.

09:29AM  16   You may publish it.

09:29AM  17        (Exhibit 11-3 was received in evidence.)

09:29AM  18   BY MS. AFFINITO:

09:29AM  19   Q    So there are a number of columns here.  Could you walk the

09:29AM  20   jury through what these columns show?

09:29AM  21   A    Yes.  The first column is the date, and that's the date

09:29AM  22   the transaction was initiated.  Payer or payee, that's either

09:29AM  23   who the money is coming from or going to.  Receipts, what was

09:30AM  24   deposited into the escrow account.  Disbursements, what were

09:30AM  25   paid out of the escrow account.  And then the last column is

| | | |
|---|---|---|
| 09:30AM | 1 | disbursement destinations, so where the money eventually |
| 09:30AM | 2 | landed. |
| 09:30AM | 3 | Q    Okay.  Now, does this show all of the transactions that |
| 09:30AM | 4 | were in the escrow account? |
| 09:30AM | 5 | A    No. |
| 09:30AM | 6 | Q    Okay.  And so which ones are not shown here? |
| 09:30AM | 7 | A    It's not showing the money that's transferred to the |
| 09:30AM | 8 | interest-bearing bank account and then back.  And it's not |
| 09:30AM | 9 | showing a handful of transactions.  There is a fee to the |
| 09:30AM | 10 | escrow company, there is a payment out to Kama'aina Rolloff, |
| 09:30AM | 11 | and then a payment made to a title company on behalf of |
| 09:30AM | 12 | Mr. Dahl. |
| 09:30AM | 13 | Q    Okay.  So here, the first three rows show payments into |
| 09:30AM | 14 | the escrow count by Nordic PCL, correct? |
| 09:30AM | 15 | A    Correct. |
| 09:30AM | 16 | Q    So those were payments for the Keola La'i job; is that |
| 09:31AM | 17 | right? |
| 09:31AM | 18 | A    That's right. |
| 09:31AM | 19 | Q    Okay.  And the remaining entries here then show where |
| 09:31AM | 20 | those payments from the escrow account went; is that correct? |
| 09:31AM | 21 | A    Correct. |
| 09:31AM | 22 | Q    Okay.  So did some of the money from the Keola La'i job go |
| 09:31AM | 23 | into Mike Miske's personal bank accounts? |
| 09:31AM | 24 | A    Yes. |
| 09:31AM | 25 | Q    And approximately how much? |

09:31AM  1   A    A little -- a little over 470,000.

09:31AM  2   Q    Okay.  And did some of the money go into various Leverage

09:31AM  3   bank accounts?

09:31AM  4   A    Yes.

09:31AM  5   Q    And how much?

09:31AM  6   A    1,050,000.

09:31AM  7   Q    Okay.  And then did some of it go into Kama'aina Termite

09:31AM  8   and Pest Control's bank accounts?

09:31AM  9   A    Yes.

09:31AM  10  Q    And how much was that?

09:31AM  11  A    300,000.

09:31AM  12  Q    Okay.  So I don't know if I'll be able to zoom in on this,

09:31AM  13  but do you see on -- here on February 24th, 2011, there's a

09:32AM  14  $150,000 disbursement to Pacific Rim Bank, correct?

09:32AM  15  A    Correct.

09:32AM  16  Q    And what is that payment for?

09:32AM  17  A    That's a payment on the Pacific Rim loan for the land at

09:32AM  18  6 Lumahai.

09:32AM  19       MS. AFFINITO:  Okay.  I'd like to now show the witness

09:32AM  20  only Exhibit 11-11 from the 47th supplement.

09:32AM  21       THE COURT:  Go ahead.

09:32AM  22  BY MS. AFFINITO:

09:32AM  23  Q    Can you see that?

09:32AM  24  A    Yes.

09:32AM  25  Q    Okay.  So is this a copy of the $150,000 check out of the

| | | |
|---|---|---|
| 09:32AM | 1 | Keola La'i escrow account that was disbursed to Pacific Rim |
| 09:32AM | 2 | Bank? |
| 09:32AM | 3 | A    Yes. |
| 09:32AM | 4 | Q    And this is you said in connection with a Pacific Rim Bank |
| 09:32AM | 5 | loan for the land at 6 Lumahai, correct? |
| 09:33AM | 6 | A    Correct. |
| 09:33AM | 7 | MS. AFFINITO:  Your Honor, I would move to admit and |
| 09:33AM | 8 | publish Exhibit 11-11.  There's a certification at 11-7. |
| 09:33AM | 9 | THE COURT:  Any objection? |
| 09:33AM | 10 | MS. PANAGAKOS:  No objection. |
| 09:33AM | 11 | THE COURT:  11-11 is admitted then.  You may publish. |
| 09:33AM | 12 | (Exhibit 11-11 was received in evidence.) |
| 09:33AM | 13 | BY MS. AFFINITO: |
| 09:33AM | 14 | Q    So if we look, I guess, first at the top portion here, |
| 09:33AM | 15 | this shows this was a loan payment by Michael Miske to Pacific |
| 09:33AM | 16 | Rim Bank, correct? |
| 09:33AM | 17 | A    Correct. |
| 09:33AM | 18 | Q    And then you can see the disbursement in this check, this |
| 09:33AM | 19 | is the $150,000 check below there, correct? |
| 09:33AM | 20 | A    Correct. |
| 09:33AM | 21 | Q    Okay.  And so I don't know if it's easy to see here, but |
| 09:33AM | 22 | the date on this check is February 24th, 2011, correct? |
| 09:33AM | 23 | A    Correct. |
| 09:33AM | 24 | Q    And so that corresponds with -- it matches the escrow |
| 09:33AM | 25 | account date, correct? |

| | | | |
|---|---|---|---|
| 09:33AM | 1 | A | Correct. |
| 09:33AM | 2 | Q | Okay.  So on the check here, right below it there's a |
| 09:33AM | 3 | | different date, March 7th, 2011.  What does that mean? |
| 09:34AM | 4 | A | That's the date that Pacific Rim would have processed it. |
| 09:34AM | 5 | | There is very effectually lag time between when a check is |
| 09:34AM | 6 | | written to when it finally gets cashed or processed. |
| 09:34AM | 7 | | MS. AFFINITO:  I'd like to now show the witness only |
| 09:34AM | 8 | | Exhibit 11-8 from the 47th supplement. |
| 09:34AM | 9 | | THE COURT:  Yes, go ahead. |
| 09:34AM | 10 | | BY MS. AFFINITO: |
| 09:34AM | 11 | Q | Okay.  So is this a copy of a history of loan payments by |
| 09:34AM | 12 | | Michael Miske on the -- to Pacific Rim Bank on that loan for |
| 09:34AM | 13 | | the land at 6 Lumahai? |
| 09:34AM | 14 | A | Yes. |
| 09:34AM | 15 | | MS. AFFINITO:  Your Honor, I would move to admit and |
| 09:34AM | 16 | | publish Exhibit 11-8.  There's a certification at 11-7. |
| 09:34AM | 17 | | THE COURT:  Any objection? |
| 09:34AM | 18 | | MS. PANAGAKOS:  No objection. |
| 09:35AM | 19 | | THE COURT:  11-8 is admitted then.  You may publish. |
| 09:35AM | 20 | | (Exhibit 11-8 was received in evidence.) |
| 09:35AM | 21 | Q | So if we first look at the top portion here, so this |
| 09:35AM | 22 | | identifies Michael J. Miske, Jr., correct? |
| 09:35AM | 23 | A | Correct. |
| 09:35AM | 24 | Q | And this document, it says it's a loan history record, |
| 09:35AM | 25 | | correct? |

09:35AM   1   A   Correct.

09:35AM   2   Q   Related to Pacific Rim Bank?

09:35AM   3   A   Correct.

09:35AM   4   Q   And this loan, it says it's for a first mortgage, vacant

09:35AM   5   land at 6 Lumahai Street; is that correct?

09:35AM   6   A   Correct.

09:35AM   7   Q   Okay.  And then if we look at the bottom here, is this

09:35AM   8   dated March 7th, and there's an amount here $150,000, does this

09:35AM   9   correspond to the $150,000 payment out of the Keola La'i escrow

09:35AM   10  account?

09:35AM   11  A   Yes.

09:35AM   12  Q   Okay.  And so here they're using the processing date as

09:36AM   13  opposed to the initiation date, correct?

09:36AM   14  A   Correct.

09:36AM   15  Q   Okay.  So this $150,000 payment on the loan for the land

09:36AM   16  at 6 Lumahai was ultimately sourced from Kama'aina Termite and

09:36AM   17  Pest Control, correct?

09:36AM   18  A   Correct.

09:36AM   19  Q   Okay.  So it was -- specifically, it came from money that

09:36AM   20  Kama'aina Termite received for the Keola La'i job, correct?

09:36AM   21  A   Correct.

09:36AM   22  Q   Okay.  And based on your review of the loan documents and

09:36AM   23  accounting and tax records, did Mr. Miske identify any uses for

09:36AM   24  the 6 Lumahai land aside from building the property on it?

09:36AM   25  A   Yes.  In the mun (sic) documents it stated that he would

| | | |
|---|---|---|
| 09:36AM | 1 | be using it for rental storage of equipment, specifically for |
| 09:36AM | 2 | Kama'aina Plumbing and Kama'aina Termite. |
| 09:36AM | 3 | Q    Okay.  And I can show you again -- |
| 09:36AM | 4 | MS. AFFINITO:  Publish Exhibit 11-3, which is already |
| 09:37AM | 5 | admitted. |
| 09:37AM | 6 | THE COURT:  Yes. |
| 09:37AM | 7 | BY MS. AFFINITO: |
| 09:37AM | 8 | Q    So this is that summary we were just looking at that you |
| 09:37AM | 9 | made.  So you testified earlier that over a million dollars of |
| 09:37AM | 10 | the money that you earned from the Keola La'i job went to the |
| 09:37AM | 11 | Leverage accounts; is that correct? |
| 09:37AM | 12 | A    That's correct. |
| 09:37AM | 13 | Q    And so the first payment here into a Leverage account is |
| 09:37AM | 14 | this on February 28th, 2011, correct? |
| 09:37AM | 15 | A    Correct. |
| 09:37AM | 16 | Q    It goes to Leverage Entertainment LLC, correct? |
| 09:37AM | 17 | A    Correct. |
| 09:37AM | 18 | Q    And it's for $350,000, correct? |
| 09:37AM | 19 | A    Correct. |
| 09:37AM | 20 | Q    And then between October and December of 2011, an |
| 09:37AM | 21 | additional $700,000 of the Keola La'i money gets disbursed to |
| 09:37AM | 22 | Leverage accounts; is that correct? |
| 09:37AM | 23 | A    Correct. |
| 09:37AM | 24 | Q    And do you know what that money was for? |
| 09:37AM | 25 | A    That was the first year of Leverage, it's to operate and |

09:38AM   1   start the business.

09:38AM   2   Q    Okay.  So this money is going into Leverage around the

09:38AM   3   time that it's starting up; is that correct?

09:38AM   4   A    Correct.

09:38AM   5   Q    Okay.  And 2011 was the Leverage's first year of

09:38AM   6   operation.  Is that what you were testifying to?

09:38AM   7   A    Yes, that's correct.

09:38AM   8   Q    Okay.  And so were these -- these were contributions to

09:38AM   9   Leverage; is that right?

09:38AM   10   A    That's right.

09:38AM   11   Q    And if we look here on September 27th, 2011, there is a

09:38AM   12   $556,252.87 disbursement to Title Guaranty Escrow Services; is

09:38AM   13   that right?

09:38AM   14   A    Yes.

09:38AM   15   Q    So is this the same escrow company who's holding the

09:38AM   16   entire escrow account?

09:38AM   17   A    Same company, yes.

09:38AM   18   Q    Okay.  This disbursement goes to the escrow company,

09:38AM   19   correct?

09:38AM   20   A    Yes.

09:38AM   21   Q    Okay.  So did it actually go to a different office within

09:39AM   22   the escrow company?

09:39AM   23   A    Yes.

09:39AM   24   Q    Okay.  And did you review records to determine what that

09:39AM   25   disbursement was used for?

| | | | |
|---|---|---|---|
| 09:39AM | 1 | A | Yes. |
| 09:39AM | 2 | Q | And what was it used for? |
| 09:39AM | 3 | A | It was the purchase of Paokano Loop property. |
| 09:39AM | 4 | | MS. AFFINITO:  If I could show the witness only |
| 09:39AM | 5 | | Exhibit 11-20 from the 47th supplement. |
| 09:39AM | 6 | | THE COURT:  Yes, go ahead. |
| 09:39AM | 7 | | BY MS. AFFINITO: |
| 09:39AM | 8 | Q | So can you see this document before you? |
| 09:39AM | 9 | A | Yes. |
| 09:39AM | 10 | Q | Okay.  So is this a copy of the final buyer statement for |
| 09:39AM | 11 | | a property purchased by Michael Miske at 614 Paokano Loop? |
| 09:39AM | 12 | A | Yes. |
| 09:39AM | 13 | Q | And does this show a roughly $556,000 disbursement from |
| 09:39AM | 14 | | that Keola La'i escrow account? |
| 09:39AM | 15 | A | Yes. |
| 09:39AM | 16 | | MS. AFFINITO:  Your Honor, I'd move to admit and |
| 09:40AM | 17 | | publish Exhibit 11-20.  There's a certification at 11-16. |
| 09:40AM | 18 | | THE COURT:  Any objection to 11-20? |
| 09:40AM | 19 | | MS. PANAGAKOS:  No objection, Your Honor. |
| 09:40AM | 20 | | THE COURT:  That exhibit is then admitted without |
| 09:40AM | 21 | | objection.  You may publish it. |
| 09:40AM | 22 | | (Exhibit 11-20 was received in evidence.) |
| 09:40AM | 23 | | BY MS. AFFINITO: |
| 09:40AM | 24 | Q | So if we zoom in here and look at the top.  So this is -- |
| 09:40AM | 25 | | this is the final buyer's statements for the property at 614 |

09:40AM  1    Paokano Loop in Kailua, Hawaii; is that right?

09:40AM  2    A    Yes.

09:40AM  3    Q    And it identifies Michael Miske on this document, correct?

09:40AM  4    A    Correct.

09:40AM  5    Q    And then again, that same Title Guaranty Escrow Services

09:40AM  6    company, correct?

09:40AM  7    A    Correct.

09:40AM  8    Q    And if we look a little further down, do you see the

09:40AM  9    deposit of $556,252.87?

09:41AM  10   A    Yes.

09:41AM  11   Q    And so that's the exact same amount down to the cent that

09:41AM  12   was disbursed from the Keola La'i escrow account, correct?

09:41AM  13   A    Correct.

09:41AM  14   Q    And then we see that here, and you see that number down

09:41AM  15   here again as well.

09:41AM  16   A    Correct.

09:41AM  17   Q    Okay.  And here it says "TGES Main Office."  Is that the

09:41AM  18   escrow company?

09:41AM  19   A    Yes.

09:41AM  20   Q    Okay.  And so it has this roughly $556,000 payment, again

09:41AM  21   dated September 27th, 2011; is that right?

09:41AM  22   A    That's right.

09:41AM  23   Q    And so that's the same date that's identified on the

09:41AM  24   escrow account; is that right?

09:41AM  25   A    Correct.

09:41AM  1   Q    Okay.  So the payment for the purchase of the Paokano Loop

09:41AM  2   property was ultimately sourced from monies that Kama'aina

09:41AM  3   Termite received; is that right?

09:41AM  4   A    Correct.

09:41AM  5   Q    And specifically, this money came from money that

09:41AM  6   Kama'aina Termite received for the Keola job -- Keola La'i job;

09:41AM  7   is that correct?

09:41AM  8   A    That's correct.

09:42AM  9        MS. AFFINITO:  Nothing further.

09:42AM 10        THE COURT: Ms. Panagakos.

09:42AM 11        MS. PANAGAKOS:  No, Judge.

09:42AM 12        THE COURT:  All right.  Ms. Young, you may step down

09:42AM 13   subject to cross-examination at a later date.

09:42AM 14        THE WITNESS:  Thank you.

09:42AM 15        THE COURT:  Next witness.

09:42AM 16        MR. AKINA:  The government calls Greg Turner.

09:43AM 17        THE CLERK:  Please raise your right hand.

09:43AM 18                  GREGORY TURNER,

09:43AM 19   called as a witness, having been first duly sworn, was examined

09:43AM 20   and testified as follows:

09:43AM 21        THE CLERK:  Please state your full name, spelling your

09:43AM 22   last name for the record.

09:43AM 23        THE WITNESS:  My name is Gregory Turner, T-U-R-N-E-R.

        24

        25

| | | |
|---|---|---|
| 09:43AM | 1 | DIRECT EXAMINATION |
| 09:43AM | 2 | BY MR. AKINA: |
| 09:43AM | 3 | Q    Good morning, Agent Turner. |
| 09:43AM | 4 | A    Good morning. |
| 09:43AM | 5 | Q    Welcome back. |
| 09:43AM | 6 | Remind the jury, how long have you been with the FBI? |
| 09:43AM | 7 | A    I joined the FBI in July of 2010, graduated the academy |
| 09:43AM | 8 | in -- I'm sorry, it's coming up on ten years.  That's where the |
| 09:43AM | 9 | ten years came from.  So, yeah, I joined the bureau in July of |
| 09:43AM | 10 | 2014, I graduated the academy, and got up here to Honolulu in |
| 09:43AM | 11 | December of 2014. |
| 09:43AM | 12 | Q    And what do you do for the FBI? |
| 09:43AM | 13 | A    I am a special agent assigned to the white collar crime |
| 09:43AM | 14 | squad.  We investigate financial crimes, public corruption, and |
| 09:43AM | 15 | then also the evidence response team, senior team leader. |
| 09:44AM | 16 | Q    And in this case did you assist in the seizure of certain |
| 09:44AM | 17 | properties related to Michael Miske? |
| 09:44AM | 18 | A    I did. |
| 09:44AM | 19 | Q    And around what year did most of those -- or did those |
| 09:44AM | 20 | seizures take place? |
| 09:44AM | 21 | A    July of 2020. |
| 09:44AM | 22 | Q    Did you also look at financial documents related to some |
| 09:44AM | 23 | of those properties? |
| 09:44AM | 24 | A    I did. |
| 09:44AM | 25 | Q    I want to ask you some questions about 6 Lumahai. |

09:44AM    1              MR. AKINA:  If we could pull up Exhibit 9-1374,

09:44AM    2    already in evidence in the government's 40th list.

09:44AM    3              THE COURT:  Go ahead.

09:44AM    4    BY MR. AKINA:

09:44AM    5    Q    Going to page 2.  And if we focus on just the top portion

09:45AM    6    of the document.  You see here this is a loan amount for

09:45AM    7    6 Lumahai Street?

09:45AM    8    A    That's correct.

09:45AM    9    Q    And what's the amount?

09:45AM    10   A    1,175,000.

09:45AM    11   Q    And what was this for?

09:45AM    12   A    This was a loan that was applied for and granted in 2010

09:45AM    13   to help purchase what was then a vacant lot at 6 Lumahai.

09:45AM    14   Q    So this was an additional funding source to purchase that

09:45AM    15   land?

09:45AM    16   A    That's correct.

09:45AM    17   Q    And if we zoom out of here, let me just focus on the

09:45AM    18   primary applicant.  Who's -- above, yeah, who's listed there?

09:45AM    19   A    Michael Miske.

09:45AM    20              MR. AKINA:  We can take this down.

09:45AM    21   BY MR. AKINA:

09:45AM    22   Q    Did you look at mortgage payments made on this loan for

09:45AM    23   6 Lumahai?

09:46AM    24   A    I did.

09:46AM    25   Q    And where did those payments come from, the money for

| | | |
|---|---|---|
| 09:46AM | 1 | those payments? |
| 09:46AM | 2 | A    The source of the payments for both the principal and |
| 09:46AM | 3 | interest came from Kama'aina Termite and Pest Control, and then |
| 09:46AM | 4 | earlier on there was some interest-only payments that came out |
| 09:46AM | 5 | of Mr. Miske's personal bank account. |
| 09:46AM | 6 | Q    Did you create a summary of those mortgage payments -- |
| 09:46AM | 7 | A    I did. |
| 09:46AM | 8 | Q    -- from 2010 to 2018? |
| 09:46AM | 9 | A    Sorry.  Yes, I did. |
| 09:46AM | 10 | MR. AKINA:  And if we could show the witness |
| 09:46AM | 11 | Exhibit 11-6 from the 47th supplemental list. |
| 09:46AM | 12 | THE COURT:  Yes, go ahead. |
| 09:46AM | 13 | BY MR. AKINA: |
| 09:46AM | 14 | Q    And is this that summary that you generated? |
| 09:46AM | 15 | A    It is. |
| 09:46AM | 16 | Q    And what does it show? |
| 09:46AM | 17 | A    It shows -- yeah, payments that were made on that loan |
| 09:46AM | 18 | over the -- over the life of the loan. |
| 09:46AM | 19 | Q    It shows the accounts it came from and the amounts as |
| 09:46AM | 20 | well? |
| 09:46AM | 21 | A    Yeah, correct.  It's an Excel spreadsheet, and, yeah, you |
| 09:47AM | 22 | have the actual bank account with the last three digits of the |
| 09:47AM | 23 | bank account number, and then the owner, whether that's |
| 09:47AM | 24 | Kama'aina Termite or Mr. Miske's personal account. |
| 09:47AM | 25 | MR. AKINA:  I offer Exhibit 11-6 into evidence. |

| | | |
|---|---|---|
| 09:47AM | 1 | THE COURT:  Any objection? |
| 09:47AM | 2 | MR. KENNEDY:  No objection. |
| 09:47AM | 3 | THE COURT:  11-6 is admitted then.  You may publish. |
| 09:47AM | 4 | (Exhibit 11-6 was received in evidence.) |
| 09:47AM | 5 | MR. AKINA:  If we could focus on the top, the heading |
| 09:47AM | 6 | of the column headers. |
| 09:47AM | 7 | BY MR. AKINA: |
| 09:47AM | 8 | Q    If you could just walk the jury through what this means. |
| 09:47AM | 9 | A    Yeah, so starting on the left, the account, that's going |
| 09:47AM | 10 | to be the source bank account.  So for example, FHB, First |
| 09:47AM | 11 | Hawaiian Bank, the bank account ending in 379 or 376.  The |
| 09:47AM | 12 | owner of the account is either going to be Kama'aina Termite or |
| 09:47AM | 13 | Mike Miske personal, so MM personal.  The date can be the date |
| 09:47AM | 14 | of the payment.  The description from the banking records. |
| 09:48AM | 15 | Check -- check Number/ACH, so some of the payments were checks, |
| 09:48AM | 16 | some of them were electronic payments, which is what ACH is, |
| 09:48AM | 17 | and then the payment amount. |
| 09:48AM | 18 | MR. AKINA:  If we can zoom out of this. |
| 09:48AM | 19 | BY MR. AKINA: |
| 09:48AM | 20 | Q    And so staying on this page 1, looking at the Payment |
| 09:48AM | 21 | column on the far right, that's roughly $12,000 payments |
| 09:48AM | 22 | followed by five or -- four to $6,000 payments, are those the |
| 09:48AM | 23 | principal and interest payments you were talking about earlier? |
| 09:48AM | 24 | A    Yes. |
| 09:48AM | 25 | Q    And looking on the second column from the left, are those |

09:48AM  1    payments coming out of Kama'aina Termite and Pest Control

09:48AM  2    accounts as well as Michael Miske's personal accounts?

09:48AM  3    A    Yes.

09:48AM  4    Q    And which one was paying for which?

09:48AM  5    A    Early on the Mike Miske personal accounts were basically

09:48AM  6    covering the interest only, and the principal payments were the

09:49AM  7    Kama'aina Termite payments.

09:49AM  8    Q    If we go to page 3 of the document, does that change as

09:49AM  9    far as money coming out of Michael Miske's personal account?

09:49AM  10   A    Yes.  So, you know, at some point, approximately June of

09:49AM  11   2013, the payments out of Mr. Miske's personal account stopped,

09:49AM  12   and the remaining payments for the life of the loan come out of

09:49AM  13   the Kama'aina Termite account.

09:49AM  14   Q    If we go to page 7, which should be the last page.  You

09:49AM  15   said this goes up to 2018.  Here we see First Foundation

09:49AM  16   instead of Pacific Rim Bank.  Does that mean that the -- the

09:49AM  17   loan -- whoever held the loan changed?

09:49AM  18   A    Yes, correct.  So First Foundation bought out Pacific Rim

09:49AM  19   in 2015.  So the same loan but the payee changed obviously at

09:50AM  20   that time.

09:50AM  21   Q    And so monthly, approximately how much in payments was

09:50AM  22   Kama'aina -- was coming out of the Kama'aina Termite and Pest

09:50AM  23   Control accounts?

09:50AM  24   A    Towards the end, you know, on this last page,

09:50AM  25   September 17th through March of '18, approximately -- not

09:50AM   1   approximately -- exactly $15,000.

09:50AM   2            MR. AKINA:  If we could show the witness Exhibit 11-9

09:50AM   3   from the 47th list.

09:50AM   4            THE COURT:  Go ahead.

09:50AM   5   BY MR. AKINA:

09:50AM   6   Q    Is this an example of a check face of one of those

09:50AM   7   payments that were being made -- or two of those payments that

09:50AM   8   were being made over time?

09:50AM   9   A    Yes, one of them.

09:50AM   10  Q    If we could go to the second page to the second example.

09:50AM   11  A    Yeah, correct.  Yes.

09:50AM   12           MR. AKINA:  I would offer Exhibit 11-9 into evidence.

09:50AM   13  The certification is at 11-7.

09:50AM   14           THE COURT:  Any objection?

09:50AM   15           MR. KENNEDY:  No objection.

09:50AM   16           THE COURT:  11-9 is admitted.  You may publish.

09:51AM   17           (Exhibit 11-9 was received in evidence.)

09:51AM   18  Q    Let me focus on the bottom -- third from the bottom --

09:51AM   19  third to the bottom, sorry, that check.

09:51AM   20           So just by way of example, is this a check from

09:51AM   21  Kama'aina Termite and Pest Control to Pacific Rim Bank?

09:51AM   22  A    Yes.

09:51AM   23  Q    And it's in the amount of $12,000?

09:51AM   24  A    Yes.

09:51AM   25  Q    And then looking in the memo line, what is written there?

09:51AM   1   A     "Lease 6 Lumahai."

09:51AM   2   Q     Are you aware that there was also supposed to be a lease

09:51AM   3   arrangement where the land was being leased to Kama'aina

09:51AM   4   Termite and Pest Control for storage?

09:51AM   5   A     Yes.

09:51AM   6   Q     And does this correspond to a line item on the chart that

09:51AM   7   you created?

09:51AM   8   A     This check payment does, yes.

09:51AM   9          MR. AKINA:  Now, we can take this exhibit down.

09:51AM  10   BY MR. AKINA:

09:51AM  11   Q     So based on your review of records, was 6 Lumahai obtained

09:52AM  12   and acquired through using proceeds from Kama'aina Termite and

09:52AM  13   Pest Control?

09:52AM  14   A     The loan that was used to partially -- or, yeah, the loan

09:52AM  15   was used to partially acquire the property and, yes, Kama'aina

09:52AM  16   money and Mike Miske's personal account paid down that loan

09:52AM  17   over time.

09:52AM  18   Q     I'm going to ask you about 559 Kumukahi Place.  What type

09:52AM  19   of building is that?

09:52AM  20   A     It's a residence in Hawaii Kai.

09:52AM  21   Q     And was that property sold in the amount of $611,123.60

09:52AM  22   approximately?

09:52AM  23   A     Yes, that was the net proceeds after the accompanying

09:52AM  24   mortgage was paid off, but -- yeah.

09:52AM  25   Q     And who owned that property prior to the sale?

| | | | |
|---|---|---|---|
| 09:53AM | 1 | A | Michael Miske. |
| 09:53AM | 2 | Q | And do you remember approximately when he acquired that |
| 09:53AM | 3 | | property? |
| 09:53AM | 4 | A | It was at the very end of 2019. |
| 09:53AM | 5 | Q | And to acquire that property initially, were any |
| 09:53AM | 6 | | associates of Michael Miske's used? |
| 09:53AM | 7 | A | Yes. |
| 09:53AM | 8 | Q | Who? |
| 09:53AM | 9 | A | Kaulana Freitas. |
| 09:53AM | 10 | Q | And how was he used? |
| 09:53AM | 11 | A | The -- the home was purchased at a foreclosure auction, |
| 09:53AM | 12 | | and Kaulana Freitas used money from Mike Miske's accounts to |
| 09:53AM | 13 | | actually go to the auction and bid on the house. |
| 09:53AM | 14 | | MR. AKINA:  If we could show the witness only |
| 09:53AM | 15 | | Exhibit 11-25 from the 47th list. |
| 09:53AM | 16 | | THE COURT:  Go ahead. |
| 09:53AM | 17 | | BY MR. AKINA: |
| 09:53AM | 18 | Q | What is this document we are looking at? |
| 09:53AM | 19 | A | It's a letter from Kaulana Freitas just acknowledging his |
| 09:54AM | 20 | | role in initially, you know, acting as the buyer for Mr. Miske. |
| 09:54AM | 21 | Q | And is it signed by Michael Miske? |
| 09:54AM | 22 | A | It is. |
| 09:54AM | 23 | Q | And is it signed by Kaulana Freitas? |
| 09:54AM | 24 | A | It is. |
| 09:54AM | 25 | | MR. AKINA:  I would offer 11-25 into evidence.  There |

09:54AM    1    is a certification at 11-21.

09:54AM    2              THE COURT:  Any objection?

09:54AM    3              MR. KENNEDY:  No objection.

09:54AM    4              THE COURT:  11-25 is admitted.  You may publish.

09:54AM    5              (Exhibit 11-25 was received in evidence.)

09:54AM    6    Q    And the very top, you see this is on Kama'aina Termite and

09:54AM    7    Pest Control letterhead?

09:54AM    8    A    Yes.

09:54AM    9    Q    And if we focus on the first paragraph, is this what

09:54AM   10    you're describing about Kaulana Freitas being the bidder at the

09:54AM   11    auction?

09:54AM   12    A    Yes.

09:54AM   13    Q    And then if we go to the second paragraph.  Is this an

09:55AM   14    explanation that Kaulana Freitas is then designating Michael

09:55AM   15    Miske to be the buyer of the property?

09:55AM   16    A    Yes.

09:55AM   17    Q    And was -- were payments -- did payments go through

09:55AM   18    Kaulana Freitas for this property as well?

09:55AM   19    A    Yes.  So Mr. Miske had four cashier's checks withdrawn

09:55AM   20    from his account, and those cashier's checks were given to

09:55AM   21    Kaulana Freitas.  They were written out to him actually, to

09:55AM   22    Kaulana Freitas, again for the purpose of going to the auction

09:55AM   23    and bidding on the house.

09:55AM   24    Q    And was that money ultimately applied to the purchase of

09:55AM   25    the home?

| | | | |
|---|---|---|---|
| 09:55AM | 1 | A | It was. |
| 09:55AM | 2 | Q | About how much was that in total? |
| 09:55AM | 3 | A | 140,000. |
| 09:55AM | 4 | Q | Did money go through any other associates of Michael |
| 09:56AM | 5 | | Miske's? |
| 09:56AM | 6 | A | Yes. |
| 09:56AM | 7 | Q | Who? |
| 09:56AM | 8 | A | So basically three buckets of money that were used to |
| 09:56AM | 9 | | purchase Kumukahi.  One was the cashier's checks from Kaulana |
| 09:56AM | 10 | | Freitas for $140,000.  There was an additional $250,000 down |
| 09:56AM | 11 | | payment that came from a checking account, and the signatory on |
| 09:56AM | 12 | | that was Delia Fabro-Miske, and it was a joint account with her |
| 09:56AM | 13 | | and a minor child. |
| 09:56AM | 14 | Q | And were you able to trace money going from both Kaulana |
| 09:56AM | 15 | | Freitas's account and Delia Fabro-Miske's accounts back to |
| 09:56AM | 16 | | Michael Miske's personal account? |
| 09:56AM | 17 | A | The cashier's checks used by Kaulana Freitas and the money |
| 09:56AM | 18 | | from the joint account of Delia Fabro-Miske and her minor |
| 09:56AM | 19 | | child, yes, were traced into the escrow account to buy the |
| 09:56AM | 20 | | house. |
| 09:56AM | 21 | Q | And did those monies go out at different points in time |
| 09:56AM | 22 | | from his accounts? |
| 09:56AM | 23 | A | Yes. |
| 09:57AM | 24 | Q | About how much time elapsed? |
| 09:57AM | 25 | A | Approximately a year. |

| | | | |
|---|---|---|---|
| 09:57AM | 1 | Q | Which one went out first? |
| 09:57AM | 2 | A | So the checks came out, you know, at the foreclosure |

09:57AM   3   auction, and because it was a foreclosure, I think the escrow,

09:57AM   4   the closing of the property took a lot longer than a normal

09:57AM   5   closing.  So, yeah, the checks happened, and then maybe a year

09:57AM   6   later the $250,000 came into the escrow account.

09:57AM   7   Q     So the checks from Kaulana Freitas, those came out first?

09:57AM   8   A     Yes.

09:57AM   9   Q     And for those checks, were you able to trace where that

09:57AM   10   came from from Mr. Miske's account?

09:57AM   11   A     Yes.

09:57AM   12   Q     Where did that come from?

09:57AM   13   A     So that was sourced from -- okay, in 2018, Mr. Miske got a

09:57AM   14   refinanced loan from Bank of Hawaii and took some cash out from

09:57AM   15   that refinance loan.  And so the -- some of the funds that were

09:58AM   16   used from that refinanced loan were used to get the cashier's

09:58AM   17   checks that Kaulana Freitas used to buy the house.

09:58AM   18   Q     So proceeds from the Bank of Hawaii loan at 6 Lumahai,

09:58AM   19   where 6 Lumahai was the collateral, those proceeds were used in

09:58AM   20   part to purchase Kumukahi Place?

09:58AM   21   A     That's correct.

09:58AM   22   Q     Did you --

09:58AM   23         MR. AKINA:  Can we show the witness Exhibit 11-22 from

09:58AM   24   the 47th list?

09:58AM   25         THE COURT:  Go ahead.

09:58AM   1    BY MR. AKINA:

09:58AM   2    Q    And what is this document?

09:58AM   3    A    This is a settlement statement.  So, yeah, when the house

09:58AM   4    closed, it's just kind of an accounting basically of the money

09:58AM   5    in and out, and who owes what to document the purchase of the

09:58AM   6    property.

09:58AM   7    Q    Does it also document those deposits -- those payments

09:58AM   8    that you just described?

09:58AM   9    A    It does.

09:58AM   10            MR. AKINA:  I'd offer Exhibit 11-22 into evidence.

09:59AM   11   There's a certification at 11-21.

09:59AM   12            THE COURT:  Any objection to 11-22?

09:59AM   13            MR. KENNEDY:  No objection.

09:59AM   14            THE COURT:  That exhibit then is admitted.  You may

09:59AM   15   publish it.

09:59AM   16            (Exhibit 11-22 was received in evidence.)

09:59AM   17   Q    If we could focus on the third box from the top.  So this

09:59AM   18   is the settlement statement for that Kumukahi Place; is that

09:59AM   19   correct?

09:59AM   20   A    Yes.

09:59AM   21   Q    And who's listed as the buyer on this?

09:59AM   22   A    Michael John Miske, Jr., and Delia Miske.

09:59AM   23   Q    And you said it was purchased around towards the end of

09:59AM   24   2019, December 31st, 2019, to be exact?

09:59AM   25   A    Yes.

| | | |
|---|---|---|
| 09:59AM | 1 | Q    If we can zoom out of this. |
| 09:59AM | 2 | If we focus on the first portion of that last box |
| 09:59AM | 3 | under "Financial."  It shows the sale price was 1.4 million for |
| 10:00AM | 4 | the home? |
| 10:00AM | 5 | A    That's correct. |
| 10:00AM | 6 | Q    And then there are two deposits here.  Are these the two |
| 10:00AM | 7 | deposits you were talking about? |
| 10:00AM | 8 | A    Yes. |
| 10:00AM | 9 | Q    Okay.  So the $140,000 that came through the Law Office of |
| 10:00AM | 10 | James Dandar, was that the Kaulana Freitas checks? |
| 10:00AM | 11 | A    Yes. |
| 10:00AM | 12 | Q    And the 250,000 you talked about, it says Michael Miske |
| 10:00AM | 13 | here, but it came through Delia Fabro-Miske's account? |
| 10:00AM | 14 | A    That's correct. |
| 10:00AM | 15 | Q    Were you able to sort of chart out the different accounts |
| 10:00AM | 16 | and the flow of the funds? |
| 10:00AM | 17 | A    I was. |
| 10:00AM | 18 | MR. AKINA:  If we could show the witness Exhibit 11-34 |
| 10:00AM | 19 | from the 47th list. |
| 10:00AM | 20 | THE COURT:  Go ahead. |
| 10:00AM | 21 | BY MR. AKINA: |
| 10:00AM | 22 | Q    Is this that chart, the flow of the funds that you |
| 10:00AM | 23 | created? |
| 10:00AM | 24 | A    It is. |
| 10:00AM | 25 | MR. AKINA:  I'd offer Exhibit 11-34 into evidence. |

| | | |
|---|---|---|
| 10:00AM | 1 | THE COURT:  Any objection? |
| 10:01AM | 2 | MR. KENNEDY:  No objection. |
| 10:01AM | 3 | THE COURT:  11-34 is admitted.  You may publish it. |
| 10:01AM | 4 | (Exhibit 11-34 was received in evidence.) |
| 10:01AM | 5 | Q    Okay.  So the -- you said there were three buckets of |
| 10:01AM | 6 | payments, is that -- that's depicted here? |
| 10:01AM | 7 | A    Yes. |
| 10:01AM | 8 | Q    Under the Escrow column, the $140,000, $250,000, and over |
| 10:01AM | 9 | 1 million? |
| 10:01AM | 10 | A    Right. |
| 10:01AM | 11 | Q    So this top row that starts on the left, "From BOH refi 6 |
| 10:01AM | 12 | Lumahai," which -- which person did these go through? |
| 10:01AM | 13 | A    So, yeah, looking at the right column, right, so the |
| 10:01AM | 14 | $140,000 was sourced left to right.  So the top chunk of money |
| 10:01AM | 15 | is the chunk of money that Kaulana Freitas was involved in. |
| 10:01AM | 16 | Q    And so just working through, can you explain to the jury |
| 10:01AM | 17 | the path that the money took? |
| 10:01AM | 18 | A    Yeah, so if you start in the top left, you have the Bank |
| 10:02AM | 19 | of Hawaii refinance loan.  Some of those proceeds went into -- |
| 10:02AM | 20 | I'm sorry, all of those proceeds went into Mr. Miske's Bank of |
| 10:02AM | 21 | Hawaii account ending in 729, and then some of those proceeds |
| 10:02AM | 22 | were used to purchase the cashier's checks that totaled |
| 10:02AM | 23 | $140,000 that were written out to Kaulana Freitas. |
| 10:02AM | 24 | And then Kaulana Freitas goes to the foreclosure |
| 10:02AM | 25 | auction and has to put 10 percent down, right.  10 percent of |

| | | |
|---|---|---|
| 10:02AM | 1 | 1.4 million is 140,000, and so that's the first -- that top |
| 10:02AM | 2 | row. |
| 10:02AM | 3 | MR. AKINA:  And if we can show Exhibit 11-19 to the |
| 10:02AM | 4 | witness. |
| 10:02AM | 5 | THE COURT:  Yes, go ahead. |
| 10:02AM | 6 | BY MR. AKINA: |
| 10:02AM | 7 | Q    What are we looking at here? |
| 10:02AM | 8 | A    So this is a -- kind of a subset or a portion of a |
| 10:03AM | 9 | previous exhibit, but, yeah, it's -- it shows the Bank of |
| 10:03AM | 10 | Hawaii refinance loan money coming into Mr. Miske's personal |
| 10:03AM | 11 | account, and then the disbursements that were made subsequent |
| 10:03AM | 12 | to that. |
| 10:03AM | 13 | Q    So this would show the money coming in, and then also the |
| 10:03AM | 14 | money going out from that chart? |
| 10:03AM | 15 | A    Yes. |
| 10:03AM | 16 | Q    And is this a summary of the underlying documents -- |
| 10:03AM | 17 | A    It is. |
| 10:03AM | 18 | Q    -- for that loan? |
| 10:03AM | 19 | A    It is. |
| 10:03AM | 20 | MR. AKINA:  I would offer Exhibit 11-19 into evidence. |
| 10:03AM | 21 | THE COURT:  Any objection to 11-19? |
| 10:03AM | 22 | MR. KENNEDY:  Your Honor, no objection, but the -- I |
| 10:03AM | 23 | would ask that the last entry that's not paged, the last entry |
| 10:03AM | 24 | on the last page just be blackened out. |
| 10:03AM | 25 | THE COURT:  Any objection to that? |

| | | |
|---|---|---|
| 10:04AM | 1 | MR. AKINA:  No objection to that. |
| 10:04AM | 2 | THE COURT:  This is one of the entries dated |
| 10:04AM | 3 | July 24th, 2018? |
| 10:04AM | 4 | MR. AKINA:  I believe it's a July 26, 2018 entry. |
| 10:04AM | 5 | THE COURT:  I see.  I was missing one page. |
| 10:04AM | 6 | All right.  Without objection then, 11-19 is admitted |
| 10:04AM | 7 | with the caveat that the final entry -- I was looking for a |
| 10:04AM | 8 | page number.  It doesn't look like this document has page |
| 10:04AM | 9 | numbers, but the final entry dated July 26, 2018, will be |
| 10:04AM | 10 | admitted -- will be deleted -- excuse me -- redacted before it |
| 10:04AM | 11 | goes back to the jury. |
| 10:04AM | 12 | (Exhibit 11-19 was received in evidence.) |
| 10:04AM | 13 | MR. KENNEDY:  And, Your Honor, since I'm looking at it |
| 10:04AM | 14 | on my computer, it looks like it totals 15 pages in total. |
| 10:05AM | 15 | THE COURT:  Okay, thank you. |
| 10:05AM | 16 | MR. KENNEDY:  You're welcome. |
| 10:05AM | 17 | THE COURT:  It appears on the final page. |
| 10:05AM | 18 | MR. AKINA:  Permission to publish? |
| 10:05AM | 19 | THE COURT:  Yes. |
| 10:05AM | 20 | BY MR. AKINA: |
| 10:05AM | 21 | Q    Okay.  So this is a summary of Michael Miske's personal |
| 10:05AM | 22 | accounts at the time? |
| 10:05AM | 23 | A    That's correct. |
| 10:05AM | 24 | Q    And if we focus on the top left corner with the gray |
| 10:05AM | 25 | boxes, and this was at which bank? |

10:05AM  1    A    Bank of Hawaii.

10:05AM  2    Q    And if we go -- zoom out of this.

10:05AM  3         On the far right column, what is that?  If we zoom on

10:05AM  4    that header beginning "Non-loan funds."

10:05AM  5    A    Right, so Mr. Miske had some money in his bank account

10:05AM  6    prior to the loan proceeds coming in.  So prior to the loan

10:06AM  7    proceeds, he had $231,278.89 in that account.  So this heading

10:06AM  8    in this column shows the money that was in the account, yeah,

10:06AM  9    prior to those loan proceeds coming in.

10:06AM  10        MR. AKINA:  And so if we zoom out of here, if we focus

10:06AM  11   on the balance and just the first row underneath balance in the

10:06AM  12   middle of the page.  Just the first two rows.

10:06AM  13   BY MR. AKINA:

10:06AM  14   Q    Okay.  This is what you're talking about, how it starts at

10:06AM  15   $231,000 approximately?

10:06AM  16   A    Correct.

10:06AM  17   Q    And then the next number, this is the balance,

10:06AM  18   2.1 million; is that correct?

10:06AM  19   A    Right, yeah, that's essentially the balance before the

10:06AM  20   loan proceeds come in, the loan proceeds come in, and then your

10:06AM  21   new balance in that bank account is 2.1 million roughly.

10:07AM  22   Q    Okay.  If we zoom out, that highlighted box with

10:07AM  23   1.9 million, that's the loan proceeds, right?

10:07AM  24   A    Right.

10:07AM  25   Q    That's the refi on -- the refinance on the 6 Lumahai home?

10:07AM   1   A    Yes.

10:07AM   2   Q    And so this column on the far right, is this just a

10:07AM   3   running tally of how the pre- -- the money that was in the

10:07AM   4   account before the loan hit the account, did you just kind of

10:07AM   5   keep an eye on that to assume that that money would be used

10:07AM   6   first?

10:07AM   7   A    Yeah, so those right two columns are -- yeah, basically

10:07AM   8   the beginning funds in that account, and then you'll see the

10:07AM   9   loan funds.  And so as you work down the page, the transactions

10:07AM   10  happen, the money that was in the account, I subtracted it

10:07AM   11  first, and, you know, after you hit, let's say, 231,000 and

10:08AM   12  expenditures, you get into the loan money.

10:08AM   13          So, yeah, the two right columns just track that, you

10:08AM   14  know, is it the beginning money or is it the money that came in

10:08AM   15  with the loan proceeds.

10:08AM   16  Q    And so this is a way for you to keep track of whether

10:08AM   17  those four checks going to Kaulana Freitas were actually coming

10:08AM   18  from the loan proceeds?

10:08AM   19  A    Yes.

10:08AM   20  Q    If we go to the second page.  You highlighted some of the

10:08AM   21  cells.  Is that where -- does that signify where the

10:08AM   22  preexisting money was used up, and then now you're switching

10:08AM   23  over to the loan proceeds that are being used?

10:08AM   24  A    That's correct, yes.  And that's shown in the two -- in

10:08AM   25  the two right-hand columns as well.

10:08AM  1          MR. AKINA:  If we go to page 8.  And focusing on these

10:08AM  2    top six withdrawals going down to -- from May 16, 2018, just

10:09AM  3    going the first four, five columns -- first five columns.  Just

10:09AM  4    the first five columns.

10:09AM  5    BY MR. AKINA:

10:09AM  6    Q    So May 16, 2018, there are a number of checks going out,

10:09AM  7    and here we see four check numbers; is that correct?

10:09AM  8    A    Yes.

10:09AM  9    Q    And the amounts for those four check numbers, 20,000,

10:09AM  10   50,000, 50,000, and 20,000; is that correct?

10:09AM  11   A    Yes.

10:09AM  12   Q    That's -- is that the $140,000 worth of checks going out

10:09AM  13   to Kaulana Freitas?

10:09AM  14   A    Right.

10:09AM  15         MR. AKINA:  And if we zoom out of here, and zoom to

10:10AM  16   the next five columns for that same period, to the right.

10:10AM  17   BY MR. AKINA:

10:10AM  18   Q    And here it shows that they were checks made out for

10:10AM  19   Kaulana Freitas?

10:10AM  20   A    Correct.

10:10AM  21         MR. AKINA:  If we could show the witness Exhibit 11-28

10:10AM  22   from the 47th list.

10:10AM  23         THE COURT:  Go ahead.

10:10AM  24         MR. AKINA:  And if we just scroll through.

10:10AM  25   BY MR. AKINA:

| | | |
|---|---|---|
| 10:10AM | 1 | Q    And as we're scrolling through, can you tell us what these |
| 10:10AM | 2 | are? |
| 10:10AM | 3 | A    Yes, so these are -- once the checks were deposited, this |
| 10:10AM | 4 | is what this is.  So some of the copies of the checks after |
| 10:11AM | 5 | they had been transacted, and then some related financial |
| 10:11AM | 6 | information. |
| 10:11AM | 7 | Q    And so are these copies of those cashier's checks? |
| 10:11AM | 8 | A    Yes. |
| 10:11AM | 9 | Q    And going back to the first page, is that a deposit slip |
| 10:11AM | 10 | for those four checks combined to that law office of James |
| 10:11AM | 11 | Dandar? |
| 10:11AM | 12 | A    Yes. |
| 10:11AM | 13 | MR. AKINA:  I'd offer Exhibit 11-28 into evidence. |
| 10:11AM | 14 | There's a certification at 11-26. |
| 10:11AM | 15 | THE COURT:  Any objection? |
| 10:11AM | 16 | MR. KENNEDY:  No objection. |
| 10:11AM | 17 | THE COURT:  11-28 is admitted.  You may publish. |
| 10:11AM | 18 | (Exhibit 11-28 was received in evidence.) |
| 10:11AM | 19 | Q    And if we go to the third page, this is one of those |
| 10:11AM | 20 | checks that we were just looking at? |
| 10:11AM | 21 | A    It is. |
| 10:11AM | 22 | Q    $20,000 to Kaulana Freitas on May 18, 2018? |
| 10:11AM | 23 | A    Right. |
| 10:11AM | 24 | Q    And it's -- going down to the fourth page, is this the |
| 10:11AM | 25 | back of that check? |

| | | | |
|---|---|---|---|
| 10:11AM | 1 | A | It is. |
| 10:11AM | 2 | Q | And it was deposited at Hawaii National Bank? |
| 10:12AM | 3 | A | Yep. |
| 10:12AM | 4 | | MR. AKINA:  And then if we could zoom in down here, |
| 10:12AM | 5 | | the sequence number. |
| 10:12AM | 6 | | BY MR. AKINA: |
| 10:12AM | 7 | Q | Do the back of each of the checks in this document have a |
| 10:12AM | 8 | | sequence number? |
| 10:12AM | 9 | A | They do. |
| 10:12AM | 10 | Q | And are they sequential, meaning one after another after |
| 10:12AM | 11 | | another? |
| 10:12AM | 12 | A | Yes. |
| 10:12AM | 13 | Q | And with the deposit slip -- |
| 10:12AM | 14 | | MR. AKINA:  We can zoom out of that, and going back to |
| 10:12AM | 15 | | the first page.  And now the second page. |
| 10:12AM | 16 | | BY MR. AKINA: |
| 10:12AM | 17 | Q | Is the second page the back of that deposit slip? |
| 10:12AM | 18 | A | It is. |
| 10:12AM | 19 | Q | And that's for the four checks? |
| 10:12AM | 20 | A | Yes. |
| 10:12AM | 21 | Q | And this sequence number also at Hawaii National Bank, is |
| 10:12AM | 22 | | that the beginning of that series of numbers? |
| 10:12AM | 23 | A | It is. |
| 10:12AM | 24 | Q | All done on the same day? |
| 10:12AM | 25 | A | Yes. |

| | | |
|---|---|---|
| 10:12AM | 1 | Q    So what does that mean? |
| 10:12AM | 2 | A    Basically that the deposit slip was transacted at the same |
| 10:12AM | 3 | time as the -- as the checks.  Same transaction. |
| 10:13AM | 4 | MR. AKINA:  We can take this down. |
| 10:13AM | 5 | If we could go back to Exhibit 11-34 already in |
| 10:13AM | 6 | evidence. |
| 10:13AM | 7 | THE COURT:  Go ahead. |
| 10:13AM | 8 | BY MR. AKINA: |
| 10:13AM | 9 | Q    Okay.  So did you do -- so that was Kaulana Freitas on the |
| 10:13AM | 10 | top row, and then Delia Fabro-Miske, is she in that middle row |
| 10:13AM | 11 | for $250,000? |
| 10:13AM | 12 | A    Yes. |
| 10:13AM | 13 | Q    And similarly, were you able to look at documents that |
| 10:13AM | 14 | sort of showed the flow of funds for this one? |
| 10:13AM | 15 | A    I was. |
| 10:13AM | 16 | Q    And the difference is this one didn't go back to the |
| 10:13AM | 17 | Lumahai refinance, right? |
| 10:13AM | 18 | A    Yeah, that's correct. |
| 10:14AM | 19 | Q    It came out of Michael Miske's personal account? |
| 10:14AM | 20 | A    Yes. |
| 10:14AM | 21 | Q    And so can you walk the jury through just the path that it |
| 10:14AM | 22 | took. |
| 10:14AM | 23 | A    Yes.  So, yeah, looking at that kind of second horizontal |
| 10:14AM | 24 | row, you have money in Mr. Miske's personal account, $200,000, |
| 10:14AM | 25 | it goes to an account at Bank of Hawaii in the name of Delia |

10:14AM  1    Fabro-Miske and her minor child.

10:14AM  2          That account gets closed and moved over to Hawaiian

10:14AM  3    Financial Federal Credit Union.  And so you have $200,000 for

10:14AM  4    Michael Miske that goes into the first Delia account.  The

10:14AM  5    entire balance in that account moves over to Hawaiian Financial

10:14AM  6    Federal Credit Union.  So, you know, 200 of the $268,000 total

10:14AM  7    was attributable to Mr. Miske.

10:14AM  8          And then in that last account, the Hawaiian Financial

10:15AM  9    account, $200,000 from Mr. Miske is added to $50,000 that is

10:15AM  10   otherwise in that account to go to the escrow account to buy

10:15AM  11   the house.

10:15AM  12   Q    And I'm not going to walk you through the underlying

10:15AM  13   documents, but this chart you put the yellow box on the top

10:15AM  14   left, the 6 Lumahai refinance, right?

10:15AM  15   A    Right.

10:15AM  16   Q    And does this chart show just how money flowed from that

10:15AM  17   refinance to the purchase of Kumukahi Place?

10:15AM  18   A    Yes.

10:15AM  19          MR. AKINA:  We can take this exhibit down.

10:15AM  20   BY MR. AKINA:

10:15AM  21   Q    I'm going to ask you about the Painkiller.  Are you

10:15AM  22   familiar with generally what that is?

10:15AM  23   A    Yes.

10:15AM  24   Q    What was that?

10:15AM  25   A    That's a Boston Whaler 370 Outrage pleasure craft.  Yeah,

10:15AM  1   the boat name is Painkiller.

10:15AM  2   Q    And how did this relate to Miske's businesses?

10:16AM  3   A    The boat was purchased in the summer of 2016, and the

10:16AM  4   funds for that came from two different loans that were taken

10:16AM  5   out on behalf of one of Mr. Miske's companies, Kama'aina

10:16AM  6   Holdings.

10:16AM  7              MR. AKINA:  So if we can show the witness

10:16AM  8   Exhibit 9128-002 from the defense original list.

10:16AM  9              THE COURT:  Go ahead.

10:16AM  10             MR. AKINA:  And permission to publish?

10:16AM  11             THE COURT:  Yes.

10:16AM  12  BY MR. AKINA:

10:16AM  13  Q    You see this, this is a bill of sale for the Painkiller?

10:16AM  14  A    Yes.

10:17AM  15             MR. AKINA:  And if we zoom in on the top quarter of

10:17AM  16  the document.

10:17AM  17  BY MR. AKINA:

10:17AM  18  Q    Sold for $425,000?

10:17AM  19  A    Correct.

10:17AM  20             MR. AKINA:  If we zoom out of this and zoom in on the

10:17AM  21  portion right underneath that.

10:17AM  22  BY MR. AKINA:

10:17AM  23  Q    The buyer was Hawai'i Partners LLC, right?

10:17AM  24  A    Yes.  That was taken out in the name of Kama'aina

10:17AM  25  Holdings, but the boat was registered in the name of Hawai'i

| | | |
|---|---|---|
| 10:17AM | 1 | Partners. |
| 10:17AM | 2 | MR. AKINA:  And if we could zoom in on the bottom |
| 10:17AM | 3 | portion of this page where it starts "The undersigned buyer |
| 10:17AM | 4 | accepts." |
| 10:17AM | 5 | BY MR. AKINA: |
| 10:17AM | 6 | Q    You see that it's signed on behalf of Hawai'i Partners |
| 10:17AM | 7 | LLC? |
| 10:17AM | 8 | A    Yes. |
| 10:17AM | 9 | MR. AKINA:  If we could show the witness 11-51 from |
| 10:17AM | 10 | the 47th supplement. |
| 10:17AM | 11 | BY MR. AKINA: |
| 10:18AM | 12 | Q    Is this a check for that payment $425,000? |
| 10:18AM | 13 | A    It is. |
| 10:18AM | 14 | MR. AKINA:  I would offer 11-51 into evidence. |
| 10:18AM | 15 | There's a certification at 11-35. |
| 10:18AM | 16 | THE COURT:  Any objection to 11-51? |
| 10:18AM | 17 | MR. KENNEDY:  No objection. |
| 10:18AM | 18 | THE COURT:  Without objection, that exhibit is |
| 10:18AM | 19 | admitted.  You may publish. |
| 10:18AM | 20 | (Exhibit 11-51 was received in evidence.) |
| 10:18AM | 21 | MR. AKINA:  And focusing on the top the face of the |
| 10:18AM | 22 | check. |
| 10:18AM | 23 | BY MR. AKINA: |
| 10:18AM | 24 | Q    Who is this check being -- who's making this check out? |
| 10:18AM | 25 | A    So it's a, yeah, Central Pacific Bank -- official bank |

10:18AM  1    check.

10:18AM  2    Q    And who -- which account is it coming from?

10:18AM  3    A    It is -- the source of funds comes from, yeah, Kama'aina

10:19AM  4    Holdings.

10:19AM  5    Q    So this is what you were saying earlier was paid for

10:19AM  6    through Kama'aina Holdings but registered under Hawai'i

10:19AM  7    Partners?

10:19AM  8    A    Yeah, correct.

10:19AM  9         MR. AKINA:  We can take this down.

10:19AM  10   BY MR. AKINA:

10:19AM  11   Q    You mentioned that this was paid for using two credit

10:19AM  12   applications.  Were those business loans?

10:19AM  13   A    Yes.

10:19AM  14   Q    And did you chart out the path from those loans to this

10:19AM  15   check that we're looking at?

10:19AM  16   A    I did.

10:19AM  17        MR. AKINA:  Could we show the witness 11-54 from the

10:19AM  18   47th supplement?

10:19AM  19        THE COURT:  Yes.

10:19AM  20   BY MR. AKINA:

10:19AM  21   Q    Is this that chart just showing -- showing where the money

10:19AM  22   came from?

10:19AM  23   A    It is.

10:19AM  24        MR. AKINA:  I'd offer 11-54 into evidence.

10:19AM  25        THE COURT:  Any objection?

```
10:19AM   1              MR. KENNEDY:  No objection.

10:19AM   2              THE COURT:  11-54 is admitted.  You may publish.

10:20AM   3              (Exhibit 11-54 was received in evidence.)

10:20AM   4    Q    Okay.  There are two yellow boxes.  What do those

10:20AM   5    represent?

10:20AM   6    A    Those represent the two loans that were taken out.

10:20AM   7    Q    And money from those two loans, they ended up in this blue

10:20AM   8    box in the middle, Michael Miske's personal account?

10:20AM   9    A    That's correct.

10:20AM  10    Q    And then out of that account, is that where that check

10:20AM  11    that we just looked at came from?

10:20AM  12    A    Yes.  One of the loans went through the Kama'aina Holdings

10:20AM  13    business account, and then the other loan was deposited

10:20AM  14    directly into Mr. Miske's account, and then, yeah, correct, the

10:20AM  15    $425,000 check came out of the personal account.

10:20AM  16    Q    Okay.  So I'm going to ask you questions about this first

10:20AM  17    one on the left, that first yellow box, the loan ending in 957.

10:20AM  18              MR. AKINA:  If I can show you Exhibit 11-36 from the

10:20AM  19    47th supplement.

10:20AM  20              THE COURT:  Go ahead.

10:20AM  21    BY MR. AKINA:

10:20AM  22    Q    Is this the credit application for that loan ending in 957

10:21AM  23    that we were talking about?

10:21AM  24    A    Yes.

10:21AM  25              MR. AKINA:  I'd offer Exhibit 11-36 into evidence.
```

| | | |
|---|---|---|
| 10:21AM | 1 | There's a certification at 11-35. |
| 10:21AM | 2 | THE COURT:  Any objection? |
| 10:21AM | 3 | MR. KENNEDY:  I'm just going to review it briefly, |
| 10:21AM | 4 | Your Honor. |
| 10:21AM | 5 | THE COURT:  Yes, go ahead. |
| 10:21AM | 6 | MR. KENNEDY:  No objection. |
| 10:21AM | 7 | THE COURT:  11-36 is admitted.  You may publish it. |
| 10:21AM | 8 | (Exhibit 11-36 was received in evidence.) |
| 10:21AM | 9 | BY MR. AKINA: |
| 10:21AM | 10 | Q    So what was the amounts of the two credit applications |
| 10:21AM | 11 | that went -- that were the source of the funds for the |
| 10:21AM | 12 | Painkiller? |
| 10:21AM | 13 | A    So both of them were $250,000. |
| 10:21AM | 14 | Q    So if we focus on this top box under "Credit Request |
| 10:22AM | 15 | Information," is that amount reflected here, $250,000? |
| 10:22AM | 16 | A    It is. |
| 10:22AM | 17 | Q    And under "Use of Funds," there had to be something |
| 10:22AM | 18 | checked.  What was checked for the use of funds? |
| 10:22AM | 19 | A    "Purchase equipment." |
| 10:22AM | 20 | Q    And do you see here this notice, can you read that out, |
| 10:22AM | 21 | please? |
| 10:22AM | 22 | A    Yes.  "This credit application is for business purposes |
| 10:22AM | 23 | only.  Credit for personal, family, and/or household purposes |
| 10:22AM | 24 | is prohibited under business credit lines/loans." |
| 10:22AM | 25 | Q    Is that pretty typical for a business loan, it's got to be |

10:22AM   1    for a business purpose?

10:22AM   2    A    Yes.

10:22AM   3         MR. AKINA:  And if we go -- zoom out of here and focus

10:22AM   4    towards the middle under the "Applicant Information."

10:22AM   5    BY MR. AKINA:

10:23AM   6    Q    Okay.  Who is the applicant here?

10:23AM   7    A    Kama'aina Holdings.

10:23AM   8    Q    And then there's an email address.  Whose email address is

10:23AM   9    that?

10:23AM   10   A    Yeah, mike@kama'aina.com.

10:23AM   11        MR. AKINA:  If we go to page 3 of the document,

10:23AM   12   focusing on this middle box on left.

10:23AM   13   BY MR. AKINA:

10:23AM   14   Q    Who is the guarantor?

10:23AM   15   A    Michael Miske, Jr.

10:23AM   16   Q    And if we focus on the box to the right -- on the right

10:23AM   17   side of the page of that, is there another guarantor listed for

10:23AM   18   Kama'aina Termite and Pest Control?

10:23AM   19   A    Yes.

10:23AM   20        MR. AKINA:  If we go to page 4 of the document.  If we

10:23AM   21   can focus on that first signature in the middle and the name

10:23AM   22   next to it.

10:23AM   23   BY MR. AKINA:

10:24AM   24   Q    Is this signed by Michael Miske?

10:24AM   25   A    Yes.

| | | |
|---|---|---|
| 10:24AM | 1 | MR. AKINA:  And there's a bunch of language above |
| 10:24AM | 2 | that.  I want to focus on the first paragraph towards the third |
| 10:24AM | 3 | to the last line where it starts with number 5. |
| 10:24AM | 4 | BY MR. AKINA: |
| 10:24AM | 5 | Q    It's a little hard to make out, but number 5, is that |
| 10:24AM | 6 | essentially the same language from that notice on the first |
| 10:24AM | 7 | page? |
| 10:24AM | 8 | A    It is. |
| 10:24AM | 9 | Q    About this has to be for business purposes and not for |
| 10:24AM | 10 | personal, family or household purposes? |
| 10:24AM | 11 | A    Yes. |
| 10:24AM | 12 | Q    And I'm going to show you -- ask you about the second |
| 10:24AM | 13 | loan. |
| 10:24AM | 14 | MR. AKINA:  If we could show the witness Exhibit 11-41 |
| 10:24AM | 15 | from the 47th list. |
| 10:24AM | 16 | THE COURT:  Yes, go ahead. |
| 10:24AM | 17 | BY MR. AKINA: |
| 10:24AM | 18 | Q    This is that second loan ending 956, the application for |
| 10:25AM | 19 | it? |
| 10:25AM | 20 | A    Yes. |
| 10:25AM | 21 | Q    Also for $250,000? |
| 10:25AM | 22 | A    Right. |
| 10:25AM | 23 | MR. AKINA:  And I would offer 11-41 into evidence. |
| 10:25AM | 24 | There's a certification at 11-35. |
| 10:25AM | 25 | THE COURT:  Any objection? |

| | | |
|---|---|---|
| 10:25AM | 1 | MR. KENNEDY:  Just give me a moment to review it, Your |
| 10:25AM | 2 | Honor. |
| 10:25AM | 3 | THE COURT:  Of course. |
| 10:25AM | 4 | MR. KENNEDY:  No objection. |
| 10:25AM | 5 | THE COURT:  11-41 is admitted you.  You may publish |
| 10:25AM | 6 | it. |
| 10:25AM | 7 | (Exhibit 11-41 was received in evidence.) |
| 10:25AM | 8 | BY MR. AKINA: |
| 10:25AM | 9 | Q    Are a lot of the terms in this application similar to the |
| 10:25AM | 10 | terms in the first application we looked at? |
| 10:25AM | 11 | A    Similar, yeah.  The amount is the same, $250,000.  This is |
| 10:25AM | 12 | a line of credit and not a term loan, but yes. |
| 10:25AM | 13 | Q    And so focusing on the top box again.  Same amount, |
| 10:25AM | 14 | $250,000, right? |
| 10:25AM | 15 | A    Right. |
| 10:25AM | 16 | Q    And like you said, line of credit.  This time what option |
| 10:26AM | 17 | was checked for the use of the funds? |
| 10:26AM | 18 | A    "Other business purpose and working capital" was typed in. |
| 10:26AM | 19 | Q    And then is that same notice about person -- about |
| 10:26AM | 20 | business purposes only here? |
| 10:26AM | 21 | A    Yes. |
| 10:26AM | 22 | MR. AKINA:  And zooming out of this, focusing on the |
| 10:26AM | 23 | applicant information. |
| 10:26AM | 24 | BY MR. AKINA: |
| 10:26AM | 25 | Q    Is that the same applicant information as the other one? |

| | | |
|---|---|---|
| 10:26AM | 1 | A    It is, yeah.  Kama'aina Holdings with an associated email |
| 10:26AM | 2 | address of mike@kama'aina.com. |
| 10:26AM | 3 | Q    And if we go to page 3, is Michael Miske and Kama'aina |
| 10:26AM | 4 | Termite and Pest Control also the guarantor on this loan? |
| 10:26AM | 5 | A    Yes. |
| 10:26AM | 6 | Q    And if we go to page 4, is this also signed by Michael |
| 10:26AM | 7 | Miske? |
| 10:26AM | 8 | A    Yes. |
| 10:26AM | 9 | Q    And if we focus on that first paragraph above it, does it |
| 10:27AM | 10 | have that similar language about business purposes only? |
| 10:27AM | 11 | A    Yes, it does. |
| 10:27AM | 12 | Q    And on the far right, the date for the signature, this is |
| 10:27AM | 13 | May 2016; is that right? |
| 10:27AM | 14 | A    Right. |
| 10:27AM | 15 | Q    Is that the same date as the other loan? |
| 10:27AM | 16 | A    Yes. |
| 10:27AM | 17 | MR. AKINA:  If we could show the witness Exhibit 11-53 |
| 10:27AM | 18 | from the 47th list. |
| 10:27AM | 19 | THE COURT:  Yes. |
| 10:27AM | 20 | BY MR. AKINA: |
| 10:27AM | 21 | Q    Are these text messages between Trisha Castro and Michael |
| 10:27AM | 22 | Miske? |
| 10:27AM | 23 | A    They are. |
| 10:27AM | 24 | MR. AKINA:  I'd offer Exhibit 11-53 into evidence. |
| 10:27AM | 25 | There is a certification at 9-1313 from the government's 29th |

10:27AM    1    list.

10:27AM    2              THE COURT:  Any objection?

10:27AM    3              MR. KENNEDY:  Just a moment to review them, Your

10:27AM    4    Honor.

10:28AM    5              No objection.

10:28AM    6              THE COURT:  11-53 is admitted.  You may publish.

10:28AM    7              (Exhibit 11-53 was received in evidence.)

10:28AM    8              MR. AKINA:  Focusing towards the middle of the page,

10:28AM    9    starting 2016, October 5th, at 23:26.  So lower than where the

10:29AM    10   mouse is right now.  Okay.  Right there.  And go down -- yeah,

10:29AM    11   that's good.

10:29AM    12   BY MR. AKINA:

10:29AM    13   Q    Okay.  You see this text from Trisha Castro on

10:29AM    14   October 5th, 2016:  "Do you own Painkiller personally or

10:29AM    15   Holdings?"

10:29AM    16   A    Yes.

10:29AM    17   Q    And Holdings would be Kama'aina Holdings?

10:29AM    18   A    I assume so, yeah.

10:29AM    19              MR. AKINA:  And if we zoom out of here.  If we could

10:29AM    20   focus on the next couple of lines of text starting at 23:26

10:29AM    21   hours.  And further down.

10:29AM    22   BY MR. AKINA:

10:29AM    23   Q    Right here, what is the response?

10:29AM    24   A    Personally.

10:29AM    25              MR. AKINA:  We can zoom out.

| | | |
|---|---|---|
| 10:29AM | 1 | BY MR. AKINA: |
| 10:29AM | 2 | Q    Is that consistent with what was on the loan applications? |
| 10:30AM | 3 | A    No. |
| 10:30AM | 4 | MR. AKINA:  Okay.  We can take this down. |
| 10:30AM | 5 | BY MR. AKINA: |
| 10:30AM | 6 | Q    I'm going to ask you about another boat, the Rachel.  Is |
| 10:30AM | 7 | that a fishing vessel? |
| 10:30AM | 8 | A    It is. |
| 10:30AM | 9 | Q    And was that vessel also sold pursuant -- was that sold? |
| 10:30AM | 10 | A    Yes, the vessel was sold. |
| 10:30AM | 11 | Q    And was that for approximately $676,000 -- $676,785.56 -- |
| 10:30AM | 12 | THE COURT REPORTER:  Could you say that again? |
| 10:30AM | 13 | BY MR. AKINA: |
| 10:30AM | 14 | Q    $676,785.56. |
| 10:30AM | 15 | A    Yes. |
| 10:30AM | 16 | Q    Was there anything accompanying the -- the Rachel as well? |
| 10:30AM | 17 | A    Yes.  So there's a fishing permit that's associated with |
| 10:30AM | 18 | the vessel or that was at the time. |
| 10:30AM | 19 | Q    Is that a longline limited entry permit? |
| 10:31AM | 20 | A    Yes. |
| 10:31AM | 21 | Q    And generally, what does that let you do? |
| 10:31AM | 22 | A    It allows for, you know, fishing certain species in |
| 10:31AM | 23 | certain areas, and then this permit specifically allowed for |
| 10:31AM | 24 | tuna fishing in parts of the Pacific. |
| 10:31AM | 25 | Q    And is that required to fish around Hawaii? |

| 10:31AM | 1 | A    It's required to at least do, yeah, certain fishing |
| 10:31AM | 2 | activities.  Not exactly sure what. |
| 10:31AM | 3 | Q    Not all fishing activities but certain fishing activities. |
| 10:31AM | 4 | A    Right. |
| 10:31AM | 5 |      MR. AKINA:  If we could show the witness Exhibit 11-55 |
| 10:31AM | 6 | from the 47th supplemental. |
| 10:31AM | 7 |      THE COURT:  Yes. |
| 10:31AM | 8 | BY MR. AKINA: |
| 10:31AM | 9 | Q    Is this a buy-sell agreement for the Rachel and that entry |
| 10:31AM | 10 | permit? |
| 10:31AM | 11 | A    It is. |
| 10:31AM | 12 | Q    And if we go to the last page, page 3, is it signed by |
| 10:31AM | 13 | Michael Miske? |
| 10:31AM | 14 | A    It is. |
| 10:31AM | 15 |      MR. AKINA:  And I'd offer Exhibit 11-55 into evidence. |
| 10:32AM | 16 | There is a certification at 1-1050 from the original list. |
| 10:32AM | 17 |      THE COURT:  Any objection? |
| 10:32AM | 18 |      MR. KENNEDY:  No objection. |
| 10:32AM | 19 |      THE COURT:  11-55 then is admitted.  You may publish |
| 10:32AM | 20 | it. |
| 10:32AM | 21 |      (Exhibit 11-55 was received in evidence.) |
| 10:32AM | 22 |      MR. AKINA:  If we can focus here on the two |
| 10:32AM | 23 | signatures.  This is the last page. |
| 10:32AM | 24 | BY MR. AKINA: |
| 10:32AM | 25 | Q    Is the bottom, that's Mike Miske? |

| | | |
|---|---|---|
| 10:32AM | 1 | A    Correct. |
| 10:32AM | 2 | Q    On behalf of Kama'aina Holdings? |
| 10:32AM | 3 | A    Yes. |
| 10:32AM | 4 | Q    And the date here for the top signature is December 2nd, |
| 10:32AM | 5 | 2010? |
| 10:32AM | 6 | A    That's correct. |
| 10:32AM | 7 |     MR. AKINA:  If we could go to the first page, and |
| 10:32AM | 8 | focusing on the top portion, including the first three |
| 10:32AM | 9 | paragraphs. |
| 10:32AM | 10 | BY MR. AKINA: |
| 10:32AM | 11 | Q    Who is this agreement between?  Who are the parties? |
| 10:32AM | 12 | A    So the agreement is between Kama'aina Holdings, who is |
| 10:33AM | 13 | buying the Rachel and the fishing permit, and Pelagic Fisheries |
| 10:33AM | 14 | is the seller through an escrow agent that was associated with |
| 10:33AM | 15 | this.  But, yeah, that's the buyer and seller, and the -- yes. |
| 10:33AM | 16 | Q    And there are two dollar amounts listed here.  Can you |
| 10:33AM | 17 | explain what those are for? |
| 10:33AM | 18 | A    Correct.  Yeah, so the total purchase price was $900,000, |
| 10:33AM | 19 | and in this paragraph they just kind of break out, you know, at |
| 10:33AM | 20 | least on paper, how much is attributable to the boat versus how |
| 10:33AM | 21 | much is attributable to the fishing license. |
| 10:33AM | 22 | Q    And was it 800,000 for the boat and 100,000 for the |
| 10:33AM | 23 | Hawaiian limited entry longline permit? |
| 10:33AM | 24 | A    Yes. |
| 10:33AM | 25 |     MR. AKINA:  If we can show the witness Exhibit 11-56 |

10:33AM   1    from the 47th supplement.

10:33AM   2           THE COURT:  Go ahead.

10:33AM   3    BY MR. AKINA:

10:33AM   4    Q    And what is this?

10:34AM   5    A    This is the bill of sale documenting the transaction.

10:34AM   6    Q    Between those two parties again?

10:34AM   7    A    Yeah, between Pelagic Fisheries as the seller and

10:34AM   8    Kama'aina Holdings as the buyer.

10:34AM   9           MR. AKINA:  I'd offer Exhibit 11-56 into evidence.

10:34AM  10           THE COURT:  Any objection to that?

10:34AM  11           MR. KENNEDY:  No objection.

10:34AM  12           THE COURT:  11-56 is admitted without objection.  You

10:34AM  13    may publish it.

10:34AM  14           (Exhibit 11-56 was received in evidence.)

10:34AM  15           MR. AKINA:  And focusing on top portions, one -- boxes

10:34AM  16    1, 2, 3 and 4.

10:34AM  17    BY MR. AKINA:

10:34AM  18    Q    This lists the parties from that previous buy-sell

10:34AM  19    agreement?

10:34AM  20    A    That's correct.

10:34AM  21           MR. AKINA:  We can take this down.

10:34AM  22    BY MR. AKINA:

10:34AM  23    Q    Okay.  And how was the -- where did the money come from

10:34AM  24    for the Rachel?

10:34AM  25    A    The operations, you have Kama'aina Termite and Pest

10:35AM   1   Control.

10:35AM   2   Q    And were you able to trace that to a specific type of job

10:35AM   3   at Kama'aina Termite and Pest Control?

10:35AM   4   A    Yes.

10:35AM   5   Q    Which job?

10:35AM   6   A    It was the job at the Keola La'i building.

10:35AM   7   Q    And were you able to chart out that path of funds?

10:35AM   8   A    I was.

10:35AM   9        MR. AKINA:  Could we show the witness Exhibit 11-59

10:35AM  10   from the 47th list?

10:35AM  11        THE COURT:  Yes.

10:35AM  12   BY MR. AKINA:

10:35AM  13   Q    Is this that path of funds that you charted out?

10:35AM  14   A    It is.

10:35AM  15        MR. AKINA:  I'd offer 11-59 into evidence.

10:35AM  16        THE COURT:  Any objection?

10:35AM  17        MR. KENNEDY:  No objection.

10:35AM  18        THE COURT:  11-59 is admitted.  You may publish.

10:35AM  19        (Exhibit 11-59 was received in evidence.)

10:35AM  20   Q    Can you walk the jury through the path of funds for the

10:35AM  21   Rachel and the longline permit?

10:35AM  22   A    Yes.  So starting at the top left, that's income from the

10:35AM  23   Keola La'i building job, which -- and Nordic PCL was the

10:36AM  24   company.  So Nordic PCL for the Keola La'i job wrote two

10:36AM  25   checks.  The checks went into the Kama'aina Termite business

10:36AM  1  account, and then $950,000 of that money went to Kama'aina

10:36AM  2  Holdings, and then approximately $900,000 of that money went to

10:36AM  3  buy the -- the Rachel and the permit.

10:36AM  4  Q    So the Rachel and the permit were obtained using proceeds

10:36AM  5  from -- using Kama'aina Termite and Pest Control proceeds

10:36AM  6  specifically from that Keola La'i job?

10:36AM  7  A    That's correct.

10:36AM  8  Q    Was any money from -- was there money spent also to

10:36AM  9  maintain the Rachel?

10:36AM  10  A    Yes.

10:36AM  11  Q    And where did that come from?

10:37AM  12  A    So in 2018, there was a good bit of refurbishment, repair,

10:37AM  13  etcetera, work done.  And the money that was -- part of the

10:37AM  14  money that was used to do that work came from the refinance

10:37AM  15  from the Bank of Hawaii loan from the 6 Lumahai property.

10:37AM  16  Q    That's the same refinance you were talking about earlier?

10:37AM  17  A    That's correct.

10:37AM  18  Q    And were you able to chart out the path for the funds for

10:37AM  19  that as well?

10:37AM  20  A    Yes.

10:37AM  21          MR. AKINA:  And could we show the witness

10:37AM  22  Exhibit 11-60?

10:37AM  23          THE COURT:  Yes, go ahead.

10:37AM  24  BY MR. AKINA:

10:37AM  25  Q    And is this that path of funds that you charted out?

| | | |
|---|---|---|
| 10:37AM | 1 | A    It is. |
| 10:37AM | 2 | MR. AKINA:  I'd offer Exhibit 11-60 into evidence. |
| 10:37AM | 3 | THE COURT:  Any objection? |
| 10:37AM | 4 | MR. KENNEDY:  No objection. |
| 10:37AM | 5 | THE COURT:  11-60 is admitted.  You may publish. |
| 10:37AM | 6 | (Exhibit 11-60 was received in evidence.) |
| 10:38AM | 7 | BY MR. AKINA: |
| 10:38AM | 8 | Q    So based on the documents you reviewed, did money come |
| 10:38AM | 9 | from that refinance?  I think earlier you testified that that |
| 10:38AM | 10 | whole 1.9 million went into Michael Miske's personal accounts? |
| 10:38AM | 11 | A    That's correct. |
| 10:38AM | 12 | Q    And then there's a $25,000 payment that goes out in May of |
| 10:38AM | 13 | 2018? |
| 10:38AM | 14 | A    Yes, there's a $25,000 transfer to Kama'aina Holdings, and |
| 10:38AM | 15 | then that $25,000 was used in various ways for maintenance on |
| 10:38AM | 16 | the Rachel. |
| 10:38AM | 17 | Q    And there's some language in quotes here, "Shipyard |
| 10:38AM | 18 | payment, dry dock 2018."  Did that come from the documents you |
| 10:38AM | 19 | were reviewing? |
| 10:38AM | 20 | A    Yes. |
| 10:38AM | 21 | Q    So that was -- what was that? |
| 10:38AM | 22 | A    That would have been a notation on the documents that we |
| 10:38AM | 23 | got from the bank. |
| 10:38AM | 24 | Q    I'm going to ask you -- |
| 10:39AM | 25 | MR. AKINA:  If we can show and publish Exhibit 11-19, |

10:39AM    1    which is already in evidence.

10:39AM    2              THE COURT:  Yes, go ahead.

10:39AM    3    BY MR. AKINA:

10:39AM    4    Q    This is the summary chart that you created of Michael

10:39AM    5    Miske's personal accounts showing when that refinance loan hit

10:39AM    6    the account?

10:39AM    7    A    Yeah, correct.

10:39AM    8              MR. AKINA:  And if we go to page 9 of the document.

10:39AM    9    And focusing on May 25th, 2018.  There is a check -- let's do

10:39AM   10    the first left half of the page first.

10:39AM   11    BY MR. AKINA:

10:39AM   12    Q    This one, May 25th, 2018, Check Number 296 for $25,000, is

10:40AM   13    that what was depicted in that chart?

10:40AM   14    A    Yes.  The bottom line, yeah.

10:40AM   15    Q    And if we focus on the rest of the row to the right of it,

10:40AM   16    it was made out to Kama'aina Holdings with the notation for

10:40AM   17    "Shipyard payment, dry dock"?

10:40AM   18    A    That's correct.

10:40AM   19              MR. AKINA:  We can take this down.

10:40AM   20    BY MR. AKINA:

10:40AM   21    Q    Was there a Ferrari that was seized from 6 Lumahai?

10:40AM   22    A    There was.

10:40AM   23    Q    Specifically a Ferrari Berlinetta?

10:40AM   24    A    Yes.

10:40AM   25              MR. AKINA:  Could we show and publish Exhibit 9-1194,

| | | |
|---|---|---|
| 10:40AM | 1 | from the third supplement already in evidence? |
| 10:41AM | 2 | THE COURT:  I don't have it. |
| 10:41AM | 3 | MR. AKINA:  9-1194 from the third supplement? |
| 10:41AM | 4 | THE COURT:  Yes.  Okay, go ahead. |
| 10:41AM | 5 | BY MR. AKINA: |
| 10:41AM | 6 | Q    This is a picture of that Ferrari? |
| 10:41AM | 7 | A    It is. |
| 10:41AM | 8 | MR. AKINA:  And if we can now publish Exhibit 9-1197 |
| 10:41AM | 9 | from the third supplement. |
| 10:42AM | 10 | And going to page 5 of the document. |
| 10:42AM | 11 | BY MR. AKINA: |
| 10:42AM | 12 | Q    Do you see, if we focus on top left corner, the buyer in |
| 10:42AM | 13 | the name of Hawai'i Partners; is that correct? |
| 10:42AM | 14 | A    That's correct, yes. |
| 10:42AM | 15 | MR. AKINA:  And zooming out of this, right below that |
| 10:42AM | 16 | under the description of the vehicle, the year, make and model. |
| 10:42AM | 17 | BY MR. AKINA: |
| 10:42AM | 18 | Q    What was the year, make and model? |
| 10:42AM | 19 | A    2017 Ferrari F12berlinetta. |
| 10:42AM | 20 | MR. AKINA:  And then if we could focus on the VIN, |
| 10:42AM | 21 | which is right below that to the right. |
| 10:42AM | 22 | BY MR. AKINA: |
| 10:42AM | 23 | Q    The VIN number, is it ZFF74UFA5H0223173? |
| 10:43AM | 24 | A    Yes. |
| 10:43AM | 25 | Q    And above that there's a date of May 30th, 2020, to be |

10:43AM   1   delivered; is that correct?

10:43AM   2   A    Yes.

10:43AM   3   Q    And below that, what was the purchase price?

10:43AM   4   A    Yeah, a little over two -- well, almost 218.  $217,866.52.

10:43AM   5   Q    And how was this Ferrari paid for?

10:43AM   6   A    It came -- yeah, the source of the money was Kama'aina

10:43AM   7   Termite bank account.

10:43AM   8   Q    And were you able to trace that to a specific job?

10:43AM   9   A    Yes.

10:43AM   10  Q    Which job?

10:43AM   11  A    It was a job on the Big Island related to the Maunakea --

10:43AM   12  Maunakea LLC.

10:43AM   13       MR. AKINA:  If we could show the witness Exhibit 11-67

10:44AM   14  from the 47th supplemental.

10:44AM   15       THE COURT:  Go ahead.

10:44AM   16  BY MR. AKINA:

10:44AM   17  Q    What are we looking at here?

10:44AM   18  A    Yeah, so a portion of the previous -- previous exhibit

10:44AM   19  related to, you know, bank accounts, and so this is a portion

10:44AM   20  of the Kama'aina Termite and Pest Control bank account for

10:44AM   21  April, May and June of 2020.

10:44AM   22  Q    So did you put it into a -- an Excel spreadsheet showing

10:44AM   23  all the activity in that period after April 2020?

10:44AM   24  A    Yes.

10:44AM   25  Q    And does that cover payments from the Maunakea job?

10:44AM  1   A    Yes.

10:44AM  2   Q    And does it cover a payment for the Ferrari?

10:44AM  3   A    Yes.

10:45AM  4          MR. AKINA:  I would offer Exhibit 11-67 into evidence.

10:45AM  5          THE COURT:  Any objection?

10:45AM  6          MR. KENNEDY:  No objection.

10:45AM  7          THE COURT:  11-67 is admitted.  You may publish.

10:45AM  8          (Exhibit 11-67 was received in evidence.)

10:45AM  9          MR. AKINA:  And if we could focus on the top left-hand

10:45AM  10  corner between the gray boxes.

10:45AM  11  BY MR. AKINA:

10:45AM  12  Q    This is a summary of account activity for Kama'aina

10:45AM  13  Termite and Pest Control?

10:45AM  14  A    Yes, one of the Kama'aina Termite and Pest Control

10:45AM  15  accounts.  This is the business savings account.

10:45AM  16          MR. AKINA:  And if we zoom out of here.  Focusing on

10:45AM  17  the balance in the middle of the page from the top line.  And

10:45AM  18  the -- yeah.

10:45AM  19  BY MR. AKINA:

10:45AM  20  Q    Okay.  So the top line where this starts is April 2020.

10:46AM  21  What does this represent, this starting balance?

10:46AM  22  A    So, yeah, this is the balance that's in the account as of

10:46AM  23  April 1st before any of the money from the Maunakea job gets

10:46AM  24  transferred into the -- into the account.

10:46AM  25  Q    So there's approximately $151,000 prior to the Maunakea

10:46AM  1   job payments.

10:46AM  2   A     Correct.

10:46AM  3            MR. AKINA:  If we could zoom out of that.  If we focus

10:46AM  4   on the next couple of payments, the Additions column all the

10:46AM  5   way to the Source Description for the rest of April.

10:46AM  6   BY MR. AKINA:

10:46AM  7   Q     Okay.  And then you see three customer deposits being made

10:46AM  8   in April of varying amounts?

10:46AM  9   A     Right.

10:46AM  10  Q     What are those?

10:46AM  11  A     Yeah, again, those are funds from the Maunakea LLC related

10:47AM  12  to the -- the job on Big Island.  So these are payments on

10:47AM  13  that -- for that service.

10:47AM  14           MR. AKINA:  And if we zoom out.

10:47AM  15  BY MR. AKINA:

10:47AM  16  Q     And then there's another deposit, May 5th, 2020.  Is that

10:47AM  17  a fourth payment for that Maunakea job as well?

10:47AM  18  A     Yes.

10:47AM  19  Q     Now, if we zoom out of here, going down to June 1st, 2020,

10:47AM  20  do you see a withdrawal for $217,000?

10:47AM  21  A     Yes.

10:47AM  22  Q     Where did that go to?

10:47AM  23  A     So that money went into the Hawai'i Partners bank account.

10:47AM  24  Q     And ultimately where did it go?

10:47AM  25  A     To purchase the Ferrari.

10:47AM   1   Q    And as of June 1st, 2020, was there -- was there a

10:47AM   2   significant amount of money coming in besides the Maunakea job?

10:48AM   3   A    No.

10:48AM   4   Q    And but for that Maunakea job money, would the starting

10:48AM   5   balance of $151,000 have been enough to cover that $217,000

10:48AM   6   payment?

10:48AM   7   A    No.

10:48AM   8          MR. AKINA:  If we could show the witness

10:48AM   9   Exhibit 11-1199 from the third supplement.

10:48AM  10          THE COURT:  Go ahead.

10:48AM  11   BY MR. AKINA:

10:48AM  12   Q    What are we looking at here?

10:48AM  13   A    So, yeah, documentation, a check from the Bank of Hawaii

10:48AM  14   for the payment on the -- for the Ferrari.

10:48AM  15          MR. AKINA:  I'd offer Exhibit 9-1199 into evidence.

10:48AM  16          THE COURT:  Any objection to that?

10:48AM  17          MR. KENNEDY:  No objection.

10:48AM  18          THE COURT:  9-1199 is admitted then without objection.

10:48AM  19   You may publish.

10:48AM  20          (Exhibit 9-1199 was received in evidence.)

10:49AM  21          MR. AKINA:  If we can focus in on the check itself.

10:49AM  22   BY MR. AKINA:

10:49AM  23   Q    And -- and what's the date?

10:49AM  24   A    May 30th, 2020.

10:49AM  25   Q    And I said check, but this is a receipt for that check; is

10:49AM   1   that correct?

10:49AM   2   A    Yes.  Yeah, it's -- yeah, a Bank of Hawaii documentation

10:49AM   3   for the -- for the payment, yeah.

10:49AM   4   Q    Okay.  And the purchaser is Hawai'i Partners?

10:49AM   5   A    That's correct.

10:49AM   6   Q    And this is paid out to Ferrari Hawaii?

10:49AM   7   A    Yes.

10:49AM   8   Q    Now, so based on the documents reviewed, was the Ferrari

10:49AM   9   purchased with proceeds from Kama'aina Termite and Pest

10:49AM   10  Control, specifically the Maunakea job?

10:49AM   11  A    Yes.

10:49AM   12       MR. AKINA:  You can take this exhibit down.

10:49AM   13       If we could go back to Exhibit 11-67.

10:49AM   14       THE COURT:  Go ahead.

10:49AM   15       MR. AKINA:  I want to focus on this -- on the top

10:49AM   16  portions, the April and May additions and subtractions --

10:50AM   17  sorry, from April to May 5th.

10:50AM   18       Could you do additions and subtractions?

10:50AM   19  BY MR. AKINA:

10:50AM   20  Q    So these top three numbers, previously you testified that

10:50AM   21  came from the Maunakea job?

10:50AM   22  A    Right.

10:50AM   23  Q    And then this subsequent number, $669,000 approximately,

10:50AM   24  that was a fourth payment from the Maunakea job?

10:50AM   25  A    Right.

10:50AM   1    Q    And then on May 5th, 2020, there's a subtraction of

10:50AM   2    approximately $1.1 million.  What do the parentheses represent

10:50AM   3    around that number?

10:50AM   4    A    Just the parentheses -- parentheses just show that it's

10:50AM   5    negative.  It's a withdrawal, a subtraction.

10:50AM   6    Q    So this is money going out of the Kama'aina Termite and

10:51AM   7    Pest Control accounts?

10:51AM   8    A    Yes.

10:51AM   9    Q    And does this amount, specifically $1,162,826.76, is that

10:51AM   10   the sum of the first two payments from the Maunakea job?

10:51AM   11   A    It is.

10:51AM   12   Q    And what was -- was this a cash withdrawal or a check, or

10:51AM   13   what was this, this $1.1 million --

10:51AM   14   A    It was a -- yeah, it was a withdrawal, and it was -- it's

10:51AM   15   an official bank check.

10:51AM   16          MR. AKINA:  If we could show Exhibit 11-72.

10:51AM   17          THE COURT:  Okay.

10:51AM   18   BY MR. AKINA:

10:51AM   19   Q    Is this a copy of that cashier's check for that amount

10:51AM   20   coming out of Kama'aina Termite and Pest Control's account?

10:51AM   21   A    Yes, it is.

10:52AM   22          MR. AKINA:  I'd offer Exhibit 11-72 into evidence.

10:52AM   23          THE COURT:  Any objection?

10:52AM   24          MR. KENNEDY:  No objection.

10:52AM   25          THE COURT:  11-72 is admitted.  You may publish.

| | | |
|---|---|---|
| 10:52AM | 1 | (Exhibit 11-72 was received in evidence.) |
| 10:52AM | 2 | MR. AKINA:  If we could focus on the cashier's check. |
| 10:52AM | 3 | BY MR. AKINA: |
| 10:52AM | 4 | Q    So you see that this -- so this corresponds to that line |
| 10:52AM | 5 | item on the chart that we were just looking at? |
| 10:52AM | 6 | A    It does. |
| 10:52AM | 7 | Q    And the date is May 5th, 2020, on this cashier's check? |
| 10:52AM | 8 | A    Right. |
| 10:52AM | 9 | Q    And who is it made out to? |
| 10:52AM | 10 | A    Kama'aina Termite and Pest Control. |
| 10:52AM | 11 | Q    Do you know who drew this cashier's check out of the |
| 10:52AM | 12 | account? |
| 10:52AM | 13 | A    Yeah, based on the -- the documents from the bank, yeah, |
| 10:52AM | 14 | Delia Fabro-Miske. |
| 10:53AM | 15 | MR. AKINA:  And if we zoom out of here.  If I could |
| 10:53AM | 16 | show the witness Exhibit 11-71 from the 47th supplement. |
| 10:53AM | 17 | THE COURT:  Yes. |
| 10:53AM | 18 | MR. AKINA:  If we go to the second page. |
| 10:53AM | 19 | BY MR. AKINA: |
| 10:53AM | 20 | Q    And what are we looking at here? |
| 10:53AM | 21 | A    Yeah, so documentation again from Bank of Hawaii related |
| 10:53AM | 22 | to that withdrawal and the corresponding cashier's check. |
| 10:53AM | 23 | MR. AKINA:  If we go back to the first page. |
| 10:53AM | 24 | I offer Exhibit 11-71 into evidence.  There's a |
| 10:53AM | 25 | certification at 9-1334. |

| | | |
|---|---|---|
| 10:53AM | 1 | THE COURT:  Any objection? |
| 10:53AM | 2 | MR. KENNEDY:  No objection. |
| 10:53AM | 3 | THE COURT:  11-71 is admitted.  You may publish. |
| 10:53AM | 4 | (Exhibit 11-71 was received in evidence.) |
| 10:53AM | 5 | MR. AKINA:  And so this is from Bank of Hawaii, and if |
| 10:53AM | 6 | we could focus on the first -- the withdrawal -- the face of |
| 10:53AM | 7 | that withdrawal slip.  The entire -- the entire slip. |
| 10:53AM | 8 | BY MR. AKINA: |
| 10:54AM | 9 | Q    And what does this show? |
| 10:54AM | 10 | A    So, yeah, this is the withdrawal slip documentation, yeah, |
| 10:54AM | 11 | that would have been prepared at the time the check was issued |
| 10:54AM | 12 | in May, and the signature appears to be Delia Fabro's. |
| 10:54AM | 13 | Q    And this is the same dollar amount? |
| 10:54AM | 14 | A    Yes. |
| 10:54AM | 15 | Q    And the same date, May 5th, 2020? |
| 10:54AM | 16 | A    Right. |
| 10:54AM | 17 | Q    So fair to say that this cashier's check in a little bit |
| 10:54AM | 18 | over $1.1 million, that's money that came from the Maunakea |
| 10:54AM | 19 | job? |
| 10:54AM | 20 | A    Yes. |
| 10:54AM | 21 | MR. AKINA:  We can take this down. |
| 10:54AM | 22 | BY MR. AKINA: |
| 10:54AM | 23 | Q    And in addition to the Ferrari, were other vehicles |
| 10:54AM | 24 | seized? |
| 10:54AM | 25 | A    Yes. |

| | | |
|---|---|---|
| 10:54AM | 1 | Q    And that was pursuant to court order? |
| 10:55AM | 2 | A    They were seized, yeah, as evidence when the search |
| 10:55AM | 3 | warrant happened. |
| 10:55AM | 4 | Q    And what types of other vehicles were seized? |
| 10:55AM | 5 | A    There were four Volkswagens and a Ford Bronco. |
| 10:55AM | 6 | THE COURT:  Mr. Akina, if you're going to move -- if |
| 10:55AM | 7 | you're in the position of moving past the Ferrari, this might |
| 10:55AM | 8 | be a good time to take a break. |
| 10:55AM | 9 | MR. AKINA:  Sounds good, Your Honor. |
| 10:55AM | 10 | THE COURT:  Okay.  We'll go ahead and take our break. |
| 10:55AM | 11 | It's nearly 11:00. |
| 10:55AM | 12 | As we go to break, I remind our jurors to please |
| 10:55AM | 13 | refrain from discussing the substance of this case with anyone, |
| 10:55AM | 14 | including each other until I advise you otherwise; to also |
| 10:55AM | 15 | refrain from accessing any media or other accounts of this case |
| 10:55AM | 16 | that may be out there; and do not conduct your own |
| 10:55AM | 17 | investigation into anything relating to this case. |
| 10:55AM | 18 | We'll take a short break, and a reminder that we will |
| 10:55AM | 19 | be taking a full lunch break somewhere around the noon hour, |
| 10:55AM | 20 | maybe a little later, given when we're breaking now. |
| 10:55AM | 21 | (Proceedings were recessed at 10:55 a.m. to 11:26 |
| 11:24AM | 22 | a.m.) |
| 11:26AM | 23 | THE COURT:  All right.  Mr. Akina, you may resume when |
| 11:26AM | 24 | you're ready. |
| 11:26AM | 25 | MR. AKINA:  Could we publish Exhibit 11-28 that was |

11:26AM   1   admitted earlier this morning?

11:26AM   2            THE COURT:  Yes, you may.

11:26AM   3   BY MR. AKINA:

11:26AM   4   Q    So going back to the Kumukahi residence, you had testified

11:26AM   5   earlier this morning that money had gone from -- from the Keola

11:26AM   6   La'i job to Michael Miske to -- sorry, to the Lumahai refinance

11:26AM   7   all the way through Mr. Miske to Kaulana Freitas; is that

11:26AM   8   correct?

11:26AM   9   A    Right.

11:26AM   10  Q    And then money -- those checks went from Kaulana Freitas

11:27AM   11  to an attorney, James Dandar?

11:27AM   12  A    Right, yeah.

11:27AM   13  Q    And did you -- are you aware of who James Dandar was in

11:27AM   14  relation to this foreclosure sale?

11:27AM   15  A    Yeah, so it was purchased at foreclosure, right, and so

11:27AM   16  the person running the foreclosure auction -- this is an escrow

11:27AM   17  account basically.  So, yeah, the law offices of James Dandar

11:27AM   18  is essentially just an escrow or trust account to hold those

11:27AM   19  funds while the purchase process continues.

11:27AM   20           MR. AKINA:  And if we could show the witness

11:27AM   21  Exhibit 11-24 from the 47th supplement.

11:27AM   22           Just going to the second page, focusing on that first

11:27AM   23  paragraph 1 at the bottom.

11:27AM   24  BY MR. AKINA:

11:27AM   25  Q    And is it your understanding that James Dandar, he was

| | | |
|---|---|---|
| 11:28AM | 1 | appointed by a state court to oversee the sale of that |
| 11:28AM | 2 | property? |
| 11:28AM | 3 | A    Yes. |
| 11:28AM | 4 | MR. AKINA:  We can take this down. |
| 11:28AM | 5 | BY MR. AKINA: |
| 11:28AM | 6 | Q    So before the break you testified that there were several |
| 11:28AM | 7 | vehicles in addition to the Ferrari.  And of those four |
| 11:28AM | 8 | Volkswagens and the Ford Bronco that you mentioned, who -- what |
| 11:28AM | 9 | entity were they held in?  Who was the registered owner? |
| 11:28AM | 10 | A    The registered owner was Hawai'i Partners LLC. |
| 11:28AM | 11 | Q    For each of those vehicles? |
| 11:28AM | 12 | A    Right. |
| 11:28AM | 13 | Q    And those were seized in July of 2020? |
| 11:28AM | 14 | A    Yes. |
| 11:28AM | 15 | MR. AKINA:  Can we show and publish Exhibit 9-1232 |
| 11:29AM | 16 | from the third supplement. |
| 11:29AM | 17 | THE COURT:  Yes, go ahead. |
| 11:29AM | 18 | BY MR. AKINA: |
| 11:29AM | 19 | Q    Is this a picture of three of those Volkswagens? |
| 11:29AM | 20 | A    It is. |
| 11:29AM | 21 | MR. AKINA:  And if we can show -- if we can publish |
| 11:29AM | 22 | Exhibit 9-1219 from the third supplement, also in evidence. |
| 11:29AM | 23 | THE CORT:  Go ahead. |
| 11:29AM | 24 | BY MR. AKINA: |
| 11:29AM | 25 | Q    Is this the fourth Volkswagen? |

11:29AM    1    A    It is, yeah.  The back of the Volkswagen van.

11:29AM    2            MR. AKINA:  And then if we can publish Exhibit 9-1230

11:30AM    3    from the third supplement.

11:30AM    4    BY MR. AKINA:

11:30AM    5    Q    Is this the Ford Bronco you mentioned?

11:30AM    6    A    It is.

11:30AM    7            MR. AKINA:  Now, can we show the witness

11:30AM    8    Exhibit 11-73?

11:30AM    9            THE COURT:  Go ahead.

11:30AM   10            MR. AKINA:  And 11-74.

11:30AM   11            THE COURT:  Yes.

11:30AM   12            MR. AKINA:  11-75.

11:30AM   13            THE COURT:  Yes.

11:30AM   14            MR. AKINA:  11-76.

11:30AM   15            THE COURT:  Yes.

11:30AM   16            MR. AKINA:  11-77.

11:30AM   17            THE COURT:  Yes.

11:30AM   18            MR. AKINA:  11-78.

11:30AM   19            THE COURT:  Go ahead.

11:30AM   20            MR. AKINA:  And 11-79.

11:30AM   21            THE COURT:  Yes.

11:30AM   22    BY MR. AKINA:

11:31AM   23    Q    Are these all DMV records with certifications relating to

11:31AM   24    those vehicles that I just showed pictures of?

11:31AM   25    A    Yes.  Yeah, registration and ownership documentation

11:31AM   1   maintained by the City and County, yeah.

11:31AM   2   Q    And they have -- they each have a seal attesting to it

11:31AM   3   being correct and accurate?

11:31AM   4   A    Yes.

11:31AM   5         MR. AKINA:  I'd offer Exhibits 11-73 through 11-79

11:31AM   6   into evidence.

11:31AM   7         THE COURT:  Any objection?

11:31AM   8         MR. KENNEDY:  No objection.

11:31AM   9         THE COURT:  11-73 through 11-79 then are each admitted

11:31AM   10  without objection.  You may publish.

11:31AM   11  (Exhibits 11-73 through 11-79 were received in evidence.)

11:31AM   12        MR. AKINA:  If we could start with 11-73.

11:31AM   13  BY MR. AKINA:

11:31AM   14  Q    And is this one of the Volkswagen Bugs?

11:31AM   15  A    Yes.

11:31AM   16  Q    And specifically, this is the 1951 Volkswagen.  What's the

11:31AM   17  VIN number here, if we could focus on that portion?

11:32AM   18  A    10234188.

11:32AM   19  Q    And what was the license number for that?

11:32AM   20  A    SYB865.

11:32AM   21        MR. AKINA:  And if we zoom out of that.

11:32AM   22  BY MR. AKINA:

11:32AM   23  Q    And it's registered to Hawai'i Partners, correct?

11:32AM   24  A    Yes.

11:32AM   25  Q    And what's the issuance date on this?

11:32AM   1   A    It's 8/26/2016, so August of 2016.

11:32AM   2        MR. AKINA:  If we can go to Exhibit 11-74.  And

11:32AM   3   focusing on these top boxes showing the vehicle information.

11:32AM   4   All the way to the date.

11:32AM   5   BY MR. AKINA:

11:32AM   6   Q    And this is for another Volkswagen Bug, 1956 model?

11:32AM   7   A    Correct.

11:32AM   8   Q    And what's the license number?

11:33AM   9   A    56VDUB.

11:33AM  10   Q    And the VIN number?

11:33AM  11   A    109382821.

11:33AM  12   Q    What date was this registration issued?

11:33AM  13   A    8/29/2016.

11:33AM  14   Q    And zooming out, does it show Hawai'i Partners as the

11:33AM  15   registered owner?

11:33AM  16   A    Yes.

11:33AM  17   Q    If we could go to 11-76, is this for another one of the

11:33AM  18   Volkswagen Bugs?

11:33AM  19   A    Yes.

11:33AM  20   Q    And zooming in on that box with the vehicle information,

11:33AM  21   this is a 1957 model?

11:33AM  22   A    Yes.

11:33AM  23   Q    And what's the license number?

11:33AM  24   A    EBYGRL.

11:33AM  25   Q    And the VIN?

| | | | |
|---|---|---|---|
| 11:33AM | 1 | A | 1529889. |
| 11:33AM | 2 | Q | And what date is this registration issued? |
| 11:33AM | 3 | A | 7/14/27 (verbatim). |
| 11:34AM | 4 | Q | And it's held in the name of Hawai'i Partners? |
| 11:34AM | 5 | A | Yes. |
| 11:34AM | 6 | Q | If we go to 11-75, and you see this notice of transfer in |
| 11:34AM | 7 | | the top right corner for that same vehicle, EBYGRL? |
| 11:34AM | 8 | A | Yes. |
| 11:34AM | 9 | Q | The date here, it's an earlier date of January 2015? |
| 11:34AM | 10 | A | Yes. |
| 11:34AM | 11 | Q | And so previously, who was the prior owner before Hawai'i |
| 11:34AM | 12 | | Partners? |
| 11:34AM | 13 | A | Kaulana Freitas. |
| 11:34AM | 14 | | MR. AKINA:  If we could publish Exhibit 11-78.  Zoom |
| 11:34AM | 15 | | in on vehicle information. |
| 11:34AM | 16 | | BY MR. AKINA: |
| 11:34AM | 17 | Q | Is this for the Volkswagen van? |
| 11:34AM | 18 | A | Yes. |
| 11:34AM | 19 | Q | And this is a 1961 model? |
| 11:34AM | 20 | A | Yes. |
| 11:34AM | 21 | Q | And what is the license number? |
| 11:34AM | 22 | A | SYB762. |
| 11:35AM | 23 | Q | And the VIN? |
| 11:35AM | 24 | A | 685167. |
| 11:35AM | 25 | Q | And what date was this registration issued? |

| | | | |
|---|---|---|---|
| 11:35AM | 1 | A | 7/17/2017. |
| 11:35AM | 2 | Q | And zooming out, it's also held in Hawai'i Partners' name? |
| 11:35AM | 3 | A | Yes. |
| 11:35AM | 4 | | MR. AKINA:  And can we publish Exhibit 11-77. |
| 11:35AM | 5 | | THE COURT:  Go ahead. |
| 11:35AM | 6 | | BY MR. AKINA: |
| 11:35AM | 7 | Q | Focusing on the vehicle information, is this that same |
| 11:35AM | 8 | | vehicle license plate SYB762? |
| 11:35AM | 9 | A | Yes. |
| 11:35AM | 10 | Q | So still for the Volkswagen van? |
| 11:35AM | 11 | A | Right. |
| 11:35AM | 12 | Q | And it's an older date here now, August of 2016; is that |
| 11:35AM | 13 | | right? |
| 11:35AM | 14 | A | Yes, August 23rd, 2016. |
| 11:35AM | 15 | Q | And if we zoom out, who was the previous owner? |
| 11:35AM | 16 | A | Delia Ann M. Fabro. |
| 11:36AM | 17 | | MR. AKINA:  If we could publish Exhibit 11-79. |
| 11:36AM | 18 | | THE COURT:  Yes. |
| 11:36AM | 19 | | BY MR. AKINA: |
| 11:36AM | 20 | Q | Focusing on vehicle information, this one is made by Ford, |
| 11:36AM | 21 | | so this is for the Ford Bronco? |
| 11:36AM | 22 | A | That's correct. |
| 11:36AM | 23 | Q | And what's the -- a 1970 model? |
| 11:36AM | 24 | A | Yes. |
| 11:36AM | 25 | Q | And what is the license number? |

| | | | |
|---|---|---|---|
| 11:36AM | 1 | A | TTY105. |
| 11:36AM | 2 | Q | And the VIN? |
| 11:36AM | 3 | A | U15GLG85573. |
| 11:36AM | 4 | Q | What is the issuance date for this registration? |
| 11:36AM | 5 | A | 5/20/2019. |
| 11:36AM | 6 | Q | And zooming out, is it held in the name of Hawai'i |
| 11:36AM | 7 | | Partners? |
| 11:36AM | 8 | A | Yes. |
| 11:36AM | 9 | Q | So the registration dates that we looked over, that ranges |
| 11:36AM | 10 | | from 2016 to 2019; is that correct? |
| 11:36AM | 11 | A | That's correct. |
| 11:36AM | 12 | Q | And based on -- and is it your understanding that that's |
| 11:37AM | 13 | | the time frame where Michael Miske's companies were in |
| 11:37AM | 14 | | operation? |
| 11:37AM | 15 | A | Yes. |
| 11:37AM | 16 | Q | So each of these would be considered property of Hawai'i |
| 11:37AM | 17 | | Partners? |
| 11:37AM | 18 | A | Yes, according to the registration, yeah. |
| 11:37AM | 19 | Q | It's registered in Hawai'i Partners' name. |
| 11:37AM | 20 | A | Yes. |
| 11:37AM | 21 | | MR. AKINA:  And we can take this down. |
| 11:37AM | 22 | | BY MR. AKINA: |
| 11:37AM | 23 | Q | Was artwork, including paintings and sculptures, also |
| 11:37AM | 24 | | found at the 6 Lumahai residence? |
| 11:37AM | 25 | A | Yes. |

| | | |
|---|---|---|
| 11:37AM | 1 | Q    And that was also in July of 2020? |
| 11:37AM | 2 | A    Yes. |
| 11:37AM | 3 | MR. AKINA:  If I can show the witness a series of |
| 11:37AM | 4 | exhibits from the 47th supplemental list, starting with 11-80? |
| 11:37AM | 5 | THE COURT:  Go ahead. |
| 11:37AM | 6 | MR. AKINA:  And 11-81.  11-82.  11-84.  11-85.  11-86. |
| 11:38AM | 7 | 11-87.  11-88.  And 11-89. |
| 11:38AM | 8 | BY MR. AKINA: |
| 11:38AM | 9 | Q    Are these pictures of artwork and paintings and sculptures |
| 11:38AM | 10 | that were at the 6 Lumahai residence? |
| 11:38AM | 11 | A    Yes. |
| 11:38AM | 12 | MR. AKINA:  I'd offer Exhibits 11-80 through 11-82 and |
| 11:38AM | 13 | 11-84 through 11-89 into evidence. |
| 11:38AM | 14 | THE COURT REPORTER:  Can you say that again?  11 dash? |
| 11:38AM | 15 | MR. AKINA:  11-80 through 11-82 and 11-84 through |
| 11:38AM | 16 | 11-89 into evidence. |
| 11:38AM | 17 | THE COURT:  Any objection to those nine exhibits? |
| 11:38AM | 18 | MR. KENNEDY:  No objection. |
| 11:38AM | 19 | THE COURT:  Without objection, those nine exhibits are |
| 11:38AM | 20 | each admitted.  That's 11-80 through 11-82 and 11-84 through |
| 11:39AM | 21 | 11-89.  You may publish. |
| 11:38AM | 22 | (Exhibits 11-80 through 11-82 and 11-84 through 11-89 were |
| 11:38AM | 23 | received in evidence.) |
| 11:39AM | 24 | MR. AKINA:  If we could start with 11-80. |
| 11:39AM | 25 | BY MR. AKINA: |

11:39AM   1   Q    Is this painting Ludavico & Ludovio by an artist named

11:39AM   2   Retna?

11:39AM   3   A    Yes.

11:39AM   4          MR. AKINA:  Can we go to 11-81.

11:39AM   5   BY MR. AKINA:

11:39AM   6   Q    Is this a painting Watermark by artist Retna?

11:39AM   7   A    Yes.

11:39AM   8          MR. AKINA:  Can we go to 11-82.

11:39AM   9   BY MR. AKINA:

11:39AM  10   Q    Is this a painting Forever Young by Retna?

11:39AM  11   A    Yes.

11:39AM  12          MR. AKINA:  Can we go to the second page of the

11:39AM  13   document.  And focusing in on -- on the back of the painting

11:39AM  14   itself.

11:39AM  15   BY MR. AKINA:

11:39AM  16   Q    Can you make out the words "Forever" in the top left box?

11:39AM  17   A    Yes.

11:39AM  18   Q    And the top middle box, does that appear to be the word

11:40AM  19   "Young"?

11:40AM  20   A    It appears to be, yeah.

11:40AM  21          MR. AKINA:  If we can publish Exhibit 9-1349 from the

11:40AM  22   36 supplemental list, already in evidence.

11:40AM  23          THE COURT:  Go ahead.

11:40AM  24          MR. AKINA:  Go to page 8.

11:40AM  25   BY MR. AKINA:

| | | |
|---|---|---|
| 11:40AM | 1 | Q    Does this -- |
| 11:40AM | 2 | MR. AKINA:  And if we can zoom in on the top left |
| 11:40AM | 3 | corner with the invoice to and information below it as well. |
| 11:40AM | 4 | BY MR. AKINA: |
| 11:40AM | 5 | Q    Does this appear to be an invoice to Michael Miske dated |
| 11:40AM | 6 | April 19, 2019, for Forever Young by Retna? |
| 11:40AM | 7 | A    Yes. |
| 11:40AM | 8 | MR. AKINA:  And zooming out, if we can focus on the |
| 11:40AM | 9 | purchase price. |
| 11:40AM | 10 | BY MR. AKINA: |
| 11:41AM | 11 | Q    What was the price here? |
| 11:41AM | 12 | A    $195,000. |
| 11:41AM | 13 | MR. AKINA:  If we can publish Exhibit 11-84. |
| 11:41AM | 14 | BY MR. AKINA: |
| 11:41AM | 15 | Q    Is this the painting Sangre Oscura by the artist Retna? |
| 11:41AM | 16 | A    Yes. |
| 11:41AM | 17 | MR. AKINA:  If we can go to Exhibit 11-85. |
| 11:41AM | 18 | BY MR. AKINA: |
| 11:41AM | 19 | Q    Is this painting Graffiti Does It by OG Slick? |
| 11:41AM | 20 | A    Yes. |
| 11:41AM | 21 | MR. AKINA:  If we go to 11-87. |
| 11:41AM | 22 | BY MR. AKINA: |
| 11:41AM | 23 | Q    Is this a sculpture Uzi Does It by OG Slick? |
| 11:41AM | 24 | A    Yes. |
| 11:41AM | 25 | MR. AKINA:  If we can now publish 11-86. |

11:41AM   1   BY MR. AKINA:

11:41AM   2   Q    Is this a sculpture titled Slick Skull also by OG Slick?

11:41AM   3   A    Yes.

11:41AM   4   Q    And what does that --

11:42AM   5        MR. AKINA:  If we can focus on that document in front

11:42AM   6   of the skull.

11:42AM   7   BY MR. AKINA:

11:42AM   8   Q    What is that?

11:42AM   9   A    It's a certificate of authenticity.

11:42AM  10        MR. AKINA:  Can we zoom out?  If we could publish

11:42AM  11   Exhibit 11-88.

11:42AM  12   BY MR. AKINA:

11:42AM  13   Q    Is this a painting Speaking in Tongues by an artist Defer,

11:42AM  14   also Alex Kizu?

11:42AM  15   A    Yes.

11:42AM  16        MR. AKINA:  And if we could publish Exhibit 11-89.

11:42AM  17   BY MR. AKINA:

11:42AM  18   Q    Is this a painting by the same artist titled Spiritual

11:42AM  19   Language?

11:42AM  20   A    It is.

11:42AM  21   Q    And is that -- were you able to look previously at that

11:42AM  22   blue tape on the top?

11:42AM  23   A    Yes.

11:42AM  24   Q    And what was written there?

11:42AM  25   A    The name of the painting.

| | | |
|---|---|---|
| 11:42AM | 1 | MR. AKINA:  We can take this down. |
| 11:42AM | 2 | BY MR. AKINA: |
| 11:43AM | 3 | Q    Were there several bank accounts that were also found? |
| 11:43AM | 4 | A    Yes, there were several bank accounts that were seized in |
| 11:43AM | 5 | July of 2020. |
| 11:43AM | 6 | Q    And what were those bank accounts? |
| 11:43AM | 7 | A    Mostly business bank accounts associated with the |
| 11:43AM | 8 | Kama'aina family of companies, and then there was one personal |
| 11:43AM | 9 | bank account of Mr. Miske's. |
| 11:43AM | 10 | Q    And so let's focus on the personal one first.  Is that a |
| 11:43AM | 11 | Hawaii Central Federal Credit Union account ending 075? |
| 11:43AM | 12 | A    I know it's a Hawaii Central, yes. |
| 11:43AM | 13 | Q    Did you schedule out activity for that account from |
| 11:43AM | 14 | August 2019 to approximately July 2020? |
| 11:43AM | 15 | A    Yes. |
| 11:43AM | 16 | Q    And that would show money coming in, money coming out of |
| 11:43AM | 17 | the account? |
| 11:43AM | 18 | A    Right. |
| 11:43AM | 19 | MR. AKINA:  Could we show the witness Exhibit 11-63. |
| 11:44AM | 20 | THE COURT:  Go ahead. |
| 11:44AM | 21 | BY MR. AKINA: |
| 11:44AM | 22 | Q    And is this that schedule that you created? |
| 11:44AM | 23 | A    It is. |
| 11:44AM | 24 | Q    And here you listed the account number as ending in 075? |
| 11:44AM | 25 | A    Right. |

| | | |
|---|---|---|
| 11:44AM | 1 | MR. AKINA:  I'd offer Exhibit 11-63 into evidence. |
| 11:44AM | 2 | THE COURT:  Any objection? |
| 11:44AM | 3 | MR. KENNEDY:  Give me a moment to just go through the |
| 11:44AM | 4 | pages, Your Honor. |
| 11:44AM | 5 | THE COURT:  Yes. |
| 11:44AM | 6 | MR. KENNEDY:  Thank you. |
| 11:44AM | 7 | MR. AKINA:  If we could scroll through the pages. |
| 11:44AM | 8 | MR. KENNEDY:  No objection.  Thank you. |
| 11:44AM | 9 | THE COURT:  11-63 then is admitted without objection. |
| 11:44AM | 10 | You may publish it. |
| 11:44AM | 11 | (Exhibit 11-63 was received in evidence.) |
| 11:44AM | 12 | MR. AKINA:  If we could go back to the first page, and |
| 11:44AM | 13 | just focusing on the top with the information on the accounts. |
| 11:45AM | 14 | Along with the titles. |
| 11:45AM | 15 | BY MR. AKINA: |
| 11:45AM | 16 | Q    Okay.  So this is Michael Miske's personal account.  At |
| 11:45AM | 17 | some point in time were there other people added on as |
| 11:45AM | 18 | signatories? |
| 11:45AM | 19 | A    Yes. |
| 11:45AM | 20 | Q    Who were those people? |
| 11:45AM | 21 | A    Delia Ann Fabro-Miske and Maydeen Stancil. |
| 11:45AM | 22 | Q    And the date there is October 2020.  Is that after the |
| 11:45AM | 23 | seizure took place? |
| 11:45AM | 24 | A    Correct. |
| 11:45AM | 25 | Q    And the activity that's shown here, that's for the time |

11:45AM   1   period going up to July 17, 2020?

11:45AM   2   A    Yes.

11:45AM   3            MR. AKINA:  If we can zoom out.

11:45AM   4   BY MR. AKINA:

11:45AM   5   Q    Okay.  There are some red highlighted cells here.  What

11:45AM   6   are those -- what do those represent?

11:45AM   7   A    The highlights are just noting deposits that were made

11:46AM   8   into the account from the Kama'aina family of companies.

11:46AM   9   Q    Did that include Kama'aina Termite and Pest Control?

11:46AM   10  A    Yes.

11:46AM   11           MR. AKINA:  And for this first red cell, if we could

11:46AM   12  focus on that as well as the balance and name portion to the

11:46AM   13  right.

11:46AM   14  BY MR. AKINA:

11:46AM   15  Q    So this was almost $4,000 deposited?

11:46AM   16  A    Right.

11:46AM   17  Q    And if we zoom out, what was the date for that

11:46AM   18  transaction?

11:46AM   19  A    August 26, 2019.

11:46AM   20  Q    And there's a memo to the right of it.  What is that memo?

11:46AM   21  A    The memo says "Payroll."

11:46AM   22  Q    So was that one of the categories of money that was coming

11:46AM   23  in from the Kama'aina family of companies?

11:46AM   24  A    Yes.

11:46AM   25           MR. AKINA:  And looking at the very bottom of this

11:46AM   1   first page, that red highlight, if we could focus on that

11:46AM   2   information to the -- all the way to the far right.  Yeah.

11:46AM   3   BY MR. AKINA:

11:46AM   4   Q    This is another type of inflow of money?

11:47AM   5   A    Right, yeah, and the -- the account there, yeah, I would

11:47AM   6   group the inflow as roughly into two categories, one in, you

11:47AM   7   know, payroll or maybe normal, you know, regularly scheduled,

11:47AM   8   let's say, additions.  And then you have these larger

11:47AM   9   shareholder distributions.  So this is one of the shareholder

11:47AM   10  distributions from Kama'aina Holdings.

11:47AM   11  Q    And if we go to the second page, we see additional

11:47AM   12  highlights.  And if we go to the third page, additional

11:47AM   13  highlights.  Are those additional monies coming in from those

11:47AM   14  companies?

11:47AM   15  A    Yes.

11:47AM   16  Q    And so on this third page on October 2nd of 2019 --

11:47AM   17       MR. AKINA:  Can we focus on those top two red

11:47AM   18  highlights going to the far right?

11:47AM   19  BY MR. AKINA:

11:47AM   20  Q    The bottom one for $3,700, is that also from another

11:47AM   21  company, Kama'aina Plumbing and Renovations?

11:47AM   22  A    Yes.

11:48AM   23       MR. AKINA:  And then if we go to page 8.

11:48AM   24  BY MR. AKINA:

11:48AM   25  Q    We skipped a few pages, but are there regular inflows of

11:48AM  1  money?

11:48AM  2  A    Yes.

11:48AM  3  Q    And is that consistent with payroll, also approximately

11:48AM  4  every two weeks?

11:48AM  5  A    Yes.

11:48AM  6        MR. AKINA:  And we're on this final page of the

11:48AM  7  document -- or, no, we're not.  We are on the eighth page of

11:48AM  8  the document, and looking at these three red cells, and if we

11:48AM  9  could zoom in all the way to the right.

11:48AM  10  BY MR. AKINA:

11:48AM  11  Q    This is January 2020.  What are the amounts here?

11:48AM  12  A    $40,000 from Kama'aina Holdings, 50,000 from Kama'aina

11:48AM  13  Termite and Pest Control, and $5,299.43 from Kama'aina Termite.

11:48AM  14  Q    Over the period that you scheduled out here from

11:49AM  15  August 20, 2019, to July 17, 2020, about how much money came in

11:49AM  16  from Kama'aina companies?

11:49AM  17  A    This is over $200,000.

11:49AM  18        MR. AKINA:  And if we go to the last page of the

11:49AM  19  document.  Looking at that line item, July 17, 2020.  The one

11:49AM  20  below that.

11:49AM  21  BY MR. AKINA:

11:49AM  22  Q    This one is to -- is this money coming in or going out?

11:49AM  23  A    So this is money going out of the account.

11:49AM  24  Q    Can you explain what this transaction shows?

11:49AM  25  A    Yes.  So we served a seizure warrant for -- for this bank

| | | |
|---|---|---|
| 11:49AM | 1 | account on Hawaii Central Federal Credit Union, and just the |
| 11:50AM | 2 | logistics and process of that is when a seizure warrant is |
| 11:50AM | 3 | served, the check is made out to the United States Marshals |
| 11:50AM | 4 | Service to go into an escrow or holding account. |
| 11:50AM | 5 | So what you're seeing here is that check coming out to |
| 11:50AM | 6 | go to the Marshals Service for the balance of the account at |
| 11:50AM | 7 | that time. |
| 11:50AM | 8 | Q   Okay.  So you said balance of the account.  That means all |
| 11:50AM | 9 | the money that was in there as of that date? |
| 11:50AM | 10 | A   Yeah, correct. |
| 11:50AM | 11 | Q   And what was the amount? |
| 11:50AM | 12 | A   $81,656.56. |
| 11:50AM | 13 | Q   Okay.  So fair to say that this account contained proceeds |
| 11:50AM | 14 | from Kama'aina Termite and Pest Control and other companies |
| 11:50AM | 15 | from the Kama'aina family of companies? |
| 11:50AM | 16 | A   Yes. |
| 11:50AM | 17 | MR. AKINA:  We can take this down. |
| 11:50AM | 18 | BY MR. AKINA: |
| 11:50AM | 19 | Q   You testified that there were other business bank accounts |
| 11:50AM | 20 | that were also seized. |
| 11:50AM | 21 | A   That's correct. |
| 11:50AM | 22 | Q   Did you schedule out just showing the accounts, the |
| 11:51AM | 23 | account numbers and the amounts taken or seized? |
| 11:51AM | 24 | A   I did, yeah. |
| 11:51AM | 25 | Q   And that was pursuant to a court order? |

11:51AM   1   A    Yes, the -- yeah, pursuant to the -- yeah, the seizure

11:51AM   2   warrant.

11:51AM   3         MR. AKINA:  If we could show the witness Exhibit 11-91

11:51AM   4   from the 47th supplement.

11:51AM   5         THE COURT:  Go ahead.

11:51AM   6   BY MR. AKINA:

11:51AM   7   Q    Does this table show those business bank accounts and the

11:51AM   8   personal Hawaii Central Federal Credit Union account that we

11:51AM   9   just looked at?

11:51AM  10   A    Yes, it does.

11:51AM  11         MR. AKINA:  I'd offer Exhibit 11-91 into evidence.

11:51AM  12         THE COURT:  Any objection?

11:51AM  13         MR. KENNEDY:  No objection.

11:51AM  14         THE COURT:  11-91 is admitted.  You may publish it.

11:51AM  15          (Exhibit 11-91 was received in evidence.)

11:51AM  16         MR. AKINA:  Can we focus on the table?

11:51AM  17   BY MR. AKINA:

11:51AM  18   Q    And so in total, there were two accounts from Kama'aina

11:52AM  19   Termite and Pest Control and two from Oahu Termite and Pest

11:52AM  20   Management?

11:52AM  21   A    Yeah, that's correct.  Yeah, like a regular maybe checking

11:52AM  22   or operating account, and then a savings account for each.

11:52AM  23   Q    And then one from Kama'aina Plumbing and Renovations?

11:52AM  24   A    Yes.

11:52AM  25   Q    And so this shows the seized balance.  That's the balances

11:52AM  1   that were in the accounts when they were seized?

11:52AM  2   A    That's correct.

11:52AM  3   Q    So for the Bank of Hawaii account ending 602 for Kama'aina

11:52AM  4   Termite and Pest Control, how much was in that?

11:52AM  5   A    $1,063,427.35.

11:52AM  6   Q    And for the Bank of Hawaii account ending 415 for the

11:52AM  7   Kama'aina Termite and Pest Control account, how much was in

11:52AM  8   that?

11:52AM  9   A    $300,372.85.

11:53AM  10  Q    And for the account -- Bank of Hawaii account ending 414

11:53AM  11  for Oahu Termite and Pest Management, how much was in that?

11:53AM  12  A    $206,725.80.

11:53AM  13  Q    And for the Bank of Hawaii account ending 218 for O'ahu

11:53AM  14  Termite and Pest Management, how much was in that?

11:53AM  15  A    $170,105.72.

11:53AM  16  Q    And for the Bank of Hawaii account ending in 220 for

11:53AM  17  Kama'aina Plumbing and Renovations, how much was in that?

11:53AM  18  A    $22,710.48.

11:53AM  19  Q    And you said that these are business operating, savings or

11:53AM  20  checking accounts?

11:53AM  21  A    Yes.

11:53AM  22  Q    So it would contain proceeds from profits that the company

11:53AM  23  has made?

11:53AM  24  A    Yes.

11:53AM  25  Q    It would contain money that could be used for -- to pay

| | | |
|---|---|---|
| 11:53AM | 1 | for expenses? |
| 11:53AM | 2 | A    Yes. |
| 11:53AM | 3 | Q    Money that could be used to be paid for -- to continue the |
| 11:53AM | 4 | operations of those companies? |
| 11:54AM | 5 | A    Yes. |
| 11:54AM | 6 | MR. AKINA:  No further questions at this time. |
| 11:54AM | 7 | THE COURT:  Mr. Kennedy, you reserve cross until |
| 11:54AM | 8 | tomorrow? |
| 11:54AM | 9 | MR. KENNEDY:  Yes. |
| 11:54AM | 10 | THE COURT:  All right. |
| 11:54AM | 11 | MR. AKINA:  Your Honor, may -- |
| 11:54AM | 12 | THE COURT:  You may step down.  Thank you, sir. |
| 11:54AM | 13 | MR. AKINA:  May we approach, Your Honor? |
| 11:54AM | 14 | THE COURT:  Yes. |
| 11:54AM | 15 | (Sidebar on the record:) |
| 11:54AM | 16 | MR. AKINA:  So that's all the witnesses that we have. |
| 11:55AM | 17 | We would be -- if cross-examination had happened, we would be |
| 11:55AM | 18 | prepared to rest.  We don't have -- we don't plan on calling |
| 11:55AM | 19 | additional witnesses unless something unforeseen happens on |
| 11:55AM | 20 | cross-examination. |
| 11:55AM | 21 | THE COURT:  Okay. |
| 11:55AM | 22 | MR. AKINA:  So that's what we have.  That's the |
| 11:55AM | 23 | state of -- |
| 11:55AM | 24 | THE COURT:  So right now then, that means we will be |
| 11:55AM | 25 | finished for today -- |

| | | |
|---|---|---|
| 11:55AM | 1 | MR. AKINA:  Correct. |
| 11:55AM | 2 | THE COURT:  -- and that the two crosses will be |
| 11:55AM | 3 | tomorrow. |
| 11:55AM | 4 | MR. AKINA:  Correct. |
| 11:55AM | 5 | THE COURT:  Okay.  And then tomorrow, assuming no |
| 11:55AM | 6 | other witnesses are prompted by the cross, the defense has |
| 11:55AM | 7 | Mr. Hines, I assume. |
| 11:55AM | 8 | MS. PANAGAKOS:  We do. |
| 11:55AM | 9 | THE COURT:  And then anyone else that you intend to |
| 11:55AM | 10 | call at this point? |
| 11:55AM | 11 | MS. PANAGAKOS:  Possibly Mr. Miske. |
| 11:55AM | 12 | THE COURT:  Possibly Mr. Miske, okay. |
| 11:55AM | 13 | Okay.  So it's possible that the jury could have this |
| 11:55AM | 14 | tomorrow. |
| 11:55AM | 15 | MS. PANAGAKOS:  Yes. |
| 11:55AM | 16 | THE COURT:  Okay.  All right.  We're just about at |
| 11:55AM | 17 | noon, so we're going to soon take a lunch break, but I guess it |
| 11:55AM | 18 | will be a break for the day at this point. |
| 11:55AM | 19 | Anything else? |
| 11:55AM | 20 | MR. KENNEDY:  Nothing from us. |
| 11:55AM | 21 | MR. AKINA:  Not from the government. |
| 11:55AM | 22 | THE COURT:  Thank you. |
| 11:55AM | 23 | MR. AKINA:  Oh, sorry, we do have one thing.  There |
| 11:56AM | 24 | was one item that we intentionally left out of the artwork. |
| 11:56AM | 25 | It's a painting -- |

| | | |
|---|---|---|
| 11:56AM | 1 | THE COURT:  Brian Flores? |
| 11:56AM | 2 | MR. AKINA:  Yes, that's the one that the government is |
| 11:56AM | 3 | going to concede.  So we'd just ask that it be taken off the |
| 11:56AM | 4 | verdict form that goes to the jury. |
| 11:56AM | 5 | THE COURT:  Okay.  I was going to tell you this at the |
| 11:56AM | 6 | end of the day today, but we just published the verdict form |
| 11:56AM | 7 | and the jury instructions from the last discussion we had |
| 11:56AM | 8 | because there were no changes from the last discussion.  So I |
| 11:56AM | 9 | think -- |
| 11:56AM | 10 | MR. KENNEDY:  Maybe we can just do a stipulation to |
| 11:56AM | 11 | say that one is no longer -- |
| 11:56AM | 12 | THE COURT:  Well, we can go in and -- I mean, the jury |
| 11:56AM | 13 | doesn't have it yet, so we can go ahead and modify the -- there |
| 11:56AM | 14 | would be no changes to the instructions.  It would just be the |
| 11:56AM | 15 | verdict form just to remove that. |
| 11:56AM | 16 | MR. AKINA:  Just to remove that. |
| 11:56AM | 17 | THE COURT:  I think we can accomplish that. |
| 11:56AM | 18 | MR. AKINA:  I believe that you listed out in the jury |
| 11:56AM | 19 | instructions as well. |
| 11:56AM | 20 | MR. KENNEDY:  In Instruction 1. |
| 11:56AM | 21 | THE COURT:  Ah, okay.  So we'll edit that in both |
| 11:56AM | 22 | cases, and then publish new ones later today. |
| 11:57AM | 23 | MR. AKINA:  Thank you. |
| 11:57AM | 24 | MS. PANAGAKOS:  Your Honor, I'm not positive about |
| 11:57AM | 25 | Mr. Hines.  That will depend on the cross. |

11:57AM    1            THE COURT:  Sure.  Sure.  Thank you.

11:57AM    2                      (End of sidebar.)

11:57AM    3            THE COURT:  All right.  So it is just about noon, and

11:57AM    4    although I thought we would be taking a lunch break right

11:57AM    5    around this point, we're actually going to be taking a break

11:57AM    6    for the trial day.  We will resume tomorrow morning at 8:30 for

11:57AM    7    the cross-examinations of the two witnesses that took the stand

11:57AM    8    earlier -- earlier this morning.

11:57AM    9            Okay.  So as we go to break, I'll remind our jury to

11:57AM   10    please once again refrain from discussing the substance of this

11:57AM   11    case with anyone, including each over, although you obviously

11:57AM   12    did deliberate on Phase 1.  At this point until deliberations

11:57AM   13    begin on Phase 2, no discussions amongst one another regarding

11:58AM   14    the substance of this case.  Also do not discuss -- do not

11:58AM   15    access, rather, any media or other accounts of this case that

11:58AM   16    may be out there, and do not conduct your own investigation

11:58AM   17    into anything relating to this case.

11:58AM   18            So we'll see you tomorrow morning at 8:30.

11:58AM   19            (Proceedings were concluded at 11:58 a.m.)

          20

          21

          22

          23

          24

          25

```
 1                    COURT REPORTER'S CERTIFICATE

 2          I, Gloria T. Bediamol, Official Court Reporter, United

 3   States District Court, District of Hawaii, do hereby certify

 4   that pursuant to 28 U.S.C. §753 the foregoing is a complete,

 5   true, and correct transcript from the stenographically reported

 6   proceedings held in the above-entitled matter and that the

 7   transcript page format is in conformance with the regulations

 8   of the Judicial Conference of the United States.

 9

10          DATED at Honolulu, Hawaii, January 16, 2025.

11

12

13                               /s/ Gloria T. Bediamol

14                               GLORIA T. BEDIAMOL.

15                               RMR, CRR, FCRR

16

17

18

19

20

21

22

23

24

25
```