```
 1              IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF HAWAII

 3
      UNITED STATES OF AMERICA,    )    CRIMINAL NO. 19-00099-DKW
 4                                 )
                 Plaintiff,        )    Honolulu, Hawaii
 5                                 )
           vs.                     )    May 6, 2025
 6                                 )
      NORMAN L. AKAU III, (09)     )    1) SENTENCING TO COUNT 1 OF
 7                                 )    THE SUPERSEDING INDICTMENT
                 Defendant.        )
 8    _____ )    2) MOTION REGARDING
                                   )    SENTENCING
 9

10                   TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE DERRICK K. WATSON,
11         CHIEF UNITED STATES DISTRICT COURT JUDGE

12   APPEARANCES:

13   For the Plaintiff:          MICHAEL DAVID NAMMAR, ESQ.
                                  AISLINN AFFINITO, ESQ.
14                                Office of the United States Attorney
                                  PJKK Federal Building
15                                300 Ala Moana Boulevard, Suite 6100
                                  Honolulu, Hawaii  96850
16
     For the Defendant:          RAMIRO SALAZAR FLORES, JR.
17                                The Law Offices of Ramiro S.
                                  Flores, PLLC
18                                55 West Franklin Street
                                  Tucson, AZ 85701
19
                                  Christian G. Enright
20                                Law Office of Christian Enright
                                  707 Richards Street
21                                Ste Ph-1
                                  Honolulu, HI 96813
22
     Official Court Reporter:    Gloria T. Bediamol, RPR RMR CRR FCRR
23                                United States District Court
                                  300 Ala Moana Boulevard
24                                Honolulu, Hawaii 96850

25    Proceedings recorded by machine shorthand, transcript produced
      with computer-aided transcription (CAT).
```

| | | |
|---|---|---|
| | 1 | May 6, 2025                                              9:01 a.m. |
| 09:01AM | 2 | THE CLERK:  Criminal Number 19-00099-DKW-KJM, United |
| 09:01AM | 3 | States of America versus Defendant (09) Norman L. Akau, III. |
| 09:01AM | 4 | This case has been called for sentencing to Count 1 of |
| 09:01AM | 5 | the superseding indictment and a motion regarding sentencing. |
| 09:01AM | 6 | Counsel, please make your appearances for the record. |
| 09:01AM | 7 | MR. NAMMAR:  Good morning, Your Honor.  Michael Nammar |
| 09:01AM | 8 | for the United States; also with me is Aislinn Affinito as |
| 09:01AM | 9 | well. |
| 09:01AM | 10 | THE COURT:  Good morning. |
| 09:01AM | 11 | MR. FLORES:  Good morning, Your Honor.  Ramiro Flores |
| 09:01AM | 12 | on behalf of Mr. Akau who is present.  I'm also accompanied by |
| 09:01AM | 13 | Mr. Enright who is local counsel, Your Honor. |
| 09:01AM | 14 | THE COURT:  Good morning to all three of you. |
| 09:01AM | 15 | Ms. Nieling, good morning to you. |
| 09:01AM | 16 | You may be seated. |
| 09:01AM | 17 | On June 9th of 2021, it's been nearly four years now |
| 09:01AM | 18 | that the defendant, Mr. Akau, pled guilty; he did so pursuant |
| 09:01AM | 19 | to a plea agreement with the United States to Count 1 of the |
| 09:02AM | 20 | superseding indictment, which was the operative indictment at |
| 09:02AM | 21 | that time.  Count 1 charged the defendant with violating the |
| 09:02AM | 22 | racketeering laws of the United States. |
| 09:02AM | 23 | Have counsel now had an opportunity to read, review, |
| 09:02AM | 24 | and discuss the revised PSR dated March 17th of this year and |
| 09:02AM | 25 | to provide the Court with any comments on or objections to the |

| 09:02AM | 1 | contents of that report? |
|---|---|---|

09:02AM   1   contents of that report?

09:02AM   2              MR. NAMMAR:  Yes, Your Honor.

09:02AM   3              MR. FLORES:  Yes, Your Honor.

09:02AM   4              THE COURT:  All right.  I'm aware of a number of

09:02AM   5   objections all from the defense side that it appears the Court

09:02AM   6   needs to resolve.  So I'm going to describe these objections

09:02AM   7   one at a time, as I understand them, and of course if I have

09:02AM   8   not accurately described them, one or both attorneys may

09:02AM   9   provide that clarification.  And then, of course, if either

09:02AM   10  side also wishes to be heard further with regard to any of

09:03AM   11  these objections, beyond what has been provided in writing to

09:03AM   12  me, all of which I've read, you may certainly do that as well.

09:03AM   13             The first objection is the following:  The defendant

09:03AM   14  objects to the racketeering act number three as described in

09:03AM   15  the PSR; that is the murder for hire of Elgin Calles, according

09:03AM   16  to the defense.  That incident -- that event should not be used

09:03AM   17  at least in his guideline calculations because doing so would

09:03AM   18  run contradictory to a number of different documents including

09:03AM   19  paragraph 21(e) of his plea agreement, government

09:03AM   20  communications dated April 23rd and June 7th of 2021, both of

09:03AM   21  which are attached to defendant's sentencing statement, and

09:03AM   22  finally by the government's statements during Mr. Akau's change

09:04AM   23  of plea hearing.

09:04AM   24             According to Mr. Akau, he and his former counsel

09:04AM   25  specifically bargained for the exclusion of the Calles incident

09:04AM  1   from the guideline calculations, and it would be unjust for the

09:04AM  2   opposite to then occur.

09:04AM  3           The Court also notes that the defendant appears not to

09:04AM  4   object to the consideration of the Calles incident for all

09:04AM  5   sentencing purposes, only for the determination of the

09:04AM  6   appropriate guideline range.

09:04AM  7           Does anyone wish to be heard further with respect to

09:04AM  8   that objection?

09:04AM  9           MR. NAMMAR:  Yes, Your Honor.

09:04AM  10          THE COURT:  Mr. Nammar.

09:04AM  11          MR. NAMMAR:  Regarding this particular argument, I

09:04AM  12   think Mr. Akau is essentially asking to undo time, but that's

09:04AM  13   not realistic given the fact pattern.  Akau told us about the

09:04AM  14   murder for hire conspiracy before he pled guilty.  And when he

09:04AM  15   did that, he was under a signed proffer agreement which said

09:04AM  16   that the government could make derivative use of the

09:05AM  17   information that he provides.

09:05AM  18          And then after that the plea hearing came and the plea

09:05AM  19   agreement comes, and we didn't then give him statutory immunity

09:05AM  20   for that crime in the plea agreement.  The plea agreement

09:05AM  21   doesn't supersede the proffer agreement, rather it specifically

09:05AM  22   references it in paragraph 24 of the plea agreement.  The

09:05AM  23   defense makes a lot of citations to Mr. Inciong's email, but

09:05AM  24   all the email does is just repeat what the terms of the plea

09:05AM  25   agreement are in paragraph 21.

| | | |
|---|---|---|
| 09:05AM | 1 | It says his own words, as in Mr. Akau's own words, |
| 09:05AM | 2 | can't be used against him.  And that's what was said on the |
| 09:05AM | 3 | record in the plea hearing and that's what we have stuck by. |
| 09:05AM | 4 | The record is also clear from the information that we cited |
| 09:05AM | 5 | that both before and after Mr. Akau's plea we had independent |
| 09:05AM | 6 | evidence of the Elgin Calles murder for hire conspiracy. |
| 09:06AM | 7 | Take, for example, Wayne Miller's sworn under-oath |
| 09:06AM | 8 | testimony before the grand jury where he said that Miske wanted |
| 09:06AM | 9 | to home run Calles and that Miller was stocking Calles with |
| 09:06AM | 10 | others, and that Miller wanted to, along with Miske, kill |
| 09:06AM | 11 | Calles so they could place whoever they wanted at the port. |
| 09:06AM | 12 | And after the plea we had ample independent evidence |
| 09:06AM | 13 | as well.  Take, for example, the trial testimony of Harry Kauhi |
| 09:06AM | 14 | who testified that the purpose of the murder for hire |
| 09:06AM | 15 | conspiracy was done to place individuals at jobs at the ports. |
| 09:06AM | 16 | Mr. Akau specifically said that he agreed to the murder for |
| 09:06AM | 17 | hire to get a job at the port, something that is of pecuniary |
| 09:06AM | 18 | value. |
| 09:06AM | 19 | In the most recent supplement, the defense adds the |
| 09:06AM | 20 | Ronald Richard's declaration.  That particular declaration |
| 09:06AM | 21 | completely contradicts what's in the proffer agreement, what's |
| 09:07AM | 22 | in the plea agreement, and the statements that Mr. Richard made |
| 09:07AM | 23 | before the plea hearing.  As Your Honor may recall, at the plea |
| 09:07AM | 24 | hearing, specifically Mr. Richards, along with the government, |
| 09:07AM | 25 | said that the only thing that was protective was Mr. Akau's |

| | | |
|---|---|---|
| 09:07AM | 1 | statements.  And so we have done that, and we have honored |
| 09:07AM | 2 | that, and I'm happy to answer any questions that the Court |
| 09:07AM | 3 | asks. |
| 09:07AM | 4 | THE COURT:  I don't have any questions, thank you. |
| 09:07AM | 5 | Mr. Flores, anything with regard to this objection |
| 09:07AM | 6 | only? |
| 09:07AM | 7 | MR. FLORES:  Yes, Your Honor.  Thank you. |
| 09:07AM | 8 | Your Honor, the record is clear.  The government |
| 09:07AM | 9 | continuously represented that that particular hit, murder for |
| 09:07AM | 10 | hire offense, was not going to be considered relevant conduct. |
| 09:07AM | 11 | All the way up until the preparations for Mr. Akau's testimony, |
| 09:07AM | 12 | if you look at Jessica Turk's declaration, Your Honor, she took |
| 09:07AM | 13 | copious notes of everything that was discussed.  And the last |
| 09:08AM | 14 | time that the government again reiterated that the relevant |
| 09:08AM | 15 | conduct was not going to be used was to her while Mr. Akau was |
| 09:08AM | 16 | being prepared for his testimony.  That was in April of 2024, |
| 09:08AM | 17 | Your Honor. |
| 09:08AM | 18 | THE COURT:  Why is a paralegal's notes or an |
| 09:08AM | 19 | investigator's notes of any relevance when I have a proffer |
| 09:08AM | 20 | agreement and a written plea agreement? |
| 09:08AM | 21 | MR. FLORES:  Well, Your Honor, it's not a paralegal's |
| 09:08AM | 22 | notes.  It's Ms. Turk's particular notes, and she is an officer |
| 09:08AM | 23 | of this Court.  She prepared an affidavit, she was sworn under |
| 09:08AM | 24 | oath, this is exactly what happened. |
| 09:08AM | 25 | THE COURT:  It still doesn't make any difference, |

09:08AM  1  right?

09:08AM  2        MR. FLORES:  Well, it does, Your Honor.  When you look

09:08AM  3  at the case law, one, any ambiguity in the plea, when you have

09:08AM  4  this proffer, the proffer itself says we can use derivative

09:08AM  5  statements or derivative evidence.  The plea agreement does

09:08AM  6  not, and there is some ambiguity there.  And the government is

09:08AM  7  pouncing on that because you must understand, Your Honor, I

09:08AM  8  have argued that the government has always maintained in every

09:09AM  9  single declaration to Mr. Richard's declarations to Mr. Akau

09:09AM  10 personally and also to Ms. Turk, which are both of his prior

09:09AM  11 attorneys, they have always maintained that he would not be

09:09AM  12 punished through the guidelines with that statement that he

09:09AM  13 made.

09:09AM  14       Now, the government makes an argument that they knew

09:09AM  15 about it already.  Your Honor, the evidence is clear that they

09:09AM  16 did not.  What they knew about it --

09:09AM  17       THE COURT:  It is.

09:09AM  18       MR. FLORES:  Well, yes, if you look at every --

09:09AM  19       THE COURT:  You don't think I haven't?

09:09AM  20       MR. FLORES:  I know you have, Your Honor.  But if you

09:09AM  21 look at every single report that they've submitted in their

09:09AM  22 response, every single one of them discusses an assault against

09:09AM  23 Mr. Calles.  When Mr. Miller testified before the grand jury

09:09AM  24 and he uses the word "home run," he immediately says that at

09:09AM  25 one point Mr. Miske considered home running Mr. Calles, but

09:09AM  1    then immediately changes his mind and says, no, no, nothing

09:09AM  2    that severe.  Let's go to a third base.  That was his testimony

09:10AM  3    before the grand jury.

09:10AM  4         Prior to that, he never once mentioned to the

09:10AM  5    government that they wanted to kill Mr. Calles.  They only

09:10AM  6    mentioned that they wanted to assault him.  They were going to

09:10AM  7    assault him through Jacob Smith, they were following him with

09:10AM  8    the GPS trackers with Jacob Smith and Mr. Miller and also

09:10AM  9    Mr. Kauhi.

09:10AM  10        Not until 2021, when Mr. Akau comes in and does his

09:10AM  11   proffer, do they realize that it was much more sinister than

09:10AM  12   just an assault.  It was a murder for hire that Mr. Miller had

09:10AM  13   basically lied about to the government for all this time and

09:10AM  14   including in front of the grand jury, Your Honor.  It's clear

09:10AM  15   that he mentioned the word "home run," but then he immediately

09:10AM  16   said, no, no, he just wanted to basically third base him, which

09:10AM  17   is some type of assault.  Maybe cripple him -- I think he uses

09:10AM  18   the word "cripple," things like that.

09:10AM  19        So the government was not aware of this prior to

09:11AM  20   Mr. Akau telling them.  And they were --

09:11AM  21        THE COURT:  They were aware of Mr. Calles, they were

09:11AM  22   aware that he was a target, what you are saying is they weren't

09:11AM  23   aware of how much damage they wanted to cause to him?

09:11AM  24        MR. FLORES:  Absolutely.  And that's important, Your

09:11AM  25   Honor, because under 1B1.8 he is being punished for a murder

09:11AM  1    for hire that he provided to the government.  Not an assault.

09:11AM  2    If the Court wants to set the guidelines as an assault, a VICAR

09:11AM  3    assault, a Violent Crime in Aid of Racketeering, then that's

09:11AM  4    fine.  That would be possible.

09:11AM  5        But the simple fact is that they were not aware of the

09:11AM  6    murder for hire.  They were aware of an assault that was going

09:11AM  7    to occur.  But again that's a completely distinct and separate

09:11AM  8    crime.  So when you look at that and then you look at every

09:11AM  9    single instance where the government promised to Mr. Akau

09:11AM  10   through his attorneys that they would not use those -- that

09:11AM  11   particular offense to set his guidelines, that is when they

09:12AM  12   breached the plea agreement.  When the PSR then uses that and

09:12AM  13   also the government supports the fact that it is a usable

09:12AM  14   offense because of the derivative evidence.

09:12AM  15       Your Honor, I did cite a case, it's a Third Circuit

09:12AM  16   Court case, Baird, and I think that particular case is very

09:12AM  17   important because the Ninth Circuit has never come to a

09:12AM  18   decision or never made a decision regarding this particular set

09:12AM  19   of facts.  But Baird specifically stated that the government

09:12AM  20   can't end around 1B1.8 by using a codefendant's statements that

09:12AM  21   is made because of Mr. Akau's statement.  In other words,

09:12AM  22   they've talked about Mr. Miller.

09:12AM  23       Now if Mr. Miller had talked about the Calles murder

09:12AM  24   before Mr. Akau, then there is no argument.  But he didn't.  He

09:12AM  25   talked about an assault against Mr. Calles.  Had Harry Kauhi

09:13AM  1  talked about a murder against Mr. Calles before Mr. Akau, we
09:13AM  2  don't have an argument.  But neither one of them did that.  Not
09:13AM  3  until the government was aware about that did they then come
09:13AM  4  clean.
09:13AM  5        Mr. Miller, a couple years later, corroborated what
09:13AM  6  Mr. Akau said.  Basically a couple of months after Mr. Akau,
09:13AM  7  Mr. Kauhi also corroborated what Mr. Akau said.  And that's
09:13AM  8  particularly important because Baird specifically stated that
09:13AM  9  if the codefendant's statements come directly from Mr. Akau,
09:13AM  10  it's a direct result.  And this is exactly what happened.
09:13AM  11  Because he was honest, they were able to then convince
09:13AM  12  Mr. Kauhi and Mr. Miller to be honest about that.  And it
09:13AM  13  doesn't matter if they testified at trial.  The genesis for
09:13AM  14  their honesty was Mr. Akau's honesty.  And 1B1.8 protects that.
09:14AM  15        Baird specifically states that the government cannot
09:14AM  16  end around 1B1.8 by simply going to a codefendant and saying,
09:14AM  17  hey, is that true?  Because that's exactly what happened here.
09:14AM  18  And they can't end around it.
09:14AM  19        So when we are talking about derivative use, the Third
09:14AM  20  Circuit says, well, if you can have completely wholly
09:14AM  21  independent derivative evidence then you can use it.  But here
09:14AM  22  there is no completely independent, wholly separate from
09:14AM  23  Mr. Akau evidence.  There is only Mr. Miller and Mr. Kauhi who
09:14AM  24  both came clean only because Mr. Akau came clean.
09:14AM  25        THE COURT:  Okay.

09:14AM  1              Mr. Nammar, anything else?

09:14AM  2              MR. NAMMAR:  I think the grand jury transcript is

09:14AM  3   clear.  Wayne Miller that we cited, Wayne Miller says before

09:14AM  4   the grand jury that Miske wanted to home run him.  And the

09:14AM  5   reason why was to put people at the port so they could place

09:14AM  6   anybody in these high lucrative jobs at the ports.  So I think

09:15AM  7   the record is clear both before and after, Your Honor.

09:15AM  8              THE COURT:  So what the defendant bargained for, in my

09:15AM  9   view, was not the exclusion of the Calles incident from the

09:15AM  10  determination of the guideline levels.  Had that been the deal,

09:15AM  11  there certainly could have been expressed language used in his

09:15AM  12  plea agreement to accomplish that goal and there isn't.

09:15AM  13             What the defendant bargained for, as indicated in some

09:15AM  14  of the very correspondence that he relies on, in particular

09:15AM  15  paragraph 21(e) of the plea agreement and its related provision

09:15AM  16  1B1.8 of the guidelines is this:  Together they prohibit the

09:15AM  17  government's use of self-incriminating statements for purposes

09:15AM  18  of guideline calculations but with enumerated exceptions.

09:15AM  19  Those exceptions include the use of information known to the

09:15AM  20  government prior to the defendant's proffer or based on

09:15AM  21  information provided by others.  The defendant's proffer coming

09:16AM  22  on March -- in March of 2021.

09:16AM  23             And here, while the defendant, Mr. Akau, no doubt

09:16AM  24  provided such self-incriminating statements regarding his role

09:16AM  25  in the Calles murder for hire, it is also true that the

09:16AM   1   government, despite the defendant's claims to the contrary,

09:16AM   2   knew of Calles, the GPS tracking of Calles, and the Miske

09:16AM   3   Enterprise's desire to cause physical harm to Calles all prior

09:16AM   4   to the defendant's proffer.  That information principally

09:16AM   5   coming from both Wayne Miller and Jacob Smith, both of whom

09:16AM   6   testified, as Mr. Nammar mentioned, before the grand jury as

09:16AM   7   well at length during Mr. Miske's 2024 trial.

09:16AM   8         That information, in other words, was known to the

09:16AM   9   government beginning at least two and a half years before the

09:16AM  10   defendant's first proffer.  In other words, by October of 2018.

09:17AM  11   The government provides support for that at Exhibits B through

09:17AM  12   E of its supplemental sentencing statement.

09:17AM  13         As the investigation of the Miske Enterprise

09:17AM  14   continued, it is certain and clear that the additional details

09:17AM  15   emerged.  And one of those was the defendant's role as the

09:17AM  16   trigger man in that effort.  That defendant provided that

09:17AM  17   information, is certain also to be sure, but it also came from

09:17AM  18   Mr. Kauhi as well as Mr. Miller.  Whether these pieces of the

09:17AM  19   puzzle seems to me were derived from a source independent of

09:17AM  20   Mr. Akau, as was the enterprise's initial targeting of

09:17AM  21   Mr. Calles, is not significant because of the defendant's

09:17AM  22   derivative use clause, something which the defendant himself

09:18AM  23   did not provide to the Court as part of his sentencing

09:18AM  24   statement.

09:18AM  25         There is no mistaking the permissive use of those

09:18AM  1    additional investigation details, for purposes of sentencing,

09:18AM  2    when one considers that clause, and whether that's true whether

09:18AM  3    or not the details came from this defendant or from cooperating

09:18AM  4    sources.

09:18AM  5            Also, in my review of the record I did not see any

09:18AM  6    evidence nor am I aware of anyone contending to the following,

09:18AM  7    which is that the derivative use clause was rescinded or

09:18AM  8    revoked.  That is certainly not true.  It remains as much in

09:18AM  9    play and in effect and not superseded by the defendant's plea

09:18AM  10   agreement today as it was when it was originally signed.

09:18AM  11           In fact, as Mr. Nammar mentioned in his remarks this

09:18AM  12   morning, as well as in the government's supplemental sentencing

09:18AM  13   statement, a portion of the plea agreement that paragraph 24

09:18AM  14   affirms, the continued viability of the defendant's proffer

09:19AM  15   agreement which includes the derivative use clause.  I see,

09:19AM  16   therefore, no prohibition to using the information related to

09:19AM  17   the Calles murder for hire in the determination of the

09:19AM  18   defendant's guideline calculations, and that objection is

09:19AM  19   therefore overruled.

09:19AM  20           The defendant also asserts entitlement, and this is

09:19AM  21   his second objection, to a minor role adjustment under 3B1.2 of

09:19AM  22   the guidelines.  I'm not certain which of the racketeering acts

09:19AM  23   that this minor role adjustment claim is being made.  I assume

09:19AM  24   it's in relation to the same murder for hire of Mr. Calles, but

09:19AM  25   if that is not correct then please clarify that in your

09:19AM   1   remarks.

09:19AM   2          Does anyone wish to be heard further with respect to

09:19AM   3   this minor role adjustment?

09:19AM   4          MR. NAMMAR:  Nothing further from the government.

09:19AM   5          THE COURT:  Mr. Flores, anything else?

09:19AM   6          MR. FLORES:  Yes, Your Honor.  Just by clarification

09:19AM   7   to the Court's comment.  Your Honor, my argument is that

09:20AM   8   Mr. Akau had a minor role in the overall conspiracy.

09:20AM   9          Now, was he involved in underlying racketeering acts?

09:20AM   10   Yes, he's admitted that, he's accepted that in the plea, and he

09:20AM   11   is before the Court because of those acts.  However, this Court

09:20AM   12   has the full breadth of this conspiracy.  We know everyone from

09:20AM   13   the top all the way to the bottom.

09:20AM   14          And Mr. Akau, when he first got involved, even as

09:20AM   15   expressed in his plea agreement, was not necessarily a hundred

09:20AM   16   percent aware of the breadth of this conspiracy.  As a matter

09:20AM   17   of fact, it wasn't even an enterprise and that obviously it was

09:20AM   18   a racketeering enterprise.  He had very if almost no contact

09:20AM   19   with the actual principle person in this -- Mr. Miske, who was

09:20AM   20   the principle actor in this enterprise.

09:20AM   21          There was numerous individuals that he didn't --

09:20AM   22   weren't even aware that were part of it.  These acts that he

09:20AM   23   has agreed that he has committed on behalf of the enterprise

09:20AM   24   again were much less than a lot of other principle players.

09:21AM   25   Jacob Smith, Mr. Miller, Harry Kauhi were involved in numerous

09:21AM   1   offenses in this enterprise.  Mr. Akau was involved in two.

09:21AM   2   Although they were serious --

09:21AM   3        THE COURT:  If you are asking me to consider a minor

09:21AM   4   role adjustment as it relates to the entire enterprise, that

09:21AM   5   seems to me to be a much more difficult argument for you to

09:21AM   6   sustain, because even though you may be correct that he is

09:21AM   7   substantially less culpable than the few individuals that you

09:21AM   8   just mentioned, there are at least a dozen individuals who are

09:21AM   9   far less culpable than this defendant, Ashlin Akau, Trisha

09:21AM   10  Castro, Delia Fabro-Miske, Dae Han Moon, Jason Yokoyama,

09:21AM   11  Preston Kimoto.  Do you want me to go on and on?

09:21AM   12       There is no way he is going to qualify if you want me

09:21AM   13  to consider it in the scope of the entire enterprise or in the

09:21AM   14  scope of the entire Count 1 racketeering conspiracy.

09:21AM   15       MR. FLORES:  I understand that, Your Honor.  Again,

09:21AM   16  all those individuals of course just named, Mr. Akau is not

09:22AM   17  above those individuals as far as culpability.  And when we're

09:22AM   18  were talking about the individual crime --

09:22AM   19       THE COURT:  Oh, absolutely he is.

09:22AM   20       MR. FLORES:  We are talking about the individual

09:22AM   21  crimes that Mr. Akau committed.  Mr. Miller was controlling him

09:22AM   22  a hundred percent.  He was the last-second participant in the

09:22AM   23  Carignan robbery.  He wasn't even --

09:22AM   24       THE COURT:  What does that matter?

09:22AM   25       MR. FLORES:  Well, because although the government

09:22AM  1    tries to argue that he planned it and things like that, that
09:22AM  2    was Ms. Akau.  Ashlin Akau set that up.  She had initially
09:22AM  3    robbed Mr. Carignan of one pound of meth and decided to go
09:22AM  4    further than that and brought in other individuals into that
09:22AM  5    scheme, Jacob Smith, Harry Kauhi, Mr. Akau, and I believe some
09:22AM  6    other individuals.

09:22AM  7         So, Your Honor, when you are looking at not only the
09:22AM  8    breadth of the conspiracy but also the individual crimes that
09:22AM  9    Mr. Akau was involved in, Your Honor, his role is definitely
09:22AM  10   lower than a lot of other individuals.

09:22AM  11        THE COURT:  Okay.  Well, you persist in making an
09:23AM  12   argument to me that is far more difficult for you to sustain
09:23AM  13   than what I had thought you were making.  So when I consider
09:23AM  14   his conduct, and Mr. Nammar I don't need to hear anything from
09:23AM  15   the government on this, because this seems to be a very
09:23AM  16   extremely easy objection to resolve and overrule.  There is no
09:23AM  17   possible way, in considering all of the actors, and I'm just
09:23AM  18   only talking about those who were charged, not those who were
09:23AM  19   uncharged, but when you consider all of the actors who were
09:23AM  20   charged in relation to Mr. Miske's enterprise, most of whom
09:23AM  21   pled guilty to Count 1, but some who didn't, some who pled
09:23AM  22   guilty to other offenses, there is no possible way that you
09:23AM  23   could find under 3B1.2 of the guidelines that Mr. Akau is
09:23AM  24   substantially less culpable than the average participant.  I
09:23AM  25   think I mentioned half a dozen of them already just in my

09:23AM   1   preliminary remarks, and there are at least another four, five,

09:23AM   2   six individuals.

09:23AM   3        So while you could certainly debate whether or not he

09:23AM   4   is substantially less culpable than persons like Jacob Smith

09:24AM   5   and Harry Kauhi, there is no possible way that anyone on the

09:24AM   6   record of the trial that we have could come to the conclusion,

09:24AM   7   at least reasonably so, that he is less culpable, much less

09:24AM   8   substantially less culpable, than all of the individuals that I

09:24AM   9   mentioned and probably a bunch that I didn't, including Mike

09:24AM   10  Buntenbah, Jonah Ortiz, Hunter Wilson, Jarrin Young, Tim

09:24AM   11  Taboada and probably Nick Carignan as well.  So there is no way

09:24AM   12  that that objection can be sustained.  It is in fact overruled.

09:24AM   13       The defendant asserts a third objection.  He contends

09:24AM   14  that the PSR uses the wrong guideline 2E1.1 and therefore

09:25AM   15  applies the wrong base offense level for a racketeering

09:25AM   16  conspiracy, such as the Title 18, Section 1962 offense to which

09:25AM   17  the defendant pled.  According to Mr. Akau, the proper

09:25AM   18  guideline is 2X1.1, not 2E1.1.

09:25AM   19       Does anyone wish to be heard with respect to that

09:25AM   20  objection?

09:25AM   21       MR. NAMMAR:  Yes, Your Honor.  One of the guiding

09:25AM   22  principles of the guidelines is you always start with the

09:25AM   23  appendix.  And the appendix tells us here that the applicable

09:25AM   24  guideline for a racketeering conspiracy is 2E1.1.  And 2E1.1

09:25AM   25  states that you use the offense level applicable to the

09:25AM  1  underlying crime or 19, whichever is greater.  Here the

09:25AM  2  underlying crime is greater.  So probation was correct in using

09:25AM  3  2E1.4.

09:25AM  4       The defense cites no cases, and there is simply no

09:25AM  5  instruction the guidelines use 2X1.1.  I took a quick look at

09:26AM  6  Ninth Circuit cases and I found United States versus Scott, 642

09:26AM  7  F.3d 791 at page 801 Ninth Circuit 2011 supports probation

09:26AM  8  analysis and they quote that Section 2E1.1 covers racketeering

09:26AM  9  conspiracies.

09:26AM  10       THE COURT:  Mr. Flores, anything else with regard to

09:26AM  11  this objection?

09:26AM  12       MR. FLORES:  No, Your Honor.  Not on this one.

09:26AM  13       THE COURT:  I don't know if there could be an

09:26AM  14  objection that is even simpler than the last one to resolve,

09:26AM  15  but this one might be that.  It is also overruled.  Sentencing

09:26AM  16  guidelines Appendix A is the starting point.  To me it's the

09:26AM  17  end point here.  2E1.1 is the correct guideline for the reasons

09:26AM  18  stated in the PSR as well as by Mr. Nammar.  It provides the

09:26AM  19  correct base offense level and no adjustment needs to be made.

09:26AM  20       The defendant asserts a fourth and final objection, at

09:27AM  21  least final according to my reading of the papers.  He asserts

09:27AM  22  that the PSR gets his criminal history score wrong by adding an

09:27AM  23  additional extra point under 4A1.1(d) of the guidelines to the

09:27AM  24  convictions for robbery, assault, and weapons possession

09:27AM  25  described at paragraph 64 of the PSR.

09:27AM    1        Does anyone wish to be heard with respect to this

09:27AM    2    particular objection?

09:27AM    3        MR. NAMMAR:  Yes, Your Honor.  Probation gets it spot

09:27AM    4    on, Your Honor, when they cite to the Gonzalez case from the

09:27AM    5    Ninth Circuit.  That case instructs that you follow the clear

09:27AM    6    and straightforward instructions in the guidelines.  And there

09:27AM    7    is nothing in the particular guideline in question that

09:27AM    8    mentions offenses have to be committed on separate occasions.

09:27AM    9        And then probation cites the Scott case from the Fifth

09:27AM   10    Circuit, and it's directly on point.  And it supports the

09:27AM   11    position that the point should be added here when you are

09:27AM   12    dealing with one criminal single episode but multiple crimes.

09:28AM   13    The Scott case even discusses the actual commentary note that

09:28AM   14    the defense brings up to suggest that the Court should rule in

09:28AM   15    its favor and rejects the defense argument.

09:28AM   16        I found one other case from the Seventh Circuit, it's

09:28AM   17    unpublished, United States versus Talbert 558 Fed. Appendix

09:28AM   18    701, that goes along with the Fifth Circuit case in Scott.  I

09:28AM   19    was not able to find a Ninth Circuit case.

09:28AM   20        THE COURT:  Mr. Flores, your thoughts.  Anything

09:28AM   21    additional?

09:28AM   22        MR. FLORES:  Your Honor, just again, because there is

09:28AM   23    really no guidance in the Ninth Circuit on this particular

09:28AM   24    point, I made this objection because again the -- just the

09:28AM   25    plain reading of it makes it seem as if it's two separate

09:28AM  1   robberies -- or two separate -- in this case robberies

09:28AM  2   because -- and they are consolidated under a plea and for

09:28AM  3   sentencing, and it makes sense that it would count as an extra

09:28AM  4   point.

09:28AM  5       Here, Mr. Akau was convicted of two violent crimes

09:29AM  6   based on the same set of facts.  And because of that I made

09:29AM  7   this objection, Your Honor, because it's not clear by these

09:29AM  8   guidelines whether it's trying to add one point for two

09:29AM  9   separate crimes or if it's adding one point for a particular

09:29AM  10  crime charged two ways.  And the only case that I could find,

09:29AM  11  which was a Fifth Circuit case, Montgomery, the facts of that

09:29AM  12  case that there was two individual crimes committed, and they

09:29AM  13  were consolidated under a plea and he was sentenced at the same

09:29AM  14  time for those two separate crimes and then it was -- the one

09:29AM  15  point was added.

09:29AM  16      Again, because of that, Your Honor, I made the

09:29AM  17  objection because I believe that the intent of the guidelines

09:29AM  18  were to deal with that set of facts, which was two separate

09:29AM  19  violent crimes committed on separate occasions and then

09:29AM  20  combined under one plea.  And so I made the objection, Your

09:29AM  21  Honor.

09:29AM  22      THE COURT:  And that is the example in fact I think

09:30AM  23  that the commentary provides.

09:30AM  24      MR. FLORES:  That's correct, Your Honor.  And again

09:30AM  25  with that example is the reason that I believe that that's what

| | | |
|---|---|---|
| 09:30AM | 1 | it was meant to apply to. |
| 09:30AM | 2 | Any further questions, Your Honor? |
| 09:30AM | 3 | THE COURT:  No, I don't have any further questions, |
| 09:30AM | 4 | thank you.  The objection nonetheless is overruled.  This does |
| 09:30AM | 5 | seem straightforward as well.  There are two separate crimes of |
| 09:30AM | 6 | violence encompassed within the paragraph 64 convictions for |
| 09:30AM | 7 | which the defendant received three criminal history points, |
| 09:30AM | 8 | those two crimes of violence being robbery and assault.  It |
| 09:30AM | 9 | seems to me to be a straightforward application of 4A1.1(d) to |
| 09:30AM | 10 | apply the one additional criminal history point as the PSR |
| 09:30AM | 11 | does.  There is no requirement that the separate crimes occur |
| 09:30AM | 12 | on different dates then combined into a single indictment as |
| 09:30AM | 13 | the defense suggests.  So that objection is likewise overruled. |
| 09:31AM | 14 | I'm not aware of any other objections from either side |
| 09:31AM | 15 | beyond the four that I've just addressed.  If I missed |
| 09:31AM | 16 | something from either side's papers, please let me know. |
| 09:31AM | 17 | MR. NAMMAR:  Not from the government. |
| 09:31AM | 18 | MR. FLORES:  No, Your Honor, not from the defense. |
| 09:31AM | 19 | THE COURT:  All right.  Having read then the revised |
| 09:31AM | 20 | PSR and there being no other objections to the factual |
| 09:31AM | 21 | statements therein from either side with the potential to |
| 09:31AM | 22 | affect the guideline calculations, the Court adopts those |
| 09:31AM | 23 | statements as its own findings.  I also accept Mr. Akau's plea |
| 09:31AM | 24 | agreement.  I am satisfied having read it in the context of the |
| 09:31AM | 25 | revised PSR that the agreement adequately reflects the |

09:31AM  1    seriousness of his offense and accepting it will not undermine

09:31AM  2    the statutory purposes of sentencing.

09:31AM  3            Mr. Nammar, I gather the government is moving for the

09:31AM  4    one-level adjustment under 3E1.1(b) of the guidelines; is that

09:31AM  5    correct?

09:31AM  6            MR. NAMMAR:  Yes, Your Honor.

09:31AM  7            THE COURT:  For good cause appearing, that request is

09:31AM  8    granted.  For purposes of sentencing then that leaves us with

09:31AM  9    the following:  A total offense level 34; the defendant's

09:32AM  10   criminal history category is three, that places him in zone D

09:32AM  11   as in delta of the sentencing guideline matrix.

09:32AM  12           The applicable guidelines then to that offense level

09:32AM  13   and criminal history category are as follows:  An imprisonment

09:32AM  14   term of between 188 and 235 months, a supervised release term

09:32AM  15   of between one and three years, a fine range of between 35,000

09:32AM  16   and $250,000.  There is also a $100 mandatory special

09:32AM  17   assessment that's required by statute, and this is of course

09:32AM  18   before consideration of the government's sentencing motion.

09:32AM  19           Counsel concur with those guideline calculations?

09:32AM  20           MR. NAMMAR:  Yes, Your Honor.

09:32AM  21           MR. FLORES:  Yes, Your Honor.

09:32AM  22           THE COURT:  Mr. Nammar, is there anything that we need

09:32AM  23   to do with respect to forfeiture as it relates to Mr. Akau?

09:32AM  24           MR. NAMMAR:  No, Your Honor.

09:32AM  25           THE COURT:  All right.  Then I'll hear from the

09:32AM   1   government please with regard to a recommendation.

09:32AM   2                MR. NAMMAR:  Thank you, Your Honor.  I want to start

09:32AM   3   with the 5K motion.  Your Honor, having sat through the entire

09:33AM   4   trial, I think you are in a great position to decide whether

09:33AM   5   our 5K is sufficient or not.  Of course, the starting point for

09:33AM   6   a 5K is the guideline itself.  And one of the provisions of the

09:33AM   7   guideline that the Court should take into consideration is the

09:33AM   8   government's view.

09:33AM   9                From our view, number one, while we filed the motion,

09:33AM   10  we didn't believe that Mr. Akau's assistance was helpful beyond

09:33AM   11  getting others to plead.  In other words, he came in early and

09:33AM   12  he pled guilty.

09:33AM   13               Number two, we didn't think he was reliable, and parts

09:33AM   14  of his testimony not credible for the reasons we pointed out,

09:33AM   15  specifically, the contradictions from the sworn statements to

09:33AM   16  Your Honor in the plea hearing and the changes that he made to

09:33AM   17  his trial testimony many of which favored the defense.

09:33AM   18               Number three, we would point out that Mr. Akau gave

09:34AM   19  Stancil privileged communications with his counsel after he had

09:34AM   20  entered a cooperation provision with the government.  How do we

09:34AM   21  know that?  We know that because the subject of the email is

09:34AM   22  about the plea hearing that Mr. Akau was about to enter into,

09:34AM   23  and the plea agreement he was going to enter into.

09:34AM   24               And what is Mr. Akau saying in those communications?

09:34AM   25  Is he saying, I'm not sure whether Stancil was there?  No, he

09:34AM 1    is not saying that.  He is saying emphatically Stancil was not

09:34AM 2    at the Carignan robbery.  He is saying that even though

09:34AM 3    Stancil, even if he had a mask on, would be easy to pick out

09:34AM 4    with his huge head and huge built, and he is saying that even

09:34AM 5    though Mr. Akau himself testified at trial that after the

09:34AM 6    Carignan robbery they all went to the Waimanalo gym to break up

09:34AM 7    the methamphetamine and Mr. Stancil was there.

09:34AM 8            So his version of the incident just doesn't make

09:34AM 9    sense.  And we think Mr. Akau is, for whatever reason, trying

09:35AM 10   to play both sides.  In the end though, Your Honor has the

09:35AM 11   discretion.  If Your Honor doesn't think our motion was

09:35AM 12   sufficient, Your Honor knows you can depart further.

09:35AM 13           As for the offense, we are asking for 168 months.

09:35AM 14   Over a four-year period Mr. Akau was an integral member in the

09:35AM 15   Miske Enterprise.  During that time he showed no moral compass

09:35AM 16   whatsoever.  He impersonated a police officer, he carried

09:35AM 17   multiple firearms, even though he was a felon, one of which had

09:35AM 18   a silencer.  He almost murdered a high-ranking union member,

09:35AM 19   and he participated in an armed robbery with others of a drug

09:35AM 20   dealer of methamphetamine, even though he had 20 years earlier

09:35AM 21   participated in a violent robbery that had gone incredibly

09:35AM 22   wrong.  But for intervention by Miller, he would have killed

09:35AM 23   Elgin Calles.  In fact, all the evidence showed that Akau was

09:36AM 24   ready and willing to go through with the murder.  The offense

09:36AM 25   conduct is violent and it's concerning.

| 09:36AM | 1  | Turning to the person that Your Honor is sentencing. |
| 09:36AM | 2  | There are some mitigating factors.  He has family support, he |
| 09:36AM | 3  | has a track record of being gainfully employed.  But in |
| 09:36AM | 4  | aggravation, the Court is confronted with someone who had a |
| 09:36AM | 5  | crack cocaine addiction, someone who shot off the ear of a cab |
| 09:36AM | 6  | driver when he was 21, and who when he was in his 40s still had |
| 09:36AM | 7  | not learned the lesson because he kept committing crimes in |
| 09:36AM | 8  | this case, someone who in this case admitted he committed the |
| 09:36AM | 9  | violent crimes because he needed money.  And that motivation |
| 09:36AM | 10 | should be concerning for the Court, especially given the fact |
| 09:36AM | 11 | that he may lose his high-paying union job because of his |
| 09:36AM | 12 | conviction in this case. |
| 09:36AM | 13 | The bottom line is, given his history and his criminal |
| 09:36AM | 14 | conduct in this case, there is a real risk that he will |
| 09:36AM | 15 | reoffend, and he is without question someone the Court needs to |
| 09:37AM | 16 | protect the public from. |
| 09:37AM | 17 | As far as similarly situated, we don't believe that |
| 09:37AM | 18 | Mr. Akau is similarly situated to anyone.  As far as |
| 09:37AM | 19 | defendants, he's probably the closest to Harry Kauhi who was |
| 09:37AM | 20 | also in criminal history category 3.  But when you look at |
| 09:37AM | 21 | Mr. Kauhi's criminal record and you look at Mr. Akau's criminal |
| 09:37AM | 22 | record, we think that they're different and Mr. Akau's is worse |
| 09:37AM | 23 | because of the shooting that I've mentioned. |
| 09:37AM | 24 | We also, from the government's perspective, we view |
| 09:37AM | 25 | his cooperation different.  As Your Honor may recall, Mr. Kauhi |

09:37AM  1   received an extensive 5K, and that's not what the government is

09:37AM  2   recommending for Mr. Akau.  And when we look at their roles in

09:37AM  3   the offense, we see them as different.  In the Calles murder,

09:37AM  4   Akau was going to be the trigger man, as the Court has always

09:37AM  5   mentioned; Kauhi was not.  And in the robbery of Nico Carignan,

09:37AM  6   Mr. Akau was the person who actually set that robbery in motion

09:38AM  7   by posing as police and blocking the road.

09:38AM  8        Your Honor may recall that Ashlin Akau actually

09:38AM  9   testified that it was Mr. Norman Akau who recruited her to

09:38AM  10  participate in the offense.  And so for all those reasons, we

09:38AM  11  don't see Mr. Akau as similar to any other defendants in this

09:38AM  12  case.

09:38AM  13       In the end, given all of the 3553(a) factors,

09:38AM  14  including the need to send a message to others that these types

09:38AM  15  of crimes will not be tolerated and given how dangerous

09:38AM  16  Mr. Akau is, we think that a 168-month sentence is sufficient

09:38AM  17  but not greater than necessary.

09:38AM  18       THE COURT:  Thank you.

09:38AM  19       Mr. Flores, your thoughts.

09:38AM  20       MR. FLORES:  Your Honor, just in the government's 5K1

09:38AM  21  motion, I think I made it really clear what our position is and

09:38AM  22  my response to that.  The government's attitude towards Norman

09:38AM  23  really changed when John Stancil filed that -- those privileged

09:39AM  24  communications.  Obviously, no attorney wants their

09:39AM  25  communications with their client to be exposed and put on the

09:39AM   1   record as it was; but in the end, that was the catalyst so that
09:39AM   2   the government is now basically want to bury Mr. Akau.
09:39AM   3          Again, our position is that they conveyed to him on
09:39AM   4   numerous times that the murder for hire was not going to be
09:39AM   5   used for the guideline purposes.  Now that's obviously not
09:39AM   6   going to happen.  He is looking at a level 37, he is looking at
09:39AM   7   168 months.  Then they submit this motion, this 5K1 motion, and
09:39AM   8   they give him a nominal one-level credit for exposing himself,
09:39AM   9   his family to some very dangerous individuals for helping the
09:39AM  10   government turn other codefendants on to their side for him
09:40AM  11   putting himself on the stand and testifying against a very
09:40AM  12   dangerous individual and a very dangerous group of individuals.
09:40AM  13          And that's not just talking about this particular
09:40AM  14   group of individuals.  We are talking from now on any further
09:40AM  15   prison time and up -- even now at FDC he is now considered a
09:40AM  16   cooperating witness.  And that's something that concerns him
09:40AM  17   greatly.
09:40AM  18          But here's the thing, Your Honor.  The motion that the
09:40AM  19   government filed, in the way I looked at it, because again I
09:40AM  20   wasn't privy to being here in the courtroom while he testified,
09:40AM  21   I wasn't privy to being his attorney when the government
09:40AM  22   prepped his testimony, but the number one factor is that the
09:40AM  23   government is saying he was inconsistent with his plea
09:40AM  24   agreement.  That is the number one factor that they have cited
09:40AM  25   for giving him a one-level credit for his cooperation, Your

09:40AM  1    Honor.

09:40AM  2            The government was a hundred percent aware that that's

09:40AM  3    exactly what he was worried about.  Because in the trial

09:41AM  4    preparations, and Ms. Turk is again her declaration, she was

09:41AM  5    present, she was taking notes.  It wasn't a paralegal, it

09:41AM  6    wasn't an investigator, it was Ms. Turk taking her own notes

09:41AM  7    about what was being said.  She brought up the fact that some

09:41AM  8    of the statements he made during the plea colloquy were not

09:41AM  9    consistent with the truth.

09:41AM  10           And the government said, Don't worry about that.

09:41AM  11   There is going to be inconsistencies and just tell the truth.

09:41AM  12   They weren't surprised by Mr. Akau's testimony.  He wasn't

09:41AM  13   unreliable.  He told them exactly what he had told them all

09:41AM  14   along.  And what their concern is is that that somehow aided

09:41AM  15   Mr. Miske, but that's not necessarily how I read the

09:41AM  16   transcript, how I understand the case.

09:41AM  17           What he did was help the government convict Mr. Miske.

09:41AM  18   And the most important factor that Mr. Akau brought to the

09:41AM  19   table was the fact that he testified that Wayne Miller, Wayne

09:42AM  20   Miller, Mr. Miske's best friend, approached him with an offer

09:42AM  21   to kidnap and potentially kill Mr. Frasure.  This was probably

09:42AM  22   the number one most important crime that the government wanted

09:42AM  23   to make sure that Mr. Miske was convicted of.  That alone

09:42AM  24   helped the government tremendously, because Mr. Miller, his

09:42AM  25   credibility was bolstered by that.

09:42AM   1          Mr. Miller even in the PSR, Your Honor, on page 23

09:42AM   2    paragraph 60, recognizes that Mr. Miller testified that he had

09:42AM   3    offered to Mr. Akau that particular hit.  Mr. Akau said no,

09:42AM   4    because he's just a kid.  But in the end that was tremendous

09:42AM   5    evidence, not only bolstering Mr. Miller's credibility but also

09:42AM   6    showing Mr. Miske's proclivity to wanting to kill people for

09:43AM   7    money -- or by offering money who have potentially wronged him.

09:43AM   8    And that's played out with the hit that Mr. Kauhi was involved

09:43AM   9    in, that plays out in the several -- I guess there was three

09:43AM  10    that Mr. Miller was involved in.

09:43AM  11          Again, all of this is very important because Mr. Akau

09:43AM  12    helped the government, didn't hinder them.  And I think I've

09:43AM  13    spelled very well how they have taken bits and pieces of his

09:43AM  14    testimony and tried to turn that testimony to say, no, this was

09:43AM  15    actually helping the defense.  But, in reality, the government

09:43AM  16    was a hundred percent aware of what this testimony was going to

09:43AM  17    be, because they prepared him for it and he also told them

09:43AM  18    through his attorney and himself said, look, the portions that

09:43AM  19    I said in my colloquy are not necessarily the truth, and they

09:43AM  20    just were like, okay, go ahead.  Now they want to turn around

09:43AM  21    and use that against him.

09:43AM  22          THE COURT:  Wait.  The portions of the plea colloquy

09:43AM  23    were not the truth?

09:43AM  24          MR. FLORES:  That's what he told them, Your Honor.  If

09:44AM  25    you look at --

09:44AM  1                 THE COURT:  He lied to me because I was the one who

09:44AM  2      asked those questions at the plea colloquy; isn't that correct?

09:44AM  3                 MR. FLORES:  Right, Your Honor.

09:44AM  4                 THE COURT:  Right.

09:44AM  5                 MR. FLORES:  Right.  But here's the thing --

09:44AM  6                 THE COURT:  So he lied to me in open court.

09:44AM  7                 MR. FLORES:  He did not lie to you, Your Honor.

09:44AM  8                 THE COURT:  You just said he did.

09:44AM  9                 MR. FLORES:  No.  No.  He didn't understand the

09:44AM  10     question because if you look at the testimony and it's in --

09:44AM  11                THE COURT:  He didn't understand my question.  So my

09:44AM  12     question was somehow confusing when I asked him whether Mr.

09:44AM  13     Miske was the one -- if he had an understanding that Mr. Miske

09:44AM  14     was the one who this $50,000 offer came from that was somehow

09:44AM  15     confusing to him?

09:44AM  16                MR. FLORES:  Right, Your Honor.

09:44AM  17                THE COURT:  Right.  It was confusing to Mr. Akau?

09:44AM  18                MR. FLORES:  I would assume so, Your Honor.  I wasn't

09:44AM  19     there.

09:44AM  20                THE COURT:  That was an incredibly ambiguous and

09:44AM  21     unclear question, I guess, right?

09:44AM  22                MR. FLORES:  No, I'm not saying that, Your Honor.

09:44AM  23     What I'm saying is his response -- and it's in Jessica Turk's

09:44AM  24     affidavit -- the answer was, That's what I understood, but I

09:44AM  25     don't know if that was the truth is what he said.  That was his

09:44AM  1   response.  And you got to understand, Your Honor, this was --
09:44AM  2   he's taking the plea while he is alone on video, his attorney
09:45AM  3   is not right next to him.  I'm not sure how the procedure was
09:45AM  4   back then in this court, but it was COVID and he was in video
09:45AM  5   at FDC Honolulu, his attorney is in LA, and so it lent itself
09:45AM  6   to some confusion and some miscalculations.
09:45AM  7          But, in the end, the government is now saying, Look,
09:45AM  8   Judge, this is how -- he turned cold on us.  But that's not
09:45AM  9   true because he tried to correct that days before.  And the
09:45AM  10  government said, Don't worry about it.  Not until John Stancil
09:45AM  11  filed those motions or that motion did it then turn around and
09:45AM  12  the government decided, you know what, we're going to use these
09:45AM  13  facts to justify a one-level reduction on a 5K1.1.
09:45AM  14         His testimony should have been just as helpful, if not
09:45AM  15  more helpful, than any other witness that is on par with what
09:45AM  16  he did, which would be Harry Kauhi, which would be Wayne
09:45AM  17  Miller.  And he should get a like reduction for that for those
09:46AM  18  reasons, Your Honor.
09:46AM  19         I'm going to move on to why I believe the Court should
09:46AM  20  sentence him to much less than 168 months not only because of
09:46AM  21  the 5K1.1, his substantial assistance; but, as the government
09:46AM  22  noted, he does have some mitigating factors.  And I think I'll
09:46AM  23  start with the biggest problem here, or at least one of the
09:46AM  24  elephants in the room, is his prior.  But that prior occurred
09:46AM  25  30 years ago, Your Honor.  Literally 30 years ago.  And it was

09:46AM   1   a violent offense, he's paid his penance.

09:46AM   2          We assume that a long prison sentence is

09:46AM   3   rehabilitating and it was for a time.  He got out, he got

09:46AM   4   married, he started a family.  He didn't commit any further

09:46AM   5   crimes, he wasn't involved in anything criminal up until he

09:46AM   6   started having some economic pressures, he started having some

09:46AM   7   issues with his family, he started abusing drugs.

09:46AM   8          And as I put down in my memorandum, Your Honor, he had

09:46AM   9   the peers that helped him get into this mess.  And that's

09:47AM  10   exactly what he did.  He got himself into a huge mess because

09:47AM  11   he agreed to commit certain crimes for money which eventually

09:47AM  12   led him to where he is at now.

09:47AM  13          But he is 52 years old now, Your Honor, he has already

09:47AM  14   done five years.  His health has deteriorated.  Just this last

09:47AM  15   week, Your Honor, I just found out, when I came to see him a

09:47AM  16   couple of days ago, that he suffers from all these health

09:47AM  17   issues that I noted in my memorandum, but he also believes that

09:47AM  18   he might have cancer, Your Honor.  He literally was just sent

09:47AM  19   to a doctor yesterday where they did some radioactive tests on

09:47AM  20   him, I have proof of those, Your Honor, if you want to look at

09:47AM  21   them; but in reality, he has some thyroid issues, they found

09:47AM  22   some lumps on those, and one of them was serious enough that

09:47AM  23   they injected him with some kind of nuclear medicine yesterday

09:47AM  24   to try to figure out what it is.

09:47AM  25          In the end, Your Honor, he is 52 years old, he has a

09:48AM 1    great family, he has great support, they are all here in the

09:48AM 2    court today, there's quite a bit of people here.  The Court has

09:48AM 3    to fashion a sentence that I believe takes everything into

09:48AM 4    account including his cooperation, including his health,

09:48AM 5    including his family obligations, and including the fact that

09:48AM 6    before he was ever even arrested for this offense, Your Honor,

09:48AM 7    he was already rehabilitating himself.  He had stopped using

09:48AM 8    drugs, he had stopped associating with all of the individuals

09:48AM 9    that the Court has named and that he was involved with.  He

09:48AM 10   stopped associating with his bike club, he stopped associating

09:48AM 11   with anybody there, he stopped using drugs on his own.  And

09:48AM 12   then he started a very successful business which he operated

09:48AM 13   for almost two years where he finally dug himself out of the

09:48AM 14   hole that he had created.

09:48AM 15        But, again, as I put down in my PSR or PSM, Your

09:48AM 16   Honor, his crimes came calling.  Two years after -- a little

09:48AM 17   bit more than two years after he committed the last offense, he

09:49AM 18   gets arrested, Your Honor.  And what does he do?  He

09:49AM 19   immediately -- well, I wouldn't say immediately, but one of the

09:49AM 20   very first things that he did was he agreed to cooperate with

09:49AM 21   the government.  And as the government said, that was a domino

09:49AM 22   effect, that allowed them to convince individuals like

09:49AM 23   Mr. Miller, Mr. Kauhi, and a bunch of other individuals who

09:49AM 24   cooperated against Mr. Miske to do so because they understood

09:49AM 25   that Mr. Akau, who was very involved in some of these offenses,

09:49AM  1    had done so.  He had done so publicly.

09:49AM  2          There was a lot of -- I looked at the record,

09:49AM  3    initially his plea was sealed.  It was sealed until his

09:49AM  4    attorney walked out the door and basically announced to the

09:49AM  5    world that Mr. Akau had cooperated.  And then it was unsealed.

09:49AM  6    And so every one of those facts allowed the government to make

09:49AM  7    this case.  And I don't think the Court should just push that

09:49AM  8    to the side.  Five years is a long time for anyone, and

09:49AM  9    especially long for someone who is 52 years old, whose health

09:49AM  10   is deteriorating.

09:49AM  11         I want the Court to consider everything that I

09:49AM  12   submitted in my memorandum, in my response to the 5K1.1, and

09:50AM  13   sentence him to a five-year term, Your Honor.

09:50AM  14         THE COURT:  Thank you.

09:50AM  15         Mr. Nammar, do you have anything else?

09:50AM  16         MR. NAMMAR:  No, Your Honor.

09:50AM  17         THE COURT:  Mr. Akau, you have the opportunity to what

09:50AM  18   we call allocute.  It's a fancy term to say that you have an

09:50AM  19   opportunity to address the Court, the community, whomever you

09:50AM  20   choose, if you choose to do so, but you should also understand

09:50AM  21   that you are not under an obligation to say anything at all

09:50AM  22   during the course of your sentencing hearing.  We merely

09:50AM  23   provide you the opportunity to do so.

09:50AM  24         So if you wish, now would be the time.

09:50AM  25         THE DEFENDANT:  Here or here?

09:50AM  1                THE COURT:  Wherever you feel comfortable.  You may

09:50AM  2    speak right from counsel table and you also may stay seated if

09:50AM  3    you wish.

09:50AM  4                THE DEFENDANT:  Thank you, Your Honor.  I'm going to

09:50AM  5    read off of this, if you don't mind.

09:50AM  6                THE COURT:  Of course, not a problem.

09:51AM  7                THE DEFENDANT:  I would like to first start off by

09:51AM  8    saying to my family, to the victims, and to the community I am

09:51AM  9    truly sorry for all the hurt my actions have caused you.  I

09:51AM  10   would also like to apologize to anyone unknown to me that has

09:51AM  11   been affected by my actions.  To my wife and my daughters, I'm

09:51AM  12   sorry for letting you guys down and causing you guys so much

09:51AM  13   pain.  I love you guys all very much, and I will do better for

09:51AM  14   you all.  You guys are my life.

09:51AM  15               I accept full responsibility for my actions.  In the

09:51AM  16   past, I demonstrated poor decision making which has brought me

09:51AM  17   here today.  I'm extremely remorseful for my past actions and

09:51AM  18   behavior.  Today, I take accountability for what I've done.  I

09:51AM  19   have been incarcerated for almost five years now.

09:51AM  20               Your Honor, what I've learned, seen, and experienced

09:51AM  21   is that time is so very precious but it can also be so cruel.

09:52AM  22   And once it's gone, there is nothing you can do to get it back.

09:52AM  23   Family is everything to me, and I want to spend as much time as

09:52AM  24   I can with them.  I love my wife and my two daughters, and I'm

09:52AM  25   very proud of them.  I watched them overcome some of life's

09:52AM  1   problems that have come their way and that they have endured

09:52AM  2   five years of their life without me and having to navigate

09:52AM  3   alone without being there for them.

09:52AM  4          I'm also super appreciative for my wife.  She has held

09:52AM  5   down my family and did an amazing job raising my kids on her

09:52AM  6   own while still coming to support and visit me as much as she

09:52AM  7   can.

09:52AM  8          I've completed a number of programs while at FDC

09:52AM  9   Honolulu.  And the tools I've learned will help me to be a

09:52AM  10  better husband, father, and a better citizen to our community.

09:52AM  11  I know I'm ready to return to my family and to society.

09:53AM  12         Your Honor, I humbly ask you for leniency in my

09:53AM  13  sentencing today.  Please give me a chance to be there for my

09:53AM  14  family.  Thank you.

09:53AM  15         THE COURT:  I appreciate your remarks.  I'll turn to

09:53AM  16  both counsel.

09:53AM  17         Mr. Flores, anything else?

09:53AM  18         MR. FLORES:  No, Your Honor.

09:53AM  19         MR. NAMMAR:  No, Your Honor.

09:53AM  20         THE COURT:  Mr. Nammar.

09:53AM  21         MR. NAMMAR:  No, Your Honor.

09:53AM  22         THE COURT:  The first order of business is the

09:53AM  23  government's 5K motion filed on the docket at 1871 on

09:53AM  24  March 14th of this year.  That motion is granted.  The Court

09:53AM  25  finds that there are mitigating circumstances of a kind or

09:53AM  1    degree that were not adequately taken into consideration by the

09:53AM  2    Sentencing Commission in formulating the guidelines, and that

09:53AM  3    these circumstances should result in a sentence different from

09:53AM  4    that suggested by the guidelines.

09:53AM  5           In its 5K motion, the government describes the

09:53AM  6    defendant's substantial assistance as, quote, very limited,

09:53AM  7    unquote.  His early plea, more specifically, encouraged

09:54AM  8    coconspirators to likewise plead early and many did so.  And

09:54AM  9    based on that, the government recommends a one-level departure.

09:54AM  10          The reason Mr. Akau's assistance, in the government's

09:54AM  11   estimation, wasn't more valuable on par with some of the other

09:54AM  12   codefendants that we have seen who testified at trial, is

09:54AM  13   because, in the government's estimation, Mr. Akau reneged on

09:54AM  14   his promise of cooperation.  And that decision to renege was

09:54AM  15   never more evident than in Mr. Miske's trial where the

09:54AM  16   defendant essentially recanted Mr. Miske's personal involvement

09:54AM  17   in two murder-for-hire contracts related to Elgin Calles, who

09:54AM  18   we talked quite a lot about already this morning, as well as

09:54AM  19   Jonathan Fraser.

09:54AM  20          In both instances, Mr. Akau testified that Mr. Miske

09:55AM  21   had nothing to do with either and both had everything to do

09:55AM  22   with Mr. Miske's associates only, to include Wayne Miller, in

09:55AM  23   contrast to Mr. Akau's admissions to this Court during his

09:55AM  24   change of plea colloquy.

09:55AM  25          Speaking of which, that colloquy talked about Mr.

| | | |
|---|---|---|
| 09:55AM | 1 | Akau's role with respect to Mr. Miske's associates and |
| 09:55AM | 2 | Mr. Akau's decision to accept financial compensation for his |
| 09:55AM | 3 | personal involvement in those two hits.  My recollection is |
| 09:55AM | 4 | during the change of plea colloquy, in addition to the facts |
| 09:55AM | 5 | that were specifically admitted by Mr. Akau in paragraph eight |
| 09:56AM | 6 | of his plea agreement, I specifically asked him whether the |
| 09:56AM | 7 | monies that had been offered to him for both of those |
| 09:56AM | 8 | contracts, to his understanding, came directly from Mr. Miske. |
| 09:56AM | 9 | I specifically asked him those questions because I |
| 09:56AM | 10 | knew of course that tying Mr. Miske specifically to these two |
| 09:56AM | 11 | acts was important, of course, and even critical to his |
| 09:56AM | 12 | upcoming trial testimony and eventually to today, what kind of |
| 09:56AM | 13 | consideration he should receive for providing the cooperation |
| 09:56AM | 14 | and assistance under 5K1 that the government was looking for. |
| 09:56AM | 15 | I looked back at the plea colloquy transcript, and I |
| 09:57AM | 16 | think my questioning, although I'm obviously biased, was |
| 09:57AM | 17 | anything but unclear or ambiguous.  And certainly Mr. Akau |
| 09:57AM | 18 | expressed no reservation or hesitation in answering my |
| 09:57AM | 19 | questions in the affirmative at that change of plea colloquy. |
| 09:57AM | 20 | In other words, his understanding was that the $50,000 that he |
| 09:57AM | 21 | was being offered came not from Mr. Miller or any other Miske |
| 09:57AM | 22 | associate but from Mr. Miske himself. |
| 09:57AM | 23 | So it came certainly as a surprise, maybe even a |
| 09:57AM | 24 | shock, when Mr. Akau took the stand in the government's case in |
| 09:57AM | 25 | chief and said precisely the opposite.  To me that was more |

09:57AM  1   than a failure to cooperate with the government, it was an

09:58AM  2   attempt to undermine the government's prosecution.  The fact

09:58AM  3   that that testimony that Mr. Miller made him the offer, these

09:58AM  4   $50,000 contracts, amounted to almost nothing.

09:58AM  5         I mean, the defense says, well, it helped bolster the

09:58AM  6   reliability of Wayne Miller.  I'm not sure that Mr. Akau's

09:58AM  7   testimony was being sought by the government in order to

09:58AM  8   increase the reliability of Wayne Miller.  It might have had

09:58AM  9   that effect, but the key issue was tying Mr. Miske to these

09:58AM  10  crimes.  That was a key issue throughout the seven-month trial

09:58AM  11  with respect to not only these events but virtually every other

09:58AM  12  event, because Mr. Miske did a fantastic job of divorcing

09:59AM  13  himself from personal involvement in relation to any number of

09:59AM  14  criminal acts.  These two, the Calles and the Frasure murders,

09:59AM  15  are but two of them.

09:59AM  16        So that was the primary importance, the primary reason

09:59AM  17  no doubt that the government called Mr. Akau to provide the

09:59AM  18  links necessary to put these contracts in the hands of

09:59AM  19  Mr. Miske, not Mr. Miller, not anyone else.  Mr. Akau took the

09:59AM  20  stand and shot the government in the foot.

09:59AM  21        So what does that mean?  It means this:  Given

10:00AM  22  Mr. Akau's efforts to affirmatively thwart the government's

10:00AM  23  prosecution of Mr. Miske, in Mr. Nammar's words, to play both

10:00AM  24  sides, the defendant should be thrilled to get anything of

10:00AM  25  value for what he did.  The Court reluctantly awards the

10:00AM   1    defendant the one-level sought and recommended by the

10:00AM   2    government.  That one level results in a total offense level of

10:00AM   3    33, criminal history category remains at three; that would

10:00AM   4    result and does result in a restated guideline range of 168 to

10:00AM   5    210 months.  That is of course not where we end up.

10:00AM   6              Section 3553(a) of Title 18 of the United States Code

10:00AM   7    requires the Court to consider many other factors beyond the

10:01AM   8    extent and value of the defendant's cooperation.  3553(a)

10:01AM   9    commands the Court to consider the individual, Mr. Akau, that

10:01AM   10   stands before the Court, and this is why the Court has heard

10:01AM   11   about issues such as pre-arrest rehabilitation, such as the

10:01AM   12   programming that the defendant has completed while at FDC.

10:01AM   13   This is why the Court considers the support network that the

10:01AM   14   defendant has, as demonstrated in part not only by the

10:01AM   15   attendance today at the defendant's sentencing but by the

10:01AM   16   character letters that have been submitted on the defendant's

10:01AM   17   behalf, all of which the Court has read and considered.

10:01AM   18             3553(a) also requires the Court to consider other

10:02AM   19   factors, the nature and circumstances of the offense, the

10:02AM   20   events -- the racketeering acts that the defendant has been

10:02AM   21   involved in.  The other 3553(a) factors that seems most

10:02AM   22   significant in Mr. Akau's case is the need to avoid unwarranted

10:02AM   23   disparities with those who have been found guilty of similar

10:02AM   24   crimes and have similar backgrounds.

10:02AM   25             I've attempted to consider these and all of the

| 10:02AM | 1 | 3553(a) factors mindful of my obligation to impose a sentence |
| 10:02AM | 2 | that is sufficient but not greater than necessary to achieve |
| 10:02AM | 3 | the many varied and sometimes conflicting goals of Section |
| 10:02AM | 4 | 3553(a)(2) of Title 18.  Those goals include the need to punish |
| 10:02AM | 5 | and to deter, but they also acknowledge and I acknowledge the |
| 10:02AM | 6 | need to allow for the defendant's rehabilitation. |
| 10:03AM | 7 | In aggravation, I think we have maybe gone as far as |
| 10:03AM | 8 | we need to go as far as the nature and role in the various |
| 10:03AM | 9 | offenses, principally the three racketeering acts that the PSR |
| 10:03AM | 10 | focuses on, the Nico Carignan drug stash robbery in which the |
| 10:03AM | 11 | defendant and others stole roughly five pounds of |
| 10:03AM | 12 | methamphetamine from Mr. Carignan and then sold it for profit. |
| 10:03AM | 13 | The defendant's role in that particular offense was, as |
| 10:03AM | 14 | Mr. Nammar described in his remarks, impersonating a law |
| 10:03AM | 15 | enforcement officer and brandishing a weapon to, I'll use the |
| 10:03AM | 16 | word, encourage Mr. Carignan to stop his vehicle.  The |
| 10:03AM | 17 | defendant got out of that vehicle and was, to my recollection |
| 10:04AM | 18 | of the testimony, the principle person who affirmatively acted |
| 10:04AM | 19 | to steal Mr. Carignan's stash. |
| 10:04AM | 20 | The Elgin Calles murder for hire that we heard much |
| 10:04AM | 21 | about, the GPS tracking of Mr. Calles that the defendant and |
| 10:04AM | 22 | others engaged in, the uncontroverted testimony that this |
| 10:04AM | 23 | defendant was the trigger man and, but for Wayne Miller's last |
| 10:04AM | 24 | minute, last second almost decision and phone call to call off |
| 10:04AM | 25 | that hit, the defendant was the person outside of Penny's Diner |

10:04AM   1   on Sand Island Access Road who would have carried out and was

10:04AM   2   prepared to carry out the actual murder of that union official

10:04AM   3   because he stood in the way of Mr. Miske's continued placement

10:04AM   4   of whomever he wished at the docks.

10:05AM   5        And, third, the murder for hire of Jonathan Fraser.

10:05AM   6   Something that I know the defendant didn't act upon beyond

10:05AM   7   accepting the contract itself.  I don't recall much, if

10:05AM   8   anything, in terms of him acting to further that murder that

10:05AM   9   was conducted by Mr. Miske and, as far as we know, others.

10:05AM   10       The defendant's criminal history, again we heard much

10:05AM   11  about, I don't disagree with Mr. Flores's comment that that

10:05AM   12  crime, while violent, is also dated and from which the

10:05AM   13  defendant rehabilitated and paid the price.  I think all of

10:05AM   14  that, is fair to say, stemming from a 1994, 31 years ago,

10:06AM   15  failed robbery of a taxi driver in the Kahala area which

10:06AM   16  resulted in that taxi driver having his ear shot off or

10:06AM   17  mutilated.

10:06AM   18       The defendant's history also includes substance abuse

10:06AM   19  addictions, which we have heard some about as well, principally

10:06AM   20  involving cocaine and crack cocaine.

10:06AM   21       In mitigation, I mentioned a few minutes ago that I'm

10:06AM   22  familiar with, having read and considered the number of letters

10:06AM   23  including from the defendant's spouse and daughters, father and

10:06AM   24  father-in-law and from the defendant himself that were attached

10:06AM   25  to the sentencing memorandum at docket 1898.

10:06AM  1          The defendant does have the evident support of his

10:06AM  2   immediate family.  I know his father is a regular visitor to

10:06AM  3   FDC and is certainly in the defendant's camp, although maybe

10:07AM  4   that wasn't always and hasn't always been the case.  The

10:07AM  5   defendant's education includes his graduation from Castle in

10:07AM  6   1991, and his regular employment as a grip in the movies and as

10:07AM  7   the owner of a small business, an air conditioning company in

10:07AM  8   particular for several years.  I believe that air conditioning

10:07AM  9   company was focused on providing those types of services to the

10:07AM  10  movies as well.  So it was outgrowth it appears from his work

10:07AM  11  as a grip in the movies.

10:07AM  12         Mr. Flores has asked me to consider other factors.

10:07AM  13  The other one that I will note -- there are two factors that I

10:07AM  14  will note beyond those already mentioned include the

10:07AM  15  defendant's medical issues.  I'm aware of them, I don't feel

10:07AM  16  like it's necessarily an appropriate thing to do to detail or

10:08AM  17  chronicle them on the record here, but I'm aware of those

10:08AM  18  medical issues that have been presented to me.

10:08AM  19         I'm also aware of the environment in which the

10:08AM  20  defendant was raised, what I'll refer to as a challenging

10:08AM  21  household.  Again, I mention it because I want Mr. Akau to be

10:08AM  22  aware of the fact that I'm aware and have considered those

10:08AM  23  factors as well.  Similar to medical issues, I don't feel like

10:08AM  24  it is something that is appropriate for me to get into much

10:08AM  25  detail about on the record here for essentially for privacy

10:08AM  1   reasons, but I do want Mr. Akau and the defense to know that I

10:08AM  2   have factored those issues in.

10:08AM  3        So where does this then result?  As I mentioned, the

10:09AM  4   guidelines the restated guideline provision has a low end of

10:09AM  5   168 months.  The guideline range is but one of the many 3553(a)

10:09AM  6   factors that the Court must consider.  The government is urging

10:09AM  7   the Court to impose a sentence at that low end of the restated

10:09AM  8   range, 168 months.  The defense has proposed a 60-month

10:09AM  9   sentence which would, as I understand it, essentially be a

10:09AM  10  time-served sentence because of the time that the defendant has

10:09AM  11  already been in custody since his arrest.

10:09AM  12       Where I am within this -- or guided by these two very

10:09AM  13  disparate recommendations is the following:

10:09AM  14       I've looked in particular at all of the defendants

10:10AM  15  that have been sentenced in the Miske Enterprise.  I've looked

10:10AM  16  at them, I'm pretty much intimately familiar with all of them

10:10AM  17  because I've sentenced every single one of them with maybe the

10:10AM  18  exception of Tim Taboada.  I think Judge Mollway may have

10:10AM  19  sentenced Mr. Taboada.  But every other one, to my

10:10AM  20  recollection, was someone that I've sentenced with only one

10:10AM  21  defendant remaining later this summer.

10:10AM  22       I don't disagree with Mr. Nammar's estimation that

10:10AM  23  Mr. Kauhi is the most comparable defendant.  We all know that

10:10AM  24  there are no two individuals that are precisely alike, when you

10:10AM  25  just look at offense conduct, that is true.  When you start

10:10AM  1    expanding that review to things like criminal history, social

10:11AM  2    history, drug use history and the like, the disparity gets even

10:11AM  3    greater because there is not one factor where two people are

10:11AM  4    precisely the same.  When you look at multiple factors that

10:11AM  5    chasm grows.

10:11AM  6         And that is no different here, even using Mr. Kauhi as

10:11AM  7    the most appropriate comparable.  His criminal history is not

10:11AM  8    the same, even if his score is the same, the criminal history

10:11AM  9    still is different.  The types of offenses, the timing of those

10:11AM  10   offenses are not the same.  Shooting someone and mutilating

10:11AM  11   that person's ear is far more violent a history than anything

10:11AM  12   that was in Mr. Kauhi's criminal background as I recall, dated

10:12AM  13   as it might be, as it relates to Mr. Akau.

10:12AM  14        The difference between many of these others who might

10:12AM  15   be considered comparable besides Mr. Kauhi, you might look at

10:12AM  16   Jake Smith, for example, as another; possibly, Michael

10:12AM  17   Buntenbah, given the nature of the violence that was employed,

10:12AM  18   but they too are far, far different in at least a couple of

10:12AM  19   respects that I can think of.

10:12AM  20        Jake Smith provided the type of cooperative testimony

10:12AM  21   on the stand over multiple days that Mr. Akau clearly did not.

10:12AM  22   Michael Buntenbah pled guilty to a completely different count

10:12AM  23   which had a, as I remember it, something like a 36-month, a

10:12AM  24   three-year statutory maximum.  So there is only so much that

10:13AM  25   one can glean from that particular person, even though the

10:13AM   1    conduct underlying his offense might very well have been

10:13AM   2    comparable in some respects.

10:13AM   3         When you look at Mr. Kauhi, if you focus on him, he

10:13AM   4    was involved in some of the same racketeering acts as this

10:13AM   5    defendant.  He appears to have been a more minor player in

10:13AM   6    comparison to this defendant, as it relates to Elgin Calles, as

10:13AM   7    it relates to Nico Carignan.  And, in addition to all of that,

10:13AM   8    Mr. Kauhi received a much, much greater 5K1 departure for his

10:13AM   9    testimony at trial in the Miske case than this defendant

10:14AM   10   deserved.

10:14AM   11        So those would be the principle reasons why Mr.

10:14AM   12   Kauhi's 106-month term of imprisonment would not be an

10:14AM   13   appropriate one for this defendant.  It would, if employed

10:14AM   14   here, understate what Mr. Akau deserved, because many of these

10:14AM   15   factors, the critical factors, is not on par with Mr. Kauhi

10:14AM   16   about or with.

10:14AM   17        So where do we end up?  When you look at some of the

10:14AM   18   other comparables, Jake Smith is another one that I just

10:14AM   19   mentioned, he received a little bit more than did Mr. Kauhi,

10:14AM   20   121 months.  But he too was the beneficiary of a significant 5K

10:14AM   21   departure, seven levels I believe is what he got.  Mr. Kauhi

10:15AM   22   got eight levels, if I didn't mention that before.  Had this

10:15AM   23   defendant testified in the manner that he had indicated to the

10:15AM   24   government that he would, as suggested by his change of plea

10:15AM   25   hearing, no doubt we would be looking at a minimum of seven

| | | |
|---|---|---|
| 10:15AM | 1 | levels, probably eight, based on the 15 or 16 sentences that |
| 10:15AM | 2 | I've already meted out in this case.  That is right in the |
| 10:15AM | 3 | heartland of where testifying defendants have come out in terms |
| 10:15AM | 4 | of 5K1.  And had that been Mr. Akau's situation, we would be |
| 10:15AM | 5 | looking at a restated offense level of somewhere in the 26th |
| 10:16AM | 6 | level at criminal history category 3, rather than 33.  And at |
| 10:16AM | 7 | 26 criminal history category 3, he would be facing a range or |
| 10:16AM | 8 | looking at a range of 78 to 97 months.  Much, much closer to |
| 10:16AM | 9 | the time served sentence that he is seeking. |
| 10:16AM | 10 | We can't end up there.  There is no possible way of |
| 10:16AM | 11 | ending up there and doing justice.  He reneged in the way I've |
| 10:16AM | 12 | already described and affirmatively sought to undermine the |
| 10:16AM | 13 | government's prosecution of Mr. Miske.  The defendant did so, |
| 10:16AM | 14 | the government, despite that effort, was able to secure |
| 10:16AM | 15 | convictions on the counts that we have talked about, not on |
| 10:16AM | 16 | everything of course, we know what the jury did, but on these |
| 10:16AM | 17 | counts, notwithstanding Mr. Akau's efforts to get in the way of |
| 10:17AM | 18 | those convictions. |
| 10:17AM | 19 | You did so for your own reasons.  Maybe to mitigate |
| 10:17AM | 20 | the risks, sir, that Mr. Flores said you were afraid of, it |
| 10:17AM | 21 | makes sense, I can't -- what's the word I'm looking for -- |
| 10:17AM | 22 | second guess that decision.  If that's what the decision was, |
| 10:17AM | 23 | it makes perfect sense to me.  A lot of people make that |
| 10:17AM | 24 | decision never to take the stand in some cases or to take the |
| 10:17AM | 25 | stand and then testifying in a way different than what everyone |

10:17AM  1    would have expected.

10:17AM  2         We don't have to look any further than Mr. Stancil in

10:17AM  3    this case for doing just that.  He didn't take the stand.  But

10:17AM  4    there is a price to be paid for that.  That's all I can tell

10:17AM  5    you.  Everyone who took the stand and testified in the way that

10:18AM  6    the government thought they would got seven levels or more.

10:18AM  7    Mr. Miller got 12 levels.  So that was the range of people in

10:18AM  8    your cohort, seven to 12 levels.  Had you done so, that's what

10:18AM  9    we would be talking about, and you might be out tomorrow.  But

10:18AM  10   you chose not to go that route.

10:18AM  11        And for that reason, the 168-month term of

10:18AM  12   imprisonment, the low end of the restated guideline range

10:18AM  13   recommended by the government, seems to me, in light of all of

10:18AM  14   these factors, to be the appropriate sentence here.  Three

10:18AM  15   years of supervised release; no fine, based on financial

10:18AM  16   information at page 28 of the PSR.  The defendant does not have

10:18AM  17   the earnings, assets or income stream with which to pay it

10:18AM  18   without it resulting in an undue hardship on him and his

10:19AM  19   family.  There is however a $100 mandatory special assessment

10:19AM  20   that's required by statute.

10:19AM  21        During the period of the defendant's supervised

10:19AM  22   release, the Court intends to adopt all 13 of the standard

10:19AM  23   conditions of release recommended by probation in which

10:19AM  24   probation provided in writing to counsel on February 6th of

10:19AM  25   this year at docket 1845.

| | | |
|---|---|---|
| 10:19AM | 1 | Any objection to any of those 13 standard conditions |
| 10:19AM | 2 | as well as any objection to waiving reading of those 13 |
| 10:19AM | 3 | conditions? |
| 10:19AM | 4 | MR. FLORES:  No objection, Your Honor. |
| 10:19AM | 5 | MR. NAMMAR:  No objection. |
| 10:19AM | 6 | THE COURT:  All 13 conditions then, as detailed in |
| 10:19AM | 7 | probation's writing on February 6th of this year, will be made |
| 10:19AM | 8 | part of the record and are part of the defendant's release |
| 10:19AM | 9 | conditions. |
| 10:19AM | 10 | There are a few mandatory and special conditions that |
| 10:19AM | 11 | likewise will apply.  They include the following: |
| 10:19AM | 12 | Refraining from the unlawful use of any controlled |
| 10:19AM | 13 | substance.  The defendant also must submit to one drug test |
| 10:19AM | 14 | within 15 days of the commencement of supervision and at least |
| 10:20AM | 15 | two drug tests thereafter, but no more than eight valid drug |
| 10:20AM | 16 | tests per month during the period of his supervision. |
| 10:20AM | 17 | You must cooperate, Mr. Akau, in the collection of DNA |
| 10:20AM | 18 | as directed by probation.  You must also report to the |
| 10:20AM | 19 | probation office in the federal judicial district where you are |
| 10:20AM | 20 | authorized to reside within 72 hours of your release, unless |
| 10:20AM | 21 | probation instructs you to report to a different office or |
| 10:20AM | 22 | within a different time frame.  These are the mandatory |
| 10:20AM | 23 | conditions of supervision. |
| 10:20AM | 24 | There are likewise a few special conditions.  They |
| 10:20AM | 25 | begin with participating in an outpatient substance abuse |

10:20AM    1    treatment program.  I know that you are well on your way to

10:20AM    2    rehabilitation.  Counsel, in your sentencing memorandum,

10:20AM    3    highlighted the fact that you quit, I think were the words,

10:20AM    4    drugs even before you were arrested, but nonetheless I think

10:20AM    5    you still could benefit from an outpatient program.  You must

10:20AM    6    follow the rules and regulations of that program.  Probation,

10:20AM    7    in consultation with your treatment provider, will supervise

10:20AM    8    your participation in that program regarding a number of issues

10:21AM    9    to include the provider, location, modality, duration, and

10:21AM    10   intensity.

10:21AM    11          As part of your substance abuse treatment, regimen and

10:21AM    12   monitoring, you must submit to substance abuse testing.  That's

10:21AM    13   designed to determine if you have used a prohibitive substance

10:21AM    14   and you may not attempt to tamper with or obstruct any of the

10:21AM    15   testing methods that are employed.

10:21AM    16          You are prohibited from using marijuana, synthetic

10:21AM    17   marijuana, any products containing THC or any other products

10:21AM    18   derived from a marijuana plant including for medicinal or

10:21AM    19   business purposes without my prior approval.

10:21AM    20          Unless you have received advanced permission from

10:21AM    21   probation or the association is required by your supervision

10:21AM    22   conditions you must disassociate yourself, if you have not

10:21AM    23   already done so, from any members of the Miske Enterprise.  And

10:21AM    24   you may not voluntarily or intentionally associate with any

10:21AM    25   individual whom you know is part of that enterprise or any

10:21AM  1    other gangs involved in criminal activity.

10:21AM  2            You must provide probation with access to any

10:22AM  3    requested financial information and authorize the release of

10:22AM  4    that information including to Mr. Nammar's office.  And you

10:22AM  5    must submit your person, property, house, residence, vehicle,

10:22AM  6    papers and office to a search conducted by a U.S. probation

10:22AM  7    officer.  The failure to submit to such a search may be grounds

10:22AM  8    for the revocation of your release status.  You must warn any

10:22AM  9    occupant or guest that your premises are subject to searches

10:22AM  10   under this condition.  Probation may conduct the search under

10:22AM  11   this condition only when reasonable suspicion exists that you

10:22AM  12   have violated a condition of your supervision and that the

10:22AM  13   areas to be searched contain evidence of this violation.  Any

10:22AM  14   search must be conducted both at a reasonable time as well as

10:22AM  15   in reasonable manner.

10:22AM  16           Counsel have any reason not already argued why this

10:22AM  17   sentence should not be imposed as proposed?

10:22AM  18           MR. NAMMAR:  No, Your Honor.

10:22AM  19           MR. FLORES:  No, Your Honor, however, I would ask the

10:22AM  20   Court for a judicial recommendation to a particular facility,

10:22AM  21   Your Honor.  FCI Sandstone in Minnesota, Your Honor.  There is

10:22AM  22   two reasons for that recommendation:  One, it's a medical

10:23AM  23   facility, and again he's concerned about the health issues, and

10:23AM  24   then just this recent news that is potentially much more

10:23AM  25   serious, and also because it's an RDAP facility, Your Honor.

| 10:23AM | 1 | So we are asking for a recommendation to an RDAP facility as |

10:23AM 1 So we are asking for a recommendation to an RDAP facility as

10:23AM 2 well.

10:23AM 3 THE COURT: Any specific one or just one with an RDAP

10:23AM 4 program?

10:23AM 5 MR. FLORES: Actually, this facility, FCI Sandstone

10:23AM 6 has both. It's a medical facility and it also has the RDAP

10:23AM 7 program.

10:23AM 8 THE COURT: All right. First of all, the Court orders

10:23AM 9 the imposition of its proposed sentence without objection.

10:23AM 10 It is, Mr. Akau, your right to appeal from the Court's

10:23AM 11 final judgment in this case, which includes the sentence just

10:23AM 12 imposed. If you choose to do that, you should know a few

10:23AM 13 things about your appellate rights.

10:23AM 14 First of all, the timing, if you wish to file a notice

10:23AM 15 of appeal, you must do so within 14 days of the Court's entry

10:23AM 16 of final judgment. I expect final judgment to enter either

10:23AM 17 today or no later than tomorrow. That's important because that

10:23AM 18 will trigger the opening of that 14-day window. If you do not

10:23AM 19 file a notice of appeal within that 14-day window, that will

10:24AM 20 constitute a waiver of your right to appeal.

10:24AM 21 In addition, any appeal that you wish to take is

10:24AM 22 limited by the confines of your appellate waiver provision,

10:24AM 23 which as you know is paragraph 13 of your plea agreement.

10:24AM 24 You are also advised that you are entitled to the

10:24AM 25 assistance of counsel in taking any appeal, and if you cannot

10:24AM  1    afford one, one will be appointed for you by the Court at no

10:24AM  2    cost to you.  Similarly, if you cannot afford the cost of any

10:24AM  3    appeal that you wish to take or that you may wish to take, you

10:24AM  4    can apply for what's called in forma pauperis or IFP status.

10:24AM  5    Through that process or through that application, either this

10:24AM  6    Court or the Ninth Circuit Court of Appeals may waive the cost

10:24AM  7    of any appeal that would otherwise apply.

10:24AM  8          Finally, if you wish, the clerk of this Court will

10:24AM  9    prepare and file a notice of appeal on your behalf, but you

10:24AM  10   would in that event remain responsible for any associated

10:25AM  11   costs.

10:25AM  12         With regard to BOP recommendations, you likely know

10:25AM  13   that this Court can make recommendations to the BOP regarding

10:25AM  14   your conditions of confinement, but we cannot dictate those

10:25AM  15   conditions to the BOP.  Counsel, Mr. Flores, has already made

10:25AM  16   or asked this Court to make one of those recommendations on

10:25AM  17   your behalf, which is a facility placement recommendation.

10:25AM  18         Mr. Flores, you should consider that done.  So FCI

10:25AM  19   Sandstone in Minnesota will be the first priority

10:25AM  20   recommendation; and then secondly, any other facility with an

10:25AM  21   RDAP program would be the Court's second recommendation.

10:25AM  22         Is there something else that you had?

10:25AM  23         MR. FLORES:  There is actually a second facility, if

10:25AM  24   you are willing to make that recommendation.

10:25AM  25         THE COURT:  Go ahead.  Yes.

10:25AM  1          MR. FLORES:  It's Seagoville, Your Honor.  It's

10:25AM  2     spelled S-E-A-G-O, ville, Texas.  And that also has an RDAP

10:25AM  3     program as well, Your Honor.

10:25AM  4          THE COURT:  All right.  So we will do FCI Sandstone,

10:26AM  5     number one; Seagoville in Texas, number two; and then third,

10:26AM  6     any other facility -- you want Honolulu?

10:26AM  7          THE DEFENDANT:  Yes.

10:26AM  8          THE COURT:  That's unlikely, to be honest, but I don't

10:26AM  9     mind including it.  It doesn't hurt to include it.

10:26AM  10          THE DEFENDANT:  I have another one, Your Honor.

10:26AM  11          THE COURT:  Go ahead.

10:26AM  12          MR. FLORES:  FCI Allenwood, Your Honor.  It's

10:26AM  13     Allenwood, Pennsylvania.

10:26AM  14          THE COURT:  All right.  And that's the third in

10:26AM  15     priority?  Honolulu does not have an RDAP program, I don't

10:26AM  16     believe.  Is that what you want, Seagoville, second; Allenwood,

10:26AM  17     Pennsylvania, third?

10:27AM  18          THE DEFENDANT:  Yes.

10:27AM  19          THE COURT:  And then fourth will be any other BOP

10:27AM  20     facility with an RDAP program.  Would that be acceptable?

10:27AM  21          MR. FLORES:  Yes, Your Honor.

10:27AM  22          THE COURT:  Substance abuse treatment would be also

10:27AM  23     part of the Court's recommendation including the RDAP program

10:27AM  24     that we've mentioned, mental health assessment, and any

10:27AM  25     necessary treatment and educational and vocational programming

10:27AM  1    will also all be part of the Court's recommendation to the BOP.

10:27AM  2            Mr. Nammar, does the government have a motion to

10:27AM  3    dismiss that it wishes to make?

10:27AM  4            MR. NAMMAR:  Yes.  Pursuant to paragraph four of the

10:27AM  5    plea agreement the government moves to dismiss Counts 16, 17,

10:27AM  6    18 and 19 as to this defendant.

10:27AM  7            THE COURT:  I assume no objection from the defense?

10:27AM  8            MR. FLORES:  No, Your Honor.

10:27AM  9            THE COURT:  Pursuant to the government's motion then

10:27AM  10   in paragraph 4 of the party's plea agreement, Count 16 through

10:27AM  11   19 of the superseding indictment are dismissed as to this

10:27AM  12   defendant.

10:27AM  13           Defendant has been in custody since July, it looks

10:27AM  14   like, of 2020 and is remanded to the marshals service and the

10:27AM  15   Bureau of Prisons.

10:27AM  16           Anything else that I can assist the parties with?

10:27AM  17           MR. NAMMAR:  No, Your Honor.

10:27AM  18           MR. FLORES:  No, Your Honor.  Thank you.

10:27AM  19           THE COURT:  We are in recess.

10:28AM  20           (Proceedings were concluded at 10:28 a.m.)

         21

         22

         23

         24

         25

1                    COURT REPORTER'S CERTIFICATE

2          I, Gloria T. Bediamol, Official Court Reporter, United

3    States District Court, District of Hawaii, do hereby certify

4    that pursuant to 28 U.S.C. §753 the foregoing is a complete,

5    true, and correct transcript from the stenographically reported

6    proceedings held in the above-entitled matter and that the

7    transcript page format is in conformance with the regulations

8    of the Judicial Conference of the United States.

9

10         DATED at Honolulu, Hawaii, June 13, 2025.

11

12

13                              /s/ Gloria T. Bediamol

14                              GLORIA T. BEDIAMOL.

15                              RMR, CRR, FCRR

16

17

18

19

20

21

22

23

24

25